**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| MICHAEL LEMMON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 26-cv-544 (TSC) |
| ) | |
| DONALD J. TRUMP, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Nicolas A. Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

February 27, 2026

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 3

    The symbolic design of the monumental core of the District of Columbia........................... 3

    Congress's role in the configuration of monuments and structures in the District................ 5

    Defendants' plan to construct an unauthorized commemorative arch.................................. 9

    This lawsuit........................................................................................................................ 12

STANDARD OF REVIEW .................................................................................................. 13

ARGUMENT ....................................................................................................................... 14

I.    Plaintiffs are likely to succeed on the merits. ..................................................... 14

    A.  Plaintiffs are likely to succeed on their ultra vires claim............................. 14

    B.  Plaintiffs are likely to succeed on their constitutional claim. ...................... 18

II.    Plaintiffs will suffer irreparable injury absent prompt relief. .............................. 20

III.    The balance of equities and public interest favor Plaintiffs................................. 22

CONCLUSION ..................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*American School of Magnetic Healing v. McAnnulty*,
 187 U.S. 94 (1902)......................................................................................... 14, 17

*Amoco Production Co. v. Village of Gambell*,
 480 U.S. 531 (1987)....................................................................................... 21, 22

*C.G.B. v. Wolf*,
 464 F. Supp. 3d 174 (D.D.C. 2020) ..................................................................... 22

*Center for Biological Diversity v. McAleenan*,
 404 F. Supp. 3d 218 (D.D.C. 2019) ..................................................................... 19

*Chamber of Commerce of the United States v. Reich*,
 74 F.3d 1322 (D.C. Cir. 1996)............................................................................. 14

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006).............................................................................. 13

*Equal Employment Opportunity Commission v. BNSF Railway Co.*,
 902 F.3d 916 (9th Cir. 2018) ............................................................................... 20

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
 561 U.S. 477 (2010)............................................................................................. 19

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
 528 U.S. 167 (2000)............................................................................................. 21

*Fund for Animals v. Norton*,
 281 F. Supp. 2d 209 (D.D.C. 2003)...................................................................... 22

*Heckler v. Chaney*,
 470 U.S. 821 (1985).............................................................................................. 18

*J.W. Hampton, Jr. & Co. v. United States*,
 276 U.S. 394 (1928).............................................................................................. 18

*Kirwa v. U.S. Department of Defense*,
 285 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................ 14

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
 752 F.3d 755 (9th Cir. 2014) ................................................................................ 22

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992).............................................................................................. 21

*Morrison v. Olson*,
  487 U.S. 654 (1988) ............................................................................................... 18

*National Association of Postal Supervisors v. U.S. Postal Service*,
  26 F.4th 960 (D.C. Cir. 2022) ............................................................................... 14

*Nuclear Regulatory Commission v. Texas*,
  605 U.S. 665 (2025) ......................................................................................... 14, 17

*Pursuing America's Greatness v. Federal Election Commission*,
  831 F.3d 500 (D.C. Cir. 2016) ............................................................................... 13

*San Diegans for the Mt. Soledad National War Memorial v. Paulson*,
  548 U.S. 1301 (2006) ............................................................................................. 22

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ............................................................................... 19

*United States v. Texas*,
  577 U.S. 1101 (2016) ............................................................................................. 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ......................................................................................... 18, 19

**Statutes**

40 U.S.C. § 8106 ................................................................................... 2, 8, 15, 16, 18

40 U.S.C. § 8711 ...................................................................................................... 7

40 U.S.C. § 8722 ...................................................................................................... 9

40 U.S.C. § 8901(1) ................................................................................................. 6

40 U.S.C. § 8901(4) ............................................................................................. 6, 15

40 U.S.C. § 8902(a)(1) ......................................................................................... 6, 15

40 U.S.C. § 8902(a)(2) ...................................................................................... 6, 7, 15

40 U.S.C. § 8902(a)(4) ............................................................................................. 7

40 U.S.C. § 8903(a) ............................................................................................... 15

40 U.S.C. § 8903(a)(1) ....................................................................................... 2, 6, 15

40 U.S.C. § 8903(d) ................................................................................................. 7

40 U.S.C. § 8904 ...................................................................................................... 7

40 U.S.C. § 8904(a)(6)................................................................................................ 23

40 U.S.C. § 8905(a) .................................................................................................... 7

40 U.S.C. § 8905(a)(2)............................................................................................... 16

40 U.S.C. § 8906(a)(2)............................................................................................ 7, 23

40 U.S.C. § 8908(b)(1) ................................................................................................ 7

40 U.S.C. § 9101......................................................................................................... 7

40 U.S.C. § 9102......................................................................................................... 9

42 U.S.C. § 4332(C) .......................................................................................... 9, 17, 24

54 U.S.C. § 300308..................................................................................................... 8

54 U.S.C. § 306108................................................................................................. 8, 24

An Act for Establishing the Temporary and Permanent Seat of the Government of the United
   States, Pub. L. No. 1-28, 1 Stat. 130 (July 16, 1790)..................................................... 3

An Act Proposing the Erection of a Memorial on Public Grounds in the District of Columbia, or
   Its Environs, in Honor and Commemoration of the Seabees of the United States Navy,
   Pub. L. No. 92-422, 86 Stat. 678 (Sept. 18, 1972)......................................................... 6

An Act to Provide a Commission to Secure Plans and Designs for a Monument or Memorial to
   the Memory of Abraham Lincoln, Pub. L. No. 61-346, 36 Stat. 898 (Feb. 9, 1911) ................. 4

Commemorative Works Act, Pub. L. No. 99-652, 100 Stat. 3650 (Nov. 14, 1986)...................... 6

Joint Resolution Authorizing the United Spanish War Veterans to Erect a Memorial in the
   District of Columbia or Its Environs, Pub. L. No. 88-612, 78 Stat. 992 (Oct. 2, 1964)............. 6

**Other Authorities**

Betsy Klein et al., *Trump Forges Ahead with Plans for 250-foot Arch Despite Concerns on the
   Ground and in the Air*, CNN (Feb. 10, 2026)...................................................... 12, 17

Callum Sutherland, *The "Arc de Trump": President Shows Off Plans for His Latest Grandiose
   D.C. Construction Project*, Time (Oct. 16, 2025) ...................................................... 10

