**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL LEMMON, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 26-cv-544 (TSC) |
| ) | |
| v. ) | **DEFENDANTS' OPPOSITION TO** |
| ) | **PLAINTIFFS' MOTION FOR** |
| DONALD J. TRUMP, et al., ) | **PRELIMINARY INJUNCTION** |
| ) | |
| Defendants. ) | |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 1

    I.     Factual Background ............................................................................... 1

    II.    Procedural Background .......................................................................... 4

    III.   Legal Background .................................................................................. 5

           A.    Arlington Memorial Bridge Commission .................................... 5

           B.    Commemorative Works Act ........................................................ 7

STANDARD OF REVIEW ........................................................................................... 7

ARGUMENT ................................................................................................................ 8

    I.     Plaintiffs Have Failed to Establish Irreparable Harm ........................... 8

    II.    Plaintiffs Are Unlikely to Succeed on the Merits .................................. 11

           A.    Plaintiffs have failed to establish the Court has, much less should exercise, jurisdiction over this dispute ....................................... 11

           B.    Plaintiffs have failed to establish likelihood of success on their *ultra vires* claim ............................................................................... 15

           C.    Plaintiffs have failed to establish likelihood of success on their constitutional claim ................................................................... 19

    III.   The Balance of Equities and Public Interest Do Not Favor Plaintiffs ................. 20

CONCLUSION ............................................................................................................. 23

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

*Abbott Labs v. Garner,*
387 U.S. 136 (1967) ................................................................................................... 13, 14

*Am. Legion v. Am. Humanist Ass'n,*
588 U.S. 29 (2019) ........................................................................................................... 13

*Am. Petroleum Inst. v. EPA,*
683 F.3d 382 (D.C. Cir. 2012) ....................................................................................... 13

*Am.'s Bldg. Trades Unions v. Dep't of Def.,*
783 F. Supp. 3d 290 (D.D.C. 2025) ............................................................................... 21

*Arizona v. Mayorkas,*
600 F. Supp. 3d 994 (D. Ariz. 2022) ............................................................................. 19

*Armstrong v. Exec. Off. of the President,*
90 F.3d 553 (D.C. Cir. 1996) ......................................................................................... 16

*Atl. States Legal Found. v. EPA,*
325 F.3d 281 (D.C. Cir. 2003) ....................................................................................... 13

*Center for Biological Diversity v. McAleenan,*
404 F.Supp.3d 218 (D.D.C. 2019) ................................................................................. 19

*Church v. Biden,*
573 F. Supp. 3d 118 (D.D.C. 2021) ......................................................................... 8, 9, 10

*Citizens for Resp. & Ethics in Wash. v. Off. of Admin.,*
566 F.3d 219 (D.C. Cir. 2009) ....................................................................................... 16

*City of Baltimore v. Brock,*
No. CIV.A. 85-3115, 1985 WL 6023 (D.D.C. Oct. 11, 1985) ................................. 21

\* *Dalton v. Specter,*
511 U.S. 462 (1994) ........................................................................................... 16, 19, 20

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.,*
85 F. Supp. 3d 250 (D.D.C. 2015) ................................................................................. 14

*Devia v. Nuclear Regul. Comm'n,*
492 F.3d 421 (D.C. Cir. 2007) ....................................................................................... 14

*Diamond v. Charles*,
    476 U.S. 54 (1986) ........................................................................................... 13

*Doe v. Doe Agency*,
    608 F. Supp. 2d 68 (D.D.C. 2009) ................................................................ 11

*Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*,
    466 F. Supp. 3d 100 (D.D.C. 2020) .............................................................. 16

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................ 13

*Fisheries Survival Fund v. Jewell*,
    236 F. Supp. 3d 332 (D.D.C. 2017) ................................................................ 8

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ...................................................................... 11

*Giron v. Zeytuna, Inc.*,
    597 F. Supp. 3d 29 (D.D.C. 2022) ................................................................ 12

\* *Glob. Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ........................................................... 15, 18, 20

*Harris Cnty. Texas v. Kennedy*,
    786 F. Supp. 3d 194 (D.D.C. 2025) ................................................................ 8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 21

*Martin v. Mott*,
    25 U.S. 19 (1827) ........................................................................................... 17

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ......................................................................................... 19

*Munaf v. Geren*,
    553 U.S. 674 (2008) .......................................................................................... 7

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ........................................................................................ 12

*Nat'l Parks Conservation Ass'n v. Semonite*,
    282 F. Supp. 3d 284 (D.D.C. 2017) .............................................................. 11

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) .................................................................... 14

\*   *New Mexico v. Musk,*
    769 F. Supp. 3d 1 (D.D.C. 2025) ............................................................. 1, 8, 9, 10

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................. 8

\*   *Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025) ............................................................................... 15, 16, 17

*Page v. Shelby,*
    172 F.3d 920 (D.C. Cir. 1998) ......................................................................... 21

*Page v. Shelby,*
    995 F. Supp. 23 (D.D.C. 1998) ........................................................................ 21

*Parrish v. Dayton,*
    No. CIV. 13-1348 MJD/AJB, 2013 WL 4536260 (D. Minn. Aug. 27, 2013) ......................... 22

*Peregrine Myanmar Ltd. v. Segal,*
    89 F.3d 41 (2d Cir.1996) ................................................................................. 22

*POET Biorefining, LLC v. EPA,*
    970 F.3d 392 (D.C. Cir. 2020) ......................................................................... 12

