**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| MICHAEL LEMMON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 26-cv-544 (TSC) |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Nicolas A. Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

March 13, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

ARGUMENT.................................................................................................................. 3

I.    This Court has jurisdiction................................................................................... 3

    A.  Plaintiffs have standing.............................................................................. 3

    B.  This case is ripe......................................................................................... 8

II.   Plaintiffs are likely to succeed on the merits. ..................................................... 11

    A.  Plaintiffs are likely to succeed on their ultra vires claim............................ 11

    B.  Plaintiffs are likely to succeed on their constitutional claim. ..................... 16

III.  Plaintiffs have shown a likelihood of imminent, irreparable injury. ................... 18

IV.   The balance of the equities and the public interest favor an injunction............... 19

CONCLUSION.............................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*American Petroleum Institute v. Environmental Protection Agency*,
    683 F.3d 382 (D.C. Cir. 2012) ............................................................ 8, 9, 10

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
    146 F.4th 1144 (D.C. Cir. 2025) ............................................................... 4

*Collins v. Yellen*,
    594 U.S. 220 (2021) ............................................................................... 16

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................................... 17

*Fowler v. Guerin*,
    899 F.3d 1112 (9th Cir. 2018) .................................................................. 9

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
    561 U.S. 477 (2010) ............................................................................... 16

*Friends of Gateway v. Slater*,
    257 F.3d 74 (2d Cir. 2001) ....................................................................... 5

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ................................................................... 17

*Las Americas Immigrant Advocacy Center v. Trump*,
    475 F. Supp. 3d 1194 (D. Or. 2020) ....................................................... 16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................. 3

*Mata v. Lynch*,
    576 U.S. 143 (2015) ................................................................................. 9

*Medellín v. Texas*,
    552 U.S. 491 (2008) ............................................................................... 17

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ................................................................................. 16

*National Federation of Independent Business v. Sebelius*,
    567 U.S. 519 (2012) ............................................................................... 18

*National Trust for Historic Preservation in the United States v. National Park Service*,
    — F. Supp. 3d —, 2026 WL 533420 (D.D.C. Feb. 26, 2026) ........................... 5, 6, 12

*New Mexico v. Musk*,
769 F. Supp. 3d 1 (D.D.C. 2025) ................................................................................ 6, 7

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025) ......................................................................................................... 12

*Revitalizing Auto Communities Environmental Response Trust v. National Grid USA*,
10 F.4th 87 (2d Cir. 2021) ............................................................................................ 9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ................................................................................................. 3, 8, 9

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ...................................................................................... 16

*Texas v. United States*,
523 U.S. 296 (1998) ......................................................................................................... 8

*Trump v. New York*,
592 U.S. 125 (2020) ......................................................................................................... 8

*Warth v. Seldin*,
422 U.S. 490 (1975) ......................................................................................................... 3

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................................... 16, 17, 18

**Statutes**

40 U.S.C. § 8106 ................................................................................................................ 10

40 U.S.C. § 8901(4)(A) ..................................................................................................... 14

40 U.S.C. § 8902(a)(1) ....................................................................................................... 15

40 U.S.C. § 8902(b) ........................................................................................................... 14

40 U.S.C. § 8903(a)(1) ....................................................................................................... 10

Act of March 4, 1913, Pub. L. No. 62-432, 37 Stat. 866 ................................................ 13

Act of February 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 ..................................... 12, 13

**Other Authorities**

Bradley Akin, U.S. Bureau of Labor Statistics, *Arlington Memorial Bridge Spans the Decades as a Study in Long-Term Price Change* (2017) .................................................... 13, 14

Congressional Research Service, *Legal Requirements for Constructing a Memorial Arch in Memorial Circle* (Jan. 23, 2026)................................................................................... 11, 15

Dan Diamond et al., *Trump Wants to Build a 250-foot-tall Arch, Dwarfing the Lincoln Memorial*, Washington Post (Jan. 31, 2026)........................................................... 4, 18

Executive Order 6166 (June 10, 1933) ..................................................................... 13

Jacob R. Straus, Congressional Research Service, *Commemorative Works in the District of Columbia: Background and Practice* (updated May 8, 2023).................................... 15

National Capital Planning Commission, *Arlington Memorial Bridge Rehabilitation* (May 4, 2018)................................................................................................................ 13

National Park Service, *Historic American Engineering Record: Arlington Memorial Bridge*, HAER No. DC-7 (1988) ....................................................................................... 13, 14

Report of the Arlington Memorial Bridge Commission, Senate Doc. No. 95, 68th Cong., 1st Session (Apr. 21, 1924)....................................................................................... 13

Robert Mackey, *Trump Says Building DC Triumphal Arch Is Domestic Policy Chief's "Primary Thing,"* The Guardian (Dec. 14, 2025) ....................................................... 6

Sophia Cai, *Trump Says Construction of the "Triumphal Arch" to Begin in "2 Months,"* Politico (Dec. 31, 2025) ................................................................................... 4, 6, 18

White House, *Celebrating America's 250th Birthday* (Jan. 29, 2025)......................... 4

White House, *Fact Sheet: President Donald J. Trump Celebrates American Greatness with the Freedom 250 Grand Prix of Washington, D.C.* (Jan. 30, 2026) ................... 4, 7, 15, 18

**Rules**

Federal Rule of Evidence 801(d)(2)(A)......................................................................... 7

Federal Rule of Evidence 803(1) ................................................................................. 7

**Constitutional Provisions**

U.S. Const. art. II, § 3 ............................................................................................... 17

**INTRODUCTION**

Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gundersen, and Calder Loth seek to preliminarily enjoin Defendants President Donald J. Trump, Domestic Policy Council Director Vince Haley, the Executive Office of the President, and the National Park Service (NPS) from constructing a monumental arch in Memorial Circle without first obtaining congressional authorization. Plaintiffs are entitled to relief, and Defendants' contrary arguments are meritless.

