UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| * * * * * * * * * * * * * * * * ) | |
| MICHAEL LEMMON, et al., ) | Civil Action No. 26-00544 |
| Plaintiffs, ) | |
| vs. ) | |
| DONALD J. TRUMP, et al., ) | Washington, D.C. April 2, 2026 2:02 p.m. |
| Defendants. ) | |
| * * * * * * * * * * * * * * * * ) | |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS: NICOLAS SANSONE, ESQ.
ALLISON M. ZIEVE, ESQ.
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, Northwest
Washington, D.C. 20009

FOR THE DEFENDANTS: BRADLEY T. CRAIGMYLE, ESQ.
MICHAEL S. SAWYER, ESQ.
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL AND NATURAL RESOURCES
601 D Street, Northwest
Washington, D.C. 20004

REPORTED BY: LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the District of Columbia
333 Constitution Avenue, Northwest
Room 6509
Washington, D.C. 20001
(202) 354-3269

THE COURTROOM DEPUTY: Your Honor, we're on the record in Civil Case 26-544, *Lemmon, et al., versus Trump, et al.*

Starting with Plaintiffs' counsel, please approach the podium and state your name for the record.

MR. SANSONE: Good afternoon, your Honor. Nicolas Sansone for Plaintiffs.

THE COURT: Good afternoon.

MR. SANSONE: With me at counsel table is Allison Zieve, and we've got Michael Lemmon in the audience today.

THE COURT: Good afternoon.

MR. CRAIGMYLE: Good afternoon, your Honor. Bradley Craigmyle for the Defendants. And at the table with me is my colleague, Michael Sawyer.

THE COURT: All right. Craigmyle, you said? Greg -- "Craigmyle."

MR. CRAIGMYLE: "Craigmyle." Yes.

THE COURT: Good afternoon.

We are on the record here today for a hearing on the Plaintiffs' motion for preliminary injunction in this matter.

Plaintiffs here are three veterans of the Vietnam War: Mr. Lemmon, who's here today; Mr. Byrnes; and Mr. Gunderson. And there's an architectural historian, Mr. Loth, all of whom regularly visit Arlington National

Cemetery and the surrounding area.

Plaintiffs challenge the Administration's alleged and -- stated, I should say -- plan to construct a 250-foot commemorative arch in Memorial Circle on National Park Service land at the southern end of Arlington Memorial Bridge between the Lincoln Memorial and Arlington National Cemetery.

Plaintiffs claim that the arch's construction without congressional authorization is, one, *ultra vires* in violation of the Commemorative Works Act of 1986 and, two, violates the president's constitutional duty under the Take Care Clause.

The complaint cites as grounds for alleging that this arch is to be built various statements from the president and the White House. I won't go over all of them, but they include an October 11th, 2025, statement in which the president posted a watercolor design of a monumental arch in Memorial Circle on his Truth Social account.

On October 15th, 2025, the president announced plans to build a triumphal arch in time to commemorate the nation's 250th anniversary on July 4, 2026, including displaying models of the arch at a White House dinner and talking about how tall he wanted the arch to be.

On December 31st, 2025, the president stated that the construction of the arch is expected to begin sometime

in the next two months.

Also in December of last year, the president announced the formation of a limited liability company called Freedom 250 that will collect donations for projects connected to the 250th anniversary.

On January 23rd, the president posted to his Truth Social account an image with renderings of the planned arch, calling it the Independence Arch.

And on January 30th, the White House released a fact sheet describing the president's plans for a new Independence Arch in Washington, D.C., to coincide with the 250th anniversary of the nation.

We are now in April, so three months away from the 250th anniversary.

Plaintiffs in support of their motion have submitted declarations from Mr. Lemmon, Mr. Byrnes and Mr. Gunderson. And the declarations state that each -- they are veterans who regularly visit the cemetery to pay their respects to their fallen comrades and to contemplate the national ideals for which they fought.

Each intends to continue visiting the cemetery, and each views the arch as a disrespectful and aesthetically obtrusive symbol that will degrade future visits.

Mr. Lemmon and Mr. Byrnes state that they plan to be buried at Arlington National Cemetery, and both would

find it -- both find it profoundly disturbing to lie in rest under the arch.

Mr. Loth -- I hope I'm saying this correctly. "Loth"?

MR. SANSONE: "Loth."

THE COURT: "Loth." Thank you.

Mr. Loth is an architectural historian who regularly visits and intends to continue visiting Arlington National Cemetery and the surrounding areas for his personal enjoyment and to take photographs for use in his historical lectures.

He alleges that the arch will diminish his experience of those areas by obstructing the views to and from Arlington National Cemetery, obstructing the symbolic link between Arlington House and the Lincoln Memorial, and standing as an affront to the country's tradition of democratic process and the rule of law.

Defendants for their part attach a declaration from the National Park Service deputy director of operations, Frank Lands, that states in relevant part that the proposal for construction of the arch is in its conceptual phase and that NPS has not completed its decision-making process for the project and that he -- it avers that NPS will follow all applicable legal requirements before making a final decision and before beginning any

construction.

Mr. Lands also states that if the project moves beyond the conceptual stage, that NPS will comply with the National Environmental Policy Act, NEPA; the National Historical Preservation Act; the Endangered Species Act; the Federal Aviation Administration regulations; and any other applicable laws and regulations before beginning construction.

Mr. Lands also declares that if the final proposal for the arch meets the definition of a commemorative work that was not authorized before passage of the current Commemorative Works Act, there would be a host of additional review and consultational approval processes that would be required, including, but not limited to, congressional authorizations and consultations with the National Capital Memorial Advisory Commission. We have a lot of commissions in the District of Columbia.

All right. As to Plaintiffs' request for preliminary injunction, Plaintiffs ask that the Court enjoin Defendants Vince Haley and the Executive Office of the President from taking any steps to construct or to direct or to facilitate construction of any structure in Memorial Circle without congressional authorization, designation by Congress of a project sponsor and compliance with all other statutory and regulatory prerequisites.

They also ask that I enjoin the National Park Service from authorizing, permitting or facilitating construction of any structure in Memorial Circle, including by expending donated funds, absent congressional authorization, designation by Congress of a project sponsor and compliance with all other statutory and regulatory prerequisites.

So I've read all the materials and the declarations and the notice of supplemental -- notices of supplemental authority filed by both sides informing the Court, as if I didn't know, of Judge Leon's decision. And I've taken -- obviously, I've reviewed that decision as well.

So I want to start with the standing and irreparable harm. Defendants challenge both the imminence and nature of the claimed injuries.

So let me start with some questions for you, Mr. Craigmyle. Is that it?

MR. CRAIGMYLE: Yes.

THE COURT: Now, did we get the microphone fixed?

THE COURTROOM DEPUTY: No.

THE COURT: Normally I would tell you you're free to sit at counsel table and just speak into the microphone. But our defense table microphone is not working, so I'm afraid you'll have to get your steps in.

NPS says that the project is still in the conceptual phase and that it will comply with any applicable statutory requirements.

This sort of flies in the face of the chief executive's own statements, which he has repeatedly made, publicly stating through White House communications and through his own Truth Social account that the arch is going to be built and that he intends for the arch to be built by July 4th of this year.

That's a pretty short timeline from here. And maybe it's possible; maybe it's not.

Do Defendants disavow those remarks? And what is -- how is the Court to factor in -- how am I -- do I ignore them? How am I to assess those remarks?

MR. CRAIGMYLE: So I think the place to start, your Honor, is this is the Plaintiffs' lawsuit, the Plaintiffs' emergency motion. So it's their burden to make a clear showing that they are entitled to relief.

THE COURT: I understand the burden. But I'm asking you -- the Plaintiffs have already alleged what's in their pleadings. So I think it makes sense to cut straight to the chase and ask you, because the chief executive officer of the country, the president of the United States, has stated repeatedly that he intends for this arch to be built.

Now, you have assured me through the declaration of Mr. Lands that that won't happen absent compliance with all the applicable legal and statutory requirements.

The president's avowed declaration that this arch be erected by July 4th, 2026, certainly conflicts with the National Park Service's statement in its declaration to me. So how am I to assess the president's statement? He is the chief executive of the Administration. Am I to ignore it? How do I assess that? I know it's the Plaintiffs' burden. But the Plaintiff -- you're challenging Plaintiffs' motion by saying it's not going to happen; it's speculative.

