**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MICHAEL LEMMON, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 26-cv-544 (TSC) |
| DONALD J. TRUMP, et al., | ) ) ) | **DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | ) ) ) ) | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.      Factual And Procedural Background .................................................................. 2

          A.      Plaintiffs' Complaint challenges only incipient arch discussions, while failing to identify any official agency action. ................................. 2

          B.      Defendants responded to Plaintiffs' preliminary injunction motion with two declarations establishing that arch construction will not begin unless and until the National Park Service issues a final agency action authorizing construction. .................................................... 4

    II.     Legal Background ............................................................................................. 6

          A.      Arlington Memorial Bridge Commission ................................................. 6

          B.      Commemorative Works Act ...................................................................... 8

STANDARD OF REVIEW ................................................................................................. 8

    I.      On a Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1), Plaintiffs Bear the Burden of Establishing That the Court Has Subject Matter Jurisdiction. ...................................................................................... 8

    II.     Federal Rule of Civil Procedure 12(b)(6) Requires Plaintiffs to State a Claim to Relief That Is Plausible on Its Face. ................................................. 9

ARGUMENT ..................................................................................................................... 10

    I.      Plaintiffs Have Failed To Carry Their Burden To Establish Subject Matter Jurisdiction. .......................................................................................... 10

          A.      Plaintiffs have not carried their burden to establish imminent injury ....... 11

          B.      Even if Plaintiffs Had Satisfied the Imminence Requirement, They Lack Standing Because They Have Not Alleged a Cognizable Harm from Arch Construction. ....................................................................... 16

          C.      Plaintiffs' Alleged Controversy Is Also Moot. ........................................ 17

    II.     The Complaint Should Be Dismissed As Prudentially Unripe. ........................... 19

    III.    Plaintiffs Fail to Plausibly Allege a Claim for Relief ........................................ 21

      A.      Plaintiffs have failed to state a viable *ultra vires* claim............................ 21

      B.      Plaintiffs have failed to state a constitutional claim ................................ 29

CONCLUSION.................................................................................................................... 31

# TABLE OF AUTHORITIES

**Other Authorities**

*Abbott Labs v. Garner*,
387 U.S. 136 (1967)................................................................................................ 20, 21

*Akinseye v. District of Columbia*,
339 F.3d 970 (D.C. Cir. 2003) ...................................................................................... 9

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)...................................................................................................... 17

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019)...................................................................................................... 16

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) .................................................................................... 20

*Arizona v. Mayorkas*,
600 F. Supp. 3d 994 (D. Ariz. 2022) .......................................................................... 30

*Armstrong v. Exec. Off. of the President*,
90 F.3d 553 (D.C. Cir. 1996) ...................................................................................... 22

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ...................................................................................... 11

\*  *Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................... 9, 10, 11, 13, 14

*Atl. States Legal Found. v. EPA*,
325 F.3d 281 (D.C. Cir. 2003)..................................................................................... 20

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015)..................................................................................... 3

*Bauxites de Guinee,*
456 U.S. 694 (1982)...................................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................... 9

*Center for Biological Diversity v. McAleenan*,
404 F.Supp.3d 218 (D.D.C. 2019) .............................................................................. 30

*Chamber of Com. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)..................................................................................... 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)......................................................................................... 10, 11, 14

*Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*,
   313 F. Supp. 3d 285 (D.D.C. 2018) ............................................................................. 19

*Ctr. for Democracy & Tech. v. Trump*,
   507 F. Supp. 3d 213 (D.D.C. 2020) ............................................................................. 14

* *Dalton v. Specter*,
   511 U.S. 462 (1994) .............................................................................................. 22, 30

*Davis v. FEC*,
   554 U.S. 724 (2008) ..................................................................................................... 10

*Davis v. Latschar*,
   202 F.3d 359 (D.C. Cir. 2000) ..................................................................................... 14

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
   85 F. Supp. 3d 250 (D.D.C. 2015) ............................................................................... 21

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ..................................................................................................... 23

*Devia v. Nuclear Regul. Comm'n*,
   492 F.3d 421 (D.C. Cir. 2007) ..................................................................................... 20

*Diamond v. Charles*,
   476 U.S. 54 (1986) ....................................................................................................... 16

*Doe v. Doe Agency*,
   608 F. Supp. 2d 68 (D.D.C. 2009) ............................................................................... 19

* *Env't Def. Fund v. FERC*,
   2 F.4th 953 (D.C. Cir. 2021) ................................................................................... 16, 17

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ..................................................................................................... 16

*Fed. Bureau of Investigation v. Fikre*,
   601 U.S. 234 (2024) ..................................................................................................... 17

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................................................... 23

*Gallardo v. Marstiller*,
   596 U.S. 420 (2022) ..................................................................................................... 27

*Gen. Motors Corp. v. Envtl. Prot. Agency*,
   363 F.3d 442 (D.C. Cir. 2004) ....................................................................................... 9

*Giron v. Zeytuna, Inc.*,
   597 F. Supp. 3d 29 (D.D.C. 2022) ............................................................................... 20

* *Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ............................................................................. 22, 30, 31

iv

*Goldstein v. California*,
  412 U.S. 546 (1973) .................................................................................................. 27

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
  185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................................... 9

*Gustave–Schmidt v. Chao*,
  226 F. Supp. 2d 191 (D.D.C. 2002) .......................................................................... 10

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) ............................................................................................ 10, 17

*Horses of Cumberland Island v. Haaland*,
  No. 1:23-CV-1592-SEG, 2024 WL 5430835 (N.D. Ga. Nov. 8, 2024) ................................... 14

*Indigenous People of Biafra v. Blinken*,
  639 F. Supp. 3d 79 (D.D.C. 2022) ............................................................................ 11

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ................................................................................ 3, 4

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021) ................................................................................... 13

*Kingman Park Civic Ass'n v. Gray*,
  956 F. Supp. 2d 230 (D.D.C. 2013) ........................................................................... 11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ............................................................................................. 8

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .......................................................................................... 27, 28

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................... 14, 16

*Martin v. Mott*,
  25 U.S. 19 (1827) ............................................................................................... 24

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) .............................................................................................. 30

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................................................. 10

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
  595 U.S. 109 (2022) ............................................................................................. 27

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ............................................................................................. 20

*Nat'l Parks Conservation Ass'n v. Semonite*,
  282 F. Supp. 3d 284 (D.D.C. 2017) ........................................................................... 15

v

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ............................................................................. 21

\* *Nuclear Regul. Comm'n v. Texas*,
    (*NRC*), 605 U.S. 665 (2025) ...................................................................... 22, 23, 24

*Pub. Citizen, Inc. v. FERC*,
    92 F.4th 1124 (D.C. Cir. 2024) ........................................................................ 18, 19

*Rushforth v. Council of Econ. Advisers*,
    762 F.2d 1038 (D.C. Cir. 1985) ............................................................................. 22

*Smith v. Shimizu*,
    544 F. Supp. 2d 15 (D.D.C. 2008) ......................................................................... 15

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ............................................................................. 22

*State Nat'l Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) ................................................................................. 14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................................................... 15

