**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MICHAEL LEMMON, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 26-cv-544 (TSC) |
| DONALD J. TRUMP, et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Nicolas Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

May 12, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 4

Statutory Background .................................................................................................................... 4

Factual Background ....................................................................................................................... 6

Procedural History ........................................................................................................................ 7

LEGAL STANDARDS .................................................................................................................... 9

ARGUMENT ................................................................................................................................. 10

I.    This Court has subject-matter jurisdiction. ...................................................................... 10

    A.  Plaintiffs have standing. ........................................................................................... 10

    B.  The case is ripe. ......................................................................................................... 16

    C.  The case is not moot. ................................................................................................. 19

II.   Plaintiffs have stated a plausible claim to relief. ............................................................ 22

    A.  Plaintiffs have stated an ultra vires claim. ............................................................. 22

    B.  Plaintiffs have stated a claim under the Take Care Clause. .................................... 34

CONCLUSION .............................................................................................................................. 38

## TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page(s)**

*Air Line Pilots Ass'n, International v. Chao*,
    889 F.3d 785 (D.C. Cir. 2018) ................................................................................................ 32

*American Petroleum Institute v. Environmental Protection Agency*,
    683 F.3d 382 (D.C. Cir. 2012) ................................................................................... 16, 17, 18

*American School of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) .................................................................................................................. 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................. 9, 10

*Attias v. Carefirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) ................................................................................................ 13

*Bruesewitz v. Wyeth LLC*,
    562 U.S. 223 (2011) ................................................................................................................ 32

*Center for Biological Diversity v. McAleenan*,
    404 F. Supp. 3d 218 (D.D.C. 2019) ........................................................................................ 34

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
    146 F.4th 1144 (D.C. Cir. 2025) ............................................................................................ 12

*Centro de Trabajadores Unidos v. Bessent*,
    167 F.4th 1218 (D.C. Cir. 2026) ............................................................................................ 30

*Chafin v. Chafin*,
    568 U.S. 165 (2013) ................................................................................................................ 19

*Chamber of Commerce of the United States v. Environmental Protection Agency*,
    642 F.3d 192 (D.C. Cir. 2011) ................................................................................................ 14

*Chamber of Commerce of the United States v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) .......................................................................................... 22, 24

*Chamber of Commerce of the United States v. Whiting*,
    563 U.S. 582 (2011) ................................................................................................................ 30

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013) ................................................................................................................ 14

*Coalition for Underground Expansion v. Mineta*,
    333 F.3d 193 (D.C. Cir. 2003) .................................................................................................. 9

*Collins v. Yellen*,
594 U.S. 220 (2021)...........................................................................................................35

*Dalton v. Specter*,
511 U.S. 462 (1994)...........................................................................................................37

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988)...........................................................................................22

*Environmental Defense Fund v. Federal Energy Regulatory Commission*,
2 F.4th 953 (D.C. Cir. 2021)........................................................................................ 12, 13

*Federal Express Corp. v. U.S. Department of Commerce*,
39 F.4th 756 (D.C. Cir. 2022)...........................................................................................22

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)...........................................................................................................12

*Fowler v. Guerin*,
899 F.3d 1112 (9th Cir. 2018) ...........................................................................................17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)...........................................................................................................36

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
561 U.S. 477 (2010)...........................................................................................................35

*Friends of Gateway v. Slater*,
257 F.3d 74 (2d Cir. 2001).................................................................................................12

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000)...........................................................................................................11

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025).............................................................................................37

*Heckler v. Chaney*,
470 U.S. 821 (1985)...........................................................................................................34

*Humane Society of the United States v. Vilsack*,
797 F.3d 4 (D.C. Cir. 2015).................................................................................................9

*J.W. Hampton, Jr. & Co. v. United States*,
276 U.S. 394 (1928)...........................................................................................................34

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) ...........................................................................................15

*Langeman v. Garland*,
88 F.4th 289 (D.C. Cir. 2023) ................................................................ 10, 25

*Las Americas Immigrant Advocacy Center v. Trump*,
475 F. Supp. 3d 1194 (D. Or. 2020) ................................................................ 35

*Leedom v. Kyne*,
358 U.S. 184 (1958) ................................................................ 25

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................ 10, 11

*Mata v. Lynch*,
576 U.S. 143 (2015) ................................................................ 17

*Medellín v. Texas*,
552 U.S. 491 (2008) ................................................................ 37

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ................................................................ 35, 36

*Morrison v. Olson*,
487 U.S. 654 (1988) ................................................................ 34

*National Ass'n of Postal Supervisors v. U.S. Postal Service*,
26 F.4th 960 (D.C. Cir. 2022) ................................................................ 22

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012) ................................................................ 38

*National Parks Conservation Ass'n v. Semonite*,
282 F. Supp. 3d 284 (D.D.C. 2017) ................................................................ 14

*National Parks Conservation Ass'n v. Semonite*,
311 F. Supp. 3d 350 (D.D.C. 2018) ................................................................ 15

*National Trust for Historic Preservation in the United States v. National Park Service*,
— F. Supp. 3d —, 2026 WL 533420 (D.D.C. Feb. 26, 2026) ................................................................ 12, 25

*National Trust for Historic Preservation in the United States v. National Park Service*,
— F. Supp. 3d —, 2026 WL 877779 (D.D.C. Mar. 31, 2026) ................................................................ 23, 29, 31, 32, 33

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025) ................................................................ 23

*Revitalizing Auto Communities Environmental Response Trust v. National Grid USA*,
10 F.4th 87 (2d Cir. 2021) ................................................................ 17

*Scenic America, Inc. v. U.S. Department of Transportation*,
    836 F.3d 42 (D.C. Cir. 2016) ................................................................................ 9, 10

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020) ................................................................................................ 15

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) .......................................................................................... 15, 16

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .................................................................................... 10, 13, 17

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ............................................................................... 36

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................................ 16

*United States Air Tour Ass'n v. Federal Aviation Administration*,
    298 F.3d 997 (D.C. Cir. 2002) ............................................................................... 19

*United States v. Sanchez-Gomez*,
    584 U.S. 381 (2018) ................................................................................................ 19

*United States v. Texas*,
    577 U.S. 1101 (2016) .............................................................................................. 35

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................................ 10

*Williams v. Lew*,
    819 F.3d 466 (D.C. Cir. 2016) ................................................................................. 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .................................................................................... 34, 36, 38

**Statutes**

16 U.S.C. § 451 (1912) ...................................................................................... 32, 33

40 U.S.C. § 68 (1912) ............................................................................................ 4, 31

40 U.S.C. § 8106 ............................................................ 2, 4, 18, 23, 29, 30, 31, 33

40 U.S.C. § 8711 ........................................................................................................ 5

40 U.S.C. § 8901(1) ................................................................................................... 5

40 U.S.C. § 8901(4) ............................................................................................. 5, 23

40 U.S.C. § 8902(a)(1)............................................................................................... 5, 28

40 U.S.C. § 8902(a)(2)............................................................................................... 5, 6

40 U.S.C. § 8902(a)(4)............................................................................................... 5, 23

40 U.S.C. § 8902(b).................................................................................................... 28

40 U.S.C. § 8903(a)(1)..................................................................................... 2, 5, 18, 23

40 U.S.C. § 8903(d)..................................................................................................... 5

40 U.S.C. § 8904.......................................................................................................... 5

40 U.S.C. § 8905(a) ..................................................................................................... 5

40 U.S.C. § 8906(a)(2)................................................................................................. 6

40 U.S.C. § 8908(b)..................................................................................................... 6

40 U.S.C. § 8908(b)(1) ................................................................................................ 6

40 U.S.C. § 9101.......................................................................................................... 5

Act of August 24, 1912,
  37 Stat. 417 ........................................................................................................... 31

Act of March 4, 1913,
  Pub. L. No. 62-432, 37 Stat. 866 ........................................................................... 26

Act of February 24, 1925,
  Pub. L. No. 68-463, 43 Stat. 974 ...................................................................... 26, 27

Act of August 21, 2002,
  Pub. L. No. 107-217, 116 Stat. 1062 ..................................................................... 31

Commemorative Works Act,
  Pub. L. No. 99-652, 100 Stat. 3650 (Nov. 14, 1986)............................................. 4

Korean War Veterans Memorial Wall of Remembrance Act,
  Pub. L. No. 114-230, 130 Stat. 947 (Oct. 7, 2016).............................................. 30

**Other Authorities**

Bradley Akin, U.S. Bureau of Labor Statistics, *Arlington Memorial Bridge Spans the
  Decades as a Study in Long-Term Price Change* (2017) ........................................ 27

CBS News, *Leavitt Discusses "Arc de Trump" at White House Briefing*
  (YouTube Apr. 15, 2026).................................................................................... 14, 28

District of Columbia Appropriation Bill, 1927, Hearing Before the Subcommittee of the
House Committee on Appropriations, 69th Cong. (1926) .................................................. 31, 32

Executive Order 6166 (June 10, 1933) ....................................................................................... 27

H.R. Rep. No. 107-479 (2002) .................................................................................................... 31

Jacob R. Straus, Congressional Research Service, *Commemorative Works in the District of
Columbia: Background and Practice* (updated May 8, 2023) ............................................... 4, 6

