**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MICHAEL LEMMON, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 26-cv-544 (TSC) |
| DONALD J. TRUMP, et al., | ) ) ) | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS** |
| Defendants. | ) ) ) | |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.      Rather Than Challenge Any Executive Action, Plaintiffs Seek Unprecedented Review Of Executive ........................................................ 2

II.     The Court Cannot And Should Not Exercise Jurisdiction Over Plaintiffs' Claims. ....................................................................................... 8

      A.     Plaintiffs have failed to establish imminent injury. ................................... 8

      B.     Plaintiffs have not alleged cognizable harm from arch construction. ........ 11

      C.     Plaintiffs' alleged controversy is moot. ..................................................... 12

III.    The Complaint Should Be Dismissed As Prudentially Unripe. ............................ 14

IV.    Plaintiffs Have Failed To State An *Ultra Vires* Claim. ....................................... 16

      A.     Plaintiffs have failed to challenge an executive action required for an *ultra vires* claim. .................................................................................... 16

      B.     The APA provides meaningful and adequate judicial review that precludes an *ultra vires* claim. .................................................................. 17

      C.     Plaintiffs' disagreement with Defendants' interpretation of the 1925 Act does not entitle them to *ultra vires* review. ....................................... 19

V.     Plaintiffs Have Failed To State A Constitutional Claim. ...................................... 23

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987) ............................................................................... 7

*Arizona v. Mayorkas*,
600 F. Supp. 3d 994 (D. Ariz. 2022) ...................................................................... 23

*Ashwander v. Tennessee Valley Authority*,
297 U.S. 288 (1936) ................................................................................................. 3

*Atl. States Legal Found. v. EPA*,
325 F.3d 281 (D.C. Cir. 2003) .......................................................................... 14, 15

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ................................................................................. 9

*Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.*,
502 U.S. 32 (1991) ............................................................................................ 17, 18

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ................................................................................................. 3

*Center for Biological Diversity v. McAleenan*,
404 F.Supp.3d 218 (D.D.C. 2019) ......................................................................... 23

*Chamber of Com. of U.S. v. Reich*,
57 F.3d 1099 (D.C. Cir. 1995) ............................................................................. 5, 6

*Chamber of Commerce of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........................................................... 1, 4, 5, 16, 18

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ............................................................. 8, 16, 19, 23

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ............................................................................................ 6, 14

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................................. 8

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025) ............................................................................ 12

*Ctr. for Democracy & Tech. v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) ....................................................................... 10

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................................... 24

*Dames & Moore v. Regan*,
453 U.S. 654 (1981).............................................................................................. 23

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
85 F. Supp. 3d 250 (D.D.C. 2015)........................................................................ 15

*Delta Const. Co. v. E.P.A.*,
783 F.3d 1291 (D.C. Cir. 2015).............................................................................. 6

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)................................................................................................ 6

*Env't Def. Fund v. FERC,
(EDF)*, 2 F.4th 953 (D.C. Cir. 2021) .................................................................... 11

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024).............................................................................................. 12

*Fed. Express Corp. v. United States Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022)................................................................................. 4

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010).............................................................................................. 24

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006).................................................................................. 3

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)................................................................................. 24

*Goldstein v. California*,
412 U.S. 546 (1973).............................................................................................. 22

*Griffith v. Fed. Lab. Rels. Auth.*,
842 F.2d 487 (D.C. Cir. 1988).............................................................................. 19

*Hollingsworth v. Perry*,
570 U.S. 693 (2013).............................................................................................. 12

*In re Cheney*,
406 F.3d 723 (D.C. Cir. 2005)................................................................................ 6

*Jafarzadeh v. Duke*,
270 F. Supp. 3d 296 (D.D.C. 2017)...................................................................... 17

*John P. Agnew & Co. v. Hoage*,
99 F.2d 349 (D.C. Cir. 1938).................................................................................. 3

*Las Americas Immigrant Advoc. Ctr. v. Biden*,
571 F. Supp. 3d 1173 (D. Or. 2021) .................................................................... 24

*Las Americas Immigrant Advoc. Ctr. v. Trump*,
475 F. Supp. 3d 1194 (D. Or. 2020) .................................................................... 23

*League of United Latin Am. Citizens v. Exec. Off. of President,*
(*LULAC*), 808 F. Supp. 3d 29 (D.D.C. 2025)........................................................................ 5, 18

*Lewis v. U.S. Parole Comm'n,*
743 F. Supp. 3d 181 (D.D.C. 2024)...................................................................................... 17

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)........................................................................................................ 10, 12

*\*Mississippi v. Johnson,*
71 U.S. 475 (1866).......................................................................................................... 23, 24

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State,*
658 F. Supp. 2d 105 (D.D.C. 2009)........................................................................................ 7

*Nat'l Parks Conservation Ass'n v. Semonite,*
282 F. Supp. 3d 284 (D.D.C. 2017)...................................................................................... 15

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.,*
No. CV 25-4316 (RJL), 2026 WL 877779 n.15 (D.D.C. Mar. 31, 2026) .............................. 17

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004)................................................................................................................ 16

*\*Nuclear Regul. Comm'n v. Texas,*
(*NRC*), 605 U.S. 665 (2025) ................................................................. 2, 3, 8, 16, 17, 19

*Oliver v. United States,*
335 F.2d 724 (D.C. Cir. 1964)................................................................................................ 4

*\*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.,*
656 F. Supp. 3d 137 (D.D.C. 2023)............................................................................... 7, 9, 10

*Pub. Citizen, Inc. v. FERC,*
92 F.4th 1124 (D.C. Cir. 2024)....................................................................................... 12, 13

*Pub. Citizen, Inc. v. Trump,*
435 F. Supp. 3d 144 (D.D.C. 2019)........................................................................................ 5

*Sierra Club v. Costle,*
657 F.2d 298 (D.C. Cir. 1981).............................................................................................. 17

*State Nat'l Bank of Big Spring v. Lew,*
795 F.3d 48 (D.C. Cir. 2015).................................................................................................. 9

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)....................................................................................................... 8, 9, 14

*Trudeau v. Fed. Trade Comm'n,*
456 F.3d 178 (D.C. Cir. 2006)............................................................................................... 18

