**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL LEMMON, et al., | ) ) ) |
| Plaintiffs, | ) ) Civil Action No. 26-cv-544 (TSC) |
| v. | ) ) **DEFENDANTS' MEMORANDUM IN** |
| DONALD J. TRUMP, et al., | ) **OPPOSITION TO PLAINTIFFS'** ) **MOTION FOR SUMMARY JUDGMENT** ) **AND IN SUPPORT OF DEFENDANTS'** |
| Defendants. | ) **CROSS-MOTION FOR SUMMARY** ) |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 2

    I.     Legal Background ...................................................................................... 2

          A.     Memorial Bridge Vision ................................................................ 2

          B.     Arlington Memorial Bridge Commission ...................................... 4

          C.     Commemorative Works Act ........................................................... 6

    II.    Factual And Procedural Background ........................................................ 6

          A.     Plaintiffs sued before Defendants took any action concerning the arch .............................................................................................. 6

          B.     Defendants responded to Plaintiffs' preliminary injunction motion with two declarations establishing that arch construction will not begin unless and until the National Park Service issues a final agency action authorizing construction ....................................... 8

STANDARD OF REVIEW ........................................................................................................ 9

    I.     On A Motion For Summary Judgment, Plaintiffs Bear The Burden Of Establishing That The Court Has Subject Matter Jurisdiction .............................. 9

    II.    While Plaintiffs Must Support Their Summary Judgment Motion With Admissible Evidence, Defendants Can Simply Identify An Absence Of Evidence ................................................................................................. 9

ARGUMENT ........................................................................................................................ 10

    I.     Plaintiffs Have Failed To Carry Their Burden To Establish Subject Matter Jurisdiction ............................................................................................. 10

          A.     Plaintiffs have not carried their burden to establish a waiver of sovereign immunity ................................................................... 10

          B.     Plaintiffs have not carried their burden to establish standing ................... 14

              1.    Plaintiffs have not established imminent injury .......................... 14

               2.    Plaintiffs have not established cognizable injuries ...................... 19

    II.    Plaintiffs' Claims Are Prudentially Unripe ............................................. 21

III.    Plaintiffs' *Ultra Vires* Claim Fails ........................................................................ 24

      A.    Plaintiffs have failed to challenge an executive action required for an *ultra vires* claim ................................................................................. 24

      B.    The APA provides meaningful and adequate judicial review that precludes an *ultra vires* claim ................................................................ 26

      C.    Plaintiffs' disagreement with Defendants' interpretation of the 1925 Act does not entitle them to *ultra vires* review ........................................ 28

      D.    Plaintiffs' statutory prohibition arguments under the Commemorative Works Act and 40 U.S.C. § 8106 fail .......................... 31

IV.    Plaintiffs' Constitutional Claim Fails .................................................................. 36

V.    Plaintiffs Are Not Entitled To Their Requested Relief......................................... 38

CONCLUSION................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

*Akinseye v. District of Columbia,*
339 F.3d 970 (D.C. Cir. 2003) ............................................................................. 9

*Al-Aulaqi v. Obama,*
727 F. Supp. 2d 1 (D.D.C. 2010) .................................................................. 12, 13

*Alexander v. Trump,*
753 F. App'x 201 (5th Cir. 2018) ....................................................................... 12

*Am. Hosp. Ass'n v. Bowen,*
834 F.2d 1037 (D.C. Cir. 1987) .......................................................................... 25

*Am. Legion v. Am. Humanist Ass'n,*
588 U.S. 29 (2019) .............................................................................................. 19

*Am. Petroleum Inst. v. EPA,*
683 F.3d 382 (D.C. Cir. 2012) ............................................................................ 23

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.,*
64 F.4th 1354 (D.C. Cir. 2023) ............................................................... 38, 39, 40

*Arizona v. Mayorkas,*
600 F. Supp. 3d 994 (D. Ariz. 2022) .................................................................. 36

*Ashwander v. Tennessee Valley Authority,*
297 U.S. 288 (1936) ...................................................................................... 10, 13

*Atl. States Legal Found. v. EPA,*
325 F.3d 281 (D.C. Cir. 2003) ...................................................................... 22, 23

*Bauxites de Guinee,*
456 U.S. 694 (1982) .............................................................................................. 9

*Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.,*
502 U.S. 32 (1991) .............................................................................................. 27

*Boire v. Greyhound Corp.,*
376 U.S. 473 (1964) ............................................................................................ 25

*Burnett v. Al Baraka Inv. & Dev. Corp.,*
292 F. Supp. 2d 9 (D.D.C. 2003) ........................................................................ 14

*Carr v. United States,*
560 U.S. 438 (2010) ............................................................................................ 12

*Cartwright Int'l Van Lines, Inc. v. Doan,*
525 F. Supp. 2d 187 (D.D.C. 2007) .................................................................... 11

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)......................................................................................... 10

*Center for Biological Diversity v. McAleenan,*
  404 F. Supp. 3d 218 (D.D.C. 2019)................................................................. 36

*Chamber of Com. of U.S. v. Reich,*
  57 F.3d 1099 (D.C. Cir. 1995)......................................................................... 16

*Chamber of Com. of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996).......................................................... 13, 14, 15, 24, 27

*\*Changji Esquel Textile Co. v. Raimondo,*
  40 F.4th 716 (D.C. Cir. 2022)................................................................. 24, 25, 29

*Cheney v. U.S. Dis. Court for Dist. of Columbia,*
  542 U.S. 367 (2004)......................................................................................... 22

*Chuidian v. Philippine Nat. Bank,*
  912 F.2d 1095 (9th Cir. 1990) ......................................................................... 14

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013).................................................................................... 14, 19

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
  146 F.4th 1144 (D.C. Cir. 2025)...................................................................... 21

*Ctr. for Democracy & Tech. v. Trump,*
  507 F. Supp. 3d 213 (D.D.C. 2020).............................................................. 19, 38

*Cullen v. Pinholster,*
  563 U.S. 170 (2011)......................................................................................... 12

*Dalton v. Specter,*
  511 U.S. 462 (1994)......................................................................................... 37

*\*Davis v. FEC,*
  554 U.S. 724 (2008)............................................................................. 10, 13, 14, 17

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.,*
  85 F. Supp. 3d 250 (D.D.C. 2015)................................................................... 23

*Delta Const. Co., Inc. v. E.P.A.,*
  783 F.3d 1291 (D.C. Cir. 2015)....................................................................... 16

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019)......................................................................................... 26

*Diamond v. Charles,*
  476 U.S. 54 (1986)........................................................................................... 19

*Doe v. Doe Agency,*
  608 F. Supp. 2d 68 (D.D.C. 2009)................................................................... 21

*Dugan v. Rank*,
  372 U.S. 609 (1963)..................................................................................................... 13

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..................................................................................................... 39

*\*Env't Def. Fund v. FERC,*
  2 F.4th 953 (D.C. Cir. 2021)....................................................................... 19, 20, 21

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..................................................................................................... 19

*\*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)....................................................................................... 12, 26, 38

*Friends of Gateway v. Slater*,
  257 F.3d 74 (2d Cir. 2001) ......................................................................................... 21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)..................................................................................................... 20

*Gallardo v. Marstiller*,
  596 U.S. 420 (2022)..................................................................................................... 33

*Gen. Motors Corp. v. Envtl. Prot. Agency*,
  363 F.3d 442 (D.C. Cir. 2004)..................................................................................... 9

*Geronimo v. Obama*,
  725 F. Supp. 2d 182 (D.D.C. 2010)......................................................................... 11

*Giron v. Zeytuna, Inc.*,
  597 F. Supp. 3d 29 (D.D.C. 2022)............................................................................ 22

*\*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)................................................................. 27, 31, 32, 37

*Goldstein v. California*,
  412 U.S. 546 (1973)..................................................................................................... 33

*Griffith v. Fed. Lab. Rels. Auth.*,
  842 F.2d 487 (D.C. Cir. 1988)................................................................................... 29

*Grimes v. D.C.*,
  794 F.3d 83 (D.C. Cir. 2015)................................................................................. 9, 10

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013)............................................................................................... 14, 21

*Irwin v. Dep't of Veterans Affairs,*
  498 U.S. 89 (1990)....................................................................................................... 11

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928)..................................................................................................... 37

*Jafarzadeh v. Duke*,
  270 F. Supp. 3d 296 (D.D.C. 2017) .................................................................... 26

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ........................................................................................... 9

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ......................................................................................... 13

*League of United Latin Am. Citizens v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................... 16, 28

*Lewis v. Casey*,
  518 U.S. 343 (1996) ......................................................................................... 40

*Lewis v. Hunt*,
  492 F.3d 565 (5th Cir. 2007) ....................................................................... 10, 13

*Lewis v. U.S. Parole Comm'n*,
  743 F. Supp. 3d 181 (D.D.C. 2024) ................................................................... 26

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ..................................................................................... 34, 35

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................... 9, 18, 19, 21

*Mackinac Tribe v. Jewell,*
  829 F.3d 754 (D.C. Cir. 2016) ........................................................................... 11

*Mackinac Tribe v. Jewell*,
  87 F. Supp. 3d 127 (D.D.C. 2015) ..................................................................... 11

*Malone v. Bowdoin*,
  369 U.S. 643 (1962) ......................................................................................... 13

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ...................................................................................... 36, 38

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ......................................................................................... 14

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*,
  658 F. Supp. 2d 105 (D.D.C. 2009) ................................................................... 17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
  595 U.S. 109 (2022) ......................................................................................... 34

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ......................................................................................... 22

*Nat'l Parks Conservation Ass'n v. Semonite*,
  282 F. Supp. 3d 284 (D.D.C. 2017) ............................................................... 18, 40

vi

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
No. CV 25-4316 (RJL), 2026 WL 877779 n.15 (D.D.C. Mar. 31, 2026) ............................... 26

