**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL LEMMON, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 26-cv-544 (TSC) |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Nicolas A. Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

July 1, 2026

## TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. This Court has jurisdiction. ........ 2

A. Defendants are not immune from accountability for their unlawful actions. ........ 2

1. Sovereign immunity does not bar declaratory and injunctive relief against ultra vires and unconstitutional executive action. ........ 2

2. The Administrative Procedure Act independently belies NPS's assertion of immunity. ........ 8

B. Plaintiffs have standing. ........ 9

II. The case is ripe. ........ 20

III. Plaintiffs properly present an ultra vires claim. ........ 23

A. Plaintiffs seek review of unlawful actions and plans, not idle desires. ........ 24

B. No statutory review scheme is available. ........ 24

C. Defendants' invocation of the 1925 Act does not bar Plaintiffs' ultra vires claim. ........ 28

IV. Plaintiffs are entitled to judgment on their claims. ........ 29

A. Plaintiffs are entitled to judgment on their ultra vires claim. ........ 30

1. Defendants are proceeding in violation of the Commemorative Works Act. ........ 31

2. Defendants are proceeding in violation of 40 U.S.C. § 8106. ........ 33

B. Plaintiffs are entitled to judgment on their constitutional claim. ........ 38

V. Plaintiffs are entitled to the declaratory and injunctive relief that they seek. ........ 41

CONCLUSION ........ 44

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Air Line Pilots Ass'n, International v. Chao*,
889 F.3d 785 (D.C. Cir. 2018) ........ 36

*Ali v. McCarthy*,
179 F. Supp. 3d 56 (D.D.C. 2016) ........ 29

*American Petroleum Institute v. Environmental Protection Agency*,
683 F.3d 382 (D.C. Cir. 2012) ........ 20, 21, 22

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ........ 24, 25

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ........ 4

*Ashwander v. Tennessee Valley Authority*,
297 U.S. 288 (1936) ........ 5

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ........ 14

*Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*,
502 U.S. 32 (1991) ........ 26

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ........ 36

*Burnett v. Al Baraka Investment & Development Corp.*,
292 F. Supp. 2d 9 (D.D.C. 2003) ........ 5

*Center for Biological Diversity v. United States Fish & Wildlife Service*,
146 F.4th 1144 (D.C. Cir. 2025) ........ 10

*Center for Democracy & Technology v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) ........ 17

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) ........ 35

*Chamber of Commerce of the United States v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........ 4, 25, 26, 28

*Chamber of Commerce of the United States v. Whiting*,
563 U.S. 582 (2011) ........ 34

*Cheney v. United States District Court for the District of Columbia*,
542 U.S. 367 (2004) ........ 20

*Chuidian v. Philippine National Bank*,
912 F.2d 1095 (9th Cir. 1990) ........ 5

*Clark v. Library of Congress*,
750 F.2d 89 (D.C. Cir. 1984) ........ 8

*Collins v. Yellen*,
594 U.S. 220 (2021) ... 38

*Dalton v. Specter*,
511 U.S. 462 (1994) ... 40

*Davis v. Federal Election Commission*,
554 U.S. 724 (2008) ... 5, 15

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ... 24

*Dixon v. DeJoy*,
2023 WL 5094876 (D.D.C. Aug. 9, 2023) ... 29

*Environmental Defense Fund v. Federal Energy Regulatory Commission*,
2 F.4th 953 (D.C. Cir. 2021) ... 11, 12, 13

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ... 10

*Fort Sill Apache Tribe v. National Indian Gaming Commission*,
103 F. Supp. 3d 113 (D.D.C. 2015) ... 9

*Fowler v. Guerin*,
899 F.3d 1112 (9th Cir. 2018) ... 20

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ... 39

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
561 U.S. 477 (2010) ... 38, 39

*Friends of Gateway v. Slater*,
257 F.3d 74 (2d Cir. 2001) ... 11

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) ... 11

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ... 26, 40

*Kingdom v. Trump*,
2025 WL 1568238 (D.D.C. June 3, 2025) ... 42

*LeBlanc v. United States Privacy & Civil Liberties Oversight Board*,
784 F. Supp. 3d 1 (D.D.C. 2025) ... 42

*Leedom v. Kyne*,
358 U.S. 184 (1958) ... 27

*Lewis v. Hunt*,
492 F.3d 565 (5th Cir. 2007) ... 5

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ... 18

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)........................................................................................21, 42

*Medellín v. Texas*,
552 U.S. 491 (2008)..........................................................................................................41

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ........................................................................................38, 39

*Morrison v. Olson*,
487 U.S. 654 (1988)..........................................................................................................38

*Murthy v. Missouri*,
603 U.S. 43 (2024)..............................................................................................................5

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012)..........................................................................................................41

*National Parks Conservation Ass'n v. Semonite*,
282 F. Supp. 3d 284 (D.D.C. 2017)...................................................................................19

*National Parks Conservation Ass'n v. Semonite*,
311 F. Supp. 3d 350 (D.D.C. 2018)...................................................................................19

*National Trust for Historic Preservation in the United States v. National Park Service*,
— F. Supp. 3d —, 2026 WL 877779 (D.D.C. Mar. 31, 2026)............ 19, 30, 34, 35, 36, 37, 38

*National Trust for Historic Preservation in the United States v. National Park Service*,
821 F. Supp. 3d 62 (D.D.C. 2026).....................................................................................27

*New Mexico v. Musk*,
— F. Supp. 3d —, 2026 WL 799635 (D.D.C. Mar. 23, 2026).................................................4

*New Mexico v. Musk*,
784 F. Supp. 3d 174 (D.D.C. 2025)...................................................................................30

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010).........................................................................................42

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025)........................................................................................................4, 28

*Orangeburg v. Federal Energy Regulatory Commission*,
862 F.3d 1071 (D.C. Cir. 2017).........................................................................................18

*Pharmaceutical Research & Manufacturers of America v. Department of Health & Human Services*,
656 F. Supp. 3d 137 (D.D.C. 2023)...................................................................................17

*Pollack v. Hogan*,
703 F.3d 117 (D.C. Cir. 2012).............................................................................................2

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992)............................................................................................................5

*Revitalizing Auto Communities Environmental Response Trust v. National Grid USA*,
10 F.4th 87 (2d Cir. 2021) ..................................................................................................20

*Schilling v. United States House of Representatives*,
102 F.4th 503 (D.C. Cir. 2024) .......... 2

*Sierra Club v. Morton*,
405 U.S. 727 (1972) .......... 11

*Steffel v. Thompson*,
415 U.S. 452 (1974) .......... 5

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 14, 20

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) .......... 39, 42

*Tolan v. Cotton*,
572 U.S. 650 (2014) .......... 18

*Trudeau v. Federal Trade Commission*,
456 F.3d 178 (D.C. Cir. 2006) .......... 8, 9

*Trump v. New York*,
592 U.S. 125 (2020) .......... 14, 15, 21

*Trump v. Slaughter*,
— S. Ct. —, 2026 WL 1855612 (U.S. June 29, 2026) .......... 9

*Turlock Irrigation District v. Federal Energy Regulatory Commission*,
786 F.3d 18 (D.C. Cir. 2015) .......... 16

*Union of Concerned Scientists v. United States Department of Energy*,
998 F.3d 926 (D.C. Cir. 2021) .......... 16

*United States Air Tour Ass'n v. Federal Aviation Administration*,
298 F.3d 997 (D.C. Cir. 2002) .......... 22

*United States Institute of Peace v. Jackson*,
783 F. Supp. 3d 316 (D.D.C. 2025) .......... 42

*United States v. Brown*,
490 F.2d 758 (D.C. Cir. 1973) .......... 6

*United States v. Oregon State Medical Society*,
343 U.S. 326 (1952) .......... 4

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
412 U.S. 669 (1973) .......... 11

*United States v. Texas*,
577 U.S. 1101 (2016) .......... 39

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 39, 41, 42

**Statutes**

5 U.S.C. § 702 .......... 8

16 U.S.C. § 451 (1912) .......... 37

40 U.S.C. § 8106 .......... 34, 35, 37

40 U.S.C. § 8902(b) .......... 31

Act of Aug. 24, 1912,
37 Stat. 417 .......... 35

Act of Feb. 24, 1925,
Pub. L. No. 68-463, 43 Stat. 974 .......... 1, 31, 32, 33

Act of Aug. 21, 2002,
Pub. L. No. 107-217, 116 Stat. 1062 .......... 35

Korean War Veterans Memorial Wall of Remembrance Act,
Pub. L. No. 114-230, 130 Stat. 947 (Oct. 7, 2016) .......... 34

**Other Authorities**

District of Columbia Appropriation Bill, 1927, Hearing Before the Subcommittee of the House Committee on Appropriations, 69th Cong. (1926) .......... 36

H.R. Rep. No. 107-479 (2002) .......... 35

National Capital Planning Commission, *Agenda and Submission Materials* .......... 7

National Park Service, *Lady Bird Johnson Park* .......... 37

National Park Service, *National Park System* .......... 37

National Park Service, *Triumphal Arch at Memorial Circle: Assessment of Effects Report* (June 2026) .......... 15, 17, 31

National Park Service, *Triumphal Arch at Memorial Circle: Environmental Assessment* (June 2026) .......... 7

National Park Service, *Triumphal Arch—Section 106 Assessment of Effect and Draft Programmatic Agreement* .......... 7

Report of the Arlington Memorial Bridge Commission (Apr. 21, 1924) .......... 33

**Rules**

Federal Rule of Civil Procedure 56(d) .......... 18

Federal Rule of Evidence 801(d)(2) .......... 6

**Constitutional Provisions**

U.S. Const. art. II, § 3 .......... 41

## INTRODUCTION

This case is straightforward: Two federal laws, the Commemorative Works Act and 40 U.S.C. § 8106, bar construction of monuments in Memorial Circle without prior congressional authorization. Defendants Donald J. Trump, Vince Haley, Executive Office of the President, and National Park Service (NPS), however, are moving expeditiously in implementing their plan to construct an enormous commemorative arch in Memorial Circle without such authorization.

Defendants do not dispute the legal requirements of the two statutes. And although they write lengthy responses to some of the facts set forth in the statement of undisputed material facts filed by Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gundersen, and Calder Loth, they do not actually *dispute* any of those facts. Instead, on the merits, Defendants argue primarily that a law passed in 1925, Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 (hereinafter, 1925 Act), that authorized the construction of Arlington Memorial Bridge over the subsequent ten years at a cost of up to $14.75 million allows them to build a monumental arch in Memorial Circle now—a century later, at a cost that dwarfs the sum set forth by statute, and although the final plans for the bridge included no arch (or anything else) on the land that now houses Memorial Circle. Defendants' reliance on the 1925 Act should be easily rejected.

