**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL LEMMON, et al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, et al.,<br><br>    Defendants. | Civil Action No. 26-cv-544 (TSC)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

    I.     Plaintiffs Have Failed To Carry Their Burden To Establish Subject Matter
        Jurisdiction ............................................................................................................ 2

        A.    Plaintiffs have not carried their burden to establish a waiver of
              sovereign immunity ................................................................................. 2

        B.    Plaintiffs have not carried their burden to establish standing ..................... 7

              1.    Plaintiffs have not established imminent injury ............................. 7

              2.    Plaintiffs have not established cognizable injuries ....................... 12

    II.    Plaintiffs' Claims Are Unripe ................................................................................ 14

    III.   Plaintiffs' *Ultra Vires* Claim Fails ........................................................................ 15

        A.    Plaintiffs have failed to challenge an executive action required for an
              *ultra vires* claim .................................................................................. 15

        B.    The APA provides meaningful and adequate judicial review that
              precludes an *ultra vires* claim .............................................................. 16

        C.    Plaintiffs' disagreement with Defendants' interpretation of the 1925
              Act does not entitle them to *ultra vires* review ........................................ 18

        D.    Plaintiffs' statutory prohibition arguments under the
              Commemorative Works Act and 40 U.S.C. § 8106 fail ............................ 19

    IV.   Plaintiffs' Constitutional Claim Fails ................................................................... 21

    V.    Plaintiffs Are Not Entitled To Their Requested Relief........................................ 23

CONCLUSION........................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902)......................................................................................................... 2

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)............................................................................................. 3, 4, 15, 22

*Ashwander v. Tennessee Valley Authority*,
297 U.S. 288 (1936)....................................................................................................... 5

*Ass'n of Battery Recyclers, Inc. v. E.P.A.*,
716 F.3d 667 (D.C. Cir. 2013) ...................................................................................... 16

*Atkins v. Fischer*,
232 F.R.D. 116 (D.D.C. 2005)........................................................................................ 6

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017)...................................................................................... 10

*Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.*,
502 U.S. 32 (1991)......................................................................................................... 17

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964)....................................................................................................... 15

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................................................................................................... 24

*Capitol Servs. Mgmt. Inc. v. Vesta Corp.*,
No. CV 17-1756 (EGS), 2023 WL 5507281 (D.D.C. Aug. 25, 2023) ...................................... 6

*Cboe Glob. Markets, Inc. v. Sec. & Exch. Comm'n*,
155 F.4th 704 (D.C. Cir. 2025)...................................................................................... 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)......................................................................................................... 6

*Chamber of Com. of U.S. v. Fed. Election Comm'n*,
76 F.3d 1234 (D.C. Cir. 1996)....................................................................................... 16

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)...................................................................................... 2, 4

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022)..................................................................................... 15, 18

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004)......................................................................................................... 6

*City of Columbus v. Trump*,
   453 F. Supp. 3d 770 (D. Md. 2020) ............................................................... 21, 22

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
   146 F.4th 1144 (D.C. Cir. 2025) ......................................................................... 12

*Ctr. for Biological Diversity v. Zinke*,
   260 F. Supp. 3d 11 (D.D.C. 2017) ...................................................................... 24

*Ctr. for Democracy & Tech. v. Trump*,
   507 F. Supp. 3d 213 (D.D.C. 2020) ...................................................................... 8

*Dalton v. Specter*,
   511 U.S. 462 (1994) ............................................................................................ 22

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ............................................................................................ 21

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
   85 F. Supp. 3d 250 (D.D.C. 2015) ...................................................................... 15

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) .............................................................................................. 6

*Env't Def. Fund v. FERC*,
   2 F.4th 953 (D.C. Cir. 2021) ......................................................................... 13, 14

*Ex parte Young*,
   209 U.S. 123 (1908) .......................................................................................... 3, 4

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................................................ 12

*Fifth Third Bank v. United States*,
   71 Fed. Cl. 56 (2006) ............................................................................................ 5

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) .............................................................................. 13

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
   604 U.S. 542 (2025) .............................................................................................. 9

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
   561 U.S. 477 (2010) ............................................................................................ 21

*Gettman v. Drug Enf't Admin.*,
   290 F.3d 430 (D.C. Cir. 2002) .............................................................................. 9

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ......................................................... 16, 19, 21, 23

*Goldstein v. California*,
   412 U.S. 546 (1973) ............................................................................................ 20

iii

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944)...................................................................................................... 24

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020) ................................................................................................... 22

*Las Americas Immigrant Advocacy Ctr. v. Biden*,
  571 F. Supp. 3d 1173 (D. Or. 2021) ............................................................................ 22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...................................................................................................... 12

*\*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)...................................................................................................... 14

*Marbury v. Madison,*
  5 U.S. 137 (1803).......................................................................................................... 25

*\*Mississippi v. Johnson*,
  71 U.S. 475 (1866)........................................................................................... 21, 22, 24

*Murthy v. Missouri*,
  603 U.S. 43 (2024).......................................................................................................... 3

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*,
  443 F.2d 689 (D.C. Cir. 1971)...................................................................................... 24

*\*Nat'l Parks Conservation Ass'n v. Semonite*,
  282 F. Supp. 3d 284 (D.D.C. 2017) .............................................................................. 11

*Natural Res. Def. Council Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988)...................................................................................... 20

*New Mexico v. Musk*,
  824 F. Supp. 3d 80 (D.D.C. 2026) .................................................................................. 3

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010)...................................................................................... 24

*\*Nuclear Regul. Comm'n v. Texas,*
  605 U.S. 665 (2025)............................................................................................... passim

*O'Shea v. Littleton*,
  414 U.S. 488 (2024)........................................................................................................ 3

*Osborn v. Bank of United States*,
  22 U.S. 738 (1824).......................................................................................................3, 4

*Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*,
  656 F. Supp. 3d 137 (D.D.C. 2023) ..................................................................... 10, 11, 12

*Pub. Citizen, Inc. v. Trump*,
  435 F. Supp. 3d 144 (D.D.C. 2019) ............................................................................... 17

*Saline Parents v. Garland*,
    88 F.4th 298 (D.C. Cir. 2023)..................................................................................... 14

*Steffel v. Thompson*,
    415 U.S. 452 (1974)............................................................................................... 3, 4

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................................................. 10

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996)................................................................................. 24

*Texas v. United States*,
    523 U.S. 296 (1998)................................................................................................. 14

*Transp. Robert (1973) LTEE v. U.S. I.N.S.*,
    940 F. Supp. 338 (D.D.C. 1996)............................................................................. 24

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)........................................................................................... 23, 24

*\*Trump v. New York*,
    592 U.S. 125 (2020)............................................................................... 5, 8, 9, 14

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973)................................................................................................. 13

*United Transp. Union v. I.C.C.*,
    891 F.2d 908 (D.C. Cir. 1989)............................................................................... 7, 8

*Younger v. Harris*,
    401 U.S. 37 (1971)..................................................................................................... 4

**Statutes**

40 U.S.C. § 8106......................................................................................................... 19

5 U.S.C. § 702....................................................................................................... 2, 5, 7

**Rules**

Fed. R. Evid. 803(3).................................................................................................... 6

**INTRODUCTION**

It remains undisputed that construction to build an arch on Memorial Circle will not start unless and until the National Park Service (NPS) authorizes it through final agency action. As Plaintiffs will suffer no injury unless and until NPS issues such a decision, the Court has no jurisdiction over this suit. Judicial review must therefore wait for a claim under the Administrative Procedure Act (APA).

