**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL LEMMON *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP *et al.*,

*Defendants*.

Civil Action No. 26-CV-544 (TSC)

# BRIEF OF NATIONAL PARKS CONSERVATION ASSOCIATION *ET AL.* AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Lauren M. Weinstein (Bar No. 1035184)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
lweinstein@omm.com

Kaitlyn Gosewehr
(*pro hac vice forthcoming*)
O'MELVENY & MYERS LLP
2 Embarcadero Ctr
28th Floor
San Francisco, CA 94111
Tel: (415) 984-8700
kgosewehr@omm.com

Harmukh Singh
(*pro hac vice forthcoming*)
O'MELVENY & MYERS LLP
401 West 4th Street
Suite 3300
Austin, TX 78701
Tel: (737) 261-8600
hsingh@omm.com

Thomas M. Harris
(*pro hac vice forthcoming*)
O'MELVENY & MYERS LLP
610 Newport Center Drive
17th Floor
Newport Beach, California 92660
Tel: (949) 823-6900
clintharris@omm.com

Marion F. Werkheiser (Bar No. 486465)
Charles N. Curlett, Jr.
Caitlin McCurdy
Katherine Lee Sorrell
Cultural Heritage Partners PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594
marion@culturalheritagepartners.com

*Counsel for* Amici Curiae

## TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF *AMICI CURIAE* ........ 1

SOURCE OF AUTHORITY TO FILE ........ 2

INTRODUCTION ........ 2

STATUTORY FRAMEWORK ........ 3

- I. The Commemorative Works Act ........ 4
- II. The National Environmental Policy Act of 1969 ........ 6
- III. The National Historic Preservation Act of 1966 ........ 7
- IV. Other Relevant Statutes ........ 7

ARGUMENT ........ 8

- I. The Process Leading to Construction of the Arch Defies the Statutory Scheme ........ 8
- II. Other Commemorative Works Illustrate the Proper Process ........ 17
- III. Defendants' Failure To Adhere to the Statutory Scheme Will Have Significant Consequences forNational Park Sites, Historic Sites, and Cultural Landscapes ........ 20

CONCLUSION ........ 23

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) .... 7

*Fund for Animals v. Clark*,
27 F. Supp. 2d 8 (D.D.C. 1998) .... 8

*Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*,
896 F.3d 520 (D.C. Cir. 2018) .... 6

*Presidio Hist. Ass'n v. Presidio Tr.*,
811 F.3d 1154 (9th Cir. 2016) .... 16

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .... 7

### Statutes

40 U.S.C. § 8901 .... 5

40 U.S.C. § 8902(a)(4) .... 4

40 U.S.C. § 8902 .... 3

40 U.S.C. § 8903 .... 3, 4, 5

40 U.S.C. § 8904 .... 5

40 U.S.C. § 8903(a)(1) .... 4

40 U.S.C. § 8903(d) .... 4

40 U.S.C. § 8905 .... 21, 5

40 U.S.C. § 8905(a)(1) .... 4

40 U.S.C. § 8905(a)(2) .... 4

40 U.S.C. § 8905(b) .... 5

40 U.S.C. § 8906 .... 3, 4

40 U.S.C. § 8907 .... 5

40 U.S.C. § 8908 .... 3, 4, 5

40 U.S.C. § 8908(b)(2) .... 5

40 U.S.C. § 8909 .... 3, 4, 5

40 U.S.C. §§ 8106 *et seq* .... 5

42 U.S.C. § 4331(b)(4) .... 13

42 U.S.C. § 4332(2)(C) .... 6

**TABLE OF AUTHORITIES**
**(continued)**


**Page(s)**

42 U.S.C. § 4336(b)(2) ........ 6

42 U.S.C. § 4336a(c) ........ 6

42 U.S.C. § 4370m-4(f) ........ 6

49 U.S.C. § 303(c) ........ 7, 12

54 U.S.C. § 306107 ........ 7, 10, 11

54 U.S.C. § 306108 ........ 7

D.C. Code § 6-601.05 ........ 7

D.C. Code § 6-601.05(b) ........ 12, 13

D.C. Code § 6-601.05(h) ........ 12

Pub. L. No. 105–201, 112 Stat. 675 (1998) ........ 19

Pub. L. No. 108–125, 117 Stat. 1347 (2003) ........ 18

Pub. L. No. 109-54, § 134, 119 Stat. 527 (2005) ........ 18

Pub. L. No. 111-88, § 129, 123 Stat. 2933 (2009) ........ 18

Pub. L. No. 61-196, 36 Stat. 452 (1910) ........ 7, 12

Pub. L. No. 103-32, 107 Stat. 90 (1993) ........ 17

Pub. L. No. 107-11, 115 Stat. 19 (2001) ........ 18

Pub. L. No. 115-51, 131 Stat. 1003 (2017) ........ 19

Pub. L. No. 117-81, § 6605, 135 Stat. 2442 (2021) ........ 19

Pub. L. No. 99-652, § 1, 100 Stat. 3650 (1986) ........ 5

**Regulations and Administrative Materials**

36 C.F.R. § 800.10(a) ........ 10

36 C.F.R. § 800.16(d) ........ 11

36 C.F.R. § 800.2(d)(1) ........ 16

36 C.F.R. § 800.4 ........ 11, 12

36 C.F.R. § 800.5 ........ 7

36 C.F.R. § 800.5(a)(2) ........ 7

36 C.F.R. § 800.6(a) ........ 8

36 C.F.R. § 800.7(c)(1)-(2) ........ 13

54 U.S.C. § 800.6 ........ 7

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

ACHP Operating Procedures (as amended July 12, 2023), *available at* https://www.achp.gov/sites/default/files/2023-08/ACHP%20Operating%20Procedures%20as%20amended%20July%2012%202023-Aug%202023draft.pdf ........ 13

Comm'n of Fine Arts, May 20, 1999 Meeting Minutes, *available at* https://archive.org/details/cfaminutes20may1999 ........ 18

Comm'n of Fine Arts, *July 24, 1997 Meeting Minutes*, *available at* https://archive.org/details/cfaminutes24july1997 ........ 17

Comm'n of Fine Arts, May 21, 1998 Meeting Minutes, *available at* https://archive.org/details/cfaminutes21may1998 ........ 18

Kathryn Smith Email to Tammy Stidham Re: Proposed Triumphal Arch Section 106 - consultation meeting, June 16, 2026, *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_09._Section_106_-_CP_Comment_Letters_Jul2026.pdf ........ 11

