**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL LEMMON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Civil Action No. 26-cv-544 (TSC)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS


INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I. Legal Background ..................................................................................... 2

A. Congress approved constructing tall structures surmounted by statues on Columbia Island when authorizing Arlington Memorial Bridge ..................................................................................... 2

B. The Executive Branch has long approved design changes to Arlington Memorial Bridge development ..................................... 5

C. Other statutes do not curtail Executive Branch design discretion ............. 8

II. Factual and Procedural Background ........................................................ 9

A. Plaintiffs prematurely filed this lawsuit to block further planning and eventual construction of the Arch .................................................. 9

B. The Executive Branch has diligently complied with the relevant statutory processes for review of the arch proposal ............................... 11

C. Plaintiffs' second preliminary injunction motion provides no new evidence ..................................................................................... 12

STANDARD OF REVIEW ..................................................................................... 12

ARGUMENT ..................................................................................................... 13

I. Plaintiffs Fail to Establish Standing, Much Less Irreparable Harm ..................... 13

A. Plaintiffs fail to establish Article III injury ............................................. 13

B. Plaintiffs fail to establish irreparable harm ............................................. 23

II. Plaintiffs Have Failed to Establish Substantial Likelihood of Success on the Merits ..................................................................................... 25

A. Plaintiffs have not carried their burden to establish a waiver of sovereign immunity ..................................................................... 26

B. Plaintiffs have failed to establish likelihood of success on their *ultra vires* statutory-authority claim ................................................ 28

a. Plaintiffs' *ultra vires* claim is unavailable due to the APA .......... 29

b. Plaintiffs fail to show that arch construction is unauthorized by the Congress ... 33

c. Plaintiffs fail to show that the CWA or § 8106 prohibit arch construction ... 37

C. Plaintiffs have failed to establish likelihood of success on their constitutional claim ... 40

III. The Balance of Equities and Public Interest Tilt Heavily Against an Injunction ... 42

CONCLUSION ... 45

## TABLE OF AUTHORITIES

### Cases

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024) ........ 39

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019) ........ 32

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987) ........ 51

*Arizona v. Mayorkas*,
600 F. Supp. 3d 994 (D. Ariz. 2022) ........ 71, 73

*Ashwander v. Tenn. Valley Auth.*,
297 U.S. 288 (1936) ........ 46

*Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.*,
502 U.S. 32 (1991) ........ 54, 55

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ........ 51

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
292 F. Supp. 2d 9 (D.D.C. 2003) ........ 47

*Carr v. United States*,
560 U.S. 438 (2010) ........ 44

*Cartwright Int'l Van Lines, Inc. v. Doan*,
525 F. Supp. 2d 187 (D.D.C. 2007) ........ 42

*Center for Biological Diversity v. McAleenan*,
404 F. Supp. 3d 218 (D.D.C. 2019) ........ 71

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........ 45, 49, 56

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ........ 48, 51, 58

*Chuidian v. Philippine Nat. Bank*,
912 F.2d 1095 (9th Cir. 1990) ........ 47

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) ........ 77

*Cullen v. Pinholster*,
563 U.S. 170 (2011) ........ 44

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 69, 70

**Davis v. FEC*,
554 U.S. 724 (2008) .......... 33, 35, 41, 46

*Davis v. Pension Benefit Guar. Corp.*,
734 F.3d 1161 (D.C. Cir. 2013) .......... 32

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 52

*Diamond v. Charles*,
476 U.S. 54 (1986) .......... 18

*Dugan v. Rank*,
372 U.S. 609 (1963) .......... 45

*EDF v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) .......... 28

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 18, 19, 22, 25

*Fisheries Survival Fund v. Jewell*,
236 F. Supp. 3d 332 (D.D.C. 2017) .......... 36

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) .......... 40

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 44, 52

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 23

*Geronimo v. Obama*,
725 F. Supp. 2d 182 (D.D.C. 2010) .......... 43

**Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... passim

*Griffith v. Fed. Lab. Rels. Auth.*,
842 F.2d 487 (D.C. Cir. 1988) .......... 59

*Hanson v. D.C.*,
120 F.4th 223 (D.C. Cir. 2024) .......... 37

*Harris Cnty. Texas v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) .......... 16

*Hutto v. Davis*,
454 U.S. 370 (1982) .......... 30

*Irwin v. Dep't of Veterans Affairs,*
498 U.S. 89 (1990) .......... 41

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928)........................................................................................................ 69

*Jafarzadeh v. Duke*,
270 F. Supp. 3d 296 (D.D.C. 2017)................................................................................ 53

*Lackey v. Stinnie*,
604 U.S. 192 (2025)................................................................................................ 15, 37

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949)........................................................................................................ 45

*League of United Latin Am. Citizens v. Exec. Office of President,*
808 F. Supp. 3d 29 (D.C. Cir. July 2, 2026) ................................................................ 56

*Lewis v. Hunt*,
492 F.3d 565 (5th Cir. 2007) .................................................................................. 41, 46

*Lewis v. U.S. Parole Comm'n*,
743 F. Supp. 3d 181 (D.D.C. 2024)................................................................................ 53

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)........................................................................................................ 67

*Mackinac Tribe v. Jewell*,
87 F. Supp. 3d 127 (D.D.C. 2015)........................................................................ 41, 42, 43

*Malone v. Bowdoin*,
369 U.S. 643 (1962)........................................................................................................ 46

*Mississippi v. Johnson*,
71 U.S. 475 (1866).......................................................................................................... 72

*Munaf v. Geren*,
553 U.S. 674 (2008)........................................................................................................ 15

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025)................................................................................ 74

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
595 U.S. 109 (2022)........................................................................................................ 66

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025)..................................................................................................... 30

**Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*,
609 U.S., ---, No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026).............................. passim

*Nat'l Parks Conservation Ass'n v. Semonite*,
282 F. Supp. 3d 284 (D.D.C. 2017)................................................................................ 38

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026)............................................................................... passim

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
827 F. Supp. 3d 93 (D.D.C. 2026) .... 9, 53

*Natural Res. Def. Council Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) .... 64

*Nken v. Holder*,
556 U.S. 418 (2009) .... 16

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .... 49

**Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .... passim

*Oliver v. United States*,
335 F.2d 724 (D.C. Cir. 1964) .... 50

*Parrish v. Dayton*,
No. CIV. 13-1348 MJD/AJB, 2013 WL 4536260 (D. Minn. Aug. 27, 2013) .... 75

*Peregrine Myanmar Ltd. v. Segal*,
89 F.3d 41 (2d Cir. 1996) .... 78

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .... 74

*Santos v. Collins*,
No. CV 24-1759, 2025 WL 1823471 (D.D.C. Feb. 26, 2025) .... 39

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) .... 32

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) .... 75

*Sheikh v. District of Columbia*,
305 F.R.D. 16 (D.D.C. 2014) .... 31

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) .... 49

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) .... 40

*Sloan v. Urb. Title Servs., Inc.*,
689 F. Supp. 2d 94 (D.D.C. 2010) .... 31

*Stagg P.C. v. United States Dep't of State,*
673 F. App'x 93 .... 77

*State v. Musk*,
769 F. Supp. 3d 1 (D.D.C. 2025) .... 36

*Thorp v. D.C.*,
319 F. Supp. 3d 1 (D.D.C. 2018) .......... 32

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 17, 24

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) .......... 57

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) .......... 29

*Trump v. California*,
609 U.S. ---, No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) .......... 33, 34, 35, 54

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 75

*Trump v. New York*,
592 U.S. 125 (2020) .......... 35, 49

*United States v. Abou-Khatwa*,
No. 18-CR-67 (TSC), 2022 WL 278770 (D.D.C. Jan. 31, 2022) .......... 30

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
454 U. S. 464 (1982) .......... 22

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
50 F.4th 164 (D.C. Cir. 2022) .......... 67

*Wildearth Guardians v. Salazar*,
880 F. Supp. 2d 77 (D.D.C. 2012) .......... 32

**Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 15, 73, 77, 78

*Yellowstone to Uintas Connection v. Bolling*,
No. 4:25-CV-00211-DCN, 2025 WL 1928052 (D. Idaho July 14, 2025) .......... 40

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 70

**Statutes**

5 U.S.C. § 702 .......... 26, 27

5 U.S.C. §§ 124–132 (1934) .......... 6

6 U.S.C. § 124n .......... 12

16 U.S.C. § 451 .......... 38, 39

40 U.S.C. § 8106 .......... passim

40 U.S.C. § 8711(b)(1) .......... 22

40 U.S.C. § 8902(a)(1) ... 38
40 U.S.C. § 8902(b) ... 37
40 U.S.C. § 9102 ... 8
54 § U.S.C. 100101(a) ... 36
37 Stat. 417 (1912) ... 8
Pub. L. No. 101-512, 104 Stat. 1915 (1990) ... 39
Pub. L. No. 103-111, 107 Stat. 1046, (1993) ... 39
Pub. L. No. 104-333, 110 Stat. 4093 (1996) ... 38
Pub. L. No. 62-432, 37 Stat. 866 (1913) ... 4
Pub. L. No. 65-181, 40 Stat. 634 (1918) ... 38
Pub. L. No. 68-463, 43 Stat. 974 (1925) ... 5, 41
Pub. L. No. 73-109, 48 Stat. 362 (1934) ... 6
Pub. L. No. 76-417, 54 Stat. 36 (1940) ... 38
Pub. L. No. 80-841, 62 Stat. 1112 (1948) ... 39
Pub. L. No. 99-652, 100 Stat. 3650 (1986) ... 8, 34

**Rules**

Fed. R. Civ. P. 65(b)(2) ... 42

**Other Authorities**

4 Comp. Gen. 832 (Apr. 3, 1925) ... 35
89 Fed. Reg. 97631 (Dec. 9, 2024) ... 36
Pub. Res. No. 74-55, 49 Stat. 798 (1935) ... 9
S. Doc. No. 95, 68th Congress, 1st Session (1924) ... 5
S. Res., 17 Cong. Rec. 4826 (May 24, 1886) ... 2
U.S. Const. art. II, § 3 ... 41

## INTRODUCTION

This case has been fully briefed on the merits three times. Plaintiffs now bring yet another breathless emergency motion seeking preliminary injunctive relief to forestall construction of an arch on Memorial Circle. But Plaintiffs' complaint has grown only weaker with time; their theory of Article III standing is now foreclosed by the Supreme Court's recent and directly on-point White House ballroom decision. *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States* (*NPS*), 609 U.S. ---, No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026). Plaintiffs allege that the arch will block their view of the Lincoln Memorial if they stand in a specific place in Arlington Cemetery. This, they feel, will "interrupt the symbolic connection between the Lincoln Memorial and Arlington National Cemetery." Lemmon Decl. ¶ 8, Dkt. 7-2. They allege that the "project is profoundly disturbing," a "visual affront" to democracy "and a personal affront to people," and that many others share their "outrage." *Id.* ¶¶ 8–9, 12–13. These allegations of offended-observer standing fail, just as Alison Hoagland's allegations that the ballroom obstructed the untarnished view of the White House failed in *National Park Service*. Plaintiffs have no answer for this. Indeed, they have repeatedly cited the district court's injunction—now stayed by the Supreme Court—as direct support for their standing. The Court should adhere to *National Park Service* and deny Plaintiffs' motion for lack of standing.

