**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MICHAEL LEMMON, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 26-cv-544 (TSC) |
| DONALD J. TRUMP, et al., | ) | |
| Defendants. | ) | |

# REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Wendy Liu (DC Bar No. 1600942)
Nicolas A. Sansone (DC Bar No. 1686810)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

October 29, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................1

I. Plaintiffs have established standing. ..........................................................................1

II. Defendants are not immune from accountability for their unlawful actions. ......................4

A. Sovereign immunity does not bar Plaintiffs' claims. ............................................4

B. The Administrative Procedure Act independently belies Defendants' assertion of immunity. .......................................................................................................6

III. Plaintiffs are likely to succeed on the merits. ............................................................8

A. Plaintiffs properly allege an ultra vires claim. .......................................................8

B. Plaintiffs are likely to succeed in showing that Defendants are proceeding in violation of the Commemorative Works Act. .........................................................13

C. Plaintiffs are likely to succeed in showing that Defendants are proceeding in violation of § 8106. ..........................................................................................16

D. Plaintiffs are likely to succeed on the merits of their constitutional claim. ...........18

IV. Plaintiffs are at imminent risk of irreparable injury ..................................................21

V. The balance of equities and public interest favor Plaintiffs. .........................................23

CONCLUSION ..........................................................................................................25

## TABLE OF AUTHORITIES

**Cases** **Pages**

*United States v. Students Challenging Regulatory Agency Procdures (SCRAP)*,
412 U.S. 669 (1973) ........ 1

*Air Line Pilots Ass'n, International v. Chao*,
889 F.3d 785 (D.C. Cir. 2018) ........ 17

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ........ 9

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) ........ 23

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ........ 6

*Ashwander v. Tenn. Valley Authority*,
297 U.S. 288 (1936) ........ 6

*Attias v. Carefirst*,
865 F.3d 620 (D.C. Cir. 2017) ........ 3

*Beatty v. Trump*,
834 F. Supp. 3d 41 (D.D.C. 2026) ........ 25

*Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*,
502 U.S. 32 (1991) ........ 10, 11

*Burnett v. Al Baraka Investment & Development Corp.*,
292 F. Supp. 2d 9 (D.D.C. 2003) ........ 6

*Chamber of Commerce of the U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........ 4, 6, 9, 10, 13

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........ 22

*Chuidian v. Philippine National Bank*,
912 F.2d 1095 (9th Cir. 1990) ........ 6

*Clark v. Library of Congress*,
750 F.2d 89 (D.C. Cir. 1984) ........ 7

*Collins v. Yellen*,
594 U.S. 220 (2021) ........ 19

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 19, 20

*DC Preservation League v. Department of Interior*,
No. 26-cv-477, 2026 WL 3210227 (D.D.C. Oct. 26, 2026) ........ 1, 3, 23, 25

*Diversity v. Fish & Wildlife Service*,
146 F.4th 1144 (D.C. Cir. 2025) ........ 1

*Fort Sill Apache Tribe v. National Indian Gaming Commission*,
103 F. Supp. 3d 113 (D.D.C. 2015) ........ 8

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
561 U.S. 477 (2010) ........ 18, 19

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*,
528 U.S. 167 (2000) ........ 1

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 11, 20

*International Dark-Sky Ass'n v. FCC*,
106 F.4th 1206 (D.C. Cir. 2024) ........ 1

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ........ 4

*Leedom v. Kyne*,
358 U.S. 184 (1958) ........ 12

*Leopold v. Manger*,
102 F.4th 491 (D.C. Cir. 2024) ........ 13

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 1, 2

*Medellín v. Texas*,
552 U.S. 491 (2008) ........ 20

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ........ 18, 19

*Morrison v. Olson*,
487 U.S. 654 (1988) ........ 18

*National Park Service v. National Trust for Historic Preservation in the United States*,
609 U.S. 1068, 2026 WL 2564318 (U.S. Aug. 31, 2026) ........ 2, 3, 17, 22

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012) ........ 21

*National Trust for Historic Preservation in the United States v. NPS*,
185 F.4th 1185 (D.C. Cir. 2026) ........ 17

*National Trust for Historic Preservation in the U.S. v. NPS*,
821 F. Supp. 3d 62 (D.D.C. 2026) ........ 12

*New Mexico v. Musk*,
784 F. Supp. 3d 174 (D.D.C. 2025) ........ 13

*New Mexico v. Musk*,
824 F. Supp. 3d 80 (D.D.C. Mar. 23, 2026) ........ 6

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025) ........ 13

*Pollack v. Hogan*,
703 F.3d 117 (D.C. Cir. 2012) ........ 4

*Powder River Basin Resource Council v. Department of Interior*,
749 F. Supp. 3d 151 (D.D.C. 2024) ........ 1

*Schilling v. U.S. House of Representatives*,
102 F.4th 503 (D.C. Cir. 2024) ........ 4

*Sea-Land Service, Inc. v. Alaska Railroad*,
659 F.2d 243 (D.C. Cir. 1981) ........ 8

*Sierra Club v. U.S. Army Corps of Engineers*,
990 F. Supp. 2d 9 (D.D.C. 2013) ........ 23

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ........ 19

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ........ 7

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) ........ 2

*United States v. Or. State Med. Society*,
343 U.S. 326 (1952) ........ 5

*United States v. Texas*,
577 U.S. 1101 (2016) ........ 19

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 22

*Yellowstone to Uintas Connection v. Bolling*,
2025 WL 1928052 (D. Idaho July 14, 2025) ........ 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........ 19, 20, 21

**Constitutional Provisions**

U.S. Const. article II, § 3 ........ 18, 20

**Statutes**

5 U.S.C. § 702 ........ 7, 8

16 U.S.C. § 451 (1912) ........ 17, 18

40 U.S.C. § 8106 ........ *passim*

40 U.S.C. § 8902(a)(1) ........ 14

40 U.S.C. § 8902(b) ........ 14

54 U.S.C. § 306108 ........ 24

**Regulations**

36 C.F.R. § 800.5 ........ 24

36 C.F.R. § 800.6 ........ 24

**Other Authorities**

NPS, *Triumphal Arch at Memorial Circle: Assessment of Effects Report* (June 2026), https://parkplanning.nps.gov/document.cfm?parkID=186&projectID=136973&documentID=151576 .......... 14, 23, 24

NPS, *Triumphal Arch Revised, Environmental Assessment* (Oct. 2026) .......... 14, 21

## INTRODUCTION

Defendants have informed this Court that construction of a monumental arch in Memorial Circle may begin as soon as next Thursday. Because, without congressional authorization, the porject is unlawful, the threatened harm is imminent, and the public interest leans heavily against allowing Defendants to blaze ahead, this Court should enter a preliminary injunction blocking Defendants from beginning construction on Memorial Circle in the hope that they can render the arch a fait accompli before this Court has made a final determination.

