**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MICHAEL LEMMON**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**DONALD J. TRUMP**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-544 (TSC) |
| **DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA**,<br><br>*Plaintiffs*,<br><br>v.<br><br>**NATIONAL PARK SERVICE**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

**DEFENDANTS' OPPOSITION TO DISTRICT OF COLUMBIA AND VIRGINIA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND § 705 STAY**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Legal Background ..... 2

A. Congress approved constructing tall structures surmounted by statues on Columbia Island when authorizing Arlington Memorial Bridge ..... 2

B. The Executive Branch has long approved design changes to Arlington Memorial Bridge development ..... 3

C. Other statutes do not curtail Executive Branch design discretion ..... 5

II. Factual and Procedural Background ..... 9

A. The Executive Branch has diligently complied with the relevant statutory processes for review of the arch proposal ..... 9

STANDARD OF REVIEW ..... 10

ARGUMENT ..... 10

I. Plaintiffs Fail to Establish Irreparable Harm or Standing ..... 10

A. Plaintiffs have not carried their burden to establish irreparable harm ..... 10

B. Plaintiffs have not carried their burden to establish standing ..... 15

a. Traffic ..... 16

b. Emergency planning ..... 18

c. Environmental impacts ..... 19

d. Historic preservation ..... 21

e. Procedural injuries ..... 21

II. Plaintiffs Have Failed to Establish Substantial Likelihood of Success on the Merits ..... 22

A. Plaintiffs' claims suffer threshold defects ..... 22

1. Plaintiffs do not challenge any final agency action ..... 23

2. Plaintiffs' injuries fall outside of the zone of interests ..... 24

B. Plaintiffs' statutory challenges fail ... 27

1. Commemorative Works Act ... 28

2. 40 U.S.C. § 8106 ... 30

3. The Arch Does Not Violate the Height of Buildings Act ... 31

a. The HBA Does Not Apply to Federal Buildings ... 31

b. The Arch is not a "building" under the HBA ... 35

c. The Authorization Act authorizes high structures ... 35

d. The Arch conforms to any applicable HBA requirements ... 36

4. Plaintiffs fail to show procedural violations ... 37

a. Defendants have not violated the APA ... 37

b. Defendants have not violated NEPA ... 38

c. Defendants have not violated the NHPA ... 40

III. The Public Interest Weighs Against Injunctive Relief ... 42

CONCLUSION ... 45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012) .......... 12, 13

*Arizona State Legislature v. Biden*,
No. 25-1370, 2026 WL 892956 (9th Cir. Apr. 1, 2026) .......... 11

*Aviles-Wynkoop v. Neal*,
978 F. Supp 2d 15 (D.D.C. 2013) .......... 10

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 27

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) .......... 45

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) .......... 38, 39

*City of Alexandria v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) .......... 8, 38, 42

*City of Boston Delegation v. FERC*,
897 F.3d 241 (D.C. Cir. 2018) .......... 16

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 20

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) .......... 17, 18, 19

*Clean Wisconsin v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) .......... 16

*Comm. in Solidarity With People of El Salvador v. Sessions*,
929 F.2d 742 (D.C. Cir. 1991) .......... 14

*Connecticut National Bank v. Germain*,
503 U.S. 249 (1992) .......... 33

*CTIA-Wireless Ass'n v. FCC*,
466 F.3d 105 (D.C. Cir. 2006) .......... 7, 40

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
698 F. Supp. 3d 39 (D.D.C. 2023) .......... 37

*Davis v. Latschar,*
202 F.3d 359 (D.C. Cir. 2000) .......... 7

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024)........................................................................................................ 34

*District of Columbia v. USDA*,
444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................................... 13

**FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................................................................................11, 17, 18

*Fisheries Survival Fund v. Jewell*,
236 F. Supp. 3d 332 (D.D.C. 2017) ........................................................................ 10, 12

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ......................................................................................... 21

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)........................................................................................................ 1

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)....................................................................................................... 15

*Gunpowder Riverkeeper v. FERC*,
807 F.3d 267 (D.C. Cir. 2015) ....................................................................................... 26

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .......................................................................................11

*Harris Cnty. Texas v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) ............................................................................... 10

*Hazardous Waste Treatment Council v. Thomas*,
885 F.2d 918 (D.C. Cir. 1989) ....................................................................................... 25

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
861 F.3d 944 (9th Cir. 2017)........................................................................................... 37

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
534 U.S. 124 (2001).............................................................................................. 32, 36

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
140 F. Supp. 3d 1123 (D.N.M. 2015) ............................................................................. 37

*Lee v. Thornburgh*,
877 F.2d 1053 (D.C. Cir. 1989) ................................................................................. 7, 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................................................................................................... 24

*Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019) ....................................................................................... 16

*Manzanita Band of Kumeyaay Nation v. Wolf*,
496 F. Supp. 3d 257 (D.D.C. 2020) ............................................................................... 15

*Match-E-Be-Nash-She-Wish Band of Pottowatomi Indians v. Patchak*,
567 U.S. 209 (2012) ........ 24

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ........ 36

*Metro. Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983) ........ 26

*Metromedia, Inc. v. City of San Diego*,
453 U.S. 490 (1981) ........ 21

*Morton v. Mancari*,
417 U.S. 535 (1974) ........ 32

*Mountain States Legal Found. v. Glickman*,
92 F.3d 1228 (D.C. Cir. 1996) ........ 24

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ........ 42

*Nat'l Min. Ass'n v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011) ........ 12

**Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*,
609 U.S. 1068 (2026) ........ 21, 25, 44, 45

*Nat'l Parks Conservation Ass'n v. Semonite*,
282 F. Supp. 3d 284 (D.D.C. 2017) ........ 15

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) ........ 25

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
827 F. Supp. 3d 93 (D.D.C. 2026) ........ 5

*New Jersey Conservation Found. v. FERC*,
111 F.4th 42 (D.C. Cir. 2024) ........ 38

*Nw. Pipeline Corp. v. Pipeline Right of Way Easement*,
197 F. Supp. 2d 1241 (E.D. Wa. 2002) ........ 13

*Parrish v. Dayton*,
No. CIV. 13-1348 MJD/AJB, 2013 WL 4536260 (D. Minn. Aug. 27, 2013) ........ 43

*Posadas v. Nat'l City Bank of N.Y.*,
296 U.S. 497 (1936) ........ 32

*Powder River Basin Res. Council v. U.S. Dep't of the Interior*,
749 F. Supp. 3d 151 (D.D.C. 2024) ........ 26

*Pres. Soc'y of Newport Cnty. v. Burgum*,
No. 23-CV-03510 (APM), 2026 WL 787910 (D.D.C. Mar. 20, 2026) ........ 8, 40

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .......... 43

*Raines v. Byrd*,
521 U.S. 811 (1997) .......... 22

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) .......... 43

**Seven Cnty. Infrastructure Coal. v. Eagle Cnty, Colo.*,
605 U.S. 168 (2025) .......... 8, 39, 40

*Sierra Club v. FERC*,
145 F.4th 74 (D.C. Cir. 2025) .......... 38

*Sierra Club v. FERC*,
153 F.4th 1295 (D.C. Cir. 2025) .......... 40

*Sierra Club v. FERC*,
97 F.4th 16 (D.C. Cir. 2024) .......... 39

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) .......... 14

*Sierra Club v. U.S. Department of Transportation*,
125 F.4th 1170 (D.C. Cir. 2025) .......... 18, 19

*Stagg P.C. v. U.S. Dep't of State*,
673 F. App'x 93 (2d Cir. 2016) .......... 45

*State v. Musk*,
769 F. Supp. 3d 1 (D.D.C. 2025) .......... 10

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 21

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 19

*Techworld Dev. Corp. v. D.C. Pres. League*,
648 F. Supp. 106 (D.D.C. 1986) .......... 37

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 15

*Trudeau v. Fed. Trade Comm'n*,
146 F.4th 1144 (D.C. Cir. 2025) .......... 37

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) .......... 37

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 43

*Twin Rivers Paper Co. v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) .................................................... 25

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .................................................... 23

*United Keetoowah Band of Cherokee Indians v. F.C.C.*,
933 F.3d 728 (D.C. Cir. 2019) .................................................... 8, 40

*United States v. Texas*,
599 U.S. 670 (2023) .................................................... 18

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .................................................... 8

*Weinberger v. Catholic Action of Hawaii/Peace Education Project*,
454 U.S. 139 (1981) .................................................... 39

*Whitman v. American Trucking Ass'n*,
531 U.S. 457 (2001) .................................................... 33

**Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................... 10, 22, 24, 42, 44, 45

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .................................................... 12

**Statutes**

16 U.S.C. § 451 .................................................... 30, 31

16 U.S.C. § 669b(c) .................................................... 20

18 U.S.C. § 3626(a)(2) .................................................... 23

40 U.S.C. § 3312(c) .................................................... 35

40 U.S.C. § 6502(c)(2) .................................................... 33

40 U.S.C. § 8106 .................................................... 5, 25, 28, 30

40 U.S.C. § 8722(d) .................................................... 34

40 U.S.C. § 8901(2) .................................................... 24

40 U.S.C. § 8902(a)(1) .................................................... 28

40 U.S.C. § 8902(b) .................................................... 6, 29

40 U.S.C. § 8904(a)(6) .................................................... 22

40 U.S.C. § 8905(a)(1) .................................................... 22

40 U.S.C. § 9102 .................................................... 5

40 U.S.C. ch. 89 .................................................... 6

42 U.S.C. § 4332 ..... 8
42 U.S.C. § 4332(2)(C)(iii) ..... 38, 39
42 U.S.C. § 4336(b) ..... 8
42 U.S.C. § 4336(b)(2) ..... 8
49 U.S.C. § 46110(a) ..... 19
5 U.S.C. § 704 ..... 23
5 U.S.C. §§ 701-706 ..... 37
54 U.S.C. § 100101(a) ..... 27
54 U.S.C. § 306108 ..... 26
54 U.S.C. §§ 100102(2), 100501 ..... 30
54 U.S.C. §§ 306101–306114 ..... 7
6 U.S.C. § 124n ..... 9
D.C. Code § 6-601.05 ..... 34
D.C. Code § 6-601.05(a) ..... 37
D.C. Code § 6-601.05(b)–(c) ..... 36
D.C. Code § 6-641.01 ..... 34
D.C. Code § 9–1201.05 ..... 36
D.C. Code §§ 6-601.01 to 6-601.09 ..... 6, 7
D.C. Code section 6-641.15 ..... 34
Pub. L. No. 100-480, § 3(a)(8)(B), 102 Stat. 2328, 2329–30 (1988) ..... 33
Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996) ..... 30
Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913) ..... 3
Pub. L. No. 65-181, 40 Stat. 634, 677 (1918) ..... 30
Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925) ..... 3, 35
Pub. L. No. 76-417, 54 Stat. 36, 36 (1940) ..... 30
Pub. L. No. 99-652 § 10(e), 100 Stat. 3654 (1986) ..... 6
Pub. L. No. 99-652, 100 Stat. 3650 (1986) ..... 6

