# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**MICHAEL LEMMON**, *et al.*,

*Plaintiffs,*

v.

**DONALD J. TRUMP**, *et al.*,

*Defendants.*

Civil Action No. 26-cv-544 (TSC)

**DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA,**

*Plaintiffs*,

v.

**NATIONAL PARK SERVICE**, *et al.*,

*Defendants*.

Civil Action No. 26-cv-3838 (TSC)

**CONSOLIDATED CASES**

## REPLY IN SUPPORT OF THE DISTRICT OF COLUMBIA AND VIRGINIA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND 5 U.S.C. § 705 STAY

## TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. Defendants' Threshold Objections Lack Merit ........ 2

A. The District and Virginia Have Standing ........ 2

B. The Decision to Approve the Arch Is Final Agency Action ........ 9

C. Plaintiffs Fall Within the Zone of Interests of Each Statute ........ 9

II. Plaintiffs Are Likely to Succeed on the Merits ........ 11

A. The Arch Violates the Commemorative Works Act ........ 11

B. The Arch Violates 40 U.S.C. § 8106 ........ 14

C. The Arch Violates the Height of Buildings Act ........ 14

D. The Decision to Approve the Arch Is Arbitrary and Capricious ........ 18

E. Defendants Have Violated the National Environmental Policy Act ........ 19

F. Defendants Have Violated the National Historic Preservation Act ........ 20

III. Plaintiffs Have Established Irreparable Injury ........ 21

IV. The Equities Favor the Issuance of a Temporary Restraining Order or Section 705 Stay ........ 24

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

*Cases*

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 11

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) ........ 2, 3

*City of Bos. Delegation v. Fed. Energy Reg. Comm'n*,
897 F.3d 241 (D.C. Cir. 2018) ........ 3

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) ........ 4

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ........ 9, 10

**Ctr. for Taxpayer Rts. v. IRS*,
190 F.4th 990 (D.C. Cir. 2026) ........ 2, 5, 6, 21, 22

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ........ 4, 25

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ........ 11

*District of Columbia v. Caton*,
48 App. D.C. 96 (1918) ........ 5

*District of Columbia v. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) ........ 22, 23

*Eagle Cnty. v. Surface Transp. Bd.*,
82 F.4th 1152 (D.C. Cir. 2023) ........ 3

*FDA v. All. for Hippocratic Medicine*,
602 U.S. 367 (2024) ........ 5, 6, 22

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ........ 8

*Her Majesty the Queen in Right of Ontario v. U.S. EPA*,
912 F.2d 1525 (D.C. Cir. 1990) ........ 9

*Int'l Bhd. of Teamsters v. DOT*,
861 F.3d 944 (9th Cir. 2017) .......... 18

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
140 F. Supp. 3d 1123 (D.N.M. 2015) .......... 18

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 21, 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) .......... 9

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 2, 4

*Narragansett Indian Tribe ex rel. Narragansett Indian Tribe Hist. Pres. Officer*,
176 F.4th 671 (D.C. Cir. 2026) .......... 8

*Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres.*,
609 U.S. 1068 (2026) .......... 7, 14

*Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) .......... 14, 24

*NRDC v. Lujan*,
768 F. Supp. 870 (D.D.C. 1991) .......... 19

*Nw. Pipeline Corp. v. Pipeline Right of Way Easement*,
197 F. Supp. 2d 1241 (E.D. Wa. 2002) .......... 23

*Oceans v. U.S. Dep't of Interior*,
2025 WL 973540 (D.D.C. Apr. 1, 2025) .......... 8

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) .......... 8

*Seven Cnty. Infra. Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......... 19

*Sierra Club v. FERC*,
145 F.4th 74 (D.C. Cir. 2025) .......... 19

**Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025) .......... 5, 6, 22

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 2

*Town of Barnstable v. FAA*,
740 F.3d 681 (D.C. Cir. 2014) .......... 4

*Statutes*

5 U.S.C. § 705 .......... 24, 25

40 U.S.C. § 8106 .......... 10, 14

40 U.S.C. § 8901 .......... 10

40 U.S.C. § 8902 .......... 11, 14

40 U.S.C. § 8903 .......... 12

40 U.S.C. § 8905 .......... 8, 10, 12

42 U.S.C. § 4332 .......... 20

54 U.S.C. § 100101 .......... 14

54 U.S.C. § 306102 .......... 11

54 U.S.C. § 306108 .......... 11

Act of Oct. 24, 2000,
Pub. L. No. 106-348, 114 Stat. 1358 .......... 12

Height of Buildings Act,
Pub. L. No. 61-196, 36 Stat. 452 (1910) .......... 15

Judiciary Office Building Development Act,
Pub. L. No. 100-480, 102 Stat. 2328 (1988) .......... 16

Memorial Bridge Act,
Pub. L. No. 68-463, 43 Stat. 974 (1925) .......... 12, 13

Omnibus Parks & Public Lands Management Act of 1996,
Pub. L. No. 104-333, 110 Stat. 4093 .......... 12

D.C. Code § 6-601.05 .......... 15, 17, 18

D.C. Code § 6-601.08 .......... 11

D.C. Code § 7-2201 .......... 6

D.C. Code § 9-101.01 .......... 5

D.C. Code § 9-1201.05 .......... 17

Va. Code § 33.2-223 .......... 5

Va. Code § 33.2-256 .......... 5

*Regulations*

36 C.F.R. § 800.3 .......... 20, 21

36 C.F.R. § 800.6 .......... 21

63 Fed. Reg. 20496 (1998) .......... 20, 21

*Other Authorities*

The Height Master Plan for Washington, DC (2013) .......... 17

National Resilience Strategy (2026) .......... 6

Webster's Unabridged Dictionary (1913) .......... 16

## INTRODUCTION

Defendants have announced the construction of a 250-foot triumphal arch in Memorial Circle that defies at least five federal statutes. Seemingly recognizing that the Arch cannot plausibly be defended on its merits, Defendants have deployed an ever-growing series of strategies to outrun or short-circuit judicial review. They have introduced eleventh-hour declarations advancing deeply implausible national security justifications for the Arch. ECF Nos. 74-8, 74-9. They have announced they intend to begin construction "immediately" after the Arch is formally approved. ECF No. 63. And they have insisted they should not be required to inform this Court that they have approved or started construction until 24 hours after it begins. ECF No. 96.