CBS News (@cbsnews) & Ed O'Keefe (@edokeefecbs), Instagram (Oct. 15, 2025)............. 9, 10

Dan Diamond et al., *Trump Wants to Build a 250-foot-tall Arch, Dwarfing the Lincoln Memorial*,
   Washington Post (Jan. 31, 2026) ...................................................................... 11

Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 23, 2026, 12:00 PM) ..................... 11

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 11, 2025, 12:27 AM) ....................... 9

Francis Fukuyama, *L'Enfant's Washington*, The American Interest (May 1, 2007)..................... 4

Jacob R. Straus, Congressional Research Service, *Commemorative Works in the District of Columbia: Background and Practice* (updated May 8, 2023).............................. 5, 6, 7, 8, 9, 15

Joey Garrison, *Trump Floats Three Designs for His "Independence Arch" in DC*, USA Today (Jan. 23, 2026) ....................................................................................... 12

Kenneth P. Vogel et al., *For $1 Million, Donors to U.S.A. Birthday Group Offered Access to Trump*, New York Times (Feb. 8, 2026) .................................................................. 12

Kenneth R. Fletcher, *A Brief History of Pierre L'Enfant and Washington, D.C.*, Smithsonian (Apr. 30, 2008)........................................................................... 3, 4

Nardine Saad & Kwasi Gyamfi Asiedu, *What We Know About White House Plans for an "Arc de Trump,"* BBC (Oct. 16, 2025) ...................................................................... 10

National Capital Planning Commission, *About the Commission* ................................................. 23

National Capital Planning Commission, *Memorials and Museums Master Plan* (Dec. 2001) .... 16

National Park Service, *Arlington Memorial Bridge & Avenue* (last updated Apr. 5, 2023) .......... 5

National Park Service, *Historic American Engineering Record: Arlington Memorial Bridge* (1988)................................................................................................................... 5

National Park Service, *Lady Bird Johnson Park* (last updated Jan. 5, 2024) .............................. 16

National Park Service, *Lady Bird Johnson Park Cultural Landscape* (last updated Oct. 8, 2021)................................................................................ 9, 15

National Park Service, *Memorial Circle Transportation Plan and Environmental Assessment* .. 17

National Park Service, *National Register Database and Research* (last updated Aug. 5, 2025)... 8

National Park Service, *Views and Vistas of the Lincoln Memorial Cultural Landscape* (last updated Oct. 10, 2024)............................................................................... 4, 5

Robert Mackey, *Trump Says Building DC Arch Is Domestic Policy Chief's "Primary Thing,"* The Guardian (Dec. 14, 2025) ..................................................................... 10

Sophia Cai, *Trump Says Construction of the "Triumphal Arch" to Begin in "2 Months,"* Politico (Dec. 31, 2025)........................................................................... 11

U.S. Commission of Fine Arts, *Who We Are*.............................................................. 23

White House, *Fact Sheet: President Donald J. Trump Celebrates American Greatness with the Freedom 250 Grand Prix of Washington, D.C.* (Jan. 30, 2026) ............................................... 11

Zolan Kanno-Youngs, *Trump Hosts Dinner for Wealthy Donors to White House Ballroom*, New York Times (Oct. 15, 2025) ............................................................................................ 10

**Regulations**

14 C.F.R. § 77.9(a).......................................................................................................... 9, 17, 24

14 C.F.R. § 77.9(b) ................................................................................................................. 9, 24

## INTRODUCTION

Since the earliest days of the Nation's capital, the configuration of federal buildings and monuments within the city's core has been carefully planned, with an eye to the visual symbolism of our national landmarks. Because of the important role that commemorative monuments play in creating a national narrative, Congress has consistently exercised control over their establishment, design, and siting. Today, congressional approval is required by law before a new commemorative work—or, indeed, *any* significant structure—may be constructed on federally administered land in the heart of the District of Columbia. Such approval, though, is only a first step. Before construction may begin, a planned monument must undergo a host of required consultations, reviews, and approvals to ensure that it is symbolically and aesthetically appropriate and that it will not raise environmental, traffic, safety, or other concerns.

Disregarding all of these requirements, President Donald J. Trump has announced that construction will imminently begin on a 250-foot-tall commemorative arch on National Park Service land within the District of Columbia, directly in the midst of a network of existing monuments. Congress has not authorized the arch. The arch has not been subjected to any of the statutorily required review processes. And the arch will sever a symbolically significant sightline between the Lincoln Memorial and Arlington National Cemetery that has been left intentionally unbroken since construction of the Lincoln Memorial more than a century ago.

Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gundersen, and Calder Loth—three Vietnam veterans and an architectural historian—all regularly visit Arlington National Cemetery and other areas from which the unauthorized arch will be prominently visible. If built, the arch will profoundly diminish their aesthetic enjoyment of an area that holds deep personal and symbolic significance for each of them, and in which Mr. Lemmon and Mr. Byrnes hope to be

1

interred. Plaintiffs challenge the planned arch as ultra vires and a dereliction of President Trump's constitutional duty, and they presently seek a preliminary injunction against Defendants Vince Haley, Director of the White House Domestic Policy Council; the Executive Office of the President; and the National Park Service that bars them from taking any steps to begin construction of the arch absent congressional authorization and the satisfaction of all other legal prerequisites.

This Court should grant the injunction. To begin, Plaintiffs are likely to succeed on the merits of their claims. The planned arch is ultra vires because Congress has not authorized it, and at least two federal statutes prohibit construction from moving forward in the absence of such authorization: the Commemorative Works Act, which bars the construction of a commemorative work on National Park Service land in the core of the District unless it is "specifically authorized by law," 40 U.S.C. § 8903(a)(1), and 40 U.S.C. § 8106, which prohibits building *any* "structure" on federal parkland in the District "without express authority of Congress." And the planned arch also reflects an unconstitutional exercise of presidential power because the President's role is to take care that Acts of Congress be faithfully executed—not to order that they be violated.

Absent a preliminary injunction, moreover, Plaintiffs will suffer irreparable injury. The President has stated on multiple occasions that he intends for the arch to be completed by July 4 of this year. Construction is therefore imminently poised to begin, and once the arch has been built, Defendants' unlawful plan is a fait accompli. At that point, the injuries to Plaintiffs' personal and aesthetic interests in the unobstructed view between Arlington National Cemetery and the Lincoln Memorial will be complete and incapable of redress.