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016) ......................................................................... 21

*Reid v. Buttigieg,*
    No. CV 20-1262 (TJK), 2023 WL 2184549 (D.D.C. Feb. 23, 2023) ....................... 21

*Rushforth v. Council of Econ. Advisers,*
    762 F.2d 1038 (D.C. Cir. 1985) ....................................................................... 16

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) .......................................................................................... 22

*Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971) ....................................................................... 16

*Texas v. United States,*
    523 U.S. 296 (1998) .......................................................................................... 11

*Toilet Goods Ass'n v. Gardner,*
    387 U.S. 158 (1967) .......................................................................................... 14

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) .......................................................................................... 22

*United States v. George S. Bush & Co., Inc.*,
   310 U.S. 371 (1940)..............................................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)....................................................................8, 10, 21

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)..............................................................................20

**Statutes**

40 U.S.C. § 8106.....................................................................................4, 17

40 U.S.C. § 8902(a)(1)............................................................................7, 17

40 U.S.C. § 8902(b).................................................................................7, 17

40 U.S.C. ch. 89..........................................................................................7

5 U.S.C. §§ 124–132....................................................................................7

5 U.S.C. §§ 124–132 (1934).........................................................................7

Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913).......................................5

Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925)................................................5

Pub. L. No. 73-109, 48 Stat. 362, 389 (1934)..............................................7

Pub. L. No. 99-652, 100 Stat. 3650 (1986)..................................................7

**Rules**

Fed. R. Civ. P. 65(b)(1)(A)..........................................................................9

## INTRODUCTION

Based on media reports that the Federal Government is considering building an arch on Memorial Circle, Plaintiffs claim they need emergency relief to stop any steps the government might take to construct the arch. But the mere *possibility* that an arch might be built in no way shows that Plaintiffs will suffer imminent, irreparable injury without an emergency injunction. *See New Mexico v. Musk*, 769 F. Supp. 3d 1, 6 (D.D.C. 2025). That alone dooms Plaintiffs' emergency motion.

There are other fatal flaws, too. Because there is no final decision on arch design, subject, construction timeline, or legal justification, Plaintiffs' claims are clearly unripe for judicial resolution. Rather than issue an advisory opinion on Plaintiffs' hypothetical concerns, the Court should withhold review to avoid judicial entanglement in an abstract dispute.

Plaintiffs' claims fare no better on the merits. They pursue standard statutory-violation arguments under the guise of *ultra vires* and constitutional claims. No matter what label Plaintiffs use, their claims fail. Despite Plaintiffs' repeated assertions in their brief, Congress has already authorized construction of two tall columns surmounted by statues on Columbia Island. At the same time, Congress delegated the authority to modify those designs. Although those columns have not yet been built, the statutory authority to build them remains.

## BACKGROUND

### I.    Factual Background

This lawsuit challenges preliminary discussions about building a monumental arch on Memorial Circle. The President first announced the possibility of building such an arch on October 11, 2025, by posting a watercolor rendering on social media. Compl. ¶ 30. According to a Time article cited by Plaintiffs, *id.* ¶ 32, the President spoke more about the idea of an arch at a dinner on October 15 and displayed "a range of models differing in size." Callum Sutherland,

*The 'Arc de Trump': President Shows Off Plans For His Latest Grandiose D.C. Construction Project*, Time (Oct. 16, 2025).[1]

The Complaint alleges that the President mentioned the arch idea again at a December holiday party, when he reportedly put White House Domestic Policy Council Director Vince Haley in charge of the nascent project. Compl. ¶ 33. According to a Politico article cited by Plaintiffs, *id.* ¶ 34, a December 31 phone call mentioned that construction could begin "sometime in the next two months." Sophia Cai, *Trump says construction of the 'Triumphal Arch' to begin in '2 months'*, Politico (Dec. 31, 2025, 11:53 AM).[2] However, a subsequent Washington Post article (also cited by Plaintiffs, Compl. ¶ 42) refuted this timeline as "unlikely given that White House officials have yet to make the final plans public or submit them to federal review panels." Dan Diamond et al., *Trump wants to build a 250-foot-tall arch, dwarfing the Lincoln Memorial*, Washington Post (Jan. 31, 2026) (hereinafter "Diamond et al.").[3]

On January 23, 2026, another social media image displayed three different digital renderings of an arch on Memorial Circle. Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 23, 2026, 12:00 PM).[4] The Washington Post later reported that, when questioned about these renderings, "White House officials said that the arch design continues to be refined." Diamond et al. The same article further states that arch models include 123-foot-high, 165-foot-high, and 250-foot-high designs. *Id.* While the President recently told reporters that he "hoped"

---

[1] https://time.com/7326081/trump-president-archwashington-project-construction/.

[2] https://www.politico.com/news/2025/12/31/trump-arch-washington-dc-america-250-00708590.

[3] https://www.washingtonpost.com/politics/2026/01/31/trump-arch-memorial-circle/.