As a threshold matter, this Court has jurisdiction. Defendants contend that Plaintiffs lack Article III standing because the injuries that Plaintiffs will suffer are insufficiently concrete and certain. Defendants, however, do not dispute that the arch will degrade Plaintiffs' aesthetic enjoyment of national landmarks that they visit regularly, and a long line of Supreme Court and D.C. Circuit precedent holds that aesthetic injuries of this sort are cognizable for standing purposes. Moreover, Defendants' characterization of these concrete harms as speculative contradicts the President's consistent statements—made repeatedly over the past several months—that an arch will be built, and soon. Notably, Defendants have not disavowed those remarks.

Defendants' Article III ripeness argument fails for the same reason as their standing arguments. Arguing that this Court should decline on prudential grounds to resolve this case despite having jurisdiction, Defendants give short shrift to the Court's obligation to decide cases that are properly before it. In any event, Defendants have identified no reason why further factual development is needed to equip this Court to resolve the legal issue at the heart of Plaintiffs' claims: whether Defendants may build an arch in Memorial Circle without congressional authorization.

Turning to that legal issue, Plaintiffs are likely to prevail on the merits. The Commemorative Works Act and 40 U.S.C. § 8106 require Congress to pass a law authorizing

1

construction before a commemorative structure may be built in Memorial Circle, and Defendants are acting ultra vires by proceeding without that authorization. Defendants contend that Plaintiffs cannot bring an ultra vires claim because the Administrative Procedure Act (APA) provides an avenue for them to challenge final agency action, but Defendants acknowledge that President Trump, Director Haley, and the Executive Office of the President are not subject to the APA, and that NPS has taken no final agency action. Meanwhile, Defendants' contention that a 1925 statute authorizing a commission that no longer exists to construct a bridge that was completed nearly a century ago provides authorization for their arch is absurd. If congressional authorization for one monument conferred authority to build limitless future monuments in the same vicinity, the monumental core of Washington, DC, would soon become crowded and chaotic—the very outcome that the Commemorative Works Act and 40 U.S.C. § 8106 were enacted to avoid.

The President's disregard for these statutes and their requirement of congressional authorization also violates his duty under the Take Care Clause. Defendants contend that the Clause is not privately enforceable, but they offer no reason why this constitutional provision, unlike others, should not be. And Defendants' argument that the President's violation of a statute can never amount to a constitutional violation distorts the case law on which they rely.

Finally, the remaining preliminary injunction factors weigh in Plaintiffs' favor. Defendants have stated that they intend for the arch to coincide with the 250th anniversary of the United States, which is just months away. Defendants have not disavowed this statement, and if construction is allowed to proceed while this lawsuit goes forward, Plaintiffs' injuries will be irreparable by the time the case reaches final judgment. The balance of hardships and the public interest also support preliminary relief. An injunction would leave Defendants free to celebrate the Nation's anniversary in any number of ways, while ensuring that the wisdom of erecting a permanent monument in the

2

middle of the capital's monumental core receives the studied congressional deliberation that the law requires.

## ARGUMENT

**I.      This Court has jurisdiction.**

### A.  Plaintiffs have standing.

Under Article III, a plaintiff invoking the jurisdiction of the federal courts must hold "a personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). A plaintiff thus must demonstrate that the defendant's challenged action has caused or will cause the plaintiff to suffer an "injury in fact" that is "concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Critically, "[a]n allegation of future injury may suffice" to establish standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

Plaintiffs here have made the requisite showing. Each has presented uncontroverted evidence that he regularly visits the landmarks around Memorial Circle, that he derives profound aesthetic and symbolic enjoyment from the existing lines of sight between these landmarks, and that the construction of an arch in Memorial Circle will irreparably degrade his aesthetic experience of the area. *See* ECF 7-2 (Lemmon Decl.) ¶¶ 6–9; ECF 7-3 (Byrnes Decl.) ¶¶ 8–13; ECF 7-4 (Gundersen Decl.) ¶¶ 6–9; ECF 7-5 (Loth Decl.) ¶¶ 5–10.