Well, according to the president's statement, it's not speculative at all. He intends for it to happen. What -- how am I to assess those statements in determining whether the Plaintiffs have met their burden?

MR. CRAIGMYLE: I think this case is on all fours with *New Mexico against Musk*.

THE COURT: My case. Always a strategic move to cite my own case.

But that case involved state attorneys general coming in and saying, We're concerned that this might happen, and that might happen if DOGE takes control of all these things that they're planning on taking control of. And you center in your pleadings on the use of the word "if."

But "if" can be used in many contexts. I think you would have been in a much stronger position if Plaintiffs had said, If the president decides to build an arch, that would be speculative in the way that the statements in *Musk* were speculative. But the president has said he's getting his arch. And as we've seen from Judge Leon's case with the White House ballroom, the president tends to get what he wants even if it means that you wake up one morning and there are bulldozers demolishing part of the White House.

So I don't want to -- I don't want to wake up one morning or get a midnight filing from Plaintiffs saying, "They're starting to dig."

So it's a little less speculative -- it's quite a lot less speculative than *Musk*, because the president has stated that it's going to happen.

MR. CRAIGMYLE: I think the legal principles are the same, your Honor. They're relying on news stories for the truth of the matter asserted.

THE COURT: You're not answering my question. There were news stories about the White House ballroom, too. So you're not answering my question. Where do I -- how do I weigh and assess the president's statements, which frankly contradict your declarant? What do I do with that?

MR. CRAIGMYLE: So I'm sorry for not answering

your question, your Honor. That was not my intent.

THE COURT: I know.

MR. CRAIGMYLE: I really don't think there needs to be any weighing, because that's not admissible evidence. And it's the --

THE COURT: We're not at trial. Are you telling me that I cannot -- you filed a declaration from a government official saying, "I'm chief of operations at the National Park Service, and we're not going to do this without complying with all the regulations."

And the president of the United States is tweeting the absolute opposite, which is, "I'm going to get my Independence Arch and I'm going to get it by July 4th."

Given what's happened with the White House ballroom, why should I not take those statements seriously? It's not a matter of whether they're admissible or not. They're a statement of a party.

MR. CRAIGMYLE: So I think it's still hearsay for a couple of reasons. But I do think the ballroom is a good example where the Court there relied on ongoing construction.

THE COURT: I don't want us to get to that point. The Plaintiffs have filed timely. They have filed before any construction has started.

Now, there is a weighing to be done, I grant you,

between: All right. They haven't started construction. How likely is it -- you know, when do you file? And obviously, you're saying this is too early; it's not ripe; there's no construction happening.

But I also have to assess your assertion and Mr. Lands's declaration in light of the statements made by the chief executive. And what you're saying is, you know, Pay no attention to the man in the corner, which is a little difficult for me when the man in the corner who's tweeting is the chief executive.

MR. CRAIGMYLE: We are relying on a sworn declaration from an agency official. They're relying on news reports. It's --

THE COURT: They're not just relying on news reports. They're relying on statements by the president of the United States. And am I not -- how do I -- I don't know any other way to ask this question. How am I to weigh those statements? Do I disregard them? How do I assess them?

MR. CRAIGMYLE: I think you assess them in the context of whether they satisfy the Plaintiffs' burden to show an imminent threat of irreparable harm.

THE COURT: They may not satisfy the burden, but they certainly add to their argument. This is not -- you know, there may not be any one thing that takes them over the line here. But this is the statement of the president

of the United States. Certainly it is going to carry some weight here. And one would argue -- one might argue that it should.

MR. CRAIGMYLE: I --

THE COURT: There were similar statements made about the ballroom. "We're going to have this beautiful, big ballroom." I mean, there were similar statements, and it happened. So why should I not in this case take those statements seriously?

MR. CRAIGMYLE: Because they're not admissible evidence. They're still being offered for the truth of the matter asserted.

THE COURT: We're not at trial. We're not at trial. We're at a motion for a preliminary injunction. Are you telling me I'm bound by the Federal Rules of Evidence as to what's admissible at a jury trial?

MR. CRAIGMYLE: My point is just that, again, it's their burden to make a clear showing that this is going to happen so quickly that there's no chance to get meaningful relief in the interim. And they haven't made that showing. They've instead flipped the burden on us to disprove what will happen.

THE COURT: Part of their showing is the president says, It's going to happen and it's going to happen by July. That's part of their showing.

And so I'm asking you, how do I assess that?

And you're saying, No, no, no, no. You can't pay any attention to that. You can only focus on the fact that they're using these speculative news reports.

Those news reports, by the way, are also based on the president's statements and statements coming from the White House, all of which you seem to be telling me are just -- musings? I don't know.

MR. CRAIGMYLE: I guess just a couple of points.

My primary point is that's hearsay and falls well short compared to our sworn declaration.

The second is the specific point in our declaration, which is that the project is in the conceptual phase. The Plaintiffs haven't identified any specific timeline. This is a lawsuit that relies on social media and news reports. One of the news reports is from December, which says that, according to the article, construction would begin in two months.

So there's good reason beyond just the formal Rules of Evidence. I think we've missed that window. That has not happened. Again, layered on with our declaration that makes clear the project is in the conceptual phase. If and when it moves forward, the agency will follow the legal requirements.

And again, it's the Plaintiffs' burden here to

make a clear showing that there is a threat of imminent irreparable harm.

THE COURT: If I find -- okay. You still haven't answered my question, and I'm not going to press you anymore on it.

But let's just say for purposes of argument here that I find that the Plaintiffs' proffer of the president's statements meets the burden. It's your job now to show me why -- to disprove that. Right? Because say I find that the president's statements and tweets establish what they need to establish to get the injunction. And you have to tell me why I shouldn't pay any attention to those or those statements aren't credible.

That's what I'm trying to get you to address. I just can't act in a vacuum. I have to pay attention not just to the -- you know, what's in the record and not just to your declaration, but to what your -- our president is saying.

And I don't think -- and it's not like the Plaintiffs haven't relied -- they're relying on those statements. They're using them to meet their burden. So what I'm asking you is: How do I weigh those? You told me I should disregard, you know, social media. The president tweeted on social media. Should I ignore that?

MR. CRAIGMYLE: As an evidentiary matter, yes.

It's a sworn declaration against hearsay in media reports and social media, your Honor.

THE COURT: So are you saying Mr. Lands -- his sworn declaration is -- I should take that to say the president is not telling the truth?

Two things can be right at the same time. The president can intend for his arch to be built by July 4th and Mr. Lands can also be saying, Well, the project is in its early stage. Two things can be true.

But I have to assess both of them. I can't just look at Mr. -- I cannot be confined to Mr. Lands's declaration, can I?

MR. CRAIGMYLE: But in weighing those two, I think your Honor should evaluate whether there is a sworn statement or a --

THE COURT: There is a sworn statement. There are also statements that are unsworn from the president. What do I do with those? That's the last time I'm going to ask.

MR. CRAIGMYLE: You credit the sworn statement over the unsworn statement. That's our declaration against hearsay media reports. And then layer on the fact that it's the Plaintiffs' burden to make a clear showing.

THE COURT: Other than the declaration of Mr. -- is it Lands or Land?

MR. CRAIGMYLE: I believe it's Lands, your Honor.

THE COURT: Lands. Sorry.

If I don't issue an injunction, what assurance do I have other than Mr. Lands's declaration that construction will not begin before I make a decision on the merits? Because -- and this goes back to what I said. I don't want to wake up in the morning and have an emergency pleading from Plaintiffs saying, There are bulldozers at Memorial Circle digging up God knows what.

That's what I'm concerned about, because Mr. Lands may be completely sincere and intending to adhere to all legal and regulatory compliance, but that doesn't necessarily mean that it won't happen, because look what happened in Judge Leon's case.

MR. CRAIGMYLE: Well, I do think that Judge Leon's case is different in the sense that the process played out before construction to build a new structure started. That's what we're dealing with here. We're not dealing with a demolition. It's not as if --

THE COURT: I don't want to deal with a demolition. I don't want to get there. That's why we're in here today. I don't want ground to be broken. I want procedures to be complied with.

And I'm asking you: What assurances do I have, save Mr. Lands's declaration?

MR. CRAIGMYLE: There will be final agency action

from the National Park Service before any construction is authorized or initiated.