*Tefera v. OneWest Bank, FSB*,
    19 F. Supp. 3d 215 (D.D.C. 2014) ......................................................................... 10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ............................................................................................... 13

*Texas v. United States*,
    523 U.S. 296 (1998) ............................................................................................... 19

*Toilet Goods Ass'n v. Gardner*,
    387 U.S. 158 (1967) ............................................................................................... 20

*Turlock Irr. Dist. v. FERC*,
    786 F.3d 18 (D.C. Cir. 2015) ................................................................................. 13

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
    998 F.3d 926 (D.C. Cir. 2021) ............................................................................... 14

*United States ex rel. Hutchins v. DynCorp Int'l, Inc.*,
    342 F. Supp. 3d 32 (D.D.C. 2018) ......................................................................... 12

*United States v. Cole*,
    459 F. Supp. 3d 116 (D.D.C. 2020) ....................................................................... 10

*United States v. George S. Bush & Co.*,
    310 U.S. 371 (1940) ............................................................................................... 24

\* *United Transp. Union v. I.C.C.*,
    891 F.2d 908 (D.C. Cir. 1989) ............................................................................... 11

*Wash. All. of Tech. Workers v. U.S Dep't of Homeland Sec.*,
  50 F.4th 164 (D.C. Cir. 2022)................................................................................ 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952).............................................................................................. 30

**Statutes**

16 U.S.C. § 451...................................................................................................... 28

40 U.S.C. § 8106............................................................................................. 4, 25, 29

40 U.S.C. § 8902(a)(1).......................................................................................... 8, 25

40 U.S.C. § 8902(b)............................................................................................. 8, 25

40 U.S.C. §§ 8722.................................................................................................. 13

5 U.S.C. §§ 124–132................................................................................................ 8

5 U.S.C. §§ 124–132 (1934)...................................................................................... 8

Pub. L. 101-512..................................................................................................... 29

Pub. L. No. 103-111............................................................................................... 29

Pub. L. No. 104-333............................................................................................... 29

Pub. L. No. 99-652.................................................................................................. 8

Pub. L. No. 99-652 § 10(e)........................................................................................ 8

**Rules**

Fed. R. Civ. P. 12(h)(3)............................................................................................. 9

Federal Rule of Civil Procedure 12(b)(1) ............................................................. i, 8, 19

Federal Rule of Civil Procedure 12(b)(6) ................................................................. i, 9

**Other Authorities**

Pub. L. No. 57-81.................................................................................................. 26

Pub. L. No. 62-432.................................................................................................. 6

Pub. L. No. 65-181................................................................................................. 28

Pub. L. No. 68-463.................................................................................................. 6

Pub. L. No. 73-109.................................................................................................. 8

Pub. L. No. 76-417................................................................................................. 28

Pub. L. No. 80-841................................................................................................. 29

### **INTRODUCTION**

Plaintiffs filed this lawsuit to challenge the Federal Government's plan to build an arch on Memorial Circle. Because Defendants have not made a final decision about arch construction, Plaintiffs do not challenge final agency action. They instead rely on media reports and conclusory allegations—unsupported by concrete facts—that Defendants may begin arch construction without getting the necessary approval from the National Park Service (NPS), the Executive Branch agency with jurisdiction over Memorial Circle.

Plaintiffs' maneuver, which would turn the Administrative Procedure Act (APA) on its head, fails many times over. Plaintiffs lack standing because they have failed to plausibly allege that arch construction is imminent, and the Court can take judicial notice that arch planning processes are still at the early stages before two third-party agencies. Their manufactured theory that Defendants will begin construction without final agency action lacks factual support and, at this point, is moot because Defendants have confirmed that arch construction will not begin unless and until NPS authorizes it.

Plaintiffs' claims fare no better on the merits. Plaintiffs lack a cause of action for their statutory claims because they have not challenged final agency action. They instead call their claims *ultra vires*, but *ultra vires* review is unavailable when a statutory review scheme provides a meaningful and adequate opportunity for judicial review. The APA is such a scheme, and Plaintiffs must wait for final agency action. Even if *ultra vires* review were available, Plaintiffs' claims would still fail because they rely on standard statutory-violation arguments. That problem dooms their Take Care Clause claim, too, which relies on a purported statutory violation. In all events, there is no statutory violation because Defendants have any congressional authorization they would need to build an arch. Congress has already authorized construction of two tall columns surmounted by statues on Columbia Island. At the same time, Congress delegated the authority to

1

modify those designs. Although those columns have not yet been built, the statutory authority to build them remains.

The Court should dismiss this case.

## BACKGROUND

**I.    Factual And Procedural Background**

### A.  Plaintiffs' Complaint challenges only incipient arch discussions, while failing to identify any official agency action.

This February 19, 2026, lawsuit challenges incipient discussions about constructing an arch on Memorial Circle. As Plaintiffs' Complaint concedes, "Defendant National Park Service is an agency within the U.S. Department of the Interior" "responsible for administering and maintaining the land on Memorial Circle." Dkt. 1, Compl. ¶ 14. But the Complaint does not allege that NPS has taken final agency action authorizing arch construction. Nor does the Complaint even bring claims under the APA.

The Complaint instead challenges an unidentified alleged "plan" or "directive" concerning the arch. *See, e.g.*, Compl. ¶ 4 ("Defendants plan to construct the Arch prior to July 4, 2026"); ¶ 64 (alleging, without identifying, "the President's directive to plan and construct an arch on Memorial Circle by July 4, 2026"). But Plaintiffs fail to specify any Executive Order, Presidential Proclamation or other official presidential action concerning the arch. Their Complaint thus seeks a novel form of non-statutory judicial review, in which the Court reviews preliminary discussions, rather than a final agency or an official presidential action.

The Complaint principally relies on media reports to describe this alleged arch "plan," but those same reports state that arch plans are neither official nor final. For example, Plaintiffs repeatedly cite a CNN article discussing the proposed arch. Compl. ¶¶ 38–39. While that article

states that the President may "sign an executive order for [arch] construction,"[1] the Complaint does not identify any such executive order or any other official executive action.

That same CNN article states that the arch "design is being 'refined' . . . and will be presented for approval to a pair of key commissions, the National Capital Planning Commission and the Commission on Fine Arts." Klein et al., *supra* n.1. In addition to review by those two commissions, the article reports that "the arch may face other more challenging reviews that require public input, including under the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA). As part of those reviews, stakeholders are expected to be consulted, including Arlington National Cemetery, the National Park Service and the DC State Historic Preservation Office, among others." *Id.*

The Complaint fails to allege that these review processes had even begun, much less were completed, when the Complaint was filed. Indeed, the review process outlined in the CNN article did not begin until *after* Plaintiffs filed their Complaint. On April 8, 2026, the Department of the Interior submitted to the Commission of Fine Arts (Arts Commission) "a set of conceptual design options for a monumental arch" for discussion at an April 16, 2026, meeting. Ex. A, Letter from Gregory D. Wischer to the Honorable Rodney Mims Cook, Jr..[2] The design concepts in that Arts Commission submission "are exploratory and intended to support discussion rather than advance a specific proposal," as Interior sought to initiate "an early dialogue with the Commission [that]

---

[1] Ex. C, Betsy Klein et al., *Trump forges ahead with plans for 250-foot arch despite concerns on the ground and in the air*, CNN (Feb. 10, 2026), https://www.cnn.com/2026/02/10/politics/independence-arch-dc-concerns-vis (Klein et al.). "A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).