Letter from Thomas E. Luebke, Secretary, Commission of Fine Arts, to Doug Burgum,
Secretary of the Interior (Apr. 23, 2026) .................................................................................. 15

National Park Service, *Historic American Engineering Record: Arlington Memorial
Bridge*, HAER No. DC-7 (1988) ......................................................................................... 26, 27

National Park Service, *Lady Bird Johnson Park* ........................................................................ 33

National Park Service, *Lincoln Memorial Design and Symbolism* .............................................. 29

National Park Service, *National Park System* ............................................................................. 33

Report of the Arlington Memorial Bridge Commission, Senate Doc. No. 95, 68th Cong.,
1st Session (Apr. 21, 1924) ....................................................................................................... 26

**Constitutional Provisions**

U.S. Const. art. II, § 3 ................................................................................................................. 37

U.S. Const. art. III, § 2 ................................................................................................................ 10

**INTRODUCTION**

For the last seven months, President Donald J. Trump has repeatedly told the American people that he plans to commemorate the Nation's 250th anniversary by building a massive arch in Memorial Circle in Washington, DC, near the entrance to Arlington National Cemetery. Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gundersen, and Calder Loth all regularly visit the area around the planned construction and derive aesthetic satisfaction and profound personal meaning from the unobstructed vistas that the arch will permanently impair. To avoid this impending injury to their aesthetic interests, Plaintiffs filed this lawsuit against President Trump, Domestic Policy Council Director Vince Haley, the Executive Office of the President, and the National Park Service (NPS), seeking a declaration that building the arch without congressional authorization is unlawful, as well as an injunction barring the arch's construction unless and until Congress has authorized it and all other statutory and regulatory prerequisites have been satisfied.

Defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. This Court should deny the motion.

As for subject-matter jurisdiction, this case presents a genuine controversy that Article III of the U.S. Constitution empowers the federal courts to resolve. Plaintiffs have standing to bring their claims because the challenged arch will cause concrete and particularized injury to their aesthetic enjoyment of a personally meaningful landscape that each Plaintiff visits and plans to continue visiting. Ample Supreme Court and D.C. Circuit precedent establishes that such an injury is sufficient to create a genuine Article III controversy, and the injunctive relief that Plaintiffs seek will redress that injury. Defendants attempt to paint Plaintiffs' injury as speculative by casting doubt on whether the arch will be built at all. But Defendants have not disavowed their repeatedly

1

stated intention to build the arch, and post-complaint developments that are subject to judicial notice confirm that Defendants are proceeding to do so.

For the same reasons, this case is ripe for adjudication. Defendants urge this Court to dismiss on the disfavored grounds of prudential ripeness, irrespective of whether this case falls within Article III's jurisdictional limits, but they offer no persuasive reason for this Court to do so. Future factual developments will cast no meaningful light on this case's central legal issue: whether Defendants lack necessary authorization from Congress to build an arch in Memorial Circle. And requiring Plaintiffs to wait until all the specifics of the project have been finalized and construction is imminently poised to begin would needlessly force resolution of that issue into an emergency posture.

Defendants' remaining jurisdictional argument—that the lawsuit is moot because Defendants have agreed to complete certain procedural steps prior to beginning construction—borders on frivolous. Since Plaintiffs filed their complaint, Defendants have reaffirmed their intention to build an arch in Memorial Circle and taken concrete steps toward that end, without seeking Congress's approval and while maintaining that they do not need Congress's approval. This Court's determination whether Defendants' continued work toward building the arch is lawful absent an act of Congress is thus as necessary now as it was when Plaintiffs filed suit.

Turning to the merits, Plaintiffs have stated a plausible ultra vires claim. Congress has not authorized Defendants' arch, and at least two federal statutes prohibit the project absent express statutory authorization: the Commemorative Works Act, which bars the construction of a commemorative work on certain NPS land in Washington, DC, unless it is "specifically authorized by law," 40 U.S.C. § 8903(a)(1), and 40 U.S.C. § 8106, which prohibits building *any* "structure" on public federal land in the capital "without express authority of Congress."

Although Defendants contend that non-statutory ultra vires review is unavailable because the Administrative Procedure Act (APA) provides a statutory avenue for review, Defendants concede that no APA claim is available. And Defendants' view that Plaintiffs cannot challenge unlawful executive action now because they might later have an APA claim to challenge unlawful action that might occur in the future is contrary to both precedent and common sense.

Defendants' efforts to demonstrate that the arch is consistent with the Commemorative Works Act and 40 U.S.C. § 8106 likewise fail. Defendants first claim that Congress authorized the arch by way of a 1925 statute that authorized a now-disbanded commission to construct a project completed in 1932—Arlington Memorial Bridge—subject to an expenditure limit that was nearly exhausted approximately a century ago. To state Defendants' argument is to refute it. Meanwhile, Defendants' suggestion that the arch might not be the sort of "commemorative work" that is subject to the requirements of the Commemorative Works Act disregards the complaint's well-pleaded allegations and the repeated statements of the President and his spokespeople. And Defendants' argument that 40 U.S.C. § 8106 does not apply to NPS projects contravenes statutory text and rests on attenuated historical arguments that Judge Leon thoroughly rebutted just last month.

Plaintiffs have also pleaded a cognizable constitutional claim under the Take Care Clause. By flouting Congress's statutory prohibitions against an unauthorized construction project in Memorial Circle, the President has violated his duty to take care that Congress's laws be faithfully executed. Defendants contend that the Take Care Clause is not privately enforceable, but they offer no reason why that constitutional provision, unlike others, should not be. Further, Defendants' argument that the President's violation of a statute can never amount to a constitutional violation distorts the case law on which they rely and makes no logical sense. Absent evidence that

3

Congress's laws are not being obeyed, after all, it would be impossible to demonstrate that the President is failing to take care that they be faithfully executed.

## BACKGROUND

**Statutory Background**

Since the founding of Washington, DC, in the late eighteenth century, the configuration of structures and monuments within the city has been subject to careful and deliberate planning. *See* ECF 1 (Compl.) ¶¶ 15–20. As the legislative body that speaks on behalf of the American public, Congress has long been responsible for authorizing the monuments and structures that appear on federally administered land within the District of Columbia to tell our national story. *See* Jacob R. Straus, Cong. Research Serv., *Commemorative Works in the District of Columbia: Background and Practice*, Summary (updated May 8, 2023) (hereafter, Straus, *Commemorative Works*).[1]

In 1912, Congress took a substantial step toward formalizing its oversight of construction on public federal land in Washington, DC, by passing a statute prohibiting "any building or structure" from being built on such lands "without express authority of Congress." 40 U.S.C. § 68 (1912). The statute, which has seen only minor, non-substantive amendments in the 110-plus years since its enactment, is now codified at 40 U.S.C. § 8106. Section 8106 speaks categorically: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

Nonetheless, even after 1912, "the process for approving site locations, memorial design plans, and funding" for monuments remained "haphazard." Straus, *Commemorative Works*, *supra* note 1, at Summary. Congress responded in 1986 by passing the Commemorative Works Act, Pub. L. No. 99-652, 100 Stat. 3650 (Nov. 14, 1986). Among the Act's purposes are to "preserve the

---

[1] https://www.congress.gov/crs_external_products/R/PDF/R41658/R41658.12.pdf.

integrity of the comprehensive design of … the Nation's Capital," 40 U.S.C. § 8901(1), and to ensure that commemorative works on federally administered land in Washington, DC, and its environs "are appropriately designed, constructed, and located," and that they "reflect a consensus of the lasting national significance of the subjects involved." *Id.* § 8901(4).

The Commemorative Works Act sets out a detailed process for approving commemorative works—defined to include "any statue, monument, sculpture, … or other structure or landscape feature[] … designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history," *id.* § 8902(a)(1)—in areas in and around the District of Columbia that are administered by NPS or the General Services Administration, *see id.* § 8902(a)(2). To begin, the Act requires that any such work be "specifically authorized by law." *Id.* § 8903(a)(1). And "[i]n considering legislation authorizing commemorative works in the District of Columbia and its environs," Congress must "solicit the views of the National Capital Memorial Advisory Commission." *Id.* § 8903(d); *see id.* § 8904 (establishing the Commission).

Upon authorizing a commemorative work, Congress designates a sponsor that will develop the project. *See id.* § 8902(a)(4). The sponsor is responsible for consulting with the National Capital Memorial Advisory Commission "regarding the selection of alternative sites and design concepts for the commemorative work" and having the Secretary of the Interior or the Administrator of General Services submit "site and design proposals" for the approval of the Commission of Fine Arts and the National Capital Planning Commission. *Id.* § 8905(a); *see id.* § 9101 (establishing the Commission of Fine Arts); *id.* § 8711 (establishing the National Capital Planning Commission). Once the consultation and approval requirements have been satisfied, the sponsor may apply to the Secretary of the Interior or the Administrator of General Services for a construction permit. *See id.* § 8905(a). A permit may issue if, among other things, "knowledgeable

5

individuals qualified in the field of preservation and maintenance have been consulted … to ensure that the commemorative work meets high professional standards." *Id.* § 8906(a)(2).