*Trump v. Hawaii,*
585 U.S. 667 (2018)................................................................................................................ 6

iv

*Trump v. New York*,
  592 U.S. 125 (2020)......................................................................................... 3, 14, 15, 17

*Turlock Irr. Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ...................................................................................... 9

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
  998 F.3d 926 (D.C. Cir. 2021)................................................................................. 7, 9

*United Transp. Union v. I.C.C.*,
  891 F.2d 908 (D.C. Cir. 1989)..................................................................................... 7

**Statutes**

40 U.S.C. § 8106............................................................................................................... 22

Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 ...................................... 13, 19, 20, 21, 25

Pub. L. No. 99-652 § 10(b).............................................................................................. 20

U.S. Const. art. II ............................................................................................................. 23

**Other Authorities**

Exec. Order No. 12,954 § 1, 60 Fed. Reg. 13023 (1995) ................................................... 5

Exec. Order No. 13492, 74 Fed. Reg. 4897 (Jan. 22, 2009)............................................... 4

**INTRODUCTION**

It is undisputed that construction to build an arch on Memorial Circle will not start unless and until the National Park Service (NPS) authorizes it through final agency action. Judicial review therefore requires final agency action under section 704 of the Administrative Procedure Act (APA). It is also undisputed that there is no final agency action. The legal consequence of that is straightforward: the Court must dismiss the case.

Plaintiffs instead contort APA review; because it is *presently* unavailable, they say *ultra vires* review must be. And such non-statutory review must be available now, Plaintiffs say, because they have alleged that the President's decision to construct the arch is settled. This theory is as wrong as it sounds, and it would upset several bedrock principles of administrative and constitutional law. Plaintiffs' the-President-really-means-it theory of *ultra vires* review would easily leapfrog the APA's default rule. Although the President's social media posts and his statements to the press aren't reviewable under the APA, Plaintiffs seem to think those statements are reviewable under the extremely limited doctrine of *ultra vires* review, so long as they allege the President has made up his mind.

Plaintiffs' theory doesn't just upset the review scheme that Congress created for Executive Branch action. It also tries to transform words alone into an Article III injury. Plaintiffs' purported injury flows from the construction of an arch. The President's statements about an arch project harm no one. The case that Plaintiffs primarily rely on, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), proves the point. There, an executive order itself inflicted an imminent injury—lost negotiating power at the collective bargaining table—before any final agency action was taken to implement that Order. For that reason, non-statutory review was appropriate. Here, by contrast, Plaintiffs point to no cognizable injury from the unimplemented

executive "intentions."  Rather, they allege only injuries from future arch construction, which has not been authorized.

The Court should reject this unrecognizably broad theory of *ultra vires* review and Article III standing. It should instead dismiss the case.

## ARGUMENT

### I.   Rather Than Challenge Any Executive Action, Plaintiffs Seek Unprecedented Review Of Executive "Intention."

Plaintiffs' opposition abandons the Complaint's speculative allegation positing "the President's directive to plan and construct an arch on Memorial Circle *by July 4, 2026*." Dkt. 1, Compl. ¶ 64 (emphasis added). Now plainly unable to rely on that timeline for completion, Plaintiffs eschew the only Presidential "directive" alleged in the Complaint. *Compare* Dkt. 31, Defs.' Mot. 14–15 (explaining unrealistic nature of allegation given judicially noticeable statistics about construction duration), *with* Dkt. 33, Pls.' Opp'n 13–14 (conceding that Plaintiffs cannot identify when construction will begin, much less conclude). Plaintiffs instead refocus their case on Defendants' "repeatedly stated intention to build the arch." Opp'n 1–2.

But Plaintiffs' pivot deprives their suit of a necessary component: a challenged executive action. *See Nuclear Regul. Comm'n v. Texas* (*NRC*), 605 U.S. 665, 681 (2025) (*ultra vires* review "applies only when an agency has taken *action* . . . ." (emphasis added)). Plaintiffs' opposition even tacitly admits that they challenge only executive "intention." *E.g.*, Opp'n 14 (challenging Defendants' "intent to build the arch"); *id.* (introducing new allegation about "the President's intent to begin building this year"); *id.* at 15 (seeking to excuse lack of identified action given Defendants' "repeatedly stated intention of building a massive arch"); *id.* at 22 ("this Court can grant effectual injunctive relief" because "Defendants intend to build an arch in Memorial Circle"). Plaintiffs assert they can challenge such unimplemented intent because "Defendants have not

2

disavowed their repeatedly stated intention," *id.* at 1–2, when sued by parties with a contrary "view of the law," *id.* at 18. Yet courts cannot issue "an advisory decree" merely because a complaint sets forth "a difference of opinion between" the parties. *John P. Agnew & Co. v. Hoage*, 99 F.2d 349, 351 (D.C. Cir. 1938) (quoting *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325 (1936)). And the Supreme Court has long held that executive officers' "pronouncements" of their "desires" "did not give rise to a justiciable controversy save as they had fruition in *action of a definite and concrete character*." *Ashwander*, 297 U.S. at 324 (emphasis added); *Trump v. New York*, 592 U.S. 125, 131 (2020) (rejecting challenge to unimplemented Presidential "desire").

The closest Plaintiffs come to articulating any challenged executive action is alleging a "plan to construct a monumental arch in Memorial Circle." Opp'n 13 (citing Compl. ¶¶ 29–41). But executive "plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20–21 (D.C. Cir. 2006) (rejecting challenge to "Presidential Budget Initiative" as nonjusticiable). Allowing judicial review of such planning "initiatives would wreak havoc with the normal operations of agencies and the executive branch." *Id.* at 21 (holding it "impossible to believe that the APA opened" a budget proposal "to judicial scrutiny as a reviewable 'agency action'"). Plaintiffs' theory falls well short of the APA's final-agency-action requirement.

Nor can Plaintiffs challenge mere executive plans under a non-statutory cause of action. As the Supreme Court recently explained, *ultra vires* review is not available "simply because [the Executive Branch] has arguably reached 'a conclusion which does not comport with the law.'" *NRC*, 605 U.S. at 681 (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). Even Plaintiffs' preferred non-statutory review cases limit judicial review to the "executive's *action*."

3

*Reich*, 74 F.3d at 1328 (citation modified); *see also Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (limiting *ultra vires* review to circumstances when the "agency plainly *acts* in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory" (citation modified)).