*Natural Res. Def. Council Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ...................................................................................... 32

*Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
435 F.3d 326 (D.C. Cir. 2006) ...................................................................................... 39

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) .................................................................................... 38

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ....................................................................................................... 24

*\*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ............................................................... 12, 24, 25, 26, 28, 29

*Oliver v. United States*,
335 F.2d 724 (D.C. Cir. 1964) ...................................................................................... 25

*Page v. Biden*,
No. 20-CV-104 (CRC), 2021 WL 311002 (D.D.C. Jan. 29, 2021) ......................................... 38

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*,
656 F. Supp. 3d 137 (D.D.C. 2023) ............................................................................... 16

*Pub. Citizen, Inc. v. Trump*,
435 F. Supp. 3d 144 (D.D.C. 2019) ............................................................................... 16

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992) ..................................................................................................... 13

*Scenic Am., Inc. v. United States Dep't of Transportation*,
836 F.3d 42 (D.C. Cir. 2016) ........................................................................................... 9

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) ...................................................................................... 25

*Sierra Club v. Envt Prot. Agency*,
873 F.3d 946 (D.C. Cir. 2017) ...................................................................................... 17

*State Nat'l Bank of Big Spring v. Lew*,
795 F.3d 48 (D.C. Cir. 2015) ........................................................................................ 15

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ..................................................................................................... 22

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ...................................................................................... 38

*Texas v. United States*,
523 U.S. 296 (1998) ..................................................................................................... 21

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ................................................................................ 39

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) ..................................................................................... 28

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ..................................................................................................... 40

*\*Trump v. New York*,
592 U.S. 125 (2020) ............................................................... 10, 15, 17, 22, 23, 24

*Turlock Irr. Dist. v. FERC*,
786 F.3d 18 (D.C. Cir. 2015) ....................................................................................... 15

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
998 F.3d 926 (D.C. Cir. 2021) ............................................................................... 15, 17

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) ..................................................................................................... 40

*United Transp. Union v. I.C.C.*,
891 F.2d 908 (D.C. Cir. 1989) ..................................................................................... 15

*Wash. All. of Tech. Workers v. U.S Dep't of Homeland Sec.*,
50 F.4th 164 (D.C. Cir. 2022) ...................................................................................... 34

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995) ..................................................................................................... 38

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
296 F.3d 1154 (D.C. Cir. 2002) ................................................................................... 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ..................................................................................................... 37

**Statutes**

16 U.S.C. § 451 .............................................................................................................. 35

40 U.S.C. § 8106 ........................................................................................... 2, 7, 31, 35

40 U.S.C. § 8902(a)(1) ............................................................................................. 6, 32

40 U.S.C. § 8902(b) .................................................................................................. 6, 31

40 U.S.C. ch. 89 ............................................................................................................... 6

5 U.S.C. § 702 ....................................................................................................... 11, 12, 14

5 U.S.C. §§ 124–132 ....................................................................................................... 6

5 U.S.C. §§ 124–132 (1934) ........................................................................................... 6

Pub. L. No. 101-512, 104 Stat. 1915, 1920 (1990) ....................................................... 35

Pub. L. No. 103-111, 107 Stat. 1046, 1051 (1993)..........................................................35

Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996)..........................................................35

Pub. L. No. 57-81, 32 Stat. 152 (1902).........................................................................33

Pub. L. No. 62-432, 37 Stat. 866, 885 (1913)..................................................................4

Pub. L. No. 65-181, 40 Stat. 634, 677 (1918)................................................................35

Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925)....................................................................5

Pub. L. No. 73-109, ch. 38, 48 Stat. 362, 389 (1934)........................................................6

Pub. L. No. 76-417, 54 Stat. 36, 36 (1940)...................................................................35

Pub. L. No. 80-841, 62 Stat. 1112, 1141 (1948)..............................................................35

Pub. L. No. 99-652, 100 Stat. 3650 (1986)................................................................6, 29

## Constitution

U.S. Const., Art. II, § 3 .........................................................................................36, 38

## Other Authorities

Executive Order 12954,
   60 Fed. Reg. 13023 (March 8, 1995)...........................................................................15

Executive Order 13492,
   74 Fed. Reg. 4897 (Jan. 22, 2009) ..............................................................................25

*Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities,*
   89 Fed. Reg. 97631 (Dec. 9, 2024) .............................................................................34

**INTRODUCTION**

It is undisputed that construction to build an arch on Memorial Circle will not start unless and until the National Park Service (NPS) authorizes it through final agency action. Judicial review therefore requires final agency action under section 704 of the Administrative Procedure Act (APA). It is also undisputed that there is no final agency action. The legal consequence of that is straightforward: the Court must grant our fully briefed pending motion to dismiss. Alternatively, the Court should grant our cross-motion for summary judgment.

Plaintiffs instead contort APA review; because it is *presently* unavailable, they say *ultra vires* review must be. And such non-statutory review must be available now, Plaintiffs say, because Defendants are taking steps to actualize the President's vision by submitting arch designs to third-party agencies for review. But the Complaint alleged that the *omission* of those very steps gave rise to an *ultra vires* claim. In arguing that *ultra vires* review is available either way, Plaintiffs transparently attempt to swallow the APA.

Plaintiffs' theory doesn't just upset the review scheme that Congress created for Executive Branch action. It also tries to transform words alone into an Article III injury. Plaintiffs' purported injury flows from the construction of an arch. The President's statements about an arch project harm no one. Plaintiffs point to no cognizable injury from the unimplemented executive "intentions" reflected in those remarks.  Rather, they allege only injuries from future arch construction, which has not been authorized.

The Court should reject this unrecognizably broad theory of *ultra vires* review and Article III standing. It should instead enter judgment for Defendants.

1

## BACKGROUND

### I.    Legal Background

#### A.  Memorial Bridge Vision

President Andrew Jackson long ago envisioned a bridge spanning the Potomac River "with arches of ever-enduring granite." Dkt. 36-22, at 1. And Secretary of State Daniel Webster pushed to fulfill that vision. *See id.* The U.S. Senate eventually directed the Secretary of War to examine and report on such a bridge in 1886. S. Res., 17 Cong. Rec. 4826 (May 24, 1886). Ensuing design competitions were held to consider different proposals for the bridge. *E.g.*, Sawyer Decl. Ex. M, U.S. Comm'n of Fine Arts, Designing the Nation's Capital: The 1901 Plan for Washington, D.C. 118 (2006) (Eds., Sue Kohler & Pamela Scott). One prominent proposal, seen below, "was the favored design" of the Senate Park Commission (a.k.a. the McMillan Commission) when it began its work:



Fig. 16 George Keller, proposed design for Memorial Bridge, 1900; perspective view from Washington side of the bridge. Library of Congress, General Collections

*Id.* at 117–118. Another design proposed arches at both ends of the memorial bridge:

2



Fig. 15 Colonel Bingham's March 1900 Plan for the Mall (detail). Collection: Pamela Scott

*Id.* at 115. Other designs proposed arches atop the bridge itself "that masked the working of its central draw," *id.* at 116–117, as seen below:





L. L. Buck, Engineer.          PERSPECTIVE OF DESIGN NO. 1.          Carrère & Hastings, | Architects.
                                                                    Walker & Morris,    |

Sawyer Decl. Exs. P & Q.

### B. Arlington Memorial Bridge Commission

Following this extensive architectural dialogue, Congress created the Arlington Memorial

Bridge Commission (Bridge Commission) to report "to Congress a suitable design for a Memorial

Bridge across the Potomac River." Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913).[1]  The Bridge

Commission reviewed much of the previous design work done for the bridge before reporting its

design in 1924, proposing designs not only for the bridge, but also for Columbia Island at the

bridge's west end.[2]  And Congress authorized construction to proceed "in accordance with the

design" in the Bridge Commission Report, while empowering the Bridge Commission to make

---

[1] The Bridge Commission consists of "the President of the United States, the President of the Senate, the Speaker of the House of Representatives, and the chairman of the Committees on Public Buildings and Grounds of the Senate and House of Representatives."  37 Stat. at 855.

[2] Report of the Arlington Memorial Bridge Commission 21–30, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

4

design changes "as in its discretion may be found to be necessary or advisable." Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925).

The design Congress approved called for the "development of Columbia Island as a park," including "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Bridge Commission Report 40–41. "The columns are 166 feet high or practically of the same height as the Colonne de Juillet in Paris." *Id.* at 41.

But the tall columns that Congress approved have not yet been built, as the Bridge Commission acceded to countervailing forces. Aviation interests expressed concern that "the proposed erection of two columns, each 200 feet high," would create safety risks for planes landing at Washington-Hoover airport. *Washington Post*, Conference Is Set on Island Columns, September 30, 1931. And they petitioned President Hoover, who was then chairman of the Bridge Commission, to block the project. *Washington Post*, Fliers Enter Fight on Island Columns, Nov. 28, 1931; *Washington Post*, Bridge Pillar Fight Will Go to Hoover, Dec. 2, 1931. The architect of the Arlington Memorial Bridge, William Kendall, "felt that the columns were absolutely necessary to his design and even went so far as to write President Hoover (who had asked that the columns be omitted) giving his arguments for keeping them, including a suggestion that the airport be moved if interference with aircraft was really a problem."[3] But Kendall's appeal to President Hoover was unsuccessful. *Id.*

After the Bridge Commission decided against the columns in December 1931, *id.*, Washington-Hoover Airport closed in 1941, being replaced by Washington National Airport (which is now Ronald Reagan Washington National Airport), *Washington Post*, Washington Airport, World's Finest, Starts Operation Tomorrow (June 15, 1941). And the United States

---

[3] Sue A. Kohler, The Commission of Fine Arts: A Brief History 1910–1995, 26 (1996).