Defendants also ask this Court not to reach the merits at all. They first contend that sovereign immunity bars Plaintiffs' claims that Defendants' construction of a monumental arch in Memorial Circle is ultra vires and unconstitutional because they have taken no "action" related to the project. Undisputed (and undisputable) facts, however, evidence that the project is barreling rapidly forward. Defendants next argue that Plaintiffs lack standing because construction of the arch is a remote and speculative possibility. Yet Defendants have, among other things, publicly committed themselves to the project, drawn up detailed plans, sought and received the approval of

the Commission of Fine Arts, conducted preliminary on-site testing, and placed their plans before the National Capital Planning Commission for consideration at its July 9 meeting. Finally, Defendants contend that the case is not ripe because there will be no harm in waiting until the shovels are closer to hitting the ground. Yet Defendants have argued the opposite in other cases, and they have been building first and answering lawsuits later.

Under the undisputed factual record, Defendants are engaged in ultra vires and unconstitutional action, and Plaintiffs are entitled to declaratory and injunctive relief. This Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion.

## ARGUMENT

### I. This Court has jurisdiction.

#### A. Defendants are not immune from accountability for their unlawful actions.

##### 1. Sovereign immunity does not bar declaratory and injunctive relief against ultra vires and unconstitutional executive action.

Under Supreme Court precedent, "'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (per curiam) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949)). Thus, the D.C. Circuit has expressly "reject[ed] the assertion of sovereign immunity if a plaintiff brings a suit for 'injunctive or declaratory relief' against a federal officer for an *ultra vires* act." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024) (brackets omitted; quoting *Pollack*, 703 F.3d at 120). After all, where federal officers act outside the scope of their lawful authority, "there is no sovereign immunity to waive—it never attached in the first place." *Id.* (quoting *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996)).

A straightforward application of these principles establishes that Plaintiffs' claims are not barred by sovereign immunity: In Count One of their complaint, Plaintiffs allege that Defendants are acting "ultra vires and in excess of legal authority." Compl., ECF 1, ¶ 52. In Count Two, Plaintiffs allege that President Trump is "violat[ing] the Take Care Clause" of the U.S. Constitution. *Id.* ¶ 64. As a remedy, Plaintiffs seek declaratory and injunctive relief. *Id.* at 18–19.

Defendants argue that they are immune from suit because the action that Plaintiffs challenge—construction of an arch in Memorial Circle—had not begun at the time that Plaintiffs filed suit. *See* Defs. Opp'n to Pls. Mot. for Summ. J. (Defs. Opp.), ECF 44-1, at 13. But Defendants offer no principled reason why, when the government announces a settled plan to undertake unlawful and injurious action, a plaintiff must wait until the injury has occurred to restrain the action—particularly here, where the government has taken concrete steps to implement its plan, and construction will be difficult to reverse once it has begun. Indeed, in other cases, Defendants have faulted the plaintiffs for failing promptly to seek relief after the government first manifested its plan to undertake an allegedly unlawful project. *See, e.g.*, Emergency Mot. for a Stay Pending Appeal at 2, *Nat'l Tr. for Historic Pres. in the U.S. v. NPS*, No. 26-5101 (D.C. Cir.) (filed Apr. 3, 2026) (arguing that the equities favor staying an injunction that halted construction of a White House ballroom because the injunction "could have been sought long ago, prior to the start of construction," given that "there was full knowledge, through large scale media attention and publicity, that the White House ballroom was planned to be built"); Defs. Memo. in Opp'n to Pls. Emergency Appl. for a TRO at 2, *Douglas v. NPS*, No. 1:26-cv-2016 (D.D.C.), ECF 11 (filed June 9, 2026) (characterizing plaintiffs' delay in challenging a government-sponsored event that had been "publicly announced almost a year [prior]" as "inexcusable").

Precedent stands firmly against Defendants' theory that a plaintiff may sue to enjoin announced ultra vires or unconstitutional official action only after the action is complete. After all, the injunctive relief that is typically sought in connection with an ultra vires claim by its nature targets future action. *See United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations."). The Supreme Court has accordingly "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, *or planning to violate*, federal law," and that this power extends as well to "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (emphasis added). And just months ago, this Court acknowledged its power to "prospectively enjoin" ultra vires or unconstitutional governmental actions. *New Mexico v. Musk*, — F. Supp. 3d —, 2026 WL 799635, at *13 (D.D.C. Mar. 23, 2026). So, for example, in *Reich*, the D.C. Circuit held that the plaintiffs had properly raised an ultra vires claim to challenge an Executive Order even though the Department of Labor had not yet promulgated the regulations that would carry the Order into effect. 74 F.3d at 1326–30.

The cases that Defendants cite are not to the contrary. It is true, as Defendants emphasize, that an ultra vires claim must target some form of executive action. *See* Defs. Opp. 12–13. But Defendants identify no authority contradicting—or even questioning—the principle that such a claim can target *forthcoming* action. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025), for example, addresses factual circumstances in which challenged governmental action had already taken place, without addressing (or having any need to address) the availability of prospective relief against unlawful action that the government planned to take in the future. *See id.* at 669 (addressing a challenge to a license that had already issued). Other cases cited by Defendants interpret statutory waivers of sovereign immunity that are not at issue here. *See Republic of*

*Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (interpreting the Foreign Sovereign Immunities Act); *Lewis v. Hunt*, 492 F.3d 565, 570–73 (5th Cir. 2007) (interpreting a statutory immunity waiver for certain quiet-title actions against the United States). Still other cases cited by Defendants stand for the uncontested proposition that an otherwise lawful official action does not become ultra vires simply because it derives from an improper motive. *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106–07 (9th Cir. 1990), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 14 (D.D.C. 2003). And the remaining cases address the constitutional requirements of Article III, not sovereign immunity. *See Davis v. FEC*, 554 U.S. 724, 734–35 (2008) (discussing the requirements for Article III standing); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325 (1936) (holding that requests for "an advisory decree upon a hypothetical state of facts" or "a decision of abstract questions as to the right[s]" of the parties "in possible contingencies" are non-justiciable).[1]

Finding no support in precedent, Defendants make the policy argument that, unless sovereign immunity bars suit until an unlawful governmental plan is far enough underway that it has inflicted injury, unrealized "dinner remarks" could form the basis for a suit against the government. Defs. Opp. 13. Certainly, the threat of future injury must be realistic and substantial to create a justiciable controversy. *See Murthy v. Missouri*, 603 U.S. 43, 69 (2024) ("To obtain forward-looking relief, [a] plaintiff[] must establish a substantial risk of future injury that is traceable to the … defendants and likely to be redressed by an injunction against them."). But a credible statement of governmental intent to take a certain action can establish a substantial threat that the action will occur, irrespective of whether the government has begun implementation. *Cf. Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (holding that a police officer's statement that an

[1] As explained in Parts I.B and II, *infra*, this case presents a justiciable Article III controversy.

individual would "likely be prosecuted" if he engaged in a certain course of action was sufficient to create "a live and acute controversy" over whether such a prosecution would be lawful).

Here, the undisputed evidence establishes that the White House has done far more than make passing "remarks" about plans to build the arch. Defs. Opp. 13. The President has repeatedly stated that he intends to construct a triumphal arch in Memorial Circle. *See, e.g.*, Sansone Decl. Exh. C, ECF 36-6, at 2 (President's statement that he prefers a "large" arch "by far"); Sansone Decl. Exh. G, ECF 36-10, at 2 (President's statement that "[w]e're building an arc[h], like the Arc de Tri[omphe] … by the Arlington Bridge, the Arlington cemetery, opposite the Lincoln Memorial"); Sansone Decl. Exh. M, ECF 36-16, at 3 (President's statement that the arch will "top" the Arc de Triomphe "by, I think, a lot"). He has posted renderings of the planned arch to his social media account. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 23, 2026, at 12:00 ET).[2] And the White House has confirmed to the American people in an official, public-facing fact sheet that the President has "announced plans for a new Independence Arch in Washington, D.C. to coincide with the [Nation's] 250th anniversary." Sansone Decl. Exh. D, ECF 36-7, at 2. What is more, these repeated statements reflect that, even before Plaintiffs filed suit, Defendants had taken action to consider the size, design, timing, and location of the arch.

Defendants contend that some—though not all—of the statements that Plaintiffs cite are "inadmissible hearsay." Defs. Counterstatement of Undisputed Material Facts (Defs. Counterst.), ECF 44-2, ¶¶ 4–5, 14. They disregard, though, that statements made by or on behalf of an opposing party are not hearsay, *see* Fed. R. Evid. 801(d)(2), and that even hearsay is admissible "to show a future intent of the declarant to perform an act if the occurrence of that act is at issue." *United States v. Brown*, 490 F.2d 758, 762 (D.C. Cir. 1973) (citing Fed. R. Evid. 803(3)). In any event,

[2] https://truthsocial.com/@realDonaldTrump/posts/115945478685595236.

Defendants have not denied that the cited statements occurred or that the statements accurately reflect Defendants' plans, Defs. Counterst. ¶¶ 4–5, 14, and Defendants' own declarant admits that they occurred. *See* Lands Decl., ECF 12-1, ¶ 5 ("I am aware … that the President has made several statements to the press regarding a proposal to construct a triumphal arch in Memorial Circle.").

Moreover, the truth of Defendants' statements that they intend to build a massive arch in Memorial Circle—and to do so without congressional authorization—is confirmed by their post-filing actions. Between the time Plaintiffs filed suit and moved for summary judgment, Defendants have had testing and surveying work performed on Memorial Circle in connection with the arch project, Defs. Counterst. ¶ 10, requested "aeronautical review" of a 250-foot structure in Memorial Circle, *id.* ¶ 11, submitted concept plans for the arch to the National Capital Planning Commission, *id.* ¶ 12, and received final design approval for the arch from the Commission of Fine Arts, *id.* ¶ 9. And even after Plaintiffs filed their summary judgment motion just over a month ago, Defendants have continued to take action to implement their project: On June 5, NPS initiated an assessment of the arch's effects on the surrounding historic properties, allowing only a ten-day window for public comment. *See* NPS, *Triumphal Arch—Section 106 Assessment of Effect and Draft Programmatic Agreement*.[3] NPS also completed a 125-page environmental assessment of the arch. NPS, *Triumphal Arch at Memorial Circle: Environmental Assessment* (June 2026).[4] And NPS has put the arch plan forward for final approval by the National Capital Planning Commission at the Commission's July 9 meeting. *See* Nat'l Capital Planning Comm'n, *Agenda and Submission Materials*.[5] All the while, Congress has done nothing to authorize any of these actions.