Unwilling to wait, Plaintiffs press a Hail Mary *ultra vires* claim. Such non-statutory review must be available now, Plaintiffs say, because Defendants are taking steps to actualize the President's vision by submitting arch designs to third-party agencies for review. That is a perverse argument given the allegations in Plaintiffs' Complaint: that Defendants would begin arch construction *without* following these mandatory steps. Plaintiffs are thus trying to use a distorted view of *ultra vires* to prevent Defendants from complying with the law.

Plaintiffs' theory doesn't just upset the review scheme that Congress created for Executive Branch action. It also tries to transform words alone into an Article III injury. Plaintiffs' purported injury flows from the construction of an arch. The President's statements about an arch project harm no one. Plaintiffs point to no cognizable injury from the executive "intentions" reflected in those remarks. Rather, they allege only injuries from future arch construction, which has not been authorized by NPS.

The Court should reject this unrecognizably broad theory of *ultra vires* review and Article III standing. It should instead enter judgment for Defendants.

## ARGUMENT

**I.      Plaintiffs Have Failed To Carry Their Burden To Establish Subject Matter Jurisdiction.**

Plaintiffs do not dispute that jurisdiction must exist when they filed their suit. *Compare* Defs.' MSJ 10–11, Dkt. 44-1, *with* Opp'n 14, Dkt. 49-1. Because they have failed to carry their burden to establish a waiver of sovereign immunity or standing when they filed suit, the Court must dismiss their claims for lack of jurisdiction.

**A.      Plaintiffs have not carried their burden to establish a waiver of sovereign immunity.**

Plaintiffs concede that any exception to sovereign immunity requires "executive action." Opp'n 4. Rather than identify any "official executive action" necessary to support an *ultra vires* claim, *see* Compl. ¶ 52, Plaintiffs' Opposition asks the Court to create an unprecedented exception to federal sovereign immunity by allowing claims challenging "some form" of "*forthcoming* action." Opp'n 4. They thus assert that sovereign immunity doesn't apply here because action has been taken to "consider the size, design, timing, and location of the arch." *Id.* at 6. As explained below, their arguments fail both legally and factually.

**1.** Plaintiffs provide no legal support for their position that considering future action waives sovereign immunity. They never dispute that the use of past tense in 5 U.S.C. § 702—authorizing "claim[s] that an agency . . . acted or failed to act"—excludes claims challenging future action. *Compare* Defs.' MSJ 12, *with* Opp'n 8–9. Nor do they provide a single case extending the judicial exception to sovereign immunity—*ultra vires* review—to future federal actions; every such case cited by Plaintiffs reviews *existing* federal action.[1]

---

[1] *See, e.g.*, *Nuclear RegulComm'n v. Texas* (*NRC*), 605 U.S. 665, 681 (2025) (*ultra vires* review "applies only when an agency *has taken action* . . . ." (emphasis added)); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 99 (1902) (reviewing claim that the Postal Department "has refused to deliver any mail," leading to accumulation of "25,000 letters" undelivered); *Chamber*

2

Unable to locate a single case waiving sovereign immunity based on the consideration of future action, Plaintiffs pivot to cases where courts entertained prospective injunctions based on past actions. Opp'n 4–5 (citing *Murthy v. Missouri*, 603 U.S. 43 (2024); *New Mexico v. Musk*, 824 F. Supp. 3d 80 (D.D.C. 2026)). *Murthy* is a standing case where the Supreme Court reiterated that "because the plaintiffs request forward-looking relief, they must face 'a real and immediate threat of *repeated* injury,'" while finding no standing for plaintiffs who could not trace prior injuries to government action. 603 U.S. at 58 (quoting *O'Shea* v. *Littleton*, 414 U.S. 488, 496 (2024), emphasis added). And *Musk* involved allegations that Department of Government Efficiency officials had "direct[ed] executive departments and agencies to cancel federal grants and loans, stop payments, terminate employees, reduce the workforce, and dismantle the department or agency itself, and have directly undertaken such actions themselves." 824 F. Supp. 3d at 90 (citation modified). Unlike either case, Plaintiffs request prospective relief on the basis of alleged activity that is at best preparatory to future agency action.

Lacking pertinent exceptions to federal sovereign immunity, Plaintiffs turn to cases authorizing suits against the enforcement of unconstitutional state laws. Opp'n 4–6 (discussing *Steffel v. Thompson*, 415 U.S. 452 (1974) and, indirectly, *Ex parte Young*, 209 U.S. 123, 150–51 (1908); *Osborn v. Bank of United States*, 22 U.S. 738, 838–839, 844 (1824)).[2] Because enforcing unconstitutional laws is not a sovereign activity, those cases authorized relief against state officers

---

*of Com. of U.S. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996) (reviewing Executive Order "issued" by President Clinton that barred agencies from contracting with employers that replace lawfully striking employees).

[2] Although Plaintiffs cite *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), they omit that the quoted portion of that decision summarizes *Ex parte Young* and *Osborn*, as well as *McAnnulty*. Because *Armstrong* cites those cases for the proposition "that federal courts may *in some circumstances* grant injunctive relief," *id.* (emphasis added), we focus on the circumstances in those cases that justified injunctive relief.

3

who were about to enforce such laws. *E.g.*, *Ex parte Young*, 209 U.S. at 159–60, 167. But they did so only after states had acted by passing allegedly unconstitutional laws. *E.g.*, *Steffel*, 415 U.S. at 454 n.1 (criminal trespass statute); *Ex parte Young*, 209 U.S. at 128–29 (criminal transportation-rate statute); *Osborn*, 22 U.S. at 840 (law expelling federal bank from state). Unlike those cases, however, Plaintiffs challenge no such official action as an enacted law.