Letter from David Maloney, D.C. State Historic Pres. Officer, to Jennifer T. Nersesian, Reg'l Dir., Nat'l Park Serv. (June 26, 2026), *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_09._Section_106_-_CP_Comment_Letters_Jul2026.pdf ........ 9

Letter from Edward Stierli, Mid-Atlantic Senior Reg'l Dir., Nat'l Parks Conservation Ass'n, to William Scharf, Chair, Nat'l Capital Planning Comm'n (May 15, 2026), *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_Public_Testimony_Jun2026.pdf ........ 21

Letter from Jennifer T. Nersesian, Nat'l Park Serv., to David Maloney, D.C. State Historic Preservation Office (June 22, 2026), *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_09._Section_106_-_CP_Comment_Letters_Jul2026.pdf ........ 8, 9

Letter from Judy Chesser and Paul Edmondson, Committee of 100, to Tammy Stidham, National Park Service (Sept. 16, 2026), *available at* https://www.washingtonpost.com/documents/38a7ea12-88b5-4c8f-b76c-0368a9d7e6bd.pdf ........ 10

Letter from Roger W. Kirchen, VA Dep't Historic Res. & State Historic Pres. Office, to Jennifer T. Nersesian, Reg'l Dir., Nat'l Park Serv. (June 26, 2026), *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_09._Section_106_-_CP_Comment_Letters_Jul2026.pdf ........ 11

Letter from Travis Voyles, Advisory Council on Historic Preservation, to Tammy Stidham, National Park Service (Sept. 24, 2026), *available at*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

https://www.achp.gov/sites/default/files/2026-09/Section106ConsultationTerminationArch.pdf ... 9, 13

Ltr. from Elizabeth Merritt, Nat'l Trust for Historic Preservation, to Travis Voyles, Advisory Council on Historic Preservation (Sept. 28, 2026), *available at* https://savingplaces.org/national-trust-objection-to-termination-of-section-106-for-arch-9-28-26 ... 16

Projects for the November 5, 2026 Commission Meeting, "New Monumental Arch," File Number 8778, *available at* https://www.ncpc.gov/review/agenda/ ... 14

Record of Decision for 2005 Base Realignment and Closure Actions at National Naval Medical Center, Bethesda, MD, 73 Fed. Reg. 27,805 (May 14, 2008) ... 15

Rpt. of the Arlington Memorial Bridge Comm'n, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) at 9, 40-41, *available at* https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf ... 10

Nat'l Park Serv., Triumphal Arch Environmental Assessment, *Finding of No Significant Impact: Triumphal Arch Environmental Assessment* (June 18, 2026), *available at* https://parkplanning.nps.gov/showFile.cfm?sfid=852874&projectID=136973 ... 13

NCPC, Global War on Terrorism Memorial Site Selection, *Commission Action*, Apr. 6, 2023, *available at* https://www.ncpc.gov/projects/8450/ ... 19

NCPC, Global War on Terrorism Site Selection, *Staff Report*, Apr. 6, 2023, *available at* https://www.ncpc.gov/docs/actions/2023April/8450_Global_War_on_Terrorism_Memorial_Site_Selection_Staff_Report_Apr2023.pdf ... 19

NAT'L PARK SERV., *June Assessment of Effects Report* (June 2026), *available at* https://www.ncpc.gov/files/download.php?id=7862 ... 11, 15, 20

NAT'L PARK SERV., *Triumphal Arch at Memorial Circle Assessment of Effects Report* (Aug. 2026), *available at* https://parkplanning.nps.gov/showFile.cfm?sfid=862935&projectID=136973 ... 12, 20, 21, 22

NAT'L PARK SERV., Triumphal Arch at Memorial Circle, *Revised Environmental Assessment* (Oct. 2026), *available at* https://parkplanning.nps.gov/showFile.cfm?sfid=869022&projectID=136973 ... 14, 21, 22

U.S. Dep't of the Interior, Approval of Final Site and Building Plan, *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_Updated_-_Project_Synopsis_Nov2026.pdf ... 22

U.S. Dep't of the Interior: National Park Service, *Cultural Landscape Report: Memorial Avenue Corridor, George Washington Parkway*, Frisbie M, Lester M, Mao C, Penberthy R, Shang H, Wang Z, Drake R, May 2024, Washington, DC, *available at* https://irma.nps.gov/DataStore/Reference/Profile/2313163 ... 22

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

U.S. Dep't of the Interior, Project Synopsis, *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_Updated_-_Project_Synopsis_Nov2026.pdf .......... 14

**Other Authorities**

*24 Steps to Erecting a Memorial on National Park Service Property in Washington, D.C.*, *available at* https://planning.nps.gov/showFile.cfm?sfid=143504&projectID=44217 .......... 4

Mike Catalini, *New plans for Trump's arch don't mention the 'military complex' he said it would host*, AP NEWS (Oct. 19, 2026), *available at* https://apnews.com/article/trump-arch-military-complex-14eaf1a088ef04e24b5a15a971d12eee .......... 15

Friends of the National World War II Memorial, *The National WWII Memorial Chronology*, *available at* https://www.wwiimemorialfriends.org/chronology .......... 18

Betsy Klein & Kaanita Iyer, CNN.com, *Trump's arch gets overwhelmingly negative public feedback but appears poised to move forward* (Apr. 16, 2026) *available at* https://www.cnn.com/2026/04/16/politics/trump-arch-feedback-commission .......... 16

Charles Moore, ed., The Improvement of the Park System of the District of Columbia, Report of the Senate Committee on the District of Columbia (1855-1942), *available at* https://archive.org/details/bub_gb_Ob7PAAAAMAAJ/page/n5/mode/2up .......... 20, 21

Mark Paoletta, *Trump's Triumphal Arch Completes A Longstanding National Aspiration*, The Federalist (Oct. 5, 2026), *available* at https://www.thefederalist.com/2026/10/05/trumps-triumphal-arch-completes-a-longstanding-national-aspiration .......... 15

*Memorials and Museums Master Plan, Appendix A Steps for Establishing A Memorial in the Nation's Capital*, *available at* https://www.ncpc.gov/docs/24_Steps_for_a_Establishing_a_Memorial.pdf .......... 4

*Monumental Arch Lighting Plan*, *available at* https://www.ncpc.gov/review/agenda .......... 22

Jacob R. Straus, Cong. Rsch. Serv., *Commemorative Works in the District of Columbia: Background and Practice* (May 8, 2023), *available at* https://www.congress.gov/crs-product/R41658 .......... 17

President Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 20, 2026, at 7:34 ET), *available at* https://truthsocial.com/@realDonaldTrump/posts/117303154231930646 .......... 14

*The National WWII Memorial Chronology*, *available at* https://www.wwiimemorialfriends.org/chronology .......... 17

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The identities and interests of *amici* are set forth in detail in the Motion for Leave to File submitted with this proposed brief. *Amici* National Parks Conservation Association, National Trust for Historic Preservation in the United States, The American Institute of Architects, The Coalition to Protect America's National Parks, The Committee of 100 on the Federal City, The Cultural Landscape Foundation, and The DC Preservation League are nonprofit organizations dedicated to preserving, protecting, and promoting public understanding of the Nation's historic, architectural, cultural, and natural resources, including the National Park System and the monuments, memorials, and cultural landscapes of the Nation's Capital.