The Court should also deny Plaintiffs' motion for lack of irreparable harm. At least the first six months of arch construction will involve below-grade excavation and foundation work that will have no effect on Plaintiffs' asserted interests in gazing across "the unobstructed vista" with "an aura of peace," undespoiled by the "visual affront" of the "arch's symbolism." Byrnes Decl., ¶¶ 9–13, Dkt. 7-3. Because six months provides ample time for the Court to resolve the pending dispositive motions, preliminary relief is not warranted.

Plaintiffs' motion also fails on the merits. In eschewing claims under the Administrative Procedure Act (APA), Plaintiffs rely exclusively on two non-statutory claims that have been repeatedly curtailed by higher courts. Their *ultra vires* claim fails for numerous reasons, including the availability of meaningful APA review and the existing Congressional authorization to build tall structures surmounted by statues on Columbia Island. And their Take Care Clause claim has been rejected by every court to consider it over the last 150 years.

Finally, the equities tilt heavily against injunctive relief. The government would be irreparably harmed by an injunction issued when Plaintiffs lack standing. An injunction would also disrupt a generational national defense opportunity to mitigate evolving threats from the proliferation of small, unmanned aircraft systems. When such weighty government interests are balanced against the Plaintiffs' asserted symbolic harms, no injunction may issue.

## BACKGROUND

### I. Legal Background

#### A. Congress approved constructing tall structures surmounted by statues on Columbia Island when authorizing Arlington Memorial Bridge.

American leaders have long envisioned majestic arches adorning the banks of the Potomac. President Andrew Jackson envisioned a bridge spanning the Potomac River "with arches of ever-enduring granite," Dkt. 36-22, at 1, and Secretary of State Daniel Webster pushed to fulfill that vision, *see id.* The U.S. Senate eventually acted to make that vision a reality, directing the Secretary of War to examine and report on such a bridge in 1886. S. Res., 17 Cong. Rec. 4826 (May 24, 1886). Ensuing design competitions were held to consider different proposals for the bridge. *E.g.*, U.S. Comm'n of Fine Arts, Designing the Nation's Capital: The 1901 Plan for Washington, D.C. 118 (2006) (Eds., Sue Kohler & Pamela Scott), Dkt. 44-18. One prominent proposal, seen below,

"was the favored design" of the Senate Park Commission (a.k.a. the McMillan Commission) when it began its work:



Fig. 16 George Keller, proposed design for Memorial Bridge, 1900; perspective view from Washington side of the bridge. Library of Congress, General Collections

*Id.* at 117–118. Whereas the Keller design proposed an arch surmounted by statues at one end of the bridge, the Bingham design proposed arches at both ends of the memorial bridge:




Fig. 15 Colonel Bingham's March 1900 Plan for the Mall (detail). Collection: Pamela Scott

*Id.* at 115. Other designs proposed arches atop the bridge itself "that masked the working of its central draw," *id.* at 116–117, as seen below:







Dkts. 44-21 & 44-22.

Following this extensive architectural dialogue, Congress created the Arlington Memorial Bridge Commission (Bridge Commission) to report "to Congress a suitable design for a Memorial Bridge across the Potomac River." Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913).[1] The Bridge Commission reviewed much of the previous design work done for the bridge before reporting its design in 1924, proposing designs not only for the bridge, but also for Columbia Island at the

[1] The Bridge Commission consists of "the President of the United States, the President of the Senate, the Speaker of the House of Representatives, and the chairman of the Committees on Public Buildings and Grounds of the Senate and House of Representatives." 37 Stat. at 855.

bridge's west end.[2] The Bridge Commission recommended "development of Columbia Island as a park," and advocated for the inclusion of "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Bridge Commission Report 40–41. "The columns are 166 feet high or practically of the same height as the Colonne de Juillet in Paris." *Id.* at 41.

Congress authorized construction to proceed "in accordance with the design" in the Bridge Commission Report. Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925) (Authorization Act). But the Authorization Act did not mandate rigid adherence to that design; instead, it empowered the Bridge Commission to make design changes "as in its discretion may be found to be necessary or advisable." *Id.*

### B. The Executive Branch has long approved design changes to Arlington Memorial Bridge development.

Despite explicit congressional authorization, the monument plaza not yet been built. In 1931, concerns were raised that the dredged soil of Columbia Island may prove insufficient for column foundations and the columns may interfere with aviation interests at the old Washington-Hoover Airport. Ex. B, Letter from Commission of Fine Arts ("CFA") Chairman to Lt. Col. Ulysses S. Grant III, Exec. Officer, Bridge Commission (Nov. 20, 1931); Dkt. No. 12, at 6. As the CFA deemed the columns "an essential feature in the proposed development of Columbia Island," it recommended "postpon[ing] the erection of these columns until the other features" were first finished. Ex. B.

---

2 Report of the Arlington Memorial Bridge Commission 21–30, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

The architect of the Arlington Memorial Bridge, William Kendall, "felt that the columns were absolutely necessary to his design and even went so far as to write President Hoover (who had asked that the columns be omitted) giving his arguments for keeping them, including a suggestion that the airport be moved if interference with aircraft was really a problem." Sue A. Kohler, The Commission of Fine Arts: A Brief History 1910–1995, 26 (1996) (Kohler, Brief History). His colleague likewise expressed great distress at eliminating a feature at "the very essence of the design." Ex. C, Letter from Lawrence Grant White to Charles Moore, CFA (Oct. 15, 1931).

After the Bridge Commission functions were reassigned to NPS[3]—and the country survived the Great Depression and World War II—the National Capital Planning Commission (NCPC) returned to the treatment of Columbia Island. Ex. D, Extract from Minutes of NCPC Meeting (Oct. 30–31, 1947). Once the dredged land had settled, NCPC recommended that NPS, in conjunction with CFA and District Commissioners "undertake a restudy of the plans for the treatment of Columbia Island under the Arlington Memorial Bridge Project, with a view to completion of the project by 1950." *Id.* And the former Executive Officer of the Bridge Commission wrote to the NPS Director lamenting that—while other parts of the bridge were finally nearing completion—"the central plaza on Columbia Island has never been undertaken and seems to be absolutely essential to link together the two parts of the project, namely, the main bridge itself and entrance to Arlington Cemetery." Ex. E, Letter from Maj. Gen. U.S. Grant III to Newton B. Drury (Nov. 17, 1947). The CFA Chairman concurred, while calling for new plans to

[3] During the New Deal-era reorganization of government, President Franklin Roosevelt transferred the Bridge Commission's functions to the Office of National Parks, Buildings, and Reservations in the Department of the Interior. 5 U.S.C. §§ 124–132 (1934); Executive Order 6166 § 2. And Congress renamed that office as the National Park Service (NPS). *See* Department of the Interior Appropriations Act, Pub. L. No. 73-109, ch. 38, 48 Stat. 362, 389 (1934).

be drawn up "as the old original plans prepared by the architects of the bridge are no longer applicable." Ex. F, Letter from Gilmore D. Clarke to NPS Director (Nov. 22, 1947). The NCPC agreed, explaining that "[b]ecause of the war and the other things the plan for development of the Island was forgotten," leaving the "middle knocked out" of the design. Ex. G, Extract from Minutes of NCPC Meeting (Dec. 11–12, 1947).

Although other aspects of the bridge—like the equestrian statues that replaced Kendall's original pylons at the Washington entrance to the bridge—were eventually added by 1951,[4] Columbia Island remains incomplete. It does not resemble "a plaza with fitting architectural adornment," including "two stately columns" "surmounted by statues." Bridge Commission Report 40–41. Memorial Circle instead remains an approximately 300-foot-diameter circle of grass, as seen in the following aerial image:



4 Although sculptors prepared plaster models in 1941, the statues were not added until 1951, after the Government of Italy cast them as a gift. National Park Service, Historic American Engineering Record (HAER), Arlington Memorial Bridge, HAER No. DC-7, at 96–102, https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0600/dc0604/data/dc0604data.pdf.

**C. Other statutes do not curtail Executive Branch design discretion.**

In 1912, the Army Corps of Engineers—then known as the Engineer Department in the War Department—had jurisdiction over parks in the District of Columbia. In that year's appropriations bill for the Engineer Department, Congress included a provision stating that "[h]ereafter there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress." Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 443-44 (1912). That provision is currently codified at 40 U.S.C. § 8106, which cannot be read to require anything more than "*some form* of authorization from Congress to construct a building." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 109 (D.D.C. 2026), *opinion clarified sub nom. Nat'l Tr. for Historic Pres. in United States v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 1027744 (D.D.C. Apr. 16, 2026). But Section 8106 says nothing about *design* approval, a subject that Congress has entrusted to the CFA. *See, e.g.*, 40 U.S.C. § 9102 (requiring deciding officers to seek the CFA's advice on "selection of models for statues, fountains, and monuments erected under the authority of the Federal Government").

In 1986, Congress passed the Commemorative Works Act (CWA), which sets forth specific procedures for new authorizations of commemorative works in certain areas of the District of Columbia. Pub. L. No. 99-652, 100 Stat. 3650 (1986), codified at 40 U.S.C. ch. 89. But the Act "does not apply to commemorative works authorized by a law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3654, codified at 40 U.S.C. § 8902(b). Thus, commemorative structures authorized by a law enacted by an earlier Congress, such as the Fourth Division

Memorial,[5] can be completed without following CWA procedures, even if many decades have passed since the authorizing law was enacted.

## II. Factual and Procedural Background

### A. Plaintiffs prematurely filed this lawsuit to block further planning and eventual construction of the Arch.

Over a year ago, President Trump first publicly proposed building an arch in Memorial Circle on Columbia Island, a site managed by the NPS. After the President posted an image of such an arch on social media,[6] ensuing press reports speculated about the size of, and construction timeline for, that arch. *See* Compl. ¶¶ 31–38, Dkt. 1 (citing press reports).