## ARGUMENT

### I. Plaintiffs have established standing.

**A.** It is well-established that aesthetic injury is a cognizable harm that gives rise to Article III standing. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000); *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 685 (1973); *Ctr. for Bio. Diversity v. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025); *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024); *Powder River Basin Res. Council v. Dep't of Interior*, 749 F. Supp. 3d 151, 160 (D.D.C. 2024). Here, the arch will affect each Plaintiff "in a personal and individual way," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992), by disrupting the environment and historical symbolism that is of special meaning to each of them. Plaintiffs' "interests show the type of here-and-now injuries, backed up by specific facts and concrete plans, that support Article III standing." *Ctr. for Bio. Diversity*, 146 F.4th at 1157–58. Specifically, Plaintiffs regularly visit the landmarks around Memorial Circle and derive profound aesthetic and personal enjoyment from the iconic vista from and between them. *See DC Pres. League v. Dep't of Interior*, No. 26-cv-477, 2026 WL 3210227, at *23 (D.D.C. Oct. 26, 2026). Plaintiffs Lemmon, Byrnes, and Gundersen also have a strong personal connection to

Arlington National Cemetery, where they visit the gravesites of their fallen comrades. *See* Lemmon Decl., ECF 7-2, ¶¶ 6–9; Byrnes Decl., ECF 7-3, ¶¶ 8–13; Gundersen Decl., ECF 7-4, ¶¶ 6–9; *see also* Loth Decl., ECF 7-5, ¶¶ 5–10. The arch will degrade each of their personal experiences when they visit the gravesites of their comrades and the land where two of them hope to be interred. *See* Lemmon Decl. ¶¶ 7–9; Byrnes Decl. ¶¶ 8–9; Gundersen Decl. ¶¶ 6–7.

**B.** Relying primarily on *National Park Service v. National Trust for Historic Preservation in the United States*, 609 U.S. 1068, 2026 WL 2564318 (U.S. Aug. 31, 2026) (per curiam), Defendants mischaracterize Plaintiffs' injuries as "mere offense, disagreement of distaste." Defs. Opp., ECF 74 at 13. In *National Park Service*, a five-Justice majority voted in an emergency posture to stay a preliminary injunction barring the construction of a ballroom on the White House grounds, finding that the plaintiff in that case—a membership organization that had submitted an affidavit from a member who found the ballroom's design "distasteful"—likely lacked Article III standing. *Id*. at *2 (majority opinion). Although the Supreme Court's interim orders "are not conclusive as to the merits," *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), the Court's per curiam opinion provides useful guidance that underscores Plaintiffs' standing here.

Importantly, the *National Park Service* opinion reaffirmed the Supreme Court's long line of precedent establishing that the desire to observe a given phenomenon, "'even for purely esthetic purposes,' can constitute 'a cognizable interest for purpose of standing.'" 2026 WL 2564318, at *3 (quoting *Lujan*, 504 U.S. at 562–63. The opinion also underscored that "a plaintiff must also show that its claimed [aesthetic] injury is 'concrete and particularized.'" *Id*. (quoting *Lujan*, 504 U.S. at 560). Plaintiffs have made this showing: Each has explained his profound personal interest in the landmarks and iconic vista that he regularly views and from which he derives meaning—an interest that Defendants' arch will irreparably harm. *See, e.g.*, Lemmon Decl., ECF 7-2, ¶ 6; Byrnes

Decl., ECF 7-3, ¶ 9; Gundersen Decl., ECF 7-4, ¶ 6; Loth Decl., ECF 7-5, ¶ 6. Indeed, Defendants have not disputed that "[t]he reciprocal view between the Lincoln Memorial and Arlington House in Arlington National Cemetery has long remained unobstructed as a visual symbol of the reunification of the Nation following the Civil War," that "[a] 250-foot arch in Memorial Circle would obstruct the views between the Lincoln Memorial and Arlington National Cemetery," and that the obstruction will "diminish [Plaintiffs'] experience" during future visits to the cemetery. Pls. Statement of Undisputed Material Facts, ECF 36-2, ¶¶ 29–30, 33, 35.

By contrast, the Court found that the plaintiff in *National Park Service* had asserted injury based on "mere offense, disagreement, or distaste" for the government's actions. *Nat'l Park Serv.*, 2026 WL 2564318, at *2. Here, Plaintiffs do not attempt to ground standing on their belief that "the government's design" for the arch is "distasteful." *Id.* Plaintiffs' injuries derives from the disruption to the existing landscape, viewshed, and their personal experiences of Arlington Cemetery. *See DC Pres. League*, 2026 WL 3210227, at *23 (making a similar distinction and finding standing).

Defendants also suggest that Plaintiffs' lack standing because the arch's construction was "speculative" when the lawsuit was filed and, perhaps, remains not "non-speculative" today. Def Opp., ECF 74 at 22. At the time that Plaintiffs filed suit, however, the White House had repeatedly announced plans to build a monumental arch in Memorial Circle and shared visual depictions of the arch with the public. *See* Pl. Memo., ECF 64-1 at 4. Accordingly, Plaintiffs faced a substantial risk that Defendants would do precisely what the President had told the American people they were planning to do. *See Attias v. Carefirst*, 865 F.3d 620, 627 (D.C. Cir. 2017) (stating that "we have frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury"). And now, Defendants have notified the Court of their intention to begin as soon as next

week, *see* ECF 63, and have secured declarations from two Cabinet secretaries to support the purported urgent need to do so. *See* Mullin Decl., ECF 74-8; Hegseth Decl., ECF 74-9.

Finally, Defendants' suggestion that Plaintiffs have "forfeited" standing, Defs. Opp., ECF 74 at 21, is absurd. Plaintiffs' opening memorandum explained how Plaintiffs are harmed by construction of the arch, *see* Pls. Memo., ECF 64-1 at 4–5, cited declarations supporting their standing, *see id.* at 4–5, and addressed the closely related issue of irreparable harm, *see id.* at 11. Plaintiffs have also repeatedly addressed the issue in court filings in this case. *See* ECF 7–2; ECF; 7–3; ECF 7–4; ECF 7–5; ECF 13 at 3–8, ECF 33 at 10–16; ECF 36-1 at 9–12; ECF 48 at 9–19; ECF 49 at 9–19; ECF 54 at 1–5. No authority supports the notion that Plaintiffs must reiterate in every motion the basis for their standing.