**Regulations**

36 C.F.R. § 800.2 ..... 41
36 C.F.R. § 800.3(c) ..... 41

36 C.F.R. § 800.3(g) ........ 41

36 C.F.R. § 800.4–5 ........ 8

36 C.F.R. § 800.6 ........ 42

36 C.F.R. § 800.6(c) ........ 8

36 C.F.R. §§ 800.3(c), (e) ........ 41

36 CFR § 800.7(a) ........ 41

D.C. Mun. Regs. tit. 21, §§ 516, 540 ........ 20

**Other Authorities**

4 Comp. Gen. 832 (Apr. 3, 1925) ........ 29

45 Cong. Rec. 4534, 36 Stat. at 455 (1910) ........ 31

55 Cong. Ch. 543, 30 Stat. 570 § 2 (July 1, 1898) ........ 36

58 Cong. Ch. 89, 33 Stat. 10 (Feb. 2, 1904) ........ 36

S. Res., 17 Cong. Rec. 4826 (May 24, 1886) ........ 2

## INTRODUCTION

The District of Columbia and the Commonwealth of Virginia (collectively, Plaintiffs) have sued to enjoin the proposed arch—one day after the Court spent hours preparing for and holding a second preliminary injunction hearing about similar requests from other plaintiffs. And Plaintiffs' motion for a temporary restraining order (TRO) on the eve of potential approval is the Court's fourth emergency motion concerning this project over the last year. Meanwhile, there are three fully briefed dispositive motions from the earlier consolidated suit on the Court's docket that remain ripe for decision.

Plaintiffs' emergency motion fails like the others before it. They have failed to establish irreparable harm or standing, as their lead diversionary injury was recently rejected by the Supreme Court. Their remaining theories fare no better, as they will not suffer any injury over the next two weeks, or within the time it will take the litigation to reach a decision on the merits.

Nor have Plaintiffs established likelihood of success on the merits. Although they invoke several new statutes, the core problem remains: Congress undeniably authorized erecting and redesigning 166-foot-tall columns surmounted by statues—exceeding any applicable height limits—and those columns have not yet been built. The proposed arch fulfills that Congressional vision and completes a significant gap on Columbia Island long lamented by the Capital's planners.

If the Court disagrees with Defendants, however, then it should just issue a decision on any of the fully briefed dispositive motions pending before it. The longer those dispositive motions go without decision, the more emergency motions the Court will face. And the Court's interim Minute Orders impose problematic notice injunctions likely to "produce needless head-on confrontations between district judges and the Chief Executive." *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring). There is no basis for further delay in resolving these long-pending dispositive motions.

# BACKGROUND

## I. Legal Background

### A. Congress approved constructing tall structures surmounted by statues on Columbia Island when authorizing Arlington Memorial Bridge.

American leaders have long envisioned majestic arches adorning the banks of the Potomac. President Andrew Jackson sought a bridge spanning the Potomac River "with arches of ever-enduring granite," Case No. 26-cv-544, Dkt. 36-22 at 1, and Secretary of State Daniel Webster pushed to fulfill that vision, *see id.* The U.S. Senate eventually acted to make that vision a reality, directing the Secretary of War to examine and report on such a bridge in 1886. S. Res., 17 Cong. Rec. 4826 (May 24, 1886). Ensuing design competitions were held to consider different proposals for the bridge. *E.g.*, U.S. Comm'n of Fine Arts, Designing the Nation's Capital: The 1901 Plan for Washington, D.C. 118 (2006) (Eds., Sue Kohler & Pamela Scott), Case No. 26-cv-544, Dkt. 44-18. One prominent proposal, seen below, "was the favored design" of the Senate Park Commission (a.k.a. the McMillan Commission) when it began its work:



Fig. 16 George Keller, proposed design for Memorial Bridge, 1900; perspective view from Washington side of the bridge. Library of Congress, General Collections

*Id.* at 117–118. Other designs proposed arches atop the bridge itself "that masked the working of its central draw" *id.* at 116–117, as seen at Case No. 26-cv-544, Dkts. 44-21 & 44-22.

Following this extensive architectural dialogue, Congress created the Arlington Memorial Bridge Commission (Bridge Commission) to report "to Congress a suitable design for a Memorial Bridge across the Potomac River." Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913). The Bridge Commission reviewed much of the previous design work done for the bridge before reporting its design in 1924, proposing designs not only for the bridge, but also for Columbia Island.[1] The Bridge Commission recommended "development of Columbia Island as a park," and advocated for building "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Bridge Commission Report 40–41. "The columns are 166 feet high or practically of the same height as the Colonne de Juillet in Paris." *Id.* at 41.

Congress authorized construction "in accordance with the design" in the Bridge Commission Report. Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925) (Authorization Act). But Congress did not mandate rigid adherence to that design; it empowered the Bridge Commission to make design changes "as in its discretion may be found to be necessary or advisable." *Id.*

### B. The Executive Branch has long approved design changes to Arlington Memorial Bridge development.

Despite explicit congressional authorization, the monument plaza not yet been built. In 1931, concerns were raised that the dredged soil of Columbia Island may prove insufficient for column foundations and the columns may interfere with aviation interests at the old Washington-Hoover Airport. Case No. 26-cv-544, Dkt. 74-2; Case No. 26-cv-544, Dkt. 12 at 6. The CFA thus recommended "postpon[ing] the erection of these columns until the other features" were finished,

[1] Report of the Arlington Memorial Bridge Commission 21–30, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

while emphasizing that the columns were "an essential feature in the proposed development of Columbia Island." Dkt. 74-2.

The architect of the Arlington Memorial Bridge, William Kendall, "felt that the columns were absolutely necessary to his design and even went so far as to write President Hoover (who had asked that the columns be omitted) giving his arguments for keeping them, including a suggestion that the airport be moved if interference with aircraft was really a problem." Sue A. Kohler, The Commission of Fine Arts: A Brief History 1910–1995, 26 (1996) (Kohler, Brief History). His colleague likewise expressed great distress at eliminating a feature at "the very essence of the design." Case No. 26-cv-544, Dkt. 74-3.

After the Bridge Commission functions were reassigned to NPS—and the country survived the Great Depression and World War II—the National Capital Planning Commission (NCPC) returned to the treatment of Columbia Island. Case No. 26-cv-544, Dkt. 74-4. Once the dredged land had settled, NCPC recommended that NPS, in conjunction with CFA and District Commissioners "undertake a restudy of the plans for the treatment of Columbia Island under the Arlington Memorial Bridge Project, with a view to completion of the project by 1950." *Id.* And the former Executive Officer of the Bridge Commission wrote to the NPS Director lamenting that—while other parts of the bridge were finally nearing completion—"the central plaza on Columbia Island has never been undertaken and seems to be absolutely essential to link together the two parts of the project, namely, the main bridge itself and entrance to Arlington Cemetery." Case No. 26-cv-544, Dkt. 74-5. The CFA Chairman concurred, while calling for new plans to be drawn up "as the old original plans prepared by the architects of the bridge are no longer applicable." Case No. 26-cv-544, Dkt. 74-6. The NCPC agreed, explaining that "[b]ecause of the

war and the other things the plan for development of the Island was forgotten," leaving the "middle knocked out" of the design. Case No. 26-cv-544, Dkt. 74-7.

Although other aspects of the bridge—like the equestrian statues that replaced Kendall's original pylons at the Washington entrance to the bridge—were eventually added by 1951, Columbia Island remains incomplete. It does not resemble "a plaza with fitting architectural adornment," including "two stately columns" "surmounted by statues." Bridge Commission Report 40–41. Memorial Circle instead remains an approximately 300-foot-diameter circle of grass.

**C. Other statutes do not curtail Executive Branch design discretion.**

1. In 1912, the Army Corps of Engineers—then known as the Engineer Department in the War Department—had jurisdiction over parks in the District of Columbia. In that year's appropriations bill for the Engineer Department, Congress included a provision stating that "[h]ereafter there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress." Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 443–44 (1912). That provision is currently codified at 40 U.S.C. § 8106, which cannot be read to require anything more than "*some form* of authorization from Congress to construct a building." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 109 (D.D.C. 2026), *opinion clarified sub nom. Nat'l Tr. for Historic Pres. in United States v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 1027744 (D.D.C. Apr. 16, 2026). But Section 8106 says nothing about *design* approval, a subject that Congress has entrusted to the CFA. *See, e.g.*, 40 U.S.C. § 9102 (requiring deciding officers to seek the CFA's advice on "selection of models for statues, fountains, and monuments erected under the authority of the Federal Government").

2. In 1986, Congress passed the Commemorative Works Act (CWA), which sets forth specific procedures for new authorizations of commemorative works in certain areas of the District of Columbia. Pub. L. No. 99-652, 100 Stat. 3650 (1986), codified at 40 U.S.C. ch. 89. But the Act "does not apply to commemorative works authorized by a law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3654, codified at 40 U.S.C. § 8902(b). Thus, commemorative structures authorized by a law enacted by an earlier Congress, such as the Fourth Division Memorial, can be completed without following CWA procedures, even if many decades have passed since the authorizing law was enacted.

3. Primarily concerned about fire safety, in 1899 Congress enacted legislation restricting the height of buildings in the District of Columbia. "An Act To regulate the height of buildings in the District of Columbia," ch. 322, 30 Stat. 922 (1899). This Height of Building Act (HBA) set height restrictions for buildings made of "combustible or nonfireproof" materials further established that "no building shall be erected or altered on any street in [D.C.] to exceed in height above the sidewalk the width of the street in its front." *Id.* § 4. It further set maximum heights of 90 and 110 feet for buildings on residence and business streets respectively. *Id.* But the HBA expressly stated that its height limits "*shall not* apply to Federal or municipal buildings." *Id.* § 7 (emphasis added).

Eleven years later, in 1910, Congress amended the HBA. "An Act To regulate the height of buildings in the District of Columbia[,]" ch. 263, 36 Stat. 452 (1910) (codified at D.C. Code §§ 6-601.01 to 6-601.09). Along with other adjustments, the 1910 HBA increased the maximum height for a "building" on a "business street or avenue," to 130 feet with an exception on the north side of Pennsylvania Avenue between 1st and 15th streets, where a height of 160 feet is allowed. *Id.* § 5. As in the original act, "[s]pires, towers, domes" were excepted from the height restrictions,

but the amended act added excepted "minarets, pinnacles, pent houses . . ., ventilation shafts, chimneys, smokestacks, and fire sprinkler tanks," and prescribed that such structures "may be erected to a greater height." *Id.* § 5. "Provided, however, [t]hat such structures when above such limit of height shall be fireproof, and no floor or compartment thereof shall be constructed or used for human occupancy above the top story of the building upon which such structures are placed[.]" *Id.* "And provided, [t]hat pent houses, ventilation shafts, and tanks shall be set back from the exterior walls distances equal to their respective heights above the adjacent roof." *Id.* The "height" of the building is measured "to the highest point of the roof." *Id.* § 7. The 1910 HBA repealed only those laws "in conflict herewith." *Id.* § 9. The 1910 HBA makes violations of the act a "common nuisance" subject to an action by the corporation counsel in D.C. Superior Court. *Id.* § 8.

4. Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 306101–306114, also does not curtail construction or design. The NHPA requires "federal agencies to 'take into account' the effects of their 'undertaking[s]' on historic properties 'included' or 'eligible for inclusion' in the [National] Register." *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 106 (D.C. Cir. 2006) (alteration in original). In doing so, the NHPA does "not require [a federal agency] to engage in any particular preservation activities; rather, Section 106 only requires that the [agency] consult the [State Historic Preservation Office] and the [Advisory Council on Historic Preservation] and consider the impacts of its undertaking." *Id.* at 106–07 (alterations in original) (quoting *Davis v. Latschar,* 202 F.3d 359, 370 (D.C. Cir. 2000)). Thus, "Congress intended these provisions to have a limited reach": "they are aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989).

The NHPA consultation process may end in "a Memorandum of Agreement among the consulting parties signifying agreement upon how the detrimental effects will be 'taken into account.'" *See City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (citing 36 C.F.R. § 800.4–5). But "[e]ven where disagreement precludes the completion of a Memorandum of Agreement an agency may implement a project after receiving and considering comments from the Advisory Council on Historic Preservation." *Id.* (citing 36 C.F.R. § 800.6(c)). Accordingly, the review process "does not dictate particular decisional outcomes, but 'merely prohibits uninformed—rather than unwise—agency action.'" *United Keetoowah Band of Cherokee Indians v. F.C.C.*, 933 F.3d 728, 734 (D.C. Cir. 2019) (citation omitted). "[T]he NHPA does not require . . . changes being made to the proposed project." *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 23-CV-03510 (APM), 2026 WL 787910, at *16 (D.D.C. Mar. 20, 2026).

5. The National Environmental Policy Act (NEPA) requires agencies to consider environmental impacts of major federal actions. 42. U.S.C. § 4332. To do so, agencies may prepare an Environmental Assessment (EA). 42 U.S.C. § 4336(b). Judicial review of the agency's determination "is a limited one." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty, Colo.*, 605 U.S. 168, 185 (2025) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)). Section 12.5 of the Department of the Interior Departmental Manual requires an EA where the "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown." 42 U.S.C. § 4336(b)(2). NPS has "broad latitude" to decide "where to draw the line" in assessing environmental effects, and "substantial discretion" in designating "feasible alternatives." *Seven Cnty.*, 605 U.S. 168.

## II. Factual and Procedural Background

### A. The Executive Branch has diligently complied with the relevant statutory processes for review of the arch proposal.

Over a year ago, President Trump first publicly proposed building an arch in Memorial Circle on Columbia Island, a site managed by the NPS. Since the President announced his idea for an Arch in Memorial Circle, NPS has undertaken activities to diligently comply with the statutory processes for review and approval of the arch proposal. NPS prepared environmental assessments to comply with NEPA. *E.g.*, Revised EA, Dkt. 74-1. Local governments and interested parties consulted on the effects the proposed arch would have on historic properties under Section 106 of the NHPA. NPS presented the arch proposal to other agencies with responsibility for evaluating various aspects of the project: the Federal Aviation Administration (FAA) determined it would not be a hazard to air navigation; the CFA approved the architectural design; and the NCPC preliminarily approved site and building plans.

National security agencies also evaluated how the arch and its design would be incorporated into their ongoing efforts to defend the National Capital Region from evolving threats, like those posed by the proliferation of small, unmanned aircraft systems. The Department of War concluded that the arch was "a generational national defense opportunity to mitigate these evolving threats" due to its location and height. Decl. of Pete Hegseth, Secretary of War ¶ 10, Dkt. 74-9. Similarly, the Department of Homeland Security identified the arch as a project that could enhance its ability to counter threats from unmanned aircraft, thus enabling it to meet its statutory duties under 6 U.S.C. § 124n. Decl. of Markwayne Mullin, Sec'y of Homeland Sec. ¶¶ 12–18, Dkt. 74-8.

Neither NCPC nor NPS has yet issued final agency actions concerning the arch. On November 5, 2026, the NCPC is scheduled to consider whether to approve final site and building

plans for the proposed arch. Should NCPC approve those plans, and NPS subsequently authorize construction, construction could begin as soon as November 5, 2026. Dkt. 63. But the initial stage of construction is anticipated to involve fencing off grassy areas, connecting utilities, and mobilizing construction equipment. Nersesian Decl. ¶¶ 8–11. And the initial six to eight months of construction is planned to focus exclusively on below-grade excavation and foundation construction. Revised EA 7, Dkt. 74-1. Above-ground construction of the structure is thus not anticipated to begin until May 2027, at the earliest. The total construction schedule, from start to finish, is anticipated to take 33 to 39 months. *Id.* at 7–8.

## STANDARD OF REVIEW

A TRO is an "extraordinary and drastic remedy." *Aviles-Wynkoop v. Neal*, 978 F. Supp 2d 15, 21 (D.D.C. 2013). The moving party must make a "clear showing": (1) that it is "likely to succeed on the merits" of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) "that the balance of equities tips in [its'] favor"; and (4) that the proposed "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008). "The last two factors merge when the government is a party." *Harris Cnty. Texas v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citation omitted).

## ARGUMENT

### I. Plaintiffs Fail to Establish Irreparable Harm or Standing.

#### A. Plaintiffs have not carried their burden to establish irreparable harm.

The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). A plaintiff's alleged injury "must be both certain and great, actual and not theoretical, beyond remediation, *and of such imminence* that there is a clear and present need for equitable relief." *State v. Musk*, 769 F. Supp. 3d 1, 5 (D.D.C. 2025) (cleaned up). "The possibility of irreparable harm is not enough." *Id.* Plaintiffs

"must demonstrate injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024).

Plaintiffs attempt to show irreparable harm by: (1) expending government resources on planning, TRO Br. 39–40, Case No. 26-cv-3838, Dkt. 2-1 (citing Mendelson Decl. ¶¶ 47, 57, 61–72, Case No. 26-cv-3838, Dkt. 2-4); (2) sediment runoff impacts on water quality, *id.* 40–41 (citing Mendelson Decl. ¶¶ 51–52); (3) architectural and planning harms, *id.* 41–42 (citing Maloney Decl. ¶¶ 98–99, Case No. 26-cv-3838, Dkt. 2-3, Kirchen Decl. ¶¶ 44, 71–73, Case No. 26-cv-3838, Dkt. 2-2); and (4) procedural harms, *id.* 42. None of these assertions establish irreparable harm.

1. Plaintiffs' lead irreparable harm theory focuses on planning the District and Virginia may undertake in response to the proposed arch. TRO Br. 39–40. But Plaintiffs provide no precedent establishing that government planning—the very thing that governments undertake every day—constitutes irreparable harm. And governments cannot manufacture standing, much less irreparable harm, with allegations of "being 'forced' to divert their resources to activities such as 'passing laws,' 'holding hearings,' and 'publicly commenting' on issues." *Arizona State Legislature v. Biden*, No. 25-1370, 2026 WL 892956, at *2 (9th Cir. Apr. 1, 2026). A government that "has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Given the Supreme Court's recent rejection of diversionary harms, Plaintiffs attempt to dress their diversionary harm up as an irreparable economic loss. TRO Br. 39–40. But they cite no evidentiary support for their claim that the arch "will require both jurisdictions to spend funds immediately." *Id.* at 39 (citing Mendelson Decl. ¶¶ 61–64; Revised EA at B-24, B-30). Chairman

Mendelson merely states that arch planning "will consume [District Department of Transportation's (DDOT)] staff time and resources," without any quantification of how much, if any, additional DDOT resources will be consumed. Mendelson Decl. ¶ 63.[2] Similarly, Chairman Mendelson opines that "coordinating responses" to "tall construction equipment" "will require [emergency] personnel and other District-funded emergency preparedness resources." *Id.* ¶ 72. But he provides no explanation why additional resources would be needed for arch construction equipment than were already used to plan for similar construction equipment in essentially the same site during the Arlington Memorial Bridge renovation from 2018 to 2020, *see* Stidham Decl. ¶¶ 4–11 & Exs. A–E, Dkts. 44-3 to 44-8. At best, Chairman Mendelson states that District of Columbia staff may be required to perform additional duties—without saying additional staff will be needed—while saying nothing about Virginia's resources. If imposing additional duties on government staff constituted irreparable harm to a government, then any motion against a government—like Plaintiffs' Saturday-morning TRO—would inflict irreparable harm. No court has sanctioned such a cavalier approach to irreparable harm, which violates this Circuit's "particularly high" standard. *See Fisheries Survival Fund*, 236 F. Supp. 3d at 336.

Even had Plaintiffs provided evidence to support their claimed economic harm, they've provided no evidence that any economic harm would be so significant to become irreparable. Under D.C. Circuit law, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Thus, businesses suing the federal government must demonstrate great economic loss—*e.g.*, "economic loss that threatens the survival of the movant's business"—to establish irreparable harm. *Nat'l*

[2] The cited portions of the revised EA say nothing about consumption of District or Virginia resources.

*Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50–54 (D.D.C. 2011); *see also Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012). Contrary to Plaintiffs' suggestion that *any* economic loss constitutes irreparable harm *per se* when sovereign immunity precludes monetary relief, TRO Br. 39–40 (citing *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020)), their proffered case establishes a different rule: "More typically, however, some form of a significance test has been imposed in this district on claims of irreparable harm from irrecoverable financial loss." *District of Columbia*, 444 F. Supp. 3d at 37 n.25. This "wiser formula requires that the economic harm be significant" to respect the high standard for irreparable injury in this Circuit; "injury must be more than simply irretrievable, it must also be serious in terms of its effect on the plaintiff." *Air Transp. Ass'n*, 840 F. Supp. 2d at 335–36 (citation omitted). And Plaintiffs have provided no evidence to establish that any additional government planning required by the arch would have a serious economic impact on government resources, much less one that would not be offset by increased revenue associated with the arch.[3]

2. Plaintiffs next theorize that "the significant risks posed by the runoff of soils and sediments from the project site" during construction establish irreparable harm. TRO Br. 40–41. But "stormwater and erosion control practices would be implemented across the construction site to minimize sediment transport and protect adjacent drainage systems and waterways." Revised

---

[3] Plaintiffs also claim that harms from increased traffic congestion are irreparable. TRO Br. 39–40 (citing *Nw. Pipeline Corp. v. Pipeline Right of Way Easement*, 197 F. Supp. 2d 1241, 1246 (E.D. Wa. 2002)). But *Northwest Pipeline* did not hold that "increased traffic congestion" standing alone was irreparable; it held that "effects of delayed improvement of the road are irreparable" because "consequent safety problems cannot be compensated financially." 197 F. Supp. 2d at 1246. And the Revised EA establishes that "the proposed action would produce substantial long-term safety and circulation benefits" and "create a safer and more connected system for people walking, biking, and driving along the Potomac riverfront." Revised EA at 52, 54. Moreover, Plaintiffs have not established that there would be any permanent street closures over the next two weeks. *See* Nersesian Decl. ¶¶ 8, 12.