Defendants' opposition brief continues this trend. It leads with the remarkable assertion that the construction of a massive new monument in a busy traffic circle on the border between the District of Columbia and Virginia will inflict *no* cognizable harm on either jurisdiction. It claims that Plaintiffs cannot assert violations of laws specifically designed to protect the interests of the District and the surrounding region. And it asserts that Plaintiffs must wait to sue until Defendants have formally announced their approval of (and immediately begun building) the Arch.

None of these arguments has merit. The District and Virginia are plainly harmed by the construction of a massive Arch that will clog traffic on a major thoroughfare, undermine emergency preparedness, inflict environmental damage, and subvert the region's historic plan. Those irreparable injuries will begin to accrue the moment construction begins. And Plaintiffs are the natural and appropriate parties to bring claims to vindicate these interests.

The Court should not allow this lawless project to evade scrutiny. It should enjoin the Arch as soon as it is formally approved. And to prevent Defendants from racing to start construction before then, the Court should administratively stay construction until it rules on this Motion.

## ARGUMENT

### I. Defendants' Threshold Objections Lack Merit.

#### A. The District and Virginia Have Standing.

The District and Virginia have established a clear likelihood that they possess standing to challenge the Arch. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (when seeking preliminary relief, the plaintiff need only "make a clear showing that [it] is likely to establish each element of standing" (citation omitted)). As Plaintiffs have explained, construction of the Arch will clog traffic between the District and Virginia, Mot. 11–13, impair the District's ability to respond to emergencies, Mot. 12–15, inflict environmental harms, Mot. 17–19, and undermine the historic value of the District's own property, Mot. 18–19. These injuries are "concrete and particularized," *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 82 (2026), and they directly interfere with Plaintiffs' "core" governmental activities. *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1001 (D.C. Cir. 2026).

Defendants suggest that these injuries are too speculative because Defendants have not yet formally approved the Arch. Opp. 15. But Defendants have made clear that there is, at minimum, a "substantial risk" that they will proceed with construction. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Defendants have announced the conclusion of the NEPA and NHPA processes, Maloney Decl. ¶ 72; Ex. 10 ("Revised FONSI") at 1–2, released final construction plans, Ex. 7, and provided this Court notice that such construction may start "immediately" after NCPC approves the project, Ex. 17. Nor is there any great mystery about what NCPC will decide. Its chair—one of six presidential appointees on the Commission—has said the absence of an arch is a "national embarrassment," Ex. 23 at 3, and the Commission has repeatedly approved preliminary designs with minimal changes. *See* Ex. 7 at 2. As this Court observed, Defendants have thus made "fairly certain" that they "will have the necessary approvals promptly and intend[]

to begin construction immediately." PI Hr'g Tr. 6:17–20 (Oct. 30, 2026).

Defendants also assert that Plaintiffs "have not identified *any* concrete injury" they will suffer from the complete Arch or from its three-year period of construction in a busy traffic circle on their respective borders. Opp. 16 (emphasis added). Litigants "sometimes make standing law more complicated than it needs to be," *Bost*, 607 U.S. at 83 (citation omitted), and this case offers a prime illustration. Any one of the harms Plaintiffs have identified is sufficient to establish standing—and Defendants surely cannot run the table in showing that *none* is valid.

*First*, the Arch will increase traffic between the District and Virginia, impairing both jurisdictions' operations and requiring them to incur costs. Mot. 11–13. As Defendants' own assessment shows, the Arch's construction will "intensify congestion" in and around Memorial Circle and cause "increased queuing, intermittent delays, and less consistent traffic flow" for "all users" traveling between the District and Virginia. Ex. 8 ("Revised EA") at 51. This in turn will cause traffic to back up, *id.* at B-34, B-35, impact "the movement of District commuters, visitors, and emergency personnel," Mendelson Decl. ¶ 57, and force Plaintiffs to assess and respond to the potential traffic disruptions on their roadways to ensure that residents and visitors alike can move unimpeded. Mendelson Decl. ¶¶ 60–64.

That increased traffic—which Defendants do not dispute will occur—is a cognizable harm on its own. Mot. 12. Defendants suggest that the D.C. Circuit has found increased traffic to be a concrete injury only where the project that causes traffic is being constructed on (or "underneath") municipal property. Opp. 16 (quoting *City of Bos. Delegation v. FERC*, 897 F.3d 241, 251 (D.C. Cir. 2018)). But that artificial limitation finds no footing in the case law; on the contrary, the D.C. Circuit has explained—in discussing the very case Defendants cite—that it "has found that a town has a concrete interest in avoiding 'increased traffic, noise, and disruption of businesses.' " *Eagle*

*Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1170 (D.C. Cir. 2023), *rev'd on other grounds*, 605 U.S. 168 (2025) (quoting *City of Bos. Delegation*, 897 F.3d at 250); *see also Town of Barnstable v. FAA*, 740 F.3d 681, 691 (D.C. Cir. 2014) (municipality's standing to challenge actions that "adversely affect . . . traffic" "might well appear self-evident"); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198–99 (9th Cir. 2004) (holding that municipality's evidence of "detrimental increase in traffic . . . affecting municipal management and public safety functions" was cognizable injury). That is exactly the "concrete interest" Plaintiffs assert here.

Plaintiffs will also suffer injuries due to the obstacle the increased traffic will pose for emergency responders traveling between the District and Arlington. Mot. 12. The likelihood that first responders will need to travel on these roads is not "speculative." *Contra* Opp. 17. The District and Arlington have a mutual-aid agreement, Ex. 27, and the Chairman of the District's Council explains that the District in fact "provides emergency response services for Memorial Circle." Mendelson Decl. ¶ 67. It is thus all but certain—and at least "likely"—that responders will need to travel this route at some point during the three-year period of construction, and that the increased traffic will introduce delays that will impair their work. *Murthy*, 603 U.S. at 58.

It is likewise foreseeable that traffic during the construction of the Arch will deter visitors from traveling between the District and Arlington, chilling business activity and tourism. Mot. 12; *see Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (standing may be based on "the predictable effect of Government actions on the decisions of third parties"). Defendants counter that they believe the *completed* Arch will increase tourism. Opp. 17–18. That is a non-sequitur; Defendants' belief that the Arch will encourage more tourism *three years* from now does not negate the injuries Plaintiffs will suffer during traffic closures in the interim.