Finally, an injunction serves the public interest. Although members of the public will undoubtedly hold diverse views about whether, where, and how a commemorative arch should be built, the statutorily required procedure is designed to take account of those views through the

2

participation of Congress. Requiring Defendants to follow that procedure, then, redounds to the benefit of all Americans, whether or not they share Plaintiffs' concerns. Furthermore, numerous statutory and regulatory consultation and review requirements that apply to a project of this nature serve to promote air-traffic safety, preservation of the natural environment, and countless other critical interests. Allowing Defendants to bypass these requirements would thus harm the public.

This Court should grant Plaintiffs' motion for a preliminary injunction.

## STATEMENT OF FACTS

**The symbolic design of the monumental core of the District of Columbia**

Washington, District of Columbia, was founded shortly after the American Revolution pursuant to an Act of Congress directing the construction of a capital territory to house the seat of government for the new Nation. *See* An Act for Establishing the Temporary and Permanent Seat of the Government of the United States, Pub. L. No. 1-28, 1 Stat. 130 (July 16, 1790). From the city's inception as a purpose-built capital, careful attention was given to the aesthetic and symbolic significance of the configuration of buildings and landmarks within the city's core.

Pierre Charles L'Enfant, who was commissioned to design the new capital, created an urban plan that strove to embody American ideals, including the principle that "every citizen was equally important." Kenneth R. Fletcher, *A Brief History of Pierre L'Enfant and Washington, D.C.*, Smithsonian (Apr. 30, 2008) (hereafter, Fletcher, *Brief History*).[1] Notably, "instead of reserving the grandest spot for the leader's palace as was customary in Europe," L'Enfant's plan centered the city on Congress, placing it "on a high point with a commanding view of the Potomac." *Id.* Radiating from that central point, "wide boulevards … offered views of important buildings and

---

[1] https://www.smithsonianmag.com/arts-culture/a-brief-history-of-pierre-lenfant-and-washington-dc-39487784.

3

common squares from great distances." *Id.* In addition, a "mile-long avenue … link[ed] Congress House to the President's House," symbolically connecting the two branches of government. Francis Fukuyama, *L'Enfant's Washington*, Am. Interest (May 1, 2007).[2] At all times, "the importance of views and vistas," including "reciprocal views between the [capital's] monuments," was paramount. Nat'l Park Serv., *Views and Vistas of the Lincoln Memorial Cultural Landscape* (last updated Oct. 10, 2024) (hereafter, Nat'l Park Serv., *Views and Vistas*).[3]

Realizing L'Enfant's aspirational vision at first proved difficult in practice, and, throughout the nineteenth century, many visitors viewed the capital city as a backwater. *See* Fletcher, *Brief History*, *supra* note 1. Consequently, in 1901, the Senate assembled a team of architects and urban planners, known as the McMillan Commission, to update the capital's monumental core in line with L'Enfant's original plan. *Id.* Among other things, the Commission recommended a monument to President Abraham Lincoln to serve as "the western anchor along [a] major east-west vista" that included the Washington Monument and the U.S. Capitol. Nat'l Park Serv., *Views and Vistas*, *supra* note 3. Taking up the Commission's proposal, Congress in 1911 commissioned a group to propose a site and design for what, following congressional approval, would be constructed as the Lincoln Memorial. *See* An Act to Provide a Commission to Secure Plans and Designs for a Monument or Memorial to the Memory of Abraham Lincoln, Pub. L. No. 61-346, 36 Stat. 898 (Feb. 9, 1911).

The McMillan Commission also proposed a bridge to connect the base of the Lincoln Memorial to Arlington National Cemetery. *See* Nat'l Park Serv., *Historic American Engineering*

---

[2] https://www.the-american-interest.com/2007/05/01/lenfants-washington.
[3] https://www.nps.gov/articles/000/lincoln-memorial-cultural-landscape-views-and-vistas.htm.

4

*Record: Arlington Memorial Bridge* 3–4 (1988).[4] This bridge, later constructed as the Arlington Memorial Bridge, *see id.*, was designed to symbolize "the strength of a united nation" by joining the Lincoln Memorial in the District of Columbia, on the north side of the Potomac River, to Arlington House—a monument to Robert E. Lee in Arlington National Cemetery—on the river's south side. Nat'l Park Serv., *Arlington Memorial Bridge & Avenue* (last updated Apr. 5, 2023).[5]

In addition to serving as "a symbolic link between north and south," Arlington Memorial Bridge is "a monument to the sacrifices and valor of our nation's military personnel" that provides a ceremonial gateway to Arlington National Cemetery, "where thousands who died fighting to preserve democratic government have been laid to rest." *Id.* The "reciprocal views" across Arlington Memorial Bridge were a significant feature of the McMillan plan, ensuring that visitors to the Lincoln Memorial would have "sweeping panoramic views of Virginia, the Potomac River, and Arlington House" and that the Lincoln Memorial would "feature in all designed views and vistas," including from Arlington House. Nat'l Park. Serv., *Views and Vistas*, *supra* note 3.

**Congress's role in the configuration of monuments and structures in the District**

Reflecting that national symbolism has been central to the layout of the District of Columbia since its founding, Congress has long been responsible for authorizing monuments and structures on federally administered land within the District. *See* Jacob R. Straus, Cong. Research Serv., *Commemorative Works in the District of Columbia: Background and Practice*, Summary (updated May 8, 2023) (hereafter Straus, *Commemorative Works*).[6] Even before the founding of the Republic, an equestrian statue of George Washington to be built in the District of Columbia

---

[4] https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0600/dc0604/data/dc0604data.pdf.
[5] https://www.nps.gov/gwmp/planyourvisit/memorialave.htm.
[6] https://www.congress.gov/crs_external_products/R/PDF/R41658/R41658.12.pdf.