[4] https://truthsocial.com/@realDonaldTrump/posts/115945478685595236.

that the larger design would be selected, he otherwise "sidestepped questions about the arch's height." *Id.*

On January 30, the White House released a document titled *Fact Sheet: President Donald J. Trump Celebrates American Greatness with the Freedom 250 Grand Prix of Washington, D.C.*,[5] which Plaintiffs cite repeatedly in their Complaint, Compl. ¶¶ 2, 29, 36. As the title suggests, the fact sheet focuses on the President's executive order "launching the Freedom 250 Grand Prix of Washington, D.C. – the first ever INDYCAR street race in the Nation's capital, to be held near the National Mall in honor of America's 250th birthday." *Id.* The final four bullet points in the fact sheet describe other ways the President aims to "give America's founding in 1776 the incredible anniversary it truly deserves." *Id.* The final bullet point states that the President had "announced plans for a new Independence Arch in Washington, D.C. to coincide with the 250th anniversary." *Id.* Unlike the Freedom 250 Grand Prix, the fact sheet does not identify an executive order directing construction of an arch. *Id.*

A CNN article also cited by Plaintiffs, Compl. ¶ 38, claims the President might "sign an executive order" for construction of an arch, but the project will "likely hit [other] legal hurdles before it can proceed." Betsy Klein et al., *Trump forges ahead with plans for 250-foot arch despite concerns on the ground and in the air*, CNN (Feb. 10, 2026) (hereinafter "Klein et al.").[6] White House officials reportedly stated that a "refined" version of the arch design "will be presented for approval to a pair of key commissions, the National Capital Planning Commission and the Commission on Fine Arts." *Id.* Any project may then face "more challenging reviews

---

[5] https://www.whitehouse.gov/fact-sheets/2026/01/fact-sheet-president-donald-j-trump-celebrates-american-greatness-with-the-freedom-250-grand-prix-of-washington-d-c/.

[6] https://www.cnn.com/2026/02/10/politics/independence-arch-dc-concerns-vis.

that require public input, including under the National Environmental Policy Act and the National Historic Preservation Act," during which "stakeholders are expected to be consulted, including Arlington National Cemetery, the National Park Service and the DC State Historic Preservation Office." *Id.*

Defendant National Park Service (NPS) likewise describes the arch project as in planning stages. As Plaintiffs allege, Memorial Circle is located on land administered by NPS. Compl. ¶ 43. "The proposal for construction of an Arch is in the conceptual phase." Decl. of Frank Lands ¶ 15 (hereinafter "Lands Decl."). "If the potential project moves beyond the conceptual stage, NPS will comply with all applicable laws and regulations including, but not limited to, the National Environmental Policy Act ("NEPA"), Section 106 of the National Historic Preservation Act ("NHPA"), Section 7 of the Endangered Species Act ("ESA"), Federal Aviation Administration ("FAA") regulations, and any other applicable laws and regulations, prior to initiating construction of an Arch or authorizing the initiation of such activities." *Id.* ¶ 7. But NPS has not yet "completed its decision-making process" on arch construction. *Id.* ¶ 15.

## II.    Procedural Background

Although no final decision related to an arch on Memorial Circle has yet occurred, Plaintiffs decided to challenge this inchoate project on February 19, 2026. Compl. p. 19. Plaintiffs' first claim asserts that Defendants' "construction of the Arch without congressional approval and without satisfaction of procedural prerequisites" constitutes "executive action that is ultra vires and in excess of legal authority." *Id.* ¶¶ 52, 57. The Complaint alleges that Defendants must satisfy the Commemorative Works Act, 40 U.S.C. § 8106, NEPA, and Section 106 of the NHPA before construction may begin. *Id.* ¶¶ 53, 55. Plaintiffs' second claim asserts that "the President's directive to plan and construct an arch on Memorial Circle by July 4, 2026,

without congressional authorization . . . and without complying with the numerous statutory requirements . . . violates the Take Care Clause." *Id.* ¶ 64.

On February 27, 2026, Plaintiffs moved to enjoin Defendants "from taking any steps to construct or to direct or facilitate construction of a commemorative arch in Memorial Circle absent congressional authorization and compliance with all other statutory and regulatory requirements for such construction." Pls.' Mot. for a Prelim. Inj. 1, Dkt. 7. Plaintiffs do not identify an event that precipitated this request for emergency relief aside from their belief that construction will "begin imminently so that the arch can be completed by July 4 of this year." *Id.*

## III.    Legal Background

### A. Arlington Memorial Bridge Commission

Congress created the Arlington Memorial Bridge Commission (Commission) to report "to Congress a suitable design for a Memorial Bridge across the Potomac River." Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913).[7]  The Commission reported its design in 1924, proposing designs not only for the bridge, but also for Columbia Island at the bridge's west end.[8]  And Congress authorized construction to proceed "in accordance with the design" in the Commission Report, while empowering the Commission to make design changes "as in its discretion may be found to be necessary or advisable." Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925).

---

[7] The Commission consists of "the President of the United States, the President of the Senate, the Speaker of the House of Representatives, and the chairman of the Committees on Public Buildings and Grounds of the Senate and House of Representatives."  37 Stat. at 855.

[8] Report of the Arlington Memorial Bridge Commission. Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

The design Congress approved called for the "development of Columbia Island as a park," including "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Commission Report 40–41. "The columns are 166 feet high or practically of the same height as the Colonne de Juillet in Paris." *Id.* at 41.