Further, Plaintiffs have demonstrated a substantial risk that the threatened harms will soon come to pass: The White House has announced that construction of the arch will "coincide with the 250th anniversary" of the United States on July 4, 2026. White House, *Fact Sheet: President Donald J. Trump Celebrates American Greatness with the Freedom 250 Grand Prix of*

*Washington, D.C.* (Jan. 30, 2026);[1] *see* White House, *Celebrating America's 250th Birthday* (Jan. 29, 2025) (identifying July 4, 2026, as "the 250th anniversary of American Independence").[2] The President has stated his plans for construction to begin in the first few months of this year. *See* Sophia Cai, *Trump Says Construction of the "Triumphal Arch" to Begin in "2 Months,"* Politico (Dec. 31, 2025).[3] The White House has reportedly retained an architect for the project. *See* Dan Diamond et al., *Trump Wants to Build a 250-foot-tall Arch, Dwarfing the Lincoln Memorial*, Wash. Post (Jan. 31, 2026).[4] And consistently since the President announced the arch in October 2025, he has identified Memorial Circle as its location. *See* ECF 7-1 (Pls. Memo.) at 9–11.

Defendants dispute whether Plaintiffs' imminent injuries are "concrete and particularized." ECF 12 (Defs. Opp.) at 12. Ample authority, however, establishes that harm to a plaintiff's personal aesthetic enjoyment of an environment that the plaintiff visits is a cognizable injury for purposes of Article III standing. *See* Pls. Memo. 21–22; *see also, e.g.*, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025) (finding standing based on aesthetic injury). Drawing on much of this same authority, a court in this District recently confirmed that it is "well-settled that the 'desire to use or observe' something, 'even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing,'" and held that a "longtime D.C. resident and scholar of history and historic preservation" who regularly visits the area around the White House had standing to challenge the construction of a ballroom there because it would "undermin[e] her enjoyment and appreciation of the grounds." *Nat'l Tr. for*

---

[1]      https://www.whitehouse.gov/fact-sheets/2026/01/fact-sheet-president-donald-j-trump-celebrates-american-greatness-with-the-freedom-250-grand-prix-of-washington-d-c.

[2] https://www.whitehouse.gov/presidential-actions/2025/01/celebrating-americas-250th-birthday.

[3] https://www.politico.com/news/2025/12/31/trump-arch-washington-dc-america-250-00708590.

[4] https://www.washingtonpost.com/politics/2026/01/31/trump-arch-memorial-circle.

4

*Historic Preservation in the U.S. v. NPS*, — F. Supp. 3d —, 2026 WL 533420, at \*4 (D.D.C. Feb. 26, 2026) (first alteration in original; quoting *Lujan*, 504 U.S. at 562–63).

Ignoring Plaintiffs' theory of injury and the case law that supports it, Defendants liken Plaintiffs to "offended observer[s]," Defs. Opp. 13 (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80 (2019) (Gorsuch, J., concurring)), and mischaracterize Plaintiffs' injuries as "subjective disagreement with the arch's symbolism," *id.* at 12. Plaintiffs, though, are not "mere bystander[s] who 'incidentally view[] something unpleasant.'" *Nat'l Tr.*, 2026 WL 533420, at \*5 (quoting *Envtl. Defense Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021)). Rather, they have "expressly articulate[d] [their] particularized connection to the land" around Memorial Circle, "describe[d] how [they] derive[] aesthetic value" from the area as it currently stands, and "explain[ed] that [their] future uses[] … and aesthetic enjoyment[] would be diminished by the President's" arch. *Id.* (internal quotation marks omitted). Defendants are correct that Plaintiffs' aesthetic enjoyment derives in part from the symbolic force of the existing configuration of monuments. *See* Lemmon Decl. ¶ 8; Byrnes Decl. ¶ 9; Gundersen Decl. ¶ 6; Loth Decl. ¶ 6. But their injury stems from the impairment that the arch will cause to their visits to an area that holds deep personal meaning, not from offense at the government's intended message. *Cf. Friends of Gateway v. Slater*, 257 F.3d 74, 78 (2d Cir. 2001) (holding that plaintiffs had standing to challenge the construction of an "eyesore" in a park that they "frequently and regularly use[d]").

Defendants also attempt to cast doubt on whether there is a substantial risk that Plaintiffs' anticipated injuries will actualize. Stating that "all of Plaintiffs' alleged injuries are tied to arch *construction*," Defendants cast those injuries as "contingent." Defs. Opp. 12. Tellingly, though, Defendants do not dispute that the President plans to construct an arch in Memorial Circle, as he has repeatedly stated. Defendants suggest that "the possibility that an arch might be built" is a

matter of "incipient discussions," *id.* at 11, and they cite to a declaration by an NPS official that describes the arch as a "potential project," *id.* at 10 (quoting ECF 12-1 (Lands Decl.) ¶ 15). But while *NPS* may be awaiting further direction, the NPS declaration casts no doubt on the *President's* plan to build the arch or on his professed intention to move forward with construction. *See* Pls. Memo. 9–12. Recent history shows that once the President has announced his intent to initiate a project, the risk that he will abruptly act on that intent is substantial. *See Nat'l Tr.*, 2026 WL 533420, at *1 (detailing how the President, "without advance notice," had the East Wing of the White House demolished less than three months after announcing an intent to "reconstruct[ ]" it).