And that's another problem with the Plaintiffs' theory here. They haven't made a clear showing that this should be an *ultra vires* theory, an *ultra vires* case, which is another important distinction from Judge Leon's case. That case was an *ultra vires* case because, as the Court found based on the Government's briefing and declarations, the entity in charge of that project --

THE COURT: I'm not asking about the *ultra vires* case. I'll get to it. I'm still concerned about the assurances that I need to have to make sure that we're not in a situation where construction begins despite noncompliance with the proper regulatory requirements.

In other words, other than Mr. Lands's declaration, what assurances do I have?

MR. CRAIGMYLE: Well, I think knowing that there is final agency action coming is an assurance. And maybe more importantly, again, it's not the Defendants' burden to disprove when the Plaintiffs have failed to meet their burden.

THE COURT: What is -- tell me what concrete steps, if any, the government has taken at the site. Have there been any groundbreaking preparations? Any applications for demolition permits? Any contracts awarded?

MR. CRAIGMYLE: I'm unaware of any of that, your Honor.

THE COURT: See, this is a problem I've been having with lawyers coming in here on these kinds of cases, because they come in and they say, "I don't know. I'm not aware of anything."

But that doesn't mean it's not happening. It means you don't know or haven't been told or don't -- you know, and that is my problem.

In preparation for this hearing, one would expect that you would know the answers to those very, very basic questions, which is: Is there any preparation for demolition happening? Have any contracts been awarded? Because all of that goes to whether -- goes to whether construction is imminent.

I know what you're going to say. You're going to say it's the Plaintiffs' burden. But the Plaintiffs can't be expected to know whether contracts have been awarded or permits have been pulled or requested. That's information that is solely in the Government's possession. And the fact that you're coming in here in this hearing without that information is troubling to me.

MR. CRAIGMYLE: Again, your Honor, I do not know of any of those formal steps that have been taken.

THE COURT: Who would know?

MR. CRAIGMYLE: I -- the project is still in the conceptual phase. So I can't -- as far as I know, none of those things have happened. It's still in the conceptual phase.

And the fact that the Plaintiffs don't know is a function of when they decided to file a lawsuit.

THE COURT: The fact that Plaintiffs don't know is a function of the fact they don't work in the White House. They can't be expected to know if contracts are being -- have been awarded, or permits. They can't. That's information that I would expect to get from counsel for the Defendants.

And I mean, this could be going on without Mr. Lands's knowledge. It's possible. So that's why I expect to have this kind of information before I can make a decision as to whether this is in fact premature.

Would you agree with me, sir, that if in fact contracts are being bid out or awarded, that if permits are being sought, then that certainly adds to Plaintiffs' argument that construction is imminent? If they haven't, it detracts from it. Would you not agree?

MR. CRAIGMYLE: I think that's inherent in the fact that the project is still in the conceptual phase.

THE COURT: You've submitted a sworn declaration from Mr. Lands. Why have you not submitted a sworn

declaration from a White House representative stating that the president does not intend to direct that construction begin without seeking National Park Service approval? And is that something that you would be prepared to submit to the Court?

MR. CRAIGMYLE: Could you repeat the last --

THE COURT: A declaration from the president or a White House representative stating that the president does not intend to direct construction to begin without seeking National Park Service approval and following all required procedures.

Because that's -- right? The president's statements on Truth Social or whatever you call it and public statements declare his intention to have this arch by July 4th.

The Park Service operations director says, No. We're going to follow -- he doesn't say it's not going to happen; he says, We're following all procedures. We're not past the conceptual stage yet.

Why haven't you submitted a declaration from the White House that would then make it clear that everybody's on board here, both the White House -- the White House intends to comply with Park Service procedures and all statutory requirements and that there's not going to be any order to begin construction until those requirements have

been met? Why haven't you submitted that? And since you haven't, would you be willing to?

MR. CRAIGMYLE: Again, that inverts the burden, your Honor. It cannot be the case that every time there's a news story about a plan the president has and then an emergency motion follows, it's the Government's burden to submit a declaration from every named party to disprove the theory.

THE COURT: It hasn't happened that often. And the last time it happened, we had a part of the White House demolished. So, you know, we're not just whistling in the dark here.

So are you saying that you're not going -- you would not be willing to submit such a declaration? I mean, the "why" is different. But you're not willing to submit such a declaration?

MR. CRAIGMYLE: I mean, that's something I would have to take back internally.

But I think the more important point is that, again, it's not our burden to disprove what they've said. There will be final agency action before any authorization to initiate or begin or permit construction.

This is an APA case. So part of the reason there's no declaration from non-APA agencies is because the default assumption is this will be an APA case.

THE COURT: Let me ask you this: Could the president without NPS approval, without NPS going through the required statutory procedures, could the president simply order construction to begin at that site? Does the president have that power?

MR. CRAIGMYLE: So this is a land administered by NPS. So there would -- my understanding is there would be a final action from --

THE COURT: No, no. That's not my question.

Does the president have the authority and the power to go over NPS and order the construction to begin on the site? Does the president have that power and authority?

MR. CRAIGMYLE: Not that I'm aware of, your Honor.

THE COURT: Okay.

MR. CRAIGMYLE: Again, it would be the Plaintiffs' burden to show --

THE COURT: I understand. I don't mean to be rude, but you keep -- clearly, you have come here and that is your -- you know, you're going to stay on message with that. I understand the burdens here. I've had more preliminary injunction cases in the last two years than I've had in ten years before. So I'm aware of the burdens that apply here.

I'm just trying to get information before I turn to the Plaintiffs. And I have many questions for them also.

It appears -- I'm referring to your opposition at Page 10 -- that you appear to concede that Plaintiffs' injuries from the substantial construction of an arch during the pendency of this lawsuit would be irreparable. Is that correct?

MR. CRAIGMYLE: Do you mean after construction --

THE COURT: If construction were to begin during the pendency of this lawsuit, before -- say I didn't grant the injunction, but we're moving ahead to the merits. And construction begins. My nightmare scenario, waking up one morning and getting an emergency motion. Construction begins.

It appears from your opposition that you concede that that would be irreparable harm. Right?

MR. CRAIGMYLE: We would not make an imminence argument at that point. Yes, your Honor.

THE COURT: I'm not asking -- that's not the imminence argument; that's the irreparable harm argument. Whether irreparable harm is imminent or not is one thing, but whether the harm is irreparable is another. There's two questions. There's two issues there. It's not just one. Do you understand me?

MR. CRAIGMYLE: Yeah. I think so.

The question is whether we would object to the irreparable nature, putting aside whether --

THE COURT: I'm asking if I -- if this lawsuit were to proceed to the merits, there is no injunction issued, and construction began before I could reach the merits, before -- you know, despite Mr. Lands's best assurances and construction began, would the Plaintiffs have suffered irreparable harm? It appears from Page 10 of your opposition that you concede that they would have. They would. Is that right?

MR. CRAIGMYLE: I don't have the page in front of me, your Honor. But I think it's unlikely that we would contest the irreparable nature once construction has started.

THE COURT: Okay. Now, are you arguing that not only is the case unripe? I obviously know that argument. But are you also arguing that no congressional authorization is required because Congress has already delegated the necessary authority to construct the arch by its previous authority to make the statues and stuff on Columbia Island --

MR. CRAIGMYLE: Yes, your Honor.

THE COURT: -- from 1925?

MR. CRAIGMYLE: Yes.

THE COURT: If construction moves forward without NPS authorization, does that action constitute final agency action?

MR. CRAIGMYLE: I'm not sure how that would work, your Honor, because there would be National Park Service final agency action before happened.

THE COURT: No, no. I'm asking you, if construction were to begin before the National Park Service had gone through its required procedures, would that constitute final agency action? Obviously, NPS wouldn't have acted. But would it constitute final agency action?

MR. CRAIGMYLE: I'm just not sure of the mechanism for how that would work, which is why I'm hesitating, because I don't know what the decision-making process for that would be.

THE COURT: I myself have my own questions with the decision-making process for these projects.

All right. Let me put the Plaintiffs to its burden -- thank you -- to their burden. Excuse me.

Mr. Sansone?

MR. SANSONE: Correct. Good afternoon.

THE COURT: Good afternoon.

NPS has declared that the arch is still in the conceptual phase and has committed in its declaration to comply with all applicable laws before construction begins.