[2] The Court should also take judicial notice of "public records" when resolving a motion to dismiss. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

would be invaluable in shaping how such a concept could be developed responsibly and in accordance with the high design standards that define Washington, D.C." *Id.* On April 17, 2026, the National Capital Planning Commission (Planning Commission) released its agenda items for its May 7, 2026 meeting. Ex. B, Planning Commission Agenda Items. While a New Monumental Arch is not listed on the agenda for that meeting, it is identified as a project anticipated for review by the Planning Commission over the next six months. *Id.* at 5. These developments, which are subject to judicial notice, highlight the premature nature of this lawsuit.

Plaintiffs' Complaint concludes by asserting two claims against unidentified "official executive action." Compl. ¶ 52. Plaintiffs' first claim asserts that "Defendants' construction of the Arch without congressional approval and without satisfaction of procedural prerequisites" is ultra vires in violation of the Commemorative Works Act, 40 U.S.C. § 8106, NEPA, and Section 106 of NHPA. *Id.* ¶¶ 52–57. That ultra vires claim is premised on Plaintiffs having "no meaningful and adequate opportunity for judicial review." *Id.* ¶ 58. Plaintiffs' second claim asserts that "the President's directive to plan and construct an arch on Memorial Circle by July 4, 2026, without congressional authorization . . . and without complying with the numerous statutory requirements . . . violates the Take Care Clause" of the Constitution. *Id.* ¶ 64.

**B. Defendants responded to Plaintiffs' preliminary injunction motion with two declarations establishing that arch construction will not begin unless and until the National Park Service issues a final agency action authorizing construction.**

One week after filing their Complaint, Plaintiffs moved to preliminarily enjoin Defendants other than the President "from taking any steps to construct or to direct or facilitate construction of a commemorative arch in Memorial Circle." Dkt. 7 at 1.

Defendants explained that Plaintiffs' preliminary injunction motion was premature, as NPS had not yet "completed its decision-making process" on arch construction. Dkt. 12-1, Decl. of Frank Lands ¶ 15 (Lands Decl.). "If the potential project moves beyond the conceptual stage, NPS

4

will comply with all applicable laws and regulations including, but not limited to, [NEPA], Section 106 of the [NHPA], Section 7 of the Endangered Species Act ("ESA"), Federal Aviation Administration ("FAA") regulations, and any other applicable laws and regulations, prior to initiating construction of an Arch or authorizing the initiation of such activities." *Id.* ¶ 7; *see also id.* ¶¶ 8–14 (explaining other procedural requirements NPS would comply with before authorizing arch construction).

Plaintiffs contended that the Lands Declaration was insufficient to address their concerns because the "NPS declaration casts no doubt on the *President's* plan to build the arch or on his professed intention to move forward with construction." Dkt. 13 at 6.

Given Plaintiffs' concerns about the Lands Declaration, the Court started its April 2, 2026 preliminary injunction hearing by asking Defendants why they had "not submitted a sworn declaration from a White House representative stating that the [P]resident does not intend to direct that construction begin without seeking National Park Service approval." Tr. 20:25 to 21:3. After explaining that they should not bear the burden to disprove Plaintiffs' allegations, Defendants emphasized that there will be final agency action before any authorization to initiate or begin or permit construction. Tr. 21:20–23.

The Court also asked Plaintiffs why the Lands Declaration was insufficient. Tr. 30:11 to 31:10 ("Why is a declaration from the executive agency tasked with implementing any such project not sufficient?"). Plaintiffs insisted that they needed a declaration from a representative of the White House. *Id.* 30:21–25.

After the hearing, Defendants provided another declaration that again confirmed arch construction will not begin unless and until NPS issues a final agency action authorizing it. Dkt. 24-1, Declaration of Joshua Fisher ¶ 1 (Fisher Decl.) (noting that the declarant, Joshua Fisher, is

an Assistant to the President and Director of the Office of Administration, Executive Office of the President). The Fisher Declaration confirms—as alleged at Paragraph 14 of the Complaint—that NPS "is the Executive Branch agency with jurisdiction over Memorial Circle and, under existing statutory requirements, its approval or authorization is a condition precedent to construction on that land." *Id.* ¶ 2. As "[n]either the Director of the Domestic Policy Council nor the Executive Office of the President will authorize construction" of the arch, such construction "will not begin unless and until NPS follows all applicable legal requirements and issues a final agency action authorizing arch construction to proceed." *Id.* ¶¶ 3–4.

## II.    Legal Background

### A.  Arlington Memorial Bridge Commission

Congress created the Arlington Memorial Bridge Commission (Bridge Commission) to report "to Congress a suitable design for a Memorial Bridge across the Potomac River." Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913).[3]  The Bridge Commission reported its design in 1924, proposing designs not only for the bridge, but also for Columbia Island at the bridge's west end.[4] And Congress authorized construction to proceed "in accordance with the design" in the Bridge Commission Report, while empowering the Bridge Commission to make design changes "as in its discretion may be found to be necessary or advisable." Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925).

---

[3] The Bridge Commission consists of "the President of the United States, the President of the Senate, the Speaker of the House of Representatives, and the chairman of the Committees on Public Buildings and Grounds of the Senate and House of Representatives."  37 Stat. at 855.

[4] Report of the Arlington Memorial Bridge Commission. Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

The design Congress approved called for the "development of Columbia Island as a park," including "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Bridge Commision Report 40–41. "The columns are 166 feet high or practically of the same height as the Colonne de Juillet in Paris." *Id.* at 41.

But the tall columns that Congress approved have not yet been built, as the Bridge Commission acceded to countervailing forces.  Aviation interests expressed concern that "the proposed erection of two columns, each 200 feet high," would create safety risks for planes landing at Washington-Hoover airport. *Washington Post*, Conference Is Set on Island Columns, September 30, 1931. And they petitioned President Hoover, who was then chairman of the Bridge Commission, to block the project. *Washington Post*, Fliers Enter Fight on Island Columns, Nov. 28, 1931; *Washington Post*, Bridge Pillar Fight Will Go to Hoover, Dec. 2, 1931. The architect of the Arlington Memorial Bridge, William Kendall, "felt that the columns were absolutely necessary to his design and even went so far as to write President Hoover (who had asked that the columns be omitted) giving his arguments for keeping them, including a suggestion that the airport be moved if interference with aircraft was really a problem."[5] But Kendall's appeal to President Hoover was unsuccessful. *Id.*

After the Bridge Commission decided against the columns in December 1931, *id.*, Washington-Hoover Airport closed in 1941, being replaced by Washington National Airport (which is now Ronald Reagan Washington National Airport), *Washington Post*, Washington Airport, World's Finest, Starts Operation Tomorrow (June 15, 1941). And the United States Department of War purchased the land once occupied by Washington-Hoover Airport to build the Pentagon. *See Washington Post*, Million-Dollar Check Closes Airport Deal (Sept. 20, 1941).