The Commemorative Works Act imposes special procedural requirements for works located in specific areas around the monumental core of the capital. *See id.* § 8908(b); *see also id.* § 8902(a)(2). Of particular relevance here, commemorative works may be built in an area designated "Area I" only if the Secretary of the Interior or the Administrator of General Services "decides that the subject of the commemorative work is of preeminent historical and lasting significance to the United States," recommends to Congress that the work be sited in Area I, and receives Congress's "approv[al]" of the recommendation "by law." *Id.* § 8908(b)(1).

Altogether, establishing a monument in the District of Columbia in compliance with the Commemorative Works Act requires the satisfaction of up to twenty-four steps that "help ensure appropriate legislation, site selection, design approval, fundraising, and construction." Straus, *Commemorative Works*, *supra* note 1, at 28; *see id.* at 28–29 (laying out the steps).

Since enacting the Act in 1986, Congress has enacted statutes authorizing commemorative works in Washington, DC, and its environs on more than forty-five occasions. *See id.* at 23–25. Fewer than half of those authorized works, however, have seen their way through the entire statutory process to eventual construction. *Id.* at 23; *see also* Compl. ¶ 25 (citing statutes).

**Factual Background**

In mid-October 2025, President Trump announced a plan to build an arch in Memorial Circle to commemorate the Nation's 250th anniversary. Compl. ¶ 29. Memorial Circle, which sits inside Lady Bird Johnson Park, is part of Washington, DC, is administered by NPS, and falls inside "Area I" for purposes of the Commemorative Works Act. *Id.* ¶¶ 14, 43. Memorial Circle is situated directly on the visual axis between the Lincoln Memorial and Arlington House, the Robert E. Lee

Memorial inside Arlington National Cemetery. *See id.* ¶¶ 18–20, 44. The unobstructed reciprocal views between those two historic structures are intended to serve as a visual symbol of the Nation's reunification following the Civil War. *Id.* ¶ 18. The arch, which is planned to be 250 feet tall in honor of the Nation's 250 years, *id.* ¶ 38, will interfere with these symbolic views. *Id.* ¶ 44.

Since Plaintiffs filed the complaint in this case, Defendants have taken concrete steps toward the arch's construction. Defendants have submitted designs for a 250-foot arch to the Commission of Fine Arts, and the Commission has approved the project concept, despite receiving roughly 1,000 public comments, all of which opposed the project. Comm'n of Fine Arts, *CFA Meeting—16 April 2026* (linking to "Meeting Recording");[2] *see* ECF 31 (Defs. Memo.) at 3–4; ECF 32-1 (Bowron Decl.) ¶ 4. Defendants have also sought review of the project by the National Capital Planning Commission. Defs. Memo. 4. And in preparation for construction of the arch, Defendants are conducting on-the-ground surveys in Memorial Circle. Bowron Decl. ¶ 5.

Congress has not passed a law specifically authorizing construction of an arch in Memorial Circle to commemorate the Nation's 250th anniversary. Compl. ¶ 47. Defendants do not plan to seek such congressional authorization prior to constructing the arch. *Id.* ¶ 49; Defs. Memo. 24–25.

**Procedural History**

Plaintiffs Michael Lemmon, Shaun Byrnes, and Jon Gundersen are Vietnam War veterans who regularly visit, and intend to continue visiting, Arlington National Cemetery to pay their respects to their fallen comrades and to satisfy their personal and aesthetic interests in the symbolism of the surrounding landscape. Compl. ¶¶ 7–9; ECF 7-2 (Lemmon Decl.) ¶¶ 2, 6–7; ECF 7-3 (Byrnes Decl.) ¶¶ 2, 8–9; ECF 7-4 (Gundersen Decl.) ¶¶ 2, 6–7. Plaintiff Calder Loth is an architectural historian who regularly visits, and intends to continue visiting, Arlington National

---

[2] https://www.cfa.gov/records-research/record-cfa-actions/2026/04/cfa-meeting.

Cemetery and its surroundings to satisfy his personal aesthetic and professional interest in the historically significant views of the Nation's capital. Compl. ¶ 10; ECF 7-5 (Loth Decl.) ¶¶ 2–3, 5–7. Construction of a monumental arch in Memorial Circle will degrade each Plaintiff's aesthetic satisfaction in future visits to the area. Compl. ¶¶ 50–51; Lemmon Decl. ¶¶ 8–9; Byrnes Decl. ¶¶ 10–13; Gundersen Decl. ¶¶ 8–9; Loth Decl. ¶¶ 8–10.

On February 19, 2026, Plaintiffs filed this lawsuit against President Trump, Director Haley, the Executive Office of the President, and NPS, seeking a declaration that the planned arch is unlawful and an injunction against its construction. The complaint states two claims for relief. First, the complaint alleges that Defendants are acting ultra vires and in excess of their lawful authority by building an arch that Congress has not authorized in Memorial Circle. Compl. ¶¶ 52–59. Second, the complaint alleges that the unauthorized arch violates President Trump's constitutional duty to take care that Congress's laws be faithfully executed. *Id.* ¶¶ 60–64.

Shortly after filing suit, Plaintiffs moved for a preliminary injunction to bar Defendants Haley, Executive Office of the President, and NPS from beginning construction of the arch during the pendency of this lawsuit unless and until Congress specifically authorizes the arch and Defendants have complied with all statutory and regulatory prerequisites. ECF 7. In opposing Plaintiffs' motion, Defendants submitted a declaration from the Deputy Director for Operations at NPS, stating that NPS would not construct or authorize construction of the arch until NPS had complied with what it understood to be "all applicable laws and regulations." ECF 12-1 (Lands Decl.) ¶ 7. Defendants also submitted a declaration from an Assistant to the President, stating that President Trump, Director Haley, and the Executive Office of the President likewise will not begin construction "unless and until NPS follows" what it understands to be "all applicable legal requirements and issues a final agency action authorizing arch construction to proceed." ECF 24-1

8

(Fisher Decl.) ¶ 4. In light of Defendants' representations, the parties proposed—and this Court entered—a consent order denying Plaintiffs' motion for a preliminary injunction without prejudice, and requiring NPS to issue public notice of any authorization for the arch and to give "at least fourteen days' notice prior to commencement of construction, or demolition in preparation for construction, of an arch on Memorial Circle." ECF 25-1 (proposed order); ECF 26 (order).

Defendants have now moved to dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Defs. Memo. 8–10.

## LEGAL STANDARDS

In resolving Defendants' motion to dismiss for lack of subject-matter jurisdiction, this Court "may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)). When the Court relies on the complaint alone, it asks whether the complaint "has made out a plausible claim" to jurisdiction, "accept[ing] facts alleged in the complaint as true and draw[ing] all reasonable inferences from those facts in the plaintiffs' favor." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). On a motion to dismiss for lack of jurisdiction at the pleading stage, then, a plaintiff satisfies her burden "by alleging sufficient facts in her pleadings," provided that the defendant has not presented evidence that controverts those facts. *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016) (emphasis omitted); *see Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016).

As for Defendants' motion to dismiss for failure to state a claim, this Court asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

9

*Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In deciding whether this standard is satisfied, this Court "must construe the complaint 'in favor of [Plaintiffs], who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023) (quoting *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam)).

## ARGUMENT

### I.      This Court has subject-matter jurisdiction.

#### A.  Plaintiffs have standing.

Because Article III of the U.S. Constitution restricts federal courts' adjudicatory authority to genuine "Cases" or "Controversies," U.S. Const. art. III, § 2, a plaintiff invoking the courts' jurisdiction must hold "a personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Specifically, a plaintiff must show that the defendant's challenged action has caused or will cause the plaintiff to suffer an "injury in fact" that is "concrete and particularized," fairly traceable to the challenged conduct, and likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Critically, "[a]n allegation of future injury may suffice" to establish standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

Plaintiffs have "alleg[ed] sufficient facts" to support their standing at the pleading stage, *Scenic Am.*, 836 F.3d at 48 (emphasis omitted); *see Lujan*, 504 U.S. at 561, and their sworn, uncontested declarations substantiate the allegations. The complaint alleges, and the declarations confirm, that Plaintiffs Lemmon, Byrnes, and Gundersen have "significant personal and aesthetic

10

interests in the unobstructed view between the Lincoln Memorial and Arlington House," and that Plaintiff Loth "has aesthetic and professional interests in the monuments in the Nation's capital and its environs and the relationship between those monuments, including the historic and symbolic viewshed between Arlington National Cemetery and the Lincoln Memorial." Compl. ¶¶ 50–51; Lemmon Decl. ¶ 6; Byrnes Decl. ¶ 9; Gundersen Decl. ¶ 6; Loth Decl. ¶¶ 5–6. The complaint further alleges, and the declarations confirm, that each Plaintiff "has visited and intends to continue in the future visiting Arlington National Cemetery and driving around Memorial Avenue Corridor, including Memorial Circle." Compl. ¶¶ 50–51; Lemmon Decl. ¶¶ 6–7; Byrnes Decl. ¶¶ 8–9; Gundersen Decl. ¶¶ 6–7; Loth Decl. ¶¶ 5, 7. Finally, the complaint alleges, and the declarations confirm, that the arch will degrade each Plaintiff's aesthetic enjoyment of the environs and adversely affect each Plaintiff's future visits to Arlington National Cemetery and the surrounding area. Compl. ¶¶ 50–51; Lemmon Decl. ¶¶ 8–9; Byrnes Decl. ¶¶ 10–13; Gundersen Decl. ¶¶ 8–9; Loth Decl. ¶¶ 8–10. These aesthetic injuries are not only concrete and particularized to Plaintiffs, but they are traceable to the construction of the challenged arch and can be remedied by an injunction barring construction.