Courts do not review unimplemented executive intentions as history abounds with unrealized executive desires. President Obama, for example, entered office vowing to close the detention facilities at Guantanamo Bay. And one of his earliest Executive Orders directed the Department of Defense to close them within one year. Executive Order 13492 § 3, 74 Fed. Reg. 4897 (Jan. 22, 2009). But when he ultimately left office eight years later, the detention facilities remained open. PBS News, *Why Obama failed to close Guantanamo* (Jan. 14, 2017).[1] Because Presidents do not always achieve their goals, courts wait for injurious executive action to undertake judicial review, lest they issue "an advisory opinion on issues which may or may not arise." *Oliver v. United States*, 335 F.2d 724, 726 n.2 (D.C. Cir. 1964).

Plaintiffs nonetheless assert that they "do not need to await agency implementation" because "the President's decision to construct the arch is settled." Opp'n 25. Even had Plaintiffs plausibly alleged such a decision—which they have not[2]—that allegation would not overcome at least three fatal flaws in their theory.

---

[1] https://www.pbs.org/newshour/show/obama-failed-close-guantanamo.

[2] The only allegation in the Complaint positing anything resembling a "settled" decision is their now-abandoned allegation about a Presidential directive to construct the arch by July 4, 2026. *See* Compl. ¶ 64. Nor does the Fisher Declaration "confirm the President's commitment" to build an arch. *Contra* Opp'n 25. Instead, both the Fisher Declaration and the Complaint recognize that NPS—not the President—is the entity with jurisdiction to authorize construction on Memorial Circle. Dkt. 24-1, Declaration of Joshua Fisher (Fisher Decl.) ¶ 2; Compl. ¶ 14.

The first flaw is that the President's "settled" decision is not harming Plaintiffs; nor could it. Plaintiffs point to a statement the President made in December 2025 about building an arch. Opp'n 25. But the President's words are not harming anyone. Rather, Plaintiffs' theory of injury relies on arch construction, Compl. ¶¶ 50–51, and the arch will not be spoken into existence. The entity that could authorize construction is NPS. *See* Compl. ¶ 14; Fisher Decl. ¶ 2. The Complaint, of course, omits any allegation that NPS has completed its decision-making process, much less authorized arch construction.

The lack of harm to Plaintiffs in the absence of a Presidential action set this case apart from *Reich*. That case simply applied an unremarkable proposition—"generally, judicial review is available to *one who has been injured by an act* of a government official which is in excess of his express or implied powers"—to an injurious executive action. 74 F.3d at 1327 (citation modified). There, President Clinton had already acted; in barring federal agencies from "contract[ing] with employers that permanently replace lawfully striking employees," his Executive Order immediately affected "22% of the labor force." *Id.* at 1324 (quoting E.O. 12,954 § 1, 60 Fed. Reg. 13023 (1995)).[3] Thus, the "plaintiffs in the *Reich* case" established standing "by showing that the Executive Order that they challenged created 'a disincentive for employers [in general] to hire replacement workers,' regardless of" how agencies subsequently implemented the challenged Executive Order. *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 159–60 (D.D.C. 2019) (quoting *Chamber of Com. of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995)). By inflicting "hardship"

---

[3] President Clinton based his action in his statutory "authority to prescribe policies and directives 'as he shall deem necessary to effectuate the provisions' of the [Procurement] Act." *Reich*, 74 F.3d at 1330 (quoting 40 U.S.C. § 486(a) (1996)). That Executive Order was thus akin to "legislative rules [that] 'may be subject to pre-enforcement review,'" whereas mere executive "guidance may not." *League of United Latin Am. Citizens v. Exec. Off. of President (LULAC)*, 808 F. Supp. 3d 29, 64 (D.D.C. 2025).

on employers confronted "with the difficult choice between surrendering their right to hire permanent replacements and risking the loss of current and future government contracts," that Executive Order created a ripe Article III case. *Reich*, 57 F.3d at 1101. Thus, *Reich* "is the proverbial exception that proves the rule" that courts wait for final agency action to undertake judicial review unless Presidential action inflicts imminent injury that cannot be meaningfully redressed by APA review. *Cf. Delta Const. Co. v. E.P.A.*, 783 F.3d 1291, 1301 (D.C. Cir. 2015).

In contrast to *Reich*, Plaintiffs have failed to establish any imminent injury from Presidential action. They do not articulate any injury from the social media posts or press reports referenced in the Complaint; nor are they injured by the ongoing agency review processes that began after the Complaint was filed. Instead, all their injuries flow from arch construction, which will not occur unless and until NPS issues a final agency action.

And unlike *Reich*, Plaintiffs challenge no official executive action, thus depriving the Court of any record should this litigation proceed. Whereas Executive Orders are reviewed, if at all, based on their "text," *Trump v. Hawaii*, 585 U.S. 667, 706 (2018), Plaintiffs challenge no such written order. Instead, they claim merely that "the President's decision to construct the arch is settled," Opp'n 25, overlooking the "general rule against inquiring into the mental processes of administrative decisionmakers," *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation modified). That rule carries utmost force where a party attempts to challenge an alleged Presidential decision, as district courts must afford "Presidential confidentiality the greatest protection consistent with the fair administration of justice, and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004) (citation modified); *see also In re Cheney*, 406 F.3d 723, 731 (D.C. Cir. 2005) (en

6

banc) (issuing a writ of mandamus directing the district court to dismiss the complaint, rather than oversee civil discovery against the Vice President).

The second flaw with Plaintiffs' theory is that, because their purported injury hinges on future agency action, it requires Defendants to shoulder Plaintiffs' burden. Plaintiffs argue that Defendants must establish that "agency review will dissuade them altogether from carrying out" intentions to build an arch. Opp'n 15. But it is Plaintiffs that bear the "significantly more rigorous burden" to establish future injury—Defendants need not affirmatively disprove a future injury. *See United Transp. Union v. I.C.C.*, 891 F.2d 908, 913 (D.C. Cir. 1989). And "judicial experience and common sense teach that the outcome of a complex bureaucratic process"—even when the President has given specific directions to an agency—"is difficult to predict" because "expectations may be wrong, and intentions may change." *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 152 (D.D.C. 2023) (finding no imminent injury from potential future agency action even where "President Biden has directed the FDA Commissioner" to work towards that result) (citation modified). As agencies must comply with legal requirements that do not apply to the President, *e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 112 (D.D.C. 2009) (discussing procedural statutes that do not apply to the President), they must involve additional constraints when acting. Here, with multiple ongoing review processes (including before third-party agencies), Mot. 3, Plaintiffs can only speculate about what the ultimate outcome of those bureaucratic processes may be. *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021).