Department of War purchased the land once occupied by Washington-Hoover Airport to build the Pentagon. *See Washington Post*, Million-Dollar Check Closes Airport Deal (Sept. 20, 1941).

Although the Bridge Commission decided against building the columns in 1931, neither the underlying Congressional authorization to build the columns—nor the discretion to modify column design—have expired. During the New Deal-era reorganization of government, President Franklin Delano Roosevelt transferred the Bridge Commission's functions to the Office of National Parks, Buildings, and Reservations in the Department of the Interior. 5 U.S.C. §§ 124–132 (1934); Executive Order 6166 § 2. And Congress renamed that office as the National Park Service. Department of the Interior Appropriations Act, Pub. L. No. 73-109, ch. 38, 48 Stat. 362, 389 (1934).

### C. Commemorative Works Act

In 1986, Congress approved the Commemorative Works Act, which sets forth specific procedures for building commemorative works in certain areas of the District of Columbia. Pub. L. No. 99-652, 100 Stat. 3650 (1986), codified at 40 U.S.C. ch. 89.  It applies to commemorative works "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history, except that the term does not include any such item which is located within the interior of a structure or a structure which is primarily used for other purposes."  40 U.S.C. § 8902(a)(1). The Act "does not apply to commemorative works authorized by a law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3654, codified at 40 U.S.C. § 8902(b).

## II.     Factual And Procedural Background

### A. Plaintiffs sued before Defendants took any action concerning the arch.

This February 19, 2026, lawsuit was filed before Defendants took any action concerning the arch. Defendants' Further Statement of Material Facts (DSOMF) ¶¶ 1–4. The only pre-filing

"facts" referenced in Plaintiffs' Statement of Material Facts (PSOMF) are mere statements or announcements, rather than action implementing the proposed arch. *See* PSOMF ¶¶ 4, 13 (citing plan announcement in January 30 fact sheet); *id.* ¶ 15 (citing alleged statement, attributed to anonymous sources, about desired arch height). Every other "material fact" invoked by Plaintiffs occurred after they filed suit—and often contradict the very allegations in their Complaint. *E.g.*, *compare* PSOMF ¶¶ 6–12, 19, 36–39 (discussing post-filing submissions to and hearings by third-party agencies), *with* Compl. ¶¶ 27, 48, 55–56 (alleging that Defendants "intend to imminently begin construction of the Arch without complying with" statutory procedures requiring review by the same third-party agencies).

As Plaintiffs' Complaint concedes, "Defendant National Park Service is an agency within the U.S. Department of the Interior" "responsible for administering and maintaining the land on Memorial Circle[.]" Dkt. 1, Compl. ¶ 14; DSOMF ¶ 6. But NPS has not taken final agency action authorizing arch construction. DSOMF ¶¶ 7–8. Nor does the Complaint even bring claims under the APA.

Plaintiffs' Complaint concludes by asserting two claims against unidentified "official executive action." Compl. ¶ 52; DSOMF ¶ 5. Plaintiffs' first claim asserts that "Defendants' construction of the Arch without congressional approval and without satisfaction of procedural prerequisites" is *ultra vires* in violation of the Commemorative Works Act, 40 U.S.C. § 8106, the National Environmental Policy Act (NEPA), Section 106 of National Historic Preservation Act (NHPA), and Federal Aviation Administration regulations. Compl. ¶¶ 45, 52–57. That *ultra vires* claim is premised on Plaintiffs having "no meaningful and adequate opportunity for judicial review." *Id.* ¶ 58. Plaintiffs' second claim asserts that "the President's directive to plan and construct an arch on Memorial Circle by July 4, 2026, without congressional authorization . . . and

7

without complying with the numerous statutory requirements . . . violates the Take Care Clause" of the Constitution. *Id.* ¶ 64.

**B. Defendants responded to Plaintiffs' preliminary injunction motion with two declarations establishing that arch construction will not begin unless and until the National Park Service issues a final agency action authorizing construction.**

One week after filing their Complaint, Plaintiffs moved to preliminarily enjoin Defendants other than the President "from taking any steps to construct or to direct or facilitate construction of a commemorative arch in Memorial Circle." Dkt. 7 at 1.

Defendants explained that Plaintiffs' preliminary injunction motion was premature, as NPS had not yet "completed its decision-making process" on arch construction. Dkt. 12-1, Decl. of Frank Lands ¶ 15 (Lands Decl.). "If the potential project moves beyond the conceptual stage, NPS will comply with all applicable laws and regulations including, but not limited to, [NEPA], Section 106 of the [NHPA], Section 7 of the Endangered Species Act ('ESA'), Federal Aviation Administration ('FAA') regulations, and any other applicable laws and regulations, prior to initiating construction of an Arch or authorizing the initiation of such activities." *Id.* ¶ 7; *see also id.* ¶¶ 8–14 (explaining other procedural requirements NPS would comply with before authorizing arch construction).

Plaintiffs nonetheless contended that the Lands Declaration was insufficient to address their concerns because the "NPS declaration casts no doubt on the *President's* plan to build the arch or on his professed intention to move forward with construction." Dkt. 13 at 6.

Thus, Defendants provided another declaration that again confirmed arch construction will not begin unless and until NPS issues a final agency action authorizing it. Dkt. 24-1, Declaration of Joshua Fisher ¶ 1 (Fisher Decl.) (noting that the declarant, Joshua Fisher, is an Assistant to the President and Director of the Office of Administration, Executive Office of the President). The Fisher Declaration confirms—as alleged at Paragraph 14 of the Complaint—that NPS "is the

Executive Branch agency with jurisdiction over Memorial Circle and, under existing statutory requirements, its approval or authorization is a condition precedent to construction on that land." *Id.* ¶ 2. As "[n]either the Director of the Domestic Policy Council nor the Executive Office of the President will authorize construction" of the arch, such construction "will not begin unless and until NPS follows all applicable legal requirements and issues a final agency action authorizing arch construction to proceed." *Id.* ¶¶ 3–4; DSOMF ¶ 7.

## STANDARD OF REVIEW

### I. On A Motion For Summary Judgment, Plaintiffs Bear The Burden Of Establishing That The Court Has Subject Matter Jurisdiction.

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency,* 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").

"[B]ecause subject-matter jurisdiction is an 'Art. III as well as a statutory requirement, . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia,* 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982)). At the summary judgment stage, the plaintiff "must set forth by affidavit or other evidence specific facts" establishing the Court's jurisdiction. *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 48 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

### II. While Plaintiffs Must Support Their Summary Judgment Motion With Admissible Evidence, Defendants Can Simply Identify An Absence Of Evidence.

Because "the plaintiff . . . bears the burden of proof of her claims, it is well established that she cannot rely on the allegations of her own complaint in response to a summary judgment motion, but must substantiate them with evidence." *Grimes v. D.C.*, 794 F.3d 83, 94 (D.C. Cir.

9

2015) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)). In contrast, a "defendant need not submit 'affidavits or other similar materials *negating* the opponent's claim.'" *Id.* at 93 (quoting *Celotex,* 477 U.S. at 323). A defendant can instead establish its right to summary judgment by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *Grimes* 794 F.3d at 93 (citation modified).

## ARGUMENT

### I.    Plaintiffs Have Failed To Carry Their Burden To Establish Subject Matter Jurisdiction.

The Court lacks jurisdiction over this case because Plaintiffs have failed to carry their burden to demonstrate either a waiver of sovereign immunity or standing. Plaintiffs' request that the Court review "the President's vision" of an arch, Plaintiffs' Mem. Summ. J. 1, Dkt. 36-1 (PMSJ), violates the Supreme Court's longstanding rule that executive officers' "pronouncements" of their "desires" "did not give rise to a justiciable controversy save as they had fruition in *action of a definite and concrete character*." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 324 (1936)) (emphasis added); *see also Trump v. New York*, 592 U.S. 125, 131 (2020) (rejecting challenge to unimplemented Presidential "desire"). Because jurisdiction must exist "when the suit was filed," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citations omitted), Plaintiffs' failure to establish any injurious executive action when they filed suit deprives the Court of jurisdiction.

### A.    Plaintiffs have not carried their burden to establish a waiver of sovereign immunity.

Because Plaintiffs filed suit before Defendants took any action concerning the arch, DSOMF ¶¶ 1–5, they cannot establish that the requisite waiver of sovereign immunity existed when their "suit was filed." *Davis*, 554 U.S. at 734; *Lewis v. Hunt*, 492 F.3d 565, 572 (5th Cir.

10

2007) (a "waiver of sovereign immunity is inapplicable if the government did not [act] at the time the suit was filed").

**1.** "It is by now well established that '[a] waiver of sovereign immunity cannot be implied but must be unequivocally expressed' in statutory text." *Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 135–36, 142 (D.D.C. 2015), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016) (quoting *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95 (1990)). Any ambiguity regarding waiver "must be construed in favor of immunity," and even an explicit waiver "must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires." *Id.* (internal citations omitted). So, "[e]ven when the federal government does waive its immunity from suit, limitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied." *Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp. 2d 187, 194 (D.D.C. 2007) (internal citation omitted).

While § 702 of the APA waives sovereign immunity for certain claims, that waiver "is strictly limited by [its] terms." *Cartwright*, 525 F. Supp. 2d at 194. "By its own terms, the waiver applies [only] when a plaintiff claims that 'an agency or an officer or employee thereof *acted or failed to act* in an official capacity or under color of legal authority.'" *Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 142 (D.D.C. 2015), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016) (quoting 5 U.S.C. § 702, emphasis added). If the plaintiff has not identified the "action needed for the APA's waiver of sovereign immunity to apply," then the court lacks jurisdiction. *Geronimo v. Obama*, 725 F. Supp. 2d 182, 184–86 (D.D.C. 2010).