---

[3] https://parkplanning.nps.gov/document.cfm?parkID=186&projectID=136973&documentID=151576.

[4] https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_Environmental_Assessment_Jul2026.pdf.

[5] https://www.ncpc.gov/review/agenda/.

**2. The Administrative Procedure Act independently belies NPS's assertion of immunity.**

An additional and independent barrier exists to NPS's assertion of sovereign immunity against Plaintiffs' ultra vires claim: Congress has expressly waived it. The Administrative Procedure Act (APA) provides that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. Although Plaintiffs do not assert an APA claim against NPS, the waiver of immunity "is not limited to APA cases"; it covers "not only … APA cause[s] of action, but … nonstatutory and [constitutional] actions as well." *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006); *see Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984) (observing that section 702 "eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity").

Defendants do not dispute that NPS is an "agency" within the meaning of section 702, and they do not dispute that Plaintiffs seek "relief other than money damages." 5 U.S.C. § 702. Instead, Defendants argue that Plaintiffs have not produced evidence that NPS had engaged in any relevant action or inaction at the time that Plaintiffs filed suit. Defs. Opp. 11–12.

Defendants, though, admit that NPS administers Memorial Circle, Defs. Counterst. ¶ 2, and that NPS knew of the President's plan to construct an arch there. Lands Decl. ¶ 5. Rather than demanding congressional authorization as a prerequisite to initiating the regulatory approval process, NPS committed to undertaking that process. *See id.* ¶ 7; *see also id.* ¶ 6 (acknowledging NPS's "preliminary discussions with other federal agencies" about the arch's construction). Although NPS suggests that it could not have known whether congressional authorization would

be required absent a "final proposal" from the President, *id.* ¶ 7, this argument disregards the White House's consistent and repeated descriptions of the President's plans, often accompanied by detailed visual renderings. *See, e.g.*, Sansone Decl. Exh. C at 1, 4; Sansone Decl. Exh. G at 1; Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 23, 2026, at 12:00 ET), *supra* n.2. Whatever the specifics of the President's "final proposal," it was clear at the time that Plaintiffs filed suit that he had decided to build a massive arch in Memorial Circle, and that NPS was following through. *Cf. Trump v. Slaughter*, — S. Ct. —, 2026 WL 1855612, at *8 (U.S. June 29, 2026) (explaining that "the Government's ministers [are] required to exercise their functions in subordination to the Executive" (citation and internal quotation marks omitted)). NPS's acquiescence—which Plaintiffs contend is unlawful—falls within section 702's capacious waiver of sovereign immunity. *See Trudeau*, 456 F.3d at 186 (explaining that section 702 was intended to "elimina[te] … the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity" (emphasis in original; quoting *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981))); *see also Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 118–19 (D.D.C. 2015) (rejecting the argument that a "claim of 'failure to act' … do[es] not qualify for a Section 702 waiver because there has been no 'final agency action'" because the argument "conflates the APA's waiver of sovereign immunity" for non-statutory claims with the "final agency action" required for an APA claim).

**B. Plaintiffs have standing.**

In moving for summary judgment, Plaintiffs explained how the uncontroverted evidence establishes that, absent relief from this Court, each of them faces a substantial risk of concrete and particularized aesthetic injury. *See* Pls. Memo. in Supp. of Pls. Mot. for Summ. J. (Pls. Memo.), ECF 36-1, at 9–12. Specifically, Plaintiffs explained that each of their sworn declarations

establishes that he "regularly visits the landmarks around Memorial Circle," that he "derives profound aesthetic and symbolic enjoyment from the existing lines of sight between these landmarks," and that "construction of an arch in Memorial Circle will irreparably degrade his aesthetic experience of the area." *Id.* at 10 (citing Lemmon Decl., ECF 7-2, ¶¶ 6–9; Byrnes Decl., ECF 7-3, ¶¶ 8–13; Gundersen Decl., ECF 7-4, ¶¶ 6–9; Loth Decl., ECF 7-5, ¶¶ 5–10). Defendants' arguments that this evidence fails to establish standing, *see* Defs. Opp. 14–21, are unavailing.

**1.** Defendants do not deny that the Supreme Court and D.C. Circuit recognize aesthetic injury as a cognizable harm that gives rise to Article III standing. *See* Pls. Memo. at 10–11 (citing cases). Instead, Defendants misrepresent the nature of Plaintiffs' injury, contending that Plaintiffs have raised no more than a "general legal, moral, ideological, or policy objection" to the construction of the arch. Defs. Opp. 19 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024) (syllabus)). Plaintiffs, though, do not claim injury "simply because [they] believe[] that the government is acting illegally" or improperly. *All. for Hippocratic Med.*, 602 U.S. at 381. To the contrary, they have shown that the arch will "affect '[them] in a personal and individual way'" by disrupting the aesthetic integrity of an area that each of them visits and plans to keep visiting. *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).

Defendants fail to distinguish Plaintiffs' injuries from the harms that precedential cases have recognized as sufficient to establish standing. Although Defendants point out that *Lujan* and *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 146 F.4th 1144 (D.C. Cir. 2025), discussed interference with "experiencing rare natural phenomena," Defs. Opp. 21, Defendants do not explain why that injury is any more concrete than the interference that Plaintiffs face with experiencing a rare—indeed, iconically unique—manmade landscape. *See Ctr. for Biological Diversity*, 146 F.4th at 1158 (describing a diminished ability to "see and enjoy" a particular insect

to further a plaintiff's "personal hobby" as an Article III injury). And although Defendants note that the plaintiffs in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), had shown that their enjoyment of a particular natural recreation area was degraded by "harmful … discharged pollutants," Defs. Opp. 20 (quoting *Friends of the Earth*, 528 U.S. at 182), Defendants overlook that "[t]he relevant showing for purposes of Article III standing[] … is not injury to the environment but injury to the plaintiff." *Friends of the Earth*, 528 U.S. at 181. As here, the relevant harm in *Friends of the Earth* was that the "'aesthetic and recreational values of the [affected] area [would] be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

Meanwhile, Defendants' only answer to *Friends of Gateway v. Slater*, 257 F.3d 74 (2d Cir. 2001), is that it is an out-of-circuit precedent. *See* Defs. Opp. 21. But *Friends of Gateway*, in acknowledging the standing of plaintiffs who "frequently and regularly use[d] areas" of a park that would be "affected" by construction of an "eyesore," 257 F.3d at 78, relied on established Supreme Court precedent. *See United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 685 (1973) (holding that disturbance to the use of "forests, streams, mountains, and other resources" for "sightseeing," among other things, is a cognizable injury); *Sierra Club*, 405 U.S. at 734 (refusing to "question" that impact of a project that would "adversely affect the scenery[] … and historic objects … of [a] park and would impair the enjoyment of the park for future generations" can "amount to an 'injury in fact' sufficient to lay the basis for standing"); *see also Friends of Gateway*, 257 F.3d at 78 (citing *SCRAP* and *Sierra Club*).

The case on which Defendants principally rely, *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), does not resemble this one. In *Environmental Defense Fund*, the D.C. Circuit rejected the argument that "a person who incidentally views something unpleasant has

suffered an injury-in-fact for purposes of standing." 2 F.4th at 970. The "only aesthetic injury" asserted by the petitioner in that case, though, was that "she must look at an 'eyesore' several times per week while driving past" a metering station that had been constructed half a mile from her residence. *Id.*; *see id.* at 968. Critically, the petitioner "never indicate[d] how she derived aesthetic value from the land as it had existed before the construction" and "never allege[d] that she used and enjoyed the land" affected by the construction or "that she intended to use the land in the future." *Id.* at 969; *see id.* at 970 (emphasizing that the petitioner had not "explained why she ha[d] any particularized connection to the land on which the metering station now sits").[6]

Here, in contrast, Plaintiffs do not assert an interest in merely "*avoiding* a structure they dislike." Defs. Opp. 21. Rather, they assert an interest in "us[ing] and enjoy[ing]" the area around Memorial Circle "as it … exist[s] before the [arch's] construction." *Env't Def. Fund*, 2 F.4th at 969. Although Defendants attempt to minimize the gravity of Plaintiffs' interest by referring to the affected landscape as nothing more than "an area that [Plaintiffs] drive[] past," Defs. Opp. 20, Plaintiffs' declarations belie this mischaracterization. *See, e.g.*, Lemmon Decl. ¶ 6 (explaining that the visual link between Arlington National Cemetery and the Lincoln Memorial "holds deep personal significance to me, embodying the reunification of our country after a bloody civil war and the commitment to bind up its wounds and to honor those who died in its defense"); Byrnes Decl. ¶ 9 (explaining that the "beautiful and uninterrupted view of the Lincoln Memorial" from the cemetery "symbolizes the restoration of the Union after the bloody Civil War, in which several

[6] Defendants point out that the petitioner in *Environmental Defense Fund* did "use[] and enjoy[]" a local park through which a pipeline that the petitioner challenged in addition to the metering station had been built. Defs. Opp. 20. The court, however, did not deny that disruption to the petitioner's enjoyment of the park was a cognizable injury. Rather, it held that the petitioner could not show that the prospective relief that she sought would redress this injury because the disruption "ended when the [pipeline's] construction was completed," and the petitioner had not shown that the underground pipeline had "any lasting impact" on the park. *Env't Def. Fund*, 2 F.4th at 969.

of my ancestors fought"); Gundersen Decl. ¶ 6 (explaining that "the inspiring view of the Lincoln Memorial" from the cemetery "reminds me of the ideals for which I fought and fills me with pride for my many years of service"); Loth Decl. ¶ 6 (explaining that the "axial vista [that] visually connects the Lincoln Memorial to Arlington House[] … creates a symbolic link between the North and the South" that "I revere" as "a native Virginian and descendant of Confederate veterans").

Defendants contend that Plaintiffs' undisputed use of and deep personal connection to the areas *around* Memorial Circle are irrelevant because Plaintiffs have not established any use of the "small circle of grass" that comprises Memorial Circle itself. Defs. Opp. 20. The 250-foot arch, however, will obstruct a uniquely symbolic and personally meaningful view of profound national significance—one in which Plaintiffs have shown a concrete, particularized interest. *See* Lemmon Decl. ¶ 9 (asserting injury from "the disruption that the arch will cause to the unobstructed sight line" from Arlington National Cemetery); Byrnes Decl. ¶ 13 (explaining that "[t]he arch will … sadly diminish my enjoyment of the views from Arlington National Cemetery"); Gundersen Decl. ¶ 8 (explaining that the arch "will profoundly diminish my enjoyment of the view from Arlington National Cemetery"); Loth Decl. ¶ 8 (asserting injury from the fact that the arch "will dominate and potentially obscure the views to and from Arlington House and the bucolic slopes of Arlington National Cemetery, the final resting place of thousands and thousands of our veterans"). Defendants cannot credibly analogize the aesthetic harm of a monumental arch looming over what Plaintiff Loth has described as "the most hallowed site in America," Loth Decl. ¶ 5, to the aesthetic harm asserted in *Environmental Defense Fund*—"incidental viewership" of a metering station that the petitioner could not see from her property and that did not affect land with which she held a "particularized connection." 2 F.4th at 970.