Plaintiffs' reliance on pre-enforcement review cases exposes the flaw in their sovereign immunity argument, as they come nowhere close to the specific "circumstances" in those cases that authorized "injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326. The Supreme Court has authorized such pre-enforcement challenges, where similar prosecutions had already occurred, based on its judgment that a claimant need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel*, 415 U.S. at 459 (citation omitted); *see also Ex parte Young*, 209 U.S. at 165 (holding that a "company ought not" be placed "in peril of large loss and its agents in great risk of fines and imprisonment" by being forced to test the constitutionality of a state law through "disobedience of the act"). But "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases." *Younger v. Harris*, 401 U.S. 37, 42 (1971). Facing no enforcement threat, Plaintiffs cannot avail themselves of the sovereign immunity exceptions established in such "circumstances." *See Armstrong*, 575 U.S. at 326.

Without the peril of prosecution, Plaintiffs must—like other *ultra vires* claimants—wait for the federal officer to have "acted in excess of his legal authority" to bring suit. *Reich*, 74 F.3d at 1329 (citations omitted). That does not mean that they must wait until "the action is complete" and "the injury has occurred." *Contra* Opp'n 3–4. It means that they cannot challenge what the

4

President "intends" or "prefers," *id.* at 6, before those desires "had fruition in action of a definite and concrete character." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 324 (1936); *see also Trump v. New York*, 592 U.S. 125, 131 (2020) (rejecting challenge to unimplemented Presidential "desire").[3]

As explained below, if and when NPS authorizes arch construction, Plaintiffs will have "a meaningful and adequate opportunity for judicial review" under the APA. *See NRC*, 605 U.S. at 681 (citation omitted). And the APA waives sovereign immunity only when "an agency or an officer or employee thereof *acted* or failed to act in an official capacity." 5 U.S.C. § 702 (emphasis added). Plaintiffs' theory, by contrast, would allow the United States to be hauled into court over reported dinner remarks. *See* Dkt. 36-6. Far from a "policy argument," Opp'n 5, this shows just how much Plaintiffs' theory of *ultra vires* review would distort the scheme that Congress created for judicial review of executive action.

**2.** Plaintiffs have failed to provide any evidence meeting their burden to show that challenged executive action occurred before they filed suit. The undisputed evidence shows that even after Plaintiffs filed suit, the "proposal for construction of an Arch [was] in the conceptual phase." Lands Decl. ¶ 15, Dkt. 12-1. Although their Complaint challenged "the President's directive to plan and construct an arch on Memorial Circle by July 4, 2026," Compl. ¶ 64, Plaintiffs have abandoned any pretense that such a directive ever issued. They instead focus their sovereign immunity case on press reports about what the President "intends" or "prefers." Opp'n 6.

---

[3] Plaintiffs' oxymoronic response that Defendants took "action to consider" arch specifics, Opp'n 6, overlooks that "consideration is not action," *Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 68 (2006), *aff'd*, 518 F.3d 1368 (Fed. Cir. 2008).

Those press reports are plainly inadmissible hearsay. *E.g.*, *Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005) ("courts within this Circuit have consistently barred newspaper articles from introduction as evidence due to the fact that they constitute inadmissible hearsay" (collecting cases)). Although Plaintiffs defend certain "statements within the article[s] as admissible hearsay," "[t]he Court need not address [that] argument . . . because [Plaintiffs have] raised no argument that the article containing those statements is admissible." *Capitol Servs. Mgmt. Inc. v. Vesta Corp.*, No. CV 17-1756 (EGS), 2023 WL 5507281, at *5 & n.3 (D.D.C. Aug. 25, 2023), *aff'd*, No. 23-7118, 2025 WL 521241 (D.C. Cir. Feb. 18, 2025).[4]

The hearsay exception invoked by Plaintiffs nonetheless demonstrates that they seek judicial review of executive intention, not action. *See* Opp'n 6 (citing Fed. R. Evid. 803(3)). By invoking the "then-existing state of mind" hearsay exception against the President, Fed. R. Evid. 803(3), Plaintiffs ask the Court to violate "the general rule against inquiring into the mental processes of administrative decisionmakers." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation modified). That rule is at its apex in suits against the President, as courts must give "Presidential confidentiality the greatest protection consistent with the fair administration of justice." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004) (citation modified). Because waivers of sovereign immunity require action, not states of mind, *see* Defs.' MSJ 13–14 (collecting cases), Plaintiffs have failed to establish any such waiver.

---

[4] Plaintiffs' suggestion that Defendants must deny "that the cited statements" in Plaintiffs' inadmissible hearsay articles "occurred," Opp'n 6–7, ignores longstanding Supreme Court law on summary judgment, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). And Plaintiffs mischaracterize the Lands Declaration as referencing the statements in Plaintiffs' inadmissible hearsay articles, when the Lands Declaration never mentions those articles. *See* Opp'n 7 (quoting Lands Decl. ¶ 5).

Beyond these inadmissible press reports, Plaintiffs' remaining evidence fails to demonstrate that the action Plaintiffs seek to challenge—arch construction—was authorized when they filed suit. The only admissible evidence states the arch proposal was in a "conceptual phase"—with numerous environmental, historical, design and planning processes not even begun—*after* Plaintiffs filed suit. Lands Decl. ¶¶ 7–15. Even today—five months after Plaintiffs sued—arch construction has not been authorized. Defendants' Response to Plaintiffs' Statement of Material Facts (DRPSOMF) ¶ 7, Dkt. 44-2. Unable to dispute this fact, Plaintiffs instead invoke steps far short of authorizing arch construction, such as NPS having "preliminary discussions with other federal agencies to see if they have capacity to assist with required environmental compliance, were the project to move beyond the conceptual phase." *E.g.*, Lands Decl. ¶ 6 (cited at Opp'n 8). But Plaintiffs provide no evidence that those steps even occurred before they filed suit, as opposed to weeks after suit when the Lands Declaration is dated.[5] More importantly, those steps do not form the basis of Plaintiffs' claims, which instead assert that such steps are legally mandatory, not *ultra vires*. *E.g.*, Compl. ¶¶ 27, 45, 55. Plaintiffs have thus failed to provide evidence establishing "a claim that an agency . . . acted or failed to act" when they filed suit. *See* 5 U.S.C. § 702.