Together, *amici* represent millions of members and supporters, including architects, landscape architects, historians, preservation professionals, and current and former National Park Service employees, who use and enjoy these places and derive aesthetic, cultural, professional, recreational, and educational benefits from their preservation. *Amici* regularly participate in National Historic Preservation Act Section 106 consultation and other federal review processes, and many participated as consulting parties or submitted comments in the federal reviews of the proposed Triumphal Arch. *Amici* therefore share a substantial interest in ensuring that federal agencies faithfully observe the procedural protections Congress established under the National Historic Preservation Act, the National Environmental Policy Act, and related statutes before

[1] *Amici curiae* are all non-profit organizations and are, accordingly, exempt from Federal Rule of Appellate Procedure 29(a)(4)(A)'s disclosure statement requirement. *See* LCvR 7(o) (incorporating FRAP 29(a)(4)). *Amici* state pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) that: (i) no party's counsel authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person—other than *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

taking actions that may permanently alter Arlington Memorial Bridge, Memorial Circle, and the surrounding historic landscape.

The issues presented in this case extend beyond the immediate parties and raise important questions regarding compliance with the procedural requirements under the National Environmental Policy Act, the National Historic Preservation Act, and other related federal laws. Those requirements exist to ensure that agencies fully evaluate impacts, consider alternatives, consult with affected stakeholders, and provide meaningful opportunities for public participation before undertaking actions that may permanently alter historic resources and public lands. Because this Court's resolution of this case may influence the protection of historic places, the administration of the Section 106 process, and the stewardship of nationally significant historic resources, *amici curiae* have a substantial interest in assisting the Court's consideration of the issues presented.

## SOURCE OF AUTHORITY TO FILE

The parties have consented to the filing of this brief.[2] Counsel has sought leave to file this *amicus* brief pursuant to Local Civil Rule 7(o).

## INTRODUCTION

The Administration is plowing forward with its enormous Triumphal Arch at Memorial Circle without the required Congressional approval and despite knowing it would permanently desecrate the viewshed of the National Mall, including the historic connection to Arlington National Cemetery. Under the Commemorative Works Act, only Congress and specialized

[2] Counsel for Plaintiffs has consented to the filing of amici's brief. Defendants consented to the filing as to the National Parks Conservation Association but claimed they had insufficient time to form a position as to the filing by other *amici* whose identities were disclosed to Defendants the afternoon this brief was filed.

agencies may authorize such works. And they may do so only following the careful consideration of the environmental and historical impacts the works may have that the National Environmental Policy Act of 1969 and the National Historic Preservation Act of 1966 require.

The process that led to the imminent construction of the Arch bears no resemblance to Congress's careful statutory design. The Arch is the product of Presidential fiat, not the will of Congress. The agency-review and public-comment periods were so perfunctory as to be meaningless. The Arch has been authorized with little, if any, genuine consideration for the lasting effects it will have on the public's enjoyment of some of America's most important landmarks—including a sacred cemetery dedicated to honoring those who gave their lives for our country. The Arch's construction should be preliminarily and permanently enjoined.[3]

## STATUTORY FRAMEWORK

A specialized statutory scheme exists to ensure that any authorized commemorative works meet rigorous standards, including environmental and historical review. The Commemorative Works Act, National Environmental Policy Act of 1969, and the National Historic Preservation Act of 1966 impose extensive requirements before any proposed commemorative works may be authorized and constructed. When honored, that statutory regime ensures that any new memorials are selected, designed, and located such that they will be in harmony with the overall scheme and purpose of national park land and the deliberate design principles of the Capital's monumental core.

[3] *Amici* write in support of Plaintiffs' request for a preliminary injunction (Dkt. 64). The same arguments advanced in this brief support the Plaintiffs' request for summary judgment (Dkt. 36).

## I. THE COMMEMORATIVE WORKS ACT

The Commemorative Works Act ("CWA") requires Congress and the sponsor of any new structure proposed for public park lands in the District of Columbia to satisfy extensive procedural steps and substantive requirements before construction may proceed. 40 U.S.C. §§ 8902-03, 8905-06, 8908-09.

Procedural Requirements. The major procedural phases of the CWA comprise the following: (i) initiation, (ii) authorizing legislation, (iii) Area I review, (iv) alternative site study, (v) environmental analysis, (vi) Commission of Fine Arts and National Capital Planning Commission review, (vii) fundraising, (viii) final design, (ix) construction permit, and (x) dedication. *See* 40 U.S.C. §§ 8903, 8905-06, 8908-09.[4] The sequence matters because each step informs the next.

The first step—Congressional authorization—requires the participation of multiple stakeholders. Congress must first identify the commemorative subject, then it must consult with the National Capital Memorial Advisory Commission regarding the project. *See* 40 U.S.C. § 8903(a)(1), (d). Congress must then pass legislation authorizing the work. *See id.*

Following the legislation's passage, Congress selects a project sponsor. *See* 40 U.S.C. § 8902(a)(4). The sponsor must consult with the National Capital Memorial Advisory Commission about site alternatives and designs for the work. *Id.* § 8905(a)(1). Only after that consultation may the sponsor submit site and design proposals to the Commission of Fine Arts and National Capital Planning Commission for consideration. *See id.* § 8905(a)(1)-(2). That

---

[4] *See also* Nat'l Park Serv., *24 Steps to Erecting a Memorial on National Park Service Property in Washington, D.C.*, *available at* https://planning.nps.gov/showFile.cfm?sfid =143504&projectID=44217; NCPC, *Memorials and Museums Master Plan, Appendix A Steps for Establishing A Memorial in the Nation's Capital*, *available at* https://www.ncpc.gov/ docs/24_Steps_for_a_Establishing_a_Memorial.pdf (identifying 24-step process).

requirement gives Congressional representatives from every State and the District of Columbia an opportunity to assess whether the proposed work warrants the Nation's endorsement.