Before any NPS action concerning the proposed arch occurred, Plaintiffs brought this lawsuit in February against NPS, the President, the Executive Office of the President, and Vince Haley, Director of the Domestic Policy Council. Plaintiffs asserted only non-statutory and constitutional ultra vires claims. *Id.* ¶¶ 52–64. They did not allege (and have not since alleged) any claim under the APA. Without mentioning the Authorization Act authorizing Columbia Island construction, Plaintiffs alleged that Defendants lack any congressional authorization to build on Memorial Circle. *See id.* ¶¶ 47, 54. Moreover, Plaintiffs alleged that—absent judicial intervention—the arch would be constructed by July 4, 2026, without following procedural prerequisites under the National Environmental Policy Act (NEPA) and Section 106 of the National Historic Preservation Act (NHPA), *id.* ¶ 64, or being submitted for "consultation and review by the [NCPC] and the [CFA]," *id.* ¶¶ 27, 55–56.

---

[5] Congress authorized the Fourth Division Memorial in 1935, Pub. Res. No. 74-55, 49 Stat. 798 (1935), but it was "not completed for another 65 years," NPS, 4th (Ivy) Infantry Division Memorial, https://www.nps.gov/gwmp/learn/historyculture/4th_infantry.htm.

[6] https://truthsocial.com/@realDonaldTrump/posts/115353640080693628.

Plaintiffs soon sought a preliminary injunction. Pls.' Mot. for Prelim. Inj., Dkt. 7. They claimed that injunctive relief was necessary to prevent the infliction of a "profoundly disturbing" "dignitary affront" that would leave them "feeling insulted and disrespected," thus disrupting their "aesthetic experience of personally meaningful vistas." Pls.' 1st Prelim. Inj. Br. 20–21, Dkt. 7-1 (citations omitted). Plaintiffs asserted no interest in Memorial Circle itself; instead, they wanted to look *over* Memorial Circle to view other monuments. *E.g.*, Byrnes Decl. ¶ 10 (expressing concern that the arch "will obstruct the clear line-of-sight view of the Lincoln Memorial and other monuments on the National Mall from the cemetery"). Likewise, Plaintiffs assumed the arch would be constructed without review by the NCPC and the CFA, and without complying with procedural requirements under NEPA and Section 106 of the NHPA. *See* Pls.' Prelim. Inj. Br. 23–24.

In response to the mistaken assumptions in Plaintiffs' preliminary injunction motion, Defendants explained that the proposed arch would not be built before NPS issued a final agency action authorizing arch construction, and that NPS would comply with NEPA and the NHPA, as well as submit the proposal for review by the NCPC and CFA. Lands Decl., Dkt. 12-1; Fisher Decl., Dkt. 24-1. Based on those representations, the parties agreed to an order implementing Defendants' representations and dismissing Plaintiffs' preliminary injunction motion. Consent Order, Dkt. 26.

The Parties then proceeded to fully litigate this suit on the merits, through three dispositive motions. Defendants moved to dismiss the Complaint in April; that motion was fully briefed in May. Dkts. 31, 33, 35. Between May and July, the Parties fully briefed two cross-motions for summary judgment. Dkts. 36, 44, 45, 48, 49, 51. A key disputed issue in all three motions was whether Plaintiffs' mere offense at viewing the proposed arch and its alleged interference with Plaintiffs viewshed constitutes a cognizable injury-in-fact for purposes of Article III.

The three dispositive motions remain pending.

### B. The Executive Branch has diligently complied with the relevant statutory processes for review of the arch proposal.

As this litigation unfolded, NPS diligently complied with the statutory processes for review and approval of the arch proposal. NPS prepared environmental assessments to comply with NEPA.[7] Local governments and interested parties consulted on the effects the proposed arch would have on historic properties under Section 106 of the NHPA.[8] NPS presented the arch proposal to other agencies with responsibility for evaluating various aspects of the project: the Federal Aviation Administration (FAA) determined it would not be a hazard to air navigation[9]; the CFA approved the architectural design[10]; and the NCPC preliminarily approved site and building plans.[11]

National security agencies also evaluated how the arch and its design would be incorporated into their ongoing efforts to defend the National Capital Region from evolving threats, like those posed by the proliferation of small, unmanned aircraft systems. The Department of War concluded that the arch was "a generational national defense opportunity to mitigate these evolving threats" due to its location and height. Decl. of Pete Hegseth, Secretary of War ¶ 10. Similarly, the Department of Homeland Security identified the arch as a project that could enhance

---

7 *E.g.*, Ex. A, NPS, Triumphal Arch at Memorial Circle – Revised Environmental Assessment (Oct. 9, 2026) (Revised EA), available at https://parkplanning.nps.gov/showFile.cfm?sfid=869022&projectID=136973.

8 *E.g.*, Triumphal Arch Assessment of Effect (Revised), https://parkplanning.nps.gov/document.cfm?parkID=186&projectID=136973&documentID=153235 (August 28, 2026).

9 FAA, Determination of No Hazard to Air Navigation, blob:https://oeaaa.faa.gov/8a2fc516-2bf2-465a-9e4a-73c3e2c9824d (Sep. 18, 2026).

10 Letter from Secretary Luebke, CFA, to Secretary of the Interior Burgum, https://www.cfa.gov/records-research/project-search/cfa-21-may-26-1 (May 28, 2026).

11 NCPC, Commission Action, https://www.ncpc.gov/docs/actions/2026July/8778_New_Monumental_Arch_Commission_Action_Jul2026.pdf (July 9, 2026).

its ability to counter threats from unmanned aircraft, thus enabling it to meet its statutory duties under 6 U.S.C. § 124n. Decl. of Markwayne Mullin, Sec'y of Homeland Sec. ¶¶ 12–18.

On November 5, 2026, the NCPC is scheduled to consider whether to approve final site and building plans for the proposed arch.[12] Should NCPC approve those plans, and NPS subsequently authorize construction, construction could begin as soon as November 5, 2026. Dkt. 63. But the initial six to eight months of construction is planned to focus exclusively on below-grade excavation and foundation construction. Ex. A, Revised EA 7. Above-ground construction of the structure is thus not anticipated to begin until May 2027, at the earliest. The total construction schedule, from start to finish, is anticipated to take 33 to 39 months. *Id.* at 7–8.

### C. Plaintiffs' second preliminary injunction motion provides no new evidence.

Although the published construction schedule demonstrates that Plaintiffs' asserted offended-observer interests will remain unaffected for at least six months, Plaintiffs have brought another emergency motion seeking preliminary injunctive relief. Pls.' 2d PI Mot., Dkt. 64. But they offer no new evidence, much less evidence of an imminent injury before the Court can rule on three fully briefed dispositive motions. Instead, Plaintiffs improperly attempt to incorporate their prior briefing and rest their asserted standing and irreparable harm entirely on filings made *before* the Supreme Court rejected essentially identical standing theories in *National Park Service*, 2026 WL 2564318. *See* Pls.' 2d PI Br. 11, Dkt. 64-1 (citing filings made in May and July).

## STANDARD OF REVIEW

A preliminary injunction is "an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance

---

[12] NCPC, Project Information, 8778: New Monumental Arch, https://www.ncpc.gov/review/project/8778/.

the equities as the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (citation modified). To obtain a preliminary injunction, the moving party must make a "clear showing": (1) that it is "likely to succeed on the merits" of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) "that the balance of equities tips in [its'] favor"; and (4) that the proposed "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008). "The last two factors merge when the government is a party." *Harris Cnty. Texas v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

### I. Plaintiffs Fail to Establish Standing, Much Less Irreparable Harm.

#### A. Plaintiffs fail to establish Article III injury.

Plaintiffs lack standing because their aesthetic and emotional displeasure at the perceived symbolism of the proposed arch does not establish a concrete and particularized injury under the Supreme Court's controlling decision in *National Park Service*, 2026 WL 2564318. There, the plaintiff claimed injury to her "'aesthetic, cultural, and historical interests' because she [found] the 'scale,' 'height,' and 'massing' of the government's design distasteful." *Id.* at *2. Plaintiffs here allege injury from the arch's symbolic and aesthetic effect on views of the Lincoln Memorial when they stand in a particular place in Arlington National Cemetery. Compl ¶¶ 8-10; Dkts. 7-2 to 7-5. The Supreme Court held that this type of harm—which amounts to "mere offense, disagreement, or distaste"—"does not qualify as a concrete and particularized injury under Article III." *NPS,* 2026 WL 2564318, at *2.

1. The "law of Art. III standing is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021). Because Article III limits federal courts to adjudicating "cases and controversies," they "do not possess a roving commission to

publicly opine on every legal question." *Id.* at 423. Nor do they "exercise general legal oversight of the Legislative and Executive Branches." *Id.* at 423–24. "Article III standing screens out" disputes grounded in a "general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

A plaintiff thus must demonstrate that he or she has a "personal stake" in the controversy by showing he or she suffered an "injury-in-fact." *All. for Hippocratic Med.*, 602 U.S. at 379. An injury in fact must be "concrete," meaning "real and not abstract," and "particularized," meaning affecting in a personal way and "not a generalized grievance" *Id.* at 381.

2. Aesthetic injuries that amount to "mere offense, disagreement, or distaste" are insufficient to establish Article III standing. *NPS*, 2026 WL 2564318, at *2. In *National Park Service*, the plaintiff's declarant, Professor Alison Hoagland, claimed that "having to view the finished ballroom the government is constructing would cause her to suffer injuries to her aesthetic, cultural, and historical interests because she finds the scale, height, and massing of the government's design distasteful." *Id.* at *2 (citation omitted).