## II. Defendants are not immune from accountability for their unlawful actions.

### A. Sovereign immunity does not bar Plaintiffs' claims.

Under Supreme Court precedent, "'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (per curiam) (quoting *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 689, 693 (1949)). Thus, the D.C. Circuit has "reject[ed] the assertion of sovereign immunity if a plaintiff brings a suit for 'injunctive or declaratory relief' against a federal officer for an ultra vires act." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024) (brackets omitted; quoting *Pollack*, 703 F.3d at 120). After all, where federal officers act outside the scope of their lawful authority, "there is no sovereign immunity to waive—it never attached in the first place." *Id*. (quoting *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996)). A straightforward application of these principles establishes that Plaintiffs' claims—for actions "ultra vires and in excess of legal

authority," Compl., ECF 1, ¶ 52, and in violation of the Take Care Clause of the U.S. Constitution, *id.* ¶ 64— are not barred by sovereign immunity.

Defendants argue that they are immune from suit because the action that Plaintiffs challenge—construction of an arch in Memorial Circle—had not begun at the time that Plaintiffs filed suit. *See* Defs. Opp., ECF 74 at 26. But Defendants offer no principled reason why, when the government announces a settled plan to undertake unlawful and injurious action, a plaintiff must wait until the injury has occurred to restrain the action—particularly here, where the government is indisputably proceeding to implement its plan, and construction will be difficult to reverse once it has begun. Indeed, in other cases, Defendants have faulted the plaintiffs for failing promptly to seek relief after the government first manifested its plan to undertake an allegedly unlawful project. *See, e.g.*, Emergency Mot. for Stay Pending Appeal at 2, *Nat'l Tr. for Historic Pres. in the U.S. v. NPS*, No. 26-5101 (D.C. Cir.) (filed Apr. 3, 2026) (arguing that the equities favored staying an injunction that halted White House ballroom construction because the injunction "could have been sought long ago, prior to the start of construction," given that "there was full knowledge, through large scale media attention and publicity, that the White House ballroom was planned to be built"); Defs. Memo. in Opp'n to Pls. TRO Appl. at 2, *Douglas v. NPS*, No. 26-cv-2016 (D.D.C.), ECF 11 (filed June 9, 2026) (characterizing as "inexcusable" the plaintiffs' delay in challenging a government-sponsored event that had been "publicly announced almost a year" earlier).

Precedent stands firmly against Defendants' theory that a plaintiff may sue to enjoin announced ultra vires or unconstitutional official action only after the action is complete. After all, the injunctive relief that is typically sought in connection with an ultra vires claim by its nature targets future action. *See United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations."). The Supreme Court has

accordingly "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, *or planning to violate*, federal law," and that this power extends as well to "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (emphasis added). For example, in *Reich*, the D.C. Circuit held that the plaintiffs had properly raised an ultra vires claim to challenge an Executive Order even though the Department of Labor had not yet promulgated the regulations to carry the Order into effect. 74 F.3d at 1326–30. More recently, this Court acknowledged its power to "prospectively enjoin" ultra vires or unconstitutional governmental actions. *New Mexico v. Musk*, 824 F. Supp. 3d 80, 106 (D.D.C. Mar. 23, 2026).

The cases that Defendants cite are not to the contrary. It is true, as Defendants emphasize, that an ultra vires claim must target some form of executive action. *See* Defs. Opp., ECF 74 at 28. But Defendants identify no authority contradicting—or even questioning—the principle that such a claim can target *forthcoming* action. Defendants' lead case addresses the constitutional requirements of Article III, not sovereign immunity. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325 (1936) (holding that requests for "an advisory decree upon a hypothetical state of facts" or "a decision of abstract questions as to the right[s]" of the parties "in possible contingencies" are non-justiciable). The other cases cited by Defendants stand for the uncontested proposition that an otherwise lawful official action does not become ultra vires simply because it derives from an improper motive. *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106–07 (9th Cir. 1990), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 14 (D.D.C. 2003).

Here, the undisputed evidence establishes that, even before Plaintiffs filed suit, Defendants had taken action to consider the size, design, timing, and location of the arch. And now, as they

have informed this Court, construction is imminent. *See* Defs. Notice, ECF 63. All the while, Congress has done nothing to authorize the new monument.

**B. The Administrative Procedure Act independently belies Defendants' assertion of immunity.**

An additional and independent barrier exists to Defendants' assertion of sovereign immunity against Plaintiffs' ultra vires claim: Congress has expressly waived it. The Administrative Procedure Act (APA) provides that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. Although Plaintiffs do not assert an APA claim against the National Park Service (NPS), the waiver of immunity "is not limited to APA cases"; it covers "not only … APA cause[s] of action, but … nonstatutory and [constitutional] actions as well." *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006); *see Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984) (observing that section 702 "eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity").

While Defendants argue that they had not engaged in any relevant action or inaction at the time that Plaintiffs filed suit, Defs. Opp., ECF 74 at 27, the events of the past ten months undeniably demonstrate that, at the time that Plaintiffs filed suit, Defendants had decided to build a massive arch in Memorial Circle and that NPS was following through. *See* Defs. Opp., ECF 74 at 11–12 (reciting *some* of the steps taken by NPS). NPS's acquiescence to the President's demand—which Plaintiffs contend is unlawful—falls within section 702's capacious waiver of sovereign immunity. *See Trudeau*, 456 F.3d at 186 (explaining that section 702 was intended to "elimina[te] … the sovereign immunity defense in *all* equitable actions for specific relief against

a Federal agency or officer acting in an official capacity" (emphasis in original; quoting *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981))); *see also Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 118–19 (D.D.C. 2015) (rejecting the argument that a "claim of 'failure to act' … do[es] not qualify for a Section 702 waiver because there has been no 'final agency action'" because the argument "conflates the APA's waiver of sovereign immunity" for non-statutory claims with the "final agency action" required for an APA claim).