EA 9. The proposed project would further "capture and treat stormwater runoff . . . and be designed with appropriate pretreatment, overflow, and underdrain components to meet standards developed in compliance with District of Columbia stormwater management regulations." *Id.* Given that Plaintiffs do not and cannot argue that D.C. stormwater management regulations fail to prevent irreparable environmental injury, Plaintiffs instead attempt to establish irreparable harm through the expenditure of District resources to implement its stormwater management program. *See* TRO Br. 16. But that argument fails for reasons discussed *supra* 11–13.

Nor have Plaintiffs established that any stormwater harm would be irreparable. Even when construction results in "water withdrawal and discharge" and "such alteration of the environment qualifies as harm, Plaintiffs have not established that it is *irreparable*." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 40 (D.D.C. 2013) (Jackson, J.). Plaintiffs have not established that any significant discharge would occur, much less that such discharge would impose irreparable effects. "[I]t is bedrock law that injunctions 'will not issue to prevent injuries neither extant nor presently threatened, but only merely feared.'" *Id.* at 41 (quoting *Comm. in Solidarity With People of El Salvador v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir. 1991)). And Plaintiffs' own conduct demonstrates that even severe discharges do not always inflict irreparable harm; when the Potomac Interceptor line collapsed in January discharging many million gallons of sewage into the Potomac River, DC Health lifted its recreational advisory for the Potomac River in less than two months. And Plaintiffs have not shown that any runoff—much less irreparably harmful runoff—would occur during the period of the requested TRO.

3. Nor have Plaintiffs established irreparable harm through historical impacts. *Contra* TRO Br. 41–42. Even were Plaintiffs correct that the arch's size and location would harm the historically planned landscape, that harm would not materialize for at least six months. *See* Revised EA 7

(showing first six to eight months of construction will be below ground). "The standard is not that irreparable harm will occur at some point in the future, but that plaintiffs suffer irreparable harm *before a decision on the merits can be reached*." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017) (emphasis added). And Plaintiffs have not shown that the installation of foundational piles on an artifical island made from dredged material will inflict any historical harm.

4. Plaintiffs' asserted procedural harms also fail to establish irreparable injury. "A chorus of federal courts . . . has found that procedural injury, standing alone, cannot constitute irreparable harm." *Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 268–69 (D.D.C. 2020). Plaintiffs "still must identify a 'concrete' and 'great' injury that accompanies their alleged procedural injury." *Id.* at 269. Because Plaintiffs' other asserted harms fail to establish irreparable harm, *see supra* 11-15, their alleged procedural harms do not establish irreparable injury, *see infra* 21–22.

**B. Plaintiffs have not carried their burden to establish standing.**

The core of this case is straightforward: Plaintiffs disagree with the design of the arch, find it distasteful, and do not want to see it. Following the Supreme Court's rejection of offense-based standing in *National Park Service v. National Trust for Historic Preservation*, Plaintiffs attempt to evade the limits of the Supreme Court's decision by identifying other purported harms, including the project's effects on traffic and emergency planning.

Plaintiffs lack Article III standing to pursue their claims. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021). As of October 31, 2026, any alleged harms depend on two future events: (1) The NCPC voting to approve the project, and (2) Interior issuing a final decision authorizing construction. Because standing is assessed "at the time the action commences," *Friends of the*

*Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000), Plaintiffs will be unable to establish standing until they file an amended complaint after Interior issues a final decision.

Even if Interior issues a final decision, Plaintiffs have not identified any concrete injury. Plaintiffs' Complaint identifies five categories of harms: traffic, emergency response, environmental impacts, historic preservation, and procedural rights. Compl. ¶¶ 65–107. None of these categories of harms are sufficient to enable Plaintiffs to bring these claims.

a. Traffic

Plaintiffs allege that increased traffic could "make it more difficult for emergency responders to travel between the District and Arlington County," impede an emergency evacuation route, and "deter tourists, workers, and other visitors from traveling between Arlington and the District, undermining each jurisdiction's economy and tax base." Compl. ¶ 70. Plaintiffs also allege that they will spend money to "assess and study the Arch project's impacts." *Id.* ¶ 71.

Increased traffic alone is insufficient to establish standing. Even if the Arch project likely increases traffic on at least one road, *see* Revised EA at B-24, B-30, increased traffic alone is insufficient to establish an injury in fact. Although the D.C. Circuit has recognized that a municipality may suffer an injury from "increased traffic," that case involved a pipeline that ran "underneath town roads," which the court concluded inflicted an injury on the town's "property interests" in its capacity as "a landowner whose land is transected by a natural gas pipeline." *City of Boston Delegation v. FERC*, 897 F.3d 241, 251 (D.C. Cir. 2018). Here, by contrast, the Plaintiffs are not suing in their capacity as landowners—the federal government, not Plaintiffs, owns Columbia Island. Even if increased traffic on federal roads could inflict an injury on Plaintiffs' citizens, States cannot sue the federal government for harm caused only to their citizens; they lack *parens patriae* standing to do so. *Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019). Instead, the Plaintiffs need to establish "direct harm to [their] economic, environmental, or

administrative interests as a result of federal action." *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (per curiam).

Plaintiffs have not adequately established harm to themselves based on the effects of traffic on first responders or emergency evacuation. Standing may not be based on a chain of causation that is "too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383. Instead, plaintiffs must "show a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385. Plaintiffs' theory of standing here is based on an attenuated chain of causation: (1) an emergency must occur during construction that requires first responders from the District to travel to Arlington County, or vice-versa; (2) the first responders' route must pass over Memorial Bridge, rather than the Chain Bridge, Key Bridge, Roosevelt Bridge, or 14th Street bridges; (3) lane closures or reconfigurations resulting from Arch construction must actually delay the emergency response. Plaintiffs' motion relies exclusively on the declaration of D.C. Council Chairman Phil Mendelson, TRO Br. 13–15, which contains no information about how often—if ever—first responders from either Plaintiff encounter circumstances that require them to cross Memorial Bridge or the bridge is used as an emergency evacuation route. These traffic-related harms are thus too speculative to support standing.

Nor have plaintiffs adequately pled standing based on Arch construction "deter[ring] tourists, workers, and other visitors from traveling between Arlington and the District." Compl. ¶ 70. Standing generally may not rest on "speculation about the unfettered choices made by independent actors not before the courts." *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *Clapper*, 568 U.S. at 414 n.5). Plaintiffs' theory that the Arch will create so much traffic that it measurably depresses the District's economy is purely speculative and contradicted by their own complaint, which quotes an NPS estimate that "between 2,000 to 22,000 individuals would visit

the site each day." Compl. ¶ 45. In essence, Plaintiffs' theory of standing is that there will be so many more tourists that tourists will not want to visit. Increased tourism would presumably increase revenues to Plaintiffs, who make no effort to demonstrate that any putative lost revenues would be greater than any putative gains.

Finally, Plaintiffs cannot establish standing based on the costs of "assess[ing] and study[ing] the Arch project's impacts" or "mitigation planning." *Id.* at ¶ 71. A plaintiff who "has not suffered a concrete injury caused by a defendant's action cannot spend [his] way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394; *see also Clapper*, 568 U.S. at 416 (rejecting standing where plaintiffs "inflict[ed] harm on themselves" by "incurr[ing] certain costs" in response to defendant's actions). No law obligates the Plaintiffs to spend money to study or plan for the traffic impacts of the Arch project. NPS, which manages traffic on the George Washington Parkway, has already conducted its own traffic analysis in its Environmental Assessment and will manage traffic around the Arch during the construction period.

b. Emergency planning

Plaintiffs allege that the construction of the Arch will require them to "expend additional resources on emergency planning and preparedness," including "updat[ing] preparedness plans" and conducting "new risk assessments." Compl. ¶ 74. But Plaintiffs may not spend their way into standing. *All. for Hippocratic Med.*, 602 U.S. at 394. Federal actions often produce "indirect effects on state revenues or state spending," but such attenuated effects do not endow States with standing to challenge every federal action. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

Plaintiffs attempt to rely on *Sierra Club v. U.S. Department of Transportation*, which held that States had standing based on the costs of safety measures they would implement in response to increased transportation of liquified natural gas by rail. 125 F.4th 1170, 1181 (D.C. Cir. 2025).

But Plaintiffs' expenditures here are in no way comparable to *Sierra Club*, where New York spent funds on rail car safety following two "catastrophic DOT-113 rail car accidents." *Id.* The court reasoned that New York's injury was not "self-inflicted or premised on speculative harm" because the two on-point accidents made it necessary for the State to spend in anticipation of a third. *Id.* The District here, by contrast, argues that it needs to engage in emergency planning for dissimilar "tragedies like Flight 5342, January 6, and the Navy Yard shooting." TRO Br. 15. None of these events involved first responders delayed in a construction zone, "risks to air safety" from a structure or construction equipment, or other harms attributed to the arch project. *Id.* at 14.

Plaintiffs also allege that they will incur additional costs because of the "risks the Arch and nearby construction equipment will pose to incoming aircraft." Compl. ¶ 76. But Plaintiffs have not adequately alleged that the Arch project presents a "substantial risk" of posing a hazard to aircraft, as they must to establish standing based on this injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5). Plaintiffs' assertion that the Arch poses a risk to aircraft is, at its core, a disagreement with the FAA's determination that the Arch will not pose a hazard to air navigation. Plaintiffs have not petitioned for review of that determination, *see* 49 U.S.C. § 46110(a), and their decision to spend money in response to a no-hazard determination is the kind of self-inflicted injury insufficient to support Article III standing.

c. Environmental impacts

Plaintiffs cannot establish standing based on the environmental effects of the Arch project. Plaintiffs identify two categories of environmental effects: an increase in stormwater runoff, Compl. ¶¶ 80–84, and potential effects of artificial lighting, cranes, and the Arch itself on the foraging behavior of northern long-eared and tricolored bats, *id.* ¶¶ 85–87.