Finally, Defendants assert that the costs Plaintiffs would incur to assess and mitigate traffic

impacts are self-inflicted injuries foreclosed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). But the D.C. Circuit has recently and repeatedly explained that *Alliance* merely forecloses an organization from "establishing standing simply by spending money 'opposing those policies' that it dislike[s].' " *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1001 (D.C. Cir. 2025) (quoting *Alliance*, 602 U.S. at 394)). It does not foreclose standing where an organization—including a state or local government—demonstrates that it is required to "divert[] its resources to continue pursuing" its "core . . . activities." *Id.*; *see, e.g.*, *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1181 (D.C. Cir. 2025) (finding standing where a state incurred expenditures to train its firefighters on how to respond to risks created by federal rule). That is the case here. The District and Virginia have legal obligations as governments to maintain the free passage of passenger, freight, and emergency vehicles: the Mayor, for example, has a federal law obligation to maintain safe conditions on District roads, *see* D.C. Code § 9-101.01; *District of Columbia v. Caton*, 48 App. D.C. 96, 106 (1918), and Virginia has similar duties, *see* Va. Code §§ 33.2-223, 33.2-256. In line with these obligations, Plaintiffs must incur costs to study the impacts of Defendants' years-long closures at Memorial Circle on the District and Virginia, as well as to address the degradation in service on Virginia's roadways that Defendants have projected. Revised EA at B-24, B-30.

*Second*, the Arch will harm the District by requiring it to expend resources on emergency planning and preparedness. As Plaintiffs have explained, the Arch will require the District to plan for the increased threats posed by the Arch's height and military use and to account for traffic changes that will complicate existing plans to use Memorial Circle for disaster response and evacuation. Mot. 13–15. Defendants' repeated suggestion that the District is attempting to "spend [its] way into standing," Opp. 18, misunderstands the nature of the injury. The District is not complaining about voluntary expenditures to advocate against or oppose the Arch. *Cf. Alliance*,

602 U.S. at 394–95. It is identifying the need to expend additional resources to carry out one of its "core [governmental] activities," *Ctr. for Taxpayer Rights*, 190 F.4th at 1001: assessing risks, planning for emergencies, and preparing first responders to operate safely and effectively under foreseeable conditions. *Sierra Club*, 125 F.4th at 1181 (state demonstrated standing by showing that it expended resources on disaster preparedness to address elevated threat).

Contrary to Defendants' suggestion (Opp. 19), the fact that the location or timing of any given emergency is impossible to predict does not somehow make these preparations optional or unduly speculative. Every responsible government must engage in planning for high-consequence but low-probability events—a point that this White House recently emphasized. *See* National Resilience Strategy 7 (June 2026), https://tinyurl.com/2hyjtv6t ("State and local governments must develop and maintain capacity to effectively manage incidents affecting their communities" and "invest in emergency management as a core function of government"). In the District's case, such preparations are also mandated by Congress. *See* D.C. Code § 7-2201 (requiring District to adopt "plans and programs to provide necessary protection, relief, and assistance . . . in the event [a] disaster shall occur"). Here, those preparations necessarily include the possible disasters that may arise from the Arch—including the threats to aviation from the use of the Arch as a launching port for drones, an addition to the plan that postdated the FAA's review. Mot. 14–15.

*Third*, the Arch is likely to cause environmental harms that concretely injure the District. The excavation of the Arch site will either cause stormwater runoff that violates District law or necessitate the establishment of a erosion and sediment control plan that the District will need to review, monitor, and ensure compliance with. Mot. 15–17. Defendants assert that the risk of uncontrolled runoff is speculative because they might obtain a permit before construction begins. Opp. 20 n.4. But there is no indication that they have yet done so, and construction is set to begin

as soon as tomorrow. There is thus a high likelihood that Defendants will be in violation of District law—and produce uncontrolled runoff into its waters—when they begin construction.

Alternatively, if Defendants somehow seek and obtain a permit by the start of construction, the District will incur costs related to whatever erosion and sediment control plan Defendants develop. Mot. 16. Defendants minimize those injuries as the costs of "processing a permit application." Opp. 20. But that misdescribes the District's injuries, which would include monitoring, ensuring compliance with, and taking measures to enforce the plan to make sure the District itself adheres to federal law requiring it to maintain water quality standards in the Potomac. Mot. 16. The District cannot realistically forgo those costs.

Similarly, the District is obligated by its State Wildlife Action Plan to monitor the potential effects of the Arch construction on endangered and threatened species in the area. Mot. 17. Defendants suggest the District could simply revise its plan to remove the need to study those species. Opp. 20. That is wrong: the U.S. Fish and Wildlife Service approved the District's plan long before the Arch project, and it requires the District to take agreed-upon actions—including studying the impact of new projects on threatened wildlife—as a condition of federal funding. *See, e.g.*, Ex. 29 at 182, 184. The District cannot disregard that plan mid-stream.

*Fourth*, Plaintiffs have explained that the Arch will fundamentally change the character of the District and Virginia by altering the character and prominence of historic sites in both jurisdictions, interfering with the District's historic L'Enfant Plan, and impairing the District's interest in protecting historic properties that it owns. Mot. 17–18. Defendants claim that Plaintiffs' interests amount to nothing more than an "aesthetic injur[y]" that the Supreme Court rejected in its recent stay order. *See Nat'l Park Serv. v. Nat'l Tr. for Historic Preserv.*, 609 U.S. 1068 (2026) (per curiam). But the interests of the single passerby in that case bear no resemblance to two

governments' weighty interests in preserving their character and protecting their land use plans. The Supreme Court has long deemed these government interests "essential" to a "satisfactory quality of life in both urban and rural communities," *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981), and the D.C. Circuit has reaffirmed they can support Article III standing. *See Narragansett Indian Tribe ex rel. Narragansett Indian Tribe Hist. Pres. Officer*, 176 F.4th 671, 679 (D.C. Cir. 2026) (tribe was injured because "[h]ad adequate consultation occurred, . . . it could have obtained better protection over land that has deep cultural and historical significance for it."). The *National Trust* stay order says even less about a plaintiff's concrete interests in protecting its *own* property—interests that courts regularly protect. *See, e.g.*, *Oceans v. U.S. Dep't of Interior*, No. 1:24-CV-141, 2025 WL 973540, at *9 (D.D.C. Apr. 1, 2025) (finding standing due to the "anticipated decline in the historic and cultural value of [plaintiffs'] properties").