5

was authorized through the Continental Congress in 1783. *Id.* at 1. Since then, Congress has authorized more than 100 memorials on federal land in the capital. *Id.*; *see, e.g.*, An Act Proposing the Erection of a Memorial on Public Grounds in the District of Columbia, or Its Environs, in Honor and Commemoration of the Seabees of the United States Navy, Pub. L. No. 92-422, 86 Stat. 678 (Sept. 18, 1972); Joint Resolution Authorizing the United Spanish War Veterans to Erect a Memorial in the District of Columbia or Its Environs, Pub. L. No. 88-612, 78 Stat. 992 (Oct. 2, 1964).

For nearly two centuries, however, "the process for approving site locations, memorial design plans, and funding was … haphazard." Straus, *Commemorative Works*, *supra* note 6, at Summary. Congress responded in 1986 by passing the Commemorative Works Act, Pub. L. No. 99-652, 100 Stat. 3650 (Nov. 14, 1986). Among the Act's purposes are to "preserve the integrity of the comprehensive design of the L'Enfant and McMillan plans for the Nation's Capital," 40 U.S.C. § 8901(1), and to ensure that commemorative works on federally administered land in the District of Columbia and its environs "are appropriately designed, constructed, and located" and "reflect a consensus of the lasting national significance of the subjects involved." *Id.* § 8901(4).

The Commemorative Works Act sets out a detailed process for approving commemorative works—defined to include "any statue, monument, sculpture, … or other structure or landscape feature[] … designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history," *id.* § 8902(a)(1)—in areas in and around the District of Columbia that are administered by the National Park Service or the General Services Administration, *see id.* § 8902(a)(2). To begin, it requires that any such work be "specifically authorized by law." *Id.* § 8903(a)(1). And "[i]n considering legislation authorizing commemorative works in the District of Columbia and its environs," Congress must "solicit the

6

views of the National Capital Memorial Advisory Commission." *Id.* § 8903(d); *see id.* § 8904 (establishing the Commission).

Once Congress has approved a commemorative work, it designates a sponsor responsible for establishing the work. *See id.* § 8902(a)(4). The sponsor must then consult with the National Capital Memorial Advisory Commission "regarding the selection of alternative sites and design concepts for the commemorative work" and have the Secretary of the Interior or the Administrator of General Services submit "site and design proposals" for the approval of the Commission of Fine Arts and the National Capital Planning Commission. *Id.* § 8905(a); *see id.* § 9101 (establishing the Commission of Fine Arts); *id.* § 8711 (establishing the National Capital Planning Commission). Once these consultation and approval requirements have been satisfied, the sponsor may apply to the Secretary of the Interior or the Administrator of General Services for a construction permit. *See id.* § 8905(a). At that point, a permit may issue if, among other things, "knowledgeable individuals qualified in the field of preservation and maintenance have been consulted … to ensure that the commemorative work meets high professional standards." *Id.* § 8906(a)(2).

The Commemorative Works Act also imposes special procedural requirements for commemorative works located in specific areas around the monumental core of the capital. *See id.* § 8902(a)(2). For example, Arlington Memorial Bridge and the land at its southern end are located in what is referred to as "Area I." *Id.*; *see* Straus, *Commemorative Works*, *supra* note 6, at 30. Commemorative works may not be built in Area I unless the Secretary of the Interior or the Administrator of General Services "decides that the subject of the commemorative work is of preeminent historical and lasting significance to the United States," recommends to Congress that the work be sited in Area I, and receives "approv[al]" of the recommendation "by law." 40 U.S.C. § 8908(b)(1).

All in all, establishing a memorial in the District of Columbia in compliance with the Commemorative Works Act requires the satisfaction of up to twenty-four steps that "help ensure appropriate legislation, site selection, design approval, fundraising, and construction." Straus, *Commemorative Works*, *supra* note 6, at 28; *see id.* at 28–29 (laying out the steps). Since the Act's enactment in 1986, Congress has enacted legislation authorizing commemorative works in the District of Columbia and its environs on more than forty-five occasions. *See id.* at 23–25. Fewer than half of those authorized works, however, have seen their way through the entire statutory process to eventual construction. *Id.* at 23.

The Commemorative Works Act, moreover, is just one of several laws that govern the construction of monuments on federal land in the District of Columbia. To begin, 40 U.S.C. § 8106 provides that any "building or structure"—whether or not it satisfies the Commemorative Works Act's definition of a commemorative work—"shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Once approved by Congress, whether pursuant to the Commemorative Works Act or 40 U.S.C. § 8106, a building project on federal land must comply with a host of other statutory and regulatory requirements. For example, the agency responsible for licensing the project must "take into account the effect of the [project] on any historic property," 54 U.S.C. § 306108, including any "historic district, site, building, structure, or object" that, like the Lincoln Memorial, Arlington House, Arlington National Cemetery, and Arlington Memorial Bridge, is listed in the National Register of Historic Places, *id.* § 300308; *see* Nat'l Park Serv., *National Register Database and Research* (last updated Aug. 5, 2025), Ref. Nos. 66000030 (Lincoln Memorial), 66000040 (Arlington House), 14000146 (Arlington National Cemetery), 80000346 (Arlington

8

Memorial Bridge).[7] If the project will "significantly affect[] the quality of the human environment," the responsible agency must prepare a "detailed statement" on its environmental impact. 42 U.S.C. § 4332(C). If the project exceeds certain height benchmarks, the agency must file notice with the Federal Aviation Administration to ensure that air traffic remains unobstructed. *See* 14 C.F.R. §§ 77.9(a)–(b). And the agency may be required to consult with the National Capital Planning Commission and the Commission of Fine Arts, irrespective of whether the project is subject to the detailed procedural requirements of the Commemorative Works Act. *See* 40 U.S.C. § 8722 (National Capital Planning Commission); *id.* § 9102 (Commission of Fine Arts).