But the tall columns that Congress approved have not yet been built, as the Commission acceded to countervailing forces.  Aviation interests expressed concern that "the proposed erection of two columns, each 200 feet high," would create safety risks for planes landing at Washington-Hoover airport. *Washington Post*, Conference Is Set on Island Columns, September 30, 1931. And they petitioned President Hoover, who was then chairman of the Arlington Memorial Bridge Commission, to block the project. *Washington Post*, Fliers Enter Fight on Island Columns, Nov. 28, 1931; *Washington Post*, Bridge Pillar Fight Will Go to Hoover, Dec. 2, 1931. The architect of the Arlington Memorial Bridge, William Kendall, "felt that the columns were absolutely necessary to his design and even went so far as to write President Hoover (who had asked that the columns be omitted) giving his arguments for keeping them, including a suggestion that the airport be moved if interference with aircraft was really a problem." Sue A. Kohler, The Commission of Fine Arts: A Brief History 1910–1995, 26 (1996). But Kendall's appeal to President Hoover was unsuccessful. *Id.*

After the Commission decided against the columns in December 1931, *id.*, Washington-Hoover Airport closed in 1941, being replaced by Washington National Airport (which is now Ronald Reagan Washington National Airport), *Washington Post*, Washington Airport, World's Finest, Starts Operation Tomorrow (June 15, 1941). And the United States Department of War purchased the land once occupied by Washington-Hoover Airport to build the Pentagon. *See Washington Post*, Million-Dollar Check Closes Airport Deal (Sept. 20, 1941).

Although the Commission decided against building the columns in 1931, neither the underlying Congressional authorization to build the columns—nor the discretion to modify column design—have expired. During the New Deal-era reorganization of government, President Franklin Delano Roosevelt transferred the Commission's functions to the Office of National Parks, Buildings, and Reservations in the Department of the Interior. 5 U.S.C. §§ 124–132 (1934); Executive Order 6166 § 2. And Congress renamed that office as the National Park Service. Department of the Interior Appropriations Act, Pub. L. No. 73-109, ch. 38, 48 Stat. 362, 389 (1934).

**B.  Commemorative Works Act**

In 1986, Congress approved the Commemorative Works Act, which sets forth specific procedures for building commemorative works in certain areas of the District of Columbia. Pub. L. No. 99-652, 100 Stat. 3650 (1986), codified at 40 U.S.C. ch. 89.  It applies to commemorative works "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history, except that the term does not include any such item which is located within the interior of a structure or a structure which is primarily used for other purposes."  40 U.S.C. § 8902(a)(1). The Act "does not apply to commemorative works authorized by a law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3654, codified at 40 U.S.C. § 8902(b).

## STANDARD OF REVIEW

A preliminary injunction is "an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). To obtain a preliminary injunction, the moving party must make a "clear showing": (1) that it is "likely to succeed on the merits" of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) "that the balance of equities tips in [its'] favor"; and (4) that the proposed "injunction is in the public interest."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-22 (2008). "The last two factors merge

when the government is a party." *Harris Cnty. Texas v. Kennedy*, 786 F. Supp. 3d 194, 203

(D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

<u>**ARGUMENT**</u>

**I.    Plaintiffs Have Failed to Establish Irreparable Harm.**

Plaintiffs have failed to prove a likelihood of imminent, irreparable harm. The "standard

for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*,

236 F. Supp. 3d 332, 336 (D.D.C. 2017). To satisfy this "threshold requirement in granting

temporary injunctive relief," a plaintiff's alleged injury "must be both certain and great, actual

and not theoretical, beyond remediation, and of such imminence that there is a clear and present

need for equitable relief." *Musk*, 769 F. Supp. 3d at 5 (internal quotations and citations omitted).

"The possibility of irreparable harm is not enough." *Id.* (internal quotation and citation omitted).

Rather, plaintiffs must provide "some evidence of irreparable harm" in the form of "proof

indicating that the harm is certain to occur in the near future." *Fisheries Survival Fund*, 236 F.

Supp. 3d at 336 (D.D.C. 2017) (internal quotation and citation omitted).

In *New Mexico v. Musk*, this Court applied these principles to deny a request for

temporary injunctive relief that was similarly based on the possibility of future actions. 769 F.

Supp. 3d at 5. The Court pointed out the plaintiffs' declaration as "replete with attestations that *if*

Musk and DOGE Defendants cancel, pause, or significantly reduce federal funding or eliminate

federal-state contracts, Plaintiff States will suffer extreme financial and programmatic harm." *Id.*

Because "the 'possibility' that Defendants *may* take actions that irreparably harm Plaintiffs 'is

not enough,'" the Court denied the motion. *Id.* at 6 (quoting *Church v. Biden*, 573 F. Supp. 3d

118, 138 (D.D.C. 2021)). Plaintiffs' reliance there on "widespread media reports that DOGE has

taken or will soon take certain actions" could not "substitute for 'specific facts in an affidavit or

a verified complaint' that 'clearly show that immediate and irreparable injury, loss, or damage will result.'" *Id.* (quoting Fed. R. Civ. P. 65(b)(1)(A)).

Plaintiffs' request for emergency relief here suffers from the same defects as the motion in *Musk*. Plaintiffs' proffered declarations speak only to the harm that Plaintiffs might suffer "if" an arch were built in Memorial Circle. Lemmon Decl. ¶ 8 ("If constructed without congressional authorization . . ."); Byrnes Decl. ¶¶ 11–13 ("If built without congressional approval and without following the procedures set out by statute and regulation . . ."); Gundersen Decl. ¶ 9 ("If the arch is built as planned . . ."); Loth Decl. ¶¶ 8, 10 ("if the arch is built"). But the declarations offer no valid evidence that a final decision to build an arch has occurred, much less evidence that NPS has taken any steps to carry out the President's wishes without regard to statutory requirements. Lemmon Decl. ¶ 2; Byrnes Decl. ¶ 10; Gundersen Decl. ¶ 8; *see also* Loth Decl. ¶¶ 8, 9.