Rather than dispute the President's plans, Defendants fault Plaintiffs for "rely[ing] on news reports and social media posts" as evidence that he harbors those plans. Defs. Opp. 9. The social media posts, however, either are from the President himself, *see* Pls. Memo. 9 & n.10; *id.* at 11 & n.16, or are video recordings of the President's remarks, *see id.* at 9 & n.8; ECF 1 (Compl.) ¶ 33 & n.16. Similarly, the news articles cited by Plaintiffs report statements made directly by the President or White House spokespeople. *See, e.g.*, Robert Mackey, *Trump Says Building DC Triumphal Arch Is Domestic Policy Chief's "Primary Thing,"* The Guardian (Dec. 14, 2025) (quoting President Trump as saying, "[w]e're building [the arch] by the Arlington Bridge, the Arlington cemetery, opposite the Lincoln Memorial");[5] Cai, *Construction to Begin*, *supra* note 3 (quoting President Trump as saying that construction would begin "sometime in the next two months").

This case is accordingly not like *New Mexico v. Musk*, 769 F. Supp. 3d 1 (D.D.C. 2025), *cited at* Defs. Opp. 8–9, where this Court declined to credit "the truth of the statements asserted" in "widespread media reports" that the Department of Government Efficiency "ha[d] taken or

---

[5] https://www.theguardian.com/us-news/2025/dec/14/trump-arch-washington-dc-policy-chief.

[would] soon take certain actions," 769 F. Supp. 3d at 6. Plaintiffs here do not ask this Court to credit third-party representations that the President plans imminently to build an arch; rather, Plaintiffs ask this Court to credit *the President's own* representations that he plans to do so. *Cf.* Fed. R. Evid. 801(d)(2)(A) (explaining that statements "offered against an opposing party" are not inadmissible hearsay when they are "made by the party in an individual or representative capacity"). Defendants do not deny that the articles and video recordings that Plaintiffs cite accurately reflect what the President and his spokespeople have said.[6] And given that the reported statements are consistent with the White House's own communications regarding its plans for the arch, *see, e.g.*, White House, *Fact Sheet*, *supra* note 1, there is every reason to believe that they accurately reflect the President's plans. Again, Defendants have not disputed that they do.

Finally, Defendants contend that Plaintiffs' injury is speculative because Plaintiffs lack definitive information about "arch design, subject, construction timeline, funding sources, or legal justification." Defs. Opp. 11. Plaintiffs' aesthetic injury, however, will come about irrespective of these factors. The injury stems from the disruption that a sizeable arch in Memorial Circle would work to the relationship between the existing monuments in the vicinity and the symbolic meaning that they hold. *See, e.g.*, Lemmon Decl. ¶ 12 (stating that an unauthorized arch would be a "continuous visual affront"); Byrnes Decl. ¶¶ 11, 13 (stating that an unauthorized arch would "stand as a disgraceful insult" that "diminish[es] … enjoyment of the views from Arlington National Cemetery"); Gundersen Decl. ¶ 9 (stating that an unauthorized arch would make it "impossible … to look out at Washington, DC, from Arlington National Cemetery without feeling

---

[6] Defendants rightly do not argue that contemporaneous reports are inadmissible to establish what the President has said. After all, a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it," like a reporter's firsthand account of what the President has just uttered in the reporter's presence, is excepted from the general rule against the admission of hearsay evidence. Fed. R. Evid. 803(1).

insulted and disrespected"). Defendants could have attested that there is no plan to build an arch in Memorial Circle despite the President's repeated statements to the contrary. Defendants, too, could have attested that they plan to seek congressional authorization for the arch prior to construction. The fact that Defendants have not done so underscores that the President intends to do what he has said that he plans to do and that the harms to Plaintiffs will result. At a minimum, the President's own uncontroverted statements establish a "substantial risk," *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted), that such harm will materialize.[7]

### B.  This case is ripe.

Under Article III, a federal court may take jurisdiction over only those cases that are "ripe for adjudication." *Texas v. United States*, 523 U.S. 296, 300 (1998). Claims that rest on "contingent future events that may not occur as anticipated, or indeed may not occur at all," do not satisfy the ripeness requirement. *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). As Defendants recognize, though, Defs. Opp. 12, when a plaintiff faces a sufficiently imminent risk of injury from a challenged action to satisfy Article III's standing requirement, Article III's ripeness requirement is likewise satisfied. *See Trump v. New York*, 592 U.S. 125, 131 (2020) (explaining that standing and ripeness are "related doctrines of justiciability" that both "originat[e] in the case-or-controversy requirement of Article III"); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (explaining that constitutional ripeness "is subsumed into the

---

[7] Defendants fault Plaintiffs for speaking in their declarations about the harm that they will suffer "if" the arch is built, characterizing Plaintiffs' conditional statements as reflecting the speculative nature of their injury. Defs. Opp. 9; *see also id.* at 12. This argument misconstrues the declarations. The declarations' use of the word "if" conveys only that the arch has not yet been built and that an injunction from this Court might yet prevent construction. Nothing in the declarations expresses doubt that Defendants, if left unchecked, intend to construct an arch in Memorial Circle.

Article III requirement of standing"). Because Plaintiffs have standing to bring their claims, *see supra* Part I.A., the claims are also ripe for Article III purposes.