Why isn't that enough?

MR. SANSONE: We don't dispute the credibility of Mr. Lands in terms of NPS's intent. If NPS is looped into

the process, and if NPS is presented with a request for a construction permit or authorization of some sort to build the arch, we have no basis for disputing what Mr. Lands has said that NPS plans to do at that stage.

THE COURT: But they haven't even gotten that far. So as to the Government's point, given Mr. Lands's representation, given that he said, you know, it doesn't look like -- at least according to Mr. Lands, he hasn't been presented with any requests for construction. What's the basis for me to conclude that injury is certainly impending or imminent rather than, as the case was in the *Musk* case, merely possible?

MR. SANSONE: So I think the silence from three out of the four Defendants here is quite telling.

The president has repeatedly and consistently --

THE COURT: The president's not a Defendant. Oh, yeah. I'm sorry. He is.

MR. SANSONE: He's consistently and repeatedly told the American people that he's going to build the arch. He's going to have it built by July 4th.

If the president's plans have changed, it would certainly be easy enough for Defendants to tell the Court as much. And they have not done so.

And certainly there is precedent for the president moving forward with construction projects on National Park

Service land without presenting a proposal, without seeking authorization from the National Park Service.

So whether or not the plan is still in a sort of conceptual phase vis-à-vis National Park Service -- again, we're not entirely sure what that means. Does it mean that there are contracts but construction has not yet started? Does it mean they're trying to figure out, you know, what statue to put on top, but otherwise everything is set to go? That term isn't defined in the declaration, and it may be because Mr. Lands doesn't know.

THE COURT: But are you asking me to go forward and issue an injunction based on the absence of evidence? I mean, because it sounds like it.

MR. SANSONE: We're asking the Court to issue an injunction based on the president's repeated statements of his intent.

THE COURT: All right. So that brings me to my next question. Can you point me to any evidence in the record other than the president's public statements and social media posts that construction is imminent? Grant you, the president's statements are big evidence. But any other -- anything else in the record?

MR. SANSONE: So we're relying on that affirmative evidence, coupled with the failure to -- the parties with direct knowledge of what the plans are and how imminent they

are, when presented with public statements, saying, "We are going to have the arch built. We're going to have it built by July 4th." They have every opportunity to come back and rebut that evidence.

THE COURT: But isn't that what Mr. Lands has done? He's director of the Park Service operation. The land is Park Service land. He's filed a declaration saying, "It's not -- it's in a conceptual phase. If it goes beyond that, we'll comply with all the regulations." And why should that not be enough?

MR. SANSONE: He's said if he's presented with a formal proposal, he will ensure that all of the required statutory and regulatory steps are followed. And again, we don't -- we have no basis for disputing what the National Park Service has said it intends to do.

But I think it's quite telling that the ballroom project, that was also on National Park Service land. And until quite recently, the White House was taking the position that the National Park Service was not looped in on that project, that -- in fact, that was their initial argument as to why the Plaintiffs in that case should have brought the very *ultra vires* claim that we bring here, is because that was not an agency project. That was not National Park Service initiated or managed.

In fact, the president has said in public

statements that Vince Haley, the director of domestic policy, the arch is his whole thing. And it's a big policy thing that he is in charge of.

THE COURT: I think if we hadn't had the White House ballroom situation, you might -- this all might be a little more academic than it is now.

The Plaintiffs argue -- and I quote -- "The NPS declaration casts no doubt on the president's plan to build the arch or on his professed intention to move forward with construction." And that's in your reply brief at Page 6.

Why is a declaration from the executive agency tasked with implementing any such project not sufficient? That's kind of like -- I mean, who else -- I've asked whether the Government would be willing to provide a declaration from the White House or the chief executive himself. And that was under advisement, I think.

But who else would you expect to make these assurances if not the director of the Park Service on whose land -- who's in charge of the land on which the memorial is to be built?

MR. SANSONE: Again, we would submit the White House or a representative of the president or a representative of Director Haley. Again, the president has represented that this is Director Haley's project to implement.

And so if in fact those plans have changed -- again, the plans that to this day are represented on the official WhiteHouse.gov website and is planned to coincide with the 250th anniversary of the nation, the individual whose plan that is and whose representations those are could let us know that plans have changed.

THE COURT: Do you have any case law to support this argument?

MR. SANSONE: I don't know that we've encountered quite this situation before.

THE COURT: We're in unique times, I grant you.

MR. SANSONE: At the risk of being redundant, I would say I think that Judge Leon's opinion from Tuesday sort of presents in very stark terms how this can all play out. In that case, on July 31st, the president made a statement that "We're going to move forward with a ballroom." There was no final agency action, or at least they represented that there was no action on the part of the National Park Service. Between July 31st and then October 20th, there were the bulldozers with no advance warning.

And so given that sort of, I guess, factual precedent, you know, I don't know that we can necessarily rely.

And again, they haven't represented -- if Mr. Lands's declaration had said, I've been in consultation

with the White House; I'm aware that the plan is, if this project moves forward, that they're going to seek authorization; they're going to seek a construction permit, that may well be sufficient. I'm not making any representation about a declaration we don't have.

But that is the sort of thing that we would expect to see if in fact these public statements no longer reflected the reality on the ground.

THE COURT: I'm going to press you a little on that one. What exactly -- if you can be more specific, what kind of declaration and from whom would be sufficient at this stage of the litigation?

MR. SANSONE: I think a declaration with anyone who has authority to know that the White House does not intend to move forward with construction of the arch unless and until authorization is sought from the National Park Service and compliance with all statutory and regulatory requirements.

THE COURT: All right. I'm moving now to the nature of the injury.

The Supreme Court has recognized aesthetic harm as a cognizable Article III injury in *Lujan*. But several of your declarants also frame their objections in terms of what the arch symbolizes, that it reflects unchecked executive power or that it disrespects veterans.

How do you distinguish the cognizable aesthetic injury from what Defendants characterize as a general idealogical grievance?

MR. SANSONE: So the injury is very much aesthetic. And in terms of what the arch is --

THE COURT: I mean, I guess what I'm asking is, why do the Plaintiffs' feelings factor into this?

MR. SANSONE: I mean --

THE COURT: Obviously, there's diminished enjoyment and all of that. But, you know, everybody has political viewpoints. Why should their political viewpoint factor into my calculus in this case?

MR. SANSONE: It influences why the -- what the nature of the aesthetic injury is.

But, you know, I think irrespective of what the arch symbolizes, they have stated that what the current configuration of monuments symbolizes is deeply significant to them.

And so the obtrusion of this monument --

THE COURT: But why wasn't that enough? I mean, normally, one would expect in a declaration from a plaintiff in a case like this about how this monument would affect their enjoyment of their visits to the Arlington cemetery and so on.

But the added language about its affront to, you

know, the rule of law and stuff, that's not -- those aren't things I can take into -- I don't think I can take those into account in finding standing here. Is this just verbiage?

MR. SANSONE: We're not relying on the sort of message that the arch communicates. But I think it is part of the, you know, reason why Plaintiffs are disturbed by this physical object.

THE COURT: But is it a reason that I can take -- that I should even take into account? People have lots of feelings about lots of things. But should those -- all of those feelings -- is all of that necessary to show standing here?

MR. SANSONE: Certainly not necessary, your Honor.

THE COURT: Okay. Mr. Lemmon and Mr. Byrnes state they plan to be interred at Arlington National Cemetery. How does that factor into the injury analysis? I mean, is dignitary harm to one's final resting place a legally cognizable injury?

MR. SANSONE: We're not treating that as a separate injury from the aesthetic injury. But we offer those facts as evidence of their connection to this very particular space.

So in other words, this isn't the sort of case in which the government puts up kind of an objectionable

billboard that people pass on their way to work and it sort of bothers them.

This is -- you know, consistent with the environmental standing cases, this is a situation where all four of our Plaintiffs have a deep, personal, meaningful connection with the land, with the site that they visit regularly.

But no. We're not relying on the plans to be interred as a sort of separate form of injury separate and apart from the aesthetic harm that we're alleging.

THE COURT: Which brings me to Mr. Loth. He's an architectural historian, not a veteran. Can you walk me through his specific concrete injury?