---

[5] Sue A. Kohler, The Commission of Fine Arts: A Brief History 1910–1995, 26 (1996).

Although the Bridge Commission decided against building the columns in 1931, neither the underlying Congressional authorization to build the columns—nor the discretion to modify column design—have expired. During the New Deal-era reorganization of government, President Franklin Delano Roosevelt transferred the Bridge Commission's functions to the Office of National Parks, Buildings, and Reservations in the Department of the Interior. 5 U.S.C. §§ 124–132 (1934); Executive Order 6166 § 2. And Congress renamed that office as the National Park Service. Department of the Interior Appropriations Act, Pub. L. No. 73-109, ch. 38, 48 Stat. 362, 389 (1934).

### B. Commemorative Works Act

In 1986, Congress approved the Commemorative Works Act, which sets forth specific procedures for building commemorative works in certain areas of the District of Columbia. Pub. L. No. 99-652, 100 Stat. 3650 (1986), codified at 40 U.S.C. ch. 89.  It applies to commemorative works "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history, except that the term does not include any such item which is located within the interior of a structure or a structure which is primarily used for other purposes."  40 U.S.C. § 8902(a)(1). The Act "does not apply to commemorative works authorized by a law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3654, codified at 40 U.S.C. § 8902(b).

### STANDARD OF REVIEW

### I. On a Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1), Plaintiffs Bear the Burden of Establishing That the Court Has Subject Matter Jurisdiction.

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377

8

(1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency,* 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").

"[B]ecause subject-matter jurisdiction is an 'Art. III as well as a statutory requirement, . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia,* 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982)). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## II.    Federal Rule of Civil Procedure 12(b)(6) Requires Plaintiffs to State a Claim to Relief That Is Plausible on Its Face.

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly:* "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotations omitted). A pleading

must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.* (internal quotations omitted), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In ruling upon a motion to dismiss, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave–Schmidt v. Chao,* 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted). Courts can take judicial notice of public records, such as the existence of "ongoing" government proceedings. *United States v. Cole*, 459 F. Supp. 3d 116, 122 (D.D.C. 2020); *see also Tefera v. OneWest Bank, FSB*, 19 F. Supp. 3d 215, 220 (D.D.C. 2014).

## **ARGUMENT**

**I.      Plaintiffs Have Failed To Carry Their Burden To Establish Subject Matter Jurisdiction.**

The Court lacks jurisdiction over this case because Plaintiffs have failed to demonstrate that they will suffer an imminent, concrete, and particularized injury, much less the continued existence of a live controversy. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Standing must exist "when the suit was filed," *Davis v. FEC*, 554 U.S. 724, 734 (2008), and "persist throughout all stages of litigation," *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). Plaintiffs have not met their burden here for multiple reasons.

**A.      Plaintiffs have not carried their burden to establish imminent injury.**

Plaintiffs have not alleged any present injury; they instead assert only potential future injuries should the arch be constructed. *See* Compl. ¶¶ 50–51 (alleging that the planned arch will "obstruct[] the symbolic and inspiring view from Arlington National Cemetery to the Lincoln Memorial"). Yet D.C. Circuit law establishes that "any petitioner alleging only future injuries confronts a significantly more rigorous burden to establish standing." *United Transp. Union v. I.C.C.*, 891 F.2d 908, 913 (D.C. Cir. 1989). Courts in this circuit thus have "well-established" authority to "reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions." *Id.* at 912; *accord Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015).

Here, Plaintiffs speculatively allege that "Defendants plan to construct the Arch prior to July 4, 2026," Compl. ¶ 4, even though "no environmental review has been conducted for the planned Arch, and plans for the Arch have not been submitted to the National Capital Planning Commission or the Commission of Fine Arts," *id.* ¶ 48. But such "bare assertions" setting forth formulaic claim elements "are conclusory and not entitled to be assumed true." *Iqbal*, 556 U.S. at 681; *see also Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 244 (D.D.C. 2013) (rejecting "conclusory assertion" that plaintiffs were "certain that the construction and excavation will cause damage to the hundreds of homes and businesses"). Instead, Plaintiffs must provide "well-pleaded, nonconclusory factual allegation[s]," *Iqbal*, 556 U.S. at 680, establishing that they "face a 'certainly impending injury,'" *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. 2022) (quoting *Clapper*, 568 U.S. 398 at 409).

Plaintiffs' principal factual basis for this speculative construction timeline misreads a fact sheet about a car race. *See* Compl. ¶ 2 & n.2 (citing *Fact Sheet: President Donald J. Trump*

11

*Celebrates American Greatness with the Freedom 250 Grand Prix of Washington, D.C.* (Jan. 30, 2026)). That fact sheet merely states that the President had "announced plans for a new Independence Arch in Washington, D.C. to coincide with the 250th anniversary," [6] which accurately describes the President's January announcement of various arch designs on social media, *see* Compl. ¶ 35. But neither the fact sheet nor the social media post says *anything* about when arch construction will begin, much less conclude. "Where allegations are contradicted by authentic writings incorporated into a complaint, the writings are credited." *United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F. Supp. 3d 32, 38 n.3 (D.D.C. 2018) (citation omitted).

Beyond misconstruing that fact sheet, Plaintiffs' other support for their speculative timeline selectively invokes one of several articles referenced in the Complaint. They cite a Politico article for the proposition that "President Trump reportedly stated in late December that construction of the Arch was expected to begin 'sometime in the next two months.'" Compl. ¶ 34 (citing Sophia Cai, *Trump says construction of the 'Triumphal Arch' to begin in '2 months'*, Politico (Dec. 31, 2025, 11:53 AM)). But that Politico article does not quote the President as stating that *construction* will start in two months; instead, it quotes the President as stating "*It* starts sometime in the next two months,"[7] which accords with the subsequent initiation of arch review processes, rather than construction. And Plaintiffs' other articles confirm that arch construction will not begin before arch planning processes, such as the ongoing reviews by the Arts and Planning Commissions, first occur. *Supra* 2–3 (discussing CNN article). Plaintiffs thus cannot rely solely on the speculative Politico timeline, as "[t]he proper question is whether there is a permissible relevant inference

---

[6]     https://www.whitehouse.gov/fact-sheets/2026/01/fact-sheet-president-donald-j-trump-celebrates-american-greatness-with-the-freedom-250-grand-prix-of-washington-d-c/.

[7]   https://www.politico.com/news/2025/12/31/trump-arch-washington-dc-america-250-00708590 (emphasis added).

from '*all* of the facts alleged, taken collectively,' not whether an inference is permissible based on 'any individual allegation, scrutinized in isolation.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007)).

The Court also "must consider" the ongoing, judicially noticeable, review processes, at two agencies, which demonstrate the wholly speculative nature of Plaintiffs' construction timeline. *Id.* As Plaintiffs allege, both the Arts and Planning Commissions must review and consult on arch design. Compl. ¶ 27 (citing 40 U.S.C. §§ 8722, 9102). The Complaint says nothing about when these review processes are expected to begin, much less conclude; instead, it makes only the conclusory assertion that "Defendants intend to imminently begin construction of the Arch without complying with these statutory requirements." Compl. ¶ 56. Because those consultation processes have only recently begun at the Arts Commission and are still forthcoming at the Planning Commission, *supra* 3–4, Plaintiffs' conclusory assertions about construction beginning without following those processes are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681.