Ample precedent establishes that harm to a plaintiff's personal aesthetic enjoyment of an environment that the plaintiff visits is a cognizable injury capable of supporting Article III standing. As the Supreme Court has explained, "the desire to … observe" a particular environment, "even for purely esthetic purposes, is undeniably a cognizable interest for purpose[s] of standing." *Lujan*, 504 U.S. at 562–63. Subsequent cases have repeatedly reinforced that principle. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area

11

will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972))); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025) (finding standing based on aesthetic injury); *Nat'l Trust for Historic Preservation in the U.S. v. NPS*, — F. Supp. 3d —, 2026 WL 533420, at *4 (D.D.C. Feb. 26, 2026) (holding that a "longtime D.C. resident and scholar of history and historic preservation" who regularly visits the White House had standing to challenge construction that would "undermin[e] her enjoyment and appreciation of the grounds"), *appeal pending*, D.C. Cir. Nos. 26-5123, 26-5134.

Defendants do not contest this precedent. Instead, they mischaracterize the nature of Plaintiffs' injury as a "general legal, moral, ideological, or policy objection to a particular government action." Defs. Memo. 16 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024) (syllabus)). Far from advancing "generalized grievance[s]," however, Plaintiffs have alleged that the arch will "affect '[them] in a personal and individual way'" by disrupting the aesthetic integrity of an area that each Plaintiff regularly visits and plans to continue visiting. *All. for Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560 n.1); *see Friends of Gateway v. Slater*, 257 F.3d 74, 78 (2d Cir. 2001) (holding that plaintiffs had standing to challenge construction of an "eyesore" in a park that they "frequently and regularly use[d]").

Defendants cite *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), for the proposition that "incidentally view[ing] something unpleasant"—even if "several times per week"—is not a cognizable Article III injury. Defs. Memo. 16 (quoting *Envtl. Def. Fund*, 2 F.4th at 970). Plaintiffs, though, do not allege the sort of "incidental" viewership that was at issue in *Environmental Defense Fund*. In that case, the D.C. Circuit held that a construction project did not inflict a cognizable aesthetic injury on a nearby resident who would pass the affected area roughly three times per week. 2 F.4th at 968. Critically, the resident "never indicate[d] how she derived

12

aesthetic value from the land as it had existed before the construction" and "never allege[d] that she used and enjoyed the land" affected by the construction or "that she intended to use the land in the future." *Id.* at 969. Here, in contrast, Plaintiffs allege that they regularly visit the relevant area and derive aesthetic enjoyment and personal meaning from its current state. Compl. ¶¶ 7–10; Lemmon Decl. ¶¶ 6–7; Byrnes Decl. ¶¶ 8–9; Gundersen Decl. ¶¶ 6–7; Loth Decl. ¶¶ 5–7.

Contrary to Defendants' arguments, Plaintiffs have also plausibly alleged that, absent relief from this Court, their aesthetic injury is "certainly impending," or, at a minimum, that it has "a substantial risk" of materializing. *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks omitted); *see Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (citing cases for the proposition that the D.C. Circuit "ha[s] frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury"). Drawing on Defendants' own consistent and often-repeated public statements, Plaintiffs have alleged that Defendants plan to construct a monumental arch in Memorial Circle to commemorate the Nation's 250th anniversary, which will occur on July 4, 2026. *See* Compl. ¶¶ 29–41. Far from suggesting that the allegations are not plausible, Defendants have asked this Court to take judicial notice of the fact that, since the filing of this lawsuit, they have taken concrete steps to move forward. *See* Defs. Memo. 3–4 (noting that the Department of the Interior has submitted the arch design to the Commission of Fine Arts and placed the arch on the agenda of the National Capital Planning Commission); *see also* ECF 32 at 1 (Defendants' notification to the Court that NPS is beginning surveys and testing at Memorial Circle to "assist [NPS] in completing the procedural prerequisites" to construction).

Defendants nonetheless object that the complaint fails to detail a specific "construction timeline." Defs. Memo. 11. Defendants, however, offer no authority to support their view that a plaintiff who has plausibly alleged a substantial risk of an impending injury must also pinpoint the

13

injury's precise timing. Rather than requiring allegations that an injury will occur at a particular time, the Supreme Court has explained that Article III's imminence requirement is designed to weed out theories of standing that rest on "a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (explaining that a future injury is insufficiently imminent if it is "conjectural"). Here, while Defendants' failure to disclose the specifics of their plans has left Plaintiffs unable to identify exactly "when arch construction will begin," Defs. Memo. 12, Plaintiffs' allegations that Defendants will soon build a monumental arch in Memorial Circle (and thereby trigger Plaintiffs' injury) are far from speculative: Defendants themselves have publicly announced their intent to build the arch. *See* Compl. ¶¶ 29–41. They have taken concrete steps toward doing so. *See supra* p. 7. And a White House representative recently stated the President's intent to begin building this year. *See* CBS News, *Leavitt Discusses "Arc de Trump" at White House Briefing* (YouTube Apr. 15, 2026) (hereafter, CBS News, *Leavitt Discusses "Arc"*).[3]

Citing *National Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284 (D.D.C. 2017), Defendants argue that the imminent *commencement* (as opposed to the completion) of construction will not harm Plaintiffs. Defs. Memo. 15. In *National Parks*, the court denied a preliminary injunction to plaintiffs challenging a construction project, where foundation work was imminent but above-ground work was not scheduled to begin for six months. *See* 282 F. Supp. 3d at 288. That the *National Parks* plaintiffs failed to demonstrate that they would "suffer irreparable harm before a decision on the merits c[ould] be reached" for purposes of securing a preliminary injunction, *id.* at 288–89, however, does not suggest that their future injury was insufficient for Article III standing purposes. In fact, *National Parks* was ultimately resolved on the merits, not

---

[3] https://www.youtube.com/watch?v=cdSGqqrCzCo.

dismissed on jurisdictional grounds. *See Nat'l Parks Conserv. Ass'n v. Semonite*, 311 F. Supp. 3d 350, 380–81 (D.D.C. 2018), *rev'd on other grounds*, 916 F.3d 1075, 1077 (D.C. Cir. 2019).

Defendants characterize Plaintiffs' injuries as speculative because, after the complaint was filed, Defendants stated that the arch project is subject to review by NPS, the Commission of Fine Arts, and the National Capital Planning Commission, and those reviews might "affect or alter" the specifics of the arch. Defs. Mem. 13. Plaintiffs' aesthetic injury, however, derives not from the specifics of the currently proposed design but from the interference that *any* sizable arch in Memorial Circle will work on the existing landscape. *See* Compl. ¶¶ 50–51. Defendants do not suggest that agency review will dissuade them altogether from carrying out their repeatedly stated intention of building a massive arch. In any event, the Court may take judicial notice of the fact that the Commission of Fine Arts has "endorsed" a monumental arch as "appropriate" for Memorial Circle. Letter from Thomas E. Luebke, Sec'y, Comm'n of Fine Arts, to Doug Burgum, Sec'y of the Interior (Apr. 23, 2026);[4] *see Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (explaining that "public records [are] subject to judicial notice on a motion to dismiss"). And, despite Defendants' suggestion to the contrary, it is scarcely realistic to expect that NPS—an Executive Branch agency answerable to the President—will "disapprove" the President's arch. Defs. Memo. 14; *cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020) (explaining that "lesser [executive] officers must remain accountable to the President, whose authority they wield").

Finally, citing *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), Defendants fault Plaintiffs for failing to allege the "specific[s]" of their future plans to visit the area around Memorial Circle. Defs. Memo. 15. In *Summers*, the Supreme Court held that an affidavit from an individual stating that he "want[ed] to" visit an area that was subject to challenged regulations,

---

[4] https://www.cfa.gov/records-research/project-search/cfa-16-apr-26-1.

without any "firm intention" to do so, was insufficient to establish a likelihood that the regulations would injure him. 555 U.S. at 496. Here, Plaintiffs all either live in or around Washington, DC, or visit the city at regular intervals, Compl. ¶¶ 7–10; they all hold a personal connection to the site that will be affected by the challenged construction, *id.*; and they all allege an intent to "continue … visiting" the site, just as they have done repeatedly in the past, *id.* ¶¶ 50–51. These allegations reflect more than a "vague desire" to someday visit a particular area. *Summers*, 555 U.S. at 496. And they are substantiated by Plaintiffs' sworn declarations. *See* Lemmon Decl. ¶¶ 6–7; Byrnes Decl. ¶¶ 8–9; Gundersen Decl. ¶¶ 6–7; Loth Decl. ¶¶ 5–7.

In sum, Plaintiffs have plausibly alleged a substantial risk that Defendants will proceed with their repeatedly professed plan to build a monumental arch in Memorial Circle and that the construction will cause concrete injury to Plaintiffs' aesthetic interest in the surrounding area. This injury is directly traceable to Defendants' challenged action and is redressable by the injunctive relief that Plaintiffs seek. Plaintiffs accordingly have standing to sue.