The third flaw with Plaintiffs' never-before-adopted theory is that it would "swallow the APA's" cause of action. *Cf. Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). In arguing that "it is scarcely realistic to expect that NPS" might not authorize arch construction,

Plaintiffs ask the Court to create a massive loophole to the APA's finality requirement. *See* Opp'n 15. If parties need not wait for final agency action because they can assume that agencies will carry out executive intent, *ultra vires* claims would become the new normal, in violation of Supreme Court and D.C. Circuit law. *See, e.g.*, *NRC*, 605 U.S. at 681–82 (an *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds" (citation omitted)); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) ("Time and again, courts have stressed that *ultra vires* review has extremely limited scope." (citation modified)).

At bottom, the Court should reject Plaintiffs' unprecedented request to undertake non-statutory review of Presidential intention before any executive action has implemented that intention. Because Plaintiffs suffer no imminent injury, the Court should dismiss their claim on jurisdictional grounds explained below. And the Court should also dismiss their claim on the merits, as no court has ever sanctioned the expansive form of non-statutory review requested by Plaintiffs.

## II.     The Court Cannot And Should Not Exercise Jurisdiction Over Plaintiffs' Claims.

### A.  Plaintiffs have failed to establish imminent injury.

Plaintiffs spend less than four pages of their opposition attempting to satisfy Article III's imminence requirement. Opp'n 13–16. And they all but abandon efforts to establish a "*certainly impending*" injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted), as they can no longer defend their implausible theory that the arch will be constructed by July 4, 2026. *See* Opp'n 13 (claiming instead that the arch will merely "commemorate the Nation's 250th anniversary" at some indeterminate point in the future). Instead, Plaintiffs focus their imminence argument on establishing "substantial risk." *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Courts utilize that test to evaluate imminence claims where defendants have certainly acted, but their action may not ultimately injure plaintiffs. Here, Defendants have not acted, so the substantial-risk test does not enable the Court to predict the outcome of agency action.

In *Driehaus*, for example, plaintiffs sought to enjoin an enacted Ohio statute criminalizing certain political statements, based on the threatened injury of future enforcement. *Driehaus*, 573 U.S. at 152–56. The Supreme Court analyzed their standing under a three-prong test for pre-enforcement standing, which analyzed the "history of past enforcement" to determine whether the enforcement threat was substantial. *Id.* at 162–166. Similarly, in *Attias v. Carefirst, Inc.*, the defendants acted by allowing a cyberattack to steal their customers' personal information, which in turn created "substantial risk of identity fraud" sufficient to establish imminent injury. 865 F.3d 620, 628 (D.C. Cir. 2017). In both cases, "the full risk was present when the complaint was filed— it did not depend on a long sequence of uncertain contingencies." *Pharm. Rsch.*, 656 F. Supp. 3d at 153 (citation modified).

Lacking any threat of enforcement, Plaintiffs cannot establish imminent injury based on the risk that an agency might eventually make an objectionable decision; a harm that "hypothesizes as to the outcome of future legal proceedings" is "too speculative to invoke the jurisdiction of an Article III Court." *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (citation modified). For this reason, the D.C. Circuit "has been reluctant to find standing based on predictions of how agencies will exercise discretion in future proceedings." *Union of Concerned Scientists*, 998 F.3d at 930 (citing *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015)). Plaintiffs offer no response to this D.C. Circuit precedent. *Compare* Mot. 13–14, *with* Opp'n 13–15.

Rather than engage with this binding caselaw, Plaintiffs mischaracterize Defendants' argument as a quibble with "precise timing." Opp'n 13–14. But that misunderstands our point, which is that courts cannot speculate about future agency actions. Moreover, Plaintiffs have not alleged any plausible facts that shed light on when their purported future injury will materialize. Plaintiffs have now walked away from the lone timing-related allegation (that the arch would be

9

constructed by July 4, 2026) in their Complaint. Their lack of an alternate allegation for when the arch will be built deprives them of an imminent injury: "to avoid stretching the imminence requirement beyond its purpose, and neglecting components of the definition of imminence such as immediate and not remote, the Court must be able to say *something* about a future injury's timing." *Pharm. Rsch.*, 656 F. Supp. 3d at 153 (citation modified). Because the Complaint says nothing about when NPS might approve arch construction, "the Court could only speculate about when such an approval will occur and, more importantly, on what terms." *Id.* at 152.

Even if Plaintiffs had shown that construction were imminent, they have still failed to show that any aesthetic harm from that construction is imminent. As the Supreme Court has repeatedly explained, "profession of an intent to return to the places [declarants] had visited before . . . is simply not enough"; "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (citation modified). Plaintiff Calder Loth, for example, resides in Richmond, Virginia, Compl. ¶ 10, and merely states that he "intends to continue visiting Washington, DC," without specifying concrete plans or even specifying when that some day will be, Dkt. 7-5, Loth Decl. ¶ 7. Such some-day intentions are insufficient to establish imminent injury under *Lujan*.

In sum, Plaintiffs have failed to carry their burden to establish imminent harm. While "the government might issue" an official arch decision they dislike, it is also "possible that it will not." *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020). "If such speculative future government action could support an injury in fact, it is hard to imagine what would *not* satisfy that requirement." *Id.*. And Plaintiffs' lack of concrete plans to visit the relevant

10

area is an independent reason why Plaintiffs have failed to satisfy their burden. The Court should thus dismiss Plaintiffs' Complaint for lack of imminent injury.