Such is the case here. Plaintiffs fail to provide any evidence that "an agency or an officer or employee thereof acted or failed to act," 5 U.S.C. § 702, when they filed suit, DSOMF ¶¶ 1–5. The only pre-filing "evidence" provided by Plaintiffs are statements by the President. PSOMF ¶¶ 4,

11

13, 15. But the President is not "an agency or an officer or employee thereof," 5 U.S.C. § 702, as the Supreme Court held in *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992). As the President is not an agency, his statements do not create a waiver of sovereign immunity under § 702.  Nor may Plaintiffs assert a "claim against the President through reliance on the APA's waiver of sovereign immunity." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 41 (D.D.C. 2010); *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018) ("[Section] 702's waiver does not apply to Alexander's claims against President Trump").

Plaintiffs cannot invoke the APA's waiver of sovereign immunity based on post-filing activity by third-party agencies. The text of the waiver is limited to suits "stating a claim that an agency or an officer or employee thereof *acted or failed to act*." 5 U.S.C. § 702 (emphasis added). In using the past tense, Congress excluded claims based on future agency action. *Carr v. United States*, 560 U.S. 438, 448 (2010) ("we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach"); *see also Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (holding that statutory language in the "past tense" was "backward-looking language" that excluded future developments). Thus, Plaintiffs' failure to establish any evidence that the sole agency Defendant—National Park Service—has acted, much less done so when Plaintiffs filed suit, DSOMF ¶ 1, renders § 702 inapplicable to this suit, *see World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) ("explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires").

**2.** Unable to invoke a statutory waiver of sovereign immunity, Plaintiffs also cannot rely on a judicial exception to sovereign immunity—the *ultra vires* doctrine—which likewise requires action. *See Nuclear Regul. Comm'n v. Texas* (*NRC*), 605 U.S. 665, 681 (2025) (*ultra vires* review

12

"applies only when an agency has taken *action* . . . ." (emphasis added)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (limiting non-statutory review to the "executive's *action*" (citation modified)). Under this doctrine, "if the federal officer, against whom injunctive relief is sought, allegedly *acted* in excess of his legal authority, sovereign immunity does not bar a suit." *Reich*, 74 F.3d at 1329 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963); *Malone v. Bowdoin*, 369 U.S. 643, 647 (1962), emphasis added).

Because executive action is a required element of this sovereign immunity exception, Plaintiffs must establish evidence that such action occurred when they filed suit. *Davis*, 554 U.S. at 734; *Lewis*, 492 F.3d at 572. Their failure to do so, DSOMF ¶¶ 1–5, deprives the Court of jurisdiction. They cannot seek to review statements describing "the President's vision," PSMJ 1, as the President's "motives and desires" "did not give rise to a justiciable controversy save as they had fruition in action of a definite and concrete character." *Ashwander*, 297 U.S. at 324; *cf. Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (focusing sovereign immunity inquiry on "whether the particular actions that the . . . state performs (whatever the motive behind them) are the *type* of actions" subject to judicial review). Otherwise, the United States could be hauled into court over reported dinner remarks. *See* Dkt. 36-6 at 3 (article reporting the President's discussions about the arch over dinner). Plaintiffs have conceded that they seek judicial review of the unimplemented executive intention behind such remarks. *See* Dkt. 33, Pls.' MTD Opp'n 14 (challenging Defendants' "intent to build the arch"); *id.* (alleging "the President's intent to begin building this year"); *id.* at 15 (seeking to excuse lack of identified action given Defendants' "repeatedly stated intention of building a massive arch"); *id.* at 22 ("this Court can grant effectual injunctive relief" because "Defendants intend to build an arch in Memorial Circle"). The Court

should reject "such a radical expansion of the exceptions to sovereign immunity" under *Larson*, which have always been focused on whether an officer's "*actions* departed from his statutory mandate," without regard to the officer's "motive." *Chuidian v. Philippine Nat. Bank*, 912 F.2d 1095, 1107 (9th Cir. 1990), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305, 130 (2010); *accord Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 14 (D.D.C. 2003).

In sum, the APA's waiver of sovereign immunity requires Plaintiffs to establish, at the summary judgment stage, evidence that an agency "acted or failed to act." 5 U.S.C. § 702. *Ultra vires* review likewise requires evidence that "the federal officer, against whom injunctive relief is sought, . . . *acted* in excess of his legal authority." *Reich*, 74 F.3d at 1329 (emphasis added). Plaintiffs' failure to provide evidence of any such action thus requires the Court to dismiss their suit on sovereign immunity grounds.

**B.      Plaintiffs have not carried their burden to establish standing.**

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Standing must exist "when the suit was filed," *Davis*, 554 U.S. at 734, and "persist throughout all stages of litigation," *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). Plaintiffs have not met their burden here for multiple reasons.

**1.   Plaintiffs have not established imminent injury.**

Plaintiffs have not established any imminent injury; they instead assert only potential future injuries should the arch be constructed. *See* PSOMF ¶¶ 33, 35 (claiming only that "[i]f constructed, the arch" will cause injuries). But it is undisputed that arch construction will not begin unless and until NPS issues a final agency action. DSOMF ¶ 7. By claiming only "future injuries," Plaintiffs

14

"confront[] a significantly more rigorous burden to establish standing." *United Transp. Union v. I.C.C.*, 891 F.2d 908, 913 (D.C. Cir. 1989).

Plaintiffs cannot meet this "significantly more rigorous burden," *id.*, because courts do not speculate about "how the Executive Branch might eventually implement" a Presidential desire. *Trump v. New York*, 592 U.S. 125, 131 (2020). Unwilling to let "the Executive Branch's decisionmaking process run its course," Plaintiffs ask the Court to speculate about an "action that [Defendants] *might* take in the future." *Id.* at 133–34. But an injury that "hypothesizes as to the outcome of future legal proceedings" is "too speculative to invoke the jurisdiction of an Article III Court." *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (citation modified). For this reason, the D.C. Circuit "has been reluctant to find standing based on predictions of how agencies will exercise discretion in future proceedings." *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021) (citing *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015)).

The lack of harm to Plaintiffs in the absence of final agency action set this case apart from *Reich*. That case simply applied an unremarkable proposition—"generally, judicial review is available to *one who has been injured by an act* of a government official which is in excess of his express or implied powers"—to an injurious executive action. 74 F.3d at 1327 (citation modified). There, President Clinton had already acted; in barring federal agencies from "contract[ing] with employers that permanently replace lawfully striking employees," his Executive Order immediately affected "22% of the labor force." *Id.* at 1324 (quoting E.O. 12,954 § 1, 60 Fed. Reg. 13023 (1995)).[4] Thus, the "plaintiffs in the *Reich* case" established standing "by showing that the

---

[4] President Clinton based his action in his statutory "authority to prescribe policies and directives 'as he shall deem necessary to effectuate the provisions' of the [Procurement] Act." *Reich*, 74 F.3d at 1330 (quoting 40 U.S.C. § 486(a) (1986)). That Executive Order was thus akin to "legislative

Executive Order that they challenged created 'a disincentive for employers [in general] to hire replacement workers,' regardless of" how agencies subsequently implemented the challenged Executive Order. *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 159–60 (D.D.C. 2019) (quoting *Chamber of Com. of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995)). By inflicting "hardship" on employers confronted "with the difficult choice between surrendering their right to hire permanent replacements and risking the loss of current and future government contracts," that Executive Order created a ripe Article III case. *Reich*, 57 F.3d at 1101. Thus, *Reich* "is the proverbial exception that proves the rule" that courts wait for final agency action to undertake judicial review unless Presidential action inflicts imminent injury that cannot be meaningfully redressed by APA review. *Cf. Delta Const. Co., Inc. v. E.P.A.*, 783 F.3d 1291, 1301 (D.C. Cir. 2015).

In contrast to *Reich*, Plaintiffs have failed to establish any imminent injury from Presidential statements. DSOMF ¶¶ 9–11. They do not articulate any injury from the social media posts or press reports referenced in the Complaint; nor are they injured by the ongoing agency review processes that began after the Complaint was filed. Instead, all their injuries flow from arch construction, *see* PSOMF ¶¶ 33, 35, which will not occur unless and until NPS issues a final agency action, DSOMF ¶ 7. And "judicial experience and common sense teach that the outcome of a complex bureaucratic process"—even when the President has given specific directions to an agency—"is difficult to predict" because "expectations may be wrong, and intentions may change." *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 152 (D.D.C. 2023) (finding no imminent injury from potential future agency action even where "President

---

rules [that] 'may be subject to pre-enforcement review,'" whereas mere executive "guidance may not." *League of United Latin Am. Citizens v. Exec. Off. of President (LULAC)*, 808 F. Supp. 3d 29, 64 (D.D.C. 2025).

Biden has directed the FDA Commissioner" to work towards that result) (citation modified). As agencies must comply with legal requirements that do not apply to the President, *e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 112 (D.D.C. 2009) (discussing procedural statutes that do not apply to the President), they must involve additional constraints when acting. Here, with multiple ongoing review processes (including before third-party agencies), *e.g.*, PSOMF ¶¶ 11–12, Plaintiffs can only speculate about what the ultimate outcome of those bureaucratic processes may be. *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021).