**2.** Misstating Plaintiffs' legal burden, Defendants maintain that Plaintiffs have failed to "show that injurious construction is—not probably—but '*certainly* impending.'" Defs. Opp. 19 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). As Plaintiffs have explained, *see* Pls. Memo. 10, future injury can support standing "if the threatened injury is certainly impending, *or* there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (emphasis added; citation and internal quotation marks omitted); *see Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) ("Since [*Susan B. Anthony*] *List*, we have frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury."). Regardless, Plaintiffs have carried their burden under any standard.

At the time Plaintiffs filed suit, the White House had repeatedly announced plans to build a monumental arch in Memorial Circle and shared visual depictions of the arch with the public. *See supra* p. 6. At minimum, Plaintiffs faced a substantial risk that Defendants would do precisely what the President had told the American people they were planning to do. And although Defendants fault Plaintiffs for relying on "post-filing evidence," Defs. Opp. 17, that evidence confirms that the risk remains substantial—and increasingly so. *See Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) ("A foundational principle of Article III is that 'an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.'" (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013))). Far from disavowing the President's plans, Defendants have moved rapidly to implement them. *See supra* p. 7.

Thus, far from resting on "speculation" about "how the Executive Branch might eventually implement [a] general statement of policy," *Trump*, 592 U.S. at 131, Plaintiffs' future injury rests on a specific, concrete project that was publicly unveiled by the President last October and that has, in the months since, moved steadily closer to execution. Defendants have put forward no

evidence that calls into question Plaintiffs' showing that "the Executive Branch's decisionmaking process" as to whether a massive arch should be built in Memorial Circle has already "run its course." *Id.* at 134. In these circumstances, Plaintiffs were not obliged to wait until the arch was in place prior to filing suit. *See Davis*, 554 U.S. at 734 (explaining that "the injury required for standing need not be actualized" before "[a] party facing prospective injury" may sue).

**3.** Given Defendants' concrete actions to implement the President's plan to build an arch in Memorial Circle, this case presents a far greater certainty of future injury than the cases that Defendants cite. In *Trump v. New York*, for example, the Supreme Court held that a group of plaintiffs lacked standing to challenge a presidential memorandum directing the Secretary of Commerce to prepare a census report that would enable the President, "to the extent practicable," to exclude undocumented immigrants from the calculations used to determine the number of seats apportioned to each State in the House of Representatives. 592 U.S. at 129–30 (citation omitted). In concluding that any injury to the plaintiffs was speculative, the Court emphasized uncertainty over the extent to which the information sought existed and could be feasibly compiled, how any information that could be produced would affect apportionment calculations, and whether those calculations would result in an overall apportionment of House seats that would adversely affect the plaintiffs. *Id.* at 132–33.

Here, in contrast, Defendants have identified no uncertainties over whether their plan can be executed. Indeed, they have devoted substantial resources to illustrating exactly how they plan to carry it out. *See, e.g.*, Sansone Decl. Exh. I, ECF 36-12 (design submitted to the Commission of Fine Arts); Sansone Decl. Exh. L, ECF 36-15 (design submitted to the National Capital Planning Commission); *see also* NPS, *Triumphal Arch at Memorial Circle: Assessment of Effects Report* (June 2026) (hereinafter, NPS, *Assessment of Effects Report*) (report prepared pursuant to the

National Historic Preservation Act of 1966 to provide further specifics of the project and its impact on surrounding historic properties).[7] And once the plan is executed and the arch is built, there is no uncertainty over whether Plaintiffs' aesthetic harm will materialize.

Defendants also rely on *Turlock Irrigation District v. FERC*, 786 F.3d 18 (D.C. Cir. 2015), where conservation groups sought review of a Federal Energy Regulatory Commission (FERC) order finding that a particular hydroelectric project was subject to FERC's licensing jurisdiction. *Id.* at 22. Although the groups argued that FERC's failure to include a neighboring project in the licensing proceeding would "frustrate[] the creation of a coordinated fish passage" between the two projects, *id.* at 23, however, the groups had presented no evidence "that FERC [could not] coordinate fish passage between [the projects] despite separate licensing," and FERC had "suggested at oral argument that it intended to do so." *Id.* at 25. By contrast, Defendants here have consistently manifested their plan to take precisely the action that will injure Plaintiffs—and have reinforced that the harm will occur by taking a slew of concrete actions to implement that plan.

Similarly, in *Union of Concerned Scientists v. U.S. Department of Energy*, 998 F.3d 926 (D.C. Cir. 2021), also cited by Defendants, *see* Defs. Opp. 17, a nonprofit organization challenged an agency rule that allegedly broadened the range of information that the agency could designate as "critical electric infrastructure information" that is exempt from disclosure under the Freedom of Information Act. 998 F.3d at 927–28. The organization, however, had not offered a basis for concluding that the agency was likely to exercise its discretion to place this designation on any particular information that the organization was likely to seek. *Id.* at 930. Again, Defendants here have repeatedly specified exactly what action they are preparing to take.

---

[7] Available for download at https://parkplanning.nps.gov/document.cfm?parkID=186&projectID=136973&documentID=151576.

Defendants' reliance on *Pharmaceutical Research & Manufacturers of America v. HHS*, 656 F. Supp. 3d 137 (D.D.C. 2023), is likewise unavailing. There, organizations challenged an agency rule authorizing States and American Indian tribes to submit proposals for the importation of Canadian drugs, *see id.* at 145–48, but had not presented evidence that any proposal—let alone any particular proposal—was likely to receive approval. *Id.* at 151–52; *see also Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020) (holding that plaintiff lacked standing to challenge an Executive Order that directed agencies to consider promulgating regulations but concededly left them with discretion as to whether and how to regulate). In this case, once again, the White House has repeatedly announced its plan to undertake a specific, concrete project that will injure Plaintiffs, and NPS has been rapidly implementing the plan without first securing the congressional authorization that Plaintiffs contend it requires.

**4.** Defendants also contend that Plaintiffs have failed to demonstrate that their aesthetic harm is imminent, faulting Plaintiffs for failing to pinpoint "when arch construction will begin." Defs. Opp. 18. But although Defendants have not disclosed their timeline for the arch, they have made clear that construction should happen as soon as possible. *See, e.g.*, Defs. Counterst. ¶ 18 (admitting to White House press secretary's statement that construction will ideally start this year); NPS, *Assessment of Effects Report* at 11 (stating that, once construction begins, crews will work "20 hours per day, year-round" to build the arch). And in the four months since Plaintiffs filed suit, Defendants have, among other things, sought and secured final approval from the Commission of Fine Arts, Defs. Counterst. ¶ 9, conducted on-site geophysical testing in anticipation of construction, *see id.* ¶ 10, and put the arch forward for final approval at a National Capital Planning Commission meeting scheduled to occur on July 9, *see supra* p. 7. Irrespective of exactly when construction ultimately begins, "[s]tanding depends on the probability of harm, not its temporal

proximity." *Orangeburg v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017) (alteration in original; quoting *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006)). And as Defendants' actions reflect, there is no uncertainty over their commitment to building an arch.

Defendants similarly fault Plaintiffs for failing to specify precisely when they will next visit the area around Memorial Circle and thereby experience aesthetic harm from the arch. Defs. Opp. 18. Each Plaintiff, however, has submitted a sworn declaration attesting that he has regularly visited the area in the past and intends to continue visiting in the future. *See* Lemmon Decl. ¶¶ 6–7 (stating that, "[f]or decades, I have gone to Arlington National Cemetery to visit the gravesites of my comrades" and that "I intend to continue visiting"); Byrnes Decl. ¶ 8 ("I regularly take visiting foreign friends to Arlington National Cemetery, and I intend to continue doing so."); Gundersen Decl. ¶¶ 6–7 (stating that, "once or twice a year, I travel to Washington, DC, to visit Arlington National Cemetery and honor the service of my many comrades-in-arms who are buried there," and that "I intend to continue visiting Washington, DC, on an annual or semi-annual basis"); Loth Decl. ¶¶ 5, 7 (stating that "I have visited Arlington National Cemetery on several occasions to … [v]iew[] the carefully controlled skyline of the capital from the cemetery" and that "I intend to continue visiting Washington, DC, and viewing and photographing the reciprocal views between the Lincoln Memorial and Arlington National Cemetery"). Far from expressing a vague desire to return "some day" to a location that they may once have visited, *see Lujan*, 504 U.S. at 564, Plaintiffs have each stated an intent to continue engaging in a presently recurring practice. Defendants have not identified any evidence that calls this intent into question.[8]

[8] Notably, Defendants have not attempted to "show[] by affidavit or declaration that, for specified reasons, [they] cannot present facts essential to justify [their] opposition" to Plaintiffs' summary judgment motion. Fed. R. Civ. P. 56(d). And on Defendants' cross-motion, all evidence must be viewed in the light most favorable to Plaintiffs. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

Finally, Defendants rely on *National Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284 (D.D.C. 2017), to argue that Plaintiffs would not suffer injury from Defendants "beginning construction." Defs. Opp. 18. Defendants, though, do not explain what reason they would have to *start* building an arch except eventually to *finish* building an arch. In any event, *National Parks* has no relevance here. There, the court denied a preliminary injunction to plaintiffs challenging a construction project, where foundation work was imminent but above-ground work was not scheduled to begin for six months. *See* 282 F. Supp. 3d at 288. That the *National Parks* plaintiffs failed to demonstrate that they would "suffer irreparable harm before a decision on the merits c[ould] be reached" for purposes of securing a preliminary injunction, *id.* at 288–89, however, does not suggest that their future injury was insufficient for Article III standing purposes. In fact, *National Parks* was ultimately resolved on the merits, not dismissed on jurisdictional grounds. *See Nat'l Parks Conserv. Ass'n v. Semonite*, 311 F. Supp. 3d 350, 380–81 (D.D.C. 2018), *rev'd on other grounds*, 916 F.3d 1075, 1077 (D.C. Cir. 2019).