B.    **Plaintiffs have not carried their burden to establish standing.**

1.  **Plaintiffs have not established imminent injury.**

Plaintiffs concede that by claiming only "future injuries," they "confront[] a significantly more rigorous burden to establish standing." *United Transp. Union v. I.C.C.*, 891 F.2d 908, 913

---

[5] Similarly, Plaintiffs' last-gasp pivot attempting to establish a waiver of sovereign immunity based on a failure-to-act theory has no basis in evidence. Their rhetoric about "NPS's acquiescence" in lieu of "demanding congressional authorization as a prerequisite to initiating the regulatory approval process," Opp'n 8–9, has no support in the Lands Declaration or any other admissible evidence. Instead, as the Lands Declaration explained, the arch proposal remained at a "conceptual phase" after Plaintiffs filed suit and regulatory approval processes had not even begun.

(D.C. Cir. 1989). But they present no unique factual circumstances to meet this "significantly more rigorous burden." *Id.* Plaintiffs instead assert that a potential future agency action, if adopted, may eventually inflict a future aesthetic injury. "If such speculative future government action could support an injury in fact, it is hard to imagine what would *not* satisfy that requirement. Article III demands more." *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222–23 (D.D.C. 2020) (finding no imminent harm from potential future agency action despite Executive Order that "sets a course of government processes into motion" towards that action).

**1.** Plaintiffs have been unable to provide even a *single case* holding that potential future agency actions created imminent injury. And there are numerous Supreme Court and D.C. Circuit precedents rejecting that standing theory. *See, e.g.*, *New York*, 592 U.S. at 131, 134 (holding that courts should let "the Executive Branch's decisionmaking process run its course," rather than speculate about "how the Executive Branch might eventually implement" a Presidential desire); *see also* Defs.' MSJ 15 (collecting additional cases).

Plaintiffs' sole response to those precedents is to make factual distinctions without differences. *See* Opp'n 15–17. While they claim that the future agency actions were less certain in those cases, they have presented no evidence that the putative future agency action—NPS authorization of arch construction—is more certain here.[6] To the contrary, it is completely undisputed that, even after Plaintiffs filed suit, NPS's consideration of the arch had not moved beyond the "conceptual phase" with numerous mandatory regulatory processes not even begun. *Compare* Lands Decl. ¶¶ 7–15, *with* Tr. 26:20–27:4, Dkt. 19 ("we have no basis for disputing what Mr. Lands has said").

---

[6] Moreover, all of these cases involved challenges to concrete, official action by the President or an agency, with the uncertainty stemming from the potential for *additional* action. Here, no such action has taken place *at all*, which makes future injury even less certain.

Despite that undisputed evidentiary record, Plaintiffs maintain that they are certain how those administrative processes will conclude as they believe "the White House has repeatedly announced its plan." Opp'n 17 (citing no evidence, much less admissible evidence). But their own history of failed predictions—such as when they told the Court (again without admissible evidence) that the President had "consistently and repeatedly" stated he was "going to have [the arch] built by July 4th"—belies their certainty. *See* Tr. 27:18–20. Weeks after July 4, arch construction has still not been authorized.

NPS, not the Executive Office of the President, is indisputably the "agency with jurisdiction over Memorial Circle" whose "authorization is a condition precedent to construction on that land." Fisher Decl. ¶¶ 2–3, Dkt. 24-1 ("the Executive Office of the President will [not] authorize construction"). Even now, five months after Plaintiffs filed suit, NPS is still undertaking numerous regulatory compliance processes, including seeking comments from the public regarding the impacts of the proposed project and submitting the project for review by third-party agencies. *E.g.*, DRPSOMF ¶ 12. Because NPS is "entitled to a presumption of regularity" in carrying out its duties, *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 577 (2025), Plaintiffs cannot presume to know the outcome of those processes merely because the President has announced his desired outcome, *New York*, 592 U.S. at 131. Nor can they establish Article III injury by advancing theories of "speculative injury dependent upon the conduct of third parties not before the court," like National Capital Planning Commission. *Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002).

**2.** Without either evidence or precedent on their side, Plaintiffs ask the Court to make remarkable new law, dramatically expanding the "substantial risk" test for imminence to allow unprecedented claims based on the speculative "risk" that an agency might act. *See* Opp'n 14

9

(quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Courts utilize that test to evaluate imminence claims where defendants have already acted, creating an imminent risk that plaintiffs could be injured "at any moment"—including the moment they filed suit. *Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 153 (D.D.C. 2023).

In *Driehaus*, for example, plaintiffs sought to enjoin an enacted Ohio statute criminalizing certain political statements, based on the threatened injury of future enforcement. 573 U.S. at 152–56. The Supreme Court analyzed their standing under a three-prong test for pre-enforcement standing, which analyzed the "history of past enforcement" to determine whether the enforcement threat was substantial. *Id.* at 164. Because the statute could be enforced by any person, and was "not restricted to state officials who are constrained by explicit guidelines or ethical obligations," the Court determined that plaintiffs faced "a real risk of complaints" from the statute sufficient to constitute imminent harm. *Id.*

Similarly, in *Attias v. Carefirst, Inc.*, the defendants acted by allowing a cyberattack to steal their customers' personal information, which in turn created "substantial risk of identity fraud." 865 F.3d 620, 628 (D.C. Cir. 2017). Because the hack occurred before plaintiffs filed suit, that "substantial risk of harm exists *already*." *Id.* at 629 (emphasis added). In both cases, even though harm was not certain, "the full risk was present when the complaint was filed—it did not depend on a long sequence of uncertain contingencies." *Pharm. Rsch.*, 656 F. Supp. 3d at 153 (citation modified).

In contrast here, NPS had not acted at all when suit began. Plaintiffs could only speculate about the outcomes of numerous regulatory approval processes; indeed, they speculated wrongly—predicting that those approval processes would be skipped over to construct an arch by

10

July 4. *See* Compl. ¶¶ 27, 45, 55, 64; *see also* Tr. 27:18–20. They thus faced no imminent risk of harm.

**3.** Plaintiffs' incorrect speculation that the arch would be completed by July 4, 2026, at least said "*something* about [their] future injury's timing." *Pharm. Rsch.*, 656 F. Supp. 3d at 153. Now that they have replaced that with the assertion that arch construction will merely begin sometime this year, *see* Opp'n 17, they can no longer say *anything* about when their view-obstruction injuries may occur. Constructing foundations, even for massive towers, does not harm "aesthetic interests any more than" the existing vehicular traffic around Memorial Circle. *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 289 (D.D.C. 2017).[7] It is undisputed that beginning construction will not obstruct their viewshed as the only view in which Plaintiffs have expressed interest is the view from Arlington House to the Lincoln Memorial. *See* Loth Decl. ¶ 6, Dkt. 7-5.[8] The proposed arch could be constructed substantially above ground without affecting that view. *See* Sansone Decl. Ex. L, Dkt. 36-15, at ECF pp. 11–12. Because they have provided no evidence about when arch construction might begin to obscure that view, they have failed to carry their burden to establish imminent injury. *See Pharm. Rsch.*, 656 F. Supp. 3d at 153.