The CWA's procedural framework disperses responsibility among Congress, the Secretary of the Interior or GSA Administrator, and the members of the National Capital Memorial Advisory Commission, Commission of Fine Arts, National Capital Planning Commission, as well as the project sponsor. Accordingly, no single person controls the project from conception to construction; Congress retains ultimate discretion to authorize commemorative works. *See* 40 U.S.C. §§ 8903-8908.

Substantively, all works under the CWA must at least be of "lasting historical significance to the American people." 40 U.S.C. § 8908(b)(2). But works in a specially designated zone around the capital's monumental core, called "Area I," are subject to a heightened requirement that the subject is of "preeminent historical and lasting significance," a determination dedicated to the discretion of the Secretary of the Interior or Administrator of General Services in consultation with the National Capital Memorial Advisory Commission. 40 U.S.C. § 8908. The commemorative work must also be properly located within the bounds of the Capital, which requires the Secretary of the Interior or Administrator of General Services, Commission of Fine Arts, and National Capital Planning Commission to determine that the work would not "interfere[ ] with, or encroach[ ] upon, any existing commemorative work." *Id.* § 8905(b).

The CWA's demanding requirements exist "to preserve the integrity of the comprehensive design of the L'Enfant and McMillan plans for the Nation's Capital," "to ensure the continued public use and enjoyment of open space in the District of Columbia and its environs," "to protect and maintain the limited amount of open space available" in the Capital,

and to ensure that future commemorative works "reflect a consensus of the lasting national significance of the subjects involved." 40 U.S.C. § 8901; Pub. L. No. 99-652, § 1, 100 Stat. 3650 (1986); 40 U.S.C. §§ 8106 *et seq*.

## II. THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

The National Environmental Policy Act of 1969 ("NEPA") requires an agency to consider the potential environmental effects of a major federal action, including the construction of commemorative works. The relevant agency must prepare an environmental impact statement, a "detailed statement by the responsible official" that includes "the reasonably foreseeable environmental effects" of the project, including unavoidable adverse effects; "a reasonable range of alternatives to the proposed" work; and "any irreversible and irretrievable commitment of Federal resources" the proposed work would have. 42 U.S.C. § 4332(2)(C). The scope of "environmental effects" under NEPA is construed broadly and includes cultural and historic impacts. *See* 42 U.S.C. § 4332(2)(C); *Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*, 896 F.3d 520, 529-30 (D.C. Cir. 2018) (recognizing NEPA environmental effects analysis encompasses effects on cultural and historic resources).

If the significance of the proposed work's environmental effects is uncertain, an agency may prepare an Environmental Assessment to determine whether a more comprehensive environmental impact statement is required. *See* 42 U.S.C. § 4336(b)(2). If the agency determines that the project would not significantly affect the quality of the human environment, the agency must issue a Finding of No Significant Impact ("FONSI"), explaining why the agency reached its conclusion. *Id.*

If, however, the agency determines the project will significantly affect the quality of the human environment, the agency must prepare a draft Environmental Impact Statement for public review, and ultimately issue a final Environmental Impact Statement that incorporates and

addresses the public's comments. *See id.* § 4336a(c). Finally, the agency must publish a Record of Decision explaining the agency's decision, alternatives considered, and plans for any necessary mitigation and monitoring. *See id.* § 4332(2)(C); *id.* § 4370m-4(f).

NEPA review ensures "every significant aspect of the environmental effect of a proposed action" has been considered prior to construction of a public work. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). The statutory process is intended to facilitate meaningful public comment on the environmental impacts of a given public work. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

## III. THE NATIONAL HISTORIC PRESERVATION ACT OF 1966

The National Historic Preservation Act of 1966 ("NHPA") requires federal agencies to consider the effects of federal undertakings on historic properties, assess those effects, and seek ways to avoid, minimize, or mitigate any adverse effects on historic properties. *See* 54 U.S.C. § 306108; 36 C.F.R. §§ 800.5, 800.6. An agency's assessment of adverse effects includes whether the undertaking may alter characteristics of a historic property that diminish its integrity in terms of location, design, setting, feeling, or association. *See* 36 C.F.R. § 800.5(a)(2). When an undertaking may directly and adversely affect a National Historic Landmark, "the head of the responsible Federal agency," must "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark." *See* 54 U.S.C. § 306107. The agency must also afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking. *See id.* § 306108.

## IV. OTHER RELEVANT STATUTES

<u>The Department of Transportation Act.</u> Section 4(f) of the Department of Transportation Act requires federal agencies to avoid adversely affecting historic resources via transportation-related undertakings unless "1) there is no prudent and feasible alternative to using that land; and

2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c).

The Height of Buildings Act of 1910. This statute establishes height limits for buildings within Washington, D.C. The maximum height allowed is 130 feet. *See* Pub. L. No. 61-196, 36 Stat. 452 (1910), D.C. Code § 6-601.05.

## ARGUMENT

### I. THE PROCESS LEADING TO CONSTRUCTION OF THE ARCH DEFIES THE STATUTORY SCHEME

Defendants have not come close to fulfilling the applicable statutes' requirements as explained in detail below. Their egregious failure to adhere to the applicable statutory scheme has resulted in the imminent construction of a structure that would irreparably harm the public's use and enjoyment of iconic landmarks. *See Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (finding irreparable harm based on procedural failure to comply with NEPA); Dkt. 36-1 at 21-25. The Arch's construction should be enjoined.

Failure to give meaningful consideration to alternative locations. The National Park Service, the project sponsor and lead federal agency for the project, failed to meaningfully consider alternative locations for the Arch that would have reduced or eliminated the harmful impacts of the project. NHPA requires the lead federal agency to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties. 36 C.F.R. § 800.6(a). Contrary to this directive, the National Park Service sent a June 22, 2026, letter to the D.C. State Historic Preservation Office to propose mitigation measures explicitly ***excluding*** site relocation as an option. Letter from Jennifer T. Nersesian, Nat'l Park Serv., to David Maloney, D.C. State Historic Preservation Office (June 22, 2026), *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_

Arch_09._Section_106_-_CP_Comment_Letters_Jul2026.pdf. The D.C. State Historic Preservation Office proposed an alternative site, at South Capitol Street, which would have avoided competition with the Lincoln Memorial and would have created new sightlines rather than severing existing ones. Letter from David Maloney, D.C. State Historic Pres. Officer, to Jennifer T. Nersesian, Reg'l Dir., Nat'l Park Serv. (June 26, 2026), https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_09._Section_106_-_CP_Comment_Letters_Jul2026.pdf. This alternative site also sits adjacent to substantial existing crowd infrastructure better suited to its celebratory character. *Id.* The National Park Service has refused to consider this—or any other—alternative location, instead asserting that the alternative location would alter the "fundamental nature" of the project. Letter from Travis Voyles, Advisory Council on Historic Preservation, to Tammy Stidham, National Park Service at 1 (Sept. 24, 2026), *available at* https://www.achp.gov/sites/default/files/2026-9/Section106ConsultationTerminationArch.pdf.