Professor Hoagland, a member and leader of the National Trust for more than 40 years and a professor of historic preservation, claimed a profound symbolic and professional interest in the preservation of the White House's "republican simplicity" through many renovations. *Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, 185 F.4th 1185, 1209 (D.C. Cir. 2026) (quoting Hoagland Decl. ¶ 10). She claimed that if the ballroom is constructed on the former site of the East Wing, it would "overshadow[] the White House, exceeding it in height and massing." Hoagland Decl. ¶ 13 (Pet. App. 75a), *NPS*, No. 26A203 (U.S.). This would obstruct unvarnished

views and change the symbolic meaning of the site: "No longer would the eye be drawn to the jewel of the building in the center, declaring to viewers that our president lives in a *house*." *Id.* It would change the essential character of the site by "diminish[ing] the primacy of the White House, which makes its structural statement through its singularity on the landscape." *Id.*

The D.C. Circuit held that the National Trust had adequately alleged standing based on Professor Hoagland's assertions. *Nat'l Trust.*, 185 F.4th at 1210. The court observed that Hoagland had alleged a permanent alteration of her view: "Professor Hoagland will no longer be able to 'use[ and] derive benefit from' seeing and studying a White House with historic and intentionally designed 'republican simplicity,' and that permanent loss will injure her 'aesthetic, cultural, and historical interests.'" *Id.* at 1213 (citing Hoagland Decl. ¶¶ 3, 10, 14). And: "She will also lose forever the opportunity to view Lafayette Square with the intentional architectural symmetry of the 235-year-old L'Enfant Plan—an experience she greatly values—if the ballroom is constructed as planned." *Id.* (citing Hoagland Decl. ¶¶ 9, 13). The court also noted a change in the symmetry of the White House complex, rendering it out of "harmony with the symmetry of Major L'Enfant's axial plan of the capital city, in which the President's House and the Capitol building sit symmetrically on perpendicular axes." *Id.* (explaining that the change would alter the "architectural integrity," and that the symmetrically designed "axial relationship" was "one of the defining attributes for the entirety of Washington, DC's monumental core"). The D.C. Circuit insisted that Hoagland alleged more than a mere "psychological" injury, and that she alleged "concrete" "recreational," "aesthetic," and "professional" injuries. *Id.* at 1211-13.

The Supreme Court rejected all of this. It held that Professor Hoagland likely failed to establish a concrete and particularized injury. *NPS*, 2026 WL 2564318 at *3. Hoagland's "desire to view" a symmetric White House demonstrated nothing beyond "'the psychological consequence

presumably produced by observation of conduct with which one disagrees.'" *Id.* at *2–3 (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U. S. 464, 485 (1982)). The asserted injuries were thus merely "distress at or disagreement with the activities of others," like doctors being distressed that other doctors might perform abortions in *Hippocratic Medicine*, which "is not a basis under Article III for a plaintiff to bring a federal lawsuit." *All. for Hippocratic Med.*, 602 U.S. 367, 390 (2024). Because "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III," that plaintiffs were unlikely to establish standing. *NPS*, 2026 WL 2564318, at *2.

It was thus irrelevant that Professor Hoagland used the affected area and would derive less aesthetic and recreational value because of the ballroom. Whereas the D.C. Circuit found the member "'adequately alleged' an injury in fact" by "'aver[ring] that she uses the affected area' and is an individual 'for whom the aesthetic and recreational values of the area will be lessened,'"[13] the Supreme Court rejected her use-by-viewing theory of standing, *NPS*, 2026 WL 2564318, at *2–3. This holding harmonizes with the Court's precedent on the "concreteness" requirement. "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including . . . reputational harm." *TransUnion*, 594 U.S. at 417. "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* The aesthetic injuries that Professor Hoagland alleged fail that test because they do not bear a "'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424.

[13] *Nat'l Tr.*, 185 F.4th at 1210 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000), citation modified).

3. Plaintiffs here allege that the arch offends their sensibilities because it will (eventually) interfere with their view of other monuments if they choose to stand in various—but unspecified—locations in Arlington National Cemetery and gaze at Washington, D.C. Just as Professor Hoagland could not establish standing based on her "desire to view" the White House, *NPS*, 2026 WL 2564318, at *3, Plaintiffs cannot establish standing based on their desire to view the Lincoln Memorial from a specific place in a public Cemetery, much less their "outrage" at "a politician intent on building a vainglorious monument." Gundersen Decl. ¶¶ 8-10, Dkt. 7-4. Nothing in their standing declarations establishes a concrete and particularized injury.

Each Plaintiff bases their injury on offense at the proposed arch and its perceived symbolism. Michael Lemmon believes "the President's planned arch will be a continuous visual affront" to the principle that "we are a Nation of laws," Lemmon Decl. ¶ 12, as it will "represent a powerful leader unilaterally imposing his will," *id.* ¶ 8 (the arch "violates the values that I have held dear throughout my life and career"). Shaun Byrnes is "concerned about the arch's symbolism," Byrnes Decl. ¶ 11, which he "will perceive . . . as a personal affront," *id.* ¶ 13. Jon Gundersen finds the arch "a vainglorious monument," Gundersen Decl. ¶ 8, that will leave him "feeling insulted and disrespected," *id.* ¶ 9. And Calder Loth thinks the arch "will dominate," Loth Decl. ¶ 8, Dkt. 7-5, "as a disrespectful imposition" on the landscape, *id.* ¶ 9. All those allegations are the sort of "general legal, moral, ideological, or policy objection to a particular government action" that "Article III standing screens out." *All. for Hippocratic Med.*, 602 U.S. at 368.

Plaintiffs' remaining allegations attempt to transmute their ideological objections into aesthetic injuries in violation of Article III's requirement that injuries be concrete and particularized. Mr. Lemmon objects that the proposed arch "will interrupt the symbolic connection between the Lincoln Memorial and Arlington National Cemetery," Lemmon Decl. ¶ 8,

diminishing his ability to "revel in the uninterrupted and inspiring view of the Lincoln Memorial," *id.* ¶ 6. Mr. Byrne "enjoy[s] the unobstructed vista of the Lincoln Memorial" from Arlington National Cemetery that "symbolizes the restoration of the Union" and "creates an aura of peace for [him]." Byrnes Decl. ¶ 9. The remaining Plaintiffs, Jon Gunderson and Calder Loth, express similar desires for an unobstructed view between the Arlington National Cemetery and the Lincoln Memorial. *E.g.*, Gunderson Decl. ¶ 6 ("I find great personal satisfaction in looking out from the cemetery at the inspiring view of the Lincoln Memorial); Loth Decl. ¶ 6 ("I also find symbolic meaning and aesthetic satisfaction in the reciprocal view, across Arlington Memorial Bridge from the Lincoln Memorial in Washington, DC, to Arlington.").

As detailed above, Plaintiffs' "aesthetic" injuries are indistinguishable from those of Professor Hoagland in *National Park Service*. Professor Hoagland attested that building the "ballroom 'would cause permanent and irreparable harm to the White House and President's Park' because it would "overshadow the White House, exceeding it in height and massing, and would diminish the primacy of the White House." *Nat'l Tr.*, 185 F.4th at 1209 (quoting Hoagland Decl. ¶ 13, citation modified). And she objected that "'no longer would the eye be drawn to the jewel of the building in the center,' which was designed to 'declare to viewers that our president lives in a *house*,' and 'not a palace.'" *Id.*

Just as Professor Hoagland desired a view of the White House unaffected by a large ballroom she found distasteful, Plaintiffs here desire "unobstructed" views between the Arlington National Cemetery and the Lincoln Memorial unaffected by an arch that offends them. But the Supreme Court explained that Hoagland's "desire to view" a symmetric White House and distress caused by the construction of a massive ballroom at the East Wing demonstrated nothing beyond

"disagreement with the activity of another," which does not qualify as a concrete and particularized injury under Article III. *NPS*, 2026 WL 2564318, at *2–3.

Plaintiffs cannot distinguish their interests as being about "the *destruction* of a landscape," *contra* Pls.' Notice of Supp. Authority, Dkt. 54, at 4–5, as Professor Hoagland made indistinguishable arguments about "the permanent visual destruction" of a planned landscape, *Nat'l Tr.*, 85 F.4th at 1213. Nor does Plaintiffs' preference for what the existing landscape "symbolizes" suffice. Professor Hoagland similarly sought standing based on her preference for the "republican simplicity" of the prior East Wing, *Nat'l Tr.*, 185 F.4th at 1213 (quoting Hoagland Decl. ¶ 10), but the Supreme Court held "none of this helps," *NPS*, 2026 WL 2564318, at *3; *accord EDF v. FERC*, 2 F.4th 953, 968 (D.C. Cir. 2021) (rejecting standing to challenge pipeline construction where plaintiff alleged that a metering station "is a looming eyesore and a traffic hazard," and "not in keeping with the character of [her] neighborhood").

And Plaintiffs cannot establish concrete or particularized injuries based on a "profound personal relationship to the iconic vista." *Contra* Dkt. 54, at 3. Such allegations are indistinguishable from Professor Hoagland's averments that "she greatly values" "view[ing] Lafayette Square" and "the architectural significance it embodies." *Nat'l Tr.*, 185 F.4th at 1213–14. But the Supreme Court rejected her attempts to inflate her viewing interests: "Article III standing, we have consistently held, is not measured by the intensity of the litigant's interest, or by a litigant's special interest in the subject*NPS*, 2026 WL 2564318, at *3 (citation modified). Thus, Plaintiffs' personal and professional experiences cannot transform distaste for the arch and its proposed placement into concrete and particularized Article III injuries. *See id.*

In sum, this motion is "squarely controlled" by *National Park Service*, which addressed a "similar" question of standing to obtain a preliminary injunction and "does not otherwise differ

from [this case] in any pertinent respect." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (finding an interim order controlling). "Lower court judges may sometimes disagree with this Court's decisions, but they are never free to defy them." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part). "[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (*per curiam*).

4. Plaintiffs do not even try to distinguish their standing theory from *National Park Service*. They instead attempt to incorporate standing arguments from their summary judgment briefs into their current motion. *See* Pls.' 2d PI Br. 11 (citing Dkts. 36-1, 48). But such incorporation is improper, as each motion must include "the specific points of law and authority that support" it. L. Civ. R. 7(a). Thus, courts in this District—including this Court—routinely reject attempts to incorporate by reference arguments from other filings. *E.g.*, *United States v. Abou-Khatwa*, No. 18-CR-67 (TSC), 2022 WL 278770, at *3 (D.D.C. Jan. 31, 2022) (finding that a moving party's citation of previously filed briefs to support an argument "is not enough to meet [the party's] burden"); *see also Sheikh v. District of Columbia*, 305 F.R.D. 16, 18 (D.D.C. 2014) ("[F]ilings that employ incorporation by reference are disfavored"); *Sloan v. Urb. Title Servs., Inc.*, 689 F. Supp. 2d 94, 99 n.3 (D.D.C. 2010) ("The parties may not incorporate legal arguments made in other pleadings by reference but must provide all relevant legal authority and argument in the operative motion). Incorporation of arguments by reference is disfavored because it deprives the court (and the nonmovant) of clear notice of the legal basis for the motion.[14]

[14] *See Sloan*, 689 F. Supp. 2d at 99 ("to ensure clarity of argument," a party may not incorporate by reference arguments made in other filings); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("[A] litigant has an obligation to spell out its arguments squarely and

Plaintiffs' failure to meaningfully address standing in their opening brief forfeits the argument. "Mentioning an argument in the most skeletal way . . . is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) (citations modified). Thus, by failing to fully develop their standing arguments in their opening brief before the Court, Plaintiffs have forfeited those arguments. *Wildearth Guardians v. Salazar*, 880 F. Supp. 2d 77, 82 (D.D.C. 2012) ("Where, as here, a party's standing is not self-evident, the basis for standing must be set forth in the party's opening brief, supported by any necessary affidavits or other evidence."), *aff'd sub nom. WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013).