## III. Plaintiffs are likely to succeed on the merits.

### A. Plaintiffs properly allege an ultra vires claim.

As Plaintiffs have explained, and Defendants agree, *see* Defs. Opp., ECF 74 at 11, Defendants have been rapidly moving forward to build a monumental arch in Memorial Circle. They have touted the arch to the American people as a commemoration of the Nation's 250th anniversary, secured design approval from the Commission of Fine Arts, hurried through the National Environmental Preservation Act process, requested and received an evaluation from the Federal Aviation Administration, and performed on-site testing and geophysical survey work to prepare for the arch's construction. *See id*. Next week, Defendants will check what they assert to be the final box: approval by the National Capital Planning Commission. *See* Defs. Notice, ECF 63. But despite actively pushing their project to the finish line, Defendants lack any legal authority to build an arch (or anything else) in Memorial Circle. Defendants do not claim that they have constitutional authority to build the arch. And, as Plaintiffs have explained, *see* Pls. Memo., ECF 64-1 at 9–10; Pls. Memo. in Support of MSJ, ECF 35-1 at 12–17, the only statutory authority that Defendants have invoked—the 1925 Act—does not authorize the arch. Thus, far from representing "a breathtaking expansion of ultra vires review," Defs. Opp., ECF 74 at 29, judicial review of Defendants' "absolutely uncontrolled and arbitrary action" of implementing a grandiose project

that is "unauthorized by any law," *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902), falls in the heartland of the ultra vires doctrine.

**1.** Arguing otherwise, Defendants begin with the assertion that Plaintiffs challenge "only Presidential words or intentions," Defs. Opp., ECF 74 at 29, and devote a page to defending against suits challenging unexecuted *presidential* actions. *Id*. But it is far too late in the day to argue that the arch is merely an idea that the President tossed out in a social media post. Defendants have confirmed repeatedly, including to this Court, and accompanied by declarations from two Cabinet Secretaries, *see* Mullin Decl., ECF 74-8; Hegseth Decl., ECF 74-9, that arch construction cannot be dismissed as a "remark over dinner," Defs. Opp., ECF 74 at 29. Thus, this Court need not "assume that agencies will carry out executive intent" with respect to the arch, Defs. Opp., ECF 74 at 30. Defendants themselves have told this Court that they will do so.

**2.** Defendants next argue that Plaintiffs cannot raise an *ultra vires* claim because Plaintiffs might someday have an APA claim against NPS. *See* Defs. Opp., ECF 74 at 31. Defendants agree, though, that Plaintiffs have no present cause of action under the APA. In the meantime, Defendants are imminently beginning construction on a project that Congress has not authorized. Requiring Plaintiffs to sit on their hands until Defendants take further ultra vires action that gives rise to a statutory cause of action would leave the Executive Branch free to pursue "absolutely uncontrolled and arbitrary action" that is "unauthorized by any law," *McAnnulty*, 187 U.S. at 110, as long as its unlawful activity might ultimately come under the aegis of a statutory review scheme.

The law does not demand such a result, as D.C. Circuit precedent makes clear. In *Chamber of Commerce v. Reich*, the plaintiffs asserted a non-statutory claim challenging an Executive Order barring the federal government from contracting with certain employers. *Reich*, 74 F.3d at 1324. While the lawsuit was pending, the Secretary of Labor promulgated regulations implementing the

Order. *Id.* at 1324–25. The plaintiffs, though, "could not possibly have relied on the APA for a cause of action prior to the Secretary's issuance of regulations implementing the Executive Order because[] … the President is not an 'agency' under [the APA] and [the plaintiffs] sued before the Secretary issued his regulations." *Id.* at 1326. Therefore, although the D.C. Circuit recognized that "an available statutory cause of action" under the APA had materialized after the plaintiffs filed suit, *id*. at 1327, it held that the plaintiffs could maintain their ultra vires claim. *Id.* at 1327–28. So too here. Plaintiffs "could not possibly … rel[y] on the APA for a cause of action" at this time, *id.* at 1326, and an ultra vires claim is an appropriate vehicle for the parties' dispute.

Attempting to distinguish *Reich*, Defendants point out that the government there had argued that "a cause of action under the APA [was] not available" to challenge the Secretary's regulations because they implemented an Executive Order that, in the government's eyes, was unreviewable. Defs. Opp., ECF 74 at 32 (quoting *Reich*, 74 F.3d at 1326–27). The D.C. Circuit, though, found that argument "unsupported," explaining that the fact that "the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA." *Reich*, 74 F.3d at 1327. In addition, Defendants' argument that "an APA claim" against specific implementing regulations "would have provided limited relief to the *Reich* plaintiffs," Defs. Opp., ECF 74 at 32, fails to distinguish that case from this one. In *Reich*, "any relief short of a declaration that the Executive Order [was] illegal would [have been] inadequate," *Reich*, 74 F.3d at 1326, because *no* agency regulation would have comported with the plaintiffs' view of the law. Similarly here, Plaintiffs seek relief against *any* implementation of Defendants' unlawful arch project.

The cases on which Defendants rely are inapposite. In *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32 (1991), a company sought to enjoin

administrative proceedings brought by the Board of Governors of the Federal Reserve System charging the company with certain regulatory violations. *See id.* at 34. Critically, however, the Financial Institutions Supervisory Act of 1966 "authorize[d] the Board to institute" such proceedings, provided a "tripartite regime of judicial review," *id.* at 38, and forbad courts from enjoining ongoing Board proceedings, *id.* at 44. Thus, although the company challenged the validity of the regulation that the Board was enforcing against it, the Court held that the detailed statutory scheme that governed Board proceedings not only ensured a "meaningful and adequate opportunity for judicial review" once the proceedings had concluded, *id.* at 43, but expressly foreclosed judicial relief in the meantime, *see id.* at 44. Similarly, in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), the D.C. Circuit considered an ultra vires claim seeking to restrain executive action that, in the court's view, was being undertaken pursuant to the "statutory processes" of the Impoundment Control Act. *Id*. at 21 n.18. In a footnote, the divided court stated that, if a statute were to provide for judicial review at the conclusion of those congressionally authorized processes, ultra vires review would be unavailable in the interim. *Id.*

Unlike in *MCorp* and *Global Health Council*, Plaintiffs here challenge an executive action that is proceeding outside any established statutory framework—let alone a framework that contains an express prohibition on injunctive relief. Defendants in fact admit that they do not view themselves as bound by the procedural requirements of the Commemorative Works Act. *See* Defs. Opp., ECF 74 at 33. In this context, this Court has the authority to enjoin the ongoing forward march of an ultra vires executive undertaking.