Many of the costs that Plaintiffs identify in connection with these impacts are, again, the kind of voluntary expenditures insufficient to confer standing. Plaintiffs allege that the District

"will need to expend time and resources to review and approve" stormwater and erosion plans. Compl. ¶ 84. But these costs are self-inflicted: the District has created a permitting agency and requires every major construction project in the city to secure permits. *See* D.C. Mun. Regs. tit. 21, §§ 516, 540. The District has also defined the fees associated with processing these permits. *See id.* tit. 21, § 501. Now the District complains that processing a permit application imposes a "concrete injury" on the District. TRO Br. 16.[4] If the District's theory is correct, every governmental regulator suffers a concrete injury every time it processes a permit application, and the District inflicts an injury upon itself every time it encourages new development. If the District has set its permitting fees too low to cover processing costs, that is a self-inflicted injury, not one it can attribute to Defendants.

Similarly, the District argues that the Arch project will require it to "expend additional funds to study the impacts of the Arch" on bats. Compl. ¶ 87. Nonsense. The arch is being constructed in a traffic circle, not a forest or a bat cave. No surprise, the EA notes that surveys between 2016 and 2018 did not capture any bats of either species and observed a "low presence" of these bats, leading NPS to conclude that the project will have no effect on the bats. Revised EA at A-6. The District nonetheless suggests it must study the arch's effect on bats by "its State Wildlife Action Plan." *Id.* But the District is the author of its Wildlife Action Plan; its choices about when studies are required is its own decision. *See* 2015 Wildlife Action Plan, Case No. 26-cv-3838, Dkt. 2-34. Although the District points out that a wildlife conservation plan is required

[4] The District also suggests that it might suffer an injury if NPS does not submit any plans to the District, which could result in "uncontrolled discharges into its waters[.]" Compl. ¶ 82. But this theory assumes that NPS will violate District requirements in the future, which is the sort of "conjectural or hypothetical" injury insufficient to confer standing. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citations omitted).

to be eligible for certain federal grants, *see* 16 U.S.C. § 669b(c), the federal statute does not say anything about when grantees are required to spend money on studies.

d. Historic preservation

Plaintiffs allege a range of injuries to their aesthetic interests. Plaintiffs allege that the Arch project will "violate[] the L'Enfant Plan's emphasis on framing and leaving fully unobstructed visual termini of the District's avenues," "adversely affect all other prominent historic landmarks on the skyline . . . by noticeably diminishing their relative prominence," and "impair the historic character of preserved neighborhoods." Compl. ¶¶ 90–92. But "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*, 609 U.S. 1068, 1071 (2026) (per curiam). Plaintiffs' alleged injuries are grounded in their distaste for the appearance of the Arch project and preference for the existing viewshed. This is not enough to establish standing.

Plaintiffs point out that municipalities have a distinct interest in the "appearance of the city." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507 (1981) (plurality opinion). But their cited cases are not Article III standing cases. The Supreme Court considered a similar standing argument in *National Park Service* and rejected it, holding that Article III requires a concrete injury even when a plaintiff has a "special interest in the subject." 609 U.S. at 1073 (cleaned up). Plaintiffs receive no special solicitude for aesthetic injuries.

e. Procedural injuries

Nor have Plaintiffs suffered Article III procedural injuries. To establish standing based on a procedural injury, a plaintiff "must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc). The "deprivation of a procedural right without some concrete interest that is affected by the deprivation" is insufficient to confer Article

III standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Plaintiffs have identified no concrete interest resulting from the alleged procedural injury here.

The Memorial Advisory Commission has an advisory function, assisting in the "selection of alternative sites and design concepts" for a monument. 40 U.S.C. § 8905(a)(1). Plaintiffs have not alleged that the Commission plays any role in mitigating traffic effects, limiting emergency-planning costs, or evaluating the environmental effects of a monument. At most, Plaintiffs allege that proceeding without Memorial Advisory Commission input will impair their aesthetic interests. As explained above, those interests are insufficient to confer standing under *National Trust*.

Any institutional injury from any alleged "bypass[ing]" of the Memorial Advisory Commission belongs to the Commission, not the District. Compl. ¶ 101. The District has one seat on the Commission. *See* 40 U.S.C. § 8904(a)(6). Individual members of a body generally lack standing to sue over an "institutional injury" that affects all members of that body equally. *Raines v. Byrd*, 521 U.S. 811, 821 (1997). So too here.

The District's alleged downstream NCPC injuries similarly fail and are additionally not yet ripe. The District argues that, absent review by the Commission, its representatives on the NCPC cannot "meaningfully evaluate the project" and cannot "cast an informed vote." TRO Br. 20. But the NCPC has not yet voted on the project; the District's representatives may vote no or seek to delay the vote until they feel adequately informed.

And Plaintiffs' SHPOs have not articulated any procedural injury as explained *infra* 40–42. Nor would any such injury be ripe before NPS makes a final agency action authorizing the undertaking.

## II. Plaintiffs Have Failed to Establish Substantial Likelihood of Success on the Merits.

### A. Plaintiffs' claims suffer threshold defects. .

Plaintiffs are not entitled to a TRO because they cannot establish that they are "likely to succeed on the merits." *Winter*, 555 U.S. at 20. In suing before NPS has issued agency action, Plaintiffs' claim fails at the outset. And even if Plaintiffs' harms may differ from aesthetic offense for standing purposes, they fall outside the zone of interests of the statutes that form the basis of their claims.

1. Plaintiffs do not challenge any final agency action.

The APA authorizes judicial review of "final agency action." 5 U.S.C. § 704. An action is "final" under the APA if (1) it "mark[s] the consummation of the agency's decisionmaking process" and (2) "rights or obligations have been determined" by it or "legal consequences will flow" from it. *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (cleaned up). Plaintiffs identify no final agency action here.

Plaintiffs allege that "Defendants have taken final agency action by deciding to construct an Arch in Memorial Circle." Compl. ¶ 111, Case No. 26-cv-3838, Dkt. 1. But that decision is not final. The agency's decisionmaking process is not complete until and unless (1) the NCPC approves the final site and building plans and (2) if the NCPC approves the plans, the Department of the Interior then issues a final decision authorizing construction. *See* Notice, *Lemmon v. Trump*, Case No. 26-cv-544 (filed Oct. 21, 2026), Dkt. 63. Plaintiffs acknowledge in their motion that there is no final agency action until "Defendants have formalized their approval of the Arch." TRO Br. 44. In the absence of final agency action, plaintiffs can obtain no relief under the APA. Their request for a "Section 705 stay," which postpones "the effective date of an agency action," is similarly ineffective absent final agency action.

A district court certainly has the authority to temporarily enjoin executive action and preserve the status quo while it considers a party's request for preliminary relief. *See* 18 U.S.C. §

3626(a)(2) (permitting district courts to issue temporary restraining orders). But such an order is a temporary restraining order, and a plaintiff must satisfy the standard from *Winter*, 555 U.S. at 20, to demonstrate that it is entitled to such relief. Plaintiffs cannot meet that burden here.

2. Plaintiffs' injuries fall outside of the zone of interests.

Should the court determine that Plaintiffs have adequately pled a concrete injury in fact, the Court will then need to determine whether Plaintiffs' Article III injury falls within the zone of interests of the statutes that supply Plaintiffs' causes of action. The "injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). To the extent the court determines that Plaintiffs have alleged any concrete injuries, several of the injuries Plaintiffs allege fall outside of the zone of interests of the statutes on which they rely for their five substantive claims.

A plaintiff falls outside a statute's zone of interests if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottowatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). While this standard is "not especially demanding," a plaintiff lacking such interests fails to adequately plead a cause of action. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Patchak*, 567 U.S. at 225).

1. Plaintiffs' first claim relies on the CWA. Compl. ¶¶ 108–117. The CWA exists to "encourage the location of commemorative works within the urban fabric of the District of Columbia." 40 U.S.C. § 8901(2). The statute helpfully states its purposes explicitly: preserving "the integrity of the comprehensive design of the L'Enfant and McMillan plans," ensuring "public use and enjoyment of open space," preserving, protecting, and maintaining open space, and

ensuring that commemorative works "are appropriately designed, constructed, and located." *Id.* § 8901(1)–(4). Plaintiffs' aesthetic injuries, while not concrete or particularized under *National Trust*, likely fall within the zone of interests protected by this statute. But the CWA says nothing about traffic flows, emergency response planning, stormwater management, or bat foraging patterns. A plaintiff whose concrete injury is based on traffic flows or emergency planning does not have interests that "systematically, not fortuitously" align with those that Congress had "in mind" when enacting the CWA. *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924, 927 (D.C. Cir. 1989). If the court agrees that Plaintiffs lack a concrete and particularized injury to their aesthetic interests, their remaining injuries are so marginally related to the purposes of the statute as to fall outside the zone of interests.

2. Plaintiffs' second claim alleges a violation of 40 U.S.C. § 8106. Compl. ¶¶ 118–124. This statute operates to safeguard Congress's institutional control over buildings on federal property in the district, serving as an "exclamation point on its exclusive powers" over federal property. *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 185 F.4th 1185, 1196 (D.C. Cir. 2026), *stay granted*, 609 U.S. 1068 (2026) (per curiam). To establish that a plaintiff's injury falls within a statute's zone of interests, the plaintiff must show that its "interests coincide systematically, not fortuitously with those of intended beneficiaries." *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (quotations omitted). Plaintiffs cannot show that their interests overlap with Congress's unique institutional interests in controlling its authority over federal property. While Plaintiffs happen to want to stop construction on federal land in this case, they do not have an institutional interest in ensuring congressional control in the same way as Congress itself. Plaintiffs do not fall within the zone of interests of a statute that protects congressional power.

3. Plaintiffs' third claim alleges a violation of the HBA. Compl. ¶¶ 125–132. As noted above, the HBA was enacted to address fire safety concerns at time when combustible building materials were frequently used. Plaintiffs, however, contend that HBA operates to "preserve the primacy of . . . the U.S. Capitol Building and the Washington Monument" in the District's skyline. TRO Br. 2. This statute contains no indication that it is intended to address traffic, stormwater, or emergency planning, all of which are at most tangentially related to building height. For example, the government does not assert that the height of the Arch itself, as opposed to the general transportation disruptions that accompany any large-scale construction project, is what will cause the alleged traffic-related injuries. To the extent that Plaintiffs' injuries on any of its non-aesthetic theories are sufficient to confer Article III standing, those injuries fall outside the zone of interests of this statute as well.

4. Plaintiffs' fourth claim alleges a violation of the NHPA. Compl. ¶¶ 133–146. NHPA is concerned with the effects of a federal action on historic properties. *See* 54 U.S.C. § 306108. This claim aligns with Plaintiffs' alleged "historic preservation impacts." Compl. ¶¶ 88–97. But traffic, emergency planning, stormwater management, and bat species have nothing to do with historic properties, and Plaintiffs allege no harm to historic properties based on those injuries. *See id.* ¶¶ 66–87. If Plaintiffs cannot establish standing based on their aesthetic interests after *National Trust*, their remaining injuries are insufficient to fall within the NHPA's zone of interests.