*Fifth*, and finally, the District and Virginia have also shown that Defendants violated three separate procedural rights, each of which caused a "distinct risk to a particularized interest" possessed by the Plaintiffs. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc); *see* Mot. 19–21. Defendants' failure to consult with the National Capital Memorial Advisory Commission (NCMAC) deprived the District's member on that Commission of the opportunity to advocate "alternatives sites and design concepts" that would protect the District's interests. 40 U.S.C. § 8905(a)(1). Defendants' failure to provide adequate information to the District's NCPC representatives will make it difficult for them to influence other members and thereby better protect the District's interests. Mot. 19–20. And Plaintiffs plainly have "articulated [a] procedural injury" under the National Historic Preservation Act (NHPA) that impairs their concrete interests. Opp. 22. Defendants' refusal to consult under the NHPA impaired Plaintiffs' ability to protect their interests, such as by meaningfully engaging on the Arch's location and

design. Mot. 37; *see* Maloney Decl. ¶¶ 60, 65; Kirchen Decl. ¶ 60.

### B. The Decision to Approve the Arch Is Final Agency Action.

Plaintiffs have challenged final agency action subject to APA review. Defendants do not dispute that, when Defendants formally approve the Arch, they will have taken final agency action. *See* Opp. 23. Plaintiffs have asked the Court to wait until Defendants issue such a decision before issuing a TRO or Section 705 stay, in order to avoid any conceivable dispute over finality. Mot. 44. Thus, both parties agree APA review will be proper at the time Plaintiffs request it.

It is therefore irrelevant whether Defendants have *already* taken final agency action. *Cf.* Opp. 23. Regardless, under the D.C. Circuit's "flexible" and "pragmatic" approach to finality, Defendants' conduct to date—which makes clear that they are "fairly certain" to proceed with construction—satisfies the threshold for APA review. *Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (citation omitted); *see supra* pp. 2–3. And even if there were a dispute about finality, Plaintiffs have advanced a variety of non-APA theories that do not turn on final agency action and that Defendants do not dispute. *See* Mot. 21.

### C. Plaintiffs Fall Within the Zone of Interests of Each Statute.

Plaintiffs also fall within the relevant statutes' zone of interests. As the Supreme Court has repeatedly instructed, the zone-of-interests test "is not meant to be especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and permits judicial review whenever "[t]he interest [the plaintiff] asserts [is] 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citation omitted). The test "do[es] not require any 'indication of congressional purpose to benefit the would-be plaintiff,' " and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the

statute that it cannot reasonably be assumed that Congress intended to permit the suit.' " *Id.* at 225. As Defendants acknowledge, many of Plaintiffs' asserted injuries fall within the zone of interests of the statutes at issue. *See, e.g.*, Opp. 25–27 (admitting that Plaintiffs' historic-preservation interests "likely fall within the zone of interests protected by" the CWA and NHPA and environmental interests fall within NEPA). And contrary to their suggestion, Plaintiffs' other harms fall comfortably within the statute's zone of interests, as well.

The CWA explicitly states that it is intended to protect interests similar to those Plaintiffs advance. In addition to the provisions that Defendants selectively quote (at 24–25), that statute states that it seeks "to ensure the continued public use and enjoyment of open space in the District of Columbia and its environs," to preserve "the urban fabric of the District of Columbia," and to protect "open space, existing public use, and cultural and natural resources" "to the maximum extent practicable." 40 U.S.C. §§ 8901(2), 8905(b)(2). The interests Plaintiffs assert in protecting continued public use of the District's roads, avoiding environmental damage, and maintaining the security of the District bear "a plausible relationship to the[se] policies." *Clarke*, 479 U.S. at 403.

Likewise, Plaintiffs fall within the zone of 40 U.S.C. § 8106 because they seek to ensure that federal construction in the District is consistent with the congressional plan. *See* Opp. 25. In asserting historic-preservation harms, Plaintiffs aim to vindicate Congress's interest in preserving "the integrity of the comprehensive design of the L'Enfant and McMillan plans for the Nation's Capital." 40 U.S.C. § 8901(1). And their remaining injuries all flow from congressional grants of authority to govern and protect the District in the manner Congress intended. *See supra* pp. 5–7.

Plaintiffs' interest in the Height of Buildings Act is similar. As Defendants admit, the Height Act is designed to ensure both the safety of buildings in the District and the preservation of the District's urban plan. Opp. 26. That is exactly what many of the District's harms concern:

ensuring that buildings are safe for the human and natural environment and that they do not disrupt the urban plan. Indeed, the Height Act explicitly defines violations of the Height Act as "common nuisances" and names the District's "Corporation Counsel"—currently known as the Attorney General—as the appropriate official to enforce violations. D.C. Code § 6-601.08.

There is also no serious dispute that Plaintiffs fall within the zone of interests of NEPA and NHPA. As to NEPA, Plaintiffs assert a series of injuries that Defendants *themselves* identified and discussed in their environmental assessment under that statute, including effects on historic properties, traffic, and water. *See* Revised EA at 32–44, 46–54. And NHPA expressly requires consultation with SHPOs to ensure that development respects historic properties and other local interests. *See* 54 U.S.C. §§ 306102(b), 306108.

Finally, Plaintiffs need not assert a violation of a "substantive statute" to assert an arbitrary-and-capricious claim under the APA. *Contra* Opp. 27. It is black-letter law that plaintiffs may challenge agency action as arbitrary and capricious even if it is authorized by statute; indeed, that standard applies even where an agency claims that failing to take a particular action would be "illegal." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 25 (2020). Plaintiffs therefore need not identify an underlying statute as the basis for such a claim. *Cf. Bennett v. Spear*, 520 U.S. 154, 160 (1997) (addressing zone-of-interests test in the context of a contrary to law claim).

## II. Plaintiffs Are Likely to Succeed on the Merits.

### A. The Arch Violates the Commemorative Works Act.

The Arch plainly violates the CWA. By Defendants' own description, the Arch is designed to "perpetuate in a permanent manner the memory" of the 250th anniversary of American independence. 40 U.S.C. § 8902(a)(1). And it has neither been "specifically authorized" by Congress, 40 U.S.C. § 8903(a)(1), nor reviewed through the process set forth in that statute, *see*

*id.* § 8905(a). It is therefore unlawful.

Defendants briefly suggest that the Arch is not a commemorative work because it might be designed to "'honor' or 'celebrate' the Nation's 250th anniversary" without seeking "to perpetuate the memory of that element of history." Opp. 28. That semantic quibble is meritless. A permanent monument designed to "honor" or "celebrate" an event necessarily seeks to perpetuate its memory. Indeed, when Congress has previously authorized monuments under the CWA, it has often stated that they serve to "honor" the designated person or event. *See, e.g.*, Pub. L. No. 106-348, § 1 (2000); Pub. L. No. 104-333, div. I, tit. V, § 508 (1996). And notwithstanding the musings of "one designer" months ago, Opp. 28, the final decisional documents that Defendants submitted to NCPC state unequivocally that the Arch is designed to "honor[]" and "celebrate" the nation's 250th anniversary. Revised EA at 1; Revised FONSI at 2.