**Defendants' plan to construct an unauthorized commemorative arch**

In mid-October 2025, President Trump announced plans to build a triumphal arch in time to commemorate the Nation's 250th anniversary on July 4, 2026. *See* CBS News (@cbsnews) & Ed O'Keefe (@edokeefecbs), Instagram (Oct. 15, 2025) (hereafter, CBS News & O'Keefe).[8] The planned arch will be located in Memorial Circle, an area of National Park Service land located within "Area I" of the District of Columbia at the southern end of Arlington Memorial Bridge, between the Lincoln Memorial and Arlington House. *Id.*; *see* Straus, *Commemorative Works*, *supra* note 6, at 30; *see also* Nat'l Park Serv., *Lady Bird Johnson Park Cultural Landscape* (last updated Oct. 8, 2021) (hereafter, Nat'l Park Serv., *Lady Bird Johnson Park*).[9]

On October 11, President Trump posted on his Truth Social account a design showing a monumental arch in Memorial Circle. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 11, 2025, 12:27 AM).[10] As President Trump reportedly stated, "[e]very time somebody rides

---

[7] https://www.nps.gov/subjects/nationalregister/database-research.htm.
[8] https://www.instagram.com/p/DP2WDAiEa4X/?utm_source=ig_embed&utm_campaign.
[9] https://www.nps.gov/articles/600245.htm#6/32.259/-91.912.
[10] https://truthsocial.com/@realDonaldTrump/posts/115353640080693628.

over" Arlington Memorial Bridge, "they literally say something is supposed to be here." Nardine Saad & Kwasi Gyamfi Asiedu, *What We Know About White House Plans for an "Arc de Trump*," BBC (Oct. 16, 2025).[11]

At an October 15 dinner for individuals who had donated funds to construct a ballroom for the White House, President Trump displayed models and diagrams of the arch in Memorial Circle. Callum Sutherland, *The "Arc de Trump": President Shows Off Plans for His Latest Grandiose D.C. Construction Project*, Time (Oct. 16, 2025) (hereafter, Sutherland, *"Arc de Trump"*)[12]; *see* Zolan Kanno-Youngs, *Trump Hosts Dinner for Wealthy Donors to White House Ballroom*, N.Y. Times (Oct. 15, 2025).[13] The models showed arches of varying sizes—"small, medium, and large"—and President Trump reportedly stated, "I happen to think the large by far looks the best." Sutherland, *"Arc de Trump*," *supra* note 12. When asked who the arch was for, the President reportedly stated: "Me." CBS News & O'Keefe, *supra* note 8.

Later, at a December 2025 White House holiday party, President Trump confirmed: "We're building an arc[h], like the Arc de Tri[omphe]" in Paris, and "[w]e're building it by the Arlington Bridge, the Arlington cemetery, opposite the Lincoln Memorial." Robert Mackey, *Trump Says Building DC Arch Is Domestic Policy Chief's "Primary Thing*," The Guardian (Dec. 14, 2025).[14] He identified Defendant Vince Haley, Director of the White House Domestic Policy Council, as being "in charge of the triumphal arc[h]." *Id.* He further stated that the arch is "a policy thing that's going to be unbelievable" and that it will be Director Haley's "primary thing." *Id.* As for the timing, the President stated in a December 31 interview that he expected construction to begin "sometime

---

[11] https://www.bbc.com/news/articles/cy7e8lv176go.

[12] https://time.com/7326081/trump-president-arch-washington-project-construction.

[13] https://www.nytimes.com/2025/10/15/us/politics/trump-white-house-dinner-ballroom-donors.html.

[14] https://www.theguardian.com/us-news/2025/dec/14/trump-arch-washington-dc-policy-chief.

in the next two months." Sophia Cai, *Trump Says Construction of the "Triumphal Arch" to Begin in "2 Months,"* Politico (Dec. 31, 2025).[15]

Since then, the President has continued to indicate that the planned construction will proceed, while giving no indication of seeking congressional authorization: On January 23, President Trump posted to Truth Social an image with three renderings of the planned arch in Memorial Circle. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 23, 2026, 12:00 PM).[16] On January 30, the White House released a fact sheet confirming the President's plans "for a new Independence Arch in Washington, D.C. to coincide with the 250th anniversary" of the United States. White House, *Fact Sheet: President Donald J. Trump Celebrates American Greatness with the Freedom 250 Grand Prix of Washington, D.C.* (Jan. 30, 2026).[17] And according to public reporting, President Trump "has grown attached to the idea of a 250-foot-tall structure overlooking the Potomac River." Dan Diamond et al., *Trump Wants to Build a 250-foot-tall Arch, Dwarfing the Lincoln Memorial*, Wash. Post (Jan. 31, 2026) (hereafter, Diamond, *Trump Wants to Build*).[18] The President has reportedly settled on an arch of this size because "250 for 250"—referring to the Nation's 250th anniversary—"makes the most sense." *Id.* According to a White House spokesperson, the arch will be "one of the most iconic landmarks not only in Washington, D.C., but throughout the world," and "President Trump's bold vision will be imprinted upon the fabric of America and be felt by generations to come." *Id.*

---

[15] https://www.politico.com/news/2025/12/31/trump-arch-washington-dc-america-250-00708590.

[16] https://truthsocial.com/@realDonaldTrump/posts/115945478685595236.

[17] https://www.whitehouse.gov/fact-sheets/2026/01/fact-sheet-president-donald-j-trump-celebrates-american-greatness-with-the-freedom-250-grand-prix-of-washington-d-c.

[18] https://www.washingtonpost.com/politics/2026/01/31/trump-arch-memorial-circle.

The President has stated that the arch will be funded with private donations. *See* Joey Garrison, *Trump Floats Three Designs for His "Independence Arch" in DC*, USA Today (Jan. 23, 2026).[19] In December 2025, he announced the formation of a limited liability company called "Freedom 250" that will amass these donations and donations to other projects connected to the Nation's 250th anniversary. *See* Kenneth P. Vogel et al., *For $1 Million, Donors to U.S.A. Birthday Group Offered Access to Trump*, N.Y. Times (Feb. 8, 2026).[20] Freedom 250 is housed within the National Park Foundation, which is the official fundraising arm of the National Park Service. *Id.* Donors who give at least $1 million to Freedom 250 have reportedly been promised a "historic photo opportunity" with President Trump and an invitation to a presidential reception. *Id.*

On February 10, CNN reported that President Trump planned to order construction to start. *See* Betsy Klein et al., *Trump Forges Ahead with Plans for 250-foot Arch Despite Concerns on the Ground and in the Air*, CNN (Feb. 10, 2026) (hereafter, Klein, *Trump Forges Ahead*).[21] To date, Congress has not authorized the arch.