Instead, Plaintiffs rely on news reports and social media posts to support their assertion that the President "intends for construction of the arch to be completed by July 4" and "has made clear that construction will begin imminently." Pls.' Br. 20, Dkt. 7-1. But the Court cannot take judicial notice of contemporary news articles "for the truth of the statements asserted therein." *Musk*, 769 F. Supp. 3d at 6. Because Plaintiffs have no evidence about arch plans beyond these media reports, the Court should deny their motion for lack of irreparable harm on this ground alone.

Even were the Court to consider these articles for the truth of the matter asserted therein, these articles merely highlight the incipient nature of the arch project. The news articles advanced by Plaintiffs state that there is no final decision on design or size for the arch, *see* Diamond et al. (describing different sized models and noting White House statements that "the

arch design continues to be refined"), or date certain by which construction would begin, *see* Klein et al. (recognizing "legal hurdles before [construction of an arch] can proceed"). Plaintiffs' most recent article observes that the President may "sign an executive order" for construction of an arch, *id.*, but Plaintiffs identify no such order. There is likewise no evidence to support Plaintiffs' claim that a 250-foot-arch will be fully constructed by July 4, 2026, as the White House fact sheet cited by Plaintiffs merely states that the President has "announced plans . . . to coincide with the 250th anniversary." *See supra* note 5. This general statement hardly indicates when construction will begin or end.

In contrast to Plaintiffs' unfounded speculation, the declaration of NPS Deputy Director for Operations Frank Lands establishes that building an arch at Memorial Circle is still a "potential project" at a "conceptual phase" of development. Lands Decl. ¶ 15. The agency is yet to complete the multiple steps required for construction to begin, including coordination with partner agencies, as well as review under NEPA, section 106 of the NHPA, and other statutory and regulatory requirements. *Id.* at ¶¶ 7–15. "It remains 'uncertain' when and how" NPS will complete these steps. *Musk*, 769 F. Supp. 3d at 6 (quoting *Church*, 573 F. Supp. 3d at 141). The arch is thus far from a "fait accompli." *Contra* Pls.' Br. 2.

This means that the irreparable harm that Plaintiffs fear is far from imminent. Plaintiffs assert injuries that would result only from *completion* (or at least substantial construction) of a 250-foot arch. *Id.* at 20 (describing the concern that the shadow from an arch would cause a "dignitary affront" that would require reconsidering burial at Arlington National Cemetery); *id.* at 20–21 (describing declarants' belief that an arch would obstruct lines of site and thus negatively impact their aesthetic enjoyment of the area around Memorial Circle). Given the significant amount of time it would take to design, plan, and build such a structure, Plaintiffs

10

cannot establish imminent injury when the project is still in an early planning stage and construction has not begun. *See Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288 (D.D.C. 2017) (plaintiffs failed to show imminent, irreparable harm to their aesthetic enjoyment of historic landscape from building 295-foot-tall electrical towers where the first stage of project involved "constructing the underwater foundations which will extend seven feet above the water").

The Court should accordingly deny Plaintiffs' premature request for emergency relief.

## II.    Plaintiffs Are Unlikely to Succeed on the Merits.

Plaintiffs have also failed to prove likelihood of success on the merits.  To establish the requisite "substantial likelihood of success on the merits," Plaintiffs "must show a likelihood of success" on both the "establishment of jurisdiction" and their "substantive theories" of the case. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation modified). As explained below, Plaintiffs have failed to establish either of these required components.

### A.   Plaintiffs have failed to establish the Court has, much less should exercise, jurisdiction over this dispute.

As a threshold matter, Plaintiffs' claims are unripe because their allegations about the arch concern incipient discussions, rather than final plans. Plaintiffs have not identified any final decision as to arch design, subject, construction timeline, funding sources, or legal justification. Instead, they merely provide media reports discussing the possibility that an arch might be built. That is no basis for Article III jurisdiction.

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). Ripeness has two facets: constitutional, which asks whether a plaintiff has alleged an injury sufficient to invoke subject-matter jurisdiction, and prudential, which "concerns the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Giron v. Zeytuna, Inc*., 597 F. Supp. 3d 29, 54 (D.D.C. 2022) (citation modified).

"Constitutional ripeness is subsumed into the Article III requirement of standing, which requires a petitioner to allege inter alia an injury-in-fact that is 'imminent' or 'certainly impending.'" *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (citation omitted). Because all of Plaintiffs' alleged injuries are tied to arch *construction*, those injuries are neither imminent nor certainly impending, given the incipient nature of the arch project. Although Plaintiffs feign imminence by claiming—without citation—that the "President has asserted on multiple occasions that he intends for the arch to be completed by July 4," Pls.' Br. 2, they provide no evidence indicating that Defendants have adopted this timeline, much less that the timeline is even realistic. Instead, their declarants testify only to contingent injuries "if the arch is built." *E.g.*, Loth Decl. ¶ 8; *see also supra* 9. Because such contingent injuries are neither imminent nor certainly impending, as required to establish Article III jurisdiction, this case is constitutionally unripe.