Defendants nonetheless argue that this Court should "decline to enter this … dispute on prudential grounds," irrespective of whether it has jurisdiction. Defs. Opp. 13. Where "a federal court has jurisdiction," however, "it also has a 'virtually unflagging obligation … to exercise' that authority." *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (omission in original; quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The Supreme Court has noted that "the prudential ripeness doctrine" is in tension with this principle. *Susan B. Anthony List*, 573 U.S. at 167. Although the Court has not abrogated the doctrine, *see id.*, its application is thus "disfavored," *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018); *see also Revitalizing Auto Communities Env'tl Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021) (treating "the Supreme Court's cautious approach to prudential ripeness" as "a reminder that the doctrine constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction").

Under D.C. Circuit precedent, a district court considering whether to take the unusual step of declining on prudential grounds to resolve a case over which it has jurisdiction should "focus on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). As for the first consideration, "the fitness of an issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the [defendant's] action is sufficiently final.'" *Id.* (quoting *Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)). Where that consideration counsels in favor of deferring review, a court assesses the second consideration and asks whether the possibility of "immediate and significant" hardship to the parties nonetheless

9

supports immediate resolution. *Id.* at 389 (quoting *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 427 (D.C. Cir. 2007)).

Here, both considerations favor Plaintiffs. Plaintiffs' claims require this Court to resolve purely legal issues: May Defendants construct an arch in Memorial Circle without congressional authorization, and, if not, has Congress provided such authorization? Again, Defendants do not dispute that they plan to construct an arch in Memorial Circle, and they do not dispute that they plan to do so without awaiting any further congressional action. Defendants argue that awaiting "specifics about arch design" and more information about the "reviews and approvals" that the arch might or might not undergo would "provide a more concrete setting for judicial review." Defs. Opp. 14. These details, though, would not facilitate judicial evaluation of Plaintiffs' claims. Whatever the design of the arch, Plaintiffs' view of the law is that it may not be built unless and until Congress authorizes it. And whatever agency reviews and approvals the arch might receive, Plaintiffs' view of the law is that those reviews and approvals are premature unless and until, at a minimum, Congress has enacted a law to initiate the project and taken all other steps required by statute. *See* 40 U.S.C. § 8106; *id.* § 8903(a)(1). This Court can decide whether Plaintiffs' view of the law is correct without awaiting specific designs or agency review that would not cure the project's fundamental illegality.[8]

Because the legal issues are fit for review, this Court need not proceed to consider the second factor of the prudential ripeness inquiry: whether Plaintiffs will suffer hardship if the Court declines on prudential grounds to resolve their claims. *Am. Petroleum Inst.*, 683 F.3d at 389. Nonetheless, the hardship consideration also favors Plaintiffs, who are at a substantial risk of

---

[8] In any event, as explained below, *see infra* Part III, Defendants are wrong to characterize Plaintiffs' understanding that "construction will begin without further reviews and approvals" as "unfounded." Defs. Opp. 14.

impending injury. *See supra* Part I.A. Defendants contend that Plaintiffs can challenge "any final agency action with which they disagree, if and when NPS authorizes a final project to proceed." Defs. Opp. 14. That argument, however, presupposes that Defendants intend to subject the arch to agency review. But although NPS has stated that it intends to comply with "all applicable laws and regulations" if the President triggers administrative procedures by presenting NPS with a "formal proposal" regarding the arch, Lands Decl. ¶¶ 6–7, the other Defendants have not disavowed an intention to begin construction without following those procedures. As explained more fully below, *see infra* Part III, Plaintiffs have shown a likelihood that Defendants plan to begin construction imminently, forgoing statutory requirements and the rigors of required agency review.

## II.    Plaintiffs are likely to succeed on the merits.

### A.  Plaintiffs are likely to succeed on their ultra vires claim.

Plaintiffs have previously explained why both the Commemorative Works Act and 40 U.S.C. § 8106 prohibit construction of a commemorative arch in Memorial Circle unless and until Congress has authorized the project. Pls. Memo. 15–16. A recently published Congressional Research Service memorandum reaches the same conclusion. *See* Cong. Research Serv., *Legal Requirements for Constructing a Memorial Arch in Memorial Circle* (Jan. 23, 2026).[9] Defendants, though, make three arguments as to why, in their view, Plaintiffs are unlikely to prevail on their ultra vires claim challenging the planned arch. All of these arguments lack merit.

*First*, Defendants argue that an ultra vires claim is unavailable because Plaintiffs can seek review of final agency action under the APA. Defs. Opp. 15–16. Defendants, however, concede that NPS is the only Defendant against whom an APA claim could be brought, *id.* at 16, and that NPS has taken no final agency action that is subject to APA review, *id.* at 15 (stating that "NPS

---

[9] https://www.king.senate.gov/imo/media/doc/crs_memorial_arch1.pdf.

has not yet made a final decision"). The APA thus provides Plaintiffs no "meaningful and adequate opportunity for judicial review." *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). As another judge in this District recently held, an ultra vires claim is appropriate in such circumstances. *See Nat'l Tr.*, 2026 WL 533420, at *1 (faulting a plaintiff for "not bring[ing] the *ultra vires* claim necessary to challenge the President's statutory authority to complete [a] construction project … without congressional approval").