MR. SANSONE: Yes. I think just as people connect with spaces and find aesthetic appreciation in spaces for all different variety of reasons -- so, for example, somebody could go to the cathedral at Notre Dame and find enormous spiritual significance there because of their Catholic faith. Someone could also be non-Catholic and go there and appreciate the art, appreciate the stained glass and the carpentry.

So I think Mr. Loth has a very deep connection with the space that he details in his declaration. It's different in nature from those of the other three Plaintiffs, but it's no less significant. And it will

injure him no less to find this space that he finds rich in historical meaning and aesthetic significance to be disrupted by this arch.

THE COURT: If there was a declaration submitted by the White House, from the White House, or a representative of the White House stating that construction will not begin until NPS completes its procedural requirements, would that suffice to preserve the status quo going forward? In other words, would I need to issue an injunction in that case?

MR. SANSONE: It of course would depend on the specifics of the declaration. But likely. Likely, that would suffice.

THE COURT: Okay. Mr. Craigmyle, I have some questions for you.

You argue in your opposition that some of Plaintiffs' claimed harms are based on offended observer status or -- sorry -- offended observer theories.

But *Friends of the Earth versus Laidlaw* recognizes standing for plaintiffs who claim to use an affected area and whose aesthetic enjoyment would be lessened by the challenged activity or actions. So how do you distinguish that case, Supreme Court precedent? How did you distinguish that case?

MR. CRAIGMYLE: I think we distinguish that case

because it's unclear at this early stage how any disruption -- what the disruption to the aesthetic injury -- to the aesthetic interest would look like.

THE COURT: It's construction. It's construction of an arch that's going to permanently alter the sight line. So I mean, you've challenged the Plaintiffs' declaration. So I'm asking you -- and you've challenged their declarations because you said they're based on an offended observer theory. But the Supreme Court has blessed that theory. It's said that that's an appropriate theory. So how does your argument hold up?

MR. CRAIGMYLE: Well --

THE COURT: How does it work?

MR. CRAIGMYLE: I don't think offended observer has been blessed. I think -- we strip that away. We strip away --

THE COURT: No, no, no. Stop. You're jumping ahead. *Friends of the Earth* says there's standing for plaintiffs who claim to use an affected area and whose aesthetic enjoyment would be lessened by the challenged activity.

The Plaintiffs have filed a declaration saying they use the affected area and their aesthetic enjoyment of the area would be disrupted -- affected by the construction and the presence of the arch.

So how does that not meet the standard set forth in *Friends of the Earth?*

MR. CRAIGMYLE: I think at this stage that's still generalized and speculative, given we don't know what any arch would look like. We don't know how, if at all, it would affect the view. It may be the case that --

THE COURT: We do know what the arch would look like, because the president's put up drawings and watercolors and models. So we do have an idea. And he talked about that he wants it to be 250 feet to fit with the 250th anniversary.

MR. CRAIGMYLE: That decision -- that final decision has not been made, your Honor. It's certainly possible that could still change. And if and when the project is finalized, then I think the aesthetic injury analysis would change.

But at this point, given how early we are in the process, and given the lack of Plaintiffs' showing of how exactly any project would interfere with their aesthetic injury, I don't see any daylight between a generalized subjective disagreement to some structure being there.

THE COURT: Plaintiffs rely on *National Trust For Historic Preservation versus National Park Service*, 2026 Westlaw 533420 at *5, a district court case from February of this year.

That court found standing for a plaintiff who -- and I quote -- "expressly articulated her particularized connection to the land," end of quote. And she described how her aesthetic enjoyment would be diminished.

Isn't that what Plaintiffs have done here? Or are you saying it's all too speculative?

MR. CRAIGMYLE: I don't think that we've necessarily taken issue with their connection to the space. I think the focus that I was trying to draw out is how exactly that their relationship with the space would be interrupted. That, I think --

THE COURT: And that goes to your standing -- challenging their standing?

MR. CRAIGMYLE: I think it first and foremost goes to irreparable harm.

THE COURT: I'm talking about standing here.

MR. CRAIGMYLE: I do think it goes to standing, your Honor, and whether the Article III injury is particular and not generalized and whether it is certainly impending and not speculative.

THE COURT: I have some questions with regard to the threshold evidentiary issues.

You argue that under the logic that I used in *Musk*, I cannot take judicial notice of news articles for the truth of the statements asserted therein.

But *Musk* was -- and that's from my opinion, somewhat. But *Musk* was about DOGE actions reported by third parties with no official confirmation.

Here, the big chief himself, the president of the United States, has repeatedly made public statements on camera, on his Truth Social account, backed by an official White House fact sheet. So that's not exactly the case in *Musk*. And why can I not take judicial notice of these statements? I understand they're hearsay, but why can't I take judicial notice of them? They're statements of a party.

MR. CRAIGMYLE: So a couple --

THE COURT: They're more than just personal statements. As I said, they're corroborated and backed by an official White House fact sheet.

MR. CRAIGMYLE: So I think the Court could take judicial notice that -- of whatever the reports say, whatever the social media posts say. I think it's a different question whether the Court could accept those for the truth of the matter alleged, because it is still hearsay. And I think even taking the statements --

THE COURT: It's not hearsay. It's a statement of a party opponent. You keep saying it's hearsay. It's -- the president of the United States is a Defendant in this case, and he has made statements. That's not hearsay. A

statement of a party opponent is not hearsay.

MR. CRAIGMYLE: Well, I think the Plaintiffs have all but conceded he's not a proper Defendant. They haven't asked for any relief against him.

And then --

THE COURT: You're shifting. You're shifting here. You've repeatedly said this is hearsay. As of right now, the Defendant is -- one of the Defendants in this case is the president of the United States and the White House. And they've made statements. You've repeatedly said it's hearsay, and I feel compelled to correct you on that as an evidentiary standpoint. It's not hearsay as defined under the Federal Rules of Evidence.

It's a statement of a party who has not bothered to submit a declaration but -- you can't have it both ways. You haven't submitted a declaration on behalf of that Defendant, the other three Defendants; and you're saying, "Don't pay any attention to those other statements that are hearsay."

They're not hearsay. And instead of telling me how I am to weigh those statements, you keep saying, Plaintiffs haven't met their burden; Plaintiffs haven't met their burden.

The statements are part of their burden. The statements are part of their case.

So why can't I take judicial notice of them?

MR. CRAIGMYLE: There's only one statement that the Plaintiffs rely on that mentions a timeline.

THE COURT: All right.

MR. CRAIGMYLE: And that's the statement in the Politico article. And there's no sworn statement from the reporter saying --

THE COURT: What about the tweets --

MR. CRAIGMYLE: None --

THE COURT: -- the Truth Social postings, whatever you call them?

MR. CRAIGMYLE: None of those mention any specific timeline, your Honor, nor does the White House fact sheet -- it simply says that there's a plan for an arch to coincide --

THE COURT: That's a timeline. July 4th is a specific fixed date in time. That's a timeline. Every day, we get closer.

MR. CRAIGMYLE: But it says nothing about the timeline for when construction would start.

THE COURT: No. That's part of the problem, isn't it? It could start at the present time. I mean, notwithstanding Mr. Lands's declaration, which I have no doubt he is sincere in his declaration, but that doesn't mean it won't happen, does it, given what we've seen with

the ballroom.

MR. CRAIGMYLE: I think the ballroom is a fundamentally different situation, your Honor. It's in a different location. It's on the White House grounds. It involves different statutory authorities.

This is NPS-administered land. There will be final agency action from NPS before there is any construction. I think that is a fundamental difference between this situation and the East Wing case.

THE COURT: Okay. All right. While I have you up here, I want to turn to the *ultra vires* claims and the Commemorative Works Act, actually. Plaintiffs argue that the project that was authorized by the 1925 act was completed in 1932. The authorizing commission was dissolved by executive order in 1933 and the appropriated funds were largely exhausted.

Given those facts, which you haven't disputed, what is your argument that the statute has remaining operative force to justify a new monument?

MR. CRAIGMYLE: So the statute authorized the design that was submitted by the commission. And that design included both a bridge and a plan for developing Columbia Island, including two columns at the end of the bridge.

THE COURT: It was done. The project was

completed in 1932.

MR. CRAIGMYLE: No. The bridge was completed in 1932. The project itself and what was supposed to happen with Columbia Island was not finished. That authorization is still in effect.

THE COURT: I guess that's my question. It's your argument that even though the bridge was completed, the authorizing commission was dissolved and the appropriated funds are pretty much gone, that that's your hook here? The 1925 act?