Furthermore, Plaintiffs have failed to allege imminent injury because they have provided no allegations whatsoever—much less well-pleaded factual allegations—about how consultation with and review by those third-party Commissions will affect or alter the proposed arch. And even if they had, any such allegations "cannot establish an Article III injury . . . . because predictions of future events (especially future actions taken by third parties) are too speculative to support a claim of standing." *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015) (citation modified).

Nor have Plaintiffs adequately alleged how Defendant NPS would exercise its discretion over the arch. The Complaint concedes that NPS "is responsible for administering and maintaining the land on Memorial Circle" under its Organic Act authority. Compl. ¶ 14 & n.3 (citing 54 U.S.C.

13

§ 100101). And that statute "furnish[es] wide discretion to the NPS." *Horses of Cumberland Island v. Haaland*, No. 1:23-CV-1592-SEG, 2024 WL 5430835, at \*10 (N.D. Ga. Nov. 8, 2024); *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000) ("the Secretary has especially broad discretion on how to implement his statutory mandate" under the Organic Act). But the D.C. Circuit "has been reluctant to find standing based on predictions of how agencies will exercise discretion in future proceedings." *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021) (citing *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015)). Even when an agency announces its objectionable "plans" in "the preamble to [its final] rule," that announcement remains "too speculative for Article III purposes" when the agency retains "discretion" in how to implement its plans. *Id.* at 929–30. Similarly here, because NPS retains discretion to modify or disapprove the proposed arch, Compl. ¶ 14, that outstanding discretion "takes" Plaintiffs' alleged construction-related injuries "from the decidedly likely to the speculative," *Union of Concerned Scientists*, 998 F.3d at 930.

Because Plaintiffs' Complaint establishes only that "the government *might* issue" an official arch decision they dislike, they have failed to establish standing. *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020) (emphasis added). After all, "[i]f such speculative future government action could support an injury in fact, it is hard to imagine what would *not* satisfy that requirement." *Id.* (emphasis in original). Plaintiffs simply have not met their burden to show that construction is—not probably—but "*certainly* impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)).

Beyond these certainty problems, Plaintiffs fail to carry their imminence burden by relying on "allegations that are sufficiently fantastic to defy reality as we know it." *Iqbal*, 556 U.S. at 696 (Souter, J., dissenting). In alleging that a 250-foot-tall arch will be completed in just four months—

14

even though no ground has yet been broken—*see* Compl. ¶¶ 4, 38–39, the Complaint "contains factual allegations that are so implausible as to be 'fantastic or delusional.'" *Smith v. Shimizu*, 544 F. Supp. 2d 15, 17 (D.D.C. 2008). The Court can take judicial notice that large structures routinely take much longer than four months to be built,[8] and Plaintiffs provide no well-pleaded factual allegations—such as the use of novel construction technology—to render plausible their allegations that the arch will be built much more quickly.

To the extent Plaintiffs attempt to recast their allegations as claiming only that construction will begin by July 4, that pivot would still fail to establish an imminent injury. Because Plaintiffs' alleged injuries are tied to the arch *obstructing* their views of monuments, Compl. ¶¶ 50–51, they have failed to establish that merely beginning construction will inflict any injury on them. *See Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288 (D.D.C. 2017) (finding that plaintiffs had not established imminent injury where they asserted aesthetic harm from the future construction of "mammoth towers" and the only imminent construction involved foundation work). Having failed to plausibly allege when above-ground construction will begin, Plaintiffs cannot establish standing.

Similarly fatal to their standing is Plaintiffs' failure to allege specific plans to visit the area surrounding Memorial Circle. Plaintiffs allege in conclusory fashion that they "ha[ve] visited and intend[] to continue in the future visiting Arlington National Cemetery and driving around Memorial Avenue Corridor, including Memorial Circle." Compl. ¶¶ 50, 51. But such "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury." *Summers v.*

---

[8] For example, the Census Bureau reports that constructing multi-unit buildings in 2024 took an average of 16.9 months from start to completion. Ex. C, https://www.census.gov/construction/nrc/xls/avg_starttocomp_cust.xlsx.

*Earth Island Inst.*, 555 U.S. 488, 496 (2009) (quoting *Defenders of Wildlife*, 504 U.S. at 564) (citation modified).

In sum, Plaintiffs have failed to establish any imminent injury, as they have not provided any plausible, well-pleaded factual allegations establishing that arch construction is imminent. Nor have they adequately alleged that, even were construction imminent, they would suffer an imminent or certainly impending injury.

### B. Even if Plaintiffs Had Satisfied the Imminence Requirement, They Lack Standing Because They Have Not Alleged a Cognizable Harm from Arch Construction.

In addition to Plaintiffs' failure to allege a plausible, imminent injury, they have also failed to allege cognizable harms. Plaintiffs assert that they believe a future arch would interfere with "historical" and "professional" interests, "dishonor their military and foreign service," and "degrade their personal experience when visiting Arlington Cemetery or traveling around Memorial Circle." Compl. ¶¶ 50–51. Those objections—no matter how deeply held—are the sort of "general legal, moral, ideological, or policy objection to a particular government action" that "Article III standing screens out." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). This "'offended observer' theory of standing has no basis in law," *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80 (2019) (Gorsuch, J., concurring), because "[t]he presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements," *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

Similarly, there is "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing." *Env't Def. Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021). For example, Plaintiff Calder Loth has "visited Arlington National Cemetery on several occasions," Dkt. 7-5 ¶ 5, but simply viewing something distasteful "several times per week" is insufficient to create a cognizable injury, *Env't*

16

*Def. Fund*, 2 F.4th at 970. Loth fails to allege that he will be able to see the arch from his "property," *see id.*, or that he will otherwise be personally affected in a meaningful way by arch construction. "Article III standing is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Hollingsworth*, 570 U.S. at 707 (citation modified). Plaintiffs thus lack standing.

### C. Plaintiffs' Alleged Controversy Is Also Moot.

Even had Plaintiffs alleged cognizable injuries, the Court would still lack jurisdiction because Plaintiffs' "actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation modified). Plaintiffs' Complaint asserts injuries from Defendants' allegedly imminent construction of the arch without "satisfaction of procedural prerequisites" like consultation with the Arts and Planning Commissions, as well as complying with procedural requirements under NEPA and Section 106 of the NHPA. *See* Compl. ¶¶ 27, 55, 57. But Defendants have submitted declarations establishing that Plaintiffs' fears are unfounded, as Defendants will comply with those requirements. Declaration of Frank Lands ¶¶ 7–14, Dkt. 12-1; Declaration of Joshua Fisher ¶¶ 2–4, Dkt. 24-1.[9] And the Court can take judicial notice that the very procedures that Plaintiffs alleged would be skipped over are currently underway. *Supra* 3–4.