### B. The case is ripe.

Under Article III, a federal court may take jurisdiction over only those cases that are "ripe for adjudication." *Texas v. United States*, 523 U.S. 296, 300 (1998). Claims that rest on "contingent future events that may not occur as anticipated, or indeed may not occur at all," do not satisfy the ripeness requirement. *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). In contrast, Article III's ripeness requirement is satisfied when a plaintiff faces a sufficiently imminent risk of injury from a challenged action to satisfy Article III's standing requirement. *See Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (explaining that constitutional ripeness "is subsumed into the Article III requirement of standing"). Because Plaintiffs have standing, *see supra* Part I.A., their claims are ripe for Article III purposes.

Nonetheless, Defendants argue that the case is "prudentially unripe," irrespective of whether it falls within Article III's jurisdictional limits. Defs. Memo. 19. When "a federal court has jurisdiction," however, "it also has a 'virtually unflagging obligation … to exercise' that authority." *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (omission in original; quoting *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976)). The Supreme Court has noted that "the prudential ripeness doctrine" is in tension with this principle. *Susan B. Anthony List*, 573 U.S. at 167. Although the Court has not abrogated the doctrine, *see id.*, its application is thus "disfavored," *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018). *See also Revitalizing Auto Cmtys. Envtl. Response Trust v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021) (treating "the Supreme Court's cautious approach to prudential ripeness" as "a reminder that the doctrine constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction").

Under D.C. Circuit precedent, a court's inquiry into whether to take the unusual step of declining on prudential grounds to resolve a case over which it has jurisdiction "focus[es] on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). As to the first consideration, "the fitness of an issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the [defendant's] action is sufficiently final.'" *Id.* (quoting *Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)). Where that consideration favors deferring review, a court assesses the second consideration and asks whether the risk of "immediate and significant" hardship to the parties nonetheless supports immediate resolution. *Id.* at 389 (quoting *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 427 (D.C. Cir. 2007)).

17

Here, both considerations favor Plaintiffs. Plaintiffs' claims ask this Court to resolve purely legal issues: whether Defendants may lawfully construct an arch in Memorial Circle without congressional authorization, and, if not, whether Congress has provided authorization. Defendants urge this Court to take judicial notice of the fact that they "are currently undertaking [certain] procedural requirements," Defs. Memo. 19, and contend that awaiting the conclusion of review by various agencies "would provide a more concrete setting for judicial review," *id.* at 20. They do not contend, however, that they are seeking or planning to await any *congressional* action before building the arch. The possibility that Defendants might satisfy *other* statutory prerequisites does not obviate or inform the dispositive legal question of whether congressional action is necessary.

For similar reasons, Defendants are wrong to contend that awaiting further specifics about "arch design, subject, construction timeline, funding sources, or legal justification" would facilitate review. *Id.* at 19. Plaintiffs have plausibly alleged that Defendants plan to construct an arch in Memorial Circle to commemorate the Nation's 250th anniversary, and that they plan to do so without first securing congressional authorization. Irrespective of "specifics about arch design," timing, or other such factors, *id.* at 20, Plaintiffs' view of the law is that Defendants may not build a commemorative arch—or any arch, for that matter—in Memorial Circle unless and until Congress has authorized it. This Court can decide whether Plaintiffs are correct without awaiting project specifics or agency approvals that, Plaintiffs allege, are premature absent an act of Congress that initiates the project in the first place. *See* 40 U.S.C. § 8106; *id.* § 8903(a)(1).

Because the legal issues in this case are presently fit for judicial resolution, this Court need not proceed to consider the second factor of the prudential ripeness inquiry: whether the parties will suffer hardship if the Court declines on prudential grounds to resolve Plaintiffs' claims. *Am. Petroleum Inst.*, 683 F.3d at 389. Nonetheless, the hardship consideration also favors Plaintiffs,

18

who face a substantial risk of imminent injury. *See supra* Part I.A.; *cf. U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1014 (D.C. Cir. 2002) (finding that withholding consideration would work hardship where delay could compromise the ability of members of the public to "experience [the] natural serenity" of a park). Minimizing the hardship that delay would create, Defendants argue that, if this case is dismissed, Plaintiffs can wait until "NPS authorizes a final project to proceed" and then refile their lawsuit before their aesthetic injury is consummated. Defs. Memo. 21. But the threat of immediate, unannounced construction following NPS approval would likely force the parties to brief—and this Court to resolve—the legal issues presented by this case in the context of an emergency motion for preliminary relief in the refiled case. Given that the legal issues presented by Plaintiffs' claims are fully capable of resolution in the ordinary course of *this* lawsuit—where a consent order safeguards against unannounced construction, *see* ECF 26—Defendants present no compelling reason why the Court should invite unnecessary future exigency by dismissing the present case on the disfavored basis of prudential ripeness.

### C. The case is not moot.

Article III's requirement that a lawsuit must present a genuine case or controversy to fall within the jurisdiction of the federal courts exists "at all stages of review, not merely at the time the complaint is filed." *United States v. Sanchez-Gomez*, 584 U.S. 381, 385 (2018) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). Accordingly, a federal court lacks jurisdiction over a case that "becomes moot at any point during the proceedings." *Id.* A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). If the parties retain "a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (quoting *Knox*, 567 U.S. at 307–08).

19

Here, as explained above, *see supra* Part I.A., the massive arch that Defendants plan will inflict concrete and particularized aesthetic injury on Plaintiffs. And far from representing that they have abandoned the arch project, Defendants acknowledge that they continue to pursue it. *See* Defs. Memo. 3–4. Plaintiffs therefore retain a concrete interest in injunctive relief from this Court.

Defendants' mootness arguments rest on a misunderstanding of Plaintiffs' claims. First, Defendants state that, because they have submitted declarations representing that "NPS will comply with all applicable laws and regulations," Lands Decl. ¶ 7; *see* Fisher Decl. ¶ 4, there is no live dispute over whether NPS will authorize an arch before complying with the agency consultations and other "procedural requirements" that Defendants believe are all that the law demands. Defs. Memo. 17. Second, Defendants state that because Defendants Trump, Haley, and the Executive Office of the President have committed not to begin construction until Defendant NPS "issues a final agency action authorizing arch construction to proceed," there is no live controversy about whether the arch will be built without NPS authorization. *Id.* at 18 (quoting Fisher Decl. ¶ 4). The gravamen of Plaintiffs' claims, however, is that the arch project is unlawful absent an act of authorization from *Congress*, *see* Compl. ¶¶ 57, 64—an act that Defendants have stated, repeatedly, that they do not believe the law requires them to seek. *See* Defs. Memo. 24; 4/2/2026 Hearing Transcript (Tr.) 55:15 (stating that Defendants "think there is current authorization" to build the arch). Defendants' stated intention to satisfy *other* legal requirements— such as agency consultation and NPS approval—that apply even to *authorized* projects does not obviate the parties' central dispute over whether the "applicable laws and regulations," Lands Decl. ¶ 7, require Defendants to obtain Congress's authorization.

Defendants are also incorrect that Plaintiffs have "conceded" that the case is moot. Defs. Memo. 17. Selectively quoting a portion of the transcript of the hearing on Plaintiffs' motion for

a preliminary injunction, Defendants misrepresent Plaintiffs' counsel as having said that "a declaration from a White House representative 'stating that construction will not begin until NPS completes its procedural requirements[]'' 'would suffice' to obviate the 'need to issue an injunction'" in this case. *Id.* at 17–18 (quoting Tr. 36:4–13). What counsel actually said is that, "depend[ing] on the specifics of the declaration," such a declaration "likely" would suffice "to preserve the status quo going forward," so as to obviate the immediate need for interim relief in the form of a *preliminary* injunction while the litigation proceeds. Tr. 36:4–13. Consistent with that statement, Plaintiffs consented to the dismissal of their preliminary injunction motion without prejudice after receiving guarantees that arch construction will not begin prior to NPS authorization, *see* Fisher Decl., and that NPS will provide adequate notice of any such authorization. ECF 26 (consent order). These guarantees that Plaintiffs will receive notice and an opportunity to renew their preliminary injunction motion before construction begins (and irreparable harm results) do not extinguish the dispute over whether Defendants are acting lawfully in the first place by moving forward without congressional authorization.

Finally, Defendants appear to argue that the prospect of future "final agency action" from NPS with respect to the arch moots Plaintiffs' claims. Defs. Memo. 18–19. Defendants, though, fail to explain why future NPS action that might form the basis for an *additional* legal claim— namely, a claim under the APA—moots Plaintiffs' claims that Defendants are *currently* violating the law by moving forward on a construction project that Congress has not authorized. Defendants' argument that the possibility of an APA claim in the future makes an ultra vires claim unavailable now, *see id.* at 21–24, goes to the claim's merits, not mootness. Besides, the argument is incorrect, *see infra* pp. 23–25, and it has no bearing on Plaintiffs' separate constitutional claim.

Put simply, as long as Defendants intend to build an arch in Memorial Circle without Congress's approval, this Court can grant effectual injunctive relief. Because Defendants have not forsworn the intention that they have repeatedly announced, the case is not moot.