### B. Plaintiffs have not alleged cognizable harm from arch construction.

In addition to Plaintiffs' failure to allege a plausible, imminent injury, they have failed to allege cognizable harms. Plaintiffs attempt to assert aesthetic injury from "regularly driv[ing]" near the potential construction site. *E.g.*, Compl. ¶ 10. But that is precisely the sort of "incidental viewership" of an "eyesore" that the D.C. Circuit found insufficient to establish standing in *Env't Def. Fund v. FERC (EDF)*, 2 F.4th 953, 970 (D.C. Cir. 2021) (holding that driving by challenged structure "several times per week" was insufficient to create a cognizable injury). Like the *EDF* petitioner, Plaintiff Calder Loth objects to the arch as upsetting the character of an area that he drives past. *Compare id.* at 968 (objecting to structure as "not in keeping with the character of [her] neighborhood"), *with* Loth Decl. ¶ 9 ("I view the planned arch as an incompatible distraction from the aesthetic and symbolic interplay of Memorial Bridge with Memorial Circle"). In both circumstances, drive-by views of a disfavored structure "reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 970.

Attempting to distinguish *EDF*, Plaintiffs focus on their prior use of the "relevant area." Opp'n 12–13. But the *EDF* petitioner also used—and resided in—the relevant area. 2 F.4th at 968 (she lived less one mile from the challenged station, and the challenged pipeline went through a local park that she used and enjoyed). Despite her residence in and enjoyment of the *area*, the D.C. Circuit focused on her lack of prior use of the exact "land on which the station now exists." *Id.* at 969. Similarly here, Plaintiffs allege no prior use of Memorial Circle, which is only a small circle of grass. While Plaintiffs may allege prior use of surrounding areas, like the Lincoln Memorial, those allegations are indistinguishable from the *EDF* petitioner who lived and recreated in the areas surrounding the challenged station that she didn't want to see.

Nor can Plaintiffs base their standing on cases where parties had cognizable interests in experiencing rare species. *Contra* Opp'n 11–12 (citing such cases). Unlike Plaintiffs who assert an interest in *avoiding* a structure they dislike, plaintiffs in other cases have asserted cognizable aesthetic interests in experiencing rare natural phenomena. *Lujan*, 504 U.S. at 562–63 ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1158 (D.C. Cir. 2025) (recognizing petitioners' "interest in observing the [endangered American burying] Beetle").

Unlike such aesthetic interests, Plaintiffs' asserted interests in avoiding views of an arch they oppose are the sort of "general legal, moral, ideological, or policy objection to a particular government action" that "Article III standing screens out." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). Extending those authorities to confer standing here would conflate concrete injuries with psychological ones and expand Article III beyond recognition. As the Supreme Court has warned, "Article III standing is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (citation modified).

## C. Plaintiffs' alleged controversy is moot.

Even had Plaintiffs alleged cognizable injuries, the Court would still lack jurisdiction because this dispute is moot. "A case is moot if a decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (citation modified). "This rule ensures that federal courts respect the bounds of their constitutionally assigned role. Among other salutary purposes, it protects courts from rendering impermissible advisory opinions." *Id.*

Plaintiffs brought suit asserting non-statutory claims against the "President's [alleged] directive to plan and construct an arch on Memorial Circle by July 4, 2026, without congressional authorization and designation by Congress of a sponsor, and without complying with the numerous statutory requirements, including those imposed by NEPA and National Historic Preservation Act." Compl. ¶ 64. Since Plaintiffs filed suit, Defendants have clarified that (1) NPS, not the President, is the entity who must authorize arch construction; (2) NPS has not yet issued such authorization; and (3) NPS will comply with applicable procedural statutory requirements before doing so. *See* Fisher Decl. ¶¶ 2–4; Dkt. 12-1, Decl. of Frank Lands ¶¶ 7–14.

Following these clarifications, Plaintiffs have abandoned their allegation of a Presidential directive to construct an arch by July 4, 2026, *supra* 2, and they no longer dispute whether NPS will comply with procedural statutory requirements before authorizing arch construction, *see* Opp'n 20. But they urge that their case is not moot because the "gravamen" of their claims is that the arch requires a further act of authorization from Congress than the 1925 Act, Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925). Opp'n 20. But a continuing dispute over an "underlying interpretation" of law is no basis for Article III jurisdiction over an abstract dispute in which there are only "hypothetical projects." *Pub. Citizen*, 92 F.4th at 1130.

Under the governing D.C. Circuit test, this case is moot. A decision will not "presently affect the parties' rights," *id.* at 1128, because no arch construction is currently authorized and Plaintiffs face no imminent injury, *supra* 8–11. Nor would a decision in this case present a "more-than-speculative chance" of affecting the parties' rights in the future. *Pub. Citizen*, 92 F.4th at 1128. As the Court cannot predict the outcome of agency decision-making processes without speculation, *supra* 7–9, any decision at this juncture would be purely advisory, *Pub. Citizen*, 92 F.4th at 1130. Moreover, the legality of any future arch construction decision must be judged

13

against (1) the rationale and funding sources that NPS ultimately adopts for its decision and (2) the statutory scheme as it exists when NPS makes its decision. Because Plaintiffs can only speculate about what legal justifications or funding sources NPS might ultimately use, as well as what intervening laws Congress may enact, this case should be dismissed as moot.

**III.    The Complaint Should Be Dismissed As Prudentially Unripe.**

Plaintiffs' claims are also prudentially unripe because they are not fit for judicial review and plaintiffs would suffer no hardship from deferring review until a final agency action issues. While the prudential ripeness doctrine is in some tension with the judiciary's "virtually unflagging" obligation to hear and decide cases within its jurisdiction, *Driehaus*, 573 U.S. at 167 (citation omitted), courts must also "give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties," *Cheney*, 542 U.S. at 382. Thus, after *Driehaus*, the Supreme Court has found cases—like this one—that challenge unimplemented Presidential desires to be unripe for judicial review. *New York*, 592 U.S. at 131 (finding unripe challenge to the President's "desire to exclude aliens without lawful status from the apportionment base," because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture'" where the implementing agency was still gathering information about and assessing feasibility of President's desire).