Despite the well-settled law prohibiting standing based on "a prediction" about "[t]he Government's eventual action," *New York*, 592 U.S. at 133,  Plaintiffs invite the Court to undertake such speculation in violation of Article III. *E.g.*, *Compare* Defs.' Mot. to Dismiss 13–14, Dkt. 31, *with* Pls.' Opp'n 13–15, Dkt. 33. And Plaintiffs' summary judgment brief all but ignores their obligation to establish imminent injury, relegating discussion of this core Article III requirement to a single paragraph. *See* PMSJ 11–12.

Tellingly, that paragraph compounds Plaintiffs' imminence problem by asking the Court to speculate about future agency action based almost entirely on post-filing evidence. *See* PSMJ 11–12 (citing PSOMF ¶¶ 6–12, 18, which discuss activity since April 2026). That post-filing evidence cannot address the relevant inquiry: whether Plaintiffs "had the requisite stake in the outcome when the suit was filed." *Davis*, 554 U.S. at 734; *Sierra Club v. Envt Prot. Agency*, 873 F.3d 946, 950 (D.C. Cir. 2017) ("Standing is assessed at the time of filing." (citation modified)).

The only pre-filing evidence provided by Plaintiffs is a fact sheet about a car race. *See* PSOMF ¶ 13 (citing *Fact Sheet: President Donald J. Trump Celebrates American Greatness with the Freedom 250 Grand Prix of Washington, D.C.* (Jan. 30, 2026), Sansone Decl. Ex. D, Dkt. 36-

17

7). That fact sheet merely states that the President had "announced plans for a new Independence Arch in Washington, D.C. to coincide with the 250th anniversary," Sansone Decl. Ex. D, Dkt. 36-7, which accurately describes the President's January announcement of various arch designs on social media, *see* Compl. ¶ 35. Because the fact sheet says nothing about when arch construction will begin, much less conclude, Plaintiffs have failed to establish imminent injuries from arch construction.

Even if Plaintiffs had shown that construction were imminent, they have still failed to show that any aesthetic harm from that construction is imminent. As the Supreme Court has repeatedly explained, "profession of an intent to return to the places [declarants] had visited before . . . is simply not enough"; "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (citation modified). Plaintiff Calder Loth, for example, resides in Richmond, Virginia, Compl. ¶ 10, and merely states that he "intends to continue visiting Washington, DC," without specifying concrete plans or even specifying when that some day will be, Dkt. 7-5, Loth Decl. ¶ 7. Such some-day intentions are insufficient to establish imminent injury under *Lujan*.

Nor have Plaintiffs provided evidence that their unspecified future plans will be harmed by arch construction. Because Plaintiffs' alleged injuries are tied to the arch "obstructing" their views, PSOMF ¶¶ 33, 35, they have failed to establish that even beginning construction will inflict imminent injury on them. *See Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017) (finding that plaintiffs had not established imminent harm to their "viewsheds" from viewing construction of foundations for "mammoth towers," as the towers "won't begin to be built for at least another six months"). Here, Plaintiffs have provided no

18

evidence about when arch construction would reach sufficient height to obstruct their views, much less evidence of a planned visit at such time. Plaintiffs thus cannot establish imminent injury required for standing.

In sum, because Plaintiffs have established only that "the government *might* issue" an official arch decision they dislike, they have failed to establish standing. *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020) (emphasis added). After all, "[i]f such speculative future government action could support an injury in fact, it is hard to imagine what would *not* satisfy that requirement." *Id.* (emphasis in original). Plaintiffs simply have not met their burden to show that injurious construction is—not probably—but "*certainly* impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2).

### 2. Plaintiffs have not established cognizable injuries.

In addition to Plaintiffs' failure to establish imminent injury, they have also failed to establish cognizable harms. Plaintiffs believe a future arch would interfere with "historical" and "professional" interests, and "dishonor their military and foreign service." Compl. ¶¶ 50–51. And they object to the arch as an "obtrusive symbol." PSOMF ¶ 33. Those objections—no matter how deeply held—are the sort of "general legal, moral, ideological, or policy objection to a particular government action" that "Article III standing screens out." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). This "'offended observer' theory of standing has no basis in law," *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80 (2019) (Gorsuch, J., concurring), because "[t]he presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements," *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

Plaintiffs' view-obstruction injuries are foreclosed by *Env't Def. Fund v. FERC (EDF)*, 2 F.4th 953, 970 (D.C. Cir. 2021). Plaintiffs attempt to assert aesthetic injury from "regularly driv[ing]" near the potential construction site, *e.g.*, Compl. ¶ 10, which is precisely the sort of

19

"incidental viewership" of an "eyesore" that the D.C. Circuit found insufficient to establish standing in *EDF*, 2 F.4th at 970 (holding that driving by challenged structure "several times per week" was insufficient to create a cognizable injury). For example, Plaintiff Calder Loth—like the *EDF* petitioner—objects to the arch as upsetting the character of an area that he drives past. *Compare id.* at 968 (objecting to structure as "not in keeping with the character of [her] neighborhood"), *with* Loth Decl. ¶ 9 ("I view the planned arch as an incompatible distraction from the aesthetic and symbolic interplay of Memorial Bridge with Memorial Circle"). In both circumstances, drive-by views of a disfavored structure "reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 970.

Attempting to distinguish *EDF*, Plaintiffs focus on their prior use of the "area." PSMJ 11. But the *EDF* petitioner also used—and resided in—the relevant area. 2 F.4th at 968 (she lived less than one mile from the challenged station, and the challenged pipeline went through a local park that she used and enjoyed). Despite her residence in and enjoyment of the *area*, the D.C. Circuit focused on her lack of prior use of the exact "land on which the station now exists." *Id.* at 969. Similarly here, Plaintiffs establish no prior use of Memorial Circle, which is only a small circle of grass. While Plaintiffs may allege prior use of surrounding areas, like the Lincoln Memorial or unspecified parts of Arlington National Cemetery, those allegations are indistinguishable from the *EDF* petitioner who lived and recreated in the areas surrounding the challenged station that she didn't want to see.

Nor can Plaintiffs base their standing on cases where parties had cognizable interests in experiencing pollution-free environments or rare species. *Contra* PSMJ 10–11 (citing such cases). Plaintiffs identify no "harmful effects from discharged pollutants," like the mercury discharges at issue in *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 182 (2000).

20

And Plaintiffs assert no cognizable aesthetic interests in experiencing rare natural phenomena. *See Lujan*, 504 U.S. at 562–63 ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1158 (D.C. Cir. 2025) (recognizing petitioners' "interest in observing the [endangered American burying] Beetle"). Instead, Plaintiffs assert only interests in *avoiding* a structure they dislike, making them indistinguishable from the "eyesore" plaintiff lacking standing in *EDF*. Plaintiffs tellingly invoke extra-circuit caselaw reaching a contrary result on whether "eyesore" injuries are cognizable. *Compare* PMSJ 11 (citing *Friends of Gateway v. Slater*, 257 F.3d 74, 78 (2d Cir. 2001)), *with EDF*, 2 F.4th at 968–70. Of course, this Court is bound by D.C. Circuit, not Second Circuit, law.

In sum, Plaintiffs' objections to the proposed arch, no matter how sincerely felt, are simply not cognizable under Article III, which does not place standing "in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (citation modified).

## II.    Plaintiffs' Claims Are Prudentially Unripe.

Plaintiffs' claims are also unripe because they challenge unimplemented executive desire. DSOMF ¶¶ 1–5. It is undisputed that arch construction will not occur unless and until NPS issues a final agency action authorizing arch construction. *Id.* ¶¶ 6–7. Because Plaintiffs will suffer no injury before such a final agency action issues—and their claims are not currently fit for review absent such a decision, *id.* ¶ 8—their claims should be rejected as prudentially unripe.

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Doe v. Doe Agency*, 608 F. Supp. 2d 68, 72 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature

21

adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). Prudential ripeness "concerns the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Giron v. Zeytuna, Inc.*, 597 F. Supp. 3d 29, 54 (D.D.C. 2022) (citation modified).

While the prudential ripeness doctrine is in some tension with the judiciary's "virtually unflagging" obligation to hear and decide cases within its jurisdiction, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (citation omitted), courts must also "give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties," *Cheney v. U.S. Dis. Court for Dist. of Columbia*, 542 U.S. 367, 382 (2004). Thus, after *Driehaus*, the Supreme Court has found cases—like this one—that challenge unimplemented Presidential desires to be unripe for judicial review. *New York*, 592 U.S. at 131 (finding unripe challenge to the President's "desire to exclude aliens without lawful status from the apportionment base," because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture" where the implementing agency was still gathering information about and assessing feasibility of President's desire (citation modified)).

As in *New York*, Plaintiffs' "case is riddled with contingencies and speculation that impede judicial review," rendering it unripe. *Id.* NPS has made no final decisions about construction authorization, arch design, or funding sources, DSOMF ¶ 8, rendering its action not "sufficiently final" for judicial review. *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)

22

(citation omitted). Plaintiffs' assertion that the Court can "resolve purely legal issues," Pls.' MTD Opp'n 18, overlooks that "even purely legal issues may be unfit for review," *Atl. States Legal Found.*, 325 F.3d at 284. Plaintiffs cannot dispute that even their legal questions "would benefit from a more concrete setting." *Id.* For example, Plaintiffs claim that funding limits in the 1925 Act prohibit arch construction, PMSJ 14, but they provide no evidence about arch cost, much less how any funding source NPS might ultimately utilize interacts with appropriations limits in the 1925 Act. "How that question will be addressed by the [agency] is yet another fundamental uncertainty impeding proper judicial consideration at this time." *New York*, 592 U.S. at 133.