Even as to a preliminary injunction, moreover, *National Parks* is a "cautionary tale." *Nat'l Trust for Historic Pres. in the U.S. v. NPS*, — F. Supp. 3d —, 2026 WL 877779, at *15 n.19 (D.D.C. Mar. 31, 2026), *appeal pending*, D.C. Cir. Nos. 26-5123, 26-5134. Because construction was allowed to proceed while the case was pending, by the time the plaintiffs secured a victory on the merits, the construction project was complete and "too costly to remove." *Id.* As in *National Parks*, Plaintiffs here have standing to challenge a construction project that will occur but for judicial intervention. And as in *National Parks*, waiting to act until construction is already underway would likely result in the challenged structure becoming a fait accompli.

## II. The case is ripe.

Because Plaintiffs are facing a future injury that is sufficiently imminent to confer standing, the case presents a ripe controversy that falls within this Court's subject-matter jurisdiction. *See Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (explaining that constitutional ripeness "is subsumed into the Article III requirement of standing"). Defendants nonetheless ask this Court to dismiss the case as prudentially unripe, irrespective of whether it presents a justiciable Article III controversy. Defs. Opp. 21–24. This Court should decline Defendants' invitation to take the unusual step of refusing to resolve a case that is properly before it.

As Defendants acknowledge, *see id.* at 22, the Supreme Court has cautioned that the prudential ripeness doctrine "is in some tension with … the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List*, 573 U.S. at 167 (internal quotation marks omitted; quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). Although the Court has not abrogated the doctrine, *see id.*, its application is "disfavored," *Fowler v. Guerin*, 899 F.3d 1112, 1116 n.1 (9th Cir. 2018). *See also Revitalizing Auto Cmtys. Env't Response Trust v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021) (treating "the Supreme Court's cautious approach to prudential ripeness" as "a reminder that the doctrine constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction").

Citing *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), Defendants suggest that separation-of-powers concerns somehow give the doctrine special force in cases involving the Executive Branch. Defs. Opp. 22. But *Cheney* did not address ripeness (prudential or otherwise). The other case on which Defendants principally rely, *Trump v. New York*, applied ordinary Article III standards and concluded that jurisdiction was lacking; the Court

did not refuse on prudential grounds to decide a case that fell within its jurisdiction. *See* 592 U.S. at 131. If anything, separation-of-powers principles militate against the judiciary's abdication of its constitutional responsibility to resolve Article III cases and controversies. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (stating, in a case against the Executive Branch, that "[i]t is emphatically the province *and duty* of the judicial department to say what the law is" (emphasis added)).

Under D.C. Circuit precedent, a court's inquiry into whether to apply the disfavored prudential ripeness doctrine "focus[es] on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). As to the first consideration, "the fitness of an issue 'depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the [defendant's] action is sufficiently final.'" *Id.* (quoting *Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)). Where that consideration favors deferring review, a court assesses the second consideration and asks whether the risk of "immediate and significant" hardship to the parties nonetheless supports immediate resolution. *Id.* at 389 (quoting *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 427 (D.C. Cir. 2007)). Here, both considerations favor Plaintiffs.

First, Plaintiffs' claims ask this Court to resolve purely legal issues: whether Defendants may lawfully construct an arch in Memorial Circle without congressional authorization, and, if not, whether Congress has provided authorization. Defendants contend that awaiting further action from NPS will provide more specifics about "construction authorization, arch design, [and] funding sources," Defs. Opp. 22, but none of these specifics will meaningfully inform the judicial

inquiry. If an arch is built in Memorial Circle—as Defendants' actions have shown that it will be, absent judicial intervention—the details of its design are immaterial to whether the project is legal.

Despite Defendants' contrary argument, *id.* at 23, further information about how the arch will be funded is also immaterial. It is true, as Defendants note, that Plaintiffs have pointed to "funding limits" in the 1925 Act, on which Defendants are relying as a source of authority for arch construction. *Id.* Defendants, however, misunderstand the role that those limits play in Plaintiffs' argument. Plaintiffs contend that the Act's statutory funding cap reflects that the Act—which in 1925 authorized the construction of Arlington Memorial Bridge—contemplated a one-time project that is limited in time and scope and that does not include Defendants' arch. *See infra* pp. 32–33. Plaintiffs have not argued that Defendants' plans for funding the arch (whatever they may be) violate the Act, precisely because the Act does not apply. Knowing those plans, then, will not aid the Court in resolving the purely legal questions that this case presents.

Second, because the legal issues in this case are presently fit for judicial resolution, this Court need not proceed to consider the second factor of the prudential ripeness inquiry: whether the parties will suffer hardship if the Court declines on prudential grounds to resolve Plaintiffs' claims. *Am. Petroleum Inst.*, 683 F.3d at 389. Nonetheless, the hardship consideration also favors Plaintiffs, who face a substantial risk of imminent injury. *See supra* Part I.B.; *cf. U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1014 (D.C. Cir. 2002) (finding that withholding consideration would work hardship where delay could compromise the ability of members of the public to "experience [the] natural serenity" of a park).

Minimizing the hardship that delay would create, Defendants argue that, if this case is dismissed, Plaintiffs can wait until "NPS issues a final agency action authorizing arch construction" and then refile their lawsuit before their aesthetic injury is consummated. Defs. Opp.

23. But the threat of immediate, unannounced construction following NPS approval would likely force the parties to brief—and this Court to resolve—the legal issues presented by this case in the context of an emergency motion for preliminary relief in the refiled case. Given that the legal issues presented by Plaintiffs' claims are fully capable of resolution in the ordinary course of *this* lawsuit—where a consent order safeguards against unannounced construction, *see* ECF 26—Defendants present no compelling reason why the Court should invite unnecessary future exigency by dismissing the present case on the disfavored basis of prudential ripeness.

### III. Plaintiffs properly present an ultra vires claim.

As Plaintiffs explained in connection with their motion for summary judgment, Defendants have been rapidly moving forward to build a monumental arch in Memorial Circle, "touting the arch to the American people as a feature of the [Nation's 250th] anniversary festivities, securing design approval from the Commission of Fine Arts, presenting the arch to the National Capital Planning Commission, requesting an evaluation from the Federal Aviation Administration, and performing on-site testing and geophysical survey work to prepare for the arch's construction." Pls. Memo. 1. Since Plaintiffs filed their motion just over a month ago, Defendants have continued to implement the project by conducting additional agency reviews and submitting the arch for final approval by the National Capital Planning Commission. *See supra* p. 7.

But despite actively pushing their project to the finish line, Defendants lack any legal authority to build an arch (or anything else) in Memorial Circle. Defendants do not claim that they have constitutional authority to build the arch. And, as Plaintiffs have explained, *see* Pls. Memo. 13–15, the only statutory authority that Defendants have invoked—the 1925 Act—does not authorize the arch. Far from representing "a breathtaking expansion of *ultra vires* review," Defs. Opp. 24, judicial review of Defendants' "absolutely uncontrolled and arbitrary action" of

implementing a grandiose project that is "unauthorized by any law," *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902), falls in the heartland of the ultra vires doctrine. Defendants raise several threshold arguments against the doctrine's application, but all of them fail.

**A. Plaintiffs seek review of unlawful actions and plans, not idle desires.**

Defendants have not denied that they are in the process of taking concrete steps to construct an enormous monumental arch in Memorial Circle. *See supra* p. 7. Yet asking this Court to ignore the facts, Defendants contend that Plaintiffs lack a cause of action because they are challenging "Presidential words or social media posts," Defs. Opp. 24, "unimplemented executive intentions" or "desire[s]," *id.* at 25, and "preliminary discussions," *id.* at 26. This Court, though, is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). Plaintiffs challenge the construction of an unauthorized arch in Memorial Circle, and Defendants' undisputed statements that they plan to take this action, together with the concrete actions that Defendants have taken (and continue to take) to implement their plan, present undeniable—and undenied—evidence that, absent judicial intervention, Defendants will build the arch without awaiting Congress's authorization. Thus, although Defendants fault Plaintiffs for "assum[ing] that [NPS] will carry out executive intent," Defs. Opp. 25, no assumptions are needed. NPS *is* carrying out executive intent by taking concrete steps to implement the President's project, despite the project's lack of congressional authorization.

**B. No statutory review scheme is available.**

Defendants next argue that Plaintiffs cannot raise an ultra vires claim because Plaintiffs might someday have an APA claim against NPS. Defs. Opp. 26–28. Defendants agree, though, that Plaintiffs have no present cause of action under the APA. In the meantime, Defendants are

taking steps to implement a project that Congress has not authorized. Requiring Plaintiffs to sit on their hands in the hope that Defendants might eventually take further ultra vires action that gives rise to a statutory cause of action would leave the Executive Branch free to pursue "absolutely uncontrolled and arbitrary action" that is "unauthorized by any law," *McAnnulty*, 187 U.S. at 110, as long as its unlawful activity might ultimately come under the aegis of a statutory review scheme.

The law does not demand such a result, as D.C. Circuit precedent makes clear. In *Chamber of Commerce v. Reich*, the plaintiffs asserted a non-statutory claim challenging an Executive Order barring the federal government from contracting with certain employers. *Reich*, 74 F.3d at 1324. While the lawsuit was pending, the Secretary of Labor promulgated regulations implementing the Order. *Id.* at 1324–25. The plaintiffs, though, "could not possibly have relied on the APA for a cause of action prior to the Secretary's issuance of regulations implementing the Executive Order because[ ] … the President is not an 'agency' under [the APA] and [the plaintiffs] sued before the Secretary issued his regulations." *Id.* at 1326. Therefore, although the D.C. Circuit recognized that "an available statutory cause of action" under the APA had materialized after the plaintiffs filed suit, *id*. at 1327, it held that the plaintiffs could maintain their ultra vires claim. *Id.* at 1327–28. So too here. Plaintiffs "could not possibly … rel[y] on the APA for a cause of action" at this time, *id.* at 1326, and an ultra vires claim is an appropriate vehicle for the parties' dispute.

Attempting to distinguish *Reich*, Defendants point out, Defs. Opp. 27, that the government there had argued that "a cause of action under the APA [was] not available" to challenge the Secretary's regulations because they implemented an Executive Order that, in the government's eyes, was unreviewable. *Reich*, 74 F.3d at 1326–27. The D.C. Circuit, though, found that argument "unsupported," explaining that the fact that "the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA."

*Id.* at 1327. In addition, Defendants' argument that "an APA claim" against specific implementing regulations "would have provided limited relief to the *Reich* plaintiffs," Defs. Opp. 28, fails to distinguish that case from this one. In *Reich*, "any relief short of a declaration that the Executive Order [was] illegal would [have been] inadequate," *Reich*, 74 F.3d at 1326, because *no* agency regulation would have comported with the plaintiffs' view of the law. Similarly here, Plaintiffs seek relief against *any* implementation of the President's unlawful arch project.