Plaintiffs attempt to excuse this evidentiary gap by suggesting—without evidence—that beginning construction will naturally be followed by completing construction. Opp'n 19. But even if that were true, it is far from clear that construction would be completed on an imminent basis given the scale of the project and number of contingencies involved. Indeed, because NPS has yet

---

[7] Plaintiffs attempt to distinguish *Semonite* as a cautionary tale, Opp'n 19, but that caution is about sleeping on one's right to bring "renewed motions," 282 F. Supp. 3d at 289 n.1, not about relaxing Article III's imminence requirement.

[8] The only other location in Arlington National Cemetery in which Plaintiffs have expressed an interest, *see* Lemmon Decl. ¶ 6, Dkt. 7-2, already lacks any view of the Lincoln Memorial, King Decl. ¶ 4, Dkt. 44-13.

11

to approve a final design, it is not even clear that a completed arch would impede Plaintiffs' view. Those are simply too many uncertain contingencies to establish imminent injury. *Pharm. Rsch.*, 656 F. Supp. 3d at 153.

**4.** Even if they could establish an imminent viewshed obstruction, they would still fail to establish imminent injury from that obstruction as they have provided nothing more than "'some day' intentions" to experience that view again. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("profession of an intent to return to the places [declarants] had visited before . . . is simply not enough"). Only Plaintiff Gunderson provides any information about when he might again visit the capital from his home in South Carolina. Gunderson Decl. ¶ 7 ("I intend to continue visiting Washington, DC, on an annual or semi-annual basis."). But neither he nor any of the other Plaintiffs indicates when they will next visit Arlington National Cemetery to experience a view that would be obstructed by the proposed arch. *See Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 146 F.4th 1144, 1159 (D.C. Cir. 2025) (holding that when "declaration offers only vague suggestions" about future visitation plans, they do not suffice under Article III). Plaintiffs ask the Court to excuse this omission on a recurring-practice theory, but they cite no caselaw supporting such a theory, which is directly contrary to *Lujan*.

### 2. Plaintiffs have not established cognizable injuries.

In addition to Plaintiffs' failure to establish that their alleged injuries are imminent, they have also failed to establish that they are cognizable harms in the first place. Plaintiffs concede (at 10) that their non-aesthetic opposition to the arch is not cognizable under Article III, which "screens out" "general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). Thus, they rely entirely on asserted aesthetic injuries to carry their standing burden.

But Plaintiffs' aesthetic interests are not cognizable as they have never "indicate[d] how [they] derived aesthetic value from" Memorial Circle as it currently exists. *Env't Def. Fund v. FERC (EDF)*, 2 F.4th 953, 969 (D.C. Cir. 2021). Their proffered declarations do not explain how they "used and enjoyed the land" or "intended to use the land in the future." *Id.* at 969. At most, they assert vaguely that construction of the proposed arch will "degrade" their experience when "traveling around Memorial Circle." Lemmon Decl. ¶ 8. But that is precisely the sort of "incidental viewership" of an "eyesore" that the D.C. Circuit found insufficient to establish standing in *EDF*, 2 F.4th at 970.

Plaintiffs make two unsuccessful attempts to overcome this on-point precedent. First, even though they have no prior or future interest in Memorial Circle itself, they assert interests in "*the area around* Memorial Circle." Opp'n 12 (emphasis added). But the *EDF* plaintiff also asserted aesthetic interests in the *area around* the challenged metering station, which was only a half-mile from her house in a wooded area and "not in keeping with the character of [her] neighborhood." 2 F.4th at 968. Her stronger aesthetic interest—in her own neighborhood—was insufficient to establish Article III injury, as she did not express particular interest in the site itself (beyond avoiding the station). If her aesthetic interest in excluding a disfavored structure from her residential neighborhood did not suffice, Plaintiffs' interest in excluding a disfavored structure from an area they occasionally visit similarly does not suffice.

Second, Plaintiffs advance older cases, like *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 685 (1973), for the proposition that "sightseeing" injuries are cognizable. Opp'n 11. But both the Supreme Court and the D.C. Circuit have long recognized that *SCRAP* is an "outlier" precedent that should no longer be extended, particularly at the summary judgment stage. *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 672 (D.C.

Cir. 1996) (en banc) (citing *Lujan*, 497 U.S. at 889). Even if generalized "sightseeing" injuries were once cognizable at the pleading stage, claimants in the D.C. Circuit must do more than document objection to an "eyesore" to establish standing at the summary judgement stage. *See EDF*, 2 F.4th at 968–70.

## II.    Plaintiffs' Claims Are Unripe.

Even were Plaintiffs able to establish standing, their claims should still be dismissed as unripe. Those claims are plainly "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *New York*, 592 U.S. at 535 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Plaintiffs' arguments are premised on the assumption that they already know the purpose, design, cost, and funding source of an arch that NPS has not yet decided to build. Their Commemorative Works Act argument, for example, turns on assumptions about the purpose of the arch that are hypothetical. *See* Opp'n 31. Similarly, their arguments against application of the 1925 Act point to a purported "higher price" of the proposed arch without any support in evidence. *Id.* at 33. But it is "anathema to the judicial function" to "ask a court to advise what the law would be upon a hypothetical state of facts." *Saline Parents v. Garland*, 88 F.4th 298, 307 (D.C. Cir. 2023) (dismissing citation modified).

Because the issues are unfit for judicial review, Plaintiffs' lack of hardship from deferring review renders this case unripe. Defendants have already agreed to provide fourteen-days' notice before construction begins. And even if immediate, unannounced construction should somehow occur, it would have no immediate effect on Plaintiffs, who claim no injury from the commencement of below-grade construction activities. *Supra* 11. In any event, the law is settled that the need to file another motion or lawsuit is not a hardship that justifies litigating an otherwise

hypothetical dispute. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F. Supp. 3d 250, 272–73 (D.D.C. 2015).