Failure to give meaningful consideration to alternative designs. The National Park Service also failed to consider alternative designs that would avoid, minimize, or mitigate adverse effects. For example, *amicus curiae* National Trust repeatedly called for the elimination of the observation deck, which would provide a vantage point for the viewing and photographing of funerals at Arlington National Cemetery, but that proposal was not adopted.

Defendants claim the Arch was authorized by the 1924 Arlington Memorial Bridge Commission. *See* Dkt. 44-1 at 38-39. But the National Park Service's failure to consider designs that hewed more closely to the structure contemplated by the Commission or the 1925 Authorization Act belies that assertion. That Commission envisioned a "plaza with fitting architectural adornment in a measure supplemental to the Lincoln Memorial across the river," featuring "two stately columns . . . framing in but not interfering with the view of the Lincoln

Memorial from the direction of the Lee Mansion" that would "symbolize the one the North and the other the South . . . surmounted by statues of Victory." Rpt. of the Arlington Memorial Bridge Comm'n, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) at 9, 40-41, *available at* https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf. *Amicus curiae* the Committee of 100 raised precisely this issue, and the D.C. State Historic Preservation Office recommended an alternative identical to the two columns reviewed by Congress in 1924 and 1925. But the National Park Service refused to consider this alternative design, stating that they were "not considering alternative location or changes in design." Letter from Judy Chesser and Paul Edmondson, Committee of 100, to Tammy Stidham, National Park Service at 1 (Sept. 16, 2026), *available at* https://www.washingtonpost.com/documents/38a7ea12-88b5-4c8f-b76c-0368a9d7e6bd.pdf.

<u>Failure to Minimize Harm to National Historic Landmarks</u>. The National Park Service has ignored NHPA's mandate to review with a heightened level of scrutiny the impacts the Arch would have on surrounding National Historic Landmarks. Under Section 110(f) of the NHPA, "[p]rior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107; 36 C.F.R. § 800.10(a). The record shows no efforts by the National Park Service to comply with this statutory requirement.

The National Park Service's own documents show that the Arch would harm six National Historic Landmarks and scores of other historic sites. The Service's National Historic Landmarks Coordinator admitted that "it appears impossible to minimize this very large and

visible project without relocating it or abandoning the arch design," and that further design review "is unlikely to result in any substantive improvements to the adverse effects unless the location, size, and/or configuration of the arch can be changed." Kathryn Smith Email to Tammy Stidham Re: Proposed Triumphal Arch Section 106 - consultation meeting, June 16, 2026, *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_09._ Section_106_-_CP_Comment_Letters_Jul2026.pdf. Both the Virginia and D.C. State Historic Preservation Offices reached the same conclusion. *See* June 26, 2026 Ltr. from D. Maloney, *supra*; Ltr. from Roger W. Kirchen, VA Dep't Historic Res. & State Historic Pres. Office, to Jennifer T. Nersesian, Reg'l Dir., Nat'l Park Serv., at 2 (June 26, 2026), *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_09._Section_106_-_CP_Comment_Letters_Jul2026.pdf. Yet the record discloses ***no*** consideration of alternative location, size, or configurations or other actions that, to "the maximum extent possible," would "minimize harm to the landmark." *See* 54 U.S.C. § 306107.

<u>Deficient Analysis of the Area of Potential Effects.</u> The National Park Service's Area of Potential Effects Report was based on an improper model, omitted or ignored numerous historic properties, and misunderstood the scale of the viewshed impacted. First, the National Park Service improperly modeled its assessment of potential effects on four precedent projects that were all rehabilitations of existing works, not new construction. Nat'l Park Serv., *June Assessment of Effects Report* § 3.2 (June 2026), *available at* https://www.ncpc.gov/files/ download.php?id=7862. Second, certain historic properties were entirely omitted from the June Area of Potential Effects Report, including Observatory Hill Historic District, the Pentagon, and

the White House, in contravention of the law. 36 C.F.R. § 800.4.[5] Although the August Assessment of Effects Report recognizes the adverse effects, it does nothing to address or resolve them. *See* Nat'l Park Serv., *Triumphal Arch at Memorial Circle Assessment of Effects Report* 33 (Aug. 2026), *available at* https://parkplanning.nps.gov/showFile.cfm?sfid=862935&projectID=136973. Third, a viewshed analysis submitted to consulting parties on July 28, 2026, justified the selection of a 3.5-mile Area of Potential Effects due to "the landscape being an urban, built-up area with relatively flat terrain;" however, the report clearly illustrates that numerous areas beyond the Area of Potential Effects would have a direct line of sight to the Arch. 36 C.F.R. § 800.4.

Failure to Comply with Section 4(f) of the Department of Transportation Act. The proposed Arch will require substantial, multi-year alterations to traffic patterns and also poses a substantial risk to flight operations at Reagan National Airport. Despite these clear transportation-related harms, the requirements to undertake "all possible planning" to minimize harms by transportation-related projects have not been met. *See* 49 U.S.C. § 303(c). Feasible and prudent alternatives, including changes to the height of the proposed Arch or its relocation, have been improperly barred from consideration by the National Park Service. And as above, the premature termination of Section 106 review precludes satisfaction of the "all possible planning" requirement.

Failure to comply with the Height of Buildings Act of 1910. The Height of Buildings Act of 1910 establishes height limits for buildings within Washington, D.C. with a maximum allowable height of 130 feet. Pub. L. No. 61-196, 36 Stat. 452 (1910). All previous exceptions

[5] The Area of Potential Effects "means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties" and "is influenced by the scale and nature of an undertaking." 36 C.F.R. § 800.16(d).

to the Height of Buildings Act have been narrowly and specifically established by law, including for Georgetown University Hospital (110 feet on a residential street) and the north side of Pennsylvania Avenue between 1st and 15th Streets NW (160 feet on a commercial street). D.C. Code § 6-601.05(b) and (h). The proposed Arch has not been exempted from this law. At over 250 feet tall, it would be substantially taller than any exemption ever granted. For example, the D.C. Code refers to the 160-foot exemption area on the north side of Pennsylvania Avenue as "an extreme height," yet the Arch would be at least 90 feet taller. D.C. Code § 6-601.05(b).