Even if Plaintiffs could incorporate their standing arguments from their summary judgment briefs, those arguments would still fail as they predate the Supreme Court's *National Park Service* decision. Unable to meet the requirements in that decision, Plaintiffs instead rely on the standing analysis in the district court's ballroom decision—which the Supreme Court rejected. Pls. Summ. J. Br. 10–11, Dkt. 36-1 (discussing *Nat'l Trust for Historic Pres. in the U.S. v. Nat'l Park Serv.*, 821 F. Supp. 3d 62 (D.D.C. Feb. 26, 2026)). The only time Plaintiffs have ever reckoned with the standing analysis in *National Park Service* is in their Notice of Supplemental Authority, Dkt. 54, which Defendants conclusively rebutted in a responsive Notice of Supplemental Authority, Dkt. 55. Their opening brief's failure to even mention the Supreme Court's on-point standing jurisprudence tellingly confirms their lack of standing.[15]

distinctly, or else forever hold its peace"); *Thorp v. D.C.*, 319 F. Supp. 3d 1, 20 (D.D.C. 2018), *aff'd*, 788 F. App'x 8 (D.C. Cir. 2019) (explaining the purpose of Local Civil Rule 7(a) is to provide notice of legal basis for motion); *see also Davis v. Pension Benefit Guar. Corp.*, 734 F.3d 1161, 1167 (D.C. Cir. 2013) (declining to allow litigants to incorporate by reference into their brief arguments from a motion, "as this would circumvent the court's rules regarding the length of briefs").

[15] Although Plaintiffs' opening brief discusses the equitable balancing in *National Park Service* as a "cautionary tale," it never engages with that decision's standing jurisprudence. Pls.' 2d PI Br. 12.

5. Plaintiffs' "I'm offended by the view" injuries are also plainly speculative as "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citations omitted). "At the time this suit was filed," Plaintiffs "had to engage in a string of speculations" to establish any injury. *Trump v. California*, 609 U.S. ---, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). Relying largely on press reports, Plaintiffs asserted that the proposed arch would somehow be constructed by July 4, 2026, in violation of procedural requirements under NEPA and the NHPA and without review by CFA and NCPC. *Supra* 9. Plaintiffs' standing theories were thus based on a "string of speculations" about "how the agency would" conduct its review of the arch proposal and "whether the agency would" submit the proposal for review to the CFA and NCPC. *California*, 2026 WL 2473573, at *4. Such speculative theories are insufficient to create standing. *Id.* Particularly where the ensuing months have disproven Plaintiffs' speculation about how agencies would implement a Presidential desire, Plaintiffs lacked non-speculative injuries when this suit began. *See id.*

Even could Plaintiffs ignore their obligation to establish standing "when the suit was filed," *Davis*, 554 U.S. at 734, they still fail to establish non-speculative injuries today. In claiming that "[a]pproval by NCPC is not in question," Plaintiffs cite comments from one member of the NCPC. Pls.' 2d PI Br. 11. But the NCPC is a twelve-member commission; half of those members were not appointed by the President. *See* 40 U.S.C. § 8711(b)(1). And even when the President directs his subordinates to "pursue certain policies," courts must wait for those subordinate agencies to adopt final actions implementing those policies to undertake judicial review. *See California*, 2026 WL 2473573, at *1, 4 ("Federal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule."); *Trump v. New York*, 592 U.S. 125, 131 (2020)

(rejecting challenge to unimplemented Presidential "desire"). Plaintiffs thus cannot establish a non-speculative injury by guessing about how an independent commission may ultimately vote.

**B. Plaintiffs fail to establish irreparable harm.**

Even if Plaintiffs' asserted offended-observer injuries were sufficient for Article III standing, they do not constitute the kind of imminent injury that qualifies as irreparable harm justifying preliminary injunctive relief. The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). To satisfy this "threshold requirement in granting temporary injunctive relief," a plaintiff's alleged injury "must be both certain and great, actual and not theoretical, beyond remediation, *and of such imminence* that there is a clear and present need for equitable relief." *State v. Musk*, 769 F. Supp. 3d 1, 5 (D.D.C. 2025) (citation modified). "The possibility of irreparable harm is not enough." *Id.* (citation modified). Rather, plaintiffs "must demonstrate injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved." *Hanson v. D.C.*, 120 F.4th 223, 244 (D.C. Cir. 2024); *see Lackey*, 604 U.S. at 200 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities as the litigation moves forward" (citation modified)).

1. Plaintiffs provide no evidence that the injuries they complain of are sufficiently imminent to constitute irreparable harm. Although Plaintiffs' motion focuses on construction that could start "in two weeks," they provide no evidence that the *commencement* of construction will cause any injury to their viewshed interests—interests that involve looking *over*—not *at*—Memorial Circle. *See* Pls. 2d PI Br. 11. Instead, the available evidence shows that any such injury to Plaintiffs preferred line-of-sight over Memorial Circle will not materialize for many months. As the Revised EA prepared by NPS states, the first phase of construction would entail two to

three months of "site preparation, excavation within the construction footprint, and installation of temporary utilities." Ex. A, Revised EA 7. Then, the project's second phase will involve "install[ing] the deep foundation system" by installing caissons "to a depth of approximately 75 feet to reach bedrock"—a task estimated to take another four to five months. *Id.* The upshot: it will be a minimum of *six months*, and as many as *eight months*, until work on the arch structure would begin "[a]fter the foundation system is completed." *Id.*

On that timeline, Plaintiffs face no imminent harm to their viewshed interests. Again, "[t]he standard is not that irreparable harm will occur at some point in the future, but that plaintiffs suffer irreparable harm *before a decision on the merits can be reached*." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017) (emphasis added). Here, Plaintiffs alleged aesthetic injury arises from the construction of large, view-obstructing structure—an injury that will not materialize for at least six months. Given the parties' fully briefed dispositive motions, six months provides "ample time" for merits decisions to issue before any harm to Plaintiffs' viewshed interests could occur. *See id.*

The Revised EA further demonstrates that any viewshed injury to Plaintiffs will take even longer than six to eight months to materialize. As noted, Plaintiffs' asserted injuries focus on the arch's potential to obstruct views of the Lincoln Memorial from Arlington National Cemetery. *See* Lemmon Decl. ¶ 9; Byrnes Decl. ¶ 10; Gundersen Decl. ¶¶ 8–9; Loth Decl. ¶ 8–9. But the Revised EA demonstrates that, from most locations within the cemetery where the arch would be visible, only the "upper portions of the Arch, including the statuary" would be visible. Ex. A, Revised EA 24–31. The statuary is not anticipated to be installed until at least *twenty months* after construction begins. *Id.* at 7–8. Although the full structure would be visible from Arlington House, only the upper half of that structure would begin to affect Lincoln Memorial views. *See id.* at 19 (comparing

view from Arlington House with and without the arch). Plaintiffs would thus be able to keep enjoying an "uninterrupted view of the Lincoln Memorial" long after above-ground construction begins. *See* Byrnes Decl. ¶ 9.

2. Even had Plaintiffs articulated imminent harm, the aesthetic injury at issue here is not significant enough to warrant an injunction. "[I]rreparable harm is a higher bar to clear than standing" and "requires not only a concrete, particularized harm, but a harm that is sufficiently serious and irremediable" to warrant emergency relief. *Santos v. Collins*, No. CV 24-1759, 2025 WL 1823471, at *6 (D.D.C. Feb. 26, 2025) (citing *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024)). Plaintiffs have failed to identify any unique resources at Memorial Circle that might be irreparably damaged by foundation excavation. It is only a patch of grass that has been repeatedly reclaimed throughout this litigation after archeological boring and excavation. *See, e.g.*, Bowron Decl. ¶ 17, Dkt. 32-1. Harm to "vegetation" that is "allowed to regrow" "is thus not irreparable." *Yellowstone to Uintas Connection v. Bolling*, No. 4:25-CV-00211-DCN, 2025 WL 1928052, at *7 (D. Idaho July 14, 2025); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 40 (D.D.C. 2013) (not all environmental harm is irreparable).

**II. Plaintiffs Have Failed to Establish Substantial Likelihood of Success on the Merits.**

Plaintiffs' merits arguments span just three pages, as they again—improperly--incorporate by reference merits arguments from three previous rounds of dispositive briefing. Pls.' 2d PI Br. 8–10. Such incorporated arguments violate Local Civil Rule 7(a) and are forfeited. *Supra* 20–21. Regardless, none of Plaintiffs briefing establishes the requisite "substantial likelihood of success on the merits," on either the "establishment of jurisdiction" and their "substantive theories" of the case. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation modified).

### A. Plaintiffs have not carried their burden to establish a waiver of sovereign immunity.

Because Plaintiffs filed suit before Defendants took any action concerning the arch, they cannot establish that the requisite waiver of sovereign immunity existed when their "suit was filed." *Davis*, 554 U.S. at 734; *Lewis v. Hunt*, 492 F.3d 565, 572 (5th Cir. 2007) (a "waiver of sovereign immunity is inapplicable if the government did not [act] at the time the suit was filed").

1. "It is by now well established that '[a] waiver of sovereign immunity cannot be implied but must be unequivocally expressed' in statutory text." *Mackinac Tribe v. Jewell*, 87 F. Supp. 3d 127, 135–36, 142 (D.D.C. 2015), *aff'd*, 829 F.3d 754 (D.C. Cir. 2016) (quoting *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95 (1990)). Any ambiguity regarding waiver "must be construed in favor of immunity," and even an explicit waiver "must be construed strictly in favor of the sovereign, and not enlarged beyond what the language requires." *Id.* (internal citations omitted). So, "[e]ven when the federal government does waive its immunity from suit, limitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied." *Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp. 2d 187, 194 (D.D.C. 2007) (citation modified).