Finally, while NPS may later take "final agency action," the gravamen of Plaintiffs' ultra vires claim is that, absent congressional authorization, NPS has no authority in the first place to take any of the actions—final or otherwise—that it is presently taking to implement the arch

project. *Cf. Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (distinguishing a challenge to "a decision of [an executive agency] made within its jurisdiction" from a challenge to a decision "made in excess of [the agency's] delegated powers" that is thus ultra vires). And recent actions by Defendants illustrate the compelling need for review *before* NPS takes what it considers to be "final" action. *See Nat'l Trust for Historic Pres. in the U.S. v. NPS*, 821 F. Supp. 3d 62, 66 (D.D.C. 2026) (detailing how the President, "without advance notice," had the East Wing of the White House demolished on land "administered by the National Park Service"); Notice, *Cultural Landscape Found. v. U.S. Dep't of the Interior*, No. 1:26-cv-1593 (D.D.C.), ECF 18 (filed June 3, 2026) (notice from NPS stating that challenged work on the Lincoln Memorial Reflecting Pool had been "complete[d]" during the pendency of a motion seeking to preliminarily enjoin that work). There is scant basis for concluding that an APA challenge to some unspecified future NPS action is an adequate substitute for an ultra vires claim capable of stopping the ongoing arch project before it culminates in harm.

**3.** Plaintiffs' claims center on the lack of congressional authorization for the arch, as required by the Commemorative Works Act and 40 U.S.C. § 8106. Defendants, however, make the somewhat bizarre argument that Plaintiffs, "[a]fter learning that [the 1925 Act] encompasses authorization to construct and redesign two large columns" on the arch location, "pivoted" from arguing that the arch lacks congressional approval, "to contesting Defendants' interpretation of that [1925] Act." Defs. Opp., ECF 74 at 33. The 1925 Act, however, is the heart of Defendants' defense in this case: They do not contest that congressional authorization is required; they claim that the 1925 Act gives it to them. Plaintiffs necessarily have responded to Defendants' argument, and doing so cannot reasonably be characterized as having "abandoned their original position" that Defendants lack authority for the arch construction. In essence, Defendants argue that by

identifying a statute and claiming that it authorizes their actions, they can transform Plaintiffs' ultra vires claim into an unreviewable dispute over statutory interpretation. *Id.* Accepting this argument would limit the availability of ultra vires relief to situations in which the executive concedes that it is acting without legal authorization. But ultra vires review is clearly not so toothless. *Cf. Reich*, 74 F.3d at 1332 (explaining that withholding judicial review simply because the President "*claims*" to be acting pursuant to statutory authority "would permit the President to bypass scores of statutory limitations on governmental authority" (emphasis in original)). While ultra vires review is not available to resolve reasonable disagreements about whether the executive has appropriately wielded its statutory authority, *see Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025), it is the job of the judiciary to interpret statutes to determine what authority has been conferred on the Executive Branch in the first place. *See Reich*, 74 F.3d at 1332–39 (performing this interpretive function in the context of an ultra vires claim).[1]

### B. Plaintiffs are likely to succeed in showing that Defendants are proceeding in violation of the Commemorative Works Act.

Defendants do not deny that any authority to build their arch must derive from Congress and that, absent congressional authorization, the arch is ultra vires irrespective of whether a statute explicitly forbids its construction. *See New Mexico v. Musk*, 784 F. Supp. 3d 174, 206 (D.D.C. 2025) ("Conduct in violation of specific statutory limitations 'is just one example of an *ultra vires* act—not the *only* example of an *ultra vires* action.'" (quoting *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024)). Nonetheless, the Commemorative Works Act does forbid the construction of unauthorized structures, underscoring the appropriateness of relief on Plaintiffs' ultra vires

[1] Under Defendants' theory, for example, had they responded to Plaintiffs' legal arguments by asserting the patently frivolous position that Title VII authorized construction, Plaintiffs could no longer pursue their ultra vires claim. To state the point is to refute it.

claim. *See* Pls. Memo., ECF 64-1 at 2.

Defendants argue that the arch might not be subject to the requirements of the Commemorative Works Act because it might not be "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." Defs. Opp., ECF 74 at 38 (quoting 40 U.S.C. § 8902(a)(1)). Defendants' professed agnosticism about the arch's commemorative nature stands at odds with the mass of statements made by the President and his representatives that connect the arch to the 250th national anniversary—statements that Defendants do not dispute were made. *See* Defs. Counterst., ECF 45-1, ¶¶ 13–19. And Defendants continue to state that "[t]he purpose of the proposed [arch] is to celebrate 250 years of American independence." NPS, *Triumphal Arch at Memorial Circle: Assessment of Effects Report* 4 (June 2026)[2], including in materials submitted for the NCPC's November 5 meeting. *See* NPS, *Triumphal Arch Revised Environmental Assessment* 1, 57, A-1, A-2 (Oct. 2026), ECF 74-1 (hereafter, Env't Assessment); NCPC, File No. 8778, *Triumphal Arch: Finding of No Significant Impact* 1, Letter from Advisory Council on Historic Preservation 2, Oct. 9, 2026, *available at* https://www.ncpc.gov/review/agenda/.

Meanwhile, the sole piece of supposedly contrary evidence to which Defendants refer—a statement that the arch "is not primarily a monument dedicated to the dead, but to the living, to this great country and its perseverance," Defs. Opp., ECF 74 at 38—is fully consistent with an intent to commemorate the anniversary.

Thus, to avoid the Commemorative Works Act, which "does not apply to commemorative works authorized by a law enacted before January 3, 1985," 40 U.S.C. § 8902(b), Defendants argue

---

[2] https://parkplanning.nps.gov/document.cfm?parkID=186&projectID=136973&document ID=151576.

that the arch was authorized by the 1925 Act. The 1925 Act, though, conferred specific and limited authority on the Arlington Memorial Bridge Commission—not Defendants—to "prosecute[] to completion" a discrete, ten-year project—the construction of Arlington Memorial Bridge—"as speedily as practicable" for "a total sum not to exceed $14,750,000." 1925 Act, § 2, 43 Stat. 974. Defendants' implausible contention that the statute authorizes limitless initiation of new executive projects, at whatever cost, indefinitely into the future, is entirely untethered from the Act's text.