5. Plaintiffs' fifth claim is brought under NEPA. Compl ¶¶ 147–154; *see also id.* ¶¶ 125–132. NEPA's zone of interests extends to "protecting the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983). Plaintiffs' asserted "economic interests simply do not fall within" NEPA's zone. *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015); *see, e.g.*, *Powder River Basin Res. Council v. U.S. Dep't of the Interior*, 749

F. Supp. 3d 151, 163 (D.D.C. 2024). To the extent that the court determines Plaintiffs have adequately alleged standing based on economic harms associated with traffic or emergency planning, permit-processing, or voluntary surveys, those monetary interests are insufficient to bring Plaintiffs within NEPA's zone of interests.

6. When a claim arises under the APA, the reviewing court looks to the "substantive provisions" of the underlying statute, the "alleged violations of which serve as the gravamen of the complaint." *Bennett v. Spear*, 520 U.S. 154, 175 (1997). This rule means that the fate of Plaintiffs' sixth claim, which alleges arbitrary and capricious agency action, should be determined by reference to the substantive statutes underlying those allegations. Plaintiffs' sixth claim largely restates the allegations that form the basis of their NEPA and NHPA claims.

**B. Plaintiffs' statutory challenges fail.**

The 1925 Authorization Act specifically authorizes construction of a monument plaza on Memorial Circle that has never been completed. *Supra* 2–5. More broadly, the NPS Organic Act authorizes NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a). NPS has used that authority for decades to engage in major construction in national park system units, including in the District of Columbia, without any further congressional approval. This includes the National Capital Region Headquarters; the U.S. Park Police Headquarters; 74,000 square feet of administrative facilities in East Potomac Park; U.S. Park Police Stables on the National Mall; a 7,500-seat tennis stadium in Rock Creek Park; and major renovations to golf courses at Langston, Rock Creek, and East Potomac. *See* Nat'l Cap. Plan. Comm'n, Executive Director's Recommendation, at 1 (Jan. 7, 2016), https://perma.cc/8D47-BNV6; Decl. of Tammy

Stidham, Assoc. Reg. Dir., Lands and Planning, NPS (dated March 3, 2026), filed in Civ. No. 25-4316 (D.D.C), ECF No. 52-1.

Those two statutes—the Authorization Act and the Organic Act—together authorize construction of the arch. And they defeat Plaintiffs' arguments invoking the Commemorative Works Act and 40 U.S.C. § 8106.

1. Commemorative Works Act

Plaintiffs' CWA arguments fail at the outset because they have not shown that the arch is a "commemorative work," which the statute defines as a structure "designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." 40 U.S.C. § 8902(a)(1). Plaintiffs assert that the arch will "honor" or "celebrate" the Nation's 250th anniversary, but that does not mean it is designed to perpetuate the memory of that element of history. Celebrating the anniversary by building a structure and using the structure to perpetuate the memory of the anniversary are not necessarily the same thing. Further, Plaintiffs lack evidence that a final decision has been made as to what the arch is designed to celebrate or symbolize. Whereas the CWA covers *backwards-looking* projects that *commemorate* something, the arch may be a *forward-looking* design, intended to inspire future American greatness. Indeed, one designer proposed that the arch "is not primarily a monument dedicated to the dead, but to the living, to this great country and its perseverance." Dkt. 44-2 at 11.

Further, the definition of commemorative work excludes "a structure which is primarily used for other purposes," and Plaintiffs have not shown that the arch will "primarily" be used to perpetuate the memory of a significant element of American history, rather than for another purpose, such as a decorative gateway to D.C., a tourist attraction, and a national security hub. The primary purpose of the structure is up to the government to decide, not the Plaintiffs.

Regardless, even were the arch a commemorative work, its construction would still not violate the CWA, which "does not apply to commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b). Because the Authorization Act provides prior authority to construct and redesign tall structures on Columbia Island, the CWA does not apply.

Plaintiffs' principal response to the Authorization Act misreads the delegation of discretion to redesign "said bridge" to exclude other aspects of the "project." *See* TRO Br. 24. But the Authorization Act rejects this construction, stating "a memorial bridge . . . includ[es] appropriate approaches, roads, streets, boulevards, avenues, and walks leading thereto on both sides of said river, together with the landscape features appertaining thereto[.]" Authorization Act § 1, 43 Stat. at 974. And the discretion-delegating clause expressly incorporates that definition of "bridge," by referring to "*said* bridge." *Id.* (emphasis added).

In a single paragraph, Plaintiffs rehash other arguments for narrowing the Authorization Act that have already been exhaustively rebutted at greater length throughout this litigation. The "ten-year program of expenditures and construction," Authorization Act § 6, 43 Stat. at 975, does not amount to a sunset provision on Congress's authorization to construct a bridge across the Potomac and "landscape features appertaining thereto," *id.* § 1, 43 Stat. at 974. Indeed, the Authorization Act was used to add new monumental features long past the ten-year window—until at least 1951. NPS, CFA, and NCPC all continued to redesign the project long after 1935.

Nor does the Authorization Act's requirement that construction be "approved and ordered" "in a total sum not to exceed $14,750,000" preclude the arch, as that limit applies to the "sum [that] is authorized to be appropriated from any moneys available or that may become available in the Treasury of the United States." Authorization Act § 2, 43 Stat. at 974. This cap on appropriations does not rule out alternative sources of funding, such as private donations. *See* A-

8713, 4 Comp. Gen. 832 (Apr. 3, 1925). Where "the authorizing legislation is silent as to monetary contributions from non-federal sources" and "in the absence of contrary congressional direction," amounts contributed by "non-federal entities" "are not to be counted" as part of the federal cost or against the cost ceiling. B-223725 (Comp. Gen. Feb. 20, 1987). Here, there is no "contrary congressional direction"; rather, the 1925 statute's reference to competing the project through means "most economical and advantageous to the Government," Authorization Act § 2, 43 Stat. at 974, undercuts any reading of the $14.75 million appropriations cap to foreclose private funding—funding that would, by definition, make the project "most economical" to the government. Historical practice confirms that approach, as the equestrian statues at the bridge's east end were gifted by the government of Italy. HAER No. DC-7, at 99, 101–02.

2. 40 U.S.C. § 8106

Plaintiffs' invocation of § 8106 fails for the same reasons: Congress authorized construction of the arch in the Authorization Act and the Organic Act. *Supra* 27.

On top of that, there is good reason to doubt that provision applies in the first place to NPS. When originally enacted in 1912, § 8106 applied only to the Engineer Department in the War Department. *Supra* 5. In the same law, Congress included a different limitation applicable to the Interior Department, which had jurisdiction over national parks across the country. Act of Aug. 24, 1912, 37 Stat. at 460. That provision was codified at 16 U.S.C. § 451, and then ultimately repealed, *see, e.g.*, Pub. L. No. 65-181, 40 Stat. 634, 677 (1918); Pub. L. No. 76-417, 54 Stat. 36, 36 (1940); Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996). Contrary to Plaintiffs' argument, TRO Br. 25, Memorial Circle is in the National Park System, 54 U.S.C. §§ 100102(2), 100501.

And NPS has erected countless structures on national parkland in the District over the past century, yet there is no record of any express congressional approval for such buildings. *Supra* 27.

This history, together with the parallel enactment of both § 8106 and § 451 suggest that § 8106 was never intended to limit NPS's construction in national parks. Section 451 played that role—and Congress chose to repeal it.

3. The Arch Does Not Violate the Height of Buildings Act.

Plaintiffs incorrectly assert that the Arch violates the HBA. That argument fails for four reasons. First, the HBA's height restrictions do not apply to federal buildings. Second, even they did, the Arch is not a "building," covered by the statute. Third, even if the Arch is a building, the Authorization Act authorized it to exceed the 130-foot limit Plaintiffs contend applies. Finally, the Arch complies with the HBA's height restriction for buildings on traffic circles.

a. The HBA Does Not Apply to Federal Buildings.

Under basic principles of statutory interpretation and the application of long accepted Supreme Court jurisprudence, the 1910 amendment did not repeal the HBA's exception of federal buildings from its height restrictions. Thus, no sound reason exists to conclude that the height restrictions apply to federal buildings.

The original HBA expressly stated that its height limits "shall not apply to Federal or municipal buildings." 30 Stat. 922 § 7. In 1910, Congress considered—and ultimately decided against—repealing the original act when amending it. When the House first voted on the 1910 amendment, it contained a provision expressly repealing the entire 1899 HBA. 45 Cong. Rec. 4534, attached as Ex. A. But the draft legislation was amended to repeal only "laws in conflict herewith." *Id.* at 4535 (quotations omitted); 36 Stat. at 455.[5] So, for example, the increased height limit in Section 5 of the 1910 amendment—of 130 feet for buildings on business streets, *see* 36

[5] When asked about the purpose of the modification, Representative Campbell explained that "[t]he act as reported repeals a number of laws outright, and I am proposing to repeal the laws in conflict herewith rather than to repeal these acts." 45 Cong. Rec. at 4535.

Stat. at 453—repeals the conflicting 110-foot limit in the original act, 30 Stat. 922. But nothing in the 1910 amendment references federal buildings or otherwise conflicts with original act's exception. As such, any argument that the 1910 amendment repealed the exception of federal buildings from height restrictions rests on implication only.

Repeals by implication are rare and only occur when (1) provisions of the two acts are in irreconcilable conflict; or (2) when the later act covers the whole subject of the earlier one and is clearly intended as a substitute. *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). If neither of those two circumstances exist then "the later act is to be construed as a continuation of, and not a substitute for, the first act." *Id.* The original act's exception of federal buildings is not irreconcilable with the 1910 amendment. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001) (when "two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective" (citation omitted)). Moreover, the legislative history does not support the conclusion that 1910 amendment was intended as a substitute for the entire 1899 HBA. Rather, the House's revision of the earlier version that repealed the entire HBA to a limited repeal of only those portions conflicting with the 1910 amendment demonstrates a "clearly expressed congressional intention" *not to repeal* or substitute for the entire 1899 HBA. And contrary to Plaintiffs' assertion, TRO Br. 29–30, Congress' silence in the 1910 HBA regarding the federal exemption is insufficient to support a repeal by implication. *Morton v. Mancari*, 417 U.S. 535, 550 (1974) (rejecting argument that congressional silence should be read as effectuates an implicit repeal). Thus, 1910 amendment did not implicitly repeal the earlier HBA's federal building exception.

Indeed, if Congress intended to regulate federal building heights by amending a law that had regulated only private buildings in D.C., it would have clearly expressed its intent by using

clear language. Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001), and reading to impose restrictions on federal buildings that did not exist before through a *non obstante* provision does just that.