Defendants also reprise their contention that, in the Memorial Bridge Act of 1925, Congress presciently authorized an arch designed to commemorate the 250th anniversary of American independence. Opp. 29. That implausible contention finds no footing in the text of the statute. As Defendants do not dispute, the Memorial Bridge Act nowhere mentions an arch. *See* Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 (1925). Nor does the "design . . . transmitted by said commission to Congress under date of April 22, 1924," which Congress expressly required the Memorial Bridge project to be constructed "in accordance with." *Id.* § 1; *see* Ex. 18.

Instead, Defendants claim that Congress permitted them to build any monument they wish in Memorial Circle because it stated that the Memorial Bridge Commission could "make such changes in design and location of *said bridge* without increasing the total cost of the project as in its discretion may be found to be necessary or advisable." Memorial Bridge Act § 1 (emphasis added). By its terms, however, this clause only permits changes to the design of the "bridge" itself.

When Congress wished to refer to the entirety of the plan for Memorial Circle, it consistently referred to it as the "project," including in the very clause on which Defendants rely. *See id* § 1 (authorizing alterations to "said *bridge* without increasing the total cost of the *project*" (emphases added)); *see also id.* §§ 2, 4, 7 (repeatedly referring to the "project" as distinct from the "bridge"). What is more, reading this clause to allow changes to any feature of the project would negate the preceding sentence, which—as noted—requires any construction to be "in accordance with" the plan submitted on April 22, 1924. *Id.* § 1. Courts do not generally read statutes in a way that causes one provision to render another meaningless.[1]

In addition to lacking any authorization in the Memorial Bridge Act, the Arch would violate the statute's timing and funding restrictions. Mot. 24–25. Defendants make no attempt to argue that a 101-year delay satisfies the statute's requirements to "proceed at once" with construction and to undertake the project "as speedily as practicable." Memorial Bridge Act §§ 1, 2. As to funding, Defendants incorrectly assert that all of the statute's funding restrictions refer to limits on "appropriations" alone. Opp. 29. Yet in the very clause Defendants stake their case on, Congress specified that any changes to the design may not "increas[e] the total *cost* of the project." *Id.* § 1 (emphasis added). Building a 250-foot, marble-plated Arch will obviously increase the project's "cost," regardless of whether that cost is borne through appropriations or private donations.

Finally, Defendants briefly suggest that NPS's organic statute authorizes construction. Opp. 27. That statute, however, merely authorizes NPS to "conserve" and leave "unimpaired" the

[1] As these textual indicia make clear, Congress did not "defin[e]" the term "bridge" to include every feature of the project. *Cf.* Opp. 29. The first sentence of section 1 authorizes the Memorial Bridge Commission to "proceed at once with the construction of a memorial bridge across the Potomac River . . . *together with* the landscape features *appertaining thereto*." Memorial Bridge Act § 1 (emphasis added). This language reinforces, not refutes, the plain-English understanding that the bridge and the surrounding landscape features are distinct objects.

"scenery, natural, and historic objects, and wild life" in the National Park System. 54 U.S.C. § 100101. It "says nothing about construction." *Nat'l Trust for Historic Preserv. in U.S. v. NPS*, 185 F.4th 1185, 1221 (D.C. Cir. 2026), *stay vacated on other grounds*, 609 U.S. 1068. And because it also says nothing about the construction of *commemorative works*, it cannot plausibly be construed as "authoriz[ation]" to construct a "commemorative work" exempt from the CWA. 40 U.S.C. § 8902(b). If it were otherwise, the CWA would be a dead letter, as NPS could point to the organic act as preexisting authorization to build a commemorative monument of any kind.

### B. The Arch Violates 40 U.S.C. § 8106.

Defendants likewise lack any plausible argument that the Arch complies with 40 U.S.C. § 8106. They do not dispute that the Arch is a "building or structure" that would be built on "reservation, park, or public grounds of the Federal Government." 40 U.S.C. § 8106. They claim (at 30) that the Memorial Bridge Act "expressly authorizes" the Arch. *Id.* But the Memorial Bridge Act cannot plausibly be viewed as "express authori[zation]" to build an arch that it says nothing about and that its text otherwise forecloses. 40 U.S.C. § 8106; *see supra* pp. 12–14.

Defendants say there is "good reason" to read an atextual exception in the statute that excludes NPS. Opp. 30. There is not. The fact that Congress at one time enacted an *additional* limitation on construction by NPS does not suggest that NPS is exempt from section 8106; it simply means the agency was required to comply with *both* limitations. *See* Mot. 25–26. And NPS's postenactment practice cannot negate the plain meaning of the statute Congress enacted, as the D.C. Circuit and four justices concluded in rejecting a similar argument several months ago. *See Nat'l Trust*, 185 F.4th at 1220; *Nat'l Trust*, 609 U.S at 1076–77 (Roberts, C.J., dissenting).

### C. The Arch Violates the Height of Buildings Act.

The Arch also violates the Height Act. That statute generally limits buildings in the District

to a maximum height of 130 feet. D.C. Code § 6-601.05(b). The Arch would exceed that limit almost twice over. It is therefore unlawful, and Defendants' contrary arguments are unavailing.

*First*, Defendants claim that the Height Act includes an unstated exemption for federal buildings. Opp. 31–35. That is not the case. On the contrary, when it enacted the Height Act of 1910, Congress *repealed* a prior enactment containing an exemption for federal and municipal buildings. *See* Mot. 29–30. Defendants suggest (at 31) that the exemption was not subject to the statute's repealing clause because it was not "in conflict" with the new statute. Height Act, Pub. L. No. 61-196, § 9, 36 Stat. 452, 455 (1910) (repealing "[a]ll laws in conflict herewith"). But a statute exempting federal and municipal buildings is plainly irreconcilable with a law providing that "[n]o building" shall be erected in excess of its height limits. *Id.* § 5. Nor is this a case (*contra* Opp. 32) where the presumption against implied repeals has work to do; Congress included an *express* repealing clause in the statute, and it must be read according to its terms.[2]

Defendants claim that Congress would have spoken more clearly had it wished the statute to apply to federal buildings. Opp. 32–33. If anything, the assumption runs the other way. If Congress had wished to preserve an exception for federal buildings—a topic that surely would have been top of mind when regulating construction in the District—it would have said so. It would not have accomplished this aim by enacting a sweeping repealer clause and then hoping that readers would infer that the words "[n]o buildings" include an unstated exception.