**This lawsuit**

Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gundersen, and Calder Loth filed this lawsuit against President Trump, Director Haley, the Executive Office of the President, and the National Park Service, seeking a declaration that the planned arch is unlawful and an injunction against its construction. ECF 1. Mr. Lemmon, Mr. Byrnes, and Mr. Gundersen are Vietnam veterans who regularly visit Arlington National Cemetery to pay their respects to their fallen comrades and to contemplate the national ideals for which they have fought and served. Lemmon

---

[19] https://www.usatoday.com/story/news/politics/2026/01/23/donald-trump-designs-independence-arch-250-anniversary/88320719007.

[20] https://www.nytimes.com/2026/02/08/us/politics/freedom-250-trump-donors.html.

[21] https://www.cnn.com/2026/02/10/politics/independence-arch-dc-concerns-vis.

Decl. ¶¶ 2, 6–7; Byrnes Decl. ¶¶ 2, 8–9; Gundersen Decl. ¶¶ 2–3, 6–7. Each intends to continue visiting the cemetery, and each views the arch as a disrespectful and aesthetically obtrusive symbol that will degrade his future visits. Lemmon Decl. ¶¶ 7–9; Byrnes Decl. ¶¶ 8, 10–13; Gundersen Decl. ¶¶ 7–9. Mr. Loth is an architectural historian who regularly visits, and intends to continue visiting, Arlington National Cemetery and the surrounding areas for his personal enjoyment and to take photographs for use in his historical lectures. Loth Decl. ¶¶ 2, 4–7. The arch will diminish Mr. Loth's experience of these areas by obstructing the views to and from Arlington National Cemetery, disrupting the symbolic link between Arlington House and the Lincoln Memorial, and standing as an affront to our tradition of democratic process and the rule of law. *Id.* ¶¶ 8–10.

Because President Trump has indicated that he intends to have construction of the arch begin imminently, so that the project can be completed by July 4, Plaintiffs now move for a preliminary injunction barring Defendants Haley, Executive Office of the President, and National Park Service from taking steps to begin construction—absent congressional authorization and satisfaction of all statutory and regulatory prerequisites—during the pendency of this lawsuit.

## STANDARD OF REVIEW

To secure a preliminary injunction, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Where, as here, the injunction would run against the government, the final two factors merge. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]he [government's] harm and the public interest are one and the same, because the government's interest *is* the public interest.").

13

**ARGUMENT**

**I.    Plaintiffs are likely to succeed on the merits.**

Construction of the unauthorized commemorative arch in Memorial Circle would exceed Defendants' statutory authority and violate the President's constitutional duty to take care that the laws be faithfully executed. Plaintiffs have thus challenged Defendants' imminent construction of the arch as both ultra vires and unconstitutional. Although Plaintiffs "need only show likelihood of success on one claim" to satisfy the first preliminary-injunction factor, *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (quoting *McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995)), Plaintiffs can establish a likelihood of success as to both claims.

**A.  Plaintiffs are likely to succeed on their ultra vires claim.**

The Supreme Court has long recognized that "[t]he acts of all [federal] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). Thus, "[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Indeed, just last Term, the Supreme Court reaffirmed that a non-statutory "ultra vires" claim is available where an executive officer "has taken action entirely 'in excess of [his] delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (emphasis omitted; quoting *Bhd. of Ry. & Steamship Clerks v. Ass'n for Ben. of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)); *see also Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022) ("So long as a statutory provision plainly delineates the

14

outer limits of [executive] authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms.").

Here, Defendants' construction of the planned arch in Memorial Circle has no foundation in a grant of statutory authority. And without congressional authorization, it would transgress specific prohibitions in the Commemorative Works Act and 40 U.S.C. § 8106.

To begin, the Commemorative Works Act sets out a detailed process of consultation and approval requirements before a commemorative work may be constructed in areas administered by the National Park Service and the Administrator of General Services in the District of Columbia and its environs. 40 U.S.C. § 8903(a); *see id.* § 8901(4); *see also supra* pp. 6–8. The planned arch is a commemorative work within the meaning of the statute because it is a "monument[] … or other structure" that is "designed to perpetuate in a permanent manner the memory of a[] … significant element of American history," 40 U.S.C. § 8902(a)(1), namely, the Nation's 250th anniversary. Memorial Circle is administered by the National Park Service, as it falls within Lady Bird Johnson Park. *See* Nat'l Park Serv., *Lady Bird Johnson Park*, *supra* note 9. The site also falls within "the District of Columbia and its environs" within the meaning of the Act. *See* 40 U.S.C. § 8902(a)(2) (defining this term to encompass Area I); *see* Straus, *Commemorative Works*, *supra* note 6, at 30 (showing that Lady Bird Johnson Park falls within Area I). The planned arch is therefore subject to the Act's requirements.

Defendants, however, have unilaterally decided to operate entirely outside the Commemorative Works Act's framework. Indeed, Defendants have not complied with even the Act's first step, which is to secure congressional authorization for the arch. *See* 40 U.S.C. § 8903(a)(1) (requiring that commemorative works subject to the Act may be built "only as

15

specifically authorized by law"). President Trump has nonetheless announced that construction will imminently begin so that the arch can be completed in time for July 4. *See supra* pp. 10–12.

Apart from the Commemorative Works Act, 40 U.S.C. § 8106 prohibits any "building or structure" from being "erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Again, Congress has not authorized the arch, which is a "structure" that Defendants plan to "erect[]" in Memorial Circle—which, again, is part of Lady Bird Johnson Park, a "park[] or public grounds of the Federal Government in the District of Columbia." *Id.*; *see* Nat'l Park Serv., *Lady Bird Johnson Park* (last updated Jan. 5, 2024).[22]

Until the essential prerequisite of congressional authorization is satisfied, Defendants may not lawfully construct an arch in Memorial Circle. Even if Congress had authorized construction, though (and it has not), any plan to proceed would also be subject to numerous other procedural requirements that govern how construction must proceed. *See supra* pp. 8–9. Defendants have indicated no intention to comply with those further requirements either, and there is reason to doubt that the arch would gain the necessary approvals if Defendants' plan were subjected to the statutorily required review procedures. For example, the site and design of a commemorative work must be approved by the National Capital Planning Commission. *See* 40 U.S.C. § 8905(a)(2). Following a comprehensive review of possible sites for new commemorative works in the capital area, however, the Commission unequivocally concluded that the "circle at the west end of Memorial Bridge is not viewed as appropriate for the location of a future memorial." Nat'l Capital Planning Comm'n, *Memorials and Museums Master Plan* at 35 (Dec. 2001).[23] Moreover,