Further, Plaintiffs' asserted aesthetic harms fall short of the concrete and particularized injuries required by Article III. Their anticipated subjective disagreement with the arch's symbolism, *e.g.*, Lemmon Decl. ¶ 12 ("the President's planned arch will be a continuous visual

affront" to the principle that "we are a Nation of laws"); *id.* ¶ 8 (expecting the arch to "interrupt the symbolic connection between the Lincoln Memorial and Arlington National Cemetery"); *id.* (suggesting the arch will "violate[]" the values [he] ha[s] held dear throughout [his] life and career"); Byrnes Decl. ¶ 11 ("I am also concerned about the arch's symbolism."); Gundersen Decl. ¶ 8 ("I view the arch as . . . a vainglorious monument . . ."); Loth Decl. ¶ 9 ("I view the planned arch as an incompatible distraction"), is the sort of "general legal, moral, ideological, or policy objection to a particular government action" that "Article III standing screens out." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). This "'offended observer' theory of standing has no basis in law," *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80 (2019) (Gorsuch, J., concurring), because "[t]he presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements," *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

Even if the Court had jurisdiction over this dispute, it should still decline to enter this amorphous dispute on prudential grounds. "[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). In evaluating ripeness, courts look to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Garner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under the fitness prong of this test, courts must consider "[1] whether [the claim] is 'purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final.'" *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted). Under the hardship prong, courts must ask whether the challenged administrative action is likely

to have a direct and immediate effect on the "primary conduct" of the plaintiff. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967). Here, Plaintiffs fail to establish prudential ripeness under both the fitness and hardship prongs of the test.

Plaintiffs' claims are not fit for review. Their claim is not purely legal, as it depends upon not only specifics about arch design, but also upon the unfounded assumption that construction will begin without further reviews and approvals. Waiting for those further decisions would provide a more concrete setting for judicial review. *See Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) ("[W]hen an agency decision may never have 'its effects felt in a concrete way by the challenging parties,' the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well." (quoting *Abbott Labs*, 387 U.S. at 148–49)).

Unwilling to let these deliberative processes play out, Plaintiffs ask the Court to resolve a hypothetical dispute. Because they have no evidence establishing that Defendants' arch planning is sufficiently final to cause an imminent or certainly impending injury, the Court should reject their claims as unripe. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) ("[T]he usually unspoken element of the rationale underlying the ripeness doctrine: [i]f we do not decide it now, we may never need to.").

As to the hardship prong, the uncertainty surrounding whether the challenged project will even occur likewise eliminates any hardship to Plaintiffs. They suffer no hardship from deferred judicial review, as they can proceed with claims challenging any final agency action with which they disagree, if and when NPS authorizes a final project to proceed. But delayed review is, by definition, no hardship in and of itself. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272–73 (D.D.C. 2015) ("If the only hardship a plaintiff will endure as a

14

result of delaying consideration of the disputed issue is the burden of having to engage in another

suit, this will not suffice to overcome an agency's ripeness challenge." (citation modified)).

In sum, Plaintiffs' claims are constitutionally and prudentially unripe, given the lack of

an actual or imminent injury, the fact that the issues would benefit from further factual

development before undergoing judicial review, and the lack of harm to Plaintiffs from

withholding review until the factual circumstances surrounding the hypothetical project are more

developed.

### B.  Plaintiffs have failed to establish likelihood of success on their *ultra vires* claim.

Plaintiffs' first bring an *ultra vires* claim, which "is essentially a Hail Mary pass—and in

court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S.

665, 681–82 (2025) (*NRC*) (citation omitted).  That claim is "unavailable if, as is usually the

case, a statutory review scheme provides aggrieved persons with a meaningful and adequate

opportunity for judicial review." *Id.* Here, Plaintiffs' *ultra vires* claim attempts to circumvent the

statutory limitations on judicial review—*viz.*, the requirement of waiting for final action from

NPS.

Defendant NPS is indisputably an agency within the Department of the Interior, whose

actions are reviewable under the Administrative Procedure Act (APA). But NPS has not yet

made a final decision on arch construction. Lands Decl. ¶ 15. Should NPS finally decide to

construct the arch or authorize construction of the arch, its decision would be subject to judicial

review under the APA, which would provide "a meaningful and adequate opportunity for judicial

review." *NRC*, 605 U.S. at 681. But Plaintiffs cannot seek judicial review before NPS has taken

final action, without circumventing the APA's statutory limits. *See Glob. Health Council v.

Trump*, 153 F.4th 1, 17 n.14 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL

2709437 (D.C. Cir. 2025).

Plaintiffs' *ultra vires* claim nonetheless asks the Court to step in before any final decision about the arch has been made and issue injunctions not only against NPS, but also against non-agencies like the President and White House Domestic Policy Council Director Vince Haley. The "President is not an 'agency' under" the APA. *Dalton v. Specter*, 511 U.S. 462, 476 (1994). Neither are staff components of the Executive Office of the President (EOP) that lack "substantial independent authority" and exist merely to assist the President in carrying out his responsibilities. *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971); *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 566 F.3d 219, 222-23 (D.C. Cir. 2009); *see also Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 107 (D.D.C. 2020) (calling "substantial independent authority" the "touchstone"). Because Director Haley provides advice to the President and otherwise lacks "meaningful non-advisory authority," he is not an agency under the APA.  *See, e.g.*, *Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (National Security Council lacks "meaningful non-advisory authority" and is therefore not an "agency"); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042–44 (D.C. Cir. 1985) (Council of Economic Advisors is not an agency because its "statutory duties" are "directed at providing … advice and assistance to the President"). Plaintiffs' *ultra vires* claim thus cannot proceed without circumventing the APA's statutory limits confining review to agency actions.