Moreover, Defendants' argument about the availability of APA relief rests on conjecture. *If* President Trump, Director Haley, and the Executive Office of the President were to seek NPS authorization prior to constructing the arch, and *if* NPS were to undertake administrative review and reach a final conclusion as to whether to approve the arch, *then* Plaintiffs could seek APA review of *NPS*'s conclusion. To start, the other Defendants are not subject to the APA. Further, as explained more fully below, *see infra* Part III, Defendants' announced timeline indicates that President Trump, Director Haley, and the Executive Office of the President plan to direct construction to begin *without* seeking NPS approval, and that NPS—having received no "formal proposal," Lands Decl. ¶ 6—will acquiesce in the arch's construction. Given the irregularity of the situation, the APA offers no realistic avenue for relief.

*Second*, Defendants argue that the arch already has the necessary congressional authorization, Defs. Opp. 5–7, 16–17, via a 1925 statute that "authorized and directed" a commission that had been created by a prior statute for purposes of designing what is now Arlington Memorial Bridge to "proceed at once with the construction" of the bridge in accordance with a design that the commission had submitted to Congress the previous year. Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974; *see also* Act of Mar. 4, 1913, Pub. L. No. 62-432, § 23, 37

Stat. 866, 885 (establishing the commission). Defendants explain that the 1924 design contained a pair of columns on the island where Memorial Circle lies, *see* Report of the Arlington Memorial Bridge Commission, Senate Doc. No. 95, 68th Cong., 1st Session, at 40–41 (Apr. 21, 1924),[10] and that the 1925 statute authorized the commission to "make such changes in design … as in its discretion may be found to be necessary or advisable," 43 Stat. at 974. Although the commission decided to delete those columns from the plans "in the interests of aviation safety and economy," NPS, *Historic American Engineering Record: Arlington Memorial Bridge*, HAER No. DC-7, Addendum at 92 (1988) (hereafter, NPS, HAER No. DC-7),[11] Defendants suggest that the arch that they now seek to install is simply a design revision, as authorized by the 1925 law.

The project that Congress approved, however, was completed nearly a century ago. *See* Nat'l Capital Planning Comm'n, *Arlington Memorial Bridge Rehabilitation* at 13 (May 4, 2018) (noting that Arlington Memorial Bridge was "completed in 1932");[12] Bradley Akin, U.S. Bur. of Labor Stats., *Arlington Memorial Bridge Spans the Decades as a Study in Long-Term Price Change* (2017) (stating that the bridge "opened for use on January 18, 1932").[13] Thus when, the following year, President Franklin D. Roosevelt abolished the commission that Congress had authorized to construct the bridge and transferred the commission's functions to what is now NPS, *see* Exec. Order 6166, § 2 (June 10, 1933), the plans were final, the bridge was in operation, and the funds that Congress appropriated for the project were largely exhausted. *See* Akin, *Arlington*

---

[10]        https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

[11] https://npshistory.com/publications/gwmp/haer-arlington-bridge.pdf.

[12]   https://www.ncpc.gov/files/projects/2018/7547_Rehabilitation_of_the_Arlington_Memorial_Bridge_Project_Design_Jun2018.pdf.

[13]        https://www.bls.gov/opub/btn/volume-6/arlington-memorial-bridge-spans-the-decades-as-a-study-in-long-term-price-change.htm.

*Memorial Bridge*, *supra* note 13 (explaining that Congress appropriated $14.75 million for the bridge, the cost of which ultimately came to $12.2 million); NPS, HAER No. DC-7, *supra* note 11, Addendum at 95 (noting that Congress later deleted $840,000 from the appropriation). It borders on the absurd to suggest that a statute directing a now-dissolved commission to undertake a specific, now-completed project with a designated set of funds provides authorization for Defendants to undertake a different project—funded by private donations, *see* Pls. Memo. 12—nearly 100 years after the project concluded.

*Third*, Defendants argue that constructing the arch would not violate any specific statutory prohibition. Defs. Opp. 17–18. As Plaintiffs have explained, *see* Pls. Memo. 15–17, however, both the Commemorative Works Act and 40 U.S.C. § 8106 forbid the construction of a commemorative arch in Memorial Circle without specific congressional authorization.

Defendants contend that the Commemorative Works Act does not apply because its coverage excludes "commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b); *see* Defs. Opp. 17. But no Act of Congress enacted before 1985—or at any other time—authorizes the construction of a monumental arch to commemorate the 250th anniversary of the United States. In arguing to the contrary, Defendants appear to rely on the 1925 Act that authorized the design and construction of Arlington Memorial Bridge. Again, though, that project concluded in the 1930s. Reading the Commemorative Works Act's grandfather clause to encompass *new* monuments that are built on the site of existing ones would be contrary to the Act's stated purpose of ensuring that "future commemorative works … are appropriately designed, constructed, and located." 40 U.S.C. § 8901(4)(A); *see also* Jacob R. Straus, Cong. Research Serv., *Commemorative Works in the District of Columbia: Background and Practice* at 8 (updated

14

May 8, 2023) (explaining that one of the Act's major aims was to prevent the proliferation of monuments on federal land in the District of Columbia).[14]