MR. CRAIGMYLE: I think a couple of things.

Yes. What Congress authorized was a plan that has not been complete.

THE COURT: And so you can use that authorization into infinity?

MR. CRAIGMYLE: Well, in this specific situation, not only did Congress authorize the design as presented by the commission, which includes a development plan for Columbia Island --

THE COURT: It included an arch?

MR. CRAIGMYLE: I'm sorry?

THE COURT: Does it include an arch?

MR. CRAIGMYLE: It included two columns and it delegated discretion to make changes to the design.

THE COURT: Right. Did it contemplate an arch, a

250-foot arch?

MR. CRAIGMYLE: No. But it didn't need to, your Honor. I don't think that affects our authorization point, given the discretion to change the plan that was authorized.

THE COURT: Well, your grandfathering argument regarding the 1925 act, it relied -- your grandfathering argument relies on the 1925 act. And that authorized construction in accordance with the commission's design, which is why I asked you about the arch.

That design called for two separate columns surrounded by statues. So walk me through your statutory argument -- no pun intended -- of why the delegation in the 1925 act includes the authority to redesign the approved structure to be a single arch.

MR. CRAIGMYLE: The authorizing statute delegated discretion to make changes to the design, which --

THE COURT: To whom?

MR. CRAIGMYLE: At the time, to the commission.

THE COURT: So -- but right. And not to the president. Right? Not to the White House. Correct? Has the commission proposed a redesign? Has there been any proposal by anybody other than the president and the White House to put up an arch instead of the original design?

MR. CRAIGMYLE: So the commission's authority was transferred to the Park Service. The Plaintiffs don't rely

on that theory. The only theory they rely on is that the project was finished, which as we know is wrong.

THE COURT: But has the park -- maybe you contend it's wrong. Has the Park Service put forth an amended design, including an arch? Where is the arch coming from?

MR. CRAIGMYLE: At this point, it's still too early to tell, your Honor, because it's in the conceptual phase.

THE COURT: Are we just going to continue to pretend here that there has not been renderings and watercolors and talk of an arch even up to its height? That has come from the president of the United States and it's come from the White House, including the White House fact sheet. That's the only place we're getting an arch from, not the National Park Service. Right?

MR. CRAIGMYLE: Well, the declaration from the National Park Service says that if the project moves forward, it would follow these legal requirements including any requirements by -- that -- imposed by the commemorative --

THE COURT: The Park Service has not put forth the proposal for an arch; is that right?

MR. CRAIGMYLE: That's correct.

THE COURT: The only proposal for an arch has come from the White House; is that correct?

MR. CRAIGMYLE: It --

THE COURT: I'm not using "proposal" as a legal term.

MR. CRAIGMYLE: I don't think that means that the Park Service would never --

THE COURT: Is that right?

MR. CRAIGMYLE: Yes. The statements so far are from the media and social media accounts.

THE COURT: Of the president.

MR. CRAIGMYLE: Including the president, yes.

THE COURT: Okay.

MR. CRAIGMYLE: Again, I don't think that means the Park Service is -- if the project moves forward, the declaration says the Park Service would follow all legal requirements. Just because that process hasn't played out yet --

THE COURT: What I want you to explain to me is how the act which authorized construction in accordance with the commission's design, which said design calls for two separate columns surrounded by statues, walk me through how we get from there to an arch. I don't know -- I can't follow your statutory argument as to how the delegation in that act includes the authority to redesign the approved structure.

MR. CRAIGMYLE: It's the discretion Congress

delegated to make changes in the discretion as may be found necessary or advisable. So there is express -- an express delegation to make the change.

THE COURT: To the Park Service?

MR. CRAIGMYLE: With the authority that has now been transferred to the Park Service. And I don't think that question would be reviewable in any event, your Honor, given there are no standards by which to judge the original plan against any future plan.

THE COURT: Well, I think I know where I can find some renderings. But I don't want to get ahead of myself here.

The Commemorative Works Act, on their definition of commemorative work, as to the act's definition of commemorative work, the president has publicly described the arch as a triumphal arch, linked it to the nation's 250th anniversary and said it would be a symbol of American greatness for generations. The White House fact sheet calls it the Independence Arch.

How is that not a structure designed to perpetuate a significant element of American history? That's -- that doesn't seem to be in accordance with the CWA definition, does it?

MR. CRAIGMYLE: What seems to not be --

THE COURT: How is that a commemorative work, is

what I'm asking. The White House's description of it doesn't really square with the definition of -- with the act's definition of commemorative work. The commemorative work is to commemorate something. That's different from the description of a symbol of American greatness.

MR. CRAIGMYLE: That would just mean the Commemorative Works Act would not apply, your Honor.

THE COURT: But then -- but you're using the commemorative -- you're using the statute from 1925. Right? Wouldn't that require a commemorative work?

MR. CRAIGMYLE: No, your Honor. The statute from 1925 is relevant to the Commemorative Works Act because the definition under 8802(b) carves out works that were authorized before January 3rd of 1985.

But I think that your Honor has highlighted a good point, which is that there's still a lack of clarity on what any purpose for any final project would be. And that would dictate whether the other part of the definition of commemorative work would apply.

And I think that certainly goes to questions like ripeness and how a more concrete setting would be helpful in this case.

THE COURT: I might agree with you if we hadn't been given renderings and drawings of the intended Independence Arch.

All right. On this topic, I have some questions for Mr. Sansone.

If Defendants are right that the 1925 act grandfathers the project, what does that do to your motion?

MR. SANSONE: If the Defendants are right that the --

THE COURT: Well, what does it do to your case, not just your motion?

MR. SANSONE: We would still have 40 USC 8106 that would prohibit construction without congressional authorization.

So I suppose that that would constitute congressional authorization for purposes of that statute as well.

So I think if this Court were to find that the 1925 act constitutes congressional authorization to build a commemorative arch for the 250th anniversary in Memorial Circle, I do think that would pose problems for both of our -- both of our statutory hooks.

THE COURT: Even setting aside the grandfathering-under-the-act question, Memorial Circle falls within Area 1 under the CWA. What additional requirements does that impose and how does that affect the Defendants' path to construction even if they ultimately seek congressional authorization?

MR. SANSONE: Certainly.

So a work that is built in Area 1 has to secure congressional authorization not just once, but twice. The work itself has to be approved by Congress and the siting of the work within Area 1 also has to be specifically approved by Congress.

THE COURT: Generally speaking, a plaintiff can't seek judicial review of an agency action before the agency takes final action. And here, NPS has not yet made a final decision on arch construction. So in what way is your *ultra vires* claim not simply an attempt to circumvent the statutory limitations on judicial review?

MR. SANSONE: Because three out of the four Defendants here are not subject to the APA at all.

And as your Honor points out, National Park Service has not taken action that is reviewable under the APA. And as our prior colloquy sort of illuminated, we are not confident that the National Park Service will be driving this project forward.

And I would also point, your Honor, to *Chamber of Commerce versus Reich*, 74 F.3d 1322. That's a D.C. Circuit opinion in which the plaintiffs there had brought an *ultra vires* claim challenging an executive order as unlawful.

And during the pendency of the suit, the secretary of labor promulgated regulations implementing the executive

order. So obviously, those regulations would have been challengeable under the APA as final agency action.

The D.C. Circuit, however, held that the fact that regulations were later promulgated doesn't undercut the fact that at the time the plaintiffs filed suit, there was no final agency action to challenge. They still had a nonstatutory cause of action.

THE COURT: All right. I have some questions for you about Section 8106. Then I'll go back to Defendants.

What's your best argument based on the statutory text that Congress has extended Section 8106 to NPS?

MR. SANSONE: I think I would just point to the categorical nature of the language. "A building or structure shall not be erected" -- and it doesn't say by whom -- "shall not be erected on any reservation, park or public grounds of the federal government in the District of Columbia without express authority of Congress."

And I think as Judge Leon very comprehensively explained on Tuesday, there's no -- you know, that's categorical language. And that doesn't imply any sort of exception for the National Park Service or anyone else.

THE COURT: What level of specificity of congressional authorization is required?

MR. SANSONE: So I don't know in the abstract. I mean, certainly Defendants have pointed to the possibility

that if Congress were to enact an appropriation that that could constitute authorization. We don't dispute that in the abstract.