Accordingly, even had Plaintiffs adequately pled standing, the current record establishes that any controversy is "no longer live." *Already*, 568 U.S. at 91 (citation modified). Indeed, Plaintiffs conceded as much during the preliminary injunction hearing. Tr. 36:4–13 (admitting that a declaration from a White House representative "stating that construction will not begin until NPS

---

[9] Courts "accept as true the supplemental evidence the government offer[s]" in support of a motion to dismiss asserting mootness. *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 242 (2024) (accepting government declaration).

completes its procedural requirements," "would suffice" to obviate the "need to issue an injunction"). Because Plaintiffs have now received the very assurances that they said "would suffice" to render unnecessary their requested relief, they cannot now assert a live controversy continues to exist.

The Complaint asserts only non-APA claims that Defendants will construct an arch without issuing a final agency action because, as Plaintiffs conceded at the April hearing, "National Park Service has not taken action that is reviewable under the APA." Tr. 51:15–17. Plaintiffs asserted that their non-APA claims were nonetheless necessary because they were "not confident that the National Park Service will be driving this project forward." *Id.* at 51:18–19. But Joshua Fisher, Director of the Office of Administration in the Executive Office of the President, has clarified Plaintiffs' misconceptions, explaining that "[c]onstruction for the [Arch] Project will not begin unless and until NPS follows all applicable legal requirements and issues a final agency action authorizing arch construction to proceed." Fisher Decl. ¶ 4.[10] Accordingly, there is no live controversy about whether the arch can be built without final agency action from NPS. And should the NPS ultimately issue final agency action authorizing arch construction, Plaintiffs would need to bring claims under the APA to challenge that agency action.

---

[10] Because Defendants offered this declaration solely to correct Plaintiffs' misunderstanding, the voluntary cessation doctrine does not apply. *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) ("The voluntary-cessation doctrine, however, does not apply automatically whenever the prospect of mootness is raised by a party's voluntary conduct."). This is not a case where Defendants ceased the challenged conduct when sued; instead, Defendants explained that Plaintiffs' fears that NPS might not "be driving this project forward," Tr. 51:18–19, were misplaced. Thus, the voluntary cessation doctrine does not apply, as the Fisher Declaration was provided to correct a misconception—not to manipulate the Court's jurisdiction—and "it would be inappropriate for the courts . . . to impute such manipulative conduct to a coordinate branch of government." *Pub. Citizen*, 92 F.4th at 1128–29 (citation modified). Regardless, even under the voluntary cessation doctrine, the Fisher Declaration makes it absolutely clear that Plaintiffs' feared conduct—arch construction without final agency action by NPS—cannot reasonably be expected to occur.

Plaintiffs cannot sidestep mootness by questioning the legality of a future NPS final action. For example, Plaintiffs have asserted that NPS needs additional statutory authorization beyond the 1925 Act to construct an arch on Memorial Circle. But that cannot solve Plaintiffs' mootness problem as the legality of any future NPS final action is "hypothetical" and insufficient to maintain a live controversy. *See Pub. Citizen*, 92 F.4th at 1130. The point is that NPS will take final agency action before arch construction begins, which means that any dispute about whether Defendants will begin construction without final agency action is moot.

## II.    The Complaint Should Be Dismissed As Prudentially Unripe.

Plaintiffs' claims are also unripe because their allegations about the arch concern incipient discussions, rather than final plans. The Complaint does not identify any final decision as to arch design, subject, construction timeline, funding sources, or legal justification. Instead, the Complaint merely speculates that construction will proceed without complying with procedural prerequisites. Because the Court can take judicial notice that Defendants are currently undertaking the procedural requirements that the Complaint asserts would be skipped over, Plaintiffs' claims should be dismissed as prudentially unripe.[11]

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies,

---

[11] Defendants' prudential ripeness arguments seek dismissal under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 294 & n.2 (D.D.C. 2018) (dismissing case as prudentially unripe, while noting, without resolving, that prudential ripeness arguments, though typically brought under Rule 12(b)(1), might be better brough under Rule 12(b)(6)).

and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). Prudential ripeness "concerns the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Giron v. Zeytuna, Inc.*, 597 F. Supp. 3d 29, 54 (D.D.C. 2022) (citation modified).

"[T]he doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). In evaluating ripeness, courts look to "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs v. Garner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under the fitness prong of this test, courts must consider "[1] whether [the claim] is 'purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final.'" *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted). Under the hardship prong, courts must ask whether the challenged administrative action is likely to have a direct and immediate effect on the "primary conduct" of the plaintiff. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967). Here, Plaintiffs fail to establish prudential ripeness under both the fitness and hardship prongs of the test.

Plaintiffs' claims are not fit for review. Their claim is not purely legal, as it depends upon not only specifics about arch design, but also upon the implausible, conclusory assertion that construction will begin without further reviews and approvals. Waiting for those further decisions would provide a more concrete setting for judicial review. *See Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) ("[W]hen an agency decision may never have 'its effects felt

20

in a concrete way by the challenging parties,' the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well." (quoting *Abbott Labs*, 387 U.S. at 148–49)).

Unwilling to let these deliberative processes play out, Plaintiffs ask the Court to resolve a hypothetical dispute. Because they have not plausibly alleged that Defendants' arch planning is sufficiently final to cause an imminent or certainly impending injury, the Court should reject their claims as unripe. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) ("[T]he usually unspoken element of the rationale underlying the ripeness doctrine: [i]f we do not decide it now, we may never need to.").

As to the hardship prong, Plaintiffs suffer no hardship from deferred judicial review, as they can proceed with claims challenging any final agency action with which they disagree, if and when NPS authorizes a final project to proceed. But delayed review is, by definition, no hardship in and of itself. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272–73 (D.D.C. 2015) ("If the only hardship a plaintiff will endure as a result of delaying consideration of the disputed issue is the burden of having to engage in another suit, this will not suffice to overcome an agency's ripeness challenge." (citation modified)).

In sum, Plaintiffs' claims are prudentially unripe, given the lack of an actual or imminent injury, the fact that the issues would benefit from further factual development before undergoing judicial review, and the lack of harm to Plaintiffs from withholding review until the factual circumstances surrounding the hypothetical project are more developed.

## III.    Plaintiffs Fail to Plausibly Allege a Claim for Relief

### A.    Plaintiffs have failed to state a viable *ultra vires* claim.

Plaintiffs lack a cause of action for their statutory claims. If NPS authorizes construction for the arch, Plaintiffs will have a path to judicial review under the APA. They of course cannot

bring an APA claim now because, as they have conceded, they do not challenge final agency action. This dooms their first claim.

Plaintiffs try to avoid this by pleading an *ultra vires* claim, but *ultra vires* review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *Nuclear Regul. Comm'n v. Texas* (*NRC*), 605 U.S. 665, 681 (2025). Here, Plaintiffs' *ultra vires* claim attempts to circumvent the statutory limitations on judicial review—*viz.*, the requirement of waiting for final action from NPS. Defendant NPS is indisputably an agency within the Department of the Interior, whose actions are reviewable under the APA. But the Complaint does not allege that NPS has made a final decision on arch construction, and there will be no arch construction unless and until NPS takes a final action authorizing that construction. *See* Compl. ¶ 14. If and when NPS takes such final action, its decision would be subject to judicial review under the APA, which would provide "a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681. Plaintiffs cannot seek judicial review before NPS has taken final action without circumventing the APA's statutory limits. *See Glob. Health Council v. Trump*, 153 F.4th 1, 17 n.14 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. 2025).