## II.    Plaintiffs have stated a plausible claim to relief.

### A.    Plaintiffs have stated an ultra vires claim.

**1.** The Supreme Court has long held that "[t]he acts of all [federal] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). Thus, "[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). After all, courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive [actor] violates such a command." *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988) (quoting *Bowen v. Mich. Acad. of Family Phys.*, 476 U.S. 667, 681 (1986)); *see Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022) ("So long as a statutory provision plainly delineates the outer limits of [executive] authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms.").

A non-statutory "ultra vires" claim "is available where (i) there is no express statutory preclusion of all judicial review; (ii) 'there is no alternative procedure for review of the … claim; and (iii) the [executive] plainly acts in excess of its delegated powers and contrary to a specific prohibition in [a] statute that is clear and mandatory.'" *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Govs.*,

22

589 F.3d 445, 449 (D.C. Cir. 2009)); *see Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (reaffirming the availability of non-statutory ultra vires claims under these circumstances).

Defendants' plan to construct an arch in Memorial Circle to commemorate the Nation's 250th anniversary satisfies these elements. No statute expressly bars judicial review of whether the arch project is legal. No alternative review procedure is presently available to Plaintiffs, as Defendants concede. Defs. Memo. 21–22 (explaining that Plaintiffs "of course cannot bring an APA claim" because "they do not challenge final agency action"). The arch has no foundation in the constitutional powers assigned to the Executive Branch. *See Nat'l Trust for Historic Preservation in the U.S. v. NPS*, — F. Supp. 3d —, 2026 WL 877779, at *5 (D.D.C. Mar. 31, 2026) (explaining Congress's constitutional "primacy over federal property, spending, and the District of Columbia"). And the arch has no basis in a statutory grant of authority to the executive. The Court "could find [Defendants'] actions *ultra vires* on that basis alone." *Id.* at *10.

Moreover, the arch project violates specific prohibitions in at least two statutes. The Commemorative Works Act provides that a commemorative work may be built in the area that encompasses Memorial Circle "only as specifically authorized by law," 40 U.S.C. § 8903(a)(1); *see id.* § 8901(4), after Congress has designated a sponsor responsible for satisfying the Act's various procedural requirements, *see id.* § 8902(a)(4). And 40 U.S.C. § 8106 prohibits constructing *any* "building or structure" in Memorial Circle "without express authority of Congress." Because Congress has neither authorized the arch nor appointed a sponsor, Defendants are acting in excess of their authority under both statutes by moving forward with the project.

**2.** Defendants' contrary arguments are meritless. Even though three of the four Defendants are not subject to the APA, *see* Defs. Memo. 22–23, and even though Plaintiffs have no APA claim against the remaining Defendant, NPS, *see id.* at 21–22, Defendants argue that the APA provides

23

"a meaningful and adequate opportunity for judicial review." *Id.* at 22 (quoting *Nuclear Regulatory Comm'n*, 605 U.S. at 681). The D.C. Circuit's opinion in *Chamber of Commerce v. Reich*, however, forecloses Defendants' view that an ultra vires claim is unavailable if future developments *might* eventually give rise to an APA claim. In *Chamber of Commerce*, the plaintiffs asserted a non-statutory claim challenging an Executive Order barring the federal government from contracting with certain employers, and the Secretary of Labor promulgated regulations implementing the Order while the lawsuit was pending. 74 F.3d at 1324. Although the D.C. Circuit recognized that "an available statutory cause of action" under the APA had thus materialized after the plaintiffs filed suit, *id.* at 1327, it held that the plaintiffs could maintain their ultra vires claim, *id.* at 1327–28. As the court stated, the plaintiffs "could not possibly have relied on the APA for a cause of action prior to the Secretary's issuance of regulations implementing the Executive Order because[] … the President is not an 'agency' under [the APA] and [the plaintiffs] sued before the Secretary issued his regulations." *Id.* at 1326. So too here. Plaintiffs "could not possibly … rel[y] on the APA for a cause of action" prior to final agency action, and an ultra vires claim is thus an appropriate vehicle for the parties' dispute over the ongoing arch project. *Id.*

Beyond being precedential, *Chamber of Commerce* is correct. As the D.C. Circuit recognized, APA review of an agency's implementation of an unlawful Executive Branch policy is a poor substitute for direct review of the policy itself. *See id.* at 1326 (observing that the plaintiffs may have declined to amend their complaint to assert an APA claim "because they fear[ed] any relief short of a declaration that the Executive Order is illegal would be inadequate"). Here, Plaintiffs challenge Defendants' decision to build an unauthorized commemorative arch in Memorial Circle, irrespective of what process Defendants follow to implement this decision and what developments may occur during agency review. Defendants contend that Plaintiffs must

24

"wait[] for final action from NPS," Defs. Memo. 22, but they overlook that, on Plaintiffs' view of the law, Defendants have no authority to take any action—final or otherwise—to advance their plans for an arch in Memorial Circle. *Cf. Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (distinguishing a challenge to "a decision of [an executive agency] made within its jurisdiction" from a challenge to a decision "made in excess of [the agency's] delegated powers" that is thus ultra vires).

Defendants attempt to distinguish *Chamber of Commerce* by contending that the plaintiffs there challenged "official Presidential action[]" in the form of an Executive Order, whereas Plaintiffs here supposedly challenge "preliminary executive discussions about potential actions." Defs. Memo. 23–24. This argument impermissibly fails to construe the complaint's allegations in the light most favorable to Plaintiffs. *See Langeman*, 88 F.4th at 294. Properly read, the complaint plausibly alleges that the President's decision to construct the arch is settled. *See, e.g.*, Compl. ¶ 33 (President's statement that "[w]e're building an arc[h]" (citation omitted)); *id.* ¶ 36 (White House statement that the President had announced "plans for a new Independence Arch in Washington, D.C." (citation omitted)); *id.* ¶ 40 (White House statement that the arch will be "one of the most iconic landmarks not only in Washington, D.C., but throughout the world" (citation omitted)). Defendants' own submissions, moreover, confirm the President's commitment to a "Project [that] involves erecting an arch in Memorial Circle … in Washington D.C." Fisher Decl. ¶ 2. As in *Chamber of Commerce*, plaintiffs do not need to await agency implementation of a presidential policy before challenging it as unlawful. *Cf. Nat'l Trust*, 2026 WL 533420, at *1 (in a case challenging construction of a White House ballroom, suggesting that the plaintiff should have brought an ultra vires claim "to challenge the President's statutory authority to complete [a] construction project … without congressional approval").

25

**3.** Defendants next argue that proceeding to build the arch violates neither the Commemorative Works Act nor 40 U.S.C. § 8106 because Congress authorized its construction in 1925. Defs. Memo. 24. Specifically, they point to a 1925 statute that "authorized and directed" a commission that had been established by a prior statute to design what is now Arlington Memorial Bridge to "proceed at once with the construction" of the bridge in accordance with a design that the commission had submitted to Congress in a report the prior year. Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 (hereafter, 1925 Act); *see* Act of Mar. 4, 1913, Pub. L. No. 62-432, § 23, 37 Stat. 866, 885 (establishing the commission). Defendants explain that the design set forth in the report contained a pair of columns on the island where Memorial Circle lies, *see* Report of the Arlington Memorial Bridge Commission, Senate Doc. No. 95, 68th Cong., 1st Session, at 40–41 (Apr. 21, 1924),[5] and that the 1925 Act authorized the commission to "make such changes in design … as in its discretion may be found to be necessary or advisable," 1925 Act, § 1, 43 Stat. at 974; *see* Defs. Memo. 6–8. Although the commission decided to delete those columns from the design "in the interests of aviation safety and economy," NPS, *Historic American Engineering Record: Arlington Memorial Bridge*, HAER No. DC-7, Addendum at 92 (1988) (hereafter, NPS, HAER No. DC-7),[6] Defendants suggest that the arch that they now seek to install is simply a design revision authorized by the 1925 Act.

Defendants' arch sits firmly outside the parameters of the 1925 Act. The Act described a finite construction project that Congress directed a statutorily designated commission to complete within a ten-year period. Specifically, the Act ordered the Arlington Memorial Bridge Commission to proceed according to "the ten-year program of expenditures and construction" that the

---

[5] https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIAL SET-08240_00_00-002-0095-0000.pdf.

[6] https://npshistory.com/publications/gwmp/haer-arlington-bridge.pdf.

commission had set out in its report to Congress, 1925 Act, § 6, 43 Stat. at 975, and the Act directed the commission to "transfer to the park system" any land that it occupied to facilitate construction "on completion of the project," *id.* § 4, 43 Stat. at 975. The entire project, Congress directed, should incur expenses of "a total sum not to exceed $14,750,000." *Id.* § 2, 43 Stat. at 974.

Consistent with the timeline and budget set forth by Congress, the Arlington Memorial Bridge was opened for use on January 18, 1932, having been constructed for a total cost of $12.2 million. *See* Bradley Akin, U.S. Bur. of Labor Stats., *Arlington Memorial Bridge Spans the Decades as a Study in Long-Term Price Change* (2017).[7] Thus when, the following year, President Franklin D. Roosevelt abolished the commission that Congress had authorized to construct the bridge and transferred the commission's functions to what is now NPS, *see* Exec. Order 6166, § 2 (June 10, 1933), the plans for the project had been finalized and implemented, the bridge was in operation, and the $14.75 million expenditure cap that Congress had set for the project had nearly been reached. *See* NPS, HAER No. DC-7, *supra* note 6, at 93 ("In early September [1931], paving and some finishing touches were all that remained to be done[.]"). It borders on the absurd to suggest that a statute directing a now-dissolved commission to undertake a long-completed project subject to a nearly exhausted expenditure limit authorizes Defendants to undertake a massive and costly new project 100 years later.