As in *New York*, Plaintiffs' "case is riddled with contingencies and speculation that impede judicial review," rendering it unripe. *Id.* NPS has made no final decisions about construction authorization, arch design, or funding sources, rendering its action not "sufficiently final" for judicial review. *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted). Plaintiffs nonetheless assert that the Court can "resolve purely legal issues," Opp'n 18, overlooking that "even purely legal issues may be unfit for review," *Atl. States Legal Found.*, 325

F.3d at 284. Plaintiffs cannot dispute that even their legal questions "would benefit from a more concrete setting." *Id.* For example, Plaintiffs claim that funding limits in the 1925 Act prohibit arch construction, Opp'n 27, but they provide no allegations about arch cost, much less how any funding source NPS might ultimately utilize interacts with appropriations limits in the 1925 Act. "How that question will be addressed by the [agency] is yet another fundamental uncertainty impeding proper judicial consideration at this time." *New York*, 592 U.S. at 133.

Because the issues are unfit for judicial review, Plaintiffs' lack of hardship from deferring review renders this case unripe. As in *New York*, "[P]laintiffs suffer no concrete harm from the challenged policy itself, which does not require them 'to do anything or to refrain from doing anything.'" *Id.* at 134 (citation omitted). Plaintiffs feign a "substantial risk of imminent injury," but never explain how that risk might materialize as arch construction will not proceed unless and until NPS issues a final agency action authorizing arch construction. *Compare* Opp'n 18–19, *with* Fisher Decl. ¶ 4.[4] And an assertion of risk that "involves a significant degree of guesswork" is insufficient to establish imminent hardship. *See New York*, 592 U.S. at 133–34. Plaintiffs' gripes about having to file a new suit to challenge a future agency action is no hardship at all. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272–73 (D.D.C. 2015) ("If

---

[4] As best can be understood, Plaintiffs appear to assert hardship from the temporary delay associated with obtaining a ruling on a future preliminary injunction motion, during which they might not be able to experience the "natural serenity" of Memorial Circle while construction proceeds. Opp'n 19 (citation modified). But Plaintiffs have not asserted an interest in the "natural serenity" of Memorial Circle, which is a patch of grass in a heavily used traffic circle. Instead, they assert interests in the "unobstructed view between the Lincoln Memorial and Arlington House." Compl. ¶ 50. And those interests will not be affected during the pendency of a preliminary injunction proceeding. *See Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017) (finding that plaintiffs had not established imminent irreparable harm to their "viewsheds" from viewing construction of foundations for "mammoth towers," as the towers "won't begin to be built for at least another six months"). Plaintiffs' sole response to *Semonite* is that the case was ultimately resolved on the merits; they never dispute its holding that foundation construction does not inflict imminent harm on viewsheds. *See* Opp'n 14.

15

the only hardship a plaintiff will endure as a result of delaying consideration of the disputed issue is the burden of having to engage in another suit, this will not suffice to overcome an agency's ripeness challenge." (citation modified)).

## IV.    Plaintiffs Have Failed To State An *Ultra Vires* Claim.

Less than a year ago, the Supreme Court cautioned against *ultra vires* review "becom[ing] an easy end-run around the limitations of . . . judicial-review statutes." *NRC*, 605 U.S. at 681. To prevent this, "time and again, courts have stressed that *ultra vires* review has extremely limited scope." *Changji Esquel*, 40 F.4th at 721–22 (citation modified). Yet Plaintiffs nonetheless ask this Court to undertake a breathtaking expansion of *ultra vires* review. According to Plaintiffs, the *ultra vires* doctrine allows for review of executive intentions *even though* they have not yet resulted in any action, *even though* any such action would be reviewable under the APA, and *even though* their challenge hinges on a "typical statutory-authority argument." *NRC*, 605 U.S. at 682. They are incorrect on all counts. The Court should accordingly reject Plaintiffs' attempted end-run around the APA's scheme for review of agency actions.

### A.    Plaintiffs have failed to challenge an executive action required for an *ultra vires* claim.

Plaintiffs cannot state a viable *ultra vires* claim by challenging only Presidential words or "intentions." *Supra* 2–8. The extremely rare cases where *ultra vires* review has been extended to the Chief Executive are limited to reviewing "presidential *actions*." *E.g.*, *Reich*, 74 F.3d at 1329 (emphasis added). Because judicial review under the APA likewise "insists upon an agency action," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (citation modified), Plaintiffs cannot extend the extremely limited *ultra vires* doctrine to reviewing Presidential words or social media posts. Because the "executive power under our Constitution . . . rests exclusively with the President," nearly all agency actions ultimately emanate from some presidential policy or directive.

16

*Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981). Yet this does not mean that every presidential announcement at the State of the Union or on the campaign trail can be challenged simply by alleging that "the President's decision . . . is settled." Opp'n 25. Having abandoned the only Presidential "directive" alleged in the Complaint, *supra* 2, Plaintiffs cannot seek review of mere Presidential "desire," *New York*, 592 U.S. at 131.

### B.    The APA provides meaningful and adequate judicial review that precludes an *ultra vires* claim.

An *ultra vires* claim is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681 (citation modified). Courts in this district have repeatedly held that the APA provides such an opportunity for review and therefore that an *ultra vires* claim does not lie where an APA claim is available. *See, e.g.*, *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 877779, at *13 n.15 (D.D.C. Mar. 31, 2026); *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 200 (D.D.C. 2024); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017).

To circumvent this well-settled law, Plaintiffs wrongly assert that their *ultra vires* challenge may proceed because no APA claim is "*presently* available" to them. *Contra* Opp'n 23 (emphasis added). But the Supreme Court has long recognized that even delayed statutory review provides a "meaningful and adequate" opportunity for judicial review. *Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.*, 502 U.S. 32, 43 (1991). In *MCorp*, the plaintiff brought an *ultra vires* challenge to a regulation being enforced against it in ongoing "administrative proceedings." *Id.* at 34. In rejecting that claim, the Supreme Court held that statutory review at the conclusion of the administrative proceedings provided MCorp with an adequate opportunity to challenge the regulation "[i]f and when the Board finds that MCorp has violated that regulation." *Id.* at 43–44.

17

Because Plaintiffs will similarly be able to pursue APA review "if and when" NPS authorizes arch construction, they indisputably have a meaningful and adequate opportunity for judicial review of their claims, thus mandating dismissal of their *ultra vires* claim.

*Reich* does not cite, much less question, *MCorp*. Plaintiffs nonetheless claim *Reich* establishes that "APA review of an agency's implementation of an unlawful Executive Branch policy is a poor substitute for direct review of the policy itself." Opp'n 24 (citing 74 F.3d at 1326). But *Reich* establishes no such principle. Unlike here, the government in *Reich* argued that "a cause of action under the APA is not available," so the court had no occasion to address whether the APA provided a meaningful opportunity for review. *Id.* at 1326–27.