Because the issues are unfit for judicial review, Plaintiffs' lack of hardship from deferring review renders this case unripe. As in *New York*, "[P]laintiffs suffer no concrete harm from the challenged [Presidential desire] itself, which does not require them 'to do anything or to refrain from doing anything.'" *Id.* at 134 (citation omitted). Plaintiffs feign a "substantial risk that the threatened harms will soon come to pass," but never explain how that risk might materialize as arch construction will not proceed unless and until NPS issues a final agency action authorizing arch construction. *Compare* PMSJ 11, *with* DSOMF ¶¶ 6–7. Plaintiffs suffer no hardship from deferred judicial review, as they can proceed with claims challenging any final agency action with which they disagree, if and when NPS authorizes a final project to proceed. Delayed review is, by definition, no hardship in and of itself. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272–73 (D.D.C. 2015) ("If the only hardship a plaintiff will endure as a result of delaying consideration of the disputed issue is the burden of having to engage in another suit, this will not suffice to overcome an agency's ripeness challenge." (citation modified)).

In sum, the "doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387

23

(D.C. Cir. 2012). Because the Court need not issue any decision to forestall Plaintiffs' alleged injuries, it should hold that Plaintiffs' claims are prudentially unripe.

### III.    Plaintiffs' *Ultra Vires* Claim Fails.

Less than a year ago, the Supreme Court cautioned against *ultra vires* review "becom[ing] an easy end-run around the limitations of . . . judicial-review statutes." *NRC*, 605 U.S. at 681. To prevent this, "time and again, courts have stressed that *ultra vires* review has extremely limited scope." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (citation modified).  Yet Plaintiffs nonetheless ask this Court to undertake a breathtaking expansion of *ultra vires* review. According to Plaintiffs, the *ultra vires* doctrine allows for review of executive intentions *even though* they have not yet resulted in any action by Defendants, *even though* any such action would be reviewable under the APA, and *even though* their challenge hinges on a "typical statutory-authority argument." *NRC*, 605 U.S. at 682. They are incorrect on all counts. The Court should accordingly reject Plaintiffs' attempted end-run around the APA's scheme for review of agency actions.

### A.    Plaintiffs have failed to challenge an executive action required for an *ultra vires* claim.

Plaintiffs cannot state a viable *ultra vires* claim by challenging only Presidential words or intentions. *Supra* 12–14; *New York*, 592 U.S. at 131. The extremely rare cases where *ultra vires* review has been extended to the Chief Executive are limited to reviewing "presidential *actions*." *Reich*, 74 F.3d at 1329 (emphasis added). As judicial review under the APA likewise "insists upon an agency action," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (citation modified), Plaintiffs cannot extend the extremely limited *ultra vires* doctrine to reviewing Presidential words or social media posts. Because the "executive power under our Constitution . . . rests exclusively with the President," nearly all agency actions ultimately emanate from some presidential policy or

24

directive. *Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981). Yet this does not mean that every presidential announcement at the State of the Union or remark over dinner can be subject to judicial review.

Courts do not review unimplemented executive intentions as history abounds with unrealized executive desires. President Obama, for example, entered office vowing to close the detention facilities at Guantanamo Bay. And one of his earliest Executive Orders directed the Department of Defense to close them within one year. Executive Order 13492 § 3, 74 Fed. Reg. 4897 (Jan. 22, 2009). But when he ultimately left office eight years later, the detention facilities remained open. PBS News, *Why Obama failed to close Guantanamo* (Jan. 14, 2017).[5] Because Presidents do not always achieve their goals, courts wait for injurious executive action to undertake judicial review, lest they issue "an advisory opinion on issues which may or may not arise." *Oliver v. United States*, 335 F.2d 724, 726 n.2 (D.C. Cir. 1964). *Ultra vires* review is thus not available "simply because [the Executive Branch] has arguably reached 'a conclusion which does not comport with the law.'" *NRC*, 605 U.S. at 681 (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)).

In seeking judicial review of unimplemented executive desire, Plaintiffs' never-before-adopted theory would "swallow the APA's" cause of action. *Cf. Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). If parties need not wait for final agency action because they can assume that agencies will carry out executive intent, *see* PMSJ 11–12, *ultra vires* claims would become the new normal, in violation of Supreme Court and D.C. Circuit law, *see, e.g.*, *NRC*, 605 U.S. at 681–82 (an *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds" (citation omitted)); *Changji Esquel* 40 F.4th at 721–22 ("Time and

---

[5] https://www.pbs.org/newshour/show/obama-failed-close-guantanamo.

again, courts have stressed that *ultra vires* review has extremely limited scope." (citation modified)).

The Court should not expand the judicially created doctrine of *ultra vires* review to encompass Plaintiffs' unprecedented theory, as doing so would discourage government transparency. Executive Branch office holders routinely "come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). When agencies undertake those deliberative processes, plaintiffs must typically wait for "final agency action" to seek judicial review. *E.g.*, *Franklin*, 505 U.S. at 796 (citing 5 U.S.C. § 704). If much earlier challenges can instead be brought against preliminary discussions by non-agencies like the Chief Executive, those Executive Branch decisionmakers will be discouraged from disclosing their unimplemented desires to the public.

> ### B.    The APA provides meaningful and adequate judicial review that precludes an *ultra vires* claim.

An *ultra vires* claim is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681 (citation modified). Courts in this District have repeatedly held that the APA provides such an opportunity for review and therefore that an *ultra vires* claim does not lie where an APA claim is available. *See, e.g.*, *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 877779, at *13 n.15 (D.D.C. Mar. 31, 2026); *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 200 (D.D.C. 2024); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017).

To circumvent this well-settled law, Plaintiffs wrongly assert that their *ultra vires* challenge may proceed because no APA claim is currently available to them. *See* PMSJ 13. But the Supreme

Court has long recognized that even delayed statutory review provides a "meaningful and adequate" opportunity for judicial review. *Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.*, 502 U.S. 32, 43 (1991). In *MCorp*, the plaintiff brought an *ultra vires* challenge to a regulation being enforced against it in ongoing "administrative proceedings." *Id.* at 34. In rejecting that claim, the Supreme Court held that statutory review at the conclusion of the administrative proceedings provided MCorp with an adequate opportunity to challenge the regulation "[i]f and when the Board finds that MCorp has violated that regulation." *Id.* at 43–44. Because Plaintiffs will similarly be able to pursue APA review "if and when" NPS authorizes arch construction, they indisputably have a meaningful and adequate opportunity for judicial review of their claims, thus mandating dismissal of their *ultra vires* claim.

The D.C. Circuit has likewise recently confirmed that delayed APA review forecloses *ultra vires* claims. *Glob. Health Council v. Trump*, 153 F.4th 1, 21 n.18 (D.C. Cir. 2025). When "APA review may be available" after "statutory processes run their course," "that would provide an alternative procedure for review and thereby independently foreclose [an] ultra vires claim." *Id.*

*Reich* is not to the contrary. It does not cite, much less question, *MCorp*. Plaintiffs nonetheless have claimed that *Reich* establishes that "APA review of an agency's implementation of an unlawful Executive Branch policy is a poor substitute for direct review of the policy itself." Pls.' MTD Opp'n 24 (citing 74 F.3d at 1326). But *Reich* establishes no such principle. Unlike here, the government in *Reich* argued that "a cause of action under the APA is not available," so the court had no occasion to address whether the APA provided a meaningful opportunity for review. *Id.* at 1326–27.

To the extent that dicta in *Reich* suggests APA review might sometimes be inadequate to challenge presidential policy, it stands for a narrow, case-by-case exception to the general rule that

delayed statutory review opportunities preclude an *ultra vires* claim. The Executive Order challenged in *Reich* amounted to a "legislative rule" that "purports to create binding, enforceable obligations on its own."   *LULAC*, 808 F. Supp. 3d at 64 (citation modified). Because that Presidential action inflicted imminent injury that would persist even if implementing regulations were struck down, *supra* 15–16, an APA claim would have provided limited relief to the *Reich* plaintiffs. That is not the case here. Because NPS "is responsible for administering and maintaining the land on Memorial Circle," Compl. ¶ 14, any plan to construct an arch will be effectuated through NPS, DSOMF ¶¶ 6–7. Challenging a final action by NPS would therefore provide Plaintiffs with an equivalent—indeed, superior—path to judicial review. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (observing that *ultra vires* review "represents a more difficult course . . . than would review under the APA").

### C.  Plaintiffs' disagreement with Defendants' interpretation of the 1925 Act does not entitle them to *ultra vires* review.

The availability of APA review dooms Plaintiffs' *ultra vires* claim, but their claim also fails because they point to no action by Defendants that is "entirely in excess of [their] delegated powers and contrary to a specific prohibition in a statute." *NRC*, 605 U.S. at 681 (citation modified). Plaintiffs' *ultra vires* claim was originally based on the allegation that Defendants plan to construct an arch on Memorial Circle "without congressional approval." Compl. ¶ 57. After learning that the 1925 Act encompasses authorization to construct and redesign two large columns surmounted by statues in the very location of the proposed arch, however, Plaintiffs pivoted to contesting Defendants' interpretation of that Act. Plaintiffs have thus abandoned their original position that there is *no* potential source of authority for construction on Memorial Circle.