The cases on which Defendants rely are inapposite. In *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32 (1991), a company sought to enjoin administrative proceedings brought by the Board of Governors of the Federal Reserve System charging the company with certain regulatory violations. *See id.* at 34. Critically, however, the Financial Institutions Supervisory Act of 1966 "authorize[d] the Board to institute" such proceedings, provided a "tripartite regime of judicial review," *id.* at 38, and forbid courts from enjoining ongoing Board proceedings, *id.* at 44. Thus, although the company challenged the validity of the regulation that the Board was enforcing against it, the Court held that the detailed statutory scheme that governed Board proceedings not only ensured a "meaningful and adequate opportunity for judicial review" once the proceedings had concluded, *id.* at 43, but expressly foreclosed judicial relief in the meantime, *see id.* at 44. Similarly, in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), which Defendants briefly mention, Defs. Opp. 27, the D.C. Circuit considered an ultra vires claim seeking to restrain executive action that, in the court's view, was being undertaken pursuant to the "statutory processes" of the Impoundment Control Act. *Global Health Council*, 153 F.4th at 21 n.18. Without reaching the issue, the divided court stated in a footnote that, if a statute were to provide for judicial review at the conclusion of those congressionally authorized processes, ultra vires review would be unavailable in the interim. *Id.*

Unlike in *MCorp* and *Global Health Council*, Plaintiffs here challenge an executive action that is proceeding outside any established statutory framework—let alone a framework that contains an express prohibition on injunctive relief. Defendants in fact admit that they do not view themselves as bound by the procedural requirements of the Commemorative Works Act. *See* Defs. Opp. 31–32. In this context, this Court has the authority to enjoin the ongoing forward march of an ultra vires executive undertaking. That Defendants have represented that "arch construction will not begin unless and until NPS issues a final agency action," Defs. Opp. 14, is immaterial. Whatever unspecified "final agency action" Defendants envision, the gravamen of Plaintiffs' ultra vires claim is that, absent congressional authorization, NPS has no authority in the first place to take any of the actions—final or otherwise—that it is presently taking to implement the arch project. *Cf. Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (distinguishing a challenge to "a decision of [an executive agency] made within its jurisdiction" from a challenge to a decision "made in excess of [the agency's] delegated powers" that is thus ultra vires).

Indeed, recent actions by Defendants illustrate the compelling need for review *before* NPS takes what it considers to be "final" action. *See Nat'l Trust for Historic Pres. in the U.S. v. NPS*, 821 F. Supp. 3d 62, 66 (D.D.C. 2026) (detailing how the President, "without advance notice," had the East Wing of the White House demolished on land "administered by the National Park Service"); Notice, *Cultural Landscape Found. v. U.S. Dep't of the Interior*, No. 1:26-cv-1593 (D.D.C.), ECF 18 (filed June 3, 2026) (notice from NPS stating that challenged work on the Lincoln Memorial Reflecting Pool had been "complete[d]" during the pendency of a motion seeking to preliminarily enjoin that work). There is scant basis for concluding that an APA challenge to some unspecified future NPS action is an adequate substitute for an ultra vires claim capable of stopping the ongoing arch project before it culminates in harm.

**C. Defendants' invocation of the 1925 Act does not bar Plaintiffs' ultra vires claim.**

Defendants next contend that Plaintiffs cannot raise an ultra vires claim because, in responding to that claim, Defendants have pointed to the 1925 Act as a source of statutory authority for the arch. Defs. Opp. 28–29. In essence, Defendants argue that by identifying a statute and claiming that it authorizes their actions, they can transform Plaintiffs' ultra vires claim into an unreviewable dispute over statutory interpretation. *Id.* Accepting this argument would limit the availability of ultra vires relief to situations in which the executive concedes that it is acting without legal authorization. But ultra vires review is clearly not so toothless. *Cf. Reich*, 74 F.3d at 1332 (explaining that withholding judicial review simply because the President "*claims*" to be acting pursuant to statutory authority "would permit the President to bypass scores of statutory limitations on governmental authority" (emphasis in original)). While ultra vires review is not available to resolve reasonable disagreements about whether the executive has appropriately wielded its statutory authority, *see Nuclear Regul. Comm'n*, 605 U.S. at 682, it is the job of the judiciary to interpret statutes to determine what authority has been conferred on the Executive Branch in the first place. *See Reich*, 74 F.3d at 1332–39 (performing this interpretive function in the context of an ultra vires claim).

As explained below, *see infra* pp. 31–33, the 1925 Act does not authorize Defendants' project. But either way, Defendants are wrong to contend that Plaintiffs have "pivoted" from their "original position that there is *no* potential source of authority for [the arch's] construction on Memorial Circle." Defs. Opp. 28. Plaintiffs maintain that position, and this Court can and should determine whether they are correct, notwithstanding Defendants' meritless invocation of the 1925 Act.

## IV. Plaintiffs are entitled to judgment on their claims.

Plaintiffs' memorandum in support of their motion for summary judgment explained why the undisputed facts entitle them to judgment as a matter of law on their ultra vires and Take Care Clause claims. Pls. Memo. 12–19. Specifically, Defendants are taking steps to construct an arch in Memorial Circle even though Congress has not authorized the project and even though the Commemorative Works Act and 40 U.S.C. § 8106 forbid unauthorized construction. *Id.*

In opposing Plaintiffs' motion, Defendants have not actually *disputed* any of the statements in Plaintiffs' Statement of Undisputed Material Facts. *See* Defs. Counterst. ¶¶ 1–39. Defendants "object" to some of the statements as "immaterial" or "vague," but Defendants do not deny that they are true. *See, e.g.*, *id.* ¶ 8 (stating that the term "250-foot arch" is "vague and subject to varying interpretations"). In addition, Defendants' responses fail to comply with Defendants' obligation to "cite evidence" for any factual "disagreement." *Dixon v. DeJoy*, 2023 WL 5094876, at *1 (D.D.C. Aug. 9, 2023). This Court accordingly may "treat the assertions" in Plaintiffs' statement as "conceded." *Ali v. McCarthy*, 179 F. Supp. 3d 56, 60 n.2 (D.D.C. 2016) (citing Local R. 7(h)(1)); *see Dixon*, 2023 WL 5094876, at *1 (explaining that "a motion for or opposition to a summary judgment [must] be accompanied by a statement asserting which material facts are or are not disputed, with corresponding citations to the record," and treating a movant's statement of facts as conceded where the opposing party failed to comply with this requirement).

Further, although Defendants seek summary judgment in their favor on the merits of Plaintiffs' claims, their "Further Statement of Material Facts" does not include *any* purported facts that go to the claims' merits. For example, Defendants do not state that they will seek congressional authorization prior to building an arch, that the arch is not intended to commemorate the Nation's

250th anniversary, or that Congress has authorized the arch. Defendants' "Further Statement," then, provides no basis for granting summary judgment on the merits in Defendants' favor.

**A. Plaintiffs are entitled to judgment on their ultra vires claim.**

Defendants do not deny that any authority to build their arch must derive from Congress and that, absent congressional authorization, the arch is ultra vires irrespective of whether a statute explicitly forbids its construction. *See New Mexico v. Musk*, 784 F. Supp. 3d 174, 206 (D.D.C. 2025) ("Conduct in violation of specific statutory limitations 'is just one example of an *ultra vires* act—not the *only* example of an *ultra vires* action.'" (quoting *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024)); *Nat'l Trust*, 2026 WL 877779, at *10 (holding that, in the absence of "*some* statutory basis" for the President to initiate a construction project, a court "could find the President's actions" to direct construction "*ultra vires* on that basis alone"). Nonetheless, both the Commemorative Works Act and 40 U.S.C. § 8106 forbid the construction of unauthorized structures, underscoring the appropriateness of relief on Plaintiffs' ultra vires claim.

Attempting to undermine the relevance of these statutes, Defendants argue that "to bring an *ultra vires* claim premised on a specific statutory prohibition, 'the prohibition at issue must confer rights upon the individual seeking ultra vires review.'" Defs. Opp. 31–32 (quoting *Global Health Council*, 153 F.4th at 20). With no elaboration, Defendants then assert that the prohibitions on unauthorized construction in the Commemorative Works Act and section 8106 "are intended to protect Congress's institutional interests," not the interests of the American people who use federal land in Washington, DC. *Id.* at 32. As the amicus brief of the District of Columbia and eighteen States explains, however, the participation of Congress "in the selection of monuments in our nation's capital" ensures "the right of all Americans to participate" in the formulation of our national narrative. States Amicus Br., ECF 43, at 1. Defendants' cursory argument makes no effort

to explain why statutes that guarantee democratic input into the choice of monuments in the Nation's capital fail to confer rights on the individuals who wish to have their voices heard.

**1. Defendants are proceeding in violation of the Commemorative Works Act.**

Defendants argue that the arch might not be subject to the requirements of the Commemorative Works Act because it might not be "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." Defs. Opp. 32 (quoting 40 U.S.C. § 8902(a)(1)). Defendants' professed agnosticism about the arch's commemorative nature stands at odds with the mass of statements made by the President and his representatives that connect the arch to the 250th national anniversary—statements that Defendants do not dispute having made. *See* Defs. Counterst. ¶¶ 13–19. And Defendants continue to state that "[t]he purpose of the proposed [arch] is to celebrate 250 years of American independence." *See* NPS, *Assessment of Effects Report* at 4. Meanwhile, the sole piece of supposedly contrary evidence to which Defendants refer—a statement that the arch "is not primarily a monument dedicated to the dead, but to the living, to this great country and its perseverance," Defs. Opp. 32—is fully consistent with an intent to commemorate the anniversary.

Thus, to avoid the Commemorative Works Act, which "does not apply to commemorative works authorized by a law enacted before January 3, 1985," 40 U.S.C. § 8902(b), Defendants argue that the arch was authorized by the 1925 Act. Defs. Opp. 31. The 1925 Act, though, conferred specific and limited authority on the Arlington Memorial Bridge Commission—not Defendants—to "prosecute[] to completion" a discrete, ten-year project—the construction of Arlington Memorial Bridge—"as speedily as practicable" for "a total sum not to exceed $14,750,000." 1925 Act, § 2, 43 Stat. at 974. Defendants' implausible contention that the statute authorizes limitless

initiation of new executive projects, at whatever cost, indefinitely into the future, is entirely untethered from the Act's text.