### III.    Plaintiffs' *Ultra Vires* Claim Fails.

Plaintiffs never dispute that their theory of *ultra vires* review, if adopted by the Court, would swallow the APA. *See* Defs.' MSJ 25. They all but ignore the Supreme Court's recent reaffirmation that *ultra vires* review must not "become an easy end-run around the limitations of . . . judicial-review statutes." *NRC*, 605 U.S. at 681 (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). Plaintiffs eschew that governing precedent, preferring instead to rely on *McAnnulty*, a 1902 decision that issued decades before Congress enacted the APA. *See* Opp'n 24–25. The Court should decline Plaintiffs' invitation to create new forms of nonstatutory review as, "time and again, courts have stressed that *ultra vires* review has extremely limited scope." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (citation modified).

### A.    Plaintiffs have failed to challenge an executive action required for an *ultra vires* claim.

Plaintiffs concede that *ultra vires* review is limited to executive actions and cannot extend to mere desires or words. *Compare* Defs.' MSJ 24–26, *with* Opp'n 24. But Plaintiffs do not challenge even a single action taken by the time they filed suit. *See* Opp'n 24. Although they describe their case as a "challenge [to] the construction of an unauthorized arch in Memorial Circle," *id.*, they concede that such construction remains unauthorized, even five months after they filed suit, *see* Pls.' Resp. to DRPSOMF ¶¶ 7–8, Dkt. 49-1. In asking the Court to extend nonstatutory review to encompass claims that an agency might eventually act, Plaintiffs' "never-before-adopted theory would swallow the APA's cause of action." *See* Defs.' MSJ 25.

The Court should decline Plaintiffs' invitation to so dramatically extend this "judge-made remedy." *See Armstrong*, 575 U.S. at 327. Plaintiffs never dispute that doing so would harm the

15

American people, by discouraging government transparency. *Compare* Defs.' MSJ 26, *with* Opp'n 24. Tellingly, they identify no upside to such an unprecedented expansion of nonstatutory review. *See* Opp'n 24. The Court should thus leave *ultra vires* review the "Hail Mary pass" that it has always been. *See NRC*, 605 U.S. at 681–82.

### B.    The APA provides meaningful and adequate judicial review that precludes an *ultra vires* claim.

Plaintiffs concede that an *ultra vires* claim is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681 (citation modified). Attempting to avoid this bar on their *ultra vires* claim, Plaintiffs ask the Court to ignore governing D.C. Circuit precedent holding that delayed statutory review provides such a meaningful opportunity. *See Glob. Health Council v. Trump*, 153 F.4th 1, 21 n.18 (D.C. Cir. 2025) (holding that when "APA review may be available" after "statutory processes run their course," "that would provide an alternative procedure for review and thereby independently foreclose the grantees' ultra vires claim").

None of Plaintiffs' responses to *Global Health Council* are availing. *See* Opp'n 26. They point out that the holding appears in a footnote and the panel opinion was divided. *Id.* But neither argument makes the opinion less binding on this Court. Plaintiffs also suggest, incorrectly, that the D.C. Circuit did not "reach[] the issue," apparently viewing the footnote as dicta. *See id.* But the statement was an alternative holding, not dicta. *See Glob. Health Council*, 153 F.4th at 13 n.6 (rejecting dissent's claim that its *ultra vires* holding was dicta); *id.* at 21 n.18 (holding that the availability of delayed statutory review "independently foreclose[s] the grantees' ultra vires claim"). And alternative holdings are binding. *Ass'n of Battery Recyclers, Inc. v. E.P.A.*, 716 F.3d 667, 673 (D.C. Cir. 2013); *Chamber of Com. of U.S. v. Fed. Election Comm'n*, 76 F.3d 1234, 1236 (D.C. Cir. 1996).

For similar reasons, Plaintiffs have failed to successfully distinguish *Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.*, 502 U.S. 32 (1991). There, the Supreme Court found that an *ultra vires* claim was unavailable for two reasons: that delayed statutory review provided an adequate opportunity for judicial review, *id.* at 43–44; and that Congress foreclosed judicial review of the law in question, *id.* at 44. Plaintiffs' suggestion that *both* conditions are required to foreclose *ultra vires* review, Opp'n 26, misreads *MCorp*. *See NRC*, 605 U.S. at 681 (interpreting *MCorp* as establishing disjunctive, not conjunctive, bases for foreclosing *ultra vires* review)*.

Despite the binding precedents in *Global Health Council* and *MCorp* firmly establishing that *ultra vires* review is unavailable when delayed statutory review will be available, Plaintiffs continue to claim, incorrectly, that *Reich* authorizes such *ultra vires* review. Opp'n 25–26. But they overlook the clear difference between *Reich* and this case: the Executive Order challenged in *Reich* inflicted imminent harm (lost bargaining power) regardless of how, if at all, agencies implemented it. *See* Defs.' MSJ 15–16 (citing *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 159–60 (D.D.C. 2019)). Although Plaintiffs never deny that aspect of *Reich*,[9] they attempt to rewrite the history of that case as establishing that *ultra vires* review was available "because *no* agency regulation would have comported with the plaintiffs' view of the law." Opp'n 26. That justification appears nowhere in the case.

In sum, binding D.C. Circuit and Supreme Court precedent firmly establish that *ultra vires* review is unavailable to Plaintiffs, who will indisputably have adequate review opportunities before they suffer any injury. Plaintiffs' revisionist history of *Reich* does not justify a different result.

---

[9] *Compare* Defs.' MSJ 27–28, *with* Opp'n 25–26.

C.  **Plaintiffs' disagreement with Defendants' interpretation of the 1925 Act does not entitle them to *ultra vires* review.**

Plaintiffs' *ultra vires* claim also fails because they have not met the "especially demanding" standard to establish "extreme" statutory error. *Changji Esquel*, 40 F.4th at 722. As Plaintiffs concede, *see* Opp'n 28, this excludes "typical statutory-authority argument[s]," *NRC*, 605 U.S. at 682. Plaintiffs' claim that the "general authority" from the 1925 Act "does not extend" to an arch "falls well shy of a meritorious [*ultra vires*] claim." *Id.* at 682.