<u>Conclusory and Incomplete FONSI.</u> The National Park Service's Finding of No Significant Impact ("FONSI") fails to consider the impact of the proposed Arch on the monumental landscape as a whole or to fully analyze effects on cultural resources as required by NEPA. *See* 42 U.S.C. § 4331(b)(4). The FONSI further fails to address more than 100,000 comments opposed to the Arch, nearly all in opposition to the project. *See* Nat'l Park Serv., Triumphal Arch Environmental Assessment, *Finding of No Significant Impact: Triumphal Arch Environmental Assessment* (June 18, 2026), *available at* https://parkplanning.nps.gov/showFile.cfm?sfid=852874&projectID=136973.

<u>Premature and Improper Termination of the NHPA Section 106 Process.</u> On September 22, 2026, the National Park Service sent correspondence to the Advisory Council on Historic Preservation stating that the Service had been unable to reach agreement with the consulting parties regarding the extent to which adverse effects could be avoided or minimized. Sept. 24, 2026 Voyles Ltr., *supra*, at 1. In response, the acting Chair of the Advisory Council on Historic Preservation terminated consultation, stating there was limited likelihood of reaching agreement on the adverse effects of the Arch. *See id*. This action was improper because only the Executive Director has authority to unilaterally terminate consultations. ACHP Operating Procedures (as

amended July 12, 2023), at 21, *available at* https://www.achp.gov/sites/default/files/2023-08/ACHP%20Operating%20Procedures%20as%20amended%20July%2012%202023-Aug%202023draft.pdf. The Council then slashed the typical 45-day public comment window to only 5 days for both the public and Council members. *Compare* Sept. 24, 2026 Voyles Ltr., *supra*, at 2, *with* 36 C.F.R. § 800.7(c)(1)-(2). The National Park Service's and the Advisory Council on Historic Preservation's actions have steamrolled the NHPA process at every stage of the "consultation" process.

Significantly Changed Design. After terminating the Section 106 process, the National Park Service submitted a modified project design to the National Capital Planning Commission, which will be considered for final approval during its November 5, 2026 meeting. *See* Projects for the November 5, 2026 Commission Meeting, "New Monumental Arch," File Number 8778, *available at* https://www.ncpc.gov/review/agenda/; U.S. Dep't of the Interior, Project Synopsis, *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_Updated_-_Project_Synopsis_Nov2026.pdf. The Arch will now stand taller than 250 feet due to a newly redesigned statuary that now includes an eternal gas flame. *See* Nat'l Park Serv., Triumphal Arch at Memorial Circle, *Revised Environmental Assessment* (Oct. 2026) *available at* https://parkplanning.nps.gov/showFile.cfm?sfid=869022&projectID=136973. And the Arch has grown wider and longer to incorporate the gas line needed for the eternal gas flame. *Id.* It might even contain drones, snipers, and large quantities of sniper ammunition. *See* President Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 20, 2026, at 7:34 ET), *available at* https://truthsocial.com/@realDonaldTrump/posts/117303154231930646 ("I have agreed to convert the magnificent Triumphal Arch . . . into a top grade Military Complex/Triumphal Arch, to house, store, and have the rapid ability to use large numbers of drones, plus Snipers, on both

the roof and plaza areas, and additionally have and hold large quantities of sniper ammunition in storage.”).

The National Park Service’s June NHPA Section 106 review—which was based on plans already stamped “Released for construction”—occurred before these most recent plan changes and announcements. Accordingly, the Section 106 consultation did not allow for consideration of or comment on the additional visual impacts of the increased mass, height, eternal flame, gas lines, and the final blindingly bright lighting design—let alone consider how to accommodate snipers and drones along with visiting tourists. *See* Nat’l Park Serv., *June Assessment of Effects Report* at 31.

The final plans submitted to the National Capital Planning Commission on October 16 do not include any mention of military features, but a spokesman for the Department of the Interior has said the design is “capable of accommodating national security functions.”[6] The Chair of the National Capital Planning Commission has confirmed that “the military has determined that the arch is a necessary platform from which to provide advance defense capabilities for our capital.”[7] A militarized security installation at the ceremonial entrance to Arlington National Cemetery would bring adverse consequences these reviews and commissions never examined, including

---

[6] Mike Catalini, *New plans for Trump’s arch don’t mention the ‘military complex’ he said it would host*, AP NEWS (Oct. 19, 2026), *available at* https://apnews.com/article/trump-arch-military-complex-14eaf1a088ef04e24b5a15a971d12eee.

[7] Mark Paoletta, *Trump’s Triumphal Arch Completes A Longstanding National Aspiration*, The Federalist (Oct. 5, 2026), *available at* https://www.thefederalist.com/2026/10/05/trumps-triumphal-arch-completes-a-longstanding-national-aspiration. Based on the record to date, it appears the National Capital Planning Commission has no plans to consider the impacts of turning the Arch into a military platform at its November 5, 2026 hearing on the proposal. Even then, military installations are not exempt from the National Historic Preservation Act and have been the subject of 106 consultations in the past. *E.g.*, Record of Decision for 2005 Base Realignment and Closure Actions at National Naval Medical Center, Bethesda, MD, 73 Fed. Reg. 27,805 (May 14, 2008), *available at* https://www.federalregister.gov/d/E8-10752.

restricted public access to Memorial Circle and Memorial Avenue, perimeter hardening, additional lighting and surveillance, munitions storage beside the cemetery, and drone operations in the approach corridor to Reagan National Airport. Terminating the Section 106 process when the scope of the undertaking is in flux undermines the very purpose of the NHPA: It allows a project to go forward without having been subject to the scrutiny required under the law.

Failure to Provide a Meaningful Public Consultation Process. The Arch has generated extraordinary public outcry, as illustrated by the unprecedented number of comments—over 110,000—nearly all of which oppose the Arch. *See, e.g.*, Betsy Klein & Kaanita Iyer, CNN.com, *Trump's arch gets overwhelmingly negative public feedback but appears poised to move forward* (Apr. 16, 2026), *available at* https://www.cnn.com/2026/04/16/politics/trump-arch-feedback-commission. "Rather than respond to the concerns repeatedly raised by the public and consulting parties, the National Park Service simply pushed ahead, accelerating the process toward a predetermined outcome." Ltr. from Elizabeth Merritt, Nat'l Trust for Historic Preservation, to Travis Voyles, Advisory Council on Historic Preservation at 4 (Sept. 28, 2026), *available at* https://savingplaces.org/national-trust-objection-to-termination-of-section-106-for-arch-9-28-26.

* * *

The National Park Service's consultation process has been little more than a formality. The NHPA requires that the agency give the identified alternatives "full and reasoned consideration," not simply declare the most meaningful avoidance measures as beyond discussion. *Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1170-71 (9th Cir. 2016). The decision to terminate consultation after disregarding all suggested mitigation measures is inconsistent with both the letter and spirit of the NHPA, as well as the Section 106 regulations.