Although most claims seeking injunctive relief against the federal agencies proceed under the APA, Plaintiffs have not brought any APA claim. Compl. ¶¶ 52–64. While § 702 of the APA waives sovereign immunity for certain non-APA claims, that waiver "is strictly limited by [its] terms." *Cartwright*, 525 F. Supp. 2d at 194. "By its own terms, the waiver applies [only] when a plaintiff claims that 'an agency or an officer or employee thereof *acted or failed to act* in an official capacity or under color of legal authority.'" *Mackinac Tribe*, 87 F. Supp. 3d at 142 (quoting 5 U.S.C. § 702, emphasis added). If the plaintiff has not identified the "action needed for the APA's

waiver of sovereign immunity to apply," then the court lacks jurisdiction. *Geronimo v. Obama*, 725 F. Supp. 2d 182, 184–86 (D.D.C. 2010).

Such is the case here. Plaintiffs fail to provide any evidence that "an agency or an officer or employee thereof acted or failed to act," 5 U.S.C. § 702, when they filed suit. The President is not "an agency or an officer or employee thereof," 5 U.S.C. § 702, as the Supreme Court held in *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992). And Plaintiffs cannot invoke the APA's waiver of sovereign immunity based on post-filing activity. In limiting the waiver to claims that an agency "*acted or failed to act*," 5 U.S.C. § 702 (emphasis added), Congress excluded claims based on future agency action, *Carr v. United States*, 560 U.S. 438, 448 (2010) ("we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach"); *see also Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (holding that statutory language in the "past tense" was "backward-looking language" that excluded future developments).

2. Unable to invoke a statutory waiver of sovereign immunity, Plaintiffs also cannot rely on a judicial exception to sovereign immunity—the *ultra vires* doctrine—which likewise requires action. *See Nuclear Regul. Comm'n v. Texas* (*NRC*), 605 U.S. 665, 681 (2025) (*ultra vires* review "applies only when an agency has taken *action* . . . ." (emphasis added)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (limiting non-statutory review to the "executive's *action*" (citation modified)). Under this doctrine, "if the federal officer, against whom injunctive relief is sought, allegedly *acted* in excess of his legal authority, sovereign immunity does not bar a suit." *Reich*, 74 F.3d at 1329 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963); *Malone v. Bowdoin*, 369 U.S. 643, 647 (1962), emphasis added).

Because executive action is a required element of this sovereign immunity exception, Plaintiffs must establish evidence that such action occurred when they filed suit. *Davis*, 554 U.S. at 734; *Lewis*, 492 F.3d at 572. Their failure to do so deprives the Court of jurisdiction. They cannot seek to review statements describing the President's arch vision, as the President's "motives and desires" "did not give rise to a justiciable controversy save as they had fruition in action of a definite and concrete character." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 324 (1936). Otherwise, the United States could be hauled into court over reported dinner remarks. *See* Dkt. 36-6 at 3 (article reporting the President's discussions about the arch over dinner). Plaintiffs have conceded that they seek judicial review of the unimplemented executive intention behind such remarks. *See, e.g.*, Pls.' MTD Opp'n 14, Dkt. 33 (challenging Defendants' "intent to build the arch"); *id.* (alleging "the President's intent to begin building this year"); *id.* at 15 (seeking to excuse lack of identified action given Defendants' "repeatedly stated intention of building a massive arch"); *id.* at 22 ("this Court can grant effectual injunctive relief" because "Defendants intend to build an arch in Memorial Circle"). The Court should reject "such a radical expansion of the exceptions to sovereign immunity" under *Larson*, which have always been focused on whether an officer's "*actions* departed from his statutory mandate," without regard to the officer's "motive." *Chuidian v. Philippine Nat. Bank*, 912 F.2d 1095, 1107 (9th Cir. 1990), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305, 130 (2010); *accord Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 14 (D.D.C. 2003).

### B. Plaintiffs have failed to establish likelihood of success on their *ultra vires* statutory-authority claim.

Last year, the Supreme Court cautioned against *ultra vires* review "becom[ing] an easy end-run around the limitations of . . . judicial-review statutes." *NRC*, 605 U.S. at 681. To prevent this, "time and again, courts have stressed that *ultra vires* review has extremely limited scope."

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (citation modified). Nonetheless, Plaintiffs ask this Court to undertake a breathtaking expansion of *ultra vires* review. According to Plaintiffs, the *ultra vires* doctrine allows for review of executive intentions *even though* they have not yet resulted in final agency action by Defendants, *even though* any such action would be reviewable under the APA, and *even though* their challenge hinges on a "typical statutory-authority argument." *NRC*, 605 U.S. at 682. They are incorrect on all counts. The Court should accordingly reject Plaintiffs' attempted end-run around the APA's scheme for review of agency actions.

a. Plaintiffs' *ultra vires* claim is unavailable due to the APA.

1. Plaintiffs cannot state a viable *ultra vires* claim by challenging only Presidential words or intentions. *Supra* 27–28; *New York*, 592 U.S. at 131. The extremely rare cases where *ultra vires* review has been extended to the Chief Executive are limited to reviewing "presidential *actions*." *Reich*, 74 F.3d at 1329 (emphasis added). As judicial review under the APA likewise "insists upon an agency action," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (citation modified), Plaintiffs cannot extend the extremely limited *ultra vires* doctrine to reviewing Presidential words or social media posts. Because the "executive power under our Constitution . . . rests exclusively with the President," nearly all agency actions ultimately emanate from some presidential policy or directive. *Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981). Yet this does not mean that every presidential announcement at the State of the Union or remark over dinner can be subject to judicial review.

Courts do not review unimplemented executive intentions as history abounds with unrealized executive desires. President Obama, for example, entered office vowing to close the detention facilities at Guantanamo Bay. And one of his earliest Executive Orders directed the Department of Defense to close them within one year. Executive Order 13492 § 3, 74 Fed. Reg.

4897 (Jan. 22, 2009). But when he ultimately left office eight years later, the detention facilities remained open. Because Presidents do not always achieve their goals, courts wait for injurious executive action to undertake judicial review, lest they issue "an advisory opinion on issues which may or may not arise." *Oliver v. United States*, 335 F.2d 724, 726 n.2 (D.C. Cir. 1964). *Ultra vires* review is thus not available "simply because [the Executive Branch] has arguably reached 'a conclusion which does not comport with the law.'" *NRC*, 605 U.S. at 681 (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)).

In seeking judicial review of unimplemented executive desire, Plaintiffs' never-before-adopted theory would "swallow the APA's" cause of action. *Cf. Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). If parties need not wait for final agency action because they can assume that agencies will carry out executive intent, *ultra vires* claims would become the new normal, in violation of Supreme Court and D.C. Circuit law, *see, e.g.*, *NRC*, 605 U.S. at 681–82 (an *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds" (citation omitted)); *Changji Esquel* 40 F.4th at 721–22 ("Time and again, courts have stressed that *ultra vires* review has extremely limited scope." (citation modified)).

The Court should not expand the judicially created doctrine of *ultra vires* review to encompass Plaintiffs' unprecedented theory, as doing so would discourage government transparency. Executive Branch office holders routinely "come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). When agencies undertake those deliberative processes, plaintiffs must typically wait for "final agency action" to seek judicial review. *E.g.*, *Franklin*, 505 U.S. at 796 (citing 5 U.S.C. § 704). If much earlier challenges can instead be brought against preliminary

discussions by non-agencies like the Chief Executive, those Executive Branch decisionmakers will be discouraged from disclosing their unimplemented desires to the public.

2. An *ultra vires* claim is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681 (citation modified). Courts in this District have repeatedly held that the APA provides such an opportunity for review and therefore that an *ultra vires* claim does not lie where an APA claim is available. *See, e.g.*, *Nat'l Tr. for Historic Pres.*, 827 F. Supp. 3d at 113 n.15 (D.D.C. Mar. 31, 2026); *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 200 (D.D.C. 2024); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017). The D.C. Circuit has likewise recently confirmed that delayed APA review forecloses *ultra vires* claims. *Glob. Health Council v. Trump*, 153 F.4th 1, 21 n.18 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. 2025). When "APA review may be available" after "statutory processes run their course," "that would provide an alternative procedure for review and thereby independently foreclose [an] ultra vires claim." *Id.* And the Supreme Court recently reiterated the federal courts wait for final agency actions to undertake judicial review: "Federal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule." *California*, 2026 WL 2473573, at *4.

To circumvent this well-settled law, Plaintiffs wrongly suggest that their *ultra vires* challenge may proceed because no APA claim is currently available to them. But the Supreme Court has long recognized that even delayed statutory review provides a "meaningful and adequate" opportunity for judicial review. *Bd. of Governors of Fed. Res. Sys. v. MCorp Financial, Inc.*, 502 U.S. 32, 43 (1991). In *MCorp*, the plaintiff brought an *ultra vires* challenge to a regulation being enforced against it in ongoing "administrative proceedings." *Id.* at 34. In rejecting that claim,

the Supreme Court held that statutory review at the conclusion of the administrative proceedings provided MCorp with an adequate opportunity to challenge the regulation "[i]f and when the Board finds that MCorp has violated that regulation." *Id.* at 43–44. Because Plaintiffs will similarly be able to pursue APA review "if and when" NPS authorizes arch construction (assuming they allege an APA claim), they indisputably have a meaningful and adequate opportunity for judicial review of their claims, thus mandating dismissal of their *ultra vires* claim.

*Reich* is not to the contrary. *Cf.* Pls.' MTD Opp. 24. That case does not cite, much less question, *MCorp*. Plaintiffs nonetheless have claimed that *Reich* establishes that "APA review of an agency's implementation of an unlawful Executive Branch policy is a poor substitute for direct review of the policy itself." *Id.* (citing 74 F.3d at 1326). But *Reich* establishes no such principle. Unlike here, the government in *Reich* argued that "a cause of action under the APA is not available," so the court had no occasion to address whether the APA provided a meaningful opportunity for review. 74 F.3d at 1326–27.

To the extent that dicta in *Reich* suggests APA review might sometimes be inadequate to challenge presidential policy, it stands for a narrow, case-by-case exception to the general rule that delayed statutory review opportunities preclude an *ultra vires* claim. The Executive Order challenged in *Reich* amounted to a "legislative rule" that "purports to create binding, enforceable obligations on its own." *League of United Latin Am. Citizens v. Exec. Office of President (LULAC)*, 808 F. Supp. 3d 29, 64 (D.C. Cir. July 2, 2026) (citation modified), *aff'd* 2026 WL 1991571 (D.C. Cir. July 2, 2026). Because that Presidential action inflicted imminent injury that would persist even if implementing regulations were struck down, an APA claim would have provided limited relief to the *Reich* plaintiffs. That is not the case here. Because NPS "is responsible for administering and maintaining the land on Memorial Circle," Compl. ¶ 14, any plan to construct

an arch will be effectuated through NPS, Defs.' Statement Of Material Facts¶¶ 6–7, Dkt. 44-2. Challenging a final action by NPS would therefore provide Plaintiffs with an equivalent—indeed, superior—path to judicial review. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (observing that *ultra vires* review "represents a more difficult course . . . than would review under the APA").

b. Plaintiffs fail to show that arch construction is unauthorized by the Congress.