The scant efforts that Defendants make to grapple with the statutory text underscore that Defendants' reading is untenable. For example, Defendants argue that the 1925 Act's direction that the Commission proceed according to a specified "ten-year program of expenditures and construction," *id.* § 6, 43 Stat. at 975, does not operate as a "sunset provision" on Congress's authorization for the project. Defs. Opp., ECF 74 at 34. Whether the Commission might lawfully have extended its work into an eleventh year, though, Congress's adoption of a ten-year schedule is a strong indication of what Congress authorized: a discrete project of finite duration, the "completion" of which Congress directed "as speedily as practicable." 1925 Act, § 2, 43 Stat. at 974; *see id.* § 4, 43 Stat. at 975 (providing for the transfer of the affected land to the park system "on completion of the project"). Despite Defendants' argument, it is accordingly irrelevant that certain ornamental touches that had been approved as part of the bridge's final design in 1933—within the 1925 Act's ten-year timeframe—were not installed until 1951. *See* Defs. Opp., ECF 74 at 34. The belated completion of finalized design elements that had encountered practical delays attributable to the Great Depression and World War II, *see id.*, hardly supports initiation of a massive new monumental structure that never formed any part of the bridge's design, nearly a century after the design was finalized. Although Defendants rely heavily on the fact that an early design proposal included "two large columns," *id.* at 31, the Commission that Congress authorized

to design the bridge *removed* them from the final design, *See* Sawyer Decl., ECF 44-17, Exh. R at 92, and the bridge was completed without them.[3]

Next, attempting to minimize the significance of the 1925 Act's spending cap, Defendants argue that "alternative sources of funding" that are not drawn from the U.S. Treasury do not count toward the cap. Defs. Opp., ECF 74 at 35. Whatever the unidentified "alternative sources" might be, a statute specifying that a bridge shall be constructed for "a total sum not to exceed $14,750,000" and authorizing that amount to be appropriated from the U.S. Treasury, 1925 Act, § 2, 43 Stat. at 974, cannot reasonably be read to authorize limitless use of non-appropriated funding to construct a monument of limitless expense. Rather, Congress's choice of a $14.75 million cap is evidence of the scope of the project that Congress authorized. The Arlington Memorial Bridge, including the embellishments included in the final design, which was built for a total cost of $12.2 million, *see* Sansone Decl. Exh. P, ECF 36-19, fits well within that scope. Adding the cost of a massive new monument, to be built a century later for an exponentially higher price, does not.

**C. Plaintiffs are likely to succeed in showing that Defendants are proceeding in violation of § 8106.**

In addition, 40 U.S.C. § 8106, which requires "express authority of Congress" for any building erected on federal park or public land in Washington, DC, also forbids Defendants' unauthorized construction project. To avoid that result, Defendants point again to the 1925 Act, which, as explained, does not help them here. *See supra* pp. 14–16. They also advance a series of

[3] Underscoring that the proposed arch was not authorized by non-final 1925 design proposal, the proposed columns were envisioned as "framing in but not interfering with the view of the Lincoln Memorial from the direction of the Lee Mansion." Report of the Arlington Memorial Bridge Commission 41, *cited in* Defs. Opp., ECF 74 at 5 n.2; *see id*. at 53 & 54 (showing two columns, each less than 15' wide and widely spaced, at the western end of the bridge).

arguments against the applicability of section 8106 that the D.C. Circuit recently rejected. *See Nat'l Tr. for Historic Pres. in the United States v. NPS*, 185 F.4th 1185, 1220–23 (D.C. Cir. 2026), *disagreed with on other grounds*, *Nat'l Park Serv.*, 2026 WL 2564318; *see also Nat'l Park Serv.*, 2026 WL 2564318, at *4 (Roberts, C.J., dissenting) (opining on behalf of four Justices that the ballroom construction is likely in violation of 40 U.S.C. § 8106).

Defendants likewise err in arguing that a now-repealed statute, 16 U.S.C. § 451 (1912), casts "doubt" on whether NPS is subject to section 8106. Defs. Opp., ECF 74 at 38. Enacted contemporaneously in 1912 with § 8106's predecessor statute, § 451 required "express authority of Congress" for the expenditure of sums above a specified threshold "for construction of administration or other buildings … in any national park." Because § 451 governed "NPS's construction in national parks," the argument runs, § 8106 "was never intended" to do so. Defs. Opp., ECF 74 at 39. And now that Congress has repealed § 451, Defendants argue, Congress's authorization is no longer required for any structure that NPS wishes to build in the national parks. *See id*. Accordingly, Defendants contend that "NPS has erected countless structures on national parkland in the District over the past century" without "express congressional approval." *Id*.

As an initial matter, as the D.C. Circuit has noted, "no one challenged those projects in court, and 'the existence of a prior administrative practice' does not 'relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority.'" *Nat'l Tr. for Historic Pres.*, 185 F.4th at 1222; *see also Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 792 (D.C. Cir. 2018) (stating that "agency practice cannot alter unambiguous statutory text"). Even putting that aside, Defendants' argument would not support the construction of an unauthorized arch in Memorial Circle. Although Memorial Circle sits within a "park[] or public grounds of the Federal Government in the District of Columbia," and so falls within the scope of 40 U.S.C.

§ 8106, it does not sit within a "national park" and so never fell within the scope of 16 U.S.C. § 451. *See* NPS, National Park System (listing the national parks);[4] NPS, Lady Bird Johnson Park (explaining that Lady Bird Johnson Park, which houses Memorial Circle, "is a unit of the George Washington Memorial Parkway").[5] More fundamentally, Defendants provide no support for the underlying premise of their argument: that Congress intended the restriction that now-rescinded 16 U.S.C. § 451 placed on construction in national parks throughout the country (no unauthorized building projects above a certain cost threshold) to supplant the more demanding restriction that 40 U.S.C. § 8106 and its predecessor placed on construction in federal parkland within Washington, DC, specifically (no unauthorized building projects at all).

**D. Plaintiffs are likely to succeed on the merits of their constitutional claim.**

Plaintiffs have also established that the President's directive to build an arch in Memorial Circle without congressional authorization and in disregard of the Commemorative Works Act and 40 U.S.C. § 8106 violates his "constitutionally appointed duty to 'take care that the laws be faithfully executed.'" *Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3). Defendants' arguments that Plaintiffs are not likely to succeed on this claim lack merit.

First, citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866), Defendants contend that "courts cannot and should not review the President's 'purely executive and political' duty 'to see that the laws are faithfully executed.'" Defs. Opp. 41 (quoting *Johnson*, 71 U.S. at 499). But the Supreme Court has since made clear that an injured party has an implied right of action under the Constitution to enforce the Constitution's structural guarantees, even where the plaintiff's claim implicates the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561

---

[4] https://www.nps.gov/aboutus/national-park-system.htm.