Historical practice confirms this understanding. Soon after the HBA was enacted, the National Archives Building was constructed on Constitution Avenue to a height of 166 feet, exceeding the HBA's generally applicable 130-foot limit for buildings on business streets.[6] And, where Congress wanted federal buildings to comply with the HBA, it expressly said so. For instance, when Congress authorized the creation of the Thurgood Marshall Federal Judiciary Building, it expressly required that its height comply with the HBA. *See* Judiciary Office Building Development Act, Pub. L. No. 100-480, § 3(a)(8)(B), 102 Stat. 2328, 2329–30 (codified as amended 40 U.S.C. § 6502(c)(2)). That provision is surplusage if the HBA already applied, by its own force, to the Judiciary Building. To avoid rendering that "language superfluous," *Connecticut National Bank v. Germain*, 503 U.S. 249, 253 (1992), the better view is that the HBA does *not* apply to federal buildings *absent* congressional say-so.

The remedies available for violating the HBA also demonstrate Congress' intent to regulate private parties, not the Federal government. The HBA, as amended in 1910, declared that violation of the height limits are "common nuisances" and those "in charge of or maintaining" them are subject to prosecution in D.C. police courts and subject to fines. § 8, 36 Stat. at 454. Congress could not have intended to subject the United States or its officers to criminal prosecution and/or

---

[6] *See* "Short History of the National Archives Building," available at https://www.archives.gov/about/history/building.html; "The National Archives Building: Temple to our History," available at https://artsandculture.google.com/story/the-national-archives-building-temple-to-our-history-u-s-national-archives/YwXxwO5TwRFIIw?hl=en.

civil penalties for violating the HBA because the statute does not meet the bar for a waiver of the United States' sovereign immunity for civil damages. It neither "unmistakably" waives sovereign immunity nor "explicitly authorizes suit against [the] government on [a nuisance] claim. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49 (2024) (citation omitted).

Rather, the HBA is properly viewed as local zoning regulations. Since the first codification of the District of Columbia's laws, the HBA has been codified in the chapter addressing zoning. *See* D.C. Code § 6-601.05 (placed in Chapter 6, Subchapter I, of Title 6, titled "Zoning and Height of Buildings"). Currently, the D.C. Zoning Commission regulates the "height . . . of buildings and other structures" under the provisions of Chapter 6, Subchapter IV, of the D.C. Code. D.C. Code § 6-641.01. Subchapter IV further provides that "[t]he permissible height of buildings in any district shall not exceed the maximum height of buildings now authorized . . . by subchapter I [the HBA]." *Id.* § 6-641.06.

But the D.C. zoning regulations expressly do "not apply to federal public buildings[.]" *Id.* § 6-641.15.[7] Rather, the regulations provide that the "height . . . of *federal public* buildings in the District of Columbia . . . will be subject to the approval of the [NCPC]." *Id.* (emphasis added). The NCPS's organic statute also exempts federal buildings from D.C. zoning regulation and does not provide that they are subject to the HBA. Instead, it directs that the "height . . . of federal public buildings in the District of Columbia . . . [is] subject to the approval of the Commission." 40 U.S.C. § 8722(d). To be sure, the NCPC staff has often applied HBA-derived height limits to most D.C.

[7] Plaintiffs contend that D.C. Code section 6-641.15 affirmatively supports an argument that Congress *did not exemp*t federal buildings from the HBA because that section explicitly exempts Federal public buildings only from the regulations in Subchapter IV with no mention of Subchapter I, which contains the codified the 1910 HBA amendments. TRO Br. 30. But again, because the 1910 amendment did not repeal the 1899 federal building exception, there was no need for Congress to extend the Section 6-415.15 exception to Subchapter I.

buildings, but that accords with the Commission's discretion to regulate building height, while considering, but not being compelled by, the HBA. *Accord* 40 U.S.C. § 3312(c) (directing General Services Administration to consider local zoning laws in building construction but not mandating compliance with them).

b. The Arch is not a "building" under the HBA.

The HBA applies only to "buildings." *See* 36 Stat. at 454. Contrary to Plaintiffs' assertions, the Arch is not a "building" as the term was defined in 1910. Tellingly, Plaintiffs omit the following italicized language from the 1913 dictionary definition of "building," "[t]hat which is built; a fabric or edifice constructed, *as a house, a church, etc*." *Compare* TRO Br. 26 *with* Webster's Unabridged Dictionary at *1646 (1913), https://archive.org/details/2976582. The use of "house" and "church" to define "building," demonstrates that the term encompassed edifices that shelter the activities occurring inside, as distinguished from other structures. A free-standing Arch is more like a monument, tower, or sculpture than a "house" or a "church." The Arch does not exist to shelter activities occurring inside—much like the Washington Monument does not exist to shelter activities inside, even though it contains an elevator and viewing areas.

c. The Authorization Act authorizes high structures.

Even if the HBA applies to federal buildings and the Arch is considered a building, the Authorization Act authorizing implementation of the Memorial Bridge Commission's 1924 Report (discussed *supra* 2–5) explicitly authorized exceedance of the 130-foot limitation that Plaintiffs contend applies. TRO Br. 27. The 1925 Authorization Act authorized a plan that included two 166-foot-tall columns and authorized discretionary design changes, Pub. L. No. 68-463 § 1, 43 Stat. 974 (empowering the Bridge Commission to make design changes "as in its discretion may be found to be necessary or advisable"), which includes modifying the two 166-foot columns into a 250-foot Arch.

Plaintiffs incorrectly assert that the Court should not give effect to the Authorization Act's authorization of a 166-foot structure, "because the [HBA] was enacted in 1910, the [1925 Authorization] Act cannot be construed to override that earlier enactment unless it overcomes the 'presumption against implied repeals'" TRO Br. 28 (citing *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020)). But no one is arguing that the Authorization Act repealed the HBA. Rather, as discussed above, and is the case here "[w]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *J.E.M. Ag Supply*, 534 U.S. at 143–44. The Court can give effect to both statutes because they are not so irreconcilable that they cannot be read together.

d. The Arch conforms to any applicable HBA requirements.

Finally, even if the HBA applies to federal buildings, and the Court concludes that the Arch is a building that was not authorized pursuant to the 1925 Authorization Act, the Arch still does violate the HBA's terms. The Arch is to be constructed on Memorial Circle, which is neither a "residence" nor a "business" street where heights are generally limited to 90 and 130 feet, respectively. D.C. Code § 6-601.05(b)–(c). Because neither homes nor business are located around Memorial Circle, these limits do not apply to the project. And the D.C. Council's authority to "denominate portions of streets in the District of Columbia as 'business streets,'" D.C. Code § 9–1201.05, does not extend to Memorial Circle, which sits on federal park system land and is under the exclusive jurisdiction of the federal government. When Congress granted the D.C. Council authority to denominate business streets, it specifically excluded the federal "park system." *See* 58 Cong. Ch. 89, 33 Stat. 10 (Feb. 2, 1904), *amending* 55 Cong. Ch. 543, 30 Stat. 570 § 2 (July 1, 1898) (placing "the park system of the District of Columbia . . . under the exclusive charge and control of the Chief of Engineers of the United States Army, under such regulations as may be prescribed by the President of the United States").

Nor would the generally applicable height limit to "the width of the street, avenue, or highway in its front, increased by 20 feet," D.C. Code § 6-601.05(a), require a shorter Arch. "When a fronting street forms part of a public traffic circle, square, or other public space, the Surveyor [of the District of Columbia] determines its width by measuring full across the entire public space depicted on the plat." *Techworld Dev. Corp. v. D.C. Pres. League*, 648 F. Supp. 106, 121 (D.D.C. 1986), *vacated as moot*, No. 86-5630, 1987 WL 1367570 (D.C. Cir. June 2, 1987). Here, "Memorial Circle, a traffic circle 300 feet in diameter," exceeds the project's 250-feet height. National Park Service, Cultural Landscapes Inventory - Memorial Avenue Corridor 31 (2004), *available at* https://npshistory.com/publications/gwmp/cli-memorial-ave-corridor.pdf. Thus, the 250-foot Arch would comply with restrictions set forth in D.C. Code § 6-601.05(a).

4. Plaintiffs fail to show procedural violations.

a. Defendants have not violated the APA.

Plaintiffs' standalone APA claim fails as a matter of law. While the APA provides a limited waiver of sovereign immunity, a cause of action, and a standard of review for challenges to final agency action, it does not prescribe substantive legal requirements. 5 U.S.C. §§ 701-706. In other words, "[t]he APA 'supplies a generic cause of action' to bring claims based on substantive law found elsewhere." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 58 (D.D.C. 2023) (quoting *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 (D.C. Cir. 2006))), *aff'd*, 146 F.4th 1144 (D.C. Cir. 2025). Accordingly, "arbitrary and capricious review does not apply in the absence of a statutory benchmark against which to measure an agency's exercise of discretion." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 955 (9th Cir. 2017); *see also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1202

(D.N.M. 2015) (collecting cases). Because Plaintiffs provide no statutory benchmark for their standalone APA arguments, this claim fails.

Moreover, Plaintiffs cannot fault Defendants for failing to provide a reasoned explanation before Defendants have produced a final decision. Nor can Plaintiffs fault Defendants—which are all agencies under the Department of the Interior—for failing to account for decisions attributed to the President and other cabinet agencies responsible for national defense and homeland security.

b. Defendants have not violated NEPA.

Plaintiffs' NEPA arguments fail at the outset because there is not yet any final agency action authorizing construction. Further, the Revised EA identified a reasonable range of alternatives and took the requisite hard look.

NPS' designation of two alternatives was reasonable given the existing statutory authorization. *See supra* 2–5. NEPA requires agencies to consider "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(iii). "Because objectives limit alternatives, the more specific the objective, the narrower the range of alternatives." *Sierra Club v. FERC*, 145 F.4th 74, 87–88 (D.C. Cir. 2025). Plaintiffs contend that NPS violated NEPA by crafting an unduly narrow "purpose and need" that is "conterminous" with the Arch itself. But NEPA "does not substantively constrain an agency's choice of objectives." *Slater*, 198 F.3d at 867; *see also New Jersey Conservation Found. v. FERC*, 111 F.4th 42, 58 (D.C. Cir. 2024) (rejecting NEPA claim even though the agency's purpose "could hardly have been more narrowly described"). Rather, courts "uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190,

196 (D.C. Cir. 1991). This inquiry requires considering the "views of Congress, expressed, to the extent the agency can determine them, in the agency's statutory authorization to act[.]" *Id.*

Here, "NPS dismissed alternative locations outside Memorial Circle because the proposed undertaking is grounded in the historic design intent for the Arlington Memorial Bridge and Memorial Avenue corridor." Revised EA at A-1. NPS considered the 1924 Report of the Arlington Memorial Bridge Commission and found the current location and the Arch itself was consistent with the original design. "Those proposed columns were intended to frame, mark, and give architectural emphasis to the transition between Arlington Memorial Bridge, Memorial Circle, Memorial Avenue, and the entrance sequence to Arlington National Cemetery." *Id.* NPS' framing of this purpose demonstrates that there was a "reasonable range of alternatives" given the agency's acceptable goal of tailoring this project to the original intent of the Commission. 42 U.S.C. § 4332(2)(C)(iii).