History also does not help Defendants. Defendants do not dispute that NCPC has consistently taken the position since at least 1938 that the Height Act applies to federal buildings, Mot. 30, nor that virtually every federal building in the District since 1910 has complied with that

[2] The legislative history reinforces this plain reading. The drafters of the 1910 act listed the provisions they believed were not repealed, and they did not include the exemption for federal and municipal buildings. *See* S. Rep. No. 61-581 at 2–3 (1910); H. Rep. No. 61-720 at 1–2 (1910).

statute. *See, e.g.*, Tr. for Nat'l Mall, Jefferson Memorial, https://tinyurl.com/bdrbtc65 (noting the Jefferson Memorial is 129 feet high). Defendants point to a single example from 1935 in which a federal building was constructed in arguable violation of the Act's limits. It is unclear what the legal basis for that decision was, and this isolated example is plainly less probative than the responsible agency's unbroken position for seven decades. Similarly uninformative is a 1988 statute providing that "[t]he height of the [Thurgood Marshall Building] shall be compatible with the height of surrounding Government and historic buildings and conform to the" Height Act. Pub. L. No. 100-480, § 3(a)(8)(B). Congress may have included the latter clause simply to clarify that the language about height earlier in the sentence did not override the Height Act; regardless, this provision does not plausibly shed light on the meaning of a statute enacted 78 years earlier.

Likewise, other zoning laws *undercut* Defendants' theory because they include an explicit carveout for federal buildings that does not extend to the Height Act. Mot. 30–31. Defendants' response—that Congress omitted the Height Act from this exemption because it does not apply to federal buildings in the first place, Opp. 34 n.7—simply assumes the conclusion of their argument.

*Second*, Defendants briefly claim that the Arch is not a "building" subject to the Height Act because it is not an "edifice that shelter[s] the activities occurring inside." Opp. 35. That peculiar formulation appears to be a definition of Defendants' own invention; it finds no basis in any dictionary, including the one they cite. *Cf.* Webster's Unabridged Dictionary at *1646 (1913) (defining a "building" as "[t]hat which is built" or an "edifice constructed"). Regardless, the Arch "shelter[s] the activities occurring inside," just like Defendants' example of a "church" or numerous other monuments that would readily be described as "buildings," such as the Lincoln Memorial. Further, the Height Act extends to buildings "erected, altered, or raised *in any manner*," D.C. Code § 6-601.05(b), a broad formulation that extends to all buildings, regardless of shape.

*Third*, Defendants claim that the Arch need not satisfy the Height Act because the Memorial Bridge Act "authorizes high structures." Opp. 35. But the Memorial Bridge Act did not give Defendants a blank check to build "high structures" of their choosing. It authorized construction of two *specific* sculptural features—namely, a pair of slender 166-foot columns designed to represent the unification of North and South. Memorial Bridge Act § 1; Ex. 18 at 9. Contrary to Defendants' perplexing suggestion (at 36), reading the Memorial Bridge Act as a blanket authorization to build structures in violation of the Height Act would surely render it "irreconcilable" with that statute, thereby triggering the presumption against implied repeals.

*Fourth*, and finally, Defendants claim that the Arch is exempt from the Height Act's 130-foot limit because it is built on a traffic circle. That is doubly incorrect. The Act designates all streets in the District as either "residential streets" or "business streets." *Compare* D.C. Code § 6-601.05(b), *with id.* § 6-601.05(c). Because Memorial Circle is not a residential street, it is a business street subject to the statute's 130-foot maximum. *See* NCPC, Height Master Plan for Washington, D.C. at 14 n.14 (2013), https://tinyurl.com/mtmj6ft3 ("The 1910 Height Act limits the height of buildings on all streets but Pennsylvania Avenue to 130 feet."). NCPC explained as much when it reviewed this project, noting that "[t]he HBA limits building height based on the width of the adjacent street with an absolute maximum height of 130 feet," and that the Arch violates the HBA because it is "above the 130-foot HBA limit." NCPC, Executive Director's Recommendation, at 10 (July 9, 2026), https://tinyurl.com/3w6hsvym. And contrary to Defendants' claim, no statute—including the one they cite—excludes streets in federal parkland from the definition of "business streets." *See* Pub. L. No. 58-13, 33 Stat. 10 (codified at D.C. Code § 9-1201.05) (authorizing designation of "business streets," with no exception for federal parks).

In any event, Defendants acknowledge that the Arch must, at minimum, comply with the

height limits in subsection (a) of the Height Act. *See* Opp. 37. That provision states that a building's height may not exceed the "the width of the street, avenue, or highway in its front, increased by 20 feet." D.C. Code § 6-601.05(a). Memorial Avenue—the street the comprises Memorial Circle—is, at its widest point, approximately 60 feet, Ex. 7 at 22, so this provision would appear to limit the height of any building in the circle to around 80 feet. Relying on a vacated 1986 district court opinion, Defendants instead attempt to measure the height of the arch by using the diameter of the land inside the traffic circle. But the statute's text looks to "the width of the *street, avenue, or highway*" in "front" of the building, not the surrounding landscape features. Even under this provision, then, the Arch exceeds the Height Act's limits.

### D. The Decision to Approve the Arch Is Arbitrary and Capricious.

Defendants have also violated the APA's arbitrary-and-capricious standard. They have neglected to explain or even acknowledge the military uses of the Arch that the federal government has repeatedly confirmed. Mot. 32–33. And they have refused to meaningfully consider alternatives to the construction of a 250-foot Arch in Memorial Circle. Mot. 33–34.

Defendants do not attempt to argue otherwise. Instead, they assert that the Arch is not subject to arbitrary and capricious review at all because there is no "statutory benchmark" against which to assess their conduct. Opp. 38. That is not how APA review works. Agencies must satisfy the reasoned decisionmaking requirement of the APA regardless of whether their conduct is authorized by statute. *See supra* p. 11. The cases Defendants cite (at Opp. 37) concern the narrow circumstances in which a matter is "committed to agency discretion by law." *Int'l Bhd. of Teamsters v. DOT*, 861 F.3d 944, 954 (9th Cir. 2017); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1207 (D.N.M. 2015). There is no plausible contention that Congress has given Defendants unfettered discretion to build whatever monuments they wish.