---

[22] https://www.nps.gov/gwmp/planyourvisit/ladybirdjohnsonpark.htm.
[23] https://www.ncpc.gov/docs/2M_Candidate_Sites.pdf.

construction of the 250-foot arch would require the participation of the Federal Aviation Administration. *See* 14 C.F.R. § 77.9(a). Because it would sit "only feet from the corridor used for flights approaching" Ronald Reagan Washington National Airport, it would raise serious "concerns about a narrow margin for pilot error in one of the nation's tightest sections of airspace." Klein, *Trump Forges Ahead*, *supra* note 21. And the arch, which would be subject to an environmental review, *see* 42 U.S.C. § 4332(C), would be located in an area that already sees "[t]he heavy use of … roads, bridges, trails, and sidewalks," which "contribute[s] to a number of safety concerns." Nat'l Park Serv., *Memorial Circle Transportation Plan and Environmental Assessment*.[24] These additional statutory and regulatory requirements, though, come into play only after congressional authorization, in the form of an enacted Public Law. *See* ECF 1 ¶ 25 (listing numerous examples of prior authorizations).

This case is thus a simple one: Because *no* congressionally conferred authorization exists for the construction of the arch, and because construction is statutorily prohibited in the absence of such authorization, Defendants' plan to proceed with construction regardless is "entirely 'in excess of [their] delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regulatory Comm'n*, 605 U.S. at 681 (emphasis omitted; quoting *Bhd. of Ry. & Steamship Clerks*, 380 U.S. at 660). Plaintiffs are therefore likely to succeed in establishing that Defendants' plan to begin construction of the arch is ultra vires and that this Court can and should enjoin Defendants' "absolutely uncontrolled and arbitrary action," which "is unauthorized by any law." *Am. Sch. of Magnetic Healing*, 187 U.S. at 110.

---

[24] https://parkplanning.nps.gov/projectHome.cfm?ProjectID=51448.

**B. Plaintiffs are likely to succeed on their constitutional claim.**

The planned arch should be declared unlawful—and Defendants Haley, Executive Office of the President, and National Park Service should be enjoined from taking steps to facilitate its construction—for the additional reason that it violates President Trump's "constitutionally appointed duty to 'take care that the laws be faithfully executed.'" *Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3). This duty "refutes the idea that [the President] is to be a lawmaker" and makes clear that "Congress has … exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitution" in the federal government. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952).

By enacting the Commemorative Works Act and 40 U.S.C. § 8106, Congress formalized its longstanding oversight role in determining the configuration of monuments and other structures on federal lands in the District of Columbia. *See supra* pp. 5–8. The President's constitutional duty, then, is to facilitate those legislative choices by enforcing the laws against those who would break them and by taking steps to prevent the building of unauthorized structures on federal land in the District. Here, the President has done the opposite, openly flouting Congress's laws by announcing a plan to imminently proceed with construction of his own unauthorized structure. Although the President has broad discretion in deciding how to allocate finite enforcement resources, *cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985), or how to "interpret[] a statute and direct[] the details of its execution," *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928), he is constitutionally prohibited from rejecting Congress's policy altogether. *See Youngstown*, 343 U.S. at 588 (holding that a presidential order violated constitutional separation-of-powers principles where it "d[id] not direct that a congressional policy be executed in a manner prescribed by Congress—[but] direct[ed] that a presidential policy be executed in a manner

18

prescribed by the President"); *see Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019) (recognizing that "separation-of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause").

Plaintiffs have an implied right of action under the Constitution to challenge the President's abdication of his constitutional duty under the Take Care Clause. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing that courts may evaluate "separation-of-powers claim[s]," like other constitutional claims, even absent a statutory cause of action); *cf. United States v. Texas*, 577 U.S. 1101 (2016) (granting certiorari and asking parties to brief the question whether a challenged presidential policy "violates the Take Care Clause of the Constitution"). And Plaintiffs are entitled to injunctive relief against the President's subordinates to bar them from executing an unlawful presidential policy. *See Youngstown*, 343 U.S. at 589 (affirming an injunction that barred the Secretary of Commerce from acting pursuant to an executive order that violated the separation of powers); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("[A]ny conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, [where] the injury at issue can be rectified by injunctive relief against subordinate officials.").

Plaintiffs, then, are likely to succeed in showing that the President's open directive that Congress's statutes be disregarded violates his constitutional duty to take care that those statutes be faithfully executed. And Plaintiffs are moreover likely to succeed in showing that this constitutional violation entitles them to injunctive relief against the Defendants who would be responsible for carrying out the President's unconstitutional directive.

19

## II.    Plaintiffs will suffer irreparable injury absent prompt relief.

Preliminary injunctive relief is necessary to prevent irreparable harm that would otherwise materialize during the pendency of this lawsuit. President Trump has announced that he intends for construction of the arch to be completed by July 4 of this year—just over four months from now—and he has made clear that construction will begin imminently to accomplish that goal. *See supra* pp. 10–12. Absent preliminary relief, it is likely that the Memorial Circle arch will be a permanent feature of the capital city's landscape by the time the parties have briefed, and this Court has resolved, motions for summary judgment.

Such a result would cause serious and irreparable injury to Plaintiffs. Mr. Lemmon and Mr. Byrnes plan to be buried in Arlington National Cemetery. Lemmon Decl. ¶ 9; Byrnes Decl. ¶ 8. Mr. Lemmon, though, would find it "profoundly disturbing" to be "interred in the shadow of what [he] believe[s] to be a personal vanity project." Lemmon Decl. ¶ 9. And Mr. Byrnes does "not want to be buried under what [he] view[s] as a symbol that violates our Nation's resistance to the rule of a king and our Nation's commitment to the rule of the people." Byrnes Decl. ¶ 12. If the arch were constructed, he would need to "seriously reconsider [his] intention to be interred in Arlington National Cemetery." *Id.* "[N]o legal remedy can fully right the wrong of such a dignitary affront." *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 929 (9th Cir. 2018).