Plaintiffs' *ultra vires* claim also fails for the independent reason that they cannot show that NPS "has taken action entirely in excess of its delegated powers." *NRC*, 605 U.S. at 681 (citation modified). The thrust of Plaintiffs' case is their misinformed argument that "Defendants' construction of the planned arch in Memorial Circle has no foundation in a grant of statutory authority." Pls.' Br. 15. As explained *supra* 5–7, Congress has already authorized the construction of two large columns surmounted by statues on Columbia Island. And just as

Congress delegated discretion sufficient to forego constructing these columns for a time, *see supra* 5–7, it also delegated discretion to revise column design, including by combining the two columns surmounted by statutes into one arch surmounted by a statue, as depicted in some of the renderings cited by Plaintiffs.[9]

Nor have Plaintiffs established that construction of an arch would be "contrary to a *specific prohibition* in a statute," as required to pursue an *ultra vires* claim. *NRC*, 605 U.S. at 681 (citation modified). Although Plaintiffs invoke both the Commemorative Works Act (CWA) and 40 U.S.C. § 8106, neither statute specifically prohibits arch construction.

The CWA "does not apply to commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b). Because Congress authorized construction of large structures on Columbia Island in 1925, along with the authority to modify their design, the CWA would not apply to the hypothetical arch project Plaintiffs challenge.

In addition to this chronological problem, Plaintiffs have failed to establish that the arch project would otherwise be subject to the CWA's substantive restrictions. The CWA governs construction of "commemorative works," defined as "any … monument … or other structure or landscape feature … designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." 40 U.S.C. § 8902(a)(1). Plaintiffs' speculative Complaint discusses a broad and varied range of potential arch subjects:

---

[9] Should that discretion ultimately be so exercised, that discretionary determination would not be subject to judicial review. "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts." *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) (quoting *Martin v. Mott*, 25 U.S. 19, 31–32 (1827)).

"triumph[]," Compl. ¶ 30; "the Nation's 250th anniversary," *id.* ¶ 29,[10] "President Trump," *id.* ¶ 31; size, *id.* ¶ 32, and American greatness, *id.* ¶ 2 & n.2. Their Brief speculates about several additional reasons why an arch is under consideration: architectural vision, Pls.' Br. 9–10 ("something is supposed to be here" (citation omitted)); and Parisian inspiration, *id.* at 10. Because many of those potential motivations for an arch lie outside the CWA's definition of "commemorative works," Plaintiffs have failed to establish that the arch will likely fall under the CWA's restrictions.

Further, § 8106—if applicable at all—merely requires "express authority of Congress" to build structures. That authority has already been given to build large structures on Columbia Island. And even though Congress has never extended § 8106 to the NPS,[11] the Administration could request Congressional appropriations for the Arch. If such appropriations were enacted, they would provide additional "express authority" to undertake construction. Consequently, the potential arch is already in full compliance with § 8106 and that status could be reinforced in the future.

In sum, Plaintiffs' *ultra vires* claim fails for three independent reasons. They are unlawfully attempting to circumvent statutory limits confining judicial review to final agency actions; they have not established that NPS would be acting entirely in excess of its delegated

---

[10] The *amici* also speculate that the arch will be "'designed to perpetuate in a permanent manner' the Nation's 250th anniversary." Br. of Legislators 9, Dkt. 8-1.

[11] No court has ever held that § 8106 applies to NPS. NPS construction appropriations, which have been used for decades to construct NPS buildings and structures in the District, are generally lump sum appropriations. And those lump sum appropriations have been used to fund construction of NPS buildings or structures in the District, as authorized by the NPS Organic Act, without further specific approvals from Congress. This indicates that—if it applies to NPS at all—§ 8106 does not require approval for a particular structure rather than authorization to build generally on a piece of land. Defendants are not aware of any public building on federal land in D.C. ever being challenged, let alone enjoined, under § 8106.

authority should it authorize arch construction; and they have not established that arch construction would be contrary to a specific statutory prohibition.

### C. Plaintiffs have failed to establish likelihood of success on their constitutional claim.

Plaintiffs next press a constitutional claim invoking the President's constitutional duty to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. This claim likewise fails for two reasons explained below.

As an initial matter, Plaintiffs have failed to provide a single case where courts assumed authority to review the President's "purely executive and political" duty "to see that the laws are faithfully executed." *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). Given the unique nature of the President's Take Care Clause authority, any "attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshal, as 'an absurd and excessive extravagance.'" *Id.* Thus, "in the 150 years since *Johnson* was decided, no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials." *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022); *accord Center for Biological Diversity v. McAleenan*, 404 F.Supp.3d 218, 245–250 (D.D.C. 2019) ("it is not at all clear that a claim under the Take Care Clause presents a justiciable claim for this Court's resolution" (quotation omitted)).

Even were a claim under the Take Care Clause an appropriate subject of judicial review, Plaintiffs' second claim would still fail because it is ultimately a statutory claim, not a constitutional one. The Supreme Court has rejected the argument that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). In limiting

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to circumstances "involv[ing] the conceded *absence* of *any* statutory authority," *Dalton*, 511 U.S. at 473, the Supreme Court precluded the assertion of "claim[s] that the President acted in excess of such authority" as constitutional claims that could be pursued without a statutory cause of action, *id.*; *accord Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. 2025) ("*Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review"). Because Defendants have never conceded the absence of any statutory authority—and instead provide on-point statutory authority for the construction of large structures on Columbia Island—Plaintiffs' claim involves only statutory, not constitutional, authority. As such, Plaintiffs cannot pursue their claim without a statutory cause of action. *Glob. Health Council*, 153 F.4th at 16.