Defendants also profess doubt as to whether the arch qualifies as a "commemorative work" under the Act. Defs. Opp. 17–18. The White House itself, however, identifies the arch as one of the ways in which "President Trump is fulfilling his campaign promise to 'give America's founding in 1776 the incredible anniversary it truly deserves.'" White House, *Fact Sheet*, *supra* note 1. And Defendants' brief acknowledges that the arch is "intended to celebrate the nation's 250th anniversary." Defs. Opp. 22. By Defendants' own description, then, the arch is a "structure … designed to perpetuate in a permanent manner the memory of a[] … significant element of American history" and so comes within the Act's definition of "commemorative work." 40 U.S.C. § 8902(a)(1); *see* Cong. Research Serv., *Legal Requirements*, *supra* note 9, at 6 (stating that "the memorial arch appears to be a 'commemorative work' as defined by" the Commemorative Works Act because it "would be a 'monument' or 'structure'" erected in honor of the anniversary).

As for 40 U.S.C. § 8106, Defendants speculate that congressional authorization might exist "[i]f" Congress were to appropriate funds for the arch. Defs. Opp. 18. Congress, though, has not done so. The possibility of hypothetical future legislation does not make Defendants' plan legal today.[15]

---

[14] https://www.congress.gov/crs_external_products/R/PDF/R41658/R41658.12.pdf.

[15] Defendants also argue that the 1925 Act authorizing the construction of Arlington Memorial Bridge provides the congressional authorization required by 40 U.S.C. § 8106. Defs. Opp. 18. That argument fails for the same reasons as it does in connection with the Commemorative Works Act. And although Defendants suggest that 40 U.S.C. § 8106 might not apply to NPS, *see id.* at 18 & n.11, Defendants identify no legal basis for that suggestion.

### B. Plaintiffs are likely to succeed on their constitutional claim.

The plan to construct an arch in Memorial Circle in contravention of the Commemorative Works Act and 40 U.S.C. § 8106 also violates the President's constitutional duty to take care that the laws be faithfully executed. *See* Pls. Memo. 18–19.

Although Defendants argue that the Take Care Clause creates no cause of action, Defs. Opp. 19, the Supreme Court has held that the Constitution creates an implied private right of action for equitable relief. *See Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *cf. Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."). Despite alluding to the "unique nature of the President's Take Care Clause authority," Defs. Opp. 19, Defendants offer "no reason" why a Take Care Clause claim "should be treated differently than every other constitutional claim," *Free Enterprise Fund*, 561 U.S. at 491 n.2; *see Las Americas Immigrant Advocacy Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1213 (D. Or. 2020) (denying a motion to dismiss a Take Care Clause claim and explaining that "[t]he case law[] … does not appear to provide any basis to find this claim non-justiciable").

Defendants point out, *see* Defs. Opp. 19, that *Mississippi v. Johnson*, 71 U.S. 475 (1866), casts doubt on whether the Take Care Clause is an appropriate vehicle for injunctive relief against the President. *See id.* at 499–501. Plaintiffs, however, do not seek to enjoin the President—just his subordinates. *See* ECF 7-6 (Plaintiffs' proposed order). The Supreme Court and the D.C. Circuit have made clear that such relief is appropriate. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) (affirming injunction); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).

Defendants also argue that Plaintiffs' Take Care Clause claim "is ultimately a statutory claim, not a constitutional one." Defs. Opp. 19. They explain, *id.* at 20, that a claim that the

16

President "acted in excess of [statutory] authority" does not necessarily implicate the Constitution, whereas a claim that the President acted in the "*absence* of *any* statutory authority" is best viewed as a constitutional claim. *Dalton v. Specter*, 511 U.S. 462, 473 (1994). These principles favor Plaintiffs. Indeed, the basis for Plaintiffs' Take Care Clause claim is that the President is directing a project that requires congressional authorization without having first obtained that authorization. That the President has not "conceded" his lack of statutory authority, Defs. Opp. 20 (quoting *Dalton*, 511 U.S. at 473), is irrelevant. This Court should reject Defendants' view that they can insulate the President from constitutional scrutiny by refusing to concede that he lacks statutory authority to order the arch's construction.[16]

To be sure, the actions that violate the President's duty under the Take Care Clause *also* exceed the scope of his authority under the Commemorative Works Act and 40 U.S.C. § 8106. But a violation of the Take Care Clause necessarily entails the President's failure to "take Care that [Congress's] Laws be faithfully executed." U.S. Const. art. II, § 3. Justice Jackson's concurrence in *Youngstown*, which "provides the accepted framework for evaluating executive action," *Medellín v. Texas*, 552 U.S. 491, 524 (2008), confirms that executive action can be inconsistent with both federal statutes and the Constitution. Justice Jackson explained that presidential power is "at its lowest ebb" when the President "takes measures incompatible with the expressed or implied will of Congress" and that such cases "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." 343 U.S. at 637–38 (Jackson,

---

[16] To the extent that Defendants rely on the D.C. Circuit's opinion in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), to support their position, Plaintiffs observe that the en banc D.C. Circuit has granted review in two cases that present similar constitutional issues and may result in clarification or abrogation of some or all of *Global Health Council*'s reasoning. *See Climate United Fund v. Citibank, N.A.*, D.C. Cir. Nos. 25-5122, 25-5123 (oral argument held Feb. 24, 2026); *Nat'l Treasury Emps. Union v. Vought*, D.C. Cir. No. 25-5091 (oral argument held Feb. 24, 2026).