Certainly here, the only sort of authorization they have pointed to is the 1925 statute, which we don't believe applies.

But I think that's a question -- given the relative dearth of case law on this issue, I think that's something that would sort of have to be taken on a case-by-case basis.

THE COURT: Is it plausible that the statute requires Congress to approve specific structures on a project-by-project basis instead of through a general appropriation of funds? I'm not sure I want congresspeople taking aesthetic decisions.

MR. SANSONE: Sure. Yeah. I mean, we don't dispute that point in the abstract.

Again, I think we would have to sort of look at a sort of concrete setting, a particular statute and a particular proposed project. But yeah. We don't have any objection with the idea that a general appropriation -- you know, if, for example, it was to, you know, construct necessary maintenance facilities, et cetera, et cetera, would be sufficient.

THE COURT: Some questions for the Government on

that issue.

Do you concede that if the statute, Section 8106, is applicable, the proposed arch -- again, "proposed" meaning the arch that has been floated out there on White House websites and Truth Social websites -- that that arch qualifies as a structure in a park or public grounds of the federal government in the District of Columbia?

MR. CRAIGMYLE: Yes, your Honor.

THE COURT: Okay. Now, I have to give effect to the unambiguous text of a statute, even if there is contrary historical evidence. So what's your best argument based on the statutory text that Congress has never extended Section 8106 to the National Park Service?

MR. CRAIGMYLE: So I think that involves looking at the laws that came before 8106, the predecessor. And Congress set out two rules, one rule for parks in D.C. and one rule for parks outside D.C.

And the Interior Department had supervision over the parks outside D.C. Congress eventually consolidated those in Section 451 with the Park Service. And so that played the function that 8106 now plays. Then Congress eventually repealed it.

And so under our reading, the idea is that means that 8106 never -- no longer -- would no longer apply to the Park Service, does not apply to the Park Service, and 810

would still have effect by applying, for example, to the Agriculture Department, which supervises the National Arboretum.

THE COURT: So that was going to be my next question: Does the statute apply to other government agencies besides NPS?

MR. CRAIGMYLE: That's the one that immediately comes to mind, your Honor.

THE COURT: How does the fact that the Administration could request congressional appropriation for the arch provide authority under the statute if the Administration hasn't done so?

MR. CRAIGMYLE: I agree that there would be no further authorization unless and until Congress acts. Obviously, we think there is current authorization. But I think our point in mentioning that highlights the ripeness issue, that there could be facts that bear on the legal issues here in the meantime.

THE COURT: You argue that general NPS appropriations are sufficient -- constitute sufficient express authority of Congress under Section 8106. What level of specificity of congressional authorization is required?

MR. CRAIGMYLE: Our view is when 8106 applies, if there has not already been authorization, the level of

specificity is just the authorization to build on a particular piece of land.

THE COURT: All right. I have some final rounds. We're getting to the end. I have some questions for Plaintiffs on the Take Care Clause argument.

The Take Care Clause is generally understood as a structural provision that empowers Congress to hold the executive accountable and does not obviously confer rights on private litigants. So what's your best affirmative argument that it generates an implied private right of action?

MR. SANSONE: I think the best case for that would be the *Free Enterprise Fund* case from the Supreme Court, which essentially held that separation-of-powers principles are enforceable by private right of actions for injunctive relief.

And in the footnote in which the Court sort of explains as much, you know, they essentially say that there's -- unless there's a sort of affirmative reason, you know, why a particular provision would not be enforceable, private litigants can hold the government to their constitutional obligations.

THE COURT: In *Global Health Council versus Trump*, which is 153 F.4th 1, a D.C. Circuit case from last year, the Circuit held that a claim grounded in a statutory

violation cannot be repackaged as a freestanding constitutional claim under an implied equitable cause of action.

So how do you distinguish your Take Care Clause claim from the one rejected in that case?

MR. SANSONE: So in that case -- and that case in turn relied on *Dalton*, which I think is distinguishable for a similar reason, which is in both *Dalton* and *Global Health Council*, the way that the courts in those cases understood the statutory framework, Congress had authorized -- had conferred particular powers on the president. In *Dalton*, it was the power to close naval shipyards. In *Global Health Council*, as the D.C. Circuit panel understood the Impoundment Control Act, it was the ability to withhold certain congressionally appropriated funds and request their rescission.

In both of those cases, the Court understood the plaintiffs' claims to be that the president had failed to follow congressionally mandated procedures in exercising powers, substantive powers that he undisputedly had were he to follow the correct procedures.

This is a case where not only does the president have no affirmative authority under statute to sort of erect monuments wherever he chooses in the District of Columbia, but where Congress has explicitly and affirmatively withheld

that power for itself, the power to authorize such projects.

So the fact that the president has no substantive authority, I think, differentiates this case from those cases where again, as the courts understood the claims, the courts understood the claims to be that the president was exercising conferred authority in an infelicitous or, you know, a manner that the statutes didn't technically permit.

THE COURT: Well, you talked about in the answer before this *Free Enterprise Fund*, and then there's *Collins versus Yellen*, for the proposition that an implied equitable cause of action exists here.

But in *Global Health*, the Circuit distinguished both those cases on the grounds that the plaintiffs there challenged the constitutionality of the statute itself, not the president's conduct under it. Can you cite me any cases where a court recognized a freestanding Take Care Clause cause of action based solely on alleged excess of statutory authority as opposed to a challenge to the statute's constitutionality?

MR. SANSONE: So we do have the cite to the District of Oregon case in our reply brief. I can pull that up if your Honor would like.

THE COURT: I mean, I have your reply brief. I can look at that.

MR. SANSONE: I think that is the one that we have

that sort of affirmatively recognizes the Take Care Clause as the hook.

But I would also point to Justice Jackson's concurrence in *Youngstown*, which very expressly recognizes that presidential power is at its ebb when it is inconsistent with the express or implied will of Congress. And the only way that we know, or at least the Supreme Court has taught us that at least the best evidence of congressional will is statutory text.

And I think again, this is not a case where sort of Congress has laid out -- I think this is not a claim where we're saying, you know, the president didn't comply in all particulars with the sort of procedural requirements of the congressional -- the Commemorative Works Act. This is a case where Congress has said: There is no process to follow. You have no authority to act unless and until we, Congress, tell you that you do.

THE COURT: *Dalton* held that when the president acts pursuant to statute, even if he allegedly exceeds it, the claim is statutory, not constitutional.

So what is your theory for why your claim is not statutory, given that the project is being carried out -- you claim -- pursuant to a claimed statutory grant?

MR. SANSONE: Your Honor is referring to the 1925 statute?

THE COURT: Yes. You dispute that that statute applies, I assume?

MR. SANSONE: We certainly dispute that that statute applies. And I would happily speak about why.

But to the constitutional question, I mean, I think again this sort of -- the 1925 statute did not sort of rear its head until litigation. This was not an instance in which the president sort of announced, Pursuant to my authority under this statute, I am going to proceed with this sort of work.

And I think if -- it would create a very sort of problematic landscape if all that the president could do to remove a constitutional claim is in briefing for an alleged constitutional violation, an action for which he had produced no sort of statutory authority, to point to a statute, however irrelevant, however inapplicable, and to just sort of rely on that and say, Therefore, there is no constitutional claim.

THE COURT: You invoke *Swan versus Clinton* for the proposition that injunctive relief again subordinate executive officials rather than the president directly is permissible.

But how does that help you establish a cause of action as opposed to merely establishing that the remedy you seek is not categorically barred?

MR. SANSONE: We're not relying on that for the cause of action.

THE COURT: Okay.

MR. SANSONE: We're relying on that for the remedy.

THE COURT: All right. Mr. Craigmyle.

Plaintiffs are seeking an injunction against Director Haley, the Executive Office of the President and the National Park Service. Under *Youngstown* and *Swan versus Clinton*, courts can enjoin subordinate officials from carrying out unlawful presidential directives.

So why doesn't that framework resolve your justiciability objections?

MR. CRAIGMYLE: I don't think it shows that this would be outside a normal statutory review scheme, meaning the APA. It would be -- it's -- the Plaintiff would need to show here that one of those actors would be in charge of the project, which was the case in the East Wing case. That was an entity controlling the project that was not subject to APA review. That's why an *ultra vires* claim mapped onto that situation.