To be sure, Plaintiffs have named non-agency Defendants that are not subject to the APA. *Dalton v. Specter*, 511 U.S. 462, 476 (1994) (noting the "President is not an 'agency' under" the APA); *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) (Presidential staff who lack "substantial independent authority" are not agencies); *Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (National Security Council lacks "meaningful non-advisory authority" and is therefore not an "agency"); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042–44 (D.C. Cir. 1985) (Council of Economic Advisors is not an agency because its

"statutory duties" are "directed at providing . . . advice and assistance to the President"). But that cannot save their *ultra vires* claim because arch construction will not begin unless and until NPS takes final action authorizing it, *see* Compl. ¶ 14, and that final action will be subject to APA review.

This case highlights why *ultra vires* review is unavailable when a statutory review scheme provides a meaningful and adequate opportunities for judicial review. *See NRC*, 605 U.S. at 681. If parties could challenge incipient discussions, as Plaintiffs attempt to do, it would discourage transparency in Executive Branch decision making. Executive Branch office holders routinely "come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). When agencies undertake those deliberative processes, plaintiffs must typically wait for "final agency action" to seek judicial review. *E.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) (citing 5 U.S.C. § 704). If much earlier challenges can instead be brought against preliminary discussions by non-agencies like the Chief Executive, those Executive Branch decisionmakers will be discouraged from disclosing those preliminary discussions to the public.

Plaintiffs have not identified a single case where courts entertained an *ultra vires* challenge to preliminary discussions. As the Supreme Court has explained, an *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, 605 U.S. at 681–82 (citation omitted). Unlike the rare successful *ultra vires* cases challenging actual or official Presidential actions, *e.g.*, *Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) (entertaining challenge to Executive Order), the Complaint attempts to create a new species of *ultra vires* claims authorizing challenges to preliminary executive discussions about potential

23

actions. *See supra* 2. The Court should reject this novel theory, as even Plaintiffs concede that their non-statutory cause of action is limited to reviewing "official executive action." Compl. ¶ 52.

Plaintiffs' *ultra vires* claim also fails for the independent reason that they cannot show that Defendants have "taken action entirely in excess of [their] delegated powers." *NRC*, 605 U.S. at 681 (citation modified). The thrust of Plaintiffs' case is their misinformed argument that Congress has provided no statutory authorization for construction in Memorial Circle. *See* Compl. ¶¶ 46–47. As explained *supra* 6–8, Congress has already authorized the construction of two large columns surmounted by statues on Columbia Island. And just as Congress delegated discretion sufficient to forego constructing these columns for a time, *see supra* 8, it also delegated discretion to revise column design, including by combining the two columns surmounted by statutes into one arch surmounted by a statue, as depicted in some of the renderings cited by Plaintiffs.[12]

Nor have Plaintiffs established that construction of an arch would be "contrary to a *specific prohibition* in a statute," as required to pursue an *ultra vires* claim. *NRC*, 605 U.S. at 681 (citation modified). Although Plaintiffs invoke both the Commemorative Works Act (CWA) and 40 U.S.C. § 8106, neither statute specifically prohibits arch construction.

The CWA "does not apply to commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b). Because Congress authorized construction of large structures on Columbia Island in 1925, along with the authority to modify their design, the CWA would not apply to the hypothetical arch project Plaintiffs challenge.

---

[12] Should that discretion ultimately be so exercised, that discretionary determination would not be subject to judicial review. "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts." *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) (quoting *Martin v. Mott*, 25 U.S. 19, 31–32 (1827)).

In addition to this chronological problem, Plaintiffs have failed to establish that the arch project would otherwise be subject to the CWA's substantive restrictions. The CWA governs construction of "commemorative works," defined as "any . . . monument . . . or other structure or landscape feature . . . designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." 40 U.S.C. § 8902(a)(1). Plaintiffs' speculative Complaint discusses a broad and varied range of potential arch subjects: "triumph[]," Compl. ¶ 30; "the Nation's 250th anniversary," *id.* ¶ 29, "President Trump," *id.* ¶ 31; size, *id.* ¶ 32, and American greatness, *id.* ¶ 2 & n.2. Because many of those potential motivations for an arch lie outside the CWA's definition of "commemorative works," Plaintiffs have failed to plausibly allege that the arch will fall under the CWA's restrictions.[13]

Further, § 8106—if applicable at all—merely requires "express authority of Congress" to build structures. That authority has already been given to build large structures on Columbia Island. *Supra* 6–8. And even though Congress has never extended § 8106 to the NPS, the Administration could request Congressional appropriations for the arch. If such appropriations were enacted before NPS issues a final agency action, they would provide additional "express authority" to undertake construction. Consequently, the potential arch is already in full compliance with § 8106 and that status could be reinforced in the future.

Moreover, § 8106 only requires an entity to have express authority from Congress to build—not to build a particular structure. That understanding flows from the provision's history: It was enacted shortly after the Army Corps of Engineers set out to reclaim "properties illegally used as dumps, or occupied by shacks, gardens, railroad companies, and even a public schoolhouse

---

[13] *See also* Tr. 48:25-49:5 (observing that the "[t]he White House's description of [the arch] doesn't really square with . . . with the [CWA's] definition of commemorative work").

25

and a church." National Register of Historic Places Registration Form, L'Enfant Plan of the City of Washington, D.C., National Park Service, at 60- 61 (1997), https://npgallery.nps.gov/pdfhost/docs/ NRHP/Text/97000332.pdf. An 1864 predecessor law was similarly focused on "prevent[ing] the improper appropriation or occupation of any of the public streets, avenues, squares, or reservations in the City of Washington belonging to the United States," and in particular "the erection of any permanent building upon any property reserved to or for the use of the United States, unless plainly authorized by act of congress." 13 Stat. 412, 412 (1864); *see also* Pub. L. No. 57-81, 32 Stat. 152 (1902) (directing Army Corps to prevent "unlawful occupation" of "public lands in the District of Columbia"). Congress was concerned about stopping encroachments by unauthorized parties—not trying to micro-manage park planning by federal authorities.

Near-contemporaneous legislative history confirms that narrower understanding. Major Ulysses S. Grant III, then Director of Public Buildings and Public Parks of the National Capital and Executing and Disbursing Officer of the Arlington Memorial Bridge Commission,[14] testified that § 8106 had been enacted at the request of his office, and "was intended for the purpose of preventing encroachments upon park property by other Government offices or by the public, and has never been construed to prevent such construction by the park authorities within the limits of the appropriations." District of Columbia Appropriation Bill, 1927, Hearing Before the Subcomm. of H. Comm. on Appropriations 533, 69th Cong. (1926) (emphasis added). He gave that response upon being asked how his agency was able to build a new facility in Anacostia Park despite that

---

[14] Kohler 18, *supra* note ___.

statute; his answer was not challenged. *See id.* The clear takeaway is that otherwise-authorized federal officials need no further congressional approval to build particular structures.[15]

Defendants' understanding of § 8106 is also consistent with historical practice. NPS has erected countless structures on national parkland in the District over the past century, yet there is no record of any express congressional approval for buildings like the National Capital Region Headquarters, U.S. Park Police Headquarters, Rock Creek Park tennis stadium, or the numerous nature centers, comfort stations, and cell phone towers that NPS has erected in Rock Creek Park and beyond.[16] The "lack of historical precedent" is a "telling indication" that a party misread a statute. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citing "longstanding practice of the government" as an "aid" to "inform a court's determination of what the law is" (citation modified)). Indeed, "[i]f Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'" *Wash. All. of Tech. Workers v. U.S Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022).