**4.** Finally, Defendants argue that even if the 1925 Act does not authorize the arch, construction is nonetheless consistent with both the Commemorative Works Act and 40 U.S.C. § 8106. Defendants are wrong as to both statutes.

---

[7]     https://www.bls.gov/opub/btn/volume-6/arlington-memorial-bridge-spans-the-decades-as-a-study-in-long-term-price-change.htm.

**a.** Pointing to the 1925 Act, Defendants first maintain that the Commemorative Works Act does not apply because, by its terms, it "does not apply to commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b); *see* Defs. Memo. 24. Because Defendants are wrong that the 1925 Act authorizes their arch, *see supra* pp. 26–27, they are also wrong that the arch falls within the Commemorative Works Act's grandfather provision.

Defendants next question whether the arch satisfies the Commemorative Works Act's definition of a "commemorative work" that is subject to the Act's requirements. Defs. Memo. 25. Plaintiffs, however, have plausibly alleged, based on Defendants' own pronouncements, that the arch is intended to "commemorate the Nation's 250th anniversary." Compl. ¶ 29; *see id.* ¶¶ 36, 38. Additional statements made by Defendants since the filing of this lawsuit confirm this allegation. *See, e.g.*, Donald J. Trump (@realdonaldtrump), Instagram (Apr. 15, 2026) (depicting the arch with the caption "The United States Triumphal Arch—Celebrating 250 Years of America!");[8] CBS News, *Leavitt Discusses "Arc," supra* note 3 (statement from White House press secretary Karoline Leavitt that the arch is "in honor of 250 years" and "a monument for every American to celebrate 250 years of our nation's proud history," and that starting construction on the arch this year will be "a fitting way to commemorate the 250th anniversary of American independence"). The arch thus falls squarely within the statutory definition of a "commemorative work": It is a "monument[] … or other structure … designed to perpetuate in a permanent manner the memory of an … event or other significant element of American history." 40 U.S.C. § 8902(a)(1).

Defendants object that the complaint's allegations suggest that the arch might *also* call to mind other themes, such as "size" or "American greatness." Defs. Memo. 25. The fact that the arch could hold additional symbolic significance, though, does not undercut the allegation that the

---

[8] https://www.instagram.com/p/DXKe-tzFhkr.

arch—as the President and his spokespeople have said—is planned to commemorate the Nation's founding 250 years ago. The Lincoln Memorial, for example, is no less a monument to Abraham Lincoln merely because aspects of its design also symbolize "democracy," the states of the Union, and national "reunification." NPS, *Lincoln Memorial Design and Symbolism*.[9] Indeed, on Defendants' view, virtually no monument would constitute a "commemorative work" because works of art are almost universally subject to varying interpretations. What matters here is that the President has told the American people what the arch is intended to celebrate, and the complaint plausibly alleges that he is pursuing a project in line with his stated intent.

**b.** As for 40 U.S.C. § 8106, Defendants again contend that the arch has received authorization through the 1925 Act and therefore meets section 8106's requirement that any building erected on federal park or public land in Washington, DC, must have "express authority of Congress." 40 U.S.C. § 8106; *see* Defs. Memo. 25. This argument again fails for the reasons given above. *See supra* pp. 26–27. And Defendants' hope that Congress might "in the future" appropriate funds for the arch, Defs. Memo. 25, is irrelevant. Regardless of whether a specific appropriation could constitute "express authority" for a particular structure for purposes of 40 U.S.C. § 8106, the fact remains that no such appropriation exists for the arch today. Defendants therefore have no statutory authorization to build.

Defendants next advance the same series of arguments against the applicability of 40 U.S.C. § 8106 that they recently made nearly verbatim in the litigation challenging the President's plan to construct a ballroom on the grounds of the White House—a series of arguments that Judge Leon comprehensively rejected. *See Nat'l Trust*, 2026 WL 877779, at *10–12. To start, Defendants argue that 40 U.S.C. § 8106 should be construed to require only that an entity "have express

---

[9] https://www.nps.gov/linc/learn/historyculture/lincoln-memorial-design-and-symbolism.htm.

29

authority from Congress to build—not to build a particular structure." Defs. Memo. 25. Yet Defendants do not identify any act of Congress that provides authorization for them to build in Memorial Circle. Moreover, Defendants' interpretation directly contravenes section 8106's text, which requires "[a] building or structure" to have "express authority of Congress" before it may be "erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia." 40 U.S.C. § 8106; *cf.* Korean War Veterans Memorial Wall of Remembrance Act, Pub. L. No. 114-230, § 2(a)(1), 130 Stat. 947, 947 (Oct. 7, 2016) (stating under the header "Authorization" that "the Korean War Veterans Memorial Foundation, Inc., may construct a Wall of Remembrance at the site of the Korean War Veterans Memorial"). Nothing in the text of section 8106 contemplates blanket authorization for Defendants to build whatever they want in the federally administered parks of Washington, DC.

Notwithstanding the statutory text, Defendants argue that the statutory history reflects that section 8106 is "concerned about stopping encroachments by unauthorized parties." Defs. Memo. 26. *But see Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's 'authoritative statement is the statutory text, not the legislative history.'" (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005))); *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1233 (D.C. Cir. 2026) (stating that the D.C. Circuit "do[es] not employ 'legislative history to cloud a statutory text that is clear'" (quoting *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 383 (D.C. Cir. 2021))). Defendants, though, do not examine the legislative history of either section 8106 or its predecessor statute, which was enacted in 1912; rather, they rely on *other* statutes, from 1864 and 1902, that address unlawful third-party occupation of public spaces. *See* Defs. Memo. 25–26. As Judge Leon recently explained when rejecting the same argument, "[w]hile other statutes" that Defendants cite "from the era" leading

up to the enactment of section 8106's predecessor "suggest 'unlawful occupation' of 'public lands' in D.C. was a concern of Congress," Defendants' "vague historical evidence has no connection to the text of § 8106." *Nat'l Trust*, 2026 WL 877779, at *11 (citation omitted).

In contrast to the 1864 and 1902 statutes on which Defendants rely, section 8106's predecessor statute—like section 8106 itself—focused not on "unauthorized parties," Defs. Memo. 26, but on unauthorized "building[s] or structure[s]." 40 U.S.C. § 8106. As enacted in 1912, the statute read: "Hereafter there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress." Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 444, *codified at* 40 U.S.C. § 68 (1912). When recodifying that law at 40 U.S.C § 8106, Congress stated that it was "codif[ying] existing law without making any substantive change in the law." H.R. Rep. No. 107-479 at 3 (2002); *see* Act of Aug. 21, 2002, Pub. L. No. 107-217, 116 Stat. 1062, 1206.

Defendants next rely on a statement made at a 1926 congressional subcommittee hearing by Major Ulysses S. Grant III, an officer of the agency that had requested the enactment of the 1912 predecessor to section 8106. Defs. Memo. 26. In response to a question asking him to justify the construction of a field house in Anacostia Park notwithstanding the 1912 statute, Major Grant replied that the 1912 statute "was intended for the purpose of preventing encroachments upon park property by other Government offices or by the public, and has never been construed to prevent … construction by the park authorities within the limits of the appropriations." District of Columbia Appropriation Bill, 1927, Hearing Before the Subcomm. of H. Comm. on Appropriations 533, 69th Cong. (1926) (hereafter, Subcomm. Hearing Tr.). Despite Defendants' characterization of Major Grant's statement as "[n]ear-contemporaneous legislative history," Defs. Memo. 26, the statement was made nearly *fifteen years after* the enactment of the 1912 predecessor

31

statute. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."). In addition, the Anacostia field house that Major Grant was discussing "had, in fact, been presented to Congress," and Congress had authorized it by "appropriat[ing] funds for [its] construction." *Nat'l Trust*, 2026 WL 877779, at *11 n.9; *see* Subcomm. Hearing Tr. 533. Major Grant's statement about park authorities acting "within the limits" of what Congress has authorized thus offers no support for Defendants' position that authorization is not required. Subcomm. Hearing Tr. 533.

Turning to "historical practice," Defendants contend that "NPS has erected countless structures on national parkland in the District over the past century" without a "record of any express congressional approval." Defs. Memo. 27. This argument, however, "runs into another fundamental principle of statutory interpretation: that agency practice cannot alter unambiguous statutory text." *Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 792 (D.C. Cir. 2018). What is more, it is not clear that the structures Defendants identify were built without Congress's authorization. *See Nat'l Trust*, 2026 WL 877779, at *12; *compare* Defs. Memo. 27 (suggesting that there is "no record" of congressional authorization for the National Capital Region Headquarters and the U.S. Park Police Headquarters), *with Nat'l Trust*, 2026 WL 877779, at *12 n.11 (citing an appropriations statute that arguably authorized construction of these buildings).