To the extent that dicta in *Reich* suggests APA review might sometimes be inadequate to challenge presidential policy, it stands for a narrow, case-by-case exception to the general rule that delayed statutory review opportunities preclude an *ultra vires* claim. The Executive Order challenged in *Reich* amounted to a "legislative rule" that "purports to create binding, enforceable obligations on its own." *LULAC*, 808 F. Supp. 3d at 64 (citation modified). Because that Presidential action inflicted imminent injury that would persist even if implementing regulations were struck down, *supra* 5–6, an APA claim would have provided limited relief to the *Reich* plaintiffs. That is not the case here. Because NPS "is responsible for administering and maintaining the land on Memorial Circle," Compl. ¶ 14, any plan to construct an arch must be effectuated through NPS. Challenging a final action by NPS would therefore provide Plaintiffs with an equivalent—indeed, superior—path to judicial review. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (observing that *ultra vires* review "represents a more difficult course . . . than would review under the APA").

But they cannot now circumvent this statutory scheme through an *ultra vires* claim.

18

## C. Plaintiffs' disagreement with Defendants' interpretation of the 1925 Act does not entitle them to *ultra vires* review.

The availability of APA review dooms Plaintiffs' *ultra vires* claim, but their claim also fails because they point to no action by Defendants that is "entirely in excess of [their] delegated powers and contrary to a specific prohibition in a statute." *NRC*, 605 U.S. at 681 (citation modified). Plaintiffs' *ultra vires* claim is based on the allegation that Defendants plan to construct an arch on Memorial Circle "without congressional approval." Compl. ¶ 57. After learning that the 1925 Act encompasses authorization to construct and redesign two large columns surmounted by statues in the very location of the proposed arch, however, Plaintiffs pivoted to contesting Defendants' interpretation of that Act. Opp'n 26–27. Plaintiffs have thus abandoned their original position that there is *no* potential source of authority for construction on Memorial Circle.

Plaintiffs' new approach amounts to "dress[ing] up a typical statutory-authority argument as an *ultra vires* claim." *NRC*, 605 U.S. at 681. Plaintiffs' argument that the "general authority" from the 1925 Act "does not extend" to an arch "falls well shy of a meritorious [*ultra vires*] claim." *Id.* at 682. Because that argument falls far short of identifying an error by Defendants "so extreme that one may view it as jurisdictional or nearly so," the Court must dismiss Plaintiffs' *ultra vires* claim. *Changji Esquel*, 40 F.4th at 722 (quoting *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

None of Plaintiffs' arguments against Defendants' interpretation of the 1925 Act are persuasive as a matter of statutory interpretation, much less sufficient to support *ultra vires* review. Plaintiffs first insist that the 1925 Act imposes a 10-year time limitation on construction that expired in 1935. Opp'n 26–27 (citing 1925 Act § 6, 43 Stat. 975) . But the provision that Plaintiffs rely on merely provides a per-year expenditure limit based on the "ten-year program of expenditures and construction contained in the report" by the Commission. 1925 Act § 6, 43 Stat.

19

975. This does not amount to a sunset provision on Congress's authorization to construct a bridge across the Potomac and "landscape features appertaining thereto." *Id.* § 1, 43 Stat. 974. To the contrary, Congress knows how to sunset a construction authorization and uses much more specific language to do so. *E.g.*, Pub. L. No. 99-652 § 10(b), (d), 100 Stat. 3650 ("Any legislative authority for a commemorative work [except laws enacted before the commencement of the Ninety-ninth Congress] shall expire at the end of the five-year period beginning on the date of the enactment of such authority, unless the Secretary or Administrator (as appropriate) has issued a construction permit for the commemorative work during that period.").

Moreover, Plaintiffs' sunsetting argument overlooks the historic implementation of the 1925 Act, which was used to add new monumental features long past the ten-year window—until at least 1951. For example, although the design Congress originally approved included pylons at the east end of the bridge,[5] the Commission of Fine Arts eventually pushed for those pylons to be replaced with the equestrian statues now located at the bridge's east end.[6] But between funding difficulties during the Great Depression and bronze shortages during World War II, those statues were not added to the bridge until 1951, twenty-six years after the 1925 Act.[7]

Plaintiffs next speculate that the arch project would violate the 1925 Act's requirement that construction be "approved and ordered" "in a total sum not to exceed $14,750,000." 1925 Act § 2,

---

[5] Report of the Arlington Memorial Bridge Commission 6. Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

[6] National Park Service, Historic American Engineering Record (HAER), Arlington Memorial Bridge, HAER No. DC-7, at 96–99, available at https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0600/dc0604/data/dc0604data.pdf.

[7] HAER No. DC-7, at 101–02.

43 Stat. 974; *see also* Opp'n 27. But the complaint contains no allegations about the cost of building an arch on Memorial Circle, nor could it given that Plaintiffs sued prematurely before any final decision for the arch had been adopted. Worse, Plaintiffs' selective quotation from the 1925 Act leaves out key context explaining that the $14,750,000 limit applies to the "sum [that] is authorized to be appropriated from any moneys available or that may become available in the Treasury of the United States." 1925 Act § 2, 43 Stat. 974. This cap on appropriations does not rule out alternative sources of funding, as again exemplified by the equestrian statues at the bridge's east end, which were gifted by the government of Italy "as a gesture of friendship to the United States."[8]

Nor does the fact that President Franklin D. Roosevelt abolished the Arlington Memorial Bridge Commission in 1933 undermine the 1925 Act's authorization to carry out construction. *Contra* Opp'n 27. As Plaintiffs themselves recognize, Executive Order 6166 "transferred the commission's functions to what is now NPS." *Id.* (citing Exec. Order 6166, § 2 (June 10, 1933)). And key elements of the project—including the bridge's connection to other roads on the Virginia side—culminated in 1938 after President Roosevelt's executive order. [9] This history belies Plaintiffs' assertion that transferring the Commission's functions to NPS or transferring the land on which the project was constructed to NPS undermined the 1925 Act's general authorization.