Plaintiffs' new approach amounts to "dress[ing] up a typical statutory-authority argument as an *ultra vires* claim." *NRC*, 605 U.S. at 682. Plaintiffs' argument that the "general authority"

28

from the 1925 Act "does not extend" to an arch "falls well shy of a meritorious [*ultra vires*] claim." *Id.* at 682. Because that argument falls far short of identifying an error by Defendants "so extreme that one may view it as jurisdictional or nearly so," the Court must dismiss Plaintiffs' *ultra vires* claim. *Changji Esquel*, 40 F.4th at 722 (quoting *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

None of Plaintiffs' arguments against Defendants' interpretation of the 1925 Act are persuasive as a matter of statutory interpretation, much less sufficient to establish a jurisdictional error that could support *ultra vires* review. Plaintiffs first insist that the 1925 Act imposes a 10-year time limitation on construction that expired in 1935. PMSJ 14 (citing 1925 Act § 6, 43 Stat. 975). But the provision that Plaintiffs rely on merely provides a per-year expenditure limit based on the "ten-year program of expenditures and construction contained in the report" by the Commission. 1925 Act § 6, 43 Stat. 975. This does not amount to a sunset provision on Congress's authorization to construct a bridge across the Potomac and "landscape features appertaining thereto." *Id.* § 1, 43 Stat. 974. To the contrary, Congress knows how to sunset a construction authorization and uses much more specific language to do so. *E.g.*, Pub. L. No. 99-652 § 10(b), (d), 100 Stat. 3650 ("Any legislative authority for a commemorative work [except laws enacted before the commencement of the Ninety-ninth Congress] shall expire at the end of the five-year period beginning on the date of the enactment of such authority, unless the Secretary or Administrator (as appropriate) has issued a construction permit for the commemorative work during that period.").

Moreover, Plaintiffs' sunsetting argument overlooks the historic implementation of the 1925 Act, which was used to add new monumental features long past the ten-year window—until at least 1951. For example, although the design Congress originally approved included pylons at

29

the east end of the bridge,[6] the Commission of Fine Arts eventually pushed for those pylons to be replaced with the equestrian statues now located at the bridge's east end.[7] But between funding difficulties during the Great Depression and bronze shortages during World War II, those statues were not added to the bridge until 1951, twenty-six years after the 1925 Act.[8]

Plaintiffs next speculate that the arch project would violate the 1925 Act's requirement that construction be "approved and ordered" "in a total sum not to exceed $14,750,000." 1925 Act § 2, 43 Stat. 974; *see also* PMSJ 14. But Plaintiffs provide no evidence about arch cost, nor could they as they sued prematurely before any final decision for the arch had been adopted. Worse, Plaintiffs' selective quotation from the 1925 Act leaves out key context explaining that the $14,750,000 limit applies to the "sum [that] is authorized to be appropriated from any moneys available or that may become available in the Treasury of the United States." 1925 Act § 2, 43 Stat. 974. This cap on appropriations does not rule out alternative sources of funding, as again exemplified by the equestrian statues at the bridge's east end, which were gifted by the government of Italy "as a gesture of friendship to the United States."[9]

Nor does the fact that President Franklin D. Roosevelt abolished the Arlington Memorial Bridge Commission in 1933 undermine the 1925 Act's authorization to carry out construction. *Contra* PMSJ 14. As Plaintiffs themselves have recognized, Executive Order 6166 "transferred

---

[6] Report of the Arlington Memorial Bridge Commission 6. Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

[7] National Park Service, Historic American Engineering Record (HAER), Arlington Memorial Bridge, HAER No. DC-7, at 96–99, available at https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0600/dc0604/data/dc0604data.pdf.

[8] HAER No. DC-7, at 101–02.

[9] HAER No. DC-7, at 99, 101–02.

30

the commission's functions to what is now NPS." Pls.' MTD Opp'n 27 (citing Exec. Order 6166, § 2 (June 10, 1933)). And key elements of the project—including the bridge's connection to other roads on the Virginia side—culminated in 1938 after President Roosevelt's executive order.[10] This history belies Plaintiffs' assertion that transferring the Commission's functions to NPS or transferring the land on which the project was constructed to NPS undermined the 1925 Act's general authorization.

In sum, Plaintiffs have failed to establish that Defendants lack statutory authority to build two large columns surmounted by statues on Memorial Circle. While Plaintiffs may dispute whether the design discretion delegated by the 1925 Act extends to connecting those two columns to form an arch, that is a paradigmatic "typical statutory authority argument" that cannot be raised via *ultra vires* claim. *Global Health*, 153 F.4th at 20–21.

### D. Plaintiffs' statutory prohibition arguments under the Commemorative Works Act and 40 U.S.C. § 8106 fail.

Plaintiffs' next argument, that the Commemorative Works Act (CWA) and 40 U.S.C. § 8106 prohibit arch construction, PMSJ 15–17, fails on three independent grounds.

**1.** Neither statute restricts construction authorized by the 1925 Act. The CWA "does not apply to commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b). And § 8106 merely requires, if at all, "express authority" of Congress to build. Because Congress authorized construction on Columbia Island of two tall columns surmounted by statues— along with discretionary design modifications—in 1925, neither statute prohibits arch construction.

**2.** Neither statute confers rights upon Plaintiffs to enforce them. Under D.C. Circuit law, to bring an *ultra vires* claim based on a specific statutory prohibition, "the prohibition at issue must

---

[10] HAER No. DC-7 at 95–96; *see also id.* at 95 (noting that, while Executive Order 6166 "might sound like a death knell for the projects these commissions managed, such was not the case").

confer rights upon the individual seeking ultra vires review." *Global Health*, 153 F.4th at 20. These statutes are intended to protect Congress's institutional interests, not Plaintiffs' visual ones. Whether Congress authorized construction in Memorial Circle is "a judgment peculiarly for Congress to make in carrying on its own functions in our constitutional system, not for non-congressional parties to carry on as an ersatz proxy for Congress itself." *Natural Res. Def. Council Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).

**3.** Plaintiffs have failed to establish that arch construction would violate either statute. As to the CWA, Plaintiffs provide no evidence that a final decision has been made as to what the arch is designed to celebrate. *See* DSOMF ¶ 8. And one designer proposed that the arch "is not primarily a monument dedicated to the dead, but to the living, to this great country and its perseverance." Defendants' Response to Plaintiffs' Statement of Material Facts (DRPSOMF) ¶ 19. Such a design would not constitute a "commemorative work" under the CWA because it is not "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." 40 U.S.C. § 8902(a)(1).

Turning to § 8106, that statute only requires an entity to have express authority from Congress to build—not to build a particular structure. That understanding flows from the provision's history: It was enacted shortly after the Army Corps of Engineers set out to reclaim "properties illegally used as dumps, or occupied by shacks, gardens, railroad companies, and even a public schoolhouse and a church." National Register of Historic Places Registration Form, L'Enfant Plan of the City of Washington, D.C., National Park Service, at 60-61 (1997), https://npgallery.nps.gov/pdfhost/docs/NRHP/Text/97000332.pdf. An 1864 predecessor law was similarly focused on "prevent[ing] the improper appropriation or occupation of any of the public streets, avenues, squares, or reservations in the City of Washington belonging to the United States,"

32

and in particular "the erection of any permanent building upon any property reserved to or for the use of the United States, unless plainly authorized by act of congress." 13 Stat. 412, 412 (1864); *see also* Pub. L. No. 57-81, 32 Stat. 152 (1902) (directing Army Corps to prevent "unlawful occupation" of "public lands in the District of Columbia"). Congress was concerned about stopping encroachments by unauthorized parties—not trying to micro-manage park planning by federal authorities.

Near-contemporaneous legislative history confirms that narrower understanding. Major Ulysses S. Grant III, then Director of Public Buildings and Public Parks of the National Capital and Executing and Disbursing Officer of the Arlington Memorial Bridge Commission,[11] testified that § 8106 had been enacted at the request of his office, and "was intended for the purpose of preventing encroachments upon park property by other Government offices or by the public, and has never been construed to prevent such construction by the park authorities within the limits of the appropriations." District of Columbia Appropriation Bill, 1927, Hearing Before the Subcomm. of H. Comm. on Appropriations 533, 69th Cong. (1926) (emphasis added). He gave that response upon being asked how his agency was able to build a new facility in Anacostia Park despite that statute; his answer was not challenged. *See id.* The clear takeaway is that otherwise-authorized federal officials need no further congressional approval to build particular structures.[12]

Defendants' understanding of § 8106 is also consistent with historical practice. NPS has erected countless structures on national parkland in the District over the past century, yet there is

---

[11] Kohler 18, *supra* note 3.

[12] To avoid "distort[ing]" the original meaning of century-old statutes, courts typically interpret acts of Congress in light of background legal principles as they existed at the time of enactment rather than "as if they were written today." *Goldstein v. California*, 412 U.S. 546, 564 (1973); *see also, e.g.*, *Gallardo v. Marstiller*, 596 U.S. 420, 434 (2022).

no record of any express congressional approval for buildings like the National Capital Region Headquarters, U.S. Park Police Headquarters, Rock Creek Park tennis stadium, or the numerous nature centers, comfort stations, and cell phone towers that NPS has erected in Rock Creek Park and beyond.[13] The "lack of historical precedent" is a "telling indication" that a party misread a statute. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citing "longstanding practice of the government" as an "aid" to "inform a court's determination of what the law is" (citation modified)). Indeed, "[i]f Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'" *Wash. All. of Tech. Workers v. U.S Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022).

Moreover, whatever the proper level of generality for an authorization under § 8106, there is good reason to doubt that the provision applies in the first place to national parks administered by NPS. History tells a narrower story of congressional intent. In 1912, the Army Corps of Engineers—then known as the Engineering Department in the War Department—had jurisdiction over parks in the District of Columbia. Congress included § 8106 along with a group of line-item appropriations to the Engineering Department. *See* Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 443-44 (1912). In that same law, Congress appropriated funds to the Interior Department, which

---

[13] *See Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972)*, 89 Fed. Reg. 97631, 97631 (Dec. 9, 2024); *Executive Director's Recommendation, National Capital Region Campus Renovation Project and Park Police District 1 Substation, Commission Meeting*, National Capital Planning Commission at 1 (Jan. 7, 2016), https://www.ncpc.gov/docs/actions/2016January/National_Park_Service_Police_District_1_Substation_Recommendation_7703_Jan2016.pdf; Joan M. Zezen, An Urban Oasis: Rock Creek Park's History and Management 130-132 (Oct. 2020), https://www.scribd.com/document/812110103/Rock-Creek-DC-adhi-2020.

had jurisdiction over several national parks across the country. For Interior, Congress included a different provision demarcating when Congress's express authority was required: "No expenditure for construction of administration or other buildings . . . exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." *Id.* at 460. Given the simultaneous enactment of these parallel provisions, it appears that Congress wanted one rule for D.C. parks under the Engineering Department, but a different rule for national parks under the Department of Interior.