The scant efforts that Defendants make to grapple with the statutory text only underscore that Defendants' reading is untenable. For example, Defendants argue that the 1925 Act's direction that the Commission proceed according to a specified "ten-year program of expenditures and construction," *id.* § 6, 43 Stat. at 975, does not operate as a "sunset provision" on Congress's authorization for the project. Defs. Opp. 29. Whether the Commission might lawfully have extended its work into an eleventh year, though, Congress's adoption of a ten-year schedule is a strong indication of what Congress authorized: a discrete project of finite duration, the "completion" of which Congress directed "as speedily as practicable." 1925 Act, § 2, 43 Stat. at 974; *see id.* § 4, 43 Stat. at 975 (providing for the transfer of the affected land to the park system "on completion of the project"). Despite Defendants' argument, Defs. Opp. 29–30, it is accordingly irrelevant that certain ornamental touches that had been approved as part of the bridge's final design in 1933—within the 1925 Act's ten-year timeframe—were not installed until 1951. *See* Sawyer Decl. Exh. R, ECF 44-23, at 98, 101–02. The belated completion of finalized design elements that had encountered practical delays attributable to the Great Depression and World War II, *see* Defs. Opp. 30, hardly supports initiation of a massive new monumental structure that never formed any part of the bridge's design, nearly a century after the design was finalized. Although Defendants rely heavily on the fact that an early design proposal included "two large columns," *id.* at 31, the Commission that Congress authorized to design the bridge removed them from the final design, Sawyer Decl. Exh. R at 92, and the bridge was completed without them.

Next attempting to minimize the significance of the 1925 Act's spending cap, Defendants argue that "alternative sources of funding" that are not drawn from the U.S. Treasury do not count

toward the cap. Defs. Opp. 30. Whatever the unidentified "alternative sources" might be, a statute specifying that a bridge shall be constructed for "a total sum not to exceed $14,750,000" and authorizing that amount to be appropriated from the U.S. Treasury, 1925 Act, § 2, 43 Stat. at 974, cannot reasonably be read to authorize limitless use of non-appropriated funding to construct a monument of limitless expense. To be sure, Defendants note that, after World War II, Italy donated statutes that had been included in the final design but delayed because of the Great Depression and the unavailability of materials during World War II. Defs. Opp. 30 (citing Sawyer Decl. Exh. R at 99, 101–02). The statutes, though, had been approved in 1933 as part of the bridge's final design, *see* Sawyer Decl. Exh. R at 98, and their cost—although ultimately footed by Italy—was included in the project's $14.75 million cost estimate. *See* Report of the Arlington Memorial Bridge Commission 48 (Apr. 21, 1924).[9] More fundamentally, Congress's choice of a $14.75 million cap is evidence of the scope of the project that Congress authorized. The Arlington Memorial Bridge, including the embellishments included in the final design, which was built for a total cost of $12.2 million, *see* Sansone Decl. Exh. P, ECF 36-19, fits well within that scope. Adding the cost of a massive new monument, to be built a century later for an exponentially higher price, does not.

Ultimately, Defendants' reliance on the 1925 Act amounts to an argument that, in approving a ten-year, $14.75 million project to be completed by a temporary commission, Congress authorized a project of limitless duration and expense. Defendants' reading defies any plausible construction of that Act.

**2. Defendants are proceeding in violation of 40 U.S.C. § 8106.**

As for 40 U.S.C. § 8106, Defendants again claim that the arch has received authorization through the 1925 Act and so meets section 8106's requirement that any building erected on federal

---

[9] https://npshistory.com/publications/gwmp/arlington-mem-bridge-com-rpt-1924.pdf.

park or public land in Washington, DC, must have "express authority of Congress." 40 U.S.C. § 8106; *see* Defs. Opp. 31. This argument fails for the reasons above. *See supra* pp. 31–33.

Defendants next advance the same series of arguments against the applicability of section 8106 that they recently made in the litigation challenging the President's plan to construct a ballroom on the grounds of the White House—a series of arguments that Judge Leon comprehensively addressed and rejected. *See Nat'l Trust*, 2026 WL 877779, at *10–12. To start, Defendants argue that section 8106 should be construed to require only that an entity "have express authority from Congress to build—not to build a particular structure." Defs. Opp. 32. Yet Defendants do not identify any Act of Congress that provides authorization for them to build in Memorial Circle. Moreover, Defendants' interpretation directly contravenes section 8106's text, which requires "[a] building or structure" to have "express authority of Congress" before it may be "erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia." 40 U.S.C. § 8106; *cf.* Korean War Veterans Memorial Wall of Remembrance Act, Pub. L. No. 114-230, § 2(a)(1), 130 Stat. 947, 947 (Oct. 7, 2016) (stating under the header "Authorization" that "the Korean War Veterans Memorial Foundation, Inc., may construct a Wall of Remembrance at the site of the Korean War Veterans Memorial"). Nothing in the text of section 8106 contemplates blanket authorization for Defendants to build whatever they want in the federally administered parks of Washington, DC.

Notwithstanding the statutory text, Defendants argue that the statutory history reflects that section 8106 is "concerned about stopping encroachments by unauthorized parties." Defs. Opp. 33. *But see Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's 'authoritative statement is the statutory text, not the legislative history.'" (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005))); *Centro de Trabajadores Unidos v.*

*Bessent*, 167 F.4th 1218, 1233 (D.C. Cir. 2026) (stating that the D.C. Circuit "do[es] not employ 'legislative history to cloud a statutory text that is clear'" (quoting *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 383 (D.C. Cir. 2021))). Defendants, though, do not examine the legislative history of either section 8106 or its predecessor statute, which was enacted in 1912; rather, they rely on *other* statutes, from 1864 and 1902, that address unlawful third-party occupation of public spaces. *See* Defs. Opp. 32–33. As Judge Leon recently explained when rejecting the same argument, "[w]hile other statutes" that Defendants cite "from the era" leading up to the enactment of section 8106's predecessor "suggest 'unlawful occupation' of 'public lands' in D.C. was a concern of Congress," Defendants' "vague historical evidence has no connection to the text of § 8106." *Nat'l Trust*, 2026 WL 877779, at *11 (citation omitted).

In contrast to the 1864 and 1902 statutes on which Defendants rely, section 8106's predecessor statute—like section 8106 itself—focused not on "unauthorized parties," Defs. Opp. 33, but on unauthorized "building[s] or structure[s]." 40 U.S.C. § 8106. As enacted in 1912, the statute read: "Hereafter there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress." Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 444, *codified at* 40 U.S.C. § 68 (1912). When recodifying that law at 40 U.S.C § 8106, Congress stated that it was "codif[ying] existing law without making any substantive change in the law." H.R. Rep. No. 107-479 at 3 (2002); *see* Act of Aug. 21, 2002, Pub. L. No. 107-217, 116 Stat. 1062, 1206.

Defendants next rely on a statement made at a 1926 congressional subcommittee hearing by Major Ulysses S. Grant III, an officer of the agency that had requested the enactment of the 1912 predecessor to section 8106. Defs. Opp. 33. In response to a question asking him to justify the construction of a field house in Anacostia Park notwithstanding the 1912 statute, Major Grant

replied that the 1912 statute "was intended for the purpose of preventing encroachments upon park property by other Government offices or by the public, and has never been construed to prevent … construction by the park authorities within the limits of the appropriations." District of Columbia Appropriation Bill, 1927, Hearing Before the Subcomm. of H. Comm. on Appropriations 533, 69th Cong. (1926) (hereinafter, Subcomm. Hearing Tr.). Despite Defendants' characterization of Major Grant's statement as "[n]ear-contemporaneous legislative history," Defs. Opp. 33, the statement was made nearly *fifteen years after* the enactment of the 1912 predecessor statute. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."). In addition, the Anacostia field house that Major Grant was discussing "had, in fact, been presented to Congress," and Congress had authorized it by "appropriat[ing] funds for [its] construction." *Nat'l Trust*, 2026 WL 877779, at *11 n.9; *see* Subcomm. Hearing Tr. 533. Major Grant's statement about park authorities acting "within the limits" of what Congress has authorized thus offers no support for Defendants' position that authorization is not required. Subcomm. Hearing Tr. 533.

Turning to "historical practice," Defendants contend that "NPS has erected countless structures on national parkland in the District over the past century" without a "record of any express congressional approval." Defs. Opp. 33–34. This argument, however, "runs into another fundamental principle of statutory interpretation: that agency practice cannot alter unambiguous statutory text." *Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 792 (D.C. Cir. 2018). What is more, it is not clear that the structures Defendants identify were built without Congress's authorization. *See Nat'l Trust*, 2026 WL 877779, at *12; *compare* Defs. Opp. 33–34 (suggesting that there is "no record" of congressional authorization for the National Capital Region

Headquarters and the U.S. Park Police Headquarters), *with Nat'l Trust*, 2026 WL 877779, at *12 n.11 (citing an appropriations statute that arguably authorized construction of these buildings).

In addition, Defendants argue at length that a now-repealed statute, 16 U.S.C. § 451 (1912), casts "doubt" on the proposition that section 8106 "applies … to national parks administered by NPS." Defs. Opp. 34. Enacted contemporaneously in 1912 with section 8106's predecessor statute, 16 U.S.C. § 451 required "express authority of Congress" for the expenditure of sums above a specified threshold "for construction of administration or other buildings … in any national park." Because 16 U.S.C. § 451 governed "NPS's construction in national parks," the argument runs, section 8106 "was never intended" to do so. Defs. Opp. 35. And now that Congress has repealed 16 U.S.C. § 451, Defendants argue, Congress's authorization is no longer required for *any* structure that NPS wishes to build in the national parks. *See id.*

Even if Defendants' argument could overcome section 8106's plain text, it would not support the construction of an unauthorized arch in Memorial Circle. Although Memorial Circle sits within a "park[] or public grounds of the Federal Government in the District of Columbia," and so falls within the scope of 40 U.S.C. § 8106, it does not sit within a "national park" and so never fell within the scope of 16 U.S.C. § 451. *See* NPS, *National Park System* (listing the national parks);[10] NPS, *Lady Bird Johnson Park* (explaining that Lady Bird Johnson Park, which houses Memorial Circle, "is a unit of the George Washington Memorial Parkway").[11]

More fundamentally, Defendants provide no support for the underlying premise of their argument: that Congress intended the restriction that now-rescinded 16 U.S.C. § 451 placed on construction in national parks throughout the country (no unauthorized building projects above a

[10] https://www.nps.gov/aboutus/national-park-system.htm.