Nothing in Plaintiffs' Opposition demonstrates any statutory error, much less an extreme one. *See* Opp'n 31–33. As to their sunsetting argument, Plaintiffs concede that the "ten-year program of expenditures" in section 6 of the 1925 act did not cutoff construction after that time. *See id.* at 32. Although Plaintiffs maintain that the 1925 Act could not be used to justify construction today, their argument misreads the statute's text. *See id.* (claiming that section 2 of the Act directs "the 'completion' [of the project] 'as speedily as practicable'"). Section 2 directs that "construction shall be entered upon as speedily as practicable," 43 Stat. at 974, not that "completion" occur so speedily. And it is hardly uncommon for memorial authorizations to precede their completion by decades; for example, "the 4th Division Memorial was authorized by Congress in 1935, but not completed for another 65 years."[10]

As to Plaintiffs' cost argument, they concede that alternative sources of funding like gift authorities can be used under the 1925 Act, as occurred when the government of Italy gifted the equestrian statues at the east end of Arlington Memorial Bridge in 1951. *Compare* Defs.' MSJ 30, *with* Opp'n 32–33. Although Plaintiffs claim that this gift authority cannot extend to a "massive new monument . . . for an exponentially higher price," *id.* at 33, that argument has no basis in

---

[10] National Park Service, 4TH (IVY) INFANTRY DIVISION MEMORIAL (Sept. 21, 2020), https://www.nps.gov/gwmp/learn/historyculture/4th_infantry.htm.

18

evidence as Plaintiffs have not provided any evidence about what the arch might cost. Nor do Plaintiffs identify any support for their theory that a monetary cap in a statute applies to anything other than appropriated funds or Treasury account funds.

In sum, Plaintiffs have failed to establish that Defendants lack statutory authority to build two large columns surmounted by statues on Memorial Circle. While Plaintiffs dispute whether the design discretion delegated by the 1925 Act extends to connecting those two columns to form an arch, that is a paradigmatic "typical statutory authority argument" that cannot be raised via *ultra vires* claim. *Global Health*, 153 F.4th at 20–21.

### D. Plaintiffs' statutory prohibition arguments under the Commemorative Works Act and 40 U.S.C. § 8106 fail.

For the foregoing reasons, this court should not reach the merits of Plaintiffs' premature claims. If it does, Plaintiffs' arguments under the Commemorative Works Act (CWA) and 40 U.S.C. § 8106 fail on three independent grounds.

**1.** Plaintiffs concede that neither statute restricts construction authorized by the 1925 Act. *Compare* Defs.' MSJ 30, *with* Opp'n 30. Because Congress authorized construction on Columbia Island of two tall columns surmounted by statues—along with discretionary design modification— neither statute prohibits construction of such structures.

**2.** Plaintiffs concede that, under D.C. Circuit law, the statutory prohibition giving rise to their *ultra vires* claim "must confer rights upon the individual seeking ultra vires review." *Global Health*, 153 F.4th at 20; *see* Opp'n 30–31. As Defendants explained, these statutes are intended to protect legislative interests, by requiring congressional authorization in certain circumstances. Defs.' MSJ 30–31. Plaintiffs dispute only whether these statutes are intended to confer rights upon them. *See* Opp'n 30–31. But Plaintiffs do not identify *any text* from either statute that "confers rights" upon the public, as opposed to the Congress. Because "non-congressional parties" cannot

19

"carry on as an ersatz proxy for Congress itself," *Natural Res. Def. Council Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988), Plaintiffs cannot assert *ultra vires* claims under these statutes.

**3.** Plaintiffs have failed to establish that arch construction would violate either statute. As to the CWA, Plaintiffs concede that no final decision has been made as to what the arch is designed to celebrate. *Compare* Defs.' MSJ 32, *with* Opp'n 31. Although Plaintiffs go to great lengths to characterize *potential* subjects of the arch as being subject to the CWA, they cannot dispute that an agency may change its approach during the "natural course of rational decision-making." *Cboe Glob. Markets, Inc. v. Sec. & Exch. Comm'n*, 155 F.4th 704, 717 (D.C. Cir. 2025). The possibility that the arch might constitute a commemorative work is insufficient, as NPS's decisionmaking regarding the project is not yet complete.

Turning to § 8106, Plaintiffs hardly dispute that NPS has a consistent practice of not requiring specific congressional authorization for each building or structure—such as the Rock Creek Park tennis stadium—that it constructs in the District of Columbia. *Compare* Defs.' MSJ 33–34, *with* Opp'n 36–37 (suggesting that arguable appropriations are sufficient to provide express authority of Congress). Plaintiffs instead argue that this long record of executive practice and legislative acquiescence thereto must be rejected in favor of their new interpretation of this century-old statute. *See* Opp'n 33–35.

But Congress is presumed to have been aware of the long history of construction in its own neighborhood when it enacted the more recent 1925 Act. To avoid "distort[ing]" the original meaning of older statutes, acts of Congress are typically interpreted in light of background legal principles as they existed at the time of enactment rather than "as if they were written today." *Goldstein v. California*, 412 U.S. 546, 564 (1973). And "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned," can "raise a

presumption" that Congress meant to delegate that power. *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (citation modified). If even general appropriations were sufficient to give NPS authorization to construct a building in the District of Columbia, as Plaintiffs suggest, then the authorization to construct and redesign two tall columns in Memorial Circle is certainly sufficient to comply with § 8106.

In sum, Plaintiffs' *ultra vires* claim fails for multiple independent reasons outlined above.

## IV.     Plaintiffs' Constitutional Claim Fails.

Plaintiffs' constitutional claim under the Take Care Clause is foreclosed by binding precedent. Notably, Plaintiffs fail to identify a *single* case in which a court has held that the Take Care Clause provides a private right of action. *See* Opp'n 38–41. Nor do they dispute that it has been settled law for 150 years that courts may not review the President's "purely executive and political" duty "to see that the laws are faithfully executed[.]" *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866); *see also* Defs.' MSJ 36 (collecting cases).

This Court should follow this well-established precedent and reject Plaintiffs' misguided invitation to break new ground. Plaintiffs rely on a footnote from *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 491 n.2 (2010), to argue that *Johnson* is "best read" to hold merely that injunctive relief against the President is unavailable. Opp'n 39. But the D.C. Circuit has held that *Free Enterprise Fund* applies to situations where the plaintiff has "challenged the constitutionality of [a] statute," not where he asserts a right of action under the Constitution itself. *Glob. Health Council*, 153 F.4th at 14. Similarly, when the plaintiffs in *City of Columbus v. Trump* argued that *Free Enterprise Fund* establishes "a right to sue directly under the Take Care Clause," the court held that *Free Enterprise Fund* simply "found unconstitutional an act of Congress which purported to tie the president's hands regarding his duties under the Take Care Clause." 453 F. Supp. 3d 770, 802 (D. Md. 2020). Just as Congress cannot intrude upon this

21

"purely executive" duty, *see Johnson*, 71 U.S. at 499, neither may a court "appropriate a degree of the discretion left to the President in *how* to take care that the [law] is faithfully executed," *City of Columbus*, 453 F. Supp. 3d at 802.