*See* 36 C.F.R. § 800.2(d)(1) ("The views of the public are essential to informed Federal decision making in the section 106 process."). The Arch exemplifies the type of work NEPA and the NHPA were intended to prevent: a rushed, historically inappropriate, and politically driven approval process that poses real, irreversible damage to historic and cultural resources in our Nation's capital.

## II. OTHER COMMEMORATIVE WORKS ILLUSTRATE THE PROPER PROCESS

Congress has authorized 48 commemorative works on federal lands in the District or its environs since the CWA's enactment. *See* Jacob R. Straus, Cong. Rsch. Serv., *Commemorative Works in the District of Columbia: Background and Practice*, 23-26 (May 8, 2023) (cataloging commemorative works). Analyzing representative examples—the World War II Memorial, the Martin Luther King, Jr. Memorial, and the National Global War on Terrorism Memorial—sheds light on what the process should look like under Congress's careful statutory scheme. Each of those projects addressed significant public input, extensively considered alternative designs and locations, and received express Congressional approval before construction commenced. These examples demonstrate that Congress knows how to build a new monument on federal land in DC but has chosen not to here.

***The World War II Memorial.*** The bill to authorize the World War II Memorial was first introduced in 1987 and was passed by Congress and signed into law by President Clinton in 1993. *See* Pub. L. No. 103-32, 107 Stat. 90 (1993). In 1994, Congress approved its Area I location. *See id.* Six years of public debate and analysis followed, during which seven sites and over four hundred designs were analyzed and considered. Friends of the National World War II Memorial, *The National WWII Memorial Chronology*, *available at* https://www.wwiimemorialfriends.org/chronology; *see also* Comm'n of Fine Arts, *July 24, 1997 Meeting Minutes*, *available at* https://archive.org/details/cfaminutes24july1997 at 45.

The Commission of Fine Arts voiced strong concern over the mass and scale of the initial design proposal, requesting that the design be given further study and resubmitted before approval. Comm'n of Fine Arts, July 24, 1997 Meeting Minutes at 77, *available at* https://archive.org/details/cfaminutes24july1997. The National Capital Planning Commission similarly requested design modifications and an analysis of various environmental considerations. Friends of the National World War II Memorial, *The National WWII Memorial Chronology*, *available at* https://www.wwiimemorialfriends.org/chronology. The changes included, among others, altering the initial design from large visually obstructive berms to a series of stone pillars representing the U.S. states and territories, safeguarding sightlines along the Mall; and lowering a proposed granite wall and waterfall on the western side of the memorial, which would have obstructed the view of the Lincoln Memorial. *See, e.g.*, Comm'n of Fine Arts, May 20, 1999 Meeting Minutes at 35, *available at* https://archive.org/details/cfaminutes20may1999; Comm'n of Fine Arts, May 21, 1998 Meeting Minutes at 48, *available at* https://archive.org/details/cfaminutes21may1998.

After the final design was approved in 2000, the January 2001 construction permit was issued, and a lawsuit stalled construction, Congress stepped in. The law (i) directed that the memorial be built "expeditiously at the dedicated Rainbow Pool site"; (ii) required any design elements not yet approved to go through the CWA § 2; and (iii) barred judicial review of the site, the commission approvals, and the permit. *See* Pub. L. No. 107-11, 115 Stat. 19 (2001). It took three years for the Commission of Fine Arts and the National Capital Planning Commission to approve the final design. Friends of the National World War II Memorial, *The National WWII Memorial Chronology*, *available at* https://www.wwiimemorialfriends.org/chronology.

**Martin Luther King, Jr. Memorial.** The Martin Luther King, Jr. Memorial obtained congressional authorization through initial and follow-on legislation spanning 1996 through 2009. Pub. L. No. 108–125, 117 Stat. 1347 (2003). Congress extended the authorization two more times. Pub. L. No. 109-54, § 134, 119 Stat. 527 (2005) (extending the authorization until November 12, 2008); Pub. L. No. 111-88, § 129, 123 Stat. 2933 (2009) (extending the authorization until November 30, 2010). Further, the memorial obtained a joint resolution from Congress approving its location in Area I. Pub. L. No. 105–201, 112 Stat. 675 (1998).

***National Global War on Terrorism Memorial.*** To expedite the National Global War on Terrorism Memorial, Congress exempted it from the requirements that (i) any military memorial "may not be authorized until at least 10 years after the officially designated end of such war or conflict, and (ii) any work "commemorating an event, individual, or group of individuals, . . . , may not be authorized until after the 25th anniversary of the event, death of the individual, or death of the last surviving member of the group." Pub. L. No. 115-51, 131 Stat. 1003 (2017). Congress overrode the general prohibition on the placement of any new memorials within the Reserve area, while still requiring that the memorial comply with other aspects of the CWA. Pub. L. No. 117-81, § 6605, 135 Stat. 2442 (2021).

The project otherwise adhered to the statutory scheme. Thirty-five potential memorial sites were considered. *See, e.g.*, NCPC, Global War on Terrorism Memorial Site Selection, *Commission Action*, Apr. 6, 2023, *available at* https://www.ncpc.gov/projects/8450/. Ultimately, the Commission of Fine Arts and National Capital Planning Commission required the memorial to maintain a low profile due to its proximity to the Lincoln Memorial. NCPC, Global War on Terrorism Site Selection, *Staff Report*, Apr. 6, 2023, *available at* https://www.ncpc.gov/docs/actions/2023April/8450_Global_War_on_Terrorism_Memorial_Site_Selection_Staff_Report_Ap

r2023.pdf; *see also* NCPC, Global War on Terrorism Memorial Site Selection, *Commission Action*, Apr. 6, 2023, *available at* https://www.ncpc.gov/projects/8450/.

## III. DEFENDANTS' FAILURE TO ADHERE TO THE STATUTORY SCHEME WILL HAVE SIGNIFICANT CONSEQUENCES FOR NATIONAL PARK SITES, HISTORIC SITES, AND CULTURAL LANDSCAPES

This case is about more than a technocratic desire to adhere to statutory requirements. Defendants' wholesale failure to comply with the CWA, NEPA, and NHPA will have significant consequences for the National Mall, Arlington National Cemetery, and the surrounding national park landscape. The location, design, and scale of the proposed Arch threaten to disturb the deliberate scheme of the Capital's monumental core and to impermissibly encroach on forty-two historic properties, including six National Historic Landmarks.