The availability of APA review once there is a final agency action thus dooms Plaintiffs' effort to obtain preliminary injunctive relief based on an *ultra vires* claim. But their claim also fails because they point to no action by Defendants that is "entirely in excess of [their] delegated powers and contrary to a specific prohibition in a statute." *NRC*, 605 U.S. at 681 (citation modified). Plaintiffs' *ultra vires* claim was originally based on the allegation that Defendants plan to construct an arch on Memorial Circle "without congressional approval." Compl. ¶ 57. After learning that the Authorization Act encompasses authorization to construct and redesign two large columns surmounted by statues in the very location of the proposed arch, however, Plaintiffs pivoted to contesting Defendants' interpretation of that Act. Plaintiffs have thus abandoned their original position that there is *no* potential source of authority for construction on Memorial Circle.

Plaintiffs' new approach amounts to "dress[ing] up a typical statutory-authority argument as an *ultra vires* claim." *NRC*, 605 U.S. at 682. Plaintiffs' argument that the "general authority" from the Authorization Act "does not extend" to an arch "falls well shy of a meritorious [*ultra vires*] claim." *Id.* at 682. Because that argument falls far short of identifying an error by Defendants "so extreme that one may view it as jurisdictional or nearly so," the Plaintiffs' *ultra vires* claim fails. *Changji Esquel*, 40 F.4th at 722 (quoting *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

None of Plaintiffs' arguments against Defendants' interpretation of the Authorization Act are persuasive as a matter of statutory interpretation, much less sufficient to establish an error that could support *ultra vires* review.

1. Plaintiffs incorrectly suggest that the Authorization Act imposes a 10-year time limitation on construction that expired in 1935. Pls.' 2d PI Br. 9 (citing Authorization Act § 6, 43 Stat. 975). But the provision that Plaintiffs rely on merely provides a per-year expenditure limit based on the "ten-year program of expenditures and construction contained in the report" by the Commission. Authorization Act § 6, 43 Stat. 975. This does not amount to a sunset provision on Congress's authorization to construct a bridge across the Potomac and "landscape features appertaining thereto." *Id.* § 1, 43 Stat. 974. To the contrary, Congress knows how to sunset a construction authorization and uses much more specific language to do so. *E.g.*, Pub. L. No. 99-652 § 10(b), (d), 100 Stat. 3650 (1986) ("Any legislative authority for a commemorative work [except laws enacted before the commencement of the Ninety-ninth Congress] shall expire at the end of the five-year period beginning on the date of the enactment of such authority . . . .").

Moreover, Plaintiffs' sunsetting argument overlooks the historic implementation of the Authorization Act, which was used to add new monumental features long past the ten-year window—until at least 1951. NPS, CFA, and NCPC all continued to redesign the bridge long after 1935. *Supra* 5–7. For example, between funding difficulties during the Great Depression and bronze shortages during World War II, equestrian statues (which replaced original pylons) were not added to the bridge until 1951, twenty-six years after the Authorization Act. *Id.* (describing history showing that the bridge project was never completed). Plaintiffs' claim that the "bridge was completed over ninety years ago" is simply incorrect. *See* Pls.' 2d PI Br. 9.

2. Plaintiffs next speculate that the arch project would violate the Authorization Act's requirement that construction be "approved and ordered" "in a total sum not to exceed $14,750,000." Authorization Act § 2, 43 Stat. 974; *see* Pls.' 2d PI Br. 9. But Plaintiffs provide no evidence about arch cost, nor could they as they sued prematurely before any final decision for the arch had been adopted.

Worse, Plaintiffs' selective quotation from the Authorization Act leaves out key context explaining that the $14,750,000 limit applies to the "sum [that] is authorized to be appropriated from any moneys available or that may become available in the Treasury of the United States." Authorization Act § 2, 43 Stat. 974. This cap on appropriations does not rule out alternative sources of funding, such as private donations. As the Comptroller General explained, the $14.75 million authorization in the Authorization Act was designed "to confer authority on the Commission to enter into contracts" before appropriations were made available. *See* A-8713, 4 Comp. Gen. 832 (Apr. 3, 1925). It is an advance contracting authority, not a cap on the total value of the undertaking. And that is consistent with later opinions by the Comptroller General, which explained that where "the authorizing legislation is silent as to monetary contributions from non-federal sources" and "in the absence of contrary congressional direction," amounts contributed by "non-federal entities" "are not to be counted" as part of the federal cost or against the cost ceiling. B-223725 (Comp. Gen. Feb. 20, 1987). Here, there is no "contrary congressional direction"; rather, the 1925 statute's reference to competing the project through means "most economical and advantageous to the government," Authorization Act § 2, 43 Stat. 974, undercuts any reading of the $14.75 million appropriations cap to foreclose private funding—funding that would, by definition, make the project "most economical" to the government. Historical practice confirms

that approach, as the equestrian statues at the bridge's east end were gifted by the government of Italy "as a gesture of friendship to the United States."[16]

3. Nor does the fact that President Franklin Roosevelt abolished the Arlington Memorial Bridge Commission in 1933 undermine the Authorization Act's approval to carry out construction. *Contra* Pls.' 2d PI Br. 9. As Plaintiffs themselves have recognized, Executive Order 6166 "transferred the commission's functions to what is now NPS." Pls.' MTD Opp'n 27 (citing Exec. Order 6166, § 2 (June 10, 1933)). And key elements of the project—including the bridge's connection to other roads on the Virginia side—were implemented in 1938 after President Roosevelt's executive order.[17] This history belies Plaintiffs' assertion that transferring the Commission's functions to NPS or transferring the land on which the project was constructed to NPS undermined the Authorization Act's general authorization.

In sum, Plaintiffs have failed to establish that Defendants lack statutory authority to build two large columns surmounted by statues on Memorial Circle. While Plaintiffs may dispute whether the design discretion delegated by the Authorization Act extends to connecting those two columns to form an arch, that is a paradigmatic "typical statutory authority argument" that cannot be raised via *ultra vires* claim. *Global Health*, 153 F.4th at 20–21.

4. In addition to the Authorization Act, NPS has authority to build under its Organic Act authority to "promote and regulate the use of the National Park System." 54 U.S.C. § 100101(a). NPS has used this statute for decades to engage in major construction on parkland. *Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities*

---

[16] HAER No. DC-7, at 99, 101–02.

[17] HAER No. DC-7 at 95–96; *see also id.* at 95 (noting that, while Executive Order 6166 "might sound like a death knell for the projects these commissions managed, such was not the case").

(1945-1972), 89 Fed. Reg. 97631, 97631 (Dec. 9, 2024). in the 1960s, NPS constructed the National Capital Region Headquarters, the U.S. Park Police Headquarters, and some 74,000 square feet of facilities in East Potomac Park. Executive Director's Recommendation, National Capital Region Campus Renovation Project and Park Police District 1 Substation, Commission Meeting, National Capital Planning Commission at 1 (Jan. 7, 2016). More recently, NPS built new U.S. Park Police Stables on the National Mall; erected a 7,500-seat tennis stadium in Rock Creek Park; and conducted major renovations to the golf courses at Langston, Rock Creek, and East Potomac. D. Ct. Doc. 52, at 14-15 (Mar. 12, 2026). None of those projects was specifically authorized by an act of Congress. All were done pursuant to the NPS Organic Act and its general authorization to operate the Park System.

c. Plaintiffs fail to show that the CWA or § 8106 prohibit arch construction.

Plaintiffs' argument that the CWA and 40 U.S.C. § 8106 prohibit arch construction, Pls.' 2d PI Br. 9, also fails. Neither statute restricts construction authorized by the Authorization Act. The CWA "does not apply to commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b). And § 8106 merely requires, if at all, "express authority" of Congress to build—not to build a particular design. Because Congress authorized construction on Columbia Island of two tall columns surmounted by statues—along with discretionary design modifications—in 1925, neither statute prohibits arch construction.

Moreover, neither statute confers rights upon Plaintiffs to enforce them. Under D.C. Circuit law, to bring an *ultra vires* claim based on a specific statutory prohibition, "the prohibition at issue must confer rights upon the individual seeking ultra vires review." *Global Health*, 153 F.4th at 20. These statutes are intended to protect Congress's institutional interests, not Plaintiffs' visual ones. Whether Congress authorized construction in Memorial Circle is "a judgment peculiarly for Congress to make in carrying on its own functions in our constitutional system, not for non-

congressional parties to carry on as an ersatz proxy for Congress itself." *Natural Res. Def. Council Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).

Plaintiffs have failed to establish that arch construction would violate either statute. As to the CWA, Plaintiffs provide no evidence that a final decision has been made as to what the arch is designed to celebrate. And one designer proposed that the arch "is not primarily a monument dedicated to the dead, but to the living, to this great country and its perseverance." Resp. to Pls.' Statement of Material Facts ¶ 19, Dkt. 44-2 at 2. Such a design would not constitute a "commemorative work" under the CWA because it is not "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." 40 U.S.C. § 8902(a)(1).

Turning to § 8106, there is good reason to doubt that provision applies in the first place to NPS. When originally enacted in 1912, § 8106 applied only to the Engineer Department in the War Department. *Supra* 8. In the same 1912 appropriations enactment, Congress included a different limitation applicable to the Interior Department, which had jurisdiction over several national parks across the country. For Interior, Congress included a different provision demarcating when Congress's express authority was required: "No expenditure for construction of administration or other buildings . . . exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." 37 Stat. 460.

But Congress repeatedly amended the Interior provision, which was codified at 16 U.S.C. § 451, before ultimately repealing the provision altogether. *See, e.g.*, Pub. L. No. 65-181, 40 Stat. 634, 677 (1918); Pub. L. No. 76-417, 54 Stat. 36, 36 (1940); Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996). In its appropriations laws, Congress also routinely exempts NPS construction

activity, including construction in the District of Columbia, from this provision. *See, e.g.*, Pub. L. No. 80-841, 62 Stat. 1112, 1141 (1948); Pub. L. No. 101-512, 104 Stat. 1915, 1920 (1990).

And NPS has erected countless structures on national parkland in the District over the past century, yet there is no record of any express congressional approval for such buildings. *Supra* 36–37. The "lack of historical precedent" is a "telling indication" that a party misread a statute. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citing "longstanding practice of the government" as an "aid" to "inform a court's determination of what the law is" (citation modified)). Indeed, "[i]f Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'" *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022).