[5] https://www.nps.gov/gwmp/planyourvisit/ladybirdjohnsonpark.htm.

U.S. 477, 491 n.2 (2010); *cf. Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."). Defendants offer "no reason" why a Take Care Clause claim "should be treated differently than every other constitutional claim." *Free Enter. Fund*, 561 U.S. at 491 n.2; *cf. United States v. Texas*, 577 U.S. 1101 (2016) (granting certiorari and requesting briefing on whether a challenged presidential policy "violates the Take Care Clause of the Constitution").

In light of *Free Enterprise Fund* and its progeny, *Johnson* is best read to hold, not that the President's exercise of his Take Care Clause duty is judicially unreviewable, but rather that a Take Care Clause violation typically cannot justify an injunction against the President. *See Johnson*, 71 U.S. at 499–501. Plaintiffs, though, do not seek to enjoin the President. *See* Proposed Order, ECF 64-2. And an injunction barring his subordinates from giving effect to an unlawful presidential directive is an available form of relief. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).

Second, Defendants argue that Plaintiffs' Take Care Clause claim "is ultimately a statutory claim, not a constitutional one." Defs. Opp, ECF 74 at 40. They explain that a claim that the President "acted in excess of [statutory] authority" does not necessarily implicate the Constitution, whereas a claim that the President acted in the "absence of any statutory authority" is best viewed as a constitutional claim. *Id*. (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). But this argument favors Plaintiffs. Indeed, the basis for Plaintiffs' Take Care Clause claim is the President's initiation of a project that requires congressional authorization without having first obtained that authorization. Defendants' say that the President has not conceded the absence of statutory authority. But this Court should reject Defendants' view that the President can insulate unlawful actions from review simply by refusing to concede that he lacks statutory authority.

Although Defendants rely on *Dalton* and the D.C. Circuit's opinion in *Global Health Council*, *see* Defs. Memo., ECF 74 at 40–41, neither opinion analyzed a claim under the Take Care Clause, and neither involved a challenge to an action that the President was wholly without statutory authority to undertake. In *Dalton*, Congress had undisputedly conferred power on the President to close naval shipyards, *see* 511 U.S. at 464–65, and the issue was whether he had exercised that power in the manner that Congress had authorized, or whether he had "exceeded his authority" under the relevant statute by committing procedural missteps. *Id*. at 476. And in *Global Health Council*, in which plaintiffs brought constitutional claims challenging the President's allegedly unlawful impoundment of foreign-assistance funds, 153 F.4th at 7, the panel identified a statute that "provides a mechanism for the President to act on impoundment," *id*. at 16, and classified the plaintiffs' claims as statutory rather than constitutional, *see id*. at 14–17. Here, Plaintiffs do not claim that the President has improperly exercised a power that Congress has granted him. Rather, they claim that the President has exercised a power that Congress has expressly retained for itself: the power to authorize construction in Memorial Circle.

To be sure, the actions that violate the President's duty under the Take Care Clause also exceed the scope of his authority under the Commemorative Works Act and 40 U.S.C. § 8106. But a violation of the Take Care Clause necessarily entails the President's failure to "take Care that [Congress's] Laws be faithfully executed." U.S. Const. art. II, § 3. Justice Jackson's concurrence in *Youngstown*, which "provides the accepted framework for evaluating executive action," *Medellín v. Texas*, 552 U.S. 491, 524 (2008), confirms that executive action can be inconsistent with both federal statutes and the Constitution. Justice Jackson explained that presidential power is "at its lowest ebb" when the President "takes measures incompatible with the expressed or implied will of Congress" and that such cases "must be scrutinized with caution, for what is at

stake is the equilibrium established by our constitutional system." 343 U.S. at 637–38 (Jackson, J., concurring). Of course, "the expressed or implied will of Congress," *id*. at 637, is revealed most reliably through the statutes that it enacts. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). The President's disregard for Congress's statutes, then, is strong evidence of a Take Care Clause violation—not a fact that insulates his actions from constitutional scrutiny.

Finally, Defendants also argue that Plaintiffs' Take Care Clause claim fails because the 1925 Act authorizes construction of an arch in Memorial Circle. *See* Defs. Opp., ECF 74 at 41. Again, this argument rests on an implausible reading of the 1925 Act. *See supra* pp. 14–16.

## IV. Plaintiffs are at imminent risk of irreparable injury.

Plaintiffs' substantial likelihood of injury both establishes their standing, *see supra* I, and is sufficiently imminent and irreparable to warrant preliminary relief. Defendants do not dispute that injuries from an arch with a constructed "upper half" will be irreparable. Defs. Opp, ECF 74 at 24. Instead, Defendants contend that Plaintiffs' injury is not imminent because, in the initial phases of construction, the arch will not be tall enough to sever the view between the Lincoln Memorial and Arlington House. Plaintiffs' injuries, however, are not limited to the arch's intrusion in the viewshed between those two landmarks. The arch's construction—excavation, drilling, and foundation construction, *see* Env't Assessment 7—will degrade their personal experiences when they visit the Cemetery, including to visit the gravesites of comrades-in-arms with whom they served. And this disturbance would be near-continuous, because "[w]ork would occur year-round with work occurring in two 10-hour shifts per day (20 hours per day) for the duration of the construction period." *Id*. at 10.

Moreover, as to the arch's obstruction of the vista, Defendants focus on the installation of the statuary (at Phase 5 of construction) as the trigger point for harm. Def. Opp., ECF 74 at 24.

But even before the statute is installed, the arch's "vertical … elements" will be constructed with "tower cranes (up to 320 feet tall)" (Phase 3) and "the roofing system" installed (Phase 4). Env't Assessment 7. All those construction activities, too, will interfere with and degrade Plaintiffs' personal experience of the currently unobstructed vista.

Accordingly, unless the Court rules on or before November 4 on Plaintiffs' Motion for Summary Judgment, ECF 26, Plaintiffs will suffer harm "before a decision on the merits [is] rendered." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). As the D.C. Circuit has explained, injury is imminent if "there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). That standard is met in spades here. Defendants do not dispute that they plan to construct the arch as quickly as they can—starting as soon as one week from today, and on an aggressive timetable with construction work occurring "20 hours per day." Env't Assessment 10. Moreover, recent history has shown that, once construction starts, it is difficult to stop. Preliminary relief (or final judgment) before the work begins may therefore be necessary to secure meaningful relief at all. *See Nat'l Park Service*, 2026 WL 2564318, at *3 (stating that "a partially completed superstructure" was already in place, that the structure was critical "to the security of the below-ground military installation," "freezing construction" would raise "significant" practical problems that militated against a stay of construction).