Nor is there any merit to Plaintiffs' suggestion that there was no "hard look" under NEPA because the extant environmental documents do not consider proposed security features of the arch. The determination of "what facts" are relevant to the agency's decision is one entitled to substantial deference. *Seven Cnty.*, 605 U.S. at 185. And Plaintiffs do not present evidence establishing how the arch's design might be modified to accommodate such applications. *Contra* Hegseth Decl. ¶ 15. It would generally be the prerogative of national security agencies, not NPS, to analyze such design modifications.[8] While there may be a subsequent dispute about whether NPS must prepare a supplemental EA or EIS, no such dispute is ripe now. *See Sierra Club v. FERC*,

[8] Under the Supreme Court's holding in *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, an NEPA analysis "need not be disclosed" if necessary to "preserve military secrets." 454 U.S. 139, 145 (1981).

97 F.4th 16, 28 (D.C. Cir. 2024) (rejecting NEPA claim because agency "made no changes to the proposed project that would trigger a supplemental NEPA analysis").

The deference point warrants emphasis: *Seven County* repeatedly admonished lower courts that "the central principle of judicial review in NEPA cases is deference." 605 U.S. at 179. Thus, all NEPA requires is whether the agency has "drawn a reasonable and manageable line," not whether "NEPA would support drawing a different line," and not whether this Court or the plaintiffs would like the agency to draw a different line. *Id.*; *see also Sierra Club v. FERC*, 153 F.4th 1295, 1311 (D.C. Cir. 2025) (recognizing that, "[a]fter *Seven County*, the era of searching NEPA review is over"). This precedent forecloses Plaintiffs' NEPA argument, which relies on second-guessing agency decisionmaking and looking beyond the agency's own analysis to demand analysis of projects features that have not been fully defined.

c. Defendants have not violated the NHPA.

Plaintiffs' NHPA claim likewise fails as there is not yet any final agency action authorizing construction. It also fails as Section 106 of the NHPA does not mandate any substantive outcome, such as mitigation or changes to a project. *United Keetoowah Band*, 933 F.3d at 734. It instead requires federal agencies to "take into account" the effects of their "undertaking[s]" on historic properties, *CTIA-Wireless Ass'n*, 466 F.3d at 106. The NHPA thus has "a limited reach," "aimed," as it is, "solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." *Thornburgh*, 877 F.2d at 1056. The NPS thus did not contravene the NHPA by declining to change its project. *Pres. Soc'y of Newport Cnty.*, 2026 WL 787910, at *16 ("[T]he NHPA does not require . . . changes being made to the proposed project.").

Nor did the NPS fail to adhere to the procedural requirements of the NHPA. *Contra* TRO Br. 36–38. NPS released a 24-page preliminary assessment of effects for multiple rounds of public

comment. Ex. B, at 6; Ex. C.[9] It held two consulting party meetings. *E.g.*, Ex. H. After considering public comments and consultation input, Exs. F &G, NPS produced a 133-page revised assessment of effects report. Ex. B. After NPS and the consulting parties were unable to agree on how to resolve those effects, the ACHP terminated the consultation pursuant to 36 CFR § 800.7(a). Ex. D. And the ACHP then provided comments to NPS. Ex. E.

The NPS did not violate 36 C.F.R. §§ 800.3(c), (e) based on when it initiated consultation. *Contra* TRO Br. 36. While those regulations require NPS to "determine the appropriate SHPO" "[a]s part of its initial planning," they do not require NPS to "initiate consultation" with the SHPO at any particular time in the initial planning. *See* 36 C.F.R. § 800.3(c) ("The agency official shall *then* initiate consultation . . ." (emphasis added)). The SHPOs participated in every step of the consultation—identifying historic properties and the area of potential effects, assessing effects on those properties, and resolving those effects. Section 106 does not require anything more.

Nor did NPS condense the multi-step consultation process over SHPO objection in violation of 36 C.F.R. § 800.3(g). *Contra* TRO Br. 37. Although NPS proposed doing so to the SHPOs, it undertook separate consultation steps after the SHPOs objected. *See* Ex. B, at 6. After consultation was initiated—and the SHPOs objected to expedition—NPS twice consulted about the identification of historic properties. *Id.* And NPS consulted about two separate draft assessing effects on historic properties. *See id.* at 6–7. NPS also attempted to resolve adverse effects through consultation; when those attempts were unsuccessful, ACHP terminated the consultation. Ex. D. While the full scope of NPS's substantial consultation efforts will be documented in an

---

[9] Although NPS proposed expedited consultation under 36 C.F.R. § 800.3(g) that addressed multiple procedural steps in one, it ultimately declined to pursue expedited consultation after SHPOs objected. It thus separately consulted on identification of historic properties and area of potential effect to comply with 36 C.F.R. § 800.2. *See* Ex. B, at 6.

administrative record—for a decision that has not yet been made—even Plaintiffs' self-serving declarations acknowledge the substantial correspondence between NPS and the SHPOs.[10]

Finally, NPS did not fail to consider alternatives or modifications to the undertaking under 36 C.F.R. § 800.6. *Contra* TRO Br. 37–38. NPS "worked to avoid or resolve the adverse effects to historic properties by developing and evaluating alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects." Ex. B, at 35–45 (discussing numerous alternatives, avoidance, mitigation and minimization measures). That none of the numerous alternatives discussed were sufficient to satisfy the SHPOs does not demonstrate a failure to consult; it demonstrates that "further consultation would not be productive," which was why ACHP terminated further consultation. Ex. D, at 1. "[W]here disagreement precludes the completion of a Memorandum of Agreement an agency may implement a project after receiving and considering comments from" ACHP. *Slater*, 198 F.3d at 871.

Plaintiffs are thus unlikely to prevail in demonstrating an NHPA violation.

**III. The Public Interest Weighs Against Injunctive Relief.**

Because Plaintiffs have not demonstrated likelihood of success on the merits or imminent irreparable injury, the Court need not consider the final two factors of the *Winters* standard. But these factors also tilt heavily against a temporary restraining order. In assessing these factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest is the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C.

---

[10] For example, the Kirchen Declaration documents a robust initiation letter, Kirchen Decl. ¶¶ 33–35, and six additional rounds of correspondence between NPS and SHPOs, *id.* ¶¶ 49–55.

2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

1. Plaintiffs tellingly provide no argument as to why a TRO would serve the public interest, instead resting on their likelihood of success on the merits and recasting some of their harms as "the public's harms." *See* TRO Br. 43–44 (discussing "noise disturbances," threatened water quality and "disrupt[ion of] the historic viewshed"). But nothing in Plaintiffs' brief supports an assertion that any of these alleged "public harms" will occur, let alone threaten the public interest, within the next fourteen days.

By contrast, the government is always "likely to suffer irreparable harm" when courts enter "injunctions that likely exceed the authority conferred" to them. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025). In this case, Plaintiffs seek a TRO before they might suffer any claimed irreparable harm. *See supra* 11–15. Imposing that "injunction based on an unripe claim and the speculative threat of injury will thwart the public interest in enforcement of a law enacted by the people's elected officials." *Parrish v. Dayton*, No. CIV. 13-1348 MJD/AJB, 2013 WL 4536260, at *1 (D. Minn. Aug. 27, 2013). Because such an injunction would stymie the "energetic executive" deemed essential by the Framers, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020), it is not in the public interest.

2. Entry of a TRO here would be particularly damaging to the public interest. As the declarations proffered from the Departments of War and Homeland Security describe in detail, the arch, as currently designed, represents "a generational national defense opportunity to mitigate" evolving threats from the proliferation of small, unmanned aircraft systems (UAS). Hegseth Decl. ¶ 10; Mullin Decl. ¶ 18 ("The Arch would, when properly equipped, provide an opportunity to substantially expand UAS detention, and if necessary, disruption or mitigation . . . , directly

supporting DHS's mission."). "The commercially available and recreational UAS market is experiencing rapid growth in the United States, with the commercial fleet alone projected to reach up to 1.015 million units by 2027." Mullin Decl. ¶ 3. "Import data suggests that current Federal Aviation Administration registration numbers significantly underestimate the true size of the recreational fleet, meaning the actual number of hobbyist drones in operation is likely much higher than official estimates." *Id.* The mass proliferation of UAS "rais[es] the risk of unauthorized or nefarious use within the federal National Capital Region (NCR)." *Id.* ¶ 4; *see also* Hegseth Decl. ¶¶ 4–5 (noting that "[t]he NCR threat environment is multi-domain and continuously evolving" and "[t]he proliferation of [small UAS] . . . presents a new and dynamic national security threat to the NCR").

The proposed location and height for the arch "provide enhanced lines of sight for both sensors and personnel, which is critical to [counter-UAS] and other security operations." Hegseth Decl. ¶ 10. "By placing sensors and communications equipment above much of the surrounding urban landscape, the structure will improve line-of-sight connectivity; reduce the masking effects of buildings, terrain, vegetation, and other obstructions; and expand the area in which potential threats and relevant activity can be detected and assessed." *Id.* ¶ 12. And it could provide "a centralized and elevated infrastructure node at a key geographic location in the NCR [that] would effectively bridge the NCR's fragmented jurisdictional boundaries and enhance homeland defense." Mullin Decl. ¶ 14.

An injunction would forestall the opportunity for these significant national security benefits and prohibit the government from taking important steps to mitigate an ever-growing threat to the Nation's capital. *Winter*, 555 U.S. at 33 (vacating preliminary injunction when it could jeopardize national security); *Nat'l Park Servs.*, 609 U.S. at 1075 (similarly staying preliminary injunction);

*Stagg P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 96 (2d Cir. 2016) (affirming denial of preliminary injunction when public interest in maintaining national security weighed against plaintiff's claimed harm); *Church v. Biden*, 573 F. Supp. 3d 118, 147-148 (D.D.C. 2021) (denying motion for preliminary injunction where public interest in military readiness outweighed plaintiffs' claims of harm). These significant national defense concerns "plainly outweigh" Plaintiffs' asserted interests. *See Winter*, 555 U.S. at 25–26. Because the "harms and equities are not nearly in equipoise," no injunction can issue. *Nat'l Park Servs.*, 609 U.S. at 1075.

## CONCLUSION

Because Plaintiffs have failed at every step to meet their burden of showing their entitlement to a TRO, the Court must deny their motion.

Date: November 3, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT STANDER
Deputy Assistant Attorney General

BENJAMIN HAYES
Deputy Assistant Attorney General

*/s/ Michael S. Sawyer*

MICHAEL S. SAWYER, Senior Attorney
ALISON VICKS, Trial Attorney
DANIEL LUECKE, Trial Attorney
Energy and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-353-5134
E-mail: michael.sawyer@usdoj.gov
alison.vicks@usdoj.gov
daniel.luecke@usdoj.gov

*Counsel for Defendants*