**E. Defendants Have Violated the National Environmental Policy Act.**

Defendants also violated NEPA. Instead of assessing a "range of reasonable alternatives" and taking a "hard look" at the consequences of their action, Defendants improperly disregarded an alternative that did not satisfy their exceedingly narrow parameters and refused to evaluate the military functions of the Arch. Mot. 34–36. Defendants assert that NEPA grants agencies broad discretion to select objectives and discard alternatives that do not satisfy them. Opp. 38. But as Defendants' own authority explains, that discretion may not be "exploited" to " 'define[] the objectives of [an] action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of [the] action.' " *Sierra Club v. FERC*, 145 F.4th 74, 87–88 (D.C. Cir. 2025) (citation omitted). That is precisely what Defendants did here: they insisted that the Arch meet criteria coterminous with the characteristics of the Arch they selected. Mot. 35. Defendants do not even defend two of those criteria: that the Arch must be 250 feet tall to match the number of years since independence and that it must be "grand and ornate." Revised EA at A-1 to A-2. And the sole criterion they do mention—that the Arch should achieve the objective of the 1925 Memorial Bridge Act, Opp. 35—fails to explain Defendants' refusal to consider a shorter monument or a design that actually matches the 166-foot columns authorized by that statute.

Defendants' appeal to "deference" is also unavailing. Although agencies' judgments under NEPA are entitled to deference, they must fall "within a broad zone of reasonableness." *Seven Cnty. Infra. Coal. v. Eagle Cnty.*, 605 U.S. 168, 183 (2025). It is patently unreasonable to assume, without analysis, that transforming an arch into a military institution replete with drones, snipers, and ammunition will have no environmental effects. *See NRDC v. Lujan*, 768 F. Supp. 870, 887 (D.D.C. 1991) (relying on "common sense" to reject agency's assumption that a change will be "environmentally insignificant"). And since Defendants conducted no analysis of these military

uses—nor attempted to consult the agencies with the agencies with expertise on these matters, *cf.* 42 U.S.C. § 4332(C)—there is simply no agency judgment for a court to defer to.

### F. Defendants Have Violated the National Historic Preservation Act.

Defendants violated the NHPA by failing to timely engage with the District's and Virginia's SHPOs, expediting consultations over the SHPOs' objection, and refusing to properly consult with the SHPOs about mitigating adverse effects. Mot. 36–38. Defendants respond that they did timely engage with the SHPOs, as required by 36 C.F.R. § 800.3. That is not true: Section 800.3 clearly states that the agency must "[i]dentify the appropriate SHPO," and then "consult[] with the SHPO" on a "plan for involving the public in the section 106 process." *Id.* § 800.3(c), (e). Defendants never consulted the SHPOs on such a plan. Instead, they waited to contact the SHPOs until after they announced the project publicly, and after "multiple rounds of public comment." Maloney Decl. ¶ 41; Kirchen Decl. ¶ 32. That does not come close to satisfying Section 800.3's requirements, or even NPS's own implementing regulations. *See* 63 Fed. Reg. 20504 ("Consultation should be undertaken early in the *planning stage* . . . ." (emphasis added)).

Defendants also claim that NPS's "Summary of Consultation" demonstrates that they did not "condense the multi-step consultation process over SHPO objection." Opp. 41 (citing Dkt. 95-2 at 6–7). In fact, that document shows that NPS had one public comment period on a draft assessment of effects (Step 3); then asked consulting parties for their comments on a list of historic properties within two weeks (Step 2); then asked the consulting parties to review a revised assessment of effects and a revised list of historic properties (Steps 2 and 3). Dkt. 95-2 at 6–7; *see* Kirchen Decl. ¶¶ 13–17. This kind of hopping back and forth only confirms that NPS was "address[ing] multiple steps" simultaneously without SHPO consent. 36 C.F.R. § 800.3(g).

The record also belies Defendants' claim (at 42) that they "did not fail to consider

alternatives" to the Arch. 36 C.F.R. § 800.6 and NPS regulations require "assessment of the widest range of preservation alternatives," which necessarily include site and design alternatives. 63 Fed. Reg. 20503. NPS considered neither: When the DC SHPO provided NPS with "several options for relocating the Arch" or changing its design, NPS "made clear that it has not and will not consider alternative sites for the Arch" and that it "will not be considering any design alternatives." Maloney Decl. ¶¶ 60, 65. And the very document Defendants cite clearly states that they were unwilling to consider a different site for the Arch: "Avoidance of adverse effects through relocation was not carried forward because the undertaking is inherently location dependent." Dkt. 95-2 at 36. As for the SHPOs' suggestions of a less-intrusive design (like the 1924 columns), NPS responded that this was simply "not consistent with the undertaking's purpose" because it had already decided to build an arch. Dkt. 95-2 at 37. NPS ultimately adopted a "laundry list of" mitigation measures that are "routine construction and land management requirements" that "do nothing to address the acknowledged 'substantial' adverse" effects of the Arch. Maloney Decl. ¶ 68. Far from showing an agency that was giving "full consideration" to alternatives, 63 Fed. Reg. 20503, this record only confirms that NPS, before speaking to the SHPOs, already decided what it wanted to build and where, and failed to even *consider* alternatives.

### III. Plaintiffs Have Established Irreparable Injury.

A threatened injury is "irreparable if it is 'certain and great,' 'actual and not theoretical,' and 'beyond remediation' at a later date." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1010 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016)). Construction of the Arch will immediately and irreparably harm the District and Virginia by clogging traffic, impeding disaster preparedness, and harming the environment; further, it will require both jurisdictions to expend resources to monitor and mitigate those impacts and inflict lasting damage on nationally significant

historic resources, including resources owned by the District. Mot. 38–42. Those harms will continue once construction is complete, and are compounded by the denial of the District's procedural rights under the CWA and both Plaintiffs' rights under the NHPA. Mot. 42.

Relying on *Alliance*, Defendants again accuse the District and Virginia of "manufactur[ing] . . . irreparable harm" and "spend[ing] [their] way into standing." Opp. 11 (quoting *Alliance*, 602 U.S. at 394). As already discussed, *Alliance* simply cannot bear the weight Defendants place on it. *See supra* p. 5. Nor are Virginia and the District trying to "spend their way into" anything. Virginia is a sovereign state charged with a duty to protect public safety, manage a transportation network, and safeguard environmental resources. Congress has entrusted the District with the same functions. Neither jurisdiction can sit idly by and allow a prolonged disruption to its transportation network, a years-long risk to public safety and the environment, or lasting injury to historic resources. *See, e.g.*, *Sierra Club*, 125 F.4th at 1181 ("Obviously, New York cannot wait until there is an LNG pool fire in its territory to begin spending funds on safety measures."). And the law is clear that when such "obstacles" make it "more difficult" for states to "accomplish [their] primary" governmental objectives, the States have harm that can be irreparable. *Ctr. for Taxpayer Rts.*, 190 F.4th at 1010 (citations omitted).