Moreover, Plaintiffs regularly visit Arlington National Cemetery and the area around Memorial Circle and derive aesthetic satisfaction and symbolic meaning from the current configuration of monuments and the reciprocal views between them. Lemmon Decl. ¶¶ 6–7; Byrnes Decl. ¶¶ 8–9; Gundersen Decl. ¶¶ 6–7; Loth Decl. ¶¶ 5–6. If the arch is built, Mr. Lemmon has attested that it will "degrade [his] personal experience when visiting Arlington Cemetery or traveling around Memorial Circle and across Memorial Bridge," Lemmon Decl. ¶ 8, and create a

20

"continuous visual affront," *id.* ¶ 12. Mr. Byrnes has attested that the arch will "sadly diminish [his] enjoyment of the views from Arlington National Cemetery," Byrnes Decl. ¶ 13, both because it will "obstruct the clear line-of-sight view of the Lincoln Memorial and other monuments on the National Mall from the cemetery," *id.* ¶ 10, and because he will view it as a symbolic "insult to those resting in Arlington National Cemetery, who fought and died to defend our democracy," *id.* ¶ 11. Mr. Gundersen, too, has attested that the arch will "profoundly diminish [his] enjoyment of the view from Arlington National Cemetery," Gundersen Decl. ¶ 8, and make it "impossible for [him] to look out at Washington, DC, from Arlington National Cemetery without feeling insulted and disrespected," *id.* ¶ 9. And Mr. Loth has attested that he views the arch as "an incompatible distraction from the aesthetic and symbolic interplay of Memorial Bridge with Memorial Circle, Arlington House, and the graves of thousands who have served our country," Loth Decl. ¶ 9, and that it will "irreparably damage [his] personal, aesthetic, and professional appreciation of the reciprocal views between Arlington National Cemetery and Washington, DC," *id.* ¶ 10.

The Supreme Court has held that, "[o]f course, the desire to … observe" a particular environment, "even for purely esthetic purposes, is undeniably a cognizable interest," an injury to which represents a concrete harm. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992); *see, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972))). And like environmental injury, aesthetic injury, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). "If such injury is sufficiently

21

likely, therefore, the balance of harms will usually favor the issuance of an injunction." *Id.* And courts have applied this principle where, as here, the gravamen of the environmental injury is harm to a plaintiff's personal aesthetic interests. *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 219–22 (D.D.C. 2003) (citing cases and holding that plaintiffs had shown irreparable harm for purposes of a preliminary injunction where defendants' actions would adversely affect plaintiffs' "ability to view, interact with, study, and appreciate" a particular bird population).

The establishment of a giant landmark in the District of Columbia's monumental core will profoundly and adversely affect Plaintiffs' aesthetic experience of personally meaningful vistas that they regularly admire. And the harm from the erection of the monument, "if indeed incorrect in law, cannot be remedied easily if at all." *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (addressing irreparable harm from logging); *cf. San Diegans for Mt. Soledad Nat'l War Memorial v. Paulson*, 548 U.S. 1301, 1303 (2006) (Kennedy, J., in chambers) (holding that the equities supported "preserving the status quo" during the pendency of appellate proceedings in light of the "irreparable harm of altering [an existing] memorial"). The proper course for this Court, then, is to enjoin construction until the arch project's legality has been evaluated.

## III.    The balance of equities and public interest favor Plaintiffs.

As against the certain and irreparable injury that Plaintiffs will experience if construction moves forward, the government—and, by extension, the public—will suffer no cognizable harm from a preliminary injunction. After all, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). The requested injunction would not bar the government from building an

22

*authorized* monument to commemorate the Nation's 250th anniversary or from lawfully commemorating the anniversary in other ways.

Furthermore, requiring congressional authorization and the satisfaction of statutory review and approval procedures prior to construction serves the public interest. As explained above, *see supra* pp. 5–7, Congress's role in authorizing the design and siting of commemorative works and other structures on federal land in the District of Columbia ensures democratic accountability and a measure of consensus in determining the symbolic configuration of landmarks in the capital city and the national narrative that those landmarks convey. The planned arch has drawn a strong response not only from Plaintiffs but from other interested members of the public too. *See* Lemmon Decl. ¶¶ 13–14; Gundersen Decl. ¶ 10; *see also, e.g.*, Diamond, *Trump Wants to Build*, *supra* note 18 (article about the arch with over 6,700 reader comments that, according to the article's summary, "overwhelmingly criticize" the project and "express concern about the potential obstruction of views, particularly from the Lincoln Memorial to Arlington Cemetery"). Following the statutory process gives those individuals and others a voice, through their representatives in Congress.

The established process also serves the purposes of the Commemorative Works Act by providing for the participation of "knowledgeable individuals qualified in the field of preservation and maintenance," 40 U.S.C. § 8906(a)(2), representatives of "federal and local constituencies with a stake in planning for the nation's capital," Nat'l Capital Planning Comm'n, *About the Commission*,[25] individuals "with expertise in the arts," U.S. Comm'n of Fine Arts, *Who We Are*,[26] and the Mayor of the District of Columbia, 40 U.S.C. § 8904(a)(6), among others. The process

---

[25] https://www.ncpc.gov/about/commission/.
[26] https://www.cfa.gov/about-cfa/who-we-are.

23

ensures that there will be a systematic evaluation of the project's impact on existing historical sites, *see* 54 U.S.C. § 306108, the natural and built environment, *see* 42 U.S.C. § 4332(C), and transportation safety, *see* 14 C.F.R. §§ 77.9(a)–(b), among other things. And, critically, following the process will confer public legitimacy on whatever monument, if any, is authorized by Congress and ultimately approved as to design and location.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court enter a preliminary injunction declaring that constructing an arch on Memorial Circle without congressional authorization and compliance with statutory prerequisites is unlawful; enjoining Defendants Haley and the Executive Office of the President from taking any steps to construct an arch on Memorial Circle absent congressional authorization, designation by Congress of a sponsor, and compliance with all other statutory and regulatory requirements; and enjoining Defendant National Park Service from authorizing or permitting construction of an arch on Memorial Circle (including by expending funds provided through the National Park Foundation and/or Freedom 250), absent congressional authorization, designation by Congress of a sponsor, and compliance with all other statutory and regulatory requirements.

Respectfully submitted,

/s/ Nicolas A. Sansone
Nicolas A. Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

24