Although Plaintiffs may disagree with the President's architectural tastes, the Constitution does not empower either Plaintiffs or the Court with discretion over those decisions. Nor has Congress delegated the discretion to modify column design to Plaintiffs or the Court. Just as President Hoover wielded that discretion to forego, for a time, constructing the congressionally approved columns on Columbia Island, *see supra* 5–7, President Trump has the discretion to direct NPS to reinvigorate that design. Plaintiffs' "constitutional" claim thus also fails.

## III.    The Balance of Equities and Public Interest Do Not Favor Plaintiffs.

Because Plaintiffs have not demonstrated likelihood of success on the merits or imminent irreparable injury, the Court need not consider the final two factors of the *Winters* standard. However, Plaintiffs' decision to prematurely move for emergency relief tilts the balance of equities and public interest heavily against an injunction.

In assessing these factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest is the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Although Plaintiffs appeal to the public interest in *ending* an unlawful government practice, Pls.' Br. 22, there is no public interest in premature judicial intervention to ensure government compliance with the law before the government has acted. To the contrary, "[v]indication of the public interest in governmental observance of the Constitution and the law is the function of Congress and the President, not the judiciary." *Page v. Shelby*, 995 F. Supp. 23, 27 (D.D.C.), *aff'd*, 172 F.3d 920 (D.C. Cir. 1998) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992)). "The public interest will not be served by injunctive relief" against hypothetical conduct because "[p]roviding advisory opinions . . . is not a function which the federal courts are competent or authorized to perform." *City of Baltimore v. Brock*, No. CIV.A. 85-3115, 1985 WL 6023, at *1 (D.D.C. Oct. 11, 1985). Accordingly, courts "cannot issue an obey-the-law injunction," especially in the absence of "evidence that could satisfy the imminence requirement" establishing certain illegal conduct. *Reid v. Buttigieg*, No. CV 20-1262 (TJK), 2023 WL 2184549, at *9 (D.D.C. Feb. 23, 2023). Here, as explained above, Plaintiffs face no imminent harm because there has been no approval to build an arch on Memorial Circle and construction has not begun.

In contrast, Defendants would suffer serious harm if the Court were to grant the sweeping relief Plaintiffs request. The government is always "likely to suffer irreparable harm" when

courts enter "injunctions that likely exceed the authority conferred" to them. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025). In this case, Plaintiffs seek an injunction well before their fears have ripened into a controversy that the Court could constitutionally resolve. *See supra* 11–15. Imposing that "injunction based on an unripe claim and the speculative threat of injury will thwart the public interest in enforcement of a law enacted by the people's elected officials." *Parrish v. Dayton*, No. CIV. 13-1348 MJD/AJB, 2013 WL 4536260, at *1 (D. Minn. Aug. 27, 2013). Because that premature injunction would stymie the "energetic executive" deemed essential by the Framers, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020), it is not in the public interest.

Worse still, Plaintiffs ask the Court to enjoin Defendants not only from structure construction, but also "from taking any steps to . . . *facilitate* construction of any structure in Memorial Circle."  Prop. Ord., Dkt. 7-6 (emphasis added). This vague and sweeping relief could restrict Defendants' ability even to undertake internal planning related to the arch project, including the very processes that Plaintiffs say are required by law. Such a vague injunction violates the specificity requirements of Rule 65. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 50-53 (2d Cir.1996) (vacating as vague an injunction requiring the appellant to "take all other reasonably needful actions to facilitate" a general result).

Defendants have demonstrated that there is existing statutory authorization for construction of structures on Columbia Island, *see supra* 5–7, and that NPS will comply with all other applicable legal requirements before any construction begins, Lands Decl. ¶ 15. The Court should therefore decline to preemptively limit Defendants' authority to plan a project intended to celebrate the nation's 250th anniversary.

## **CONCLUSION**

This case is not about the "unchecked proliferation of monuments" by "unilateral" executive decisions, as *amici curiae* claim. Br. of Legislators 3, Dkt. 8-1. Because Congress has already authorized the construction of large structures on Columbia Island, this case instead presents a narrow question about whether that congressionally approved design may be completed. Because there is not yet any final plan for how to complete that design, the Court should decline to interject itself in preliminary planning activities and deny Plaintiffs' motion for a preliminary injunction.


DATE: March 10, 2026                    Respectfully submitted,

                                        ADAM R.F. GUSTAFSON
                                        Principal Deputy Assistant Attorney General

                                        BRADLEY CRAIGMYLE
                                        Deputy Assistant Attorney General

                                         */s/ Michael S. Sawyer*
                                        MICHAEL S. SAWYER, Senior Attorney
                                        DANIEL LUECKE, Trial Attorney
                                        Environment and Natural Resources Division
                                        P.O. Box 7611
                                        Washington, D.C. 20044-7611
                                        Telephone: 202-353-5134
                                        E-mail: michael.sawyer@usdoj.gov
                                                daniel.luecke@usdoj.gov

                                        *Counsel for Defendants*