J., concurring). Of course, "the expressed or implied will of Congress," *id.* at 637, is revealed most reliably through the statutes that it enacts. *See Nat'l Federation of Indep. Business v. Sebelius*, 567 U.S. 519, 544 (2012) ("[T]he best evidence of Congress's intent is the statutory text.").

**III.    Plaintiffs have shown a likelihood of imminent, irreparable injury.**

Plaintiffs' substantial likelihood of impending injury both establishes their standing, *see supra* Part I.A., and is sufficiently imminent and irreparable to warrant preliminary relief. Indeed, Defendants do not dispute that Plaintiffs' injuries from the "substantial construction" of an arch during the pendency of this lawsuit would be irreparable. Defs. Opp. 10. Defendants argue only that "the significant amount of time it would take to design, plan, and build such a structure" make it unlikely that the arch will be built prior to final judgment in this case. *Id.*

Again, the White House has stated otherwise, announcing that construction of the arch will "coincide" with the United States' 250th anniversary, which is just three-and-a-half months away. White House, *Fact Sheet*, *supra* note 1. Defendants raise doubt that the arch will be "fully constructed" by July 4. Defs. Opp. 10. But they ignore that the design and planning process has been underway for at least half a year. *See* Pls. Memo. 9 (noting that the President shared a proposed design on October 11, 2025). And construction need not be complete for the injury to occur. Furthermore, the President has repeatedly stated that he is planning the arch as a commemoration for the anniversary. *See, e.g.*, Diamond, *Trump Wants to Build*, *supra* note 4 (reporting the President's statement that he preferred that the arch be 250 feet tall to reflect "250 for 250"). And the President's recent remark that he planned for construction to begin "sometime in the next two months" is consistent with this timeline. Cai, *Construction to Begin*, *supra* note 3. Whether or not it is practical for Defendants to "fully construct[]" the arch in time, Defs. Opp. 10, the President's statements bespeak an intent to try.

Tellingly, Defendants—who have firsthand knowledge of their own plans—offer no assurance that, absent a preliminary injunction, construction will not begin while this litigation proceeds. Defendants rely on a declaration on behalf of NPS describing the "legal and compliance processes" that NPS would undertake if it were presented with a "formal proposal." Lands Decl. ¶ 6; *see* Defs. Opp. 10. The NPS declaration, however, does not estimate how long it would take to complete the required processes, does not state that other Defendants plan to submit a formal proposal to NPS before initiating construction, and does not state whether NPS would acquiesce if other Defendants directed construction without submitting a "formal proposal" and without NPS authorization. *Cf.* Lands Decl. ¶ 15 (stating that *NPS* will not "construct[]" or "authoriz[e]" an arch before "all applicable legal requirements" are met).

Ultimately, Defendants have neither produced evidence to counter the President's statements that construction of the arch will proceed imminently, nor even denied that they intend to proceed imminently. This Court's prompt intervention is accordingly warranted.

**IV.    The balance of the equities and the public interest favor an injunction.**

The final two preliminary injunction factors—which merge in this case, *see* Defs. Opp. 21—also favor Plaintiffs. Enjoining construction of the arch unless and until Congress has authorized it will serve the public interest by ensuring compliance with the law, as well as ensuring that the merits of the project are subject to legislative deliberation by the People's chosen representatives. At the same time, the injunction will leave Defendants with ample other options for commemorating the Nation's anniversary.

Defendants contend that the public interest is not served by an injunction against "hypothetical conduct." *Id.* As explained above, however, *see supra* Parts I.A., III, there is nothing hypothetical about the plan that the President has repeatedly announced and that Defendants do

19

not disavow. Although Defendants suggest that Plaintiffs must wait until "construction has …

begun" before seeking this Court's intervention, *id.* at 21, they do not explain how it would serve

the public interest to seek an injunction that would freeze a partially completed building project in

the center of a busy and historic area of the capital for an indefinite period. Given the difficulties

of undoing construction and restoring the disrupted land, the public interest favors enjoining the

challenged conduct before it begins.

Defendants' argument that they "would suffer serious harm" from an injunction also falls

flat. *Id.* They contend that the requested injunction would "stymie" them from undertaking "the

very processes that Plaintiffs say are required by law." *Id.* at 22. Unless and until Congress has

authorized the arch, however, there are no "processes" for Defendants to undertake. If Defendants

harbor genuine concerns that an injunction would bar them from taking actions that they are

lawfully entitled to take—and Defendants have not identified any such actions—the proper course

would be for this Court to address those concerns in crafting the injunction, not to deny relief.

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in Plaintiffs' opening memorandum in

support of their motion for a preliminary injunction, this Court should grant a preliminary

injunction barring Defendants Haley, Executive Office of the President, and NPS from

constructing an arch in Memorial Circle absent congressional authorization, designation by

Congress of a project sponsor, and compliance with all other statutory and regulatory prerequisites.

Respectfully submitted,

/s/ Nicolas A. Sansone
Nicolas A. Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

21