That's not this situation here, where we know we will have final agency action from the National Park Service before any construction.

THE COURT: And I know you argue that this is a

statutory violation being repackaged as a Take Care Cause claim. But if I find that the Commemorative Works Act and Section 8106 clearly prohibit this project, that is, that there is no plausible statutory authority, does that end your argument? Does your argument collapse? And does the case start to look more like *Youngstown*?

MR. CRAIGMYLE: I don't think so, your Honor. I think that just means there would be a lack of necessary statutory authority.

We haven't argued here that the president has freestanding authority to put a structure on Memorial Circle.

THE COURT: Can you -- and I'm moving now to the balance of equities and the public interest. Can you identify specific steps that you would be prevented from lawfully taking if I were to grant Plaintiffs' injunction? What could you not do?

MR. CRAIGMYLE: So I think at least under a plausible reading of what they've asked for, if the process moved forward, the National Park Service would be unable to do any NEPA review, any National Commission Planning Act, anything that would move the ball forward in the planning and execution phase. I think that would be prohibited under the injunction they've asked for. And those are -- depending on the specifics of the project, those could be

legal requirements.

THE COURT: Assuming that the injunction that they've asked for wouldn't bar the government from building an authorized arch, what is the specific concrete harm the government will suffer if I've enjoined -- if I enjoin construction pending merits?

MR. CRAIGMYLE: Well, I think there would be -- there's necessarily harm to the executive branch anytime the judicial branch interferes with its affairs. And I think that's only magnified in this situation, where we're dealing with a situation that a sworn declaration says is only at the conceptual phase.

THE COURT: Do you agree that there is a public interest in requiring compliance with the congressional scheme that forms the basis of the Commemorative Works Act?

MR. CRAIGMYLE: Yes. I agree there's a public interest in following all of the statutes Congress --

THE COURT: How does that factor cut against an injunction? An injunction would say you just have to follow the statutory requirements. It's just because it's an interference on the executive branch?

MR. CRAIGMYLE: Well, that sounds like an "Obey the Law" injunction.

THE COURT: Well, you know, the problem is, that's exactly what happened in the ballroom case.

MR. CRAIGMYLE: I think here we have a sworn declaration that says if the project moves forward, the Park Service will comply with any and all legal requirements. And I think the precedent cuts sharply against an injunction that simply requires the government to follow the law. And that's -- one of the roles that the final agency action requirement plays is, rather than sort of programmatic remedies, they're targeted to specific concrete decisions.

THE COURT: The proposed arch, at least as presented by the White House and the executive, would sit near one of the most heavily traveled aerospace corridors in the country, near Reagan National Airport. There are multiple statutory and regulatory review processes that are required before a structure could be lawfully built.

So isn't preserving the status quo pending those reviews in the public interest given where this proposed arch would sit?

MR. CRAIGMYLE: Paragraph 11 of the Lands declaration explained that the Park Service would comply with any of those requirements imposed by the Federal Aviation Administration, your Honor.

THE COURT: Thank you.

Mr. Sansone?

Actually, Mr. Craigmyle, while I have you, let me just keep you up here rather than having you run back and

forth.

If I'm inclined to issue some form of injunction, what language would you propose to ensure that the injunction does not interfere with legitimate preconstruction compliance activities? Like you said, you believe that it would stop NPS from even beginning the regulatory compliance it is required to do. What language would you propose to allow that to happen? And I realize I'm putting you on the spot here.

MR. CRAIGMYLE: Yeah. I think I'd want to think a little more about that, your Honor. It would probably depend on the theory that the Court finds Plaintiffs have shown a likelihood of success on the merits for. But I think at a minimum, a low-hanging fruit to carve out would be following any statutory or planning processes, you know, short of breaking ground I think would be something easy to take off the table.

THE COURT: So I have two -- there's many options I have. One of them is to require -- is to order Defendants to produce a declaration from the executive branch, from either -- from one of the other three Defendants, from the director of -- was it the White House -- Director Haley --

MR. CRAIGMYLE: Domestic Policy Council.

THE COURT: Yes.

-- setting forth -- answering the questions I

asked earlier about whether any contracts have been bidded, submitted for bid, contracts have been awarded, funds have been appropriated, permits have been pulled, any and all steps that have been taken with regard to the building of this arch.

Short of that, would the parties be willing to meet and confer and try to hammer out a consent order by 5:00 tomorrow stating that all Defendants, including Mr. Haley and the Executive Office of the President, agree not to break ground before seeking NPS approval and abiding by all congressional approval and statutory review requirements? Would the parties be willing to try and work out a consent order in lieu of me having to issue -- having to rule on the request for an injunction?

I don't want -- what I do not want to happen is for ground to be broken while this case is pending. And the declaration from Mr. Lands does not satisfy me that that won't happen. This is no reflection on Mr. Lands at all.

But I would be willing to entertain a consent order or willing -- and I think the Plaintiffs should be -- that there won't be any ground broken or anything -- any steps taken that's going to begin construction of this project until I've had a chance to reach the merits, or at least that the Government will give sufficient notice that I can then -- I can hold the motion for injunction in abeyance

or the Plaintiffs can renew their motion for an injunction. But I want to make sure that happens is that I don't wake up tomorrow and get an emergency motion for a TRO because bulldozers are at the site. That's what I'm concerned about.

So I'm willing to have the parties meet and confer and see if they can come up with something satisfactory by 5:00 p.m. tomorrow. If not, I will proceed to a ruling on the motion.

Is that something you all would be willing to do?

MR. CRAIGMYLE: I'm happy to take it back, your Honor.

THE COURT: Okay. That would help a lot.

So if -- I'd like you to notify me by 5:00 p.m. tomorrow if you can come to an agreeable consent order with proposed language.

And if not, if you notify me that you have not been able to do that, then I'm going to ask for supplemental declarations from the Government next week.

MR. CRAIGMYLE: And the first option, your Honor, would be an agreement between us that there would be no construction unless and until there's a request to the Park Service?

THE COURT: And that notice is given and all of that. Yes. You all can work out the contours of it. And

if you find it mutually agreeable, then I'll sign it.

But I think if you can do that, then that would definitely slow this down a bit and give us time to consider and reflect without me having to issue an injunction. And we can go from there.

So let me know either way. If you've come to an agreement on a consent order, you just give me the -- submit the order with the proposed language. If you have not been able to come to an agreement, then I want the Government to tell me when they would be able to provide me the requested declarations, or if you'll be able to provide me those declarations from the -- from Mr. Haley.

MR. CRAIGMYLE: So I just want to make sure that I fully understand Option No. 2. That would be a declaration from Defendant Haley --

THE COURT: And the Executive Office of the White House.

MR. CRAIGMYLE: And that declaration --

THE COURT: Would set forth any and all -- all information regarding what steps have been taken for the arch. Plans, drawings, permits, funds, all of that. I won't need it. At least I won't need it anytime soon. But I won't need it if you all can come to a consent order.

MR. CRAIGMYLE: I understand, your Honor.

THE COURT: Okay. Thank you all. I know it's

been -- oh, excuse me. And the declaration -- again, assuming you all aren't able to reach a consent order, the declaration would set forth whether the Defendants intend to seek National Park Service authorization. Yes or no.

MR. CRAIGMYLE: So I guess my -- it seems like the declaration is requiring us to prove a negative.

THE COURT: No. Well, it's not requiring -- it's pretty -- I want facts. I want to know all the steps that have been taken by those Defendants to build the arch. Just because NPS says we're not doing these things doesn't mean that the Defendants aren't taking actions to get this going. That's my problem.

There are -- NPS's declaration doesn't mean steps aren't being taken. And you weren't able to give me that information. So that's the information I want.

And I also want to know whether the Defendants intend to seek NPS authorization to build this arch. And I think, given what happened in Judge Leon's case, I think that's information that the Court should have. If you don't want to give it, I mean, I can factor that in as well.

MR. CRAIGMYLE: I understand that your Honor will probably disagree. But just for the record, our view is that if there's a gap here, it just suggests that Plaintiffs haven't met their burden. The appropriate course would be to rule on their motion and deny it.

THE COURT: Thank you.

It's been a long afternoon. Thank you all for your presentations and in dealing with my many, many, many arcane questions.

Thank you.

(Proceedings concluded at 3:39 p.m.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 3rd day of April, 2026.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269