---

[15] To avoid "distort[ing]" the original meaning of century-old statutes, courts typically interpret acts of Congress in light of background legal principles as they existed at the time of enactment rather than "as if they were written today." *Goldstein v. California*, 412 U.S. 546, 564 (1973); *see also, e.g.*, *Gallardo v. Marstiller*, 596 U.S. 420, 434 (2022).

[16] *See* ; *Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972)*, 89 Fed. Reg. 97631, 97631 (Dec. 9, 2024); *Executive Director's Recommendation, National Capital Region Campus Renovation Project and Park Police District 1 Substation, Commission Meeting*, National Capital Planning Commission at 1 (Jan. 7, 2016), https://www.ncpc.gov/docs/actions/2016January/National_Park_Service_Police_District_1_Substation_Recommendation_7703_Jan2016.pdf; Joan M. Zezen, An Urban Oasis: Rock Creek Park's History and Management 130-132 (Oct. 2020), https://www.scribd.com/document/812110103/Rock-Creek-DC-adhi-2020

Moreover, whatever the proper level of generality for an authorization under § 8106, there is good reason to doubt that the provision applies in the first place to national parks administered by NPS. History tells a narrower story of congressional intent. In 1912, the Army Corps of Engineers—then known as the Engineering Department in the War Department—had jurisdiction over parks in the District of Columbia. Congress included § 8106 along with a group of line-item appropriations to the Engineering Department. *See* Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 443-44 (1912). In that same law, Congress appropriated funds to the Interior Department, which had jurisdiction over several national parks across the country. For Interior, Congress included a different provision demarcating when Congress's express authority was required: "No expenditure for construction of administration or other buildings . . . exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." *Id.* at 460. Given the simultaneous enactment of these parallel provisions, it appears that Congress wanted one rule for D.C. parks under the Engineering Department, but a different rule for national parks under the Department of Interior.

The statute pertaining to Interior was eventually codified at 16 U.S.C. § 451. In later years, including after NPS was created and vested with control of all national parks (including in the District of Columbia), Congress amended that statute to increase the cost threshold of construction of buildings in national parks that would trigger the need for approval. *See, e.g.*, Pub. L. No. 65-181, 40 Stat. 634, 677 (1918); Pub. L. No. 76-417, 54 Stat. 36, 36 (1940). In its appropriations laws, Congress also routinely exempted NPS construction activity, including construction in the District of Columbia, from this provision. *See, e.g.*, Pub. L. No. 80-841, 62 Stat. 1112, 1141 (1948); Pub. L. 101-512, 104 Stat. 1915, 1920 (1990).

28

Then, in 1996, Congress repealed § 451. *See* Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996). That is, Congress eliminated the provision that required "express authority of Congress" for NPS construction. This history suggests § 8106 was never intended to limit NPS's construction in national parks. Section 451 played that role—and Congress chose to repeal it. And this explains the sole example of Congress expressly authorizing a particular building in the District pursuant to § 8106: a 1993 statute providing that "the limitation on construction contained in [§ 8106] shall not apply to the construction" of "facilities to house bonsai collections at the National Arboretum." Pub. L. No. 103-111, 107 Stat. 1046, 1051 (1993). If § 8106 is read as restricting entities other than NPS from constructing buildings on national parkland in D.C., this makes sense: The National Arboretum is managed by the Department of Agriculture and is not a national park. Meanwhile, if § 8106 were intended to restrict NPS construction in national parks—contrary to Major Grant's near-contemporaneous explanation—virtually every building erected on national parks in the District is presumptively unlawful. That implausible construction is miles away from the clarity and obviousness required to sustain an *ultra vires* claim.

In sum, Plaintiffs' *ultra vires* claim fails for several independent reasons. They are unlawfully attempting to circumvent statutory limits confining judicial review to final agency actions (and bring an unprecedented challenge to preliminary discussions, rather than official executive action, in the process); they have not plausibly alleged that NPS would be acting entirely in excess of its delegated authority should it authorize arch construction; and they have not plausibly alleged that arch construction would be contrary to a specific statutory prohibition.

### B. Plaintiffs have failed to state a constitutional claim

Plaintiffs next press a constitutional claim invoking the President's constitutional duty to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. This claim likewise fails for two reasons explained below.

29

As an initial matter, courts lack the authority to review the President's "purely executive and political" duty "to see that the laws are faithfully executed." *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). Given the unique nature of the President's Take Care Clause authority, any "attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshal, as 'an absurd and excessive extravagance.'" *Id.* Thus, "in the 150 years since *Johnson* was decided, no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials." *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022); *accord Center for Biological Diversity v. McAleenan*, 404 F.Supp.3d 218, 245–250 (D.D.C. 2019) ("it is not at all clear that a claim under the Take Care Clause presents a justiciable claim for this Court's resolution" (quotation omitted)).

Even were a claim under the Take Care Clause an appropriate subject of judicial review, Plaintiffs' second claim would still fail because it is ultimately a statutory claim, not a constitutional one. The Supreme Court has rejected the argument that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). In limiting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to circumstances "involv[ing] the conceded *absence* of *any* statutory authority," *Dalton*, 511 U.S. at 473, the Supreme Court precluded the assertion of "claim[s] that the President acted in excess of such authority" as constitutional claims that could be pursued without a statutory cause of action, *id.*. Thus, "*Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review." *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. 2025). Because Defendants have never conceded the

30

absence of any statutory authority—and instead provide on-point statutory authority for the construction of large structures on Columbia Island—Plaintiffs' claim involves only statutory, not constitutional, authority. As such, Plaintiffs cannot pursue their claim without a statutory cause of action. *Glob. Health Council*, 153 F.4th at 16.

Although Plaintiffs may disagree with the Defendants' architectural proposal, the Constitution does not empower either Plaintiffs or the Court with discretion over those decisions. Nor has Congress delegated the discretion to modify column design to Plaintiffs or the Court. Just as President Hoover wielded that discretion to forego, for a time, constructing the congressionally approved columns on Columbia Island, *see supra* 8, Defendants have discretion to reinvigorate that design. Plaintiffs' "constitutional" claim thus also fails.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint.

DATE: April 28, 2026                    Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

 */s/ Michael S. Sawyer*
MICHAEL S. SAWYER, Senior Attorney
DANIEL LUECKE, Trial Attorney
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-353-5134
E-mail: michael.sawyer@usdoj.gov
          daniel.luecke@usdoj.gov

*Counsel for Defendants*

31