Finally, Defendants argue at length that a now-repealed statute, 16 U.S.C. § 451 (1912), casts "doubt" on the proposition that section 8106 "applies … to national parks administered by NPS." Defs. Memo. 28. Enacted contemporaneously in 1912 with section 8106's predecessor statute, 16 U.S.C. § 451 required "express authority of Congress" for the expenditure of sums above a specified threshold "for construction of administration or other buildings … in any national park." Because 16 U.S.C. § 451 governed "NPS's construction in national parks," the

32

argument runs, section 8106 "was never intended" to do so. Defs. Memo. 29. And now that Congress has repealed 16 U.S.C. § 451, Defendants argue, Congress's authorization is no longer required for *any* structure that NPS wishes to build in the national parks. *See id.*

Even if Defendants' argument could overcome section 8106's plain text, it would not support the construction of an unauthorized arch in Memorial Circle. Although Memorial Circle sits within a "park[] or public grounds of the Federal Government in the District of Columbia," and so falls within the scope of 40 U.S.C. § 8106, it does not sit within a "national park" and so never fell within the scope of 16 U.S.C. § 451. *See* NPS, *National Park System* (listing the national parks);[10] NPS, *Lady Bird Johnson Park* (explaining that Lady Bird Johnson Park, which houses Memorial Circle, "is a unit of the George Washington Memorial Parkway").[11]

More fundamentally, Defendants provide no support for the underlying premise of their argument: that Congress intended the restriction that now-rescinded 16 U.S.C. § 451 placed on construction in national parks throughout the country (no unauthorized building projects above a certain cost threshold) to supplant the more demanding restriction that 40 U.S.C. § 8106 and its predecessor placed on construction in federal parkland within Washington, DC, specifically (no unauthorized building projects at all). As Judge Leon recently explained in rejecting this same argument, "[t]he existence of a separate statute governing national parks" did not eliminate "§ 8106's limitation on parks in the District of Columbia." *Nat'l Trust*, 2026 WL 877779, at *12. Defendants' historical account offers no basis for this Court to decline to interpret section 8106 according to its plain language. *See id.* ("The stronger reading of th[e] history is that Congress means what it says!").

---

[10] https://www.nps.gov/aboutus/national-park-system.htm.

[11] https://www.nps.gov/gwmp/planyourvisit/ladybirdjohnsonpark.htm.

### B. Plaintiffs have stated a claim under the Take Care Clause.

Plaintiffs have also plausibly alleged that the President's directive to build an arch in Memorial Circle without congressional authorization violates his "constitutionally appointed duty to 'take care that the laws be faithfully executed.'" *Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3). This duty "refutes the idea that [the President] is to be a lawmaker" and makes clear that "Congress has … exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitution" in the federal government. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952).

By enacting the Commemorative Works Act and 40 U.S.C. § 8106, Congress formalized its longstanding oversight role in determining the configuration of monuments and other structures on federal lands in the District of Columbia. *See supra* pp. 4–5. The President's constitutional duty, then, is to facilitate those legislative choices by enforcing the laws against those who would break them by building unauthorized structures on federal land in Washington, DC. Here, the President has done the opposite, openly flouting Congress's laws by announcing a plan to proceed with construction of his own unauthorized structure. Although the President has broad discretion in deciding how to allocate finite enforcement resources, *cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985), or how to "interpret[] a statute and direct[] the details of its execution," *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928), he is constitutionally prohibited from rejecting Congress's policy altogether. *See Youngstown*, 343 U.S. at 588 (holding that a presidential order violated constitutional separation-of-powers principles where it "d[id] not direct that a congressional policy be executed in a manner prescribed by Congress—[but] direct[ed] that a presidential policy be executed in a manner prescribed by the President"); *see Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019) (recognizing that "separation-

34

of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause"). The complaint plausibly alleges that the President has taken just such a prohibited step by directing his subordinates to violate Congress's laws.

Defendants offer two arguments why, in their view, Plaintiffs fail to state a constitutional claim. Neither has merit.

First, citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866), Defendants contend that "courts lack the authority to review the President's 'purely executive and political' duty 'to see that the laws are faithfully executed.'" Defs. Memo. 30 (quoting *Johnson*, 71 U.S. at 499). But the Supreme Court has since made clear that an injured party has an implied right of action under the Constitution to enforce the Constitution's structural guarantees, even where the plaintiff's claim implicates the separation of powers. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *cf. Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."). Defendants offer "no reason" why a Take Care Clause claim "should be treated differently than every other constitutional claim." *Free Enter. Fund*, 561 U.S. at 491 n.2. And Defendants are simply incorrect to assert that, since *Johnson*, "no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials." Defs. Memo. 30 (quoting *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022)); *see Las Americas Immigrant Advocacy Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1213 (D. Or. 2020) (denying a motion to dismiss a Take Care Clause claim and explaining that "[t]he case law[] … does not appear to provide any basis to find this claim non-justiciable"); *cf. United States v. Texas*, 577 U.S. 1101 (2016) (granting certiorari and requesting briefing on whether a challenged presidential policy "violates the Take Care Clause of the Constitution").

35

In light of *Free Enterprise Fund* and its progeny, *Johnson* is best read to hold, not that the President's exercise of his Take Care Clause duty is judicially unreviewable, but rather that a Take Care Clause violation typically cannot justify an injunction against the President. *See Johnson*, 71 U.S. at 499–501; *see also Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion) (quoting *Johnson* for the proposition that the judiciary generally has "no jurisdiction … to enjoin the President in the performance of his official duties" (quoting 71 U.S. at 501)). Plaintiffs, though, do not seek to enjoin the President—just his subordinates. *See* Compl. at 18–19. And Supreme Court and D.C. Circuit precedent recognizes that an injunction barring the President's subordinates from giving effect to an unlawful presidential directive is an available form of relief. *See Youngstown*, 343 U.S. at 589 (affirming an injunction that barred the Secretary of Commerce from implementing an Executive Order that violated the separation of powers); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("[A]ny conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, [where] the injury at issue can be rectified by injunctive relief against subordinate officials.").

Second, Defendants argue that Plaintiffs' Take Care Clause claim "is ultimately a statutory claim, not a constitutional one." Defs. Memo. 30. They explain that a claim that the President "acted in excess of [statutory] authority" does not necessarily implicate the Constitution, whereas a claim that the President acted in the "*absence* of *any* statutory authority" is best viewed as a constitutional claim. *Id.* (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). Contrary to Defendants' assertion, this argument favors Plaintiffs. Indeed, the basis for Plaintiffs' Take Care Clause claim is the President's initiation of a project that requires congressional authorization without having first obtained that authorization. That the President has not "conceded" the absence of statutory authority, *id.* (quoting *Dalton*, 511 U.S. at 473), is irrelevant. This Court should reject

36

Defendants' view that the President can insulate his unlawful actions from constitutional scrutiny by refusing to concede that he lacks statutory authority to order the arch's construction.

Although Defendants rely on *Dalton* and the D.C. Circuit's opinion in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), *see* Defs. Memo. 30–31, neither opinion analyzed a claim under the Take Care Clause, and neither case involved a challenge to a presidential action that the President was wholly without statutory authority to undertake. In *Dalton*, Congress had undisputedly conferred power on the President to close naval shipyards, *see* 511 U.S. at 464–65, and the issue was whether he had exercised that power in the manner that Congress had authorized, or whether he had "exceeded his authority" under the relevant statute by committing procedural missteps. *Id.* at 476. And in *Global Health Council*, in which plaintiffs brought constitutional claims challenging the President's allegedly unlawful impoundment of foreign-assistance funds, 153 F.4th at 7, the panel identified a statute that "provides a mechanism for the President to act on impoundment," *id.* at 16, and classified the plaintiffs' claims as statutory rather than constitutional, *see id.* at 14–17. Here, Plaintiffs do not allege that the President has improperly exercised a power that Congress has granted him. Rather, they allege that the President has exercised a power that Congress has expressly retained for itself: the power to authorize construction in Memorial Circle.

To be sure, the actions that violate the President's duty under the Take Care Clause *also* exceed the scope of his authority under the Commemorative Works Act and 40 U.S.C. § 8106. But a violation of the Take Care Clause necessarily entails the President's failure to "take Care that [Congress's] Laws be faithfully executed." U.S. Const. art. II, § 3. Justice Jackson's concurrence in *Youngstown*, which "provides the accepted framework for evaluating executive action," *Medellín v. Texas*, 552 U.S. 491, 524 (2008), confirms that executive action can be inconsistent with both federal statutes and the Constitution. Justice Jackson explained that presidential power

37

is "at its lowest ebb" when the President "takes measures incompatible with the expressed or implied will of Congress" and that such cases "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." 343 U.S. at 637–38 (Jackson, J., concurring). Of course, "the expressed or implied will of Congress," *id.* at 637, is revealed most reliably through the statutes that it enacts. *See Nat'l Federation of Indep. Business v. Sebelius*, 567 U.S. 519, 544 (2012) ("[T]he best evidence of Congress's intent is the statutory text."). The President's disregard for Congress's statutes, then, is strong evidence of a Take Care Clause violation—not, perversely, a fact that insulates his actions from constitutional scrutiny.

## CONCLUSION

This Court should deny Defendants' motion to dismiss.

Dated: May 12, 2026

Respectfully submitted,

/s/ Nicolas Sansone
Nicolas Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

38