Not only have Plaintiffs failed to allege action entirely in excess of NPS's delegated authority, but they have also failed to allege that future construction of an arch would be contrary to a specific statutory prohibition. Plaintiffs concede that, if an arch is authorized under the 1925

---

[8] HAER No. DC-7, at 99, 101–02.

[9] HAER No. DC-7 at 95–96; *see also id.* at 95 (noting that, while Executive Order 6166 "might sound like a death knell for the projects these commissions managed, such was not the case").

Act, their objections under the Commemorative Works Act (CWA) and 40 U.S.C. § 8106 fail. Opp'n 28–29. Their arguments also fail on the merits.

As to the CWA, Plaintiffs concede that certain arch motivations alleged in the Complaint lie outside the definition of a commemorative work under that Act. *See* Opp'n 28–29 (discussing "size" and "American greatness"). While Plaintiffs contend that other arch motivations alleged in the Complaint lie within the definition of a commemorative work, they do not allege that NPS has made any final decision about what, if anything, the arch might commemorate. *See id.* They have thus failed to plausibly allege that arch construction will violate the CWA.

Turning to § 8106, Plaintiffs hardly dispute that there has been a consistent executive practice by NPS of not requiring specific congressional authorization for each building or structure—such as the Rock Creek Park tennis stadium—that it constructs in the District of Columbia. *Compare* Mot. 26–27, *with* Opp'n 32 (suggesting that arguable appropriations are sufficient to provide express authority of Congress). Plaintiffs instead argue that this long record of executive practice and legislative acquiescence thereto must be rejected in favor of their new interpretation of this century-old statute. *See* Opp'n 31–32.

Plaintiffs overlook the appropriate way to interpret the 1925 Act. To avoid "distort[ing]" the original meaning of older statutes, acts of Congress are typically interpreted in light of background legal principles as they existed at the time of enactment rather than "as if they were written today." *Goldstein v. California*, 412 U.S. 546, 564 (1973). And "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned," can "raise a presumption" that Congress meant to delegate that power. *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (citation modified). Thus, if general appropriations are sufficient to give NPS authorization to construct a building in the District of Columbia, as Plaintiffs suggest, then

22

the authorization to construct and redesign two tall columns in Memorial Circle certainly constitutes express authorization sufficient to comply with § 8106.

In sum, *ultra vires* review is "extremely narrow in scope" and is "essentially a Hail Mary pass" that "rarely succeeds." *Changji Esquel*, 40 F.4th at 722 (citation omitted). The garden-variety—and unpersuasive—statutory interpretation arguments that Plaintiffs raise here fall far short of this high bar. The Court should accordingly dismiss Plaintiffs' *ultra vires* claim.

**V.      Plaintiffs Have Failed To State A Constitutional Claim.**

Plaintiffs' constitutional claim should also be dismissed. It has been settled law for over 150 years that the President's constitutional duty to "take care that the laws be faithfully executed," U.S. Const. art. II, § 3, is not a matter for judicial review. *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022); *accord Center for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 245–250 (D.D.C. 2019). As the Supreme Court long ago explained, courts cannot and should not review the President's "purely executive and political" duty "to see that the laws are faithfully executed." *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). There, the Court rejected—as "an absurd and excessive extravagance," *id.*—even the filing of a complaint asserting that "this court is a better judge of his duty as President than the President himself; and that when he seeks to execute a law, and to avoid impeachment and denouncement as unfaithful to his duty as Executive, this court is to interfere and tell him what his duty is," *id.* at 482.

Against that substantial authority, Plaintiffs cite only one district court's opinion, while declining to mention that this court subsequently reconsidered its decision and dismissed the asserted Take Care Clause claim. *Compare* Opp'n 35 (citing *Las Americas Immigrant Advoc. Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1213 (D. Or. 2020)), *with Las Americas Immigrant Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1179–1182 (D. Or. 2021). Upon reconsideration, that court held that the Take Care Clause does not "provide[] a private right of action," and cannot be used to

23

enforce non-ministerial duties, which are "beyond the purview of the courts." *Las Americas*, 571 F. Supp. 3d at 1180. Plaintiffs' remaining cases do not arise under the Take Care Clause or otherwise call *Johnson* into question. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010).

Despite lacking a single case that authorized a Take Care Clause claim (and survived reconsideration), Plaintiffs ask the Court to overrule *Johnson*. In arguing that *Johnson* should be read to authorize Take Care Clause injunctions against the President's subordinates (including the Executive Office of the President), Opp'n 36, Plaintiffs ignore the circumstances giving rise to *Johnson*. In *Johnson*, Mississippi challenged the execution of the Reconstruction Acts by the President *and* a subordinate (the "general commanding in the District of Mississippi and Arkansas")—and the Supreme Court dismissed the suit in its entirety. *See* 71 U.S. at 497–498. Cabining *Johnson* to injunctions against the President, but not his subordinates, would still empower the Court to substitute its judgment for the President's judgment about how he must conduct *his* duty to faithfully execute the laws—the very result the *Johnson* court rejected as "absurd." *Id.* at 482, 499.

Plaintiffs' constitutional claim also fails because it is ultimately a statutory claim, not a constitutional one. Despite Plaintiffs' protestations, *see* Opp'n 36–37, their attempt to reclassify statutory interpretation arguments as constitutional arguments was squarely rejected by the Supreme Court in *Dalton v. Specter*, 511 U.S. 462, 472–73 (1994), and the D.C. Circuit in *Global Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) ("*Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. 2025). Because this Court is

24

bound to follow those precedents, it must dismiss Plaintiffs' "constitutional" claim as a dispute about the limits of authority under the 1925 Act that is not constitutional in nature.

Moreover, Plaintiffs' Take Care Clause claim fails on the merits. Congress approved the "development of Columbia Island as a park," including "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Bridge Commission Report 40–41. And Congress delegated discretion to change those designs as "may be found to be necessary or advisable." 1925 Act § 1, 43 Stat. 974. There is thus nothing unfaithful about implementing a project that Congress has authorized.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint.

DATE: May 26, 2026                    Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

 /s/ Michael S. Sawyer
MICHAEL S. SAWYER, Senior Attorney
DANIEL LUECKE, Trial Attorney
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-353-5134
E-mail: michael.sawyer@usdoj.gov
        daniel.luecke@usdoj.gov

*Counsel for Defendants*

25