The statute pertaining to Interior was eventually codified at 16 U.S.C. § 451. In later years, including after NPS was created and vested with control of all national parks (including in the District of Columbia), Congress amended that statute to increase the cost threshold of construction of buildings in national parks that would trigger the need for approval. *See, e.g.*, Pub. L. No. 65-181, 40 Stat. 634, 677 (1918); Pub. L. No. 76-417, 54 Stat. 36, 36 (1940). In its appropriations laws, Congress also routinely exempted NPS construction activity, including construction in the District of Columbia, from this provision. *See, e.g.*, Pub. L. No. 80-841, 62 Stat. 1112, 1141 (1948); Pub. L. No. 101-512, 104 Stat. 1915, 1920 (1990).

Then, in 1996, Congress repealed § 451. *See* Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996). That is, Congress eliminated the provision that required "express authority of Congress" for NPS construction. This history suggests § 8106 was never intended to limit NPS's construction in national parks. Section 451 played that role—and Congress chose to repeal it. And this explains the sole example of Congress exempting a particular building in the District pursuant to § 8106: a 1993 statute providing that "the limitation on construction contained in [§ 8106] shall not apply to the construction" of "facilities to house bonsai collections at the National Arboretum." Pub. L. No. 103-111, 107 Stat. 1046, 1051 (1993). If § 8106 is read as restricting entities other than NPS from

35

constructing buildings on national parkland in D.C., this makes sense: The National Arboretum is managed by the Department of Agriculture and is not a national park. Meanwhile, if § 8106 were intended to restrict NPS construction in national parks—contrary to Major Grant's near-contemporaneous explanation—virtually every building erected on national parks in the District is presumptively unlawful. That implausible construction is miles away from the clarity and obviousness required to sustain an *ultra vires* claim.

In sum, Plaintiffs' *ultra vires* claim fails for four independent reasons outlined above.

## IV.    Plaintiffs' Constitutional Claim Fails.

It has been settled law for over a century that the President's constitutional duty to "take care that the laws be faithfully executed," U.S. Const. art. II, § 3, is not a matter for judicial review. *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022); *accord Center for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 245–250 (D.D.C. 2019). As the Supreme Court long ago explained, courts cannot and should not review the President's "purely executive and political" duty "to see that the laws are faithfully executed[.]" *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). There, the Court rejected—as "an absurd and excessive extravagance[,]" *id.*—even the filing of a complaint asserting that "this court is a better judge of his duty as President than the President himself; and that when he seeks to execute a law, and to avoid impeachment and denouncement as unfaithful to his duty as Executive, this court is to interfere and tell him what his duty is[,]" *id.* at 482. Plaintiffs thus ask this Court to do something truly unprecedented: "in the 150 years since *Johnson* was decided, no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials." *Arizona*, 600 F. Supp. 3d at 1011. The Court should decline their invitation to overturn *Johnson*, a case they do not even cite. *See* PMSJ 17–19.

Even were a claim under the Take Care Clause an appropriate subject of judicial review, Plaintiffs' second claim would still fail because it is ultimately a statutory claim, not a constitutional one. As Plaintiffs concede, "the President has broad discretion in deciding . . . how to 'interpret[] a statute and direct[] the details of its execution." *Id.* at 18 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)). That Plaintiffs disagree with the President's discretionary interpretation of the 1925 Act is no basis for a constitutional claim. *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (rejecting the argument that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution"). In limiting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to circumstances "involv[ing] the conceded *absence* of *any* statutory authority," *Dalton*, 511 U.S. at 473, the Supreme Court precluded the assertion of "claim[s] that the President acted in excess of such authority" as constitutional claims that could be pursued without a statutory cause of action, *id.* Thus, "*Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review." *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. 2025). Because Defendants have never conceded the absence of any statutory authority—and instead provide on-point statutory authority for the construction of two large columns on Columbia Island surmounted by statues—Plaintiffs' claim involves only statutory, not constitutional, authority. As such, Plaintiffs cannot pursue their claim without a statutory cause of action.  *Glob. Health Council*, 153 F.4th at 16.

Finally, Plaintiffs' Take Care Clause claim fails on the merits. Congress approved the "development of Columbia Island as a park," including "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Bridge Commission Report 40–

37

41. And Congress delegated discretion to change those designs as "may be found to be necessary or advisable." 1925 Act § 1, 43 Stat. 974. There is thus nothing unfaithful about implementing a project that Congress has authorized.

## V.    Plaintiffs Are Not Entitled To Their Requested Relief.

Even if the Court were to find a violation, the Court should refrain from issuing Plaintiffs' requested declaratory and injunctive relief.

**1.** The Court cannot issue any relief against the President. "A court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) (citing *Johnson*, 71 U.S. at 499); *see also Swan v. Clinton*, 100 F.3d 973, 977 n.1 (D.C. Cir. 1996); *Page v. Biden*, No. 20-CV-104 (CRC), 2021 WL 311002, at *4 (D.D.C. Jan. 29, 2021), *aff'd*, No. 21-5038, 2021 WL 4767945 (D.C. Cir. Oct. 1, 2021); *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 226 (D.D.C. 2020). "Permitting declaratory or injunctive relief against the President personally would not only distract him from his constitutional responsibility to 'take Care that the Laws be faithfully executed,' U.S. Const., Art. II, § 3, but . . . would produce needless head-on confrontations between district judges and the Chief Executive." *Franklin*, 505 U.S. at 828 (Scalia, J., concurring). Separation of powers principles thus bar the Court from issuing relief against the President.

**2.** Similar reasoning also counsels against granting declaratory relief against the remaining Defendants, who have not yet acted to implement the challenged presidential intent. *See* DSOMF ¶¶ 1–5. "[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1367 (D.C. Cir. 2023) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)).

38

**3.** Nor should the Court grant Plaintiffs' request to enjoin Defendants Haley, EOP, or NPS "from taking any further steps toward" construction of an arch. *Contra* PMSJ 19. A plaintiff seeking a permanent injunction must establish: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction," *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), with elements (3) and (4) merging when the defendant is the government, *Anatol Zukerman*, 64 F.4th at 1364. "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *eBay*, 547 U.S. at 391. Here, granting the sweeping relief that Plaintiffs seek would be contrary not only to equitable principles, but also Article III and the express intent of Congress.

The Court cannot grant Plaintiffs' extraordinary request to enjoin pre-decisional planning processes which inflict no injury on Plaintiffs, much less pose any threat of irreparable injury. Article III mandates that "[a]n injunction must be narrowly tailored to remedy the specific harm shown." *Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006). The only injury that Plaintiffs identify stems from their fear that the construction of an arch would "obstruct[] the views to and from Arlington National Cemetery." PSOMF ¶ 33. Because continuing the planning process for the project could not possibly inflict this harm, DSOMF ¶¶ 9–10, Plaintiffs' requested injunction is far "more burdensome to the defendant[s] than necessary." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020).

The Court must also refrain from enjoining below-grade construction. As a court in this District held in *National Parks Conservation Association v. Semonite*, construction of "underwater foundations" extending "seven feet above the water" could not cause "irreparable harm" to a

plaintiff whose only asserted injury was having to view the "mammoth towers" that were to ultimately be built. 282 F. Supp. 3d 284, 288 (D.D.C. 2017). Likewise, Plaintiffs in this case can suffer no injury from below-grade work, as Plaintiffs have established no interest in views of Memorial Circle itself.  Any injunction accordingly should not restrict below-grade work.

It is also beyond the Court's authority to enjoin column construction that has been expressly authorized by Congress. The 1925 Act approved the construction of two 166-foot columns surmounted by statues on Columbia Island. *Supra*. The proposed arch comprises two such columns surmounted by an entablature and attic. *See* Dkt. 36-15. Any injunction thus should not prohibit Defendants from constructing such columns, even should the Court determine that NPS cannot connect those two columns to form an arch. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001) (explaining that courts have discretion to grant equitable remedies "unless a statute clearly provides otherwise").

Finally, the broad relief that Plaintiffs request would be inappropriate considering the harm to Defendants and the public interest that would result. Injunctive relief that "improperly intrudes" on the Executive Branch's ability to carry out policies is inherently harmful to the government. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025). "[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). Here, Plaintiffs not only ask the Court to enjoin authorized aspects of arch construction that pose no threat of aesthetic injury, but also ask that the Court halt pre-decisional planning within the Executive Branch. The Court should decline to engage in such unprecedented judicial encroachment. Indeed, granting Plaintiffs the relief they seek "would risk opening the door to future demands" by parties seeking to judicially restrain other executive decisionmaking processes. *Anatol Zukerman*, 64 F.4th at 1364.

40

Plaintiffs cite no decisions to grant this type of intrusive relief, and this Court should decline to issue the first.

### **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' summary judgment motion and enter judgment for Defendants.

DATE: June 17, 2026                    Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

 */s/ Michael S. Sawyer*
MICHAEL S. SAWYER, Senior Attorney
DANIEL LUECKE, Trial Attorney
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-353-5134
E-mail: michael.sawyer@usdoj.gov
          daniel.luecke@usdoj.gov

*Counsel for Defendants*