[11] https://www.nps.gov/gwmp/planyourvisit/ladybirdjohnsonpark.htm.

certain cost threshold) to supplant the more demanding restriction that 40 U.S.C. § 8106 and its predecessor placed on construction in federal parkland within Washington, DC, specifically (no unauthorized building projects at all). As Judge Leon recently explained in rejecting this same argument, "[t]he existence of a separate statute governing national parks" did not eliminate "§ 8106's limitation on parks in the District of Columbia." *Nat'l Trust*, 2026 WL 877779, at *12. Defendants' historical account offers no basis for this Court to decline to interpret section 8106 according to its plain language. *See id.* ("The stronger reading of th[e] history is that Congress means what it says!").

**B. Plaintiffs are entitled to judgment on their constitutional claim.**

Plaintiffs have also established that the President's directive to build an arch in Memorial Circle without congressional authorization and in disregard of the Commemorative Works Act and 40 U.S.C. § 8106 violates his "constitutionally appointed duty to 'take care that the laws be faithfully executed.'" *Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3). Defendants offer three arguments why, in their view, Plaintiffs are not entitled to judgment on their constitutional claim. None of them has merit.

First, citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866), Defendants contend that "courts cannot and should not review the President's 'purely executive and political' duty 'to see that the laws are faithfully executed.'" Defs. Opp. 36 (quoting *Johnson*, 71 U.S. at 499). But the Supreme Court has since made clear that an injured party has an implied right of action under the Constitution to enforce the Constitution's structural guarantees, even where the plaintiff's claim implicates the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *cf. Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional

challenge."). Defendants offer "no reason" why a Take Care Clause claim "should be treated differently than every other constitutional claim." *Free Enter. Fund*, 561 U.S. at 491 n.2; *cf. United States v. Texas*, 577 U.S. 1101 (2016) (granting certiorari and requesting briefing on whether a challenged presidential policy "violates the Take Care Clause of the Constitution").

In light of *Free Enterprise Fund* and its progeny, *Johnson* is best read to hold, not that the President's exercise of his Take Care Clause duty is judicially unreviewable, but rather that a Take Care Clause violation typically cannot justify an injunction against the President. *See Johnson*, 71 U.S. at 499–501; *see also Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion) (quoting *Johnson* for the proposition that the judiciary generally has "no jurisdiction … to enjoin the President in the performance of his official duties" (quoting 71 U.S. at 501)). Plaintiffs, though, do not seek to enjoin the President—just his subordinates. *See* Compl. at 18–19. And Supreme Court and D.C. Circuit precedent recognizes that an injunction barring the President's subordinates from giving effect to an unlawful presidential directive is an available form of relief. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) (affirming an injunction that barred the Secretary of Commerce from implementing an Executive Order that violated the separation of powers); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("[A]ny conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, [where] the injury at issue can be rectified by injunctive relief against subordinate officials.").

Second, Defendants argue that Plaintiffs' Take Care Clause claim "is ultimately a statutory claim, not a constitutional one." Defs. Opp. 37. They explain that a claim that the President "acted in excess of [statutory] authority" does not necessarily implicate the Constitution, whereas a claim that the President acted in the "*absence* of *any* statutory authority" is best viewed as a constitutional

claim. *Id.* (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). Contrary to Defendants' assertion, this argument favors Plaintiffs. Indeed, the basis for Plaintiffs' Take Care Clause claim is the President's initiation of a project that requires congressional authorization without having first obtained that authorization. That the President has not "conceded" the absence of statutory authority, *id.* (quoting *Dalton*, 511 U.S. at 473), is irrelevant. This Court should reject Defendants' view that the President can insulate his unlawful actions from review simply by refusing to concede that he lacks statutory authority to order the arch's construction. *See supra* p. 28 (citing *Reich*, 74 F.3d at 1332).

Although Defendants rely on *Dalton* and the D.C. Circuit's opinion in *Global Health Council*, *see* Defs. Memo. 37, neither opinion analyzed a claim under the Take Care Clause, and neither case involved a challenge to a presidential action that the President was wholly without statutory authority to undertake. In *Dalton*, Congress had undisputedly conferred power on the President to close naval shipyards, *see* 511 U.S. at 464–65, and the issue was whether he had exercised that power in the manner that Congress had authorized, or whether he had "exceeded his authority" under the relevant statute by committing procedural missteps. *Id.* at 476. And in *Global Health Council*, in which plaintiffs brought constitutional claims challenging the President's allegedly unlawful impoundment of foreign-assistance funds, 153 F.4th at 7, the panel identified a statute that "provides a mechanism for the President to act on impoundment," *id.* at 16, and classified the plaintiffs' claims as statutory rather than constitutional, *see id.* at 14–17. Here, Plaintiffs do not claim that the President has improperly exercised a power that Congress has granted him. Rather, they claim that the President has exercised a power that Congress has expressly retained for itself: the power to authorize construction in Memorial Circle.

To be sure, the actions that violate the President's duty under the Take Care Clause *also* exceed the scope of his authority under the Commemorative Works Act and 40 U.S.C. § 8106. But a violation of the Take Care Clause necessarily entails the President's failure to "take Care that [Congress's] Laws be faithfully executed." U.S. Const. art. II, § 3. Justice Jackson's concurrence in *Youngstown*, which "provides the accepted framework for evaluating executive action," *Medellín v. Texas*, 552 U.S. 491, 524 (2008), confirms that executive action can be inconsistent with both federal statutes and the Constitution. Justice Jackson explained that presidential power is "at its lowest ebb" when the President "takes measures incompatible with the expressed or implied will of Congress" and that such cases "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." 343 U.S. at 637–38 (Jackson, J., concurring). Of course, "the expressed or implied will of Congress," *id.* at 637, is revealed most reliably through the statutes that it enacts. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("[T]he best evidence of Congress's intent is the statutory text."). The President's disregard for Congress's statutes, then, is strong evidence of a Take Care Clause violation—not, perversely, a fact that insulates his actions from constitutional scrutiny.

Defendants also argue that Plaintiffs' Take Care Clause claim fails because the 1925 Act authorizes the President to construct an arch in Memorial Circle. Defs. Opp. 37–38. Once again, this argument rests on an implausible reading of the 1925 Act. *See supra* pp. 31–33.

## V. Plaintiffs are entitled to the declaratory and injunctive relief that they seek.

Defendants argue that even if this Court concludes that they are acting unlawfully, this Court should take no action to stop them. Defs. Opp. 38–41. This Court is not powerless to respond to Defendants' ultra vires and unconstitutional actions.

Defendants' arguments that injunctive and declaratory relief are not available against the President, Defs. Opp. 38, can be quickly dispatched. Plaintiffs do not seek injunctive relief against the President, only against Defendants Haley, Executive Office of the President, and NPS. *See* Compl. at 18–19. And as to declaratory relief, "[c]ourts in this District, and the D.C. Circuit, have previously affirmed the issuance of declaratory relief involving the President." *Kingdom v. Trump*, 2025 WL 1568238, at *16 (D.D.C. June 3, 2025) (citing *Clinton v. City of New York*, 524 U.S. 417, 421 (1998), and *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974)); *see, e.g.*, *U.S. Inst. of Peace v. Jackson*, 783 F. Supp. 3d 316, 383–84 (D.D.C. 2025); *LeBlanc v. U.S. Priv. & Civil Liberties Oversight Bd.*, 784 F. Supp. 3d 1, 35–36 (D.D.C. 2025).

The principal case on which Defendants rely, *Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010), does not contradict the precedent establishing that declaratory relief may issue against the President for ultra vires or unconstitutional action. That case simply acknowledges that courts cannot grant relief against the President's exercise of powers "committed to [his] executive discretion." *Id.* at 1012. And far from supporting Defendants, *Swan v. Clinton* notes that the Supreme Court has "left open the question" whether even injunctive relief may issue against the President under certain circumstances. 100 F.3d at 977 (quoting *Franklin*, 505 U.S. at 802 (plurality opinion)).

As for Director Haley, the Executive Office of the President, and NPS, Defendants ask this Court to exercise a "circumspect sense" of the "fitness" of declaratory relief in deciding whether to grant it. Defs. Opp. 38 (quoting *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1367 (D.C. Cir. 2023)). If this Court concludes that Defendants are acting unlawfully, it is this Court's "province and duty" to say so, *Marbury*, 5 U.S. at 177, as courts routinely do. *See, e.g.*, *Youngstown*, 343 U.S. at 589.

Turning to injunctive relief, Defendants do not dispute that the harm to Plaintiffs from construction of the arch would be irreparable or that the public has an interest in enforcement of the legal limitations on executive power. Instead, they argue that the requested injunction is broader than necessary because it would enjoin "pre-decisional planning" and "below-grade construction." Defs. Opp. 39. If this Court reaches the issue of remedy, though, it necessarily will have concluded that the arch has no legal foundation. Defendants offer no explanation why they should be permitted to plan and perform "below-grade construction" on a project that they have no legal authority to undertake. Defendants similarly revisit merits questions when they argue that they should be permitted to construct columns, if not an arch, on the basis of the 1925 Act. *Id.* at 40. Of course, Defendants' plan is to build an arch, not a pair of columns. *See* Sansone Decl. Exh. I (design submission that received approval from the Commission of Fine Arts). Even putting that point aside, if this Court rules for Plaintiffs on the merits, it necessarily will have recognized that the final plans of the Arlington Memorial Bridge Commission did not include columns and, more importantly, that any authority conferred on the Commission by the 1925 Act has long lapsed.

Finally, Defendants' argument that an injunction would harm the government and, with it, the public interest, Defs. Opp. 40–41, fails for similar reasons. Defendants emphasize the importance of "pre-decisional planning within the Executive Branch," *id.* at 40, but they do not explain why the Executive Branch has a legitimate interest in planning a project that it cannot lawfully carry out. To the contrary, as Plaintiffs, the District of Columbia, and eighteen States have explained, "requiring Defendants to comply with the requirements of the Commemorative Works Act and 40 U.S.C. § 8106 will ensure that *all* Americans have the opportunity to make their voices heard through their representatives in Congress and will accordingly confer public legitimacy on whatever monument, if any, is ultimately authorized." Pls. Memo. 21; *see* States Amicus Br. 2

("Before this arch or any other monument is built in the capital, Americans from every State have a right to weigh in through their elected officials."). This Court should not give Defendants free rein to flout those requirements and defy the will of the People's elected representatives.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Plaintiffs' opening memorandum in support of their motion for summary judgment, this Court should grant Plaintiffs' motion for summary judgment, deny Defendants' cross-motion for summary judgment, enter declaratory relief against Defendants, and enter injunctive relief against Director Haley, the Executive Office of the President, and NPS.

Respectfully submitted,

/s/ Nicolas A. Sansone
Nicolas A. Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*