The same is true here. "[T]he Supreme Court has been 'reluctant to create new causes of action' in constitutional cases." *Las Americas Immigrant Advocacy Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1179 (D. Or. 2021) (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020)); *see also Armstrong*, 575 U.S. at 325 (finding that Supremacy Clause is "silent regarding who may enforce federal laws in court" and thus does not create a private cause of action). Doing so in this case would be particularly inappropriate given the "general principles which forbid judicial interference with the exercise of Executive discretion." *Johnson*, 71 U.S. at 499.

The Court should decline Plaintiffs' invitation to effectively ignore *Johnson*. In arguing that *Johnson* should be read to authorize Take Care Clause injunctions against the President's subordinates (including the Executive Office of the President), Opp'n 39, Plaintiffs ignore the circumstances giving rise to *Johnson*. In *Johnson*, Mississippi challenged the execution of the Reconstruction Acts by the President *and* a subordinate (the "general commanding in the District of Mississippi and Arkansas")—and the Supreme Court dismissed the suit in its entirety. *See* 71 U.S. at 497–498. Cabining *Johnson* to injunctions against the President, but not his subordinates, would still empower the Court to substitute its judgment for the President's judgment about how he must conduct *his* duty to faithfully execute the laws—the very result the *Johnson* court rejected as "absurd." *Id.* at 499.

Moreover, the Supreme Court has rejected the proposition that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Plaintiffs attempt to

22

avoid this authority by relying on the complaint's characterization of their constitutional claim as a challenge to Presidential action *without* statutory authority as opposed to *in excess of* statutory authority. Opp'n 39–40; *see also* Compl. ¶ 64. But Plaintiffs cannot contend that Defendants have misinterpreted the 1925 Act, *see* Opp'n 31–33, and then assert a few pages later that their Take Care Clause claim is non-statutory in nature, *id.* at 40. Indeed, regardless of how Plaintiffs allege their claim in the complaint, the fact remains that the 1925 Act "provides a mechanism" to construct and modify the Memorial Bridge and its surrounding environs. *Global Health*, 153 F.4th at 16. Identifying this relevant source of authority is a far cry from the President "insulat[ing] his unlawful actions from review," as Plaintiffs assert. Opp'n 25.

Finally, Plaintiffs' Opposition reveals that it is their construction of the 1925 Act, not Defendants', that is unfaithful to the law Congress enacted. In seeking an injunction that would prohibit even the construction of the very columns that Congress approved in 1925, *see* Opp'n 43, Plaintiffs are effectively asking the Court to ignore that authorization.

## V.      Plaintiffs Are Not Entitled To Their Requested Relief.

Even if the Court were to rule against Defendants on the merits, it should not provide the sweeping relief that Plaintiffs request.

**1.** Regarding injunctive relief, Plaintiffs do not even attempt to demonstrate that pre-decisional planning and below-grade construction of the arch could possibly cause them harm, much less irreparable harm. Opp'n 43. That is because these activities could not possibly "obstruct[] the views to and from Arlington National Cemetery." Defs.' MSJ 39 (quoting Plaintiffs' Statement of Material Facts ¶ 33).

Plaintiffs nonetheless ask the Court to act as roving supervisor of the Executive Branch in violation of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). There, the Supreme Court held that "complete relief *to the plaintiffs before the court*" "is the maximum a court can provide." *Id.* at

23

852, 854. Courts sitting in equity must "mould each decree to the necessities of the particular case," *id.* at 854 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)), and refrain from imposing an injunction that is "'more burdensome than necessary to redress' [the] asserted harms," *id.* at 853 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Here, that means the Court cannot enjoin aspects of the challenged project—such as below-grade construction and pre-decisional planning—that pose no threat to Plaintiffs' interests.

Rather than defend their request for judicial oversight of pre-decisional executive planning, Plaintiffs insist that the government cannot have a "legitimate interest in planning a project that it cannot lawfully carry out." Opp'n 43. Although the arch project is lawful for the reasons explained *supra*, Plaintiffs are misguided to suggest that Defendants—and the public—have no interest in limiting judicial intervention in ongoing decisionmaking regardless of its ultimate legality. In limiting the APA to "final agency action," Congress acknowledged that "courts must not interfere with the executive function, whether exercised by executive officials or administrative agencies." *Transp. Robert (1973) LTEE v. U.S. I.N.S.*, 940 F. Supp. 338, 340 (D.D.C. 1996) (citing *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 698 (D.C. Cir. 1971)). This policy is based on the interest of the government and public in "protect[ing] the integrity of the administrative process," and it is no less applicable simply because Plaintiffs have attempted to circumvent the APA. *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 29 (D.D.C. 2017) (quotation modified). In this case, it counsels against granting Plaintiffs' requested relief.

**2.** Nor should the Court issue declaratory relief against the President. *Newdow v. Roberts* squarely holds that "[a] court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." 603 F.3d 1002, 1012 (D.C. Cir. 2010) (citing *Johnson*, 71 U.S. at 499; *Swan v. Clinton*, 100 F.3d 973, 976 n. 1 (D.C. Cir. 1996)). Plaintiffs

24

cannot circumvent this precedent by citing district court cases, most of which do not even discuss the propriety of declaratory relief, and none of which engage with *Newdow*. *See* Opp'n 42. And such relief is particularly inappropriate here, where Plaintiffs do not seek to declare an official executive action unlawful. Declaring presidential dinner remarks or social media posts unlawful would harm the country by distracting the Chief Executive from performance of his constitutional duties.

**3.** And, while declaratory relief against the other Defendants does not raise the same separation of powers concerns, it would still be inappropriate to declare that Defendants have acted unlawfully when they have not yet acted on the challenged presidential intent at all. Plaintiffs point to *Marbury v. Madison*'s recognition that "[i]t is emphatically the province and duty of the judicial department to say what the law is," but this duty does not extend to prohibiting potential *future* actions. 5 U.S. 137, 177 (1803).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' summary judgment motion and enter judgment for Defendants.


DATE: July 15, 2026                       Respectfully submitted,

                                          ADAM R.F. GUSTAFSON
                                          Principal Deputy Assistant Attorney General

                                          BRADLEY CRAIGMYLE
                                          Deputy Assistant Attorney General

                                          */s/ Michael S. Sawyer*
                                          MICHAEL S. SAWYER, Senior Attorney
                                          DANIEL LUECKE, Trial Attorney
                                          Environment and Natural Resources Division
                                          P.O. Box 7611
                                          Washington, D.C. 20044-7611
                                          Telephone: 202-353-5134

25

E-mail: michael.sawyer@usdoj.gov
daniel.luecke@usdoj.gov

*Counsel for Defendants*

26