The McMillan Commission, formed at the turn of the twentieth century to revive and modernize the District, created a comprehensive design of the National Mall that balanced open space, clear sightlines, and commemorative purpose. Every "considerable undertaking" within the District was intended to "contribute its part to enhancing the value of the whole," where "no such undertaking should be allowed to invade, to mutilate, or to mar the symmetry, simplicity, and dignity" of the District. Charles Moore, ed., *The Improvement of the Park System of the District of Columbia, Report of the Senate Committee on the District of Columbia* at 17 (1855-1942), *available at* https://archive.org/details/bub_gb_Ob7PAAAAMAAJ/page/n5/mode/2up. The design intentionally entailed historic "axial" views that connected the Lincoln Memorial, Arlington Memorial Bridge, Memorial Circle, and Arlington House. Nat'l Park Serv., *June Assessment of Effects Report* at 3. The proposed site of the Arch—Memorial Circle—sits at the center of this comprehensive plan, connecting the Lincoln Memorial, Arlington Memorial Bridge, and Arlington National Cemetery. The sponsoring agency describes that corridor as a nationally significant "ceremonial gateway" and "symbolic landscape commemorating national

unity and reconciliation following the Civil War." *Id.* at 12-13, 21-22.

The size, design, and location of the Arch would shatter the overall design concept of the monumental core. The Arch's height and three gilded statues, observation deck, and eight light stanchions (among other features) would contravene the "symmetry, simplicity, and dignity" intended by the McMillan Plan. Nat'l Park Serv., *August Assessment of Effects Report* at 37-45; Moore, ed., *supra*, at 17. President Trump's announcement that the Arch may house drones, snipers, and ammunition raises serious concerns that the Arch will irreparably alter the serenity and commemorative character of the entire area—a consideration made worse by the recognition that the Arch would intrude on the final resting place of American soldiers. Its hulking 250-plus-foot height, planned illumination and eternal flame, and the gilded statuary, gift shop, and viewing deck would all interfere with the solemn character of Arlington National Cemetery. *See* Nat'l Park Serv., *August Assessment of Effects Report* at 37-40; Ltr. from Edward Stierli, Mid-Atlantic Senior Reg'l Dir., Nat'l Parks Conservation Ass'n, to William Scharf, Chair, Nat'l Capital Planning Comm'n (May 15, 2026), *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_Public_Testimony_Jun2026.pdf.

Beyond disturbing Arlington National Cemetery, the Arch threatens some of the most historically significant works in the capital—the Arlington Memorial Bridge, Memorial Avenue, the Lincoln Memorial, and Arlington House—and the relationship between them. *See* 40 U.S.C. § 8905. The Lincoln Memorial and Arlington National Cemetery anchor one of the most deliberate and historically resonant acts of civic design in American history, designed to be "a monumental bridge and axial landscape composition linking the planned Lincoln Memorial with Arlington House, the former home of Robert E. Lee." Nat'l Park Serv., *August Assessment of Effects Report* at 20. The McMillan Commission's designers "envisioned a ceremonial line that

would visually and symbolically connect the monumental core of Washington, D.C., with the heights of Arlington," purposefully aligning the Lincoln Memorial's western axis with Arlington House. Nat'l Park Serv., Triumphal Arch at Memorial Circle, *Environmental Assessment* at 16-17, 25 (June 2026). Congress authorized the Arlington Memorial Bridge in 1925 with the explicit symbolic purpose "to physically and visually unite the Lincoln Memorial, representing the Union, with Arlington House and the cemetery that surrounds it, the former home of Robert E. Lee and the ground where the nation's war dead are interred," representing post-Civil War reconciliation. *Id.* at 17. Consistent with its purpose and the comprehensive design of the monumental core, the bridge "was designed low with a classical restraint that would not interrupt the sightlines between the Memorial and the cemetery." U.S. Department of the Interior: National Park Service, *Cultural Landscape Report: Memorial Avenue Corridor, George Washington Parkway*, Frisbie M, Lester M, Mao C, Penberthy R, Shang H, Wang Z, Drake R, May 2024, Washington, DC, at 27 *available at* https://irma.nps.gov/DataStore/Reference/Profile/2313163.

The Arch would fundamentally—and irreparably—upset this careful design. Critically, the Arch would disrupt the axial alignment between the Lincoln Memorial and Arlington House. Nat'l Park Serv., *August Assessment of Effects Report* at 32-33. It would also forever alter views from Arlington House and the Kennedy Gravesite to the Lincoln Memorial and Washington Monument, to and from Memorial Amphitheater, and between the Lincoln Memorial and Memorial Avenue Corridor. *Id.* at 109.[8]

---

[8] Other recent design changes would exacerbate these harms. For example, the final design includes an eternal flame in lieu of red obstruction lights. *See* U.S. Department of the Interior, Approval of Final Site and Building Plan, *available at* https://www.ncpc.gov/files/projects/2026/8778_New_Monumental_Arch_Updated_-_Project_Synopsis_Nov2026.pdf. That change requires supplemental lighting in the form of continuous floodlight searchlight projects at the

Defendants' failure to adhere to Congress's careful scheme for the construction of commemorative works has resulted in the imminent construction of an Arch that would dramatically impact public enjoyment of the most iconic commemorative works and landmarks in the country and would irreversibly alter the Capital's monumental core. This Court should stop its construction.

**CONCLUSION**

*Amici curiae* respectfully request the Court preliminarily, and permanently, enjoin construction of the Arch.

Respectfully submitted,

/s/ *Lauren M. Weinstein*

Lauren M. Weinstein (Bar No. 1035184)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
lweinstein@omm.com

Katie Gosewehr
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Tel: (415) 984-8815
kgosewehr@omm.com
*Pro Hac Vice Forthcoming*

Thomas M. Harris
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660
Tel: (949) 823-6933
clintharris@omm.com
*Pro Hac Vice Forthcoming*

base of the structure providing an "average illumination of at least 15 foot-candles." *Id.* at 29. This would make the proposed Arch incredibly bright—more than 7 times as bright as the Washington Monument—washing out the nighttime visual motif Congress carefully curated. *See Monumental Arch Lighting Plan* at 27, *available at* https://www.ncpc.gov/review/agenda.

Harmukh Singh
O'MELVENY & MYERS LLP
401 West 4th Street, Suite 3300
Austin, TX 78701
Tel: (737) 261-8643
hsingh@omm.com
*Pro Hac Vice Forthcoming*

Marion F. Werkheiser (Bar No. 486465)
Charles N. Curlett, Jr.
Caitlin McCurdy
Katherine Lee Sorrell
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594

*Counsel for* Amici Curiae