This history demonstrates § 8106 was never intended to limit NPS's construction in national parks. Section 451 played that role—and Congress chose to repeal it. And this explains the sole example of Congress exempting a particular building in the District pursuant to § 8106: a 1993 statute providing that "the limitation on construction contained in [§ 8106] shall not apply to the construction" of "facilities to house bonsai collections at the National Arboretum." Pub. L. No. 103-111, 107 Stat. 1046, 1051 (1993). If § 8106 is read as restricting entities other than NPS from constructing buildings on national parkland in D.C., this makes sense: The National Arboretum is managed by the Department of Agriculture and is not a national park.

Meanwhile, if § 8106 were intended to restrict federal construction in national parks—an interpretation long ago repudiated[18]—virtually every building erected on national parks in the District is presumptively unlawful. That implausible construction is miles away from the clarity and obviousness required to sustain an *ultra vires* claim.

C. **Plaintiffs have failed to establish likelihood of success on their constitutional claim.**

Plaintiffs' Take Care Clause claim fail because it is ultimately a statutory claim, not a constitutional one. As Plaintiffs have conceded, "the President has broad discretion in deciding . . . how to 'interpret[] a statute and direct[] the details of its execution." Pls.' Mem. in Supp. of Mot. for Summ. J. Br. 18, Dkt. 36-1 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)). That Plaintiffs disagree with the President's discretionary interpretation of the Authorization Act is no basis for a constitutional claim. *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (rejecting the argument that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution").

In limiting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to circumstances "involv[ing] the conceded *absence* of *any* statutory authority," *Dalton*, 511 U.S. at 473, the Supreme Court precluded the assertion of "claim[s] that the President acted in excess of such authority" as constitutional claims that could be pursued without a statutory cause of action, *id.* Thus, "*Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review." *Glob. Health Council*, 153 F.4th at 16. Because Defendants have never conceded the absence of any statutory authority—and instead provide on-point

[18] District of Columbia Appropriation Bill, 1927, Hearing Before the Subcomm. of H. Comm. on Appropriations 533, 69th Cong. (1926) (emphasis added). Although the D.C. Circuit rejected this historical understanding, it likely lacked jurisdiction to do so. *Compare Nat'l Trust.*, 185 F.4th at 1220, *with NPS*, 2026 WL 2564318 at *2–3.

statutory authority for the construction of two large columns on Columbia Island surmounted by statues—Plaintiffs' claim involves only statutory, not constitutional, authority. As such, Plaintiffs cannot pursue their claim without a statutory cause of action. *Id.*

It has also been settled law for over a century that the President's constitutional duty to "take care that the laws be faithfully executed," U.S. Const. art. II, § 3, is not a matter for judicial review. *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022); *accord Center for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 245–250 (D.D.C. 2019). As the Supreme Court long ago explained, courts cannot and should not review the President's "purely executive and political" duty "to see that the laws are faithfully executed." *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). There, the Court rejected—as "an absurd and excessive extravagance," *id.*—even the filing of a complaint asserting that "this court is a better judge of his duty as President than the President himself; and that when he seeks to execute a law, and to avoid impeachment and denouncement as unfaithful to his duty as Executive, this court is to interfere and tell him what his duty is[,]" *id.* at 482. Plaintiffs thus ask this Court to do something truly unprecedented: "in the 150 years since *Johnson* was decided, no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials." *Arizona*, 600 F. Supp. 3d at 1011. The Court should decline their invitation to overturn *Johnson*, a case they do not even cite. *See* Pls.' 2d PI Br. 10.

Finally, Plaintiffs' Take Care Clause claim fails on the merits. Congress approved the "development of Columbia Island as a park," including "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Bridge Commission Report 40–41. And Congress delegated discretion to change those designs as "may be found to be necessary or advisable." Authorization Act § 1, 43 Stat. 974. There is thus nothing unfaithful about

implementing a project that Congress has authorized. To the contrary, abandoning the project would less faithfully implement the Congressional plan for Columbia Island.

**III. The Balance of Equities and Public Interest Tilt Heavily Against an Injunction.**

Because Plaintiffs have not demonstrated likelihood of success on the merits or imminent irreparable injury, the Court need not consider the final two factors of the *Winters* standard. But these factors also tilt heavily against an injunction. In assessing these factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest is the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

1. Plaintiffs tellingly provide no argument as to why a preliminary injunction would serve the public interest. *See* Pls.' 2d PI Br. 12–13 (discussing these two factors in a single paragraph). They instead argue that a "temporary restraining order" would inflict only a "brief increment of delay." *Id.* at 12. As Plaintiffs' motion sought a preliminary injunction—and not a temporary restraining order—this argument is irrelevant. *See* Pls.' 2d PI Mot.. As a preliminary injunction does not automatically expire within fourteen days, *see* Fed. R. Civ. P. 65(b)(2), the government and public would suffer far more than a brief increment of delay from Plaintiffs' requested relief.

By contrast, the government is always "likely to suffer irreparable harm" when courts enter "injunctions that likely exceed the authority conferred" to them. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025). In this case, Plaintiffs without standing seek a preliminary injunction long before they might suffer any claimed irreparable harm. *See supra* 13–25. Imposing that "injunction based on an unripe claim and the speculative threat of injury will thwart the public interest in enforcement of a law enacted by the people's elected officials." *Parrish v. Dayton*, No. CIV. 13-1348

MJD/AJB, 2013 WL 4536260, at *1 (D. Minn. Aug. 27, 2013). Because such an injunction would stymie the "energetic executive" deemed essential by the Framers, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020), it is not in the public interest.

2. Entry of a preliminary injunction here would be particularly damaging to the public interest. As the attached declarations from the Departments of War and Homeland Security describe in detail, the arch, as currently designed, represents "a generational national defense opportunity to mitigate" evolving threats from the proliferation of small, unmanned aircraft systems (UAS). Hegseth Decl. ¶ 10; Mullin Decl. ¶ 18 ("The Arch would, when properly equipped, provide an opportunity to substantially expand UAS detention, and if necessary, disruption or mitigation . . . , directly supporting DHS's mission."). "The commercially available and recreational UAS market is experiencing rapid growth in the United States, with the commercial fleet alone projected to reach up to 1.015 million units by 2027." Mullin Decl. ¶ 3. "Import data suggests that current Federal Aviation Administration registration numbers significantly underestimate the true size of the recreational fleet, meaning the actual number of hobbyist drones in operation is likely much higher than official estimates." *Id.* The mass proliferation of UAS "rais[es] the risk of unauthorized or nefarious use within the federal National Capital Region (NCR)." *Id.* ¶ 4; *see also* Hegseth Decl. ¶¶ 4–5 (noting that "[t]he NCR threat environment is multi-domain and continuously evolving" and "[t]he proliferation of [small UAS] . . . presents a new and dynamic national security threat to the NCR").

The proposed location and height for the arch "provide enhanced lines of sight for both sensors and personnel, which is critical to [counter-UAS] and other security operations." Hegseth Decl. ¶ 10. "By placing sensors and communications equipment above much of the surrounding urban landscape, the structure will improve line-of-sight connectivity; reduce the masking effects

of buildings, terrain, vegetation, and other obstructions; and expand the area in which potential threats and relevant activity can be detected and assessed." *Id.* ¶ 12. And it could provide "a centralized and elevated infrastructure node at a key geographic location in the NCR [that] would effectively bridge the NCR's fragmented jurisdictional boundaries and enhance homeland defense." Mullin Decl. ¶ 14.

An injunction would forestall the opportunity for these significant national security benefits and prohibit the government from taking important steps to mitigate an ever-growing threat to the Nation's capital. *Winter*, 555 U.S. at 33 (vacating preliminary injunction when it could jeopardize national security); *NPS*, 2026 WL 2564318, at *4 (similarly staying preliminary injunction); *Stagg P.C. v. United States Dep't of State,* 673 F. App'x 93, 96 (2d Cir. 2016 (affirming denial of preliminary injunction when public interest in maintaining national security weighed against plaintiff's claimed harm); *Church v. Biden*, 573 F. Supp. 3d 118, 147-148 (D.D.C. 2021) (denying motion for preliminary injunction where public interest in military readiness outweighed plaintiffs' claims of harm). These significant national defense concerns "plainly outweigh" Plaintiffs' asserted aesthetic interests. *See Winter*, 555 U.S. at 25–26. Because the "harms and equities are not nearly in equipoise," no injunction can issue. *NPS*, 2026 WL 2564318, at *4.

Indeed, Plaintiffs ask the Court to enjoin Defendants not only from structure construction, but also "from taking any steps to . . . *facilitate* construction of any structure in Memorial Circle." Proposed Order, Dkt. No. 7-6 (emphasis added). This vague and sweeping relief could restrict Defendants' ability even to undertake even internal planning related to the national defense potential of the arch project—a sweeping remedy wholly unnecessary to alleviate any of Plaintiffs' asserted injuries. Such a vague injunction violates the specificity requirements of Rule 65. *See*

*Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 50-53 (2d Cir. 1996) (vacating as vague an injunction "to facilitate" a general result). And it would be flatly contrary to the public interest.

## CONCLUSION

Because Plaintiffs have failed at every step to meet their burden of showing their entitlement to a preliminary injunction, the Court must deny their motion. The Court must also reject proposed amici's attempt (at Dkt. 68-1) to insert new issues into this case. *E.g.*, *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 n.4 (2013) (declining to consider an amicus' argument that "was not raised by the parties"); *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 482 (D.C. Cir. 2014) ("it is now the law of this circuit that *amici* are precluded *both* from raising new issues *and* from raising new arguments" (quoting *Eldred v. Ashcroft*, 255 F.3d 849, 854 (D.C. Cir. 2001) (Sentelle, J., dissenting from denial of rehearing en banc)); *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n,* 158 F.3d 1335, 1338 (D.C. Cir. 1998) ("we ordinarily do not entertain arguments not raised by parties").

Date: October 28, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT STANDER
Deputy Assistant Attorney General

BENJAMIN HAYES
Deputy Assistant Attorney General

*/s/ Michael S. Sawyer*
MICHAEL S. SAWYER, Senior Attorney
ALISON VICKS, Trial Attorney
DANIEL LUECKE, Trial Attorney
Energy and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-353-5134
E-mail: michael.sawyer@usdoj.gov
alison.vicks@usdoj.gov
daniel.luecke@usdoj.gov

*Counsel for Defendants*