Finally, Defendants characterization of Plaintiffs' imminent injury as "[h]arm to 'vegetation,'" Def. Opp., ECF 74 at 25, is insulting. As explained above, Defendants' arch will inflict profound harm on Plaintiffs by interfering with a symbolic landscape that holds great personal meaning for each of them. An injury of this sort, like environmental harm, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long

duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Unlike the cases Defendants cite, the record here does not show a plan to reclaim the landscape as it currently stands—but to swiftly permanently alter it. *See Yellowstone to Uintas Connection v. Bolling*, No. 25-cv-211, 2025 WL 1928052, at *7 (D. Idaho July 14, 2025) (explaining that the planned "reclamation would restore habitat"), *cited in* Def. Opp., ECF 74 at 25; *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 40 (D.D.C. 2013) (discussing the pipeline's "post-construction restoration plan"), *cited in* Defs. Opp., ECF 74 at 25. Even if the arch were later removed, the harm to Plaintiffs from the noise and disturbance of the "year-round" work, going on 20 hours per day, Env't Assessment 10, as they visit gravesites, attend funerals, or seek to enjoy the viewshed cannot be undone. *Cf. DC Pres. League*, 2026 WL 3210227 at *24 (finding standing where, if government action proceeds, the "beauty and history that bring [the plaintiff] and others to the course will be lost." (cleaned up)).

## V. The balance of equities and public interest favor Plaintiffs.

The final two preliminary injunction factors also favor Plaintiffs. As Plaintiffs have explained, a preliminary injunction would serve the public interest by ensuring compliance with the law, as well as ensuring that the project is subject to legislative deliberation by the People's chosen representatives. In addition, comments submitted by members of the public and consulting parties in the Section 106 assessment process overwhelmingly opposed construction of the arch. *See* Pl. Memo, ECF 64-1 at 6 n.4. And Defendants' own assessments have revealed that the arch will have significant adverse effects on more than 40 historical sites. *Id.* at 5 (citing NPS, *Triumphal Arch at Memorial Circle: Assessment of Effects Report*).

The government offers two rejoinders. First, it claims that it is likely to suffer irreparable harm if the Court were to enter an injunction that exceeded the scope of the Court's authority. *Id.*

This argument, though, simply repackages the government's contentions as to Plaintiffs' standing and irreparable harm. Second, the government offers declarations from the Secretary of Defense Pete Hegseth and Secretary of Homeland Security Markwayne Mullin. These declarations claim that the planned arch—in addition to being "equipped with an observation deck and gilded figures," Mullin Decl., ECF 74-8, ¶ 15—also represents a "generational national defense opportunity," Hegseth Decl., ECF 74-9, ¶ 10. But neither offers any reason to believe that the public would suffer harm from waiting until the Court has considered this matter on the merits. Instead, they speak in general terms, suggesting that that there *could* be strategic benefits to a large structure on memorial circle: The proposed arch, they say, "offers *an opportunity* to situate … defense capacities" in the D.C. region, its location "*can* facilitate" a threat response, its height "*can* … support" counter-sniper personnel, and—if "equipped with the necessary technological capabilities"—would "provide an *opportunity*" to expand detection of unmanned aircraft and "*could* provide a forum" to support security of federal officials and facilities. Hegseth Decl., ECF 74-9, ¶¶ 10–12; Mullin Decl., ECF 74-8, ¶¶ 15, 18–19 (emphases added). None of this comes close to establishing that the equities support Defendants barreling forth with unauthorized construction.

Indeed, the Secretaries' declarations serve to highlight the unlawful nature of Defendants' plans. The National Historic Preservation Act of 1966 (NHPA) requires federal agencies to consider the effects of federal undertakings on historic properties and seek ways to avoid, minimize, or mitigate any such effects. *See* 54 U.S.C. §§ 306108; 36 C.F.R. §§ 800.5, 800.6. But the National Park Service's review of the proposed arch was based on a plan that did not contemplate the use of the arch to support drones, snipers, ammunition, or any other militarized use. *See* NPS, *Assessment of Effects Report*, *supra* p. 14 n.2. The NHPA review therefore took none of the impacts related to those proposed uses into consideration. Similarly, the design

submitted to the National Capital Planning Commission on October 16 makes no mention of the security features that Secretaries Hegseth and Mullin claim for the arch. Thus, beyond usurping Congress's role in authorizing the design and sighting of commemorative works on federal land in our national capital, the declarations establish that Defendants have not even sought approval from NPS or the National Capital Planning Commission for an arch-cum-military complex.

Defendants' objection that an order enjoining them from taking steps to facilitate construction is overbroad and "vague" in violation of Rule 65, Defs. Opp., ECF 74 at 44, likewise lacks merit. There is no ambiguity about what the requested injunction would forbid. And recent history makes manifest the necessity of an order that prohibits Defendants from taking steps toward construction. Time and time again, this Administration has demonstrated that, if not enjoined from doing so, it will take irreversible steps to render its unlawful pet projects a fait accompli. It did so when it demolished the East Wing of the White House. *See Nat'l Trust for Historic Pres. in the U.S. v. NPS*, 2026 WL 2276494, at *3 (D.C. Cir. Aug. 7, 2026). It did so when it felled hundreds of trees from East Potomac Golf Course. *See DC Pres. League*, 2026 WL 3210227, at *3–4. It did so when it coated the Lincoln Memorial Reflecting Pool with blue epoxy. *See* Complaint, *The Cultural Landscape Found. v. Dep't of the Interior*, No. 26-cv-01593 (D.D.C. May 11, 2026). And it attempted to do so when it affixed the President's name to the front of the Kennedy Center. *See Beatty v. Trump*, 834 F. Supp. 3d 41, 81 (D.D.C. 2026). The Court need not wonder whether the arch is next. Indeed, Defendants have told us that it is.

## CONCLUSION

For the foregoing reasons, if this Court has not ruled on Plaintiffs' motion for summary judgment, ECF 36, on or before November 4, 2026, Plaintiffs request that the Court enter the requested preliminary injunction by that date.

Dated: October 29, 2026

Respectfully submitted,

/s/ *Wendy Liu*

Wendy Liu (DC Bar No. 1600942)
Nicolas A. Sansone (DC Bar No. 1686810)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*