Defendants further contend that even if Plaintiffs' costs are cognizable, none of them are sufficiently "significant" to support *irreparable* harm. Opp. 13 (citing *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 37 (D.D.C. 2020)). This argument substantially understates the magnitude of Defendants' project. By their own account, as soon as the project begins, Defendants will shut down substantial portions of one of the District's busiest traffic circles, used by tens of thousands of commuters every week. Revised EA at 10. They predict 33 to 39 months of construction, twenty hours per day. *Id.* at 7–8, 10. During the first two to three months alone,

Defendants will excavate and haul away 1,400 truckloads of soil, at a rate of 80 to 100 truck trips per day. *Id.* at 9, A-4. That excavation will be followed by four to five months of continuous heavy-equipment operations to drill approximately 75 feet into the bedrock under Columbia Island. *Id.* at 7. Then, Defendants will erect tower cranes reaching 320 feet alongside the final approach path to Reagan Airport's Runway 19, as they begin to construct one of tallest buildings in the District. Mendelson Decl. ¶ 68. And Defendants acknowledge that while all of this is going on, traffic will build, increasing queuing and causing delays on surrounding roads. Revised EA at 51.

These construction-related impacts will inflict irreparable injury in themselves, as increased traffic will clog both jurisdictions' transit network, impede emergency response, and limit business and tourism between the District and Virginia. *See, e.g.*, *Nw. Pipeline Corp. v. 20' x '430' Pipeline Easement*, 197 F. Supp. 2d 1241, 1246 (E.D. Wash. 2002) (finding injuries from "increased traffic congestion and consequent safety problems" irreparable). And they will require an immediate response, including the devotion of substantial staff time and resources to ensure that core government operations—roadway safety, emergency services, environmental protection—can achieve their objectives despite the disruption caused by the Arch. By any measure, these costs, which will at least involve traffic forecasting, disaster planning, and substantial intergovernment and interagency coordination, Mendelson Decl. ¶¶ 57–72, are well within the threshold of significance that this Court has established for irreparable harm. *See District of Columbia*, 444 F. Supp. 3d at 38 (holding that "anticipated injuries are significant" for purposes of irreparable harm when they involve "rewriting legal notices," reviewing files, and "training staff and building technological infrastructure").

Plaintiffs will begin to incur these costs as soon as Defendants shut down Memorial Circle, and they will continue to incur them throughout the three-year construction period, which is no

"small amount of time." Tr. 19:17–18. These costs are unrecoverable due to the United States' sovereign immunity, and some are simply not quantifiable, as they result in diversion of resources from other pressing transportation, public-safety, and environmental priorities. Thus, "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (citation omitted).

Defendants claim that the harm to the District's historic plan and the historic properties in the District and Virginia is not yet irreparable because the "harm would not materialize for at least six months." Opp. 14–15. But once construction begins, it will inevitably be challenging for this Court to halt it. At that point, Defendants will have made substantial changes to the physical landscape—including excavating the ground, installing fences, reconfiguring traffic, and inserting foundational piles into the ground—that will themselves pose a continuing and irreparable threat to Plaintiffs' interests. And, Defendants, who are already warning the Court not to delay construction due to the Arch's supposed national-security functions (Opp. 44–45), will undoubtedly argue that any judicial order stopping construction mid-stream will pose a range of practical and safety problems. *See Nat'l Tr.*, 185 F.4th at 1207 (noting United States' argument that the "project's 'underground elements' . . . impacted national security"). Failing to issue an injunction before construction begins may thus impair the Court's ability to award effectual relief throughout the duration of the three-year construction project—which is no doubt why Defendants have gone to such lengths to begin construction before the Court can act. The Court should prevent Defendants from inflicting three years of irreparable costs and halt construction before it begins.

### IV. The Equities Favor the Issuance of a Temporary Restraining Order or Section 705 Stay.

The equities favor issuance of a TRO or a Section 705 stay. An injunction would preserve the status quo as it has existed for a century, prevent the construction of a plainly illegal monument, and avoid a litany of concrete harms to the public—including substantial noise, traffic, and

stormwater runoff into the Potomac. Mot. 43. These injuries are not "[un]support[ed]," Opp. 43; Defendants' own documents acknowledge they will begin to occur shortly after construction begins. *See* Revised EA at 47–48 (stormwater), 52–53 (traffic), 62–66 (noise).

By contrast, Defendants cannot identify any countervailing injury they would suffer from a 14-day delay in beginning construction. They point to eleventh-hour declarations that claim there would be "significant national security benefits" from using the completed Arch—a tourist attraction visited by up to 22,000 people per day—as a base for drones, ammunition and snipers. Opp. 43–45. Even Defendants, however, do not claim that those purported national security benefits would accrue until the Arch is completed approximately three years from now. A delay of two weeks in reaching that goal cannot be viewed as a meaningful harm.

In any event, this Court need not exhibit "a naiveté from which ordinary citizens are free." *Dep't of Commerce*, 588 U.S. at 785. Defendants did not mention national security uses of the Arch until the President posted about them in September. Ex. 15. Their final plans for the Arch contain no features adapted for such uses; they do not, for example, include secure communication facilities or safe storage for ammunition. And, as this Court has observed, Defendants' belated declarations "provide absolutely no detail or support for their conclusions." Tr. 58:4–5. It is difficult to escape the conclusion that Defendants' national-security justifications were "contrived" for litigation, *Dep't of Commerce*, 588 U.S. at 784, and that they do not provide any genuine reason why construction of this illegal monument should be permitted to proceed.

## CONCLUSION

The Court should grant Plaintiffs' motion for a temporary restraining order and a stay under 5 U.S.C. § 705, and it should administratively stay construction while it considers this Motion.

Dated: November 4, 2026

Respectfully submitted,

JAY JONES
Attorney General of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN (1672508)
MICHAEL K. PERLOFF (1601047)
Deputy Solicitors General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 997-5222
Email: mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (1026153)
ELIZA H. SIMON (90035651)
Senior Counsels to the Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH (1044671)
Senior Counsel to the Attorney General

/s/ Karthik P. Reddy
KARTHIK P. REDDY (1048848)
Special Assistant Attorney General
NICOLE S. HILL (888324938)
JOHN B. LYMAN (156467)
SAMANTHA HALL (1014735)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW
Washington, DC 20001
Tel: (202) 279-1261
Email: mitchell.reich@dc.gov

*Counsel for the District of Columbia*