**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MICHAEL LEMMON**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**DONALD J. TRUMP**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-544 (TSC) |
| **DISTRICT OF COLUMBIA** and **COMMONWEALTH OF VIRGINIA**,<br><br>*Plaintiffs*,<br><br>v.<br><br>**NATIONAL PARK SERVICE**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

**MEMORANDUM OPINION**

District of Columbia residents and visitors alike have long stood on the steps of the Lincoln Memorial and looked east. The view is among the most famous in the country: down the long expanse of the Reflecting Pool, past the World War II Memorial, to the Washington Monument, and, eventually, in the distance, the U.S. Capitol. On the other side of the Memorial, facing west, the city gives way to the Potomac River and the Arlington Memorial Bridge, which stretches across the water and toward Virginia. Across the river, where the bridge ends, is a traffic circle, or roundabout: Memorial Circle. That circle serves as a central link in a mile-long ceremonial, historic route that runs from the Lincoln Memorial, across the river, and down Memorial Avenue

to the gates of Arlington National Cemetery. Memorial Circle's construction began in 1940, and the land within it has remained undeveloped green space, affording an unobstructed view of Arlington Cemetery, for more than 85 years. Last October, President Trump announced plans to change that, declaring that he intended to build a 250-foot-tall arch in Memorial Circle.

Three Vietnam War veterans and an architectural historian sued in February 2026 to prevent the construction of the arch. *See* Compl., *Lemmon v. Trump*, No. 26-cv-544 (D.D.C. Feb. 19, 2026), ECF No. 1 ("*Lemmon* Compl.") ¶¶ 7–10. They allege that Defendants—President Trump, Domestic Policy Council Director Vince Haley, the Executive Office of the President of the United States, and the National Park Service ("NPS")—do not have the necessary congressional authorization to proceed with construction of the arch. *Id.* ¶¶ 53–57. Nonetheless, on October 21, 2026, Defendants filed notice that construction of the arch could begin as soon as November 5. ECF No. 63.

On October 31, 2026, Plaintiffs the District of Columbia ("the District") and the Commonwealth of Virginia ("Virginia") filed a separate action, asserting claims under the Administrative Procedure Act ("APA"), as well as ultra vires and mandamus claims. *See* Compl., *District of Columbia v. NPS*, No. 26-cv-3838 (D.D.C. Oct. 31, 2026), ECF No. 1 ("*D.C. & Va.* Compl.") ¶¶ 108–175. The court consolidated the cases. Order, *District of Columbia v. NPS*, No. 26-cv-3838 (D.D.C. Oct. 31, 2026), ECF No. 4. The Department of the Interior issued its final decision on November 5, 2026 approving construction of the arch. NPS, *Decision Record: Triumphal Arch at Memorial Circle* (Nov. 5, 2026), ECF No. 109-1 ("Decision Record").

Before the court are the *Lemmon* Plaintiffs' motion for preliminary injunction, ECF No. 64, No. 26-cv-544, and the District and Virginia's motion for a temporary restraining order ("TRO") and stay of agency action, No. 26-cv-3838, ECF No. 2. For the following reasons, the

court will GRANT the District and Virginia's motion for a temporary restraining order, DEFER ruling on the motion for stay of agency action, and HOLD IN ABEYANCE the *Lemmon* motion for a preliminary injunction.[1]

## I. BACKGROUND

### A. Legal Background

"Washington, D.C. has been a carefully planned city since it became the seat of the United States government in 1790." *DC Pres. League v. Bd. of Trs. of the John F. Kennedy Ctr. for the Performing Arts*, 2026 WL 1506709, at *2 (D.D.C. May 29, 2026) (citing *Planning History*, Nat'l Cap. Planning Comm'n, https://perma.cc/K6S8-6ZZG (last visited Nov. 2, 2026)). Congress has stewarded Washington's development throughout the twentieth century, passing multiple statutes to ensure continued oversight of the city's planning and growth. *See id.* Accordingly, these statutes have imposed restrictions on construction projects in the District and its environs.

In 1912, for example, Congress enacted a statute prohibiting construction of "any building or structure" on public, federal land in the District of Columbia "without express authority of Congress." Act of Aug. 24, 1912, Pub. L. No. 62-302, ch. 355, 37 Stat. 417, 444 (formerly codified at 40 U.S.C. § 68). That command, perhaps "the most straightforward of Congress's planning directives," remains in force today. *See DC Pres. League*, 2026 WL 1506709, at *2. Now codified at 40 U.S.C. § 8106, the statute provides in full: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

[1] Unless otherwise specified, all subsequent docket numbers refer to the docket of Case No. 26-cv-544.

Later in the twentieth century, Congress passed the Commemorative Works Act of 1986 ("CWA"), Pub. L. No. 99-652, 100 Stat. 3650 (codified as amended at 40 U.S.C. §§ 8901–8909), to "preserve the integrity of the comprehensive design of . . . the Nation's Capital," 40 U.S.C. § 8901(1). The CWA seeks to ensure that commemorative works on federally administered land are "appropriately designed, constructed, and located," and that they "reflect a consensus of the lasting national significance of the subjects involved." *Id.* § 8901(4). To this end, it imposes several procedural requirements for the construction of a "commemorative work," defined as "any statue, monument, sculpture, memorial, plaque, inscription, or other structure . . . designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." *Id.* § 8902(a)(1). The most salient of these is that any commemorative work erected in "areas administered by the National Park Service . . . in the District of Columbia and its environs" is to "be established . . . only as specifically authorized by law" by Congress, and "subject to applicable" procedures. *Id.* §§ 8901(4), 8903(a)(1), (a)(2). Among these procedures is the requirement of a "sponsor authorized by law to establish a commemorative work." *Id.* § 8905.

Separately, federal construction in the District is subject to review by two planning bodies: the National Capital Planning Commission ("NCPC"), which must approve the site and building plans for federal projects in the District, *see* 40 U.S.C. § 8722(b)(1), (d), and the Commission of Fine Arts ("CFA"), which advises on the design and location of monuments in the District's public spaces, *see* 40 U.S.C. § 9102(a).

**B. Factual and Procedural Background**

In October 2025, President Trump announced plans to build a new monument on Memorial Circle. *Lemmon* Compl. ¶¶ 29–30. On various occasions, the project has taken on different names,

including the "Independence Arch" and the "Triumphal Arch." *See id.* ¶¶ 29–37. The court refers to it here simply as "the Arch." Since the initial announcement, the President has discussed his plans on social media, at press conferences, and during White House dinners. *See id.* ¶¶ 30–36. He has displayed models and diagrams of the Arch. *Id.* According to an October 9, 2026 NPS Revised Environmental Assessment, the Arch is planned to stand 250 feet tall—more than double the height of the Lincoln Memorial. *Lemmon* Defs.' Opp'n to Pls.' Second Mot. for Prelim. Inj., Ex. A ("Revised EA") at 3, ECF No. 74-1. The Arch is slated for construction on Memorial Circle—a park administered by NPS and located in Washington, D.C., between the Lincoln Memorial and Arlington National Cemetery. Revised EA at 1, 3, 55; *D.C. & Va.* Compl. ¶ 44 ("Today, Memorial Circle, located within the boundaries of the District of Columbia in Lady Bird Johnson Park, connects Arlington Memorial Bridge to Memorial Avenue, forming a gateway to Arlington National Cemetery.").

The project has rapidly advanced. *See D.C. & Va.* Defs.' Opp'n to Pls.' Mot. for a TRO ("Opp'n") at 9, ECF No. 95. The CFA has approved the design; the Federal Aviation Administration issued a determination of no hazard to air navigation; and the NCPC gave preliminary approval to site and building plans. *Id.* NPS's Revised Environmental Assessment found adverse effects on historic properties, including Arlington National Cemetery and the Lincoln Memorial, and described the Arch as a commemorative feature celebrating 250 years of independence. Revised EA at 1, 84; *id.* App. C at 27–53 (stating Arch "would result in adverse effects to" many historic properties including "Memorial Avenue Corridor Cultural Landscape" and "Arlington National Cemetery Historic District"). That Assessment projects two to three months of site preparation and excavation, four to five months of foundation work, and two to three years of construction in total. Revised EA at 7–8, 52.

**1. *Lemmon v. Trump*, No. 26-cv-544**

On February 19, 2026, three Vietnam War veterans and an architectural historian sued, alleging the construction of the Arch was proceeding without necessary congressional authorization. *Lemmon* Compl. ¶¶ 53–57.

The Veteran Plaintiffs are Michael Lemmon, Shaun Byrnes, and Jon Gundersen. Lemmon was drafted into the Army in 1966 and served as a helicopter pilot in Vietnam. Decl. of Michael Lemmon ¶ 2, ECF No. 7-2. He now lives in Washington, D.C. *Id.* ¶ 7. For decades, he has visited the gravesites of fellow veterans buried at Arlington National Cemetery and attended ceremonies there. *Id.* ¶ 6. He hopes to be buried at Arlington alongside his fallen comrades. *Id.* ¶ 9. Byrnes—who lives in Falls Church, Virginia—served in the Navy. Decl. of Shaun Byrnes ¶¶ 2–3, 8, ECF No. 7-3. In October 1965, while aboard a destroyer supporting operations in Vietnam, he suffered burns over half of his body and was hospitalized for seven months, then volunteered to return to active duty. *Id.* ¶ 3. Two of his shipmates are buried at Arlington National Cemetery; he visits their graves, regularly brings visiting foreign friends to the cemetery, and hopes one day to be buried there. *Id.* ¶ 8. Gundersen served as an Army lieutenant in Vietnam beginning in 1968. Decl. of Jon Gundersen ¶¶ 2–3, ECF No. 7-4. He now lives in South Carolina. *Id.* ¶ 6. Once or twice a year, he travels to Washington to visit Arlington National Cemetery and honor comrades buried there, and he intends to continue those visits. *Id.* ¶¶ 6–7.

Plaintiff Calder Loth worked for forty years at the Virginia Department of Historic Resources, most recently as Senior Architectural Historian, and has led tours of Washington's classical architecture. Decl. of Calder Loth ¶¶ 2–3, ECF No. 7-5. Loth studies and photographs the reciprocal views between the Lincoln Memorial and Arlington National Cemetery, and he intends to continue doing so. *Id.* ¶¶ 5–7; *see also Lemmon* Compl. ¶ 10.

The *Lemmon* Plaintiffs bring two claims. Count One asserts that Defendants' Arch proposal was *ultra vires*—in excess of legal authority and without congressional approval—in violation of 40 U.S.C. § 8106, the CWA, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), and the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108. *Lemmon* Compl. ¶¶ 52–59. Count Two, brought against President Trump, alleges that the President's actions have violated the Take Care Clause of the Constitution, which "limits the President's power and ensures that he will faithfully execute Congress's laws." *Id.* ¶¶ 60–64.

Shortly after filing suit, on February 27, 2026, the *Lemmon* Plaintiffs moved for a preliminary injunction. *Lemmon* Pls.' First Mot. for Prelim. Inj., ECF No. 7. They asked the court to (1) declare construction of the Arch without congressional authorization unlawful, (2) enjoin Defendants Haley and the Executive Office of the President from taking any steps to construct the Arch without congressional authorization, and (3) enjoin NPS from authorizing or permitting construction of the Arch without congressional authorization. *Lemmon* Pls.' Mem. Supp. First Mot. for Prelim. Inj. at 24, ECF No. 7-1. Defendants opposed the preliminary injunction, arguing that there had been no "final decision on arch design, subject, construction timeline," and therefore Plaintiffs' claims were "clearly unripe for judicial resolution." *Lemmon* Defs.' Opp'n to First Mot. for Prelim. Inj. at 1, ECF No. 12. Plaintiffs filed a reply on March 13, 2026. *Lemmon* Pls.' Reply in Supp. of First Mot. for Prelim. Inj., ECF No. 13.

The court held a hearing on the motion for a preliminary injunction on April 2, 2026. *See* Apr. 2, 2026 Hr'g Tr., ECF No. 19. After that hearing, the parties jointly represented that the then-pending motion for a preliminary injunction would be resolved through a proposed consent order. *See* Joint Status Report, Apr. 6, 2026, ECF No. 22. The parties proposed, and the court entered, an order providing that NPS "shall not authorize construction of an arch on Memorial Circle to

begin before NPS has published a notice" and that NPS "shall provide at least fourteen days' notice prior to commencement of construction, or demolition in preparation for construction, of an arch on Memorial Circle." *See* Apr. 8, 2026 Consent Order at 1, ECF No. 26. Given that agreement, Plaintiffs' motion for a preliminary injunction was denied without prejudice. *Id.*

Defendants filed a motion to dismiss on April 28, 2026, ECF No. 31, Plaintiffs filed their opposition on May 12, 2026, ECF No. 33, and Defendants filed their reply on May 26, 2026, ECF No. 35. Plaintiffs then filed a motion for summary judgment on May 27, 2026. *See Lemmon* Pls.' Mot. for Summ. J., ECF No. 36. In response, Defendants filed a combined opposition to Plaintiffs' motion and a cross-motion for summary judgment. *Lemmon* Defs.' Cross Mot. for Summ. J., ECF No. 44.

On September 3, 2026, the Secretary of the Interior announced that Defendants were "preparing to start, over the next two-week period, the excavation work necessary for the Great Triumphal Arch . . . at Memorial Circle." *Lemmon* Pls.' Mem. Supp. Mot. for TRO at 1, ECF No. 56-1 (quoting Sec'y Doug Burgum (@SecretaryBurgum), X (Sept. 3, 2026, 3:01 PM)). The next day, Plaintiffs moved for a temporary restraining order barring Defendants from "taking any steps to construct or to direct or facilitate construction of any structure in Memorial Circle absent congressional authorization." *Lemmon* Pls.' Mot. for TRO at 1, ECF No. 56. Defendants responded that the planned activity was the mechanical excavation of four test pits to identify archaeological resources, which they claimed "is not construction, or demolition in preparation for construction, of an arch." Defs.' Resp. at 2, ECF No. 57.

On September 4, 2026, the court ordered Defendants to "provide the court with 48 hours' notice before engaging in any activity on Memorial Circle other than on-site information gathering." Sept. 4, 2026 Minute Order. The court reminded Defendants that "any construction

or demolition in preparation for construction before the National Park Service issues final agency action authorizing construction or without 14 days' notice would be a violation of this Order" and of the previous Consent Order. *Id.* Defendants then moved to dissolve or clarify the September 4 Order, contending that it interfered with public safety and routine park maintenance. Defs.' Mot. to Dissolve or Clarify, ECF No. 58. On September 17, 2026, the court clarified that the words "any activity" in the Order "apply only to activities related to or in preparation for the construction of an arch on Memorial Circle" and "do not apply to emergency response or routine park maintenance activities unrelated to the planned arch." Sept. 17, 2026 Minute Order. Because both parties agreed that the September 4, 2026 Minute Order fully resolved the issue, the court denied Plaintiffs' motion for a temporary restraining order as moot. *Id.*

On October 21, 2026, pursuant to the court's April 8, 2026 Consent Order, Defendants filed notice that the NCPC is scheduled to meet to consider the Arch proposal on November 5, 2026. ECF No. 63. Defendants stated that if the NCPC approves the Arch proposal, and if the Department of the Interior thereafter issues a final decision authorizing construction, then "construction or demolition in preparation for construction of an arch on Memorial Circle could commence immediately upon the [NPS] publishing a notice of that authorization." *Id.* The notice also stated that NPS "may publish such notice as early as November 5, 2026," and construction could begin as early as that same date. *Id.* Prompted by Defendants' notice, Plaintiffs filed a second motion for a preliminary injunction on October 22, 2026. *Lemmon* Pls.' Second Mot. for Prelim. Inj., ECF No. 64. Defendants filed their opposition on October 28, 2026. ECF No. 74. Alongside that response, Defendants submitted NPS's Revised Environmental Assessment and historical correspondence regarding the Arlington Memorial Bridge Commission. *See* Revised EA, ECF No. 74-1. They also submitted declarations from the Secretaries of War and Homeland

Security, which—for the first time in this litigation—describe the Arch as a potential platform for supporting "coordinated protective operations." Decl. of Pete Hegseth, Sec'y of War ("Hegseth Decl.") ¶¶ 10–12, ECF No. 74-9; *see also* Decl. of Markwayne Mullin, Sec'y of Homeland Sec. ("Mullin Decl.") ¶¶ 12–18, ECF No. 74-8. Plaintiffs filed their reply on October 29, 2026. ECF No. 85. The court heard argument the next day.

**2. *District of Columbia v. National Park Service*, No. 26-cv-3838**

On October 31, 2026, the District of Columbia and Virginia filed their own lawsuit against NPS; Jessica Bowron, in her official capacity as Comptroller Exercising the Delegated Authority of the Director of NPS; the U.S. Department of the Interior; and Doug Burgum, in his official capacity as Secretary of the Interior. *D.C. & Va*. Compl. ¶¶ 10–13. The District and Virginia allege that the construction of the Arch "will inflict immediate and irreparable harm on the District and Virginia," as the Arch is "slated to be built on a busy traffic circle that abuts the border between the jurisdictions, at the center of a historic viewshed, in a river whose environment the District has a statutory responsibility to protect." *Id.* ¶ 65. They further allege that construction would "clog traffic," cause the District to "expend additional resources on emergency planning and preparedness," have "environmental impacts," and "change the District's historic character." *Id.* ¶¶ 66, 72, 79, 88.

The District and Virginia bring eight claims, six under the APA, alleging that Defendants' actions violate the CWA, 40 U.S.C. § 8106, the Height of Buildings Act, the NHPA, and NEPA, and are arbitrary and capricious; one ultra vires claim; and one claim for mandamus and prohibition. *Id.* ¶¶ 108–175. The court consolidated the District and Virginia suit with *Lemmon*. Order (Oct. 31, 2026), *District of Columbia v. NPS*, No. 26-cv-3838, ECF No. 4.

Alongside their Complaint, the District and Virginia moved for a temporary restraining order and a stay of agency action. *D.C. & Va.* Pls.' Mot. for TRO, *District of Columbia v. NPS*, No. 26-cv-3838, ECF No. 2. Briefing on that motion was completed on November 4, 2026. *See D.C. & Va.* Defs.' Opp'n to Pls.' Mot. for TRO, ECF No. 95; *D.C. & Va.* Pls.' Reply Supp. Mot. for TRO ("Reply"), ECF No. 100.

## II. LEGAL STANDARDS

### A. Temporary Restraining Order

A temporary restraining order, like a preliminary injunction, "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) ("The same standards apply for both temporary restraining orders and preliminary injunctions." (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977))). To make this showing, the movant must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1233 (D.C. Cir. 2025). Where, as here, "the Government is the opposing party," the balance of the equities and the public interest "merge." *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1011 (D.C. Cir. 2026) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### B. Stay of Agency Action

Section 705 of the APA authorizes a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights

pending conclusion of the review proceedings" on "such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for obtaining a Section 705 stay is the same as that for obtaining a preliminary injunction. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (citing *Holiday Tours, Inc.*, 559 F.2d at 843). But the two remedies differ in nature, "with an injunction commanding a party and a stay suspending the agency action itself." *Coal. for Indep. Tech. Rsch. v. Rubio*, 836 F. Supp. 3d 215, 232 (D.D.C. 2026) (citing *Nken*, 556 U.S. at 428–29).

## III. ANALYSIS

### A. TRO and Stay Factors

All four factors—the likelihood of success on the merits, irreparable harm, public interest, and the balance of the equities—favor the District and Virginia.

#### 1. Likelihood of Success on the Merits

The first factor, the "likelihood of success on the merits, is the 'most important factor.'" *Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*, 187 F.4th 616, 625 (D.C. Cir. 2026) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). In the context of preliminary relief, "the 'merits' on which a plaintiff must show a likelihood of success encompass both substantive theories *and* establishment of jurisdiction." *Id.* (cleaned up) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

##### i. Standing

A threshold requirement for federal jurisdiction is that a plaintiff have "standing to sue under Article III of the Constitution." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). To establish standing, a plaintiff must demonstrate "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii)

that the injury likely would be redressed by the requested judicial relief." *Id.* at 380. A plaintiff moving for a temporary restraining order must "'clearly' show that it is 'likely to establish each element of standing.'" *Nat'l Tr. for Historic Pres. v. NPS*, 185 F.4th 1185, 1207 (D.C. Cir. 2026) (alteration omitted) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). And although "states lack 'standing as *parens patriae* to bring an action against the Federal Government'"—i.e., they "cannot sue the federal government on behalf of their injured state citizens"—a government "that demonstrates direct harm to *its* economic, environmental, or administrative interests as a result of federal action may have standing to sue." *Clean Wis. v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (per curiam) (emphasis added) (quoting *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)).

The District and Virginia have demonstrated a "substantial likelihood" of standing. *Mennonite Church USA v. DHS*, No. 25-5209, slip op. at 11 (D.C. Cir. Oct. 20, 2026) (quoting *Food & Water Watch*, 808 F.3d at 913). Because the District and Virginia seek "prospective relief," they must "establish a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). And the threatened harm must be "concrete" and "particularized." *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 409).

The District and Virginia face tangible economic harms from the construction of the Arch. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The record indicates that construction will lead to "lane closures," "reconfigurations," and "detours," as well as lead to "reducing westbound traffic from Arlington Memorial Bridge to two lanes," "restricting eastbound traffic," "prohibiting northbound traffic from . . . entering the circle," and requiring additional changes to traffic patterns. Revised EA at 53. Even once the Arch is complete, new traffic patterns at

Memorial Circle—created to accommodate thousands of expected daily visitors—could "result[] in significant delay[s]" in the circulation of traffic, "reduced maneuverability, and limited ability to recover from disruptions." *Id.* at 54. NPS's Revised Environmental Assessment indicates that Memorial Circle already "experience[s] periods of heavy" traffic, particularly during peak commuting hours "when inbound traffic toward Washington, D.C. is at its highest." *Id.* at 50. The congestion is not expected to improve: Defendants "project[]" that traffic will "remain high under future peak-hour conditions." *Id.*

All of this would require the District and Virginia to expend resources in assessing and responding to the congestion. Defendants' own projections demonstrate that the Arch will disrupt the level of service on roadways maintained by Virginia. *See* Revised EA at B-24 to B-27, B-30 (Richmond Highway ramps). And both during and after construction the Arch will affect the "movement of" thousands of "District commuters, visitors, and emergency personnel." *See* Decl. of Phil Mendelson ("Mendelson Decl.") ¶ 57, ECF No. 2-4, Case No. 26-cv-3838. As the Chairman of the D.C. Council avers, the D.C. Department of Transportation ("DDOT") will need to "expend staff time and operating resources" to "affirmatively and proactively manage temporary detours, crashes or disabled vehicles, unanticipated incidents, major special events, or changed construction conditions." Mendelson Decl. ¶ 62. Indeed, "continued transportation planning and coordination to assess the impact of the Arch on the District, both when construction begins and for years into the future" will consume resources the DDOT could spend elsewhere. *Id.* ¶¶ 62, 64.

Where, as here, governmental action "causes a state to undertake 'expenditures to mitigate and recover from harms that could have been prevented'" by the absence of that action, "the state suffers an injury to its proprietary interest sufficient to confer standing." *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1181 (D.C. Cir. 2025) (quoting *Air All. Hous. v. EPA*, 906 F.3d 1049,

1059–60 (D.C. Cir. 2018)). Indeed, the D.C. Circuit has recognized that "exacerbated administrative costs and burdens imposed" on state and local governments, such as the ones the construction of the Arch threaten to impose, "constitute a concrete and particularized injury" for standing purposes. *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) (citing *Clean Wis.*, 964 F.3d at 1158). Nor are these harms "speculative." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (quoting *All. for Hippocratic Med.*, 602 U.S. at 381). Defendants have told this court that construction of the Arch "could commence as early as" the day NPS approves it. *See* Notice, ECF No. 63. And the threatened harms will materialize as soon as construction begins, in part because the traffic disruptions will occur immediately. Accordingly, these harms are "real and immediate" for standing purposes. *Murthy*, 603 U.S. at 58 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

Defendants protest that "standing is assessed 'at the time the action commences,'" and that, "[a]s of October 31, 2026," the NCPC had not voted to approve the project, nor had Interior issued a final decision authorizing construction. Opp'n at 15. Defendants thus insist that "Plaintiffs will be unable to establish standing until they file an amended complaint after Interior issues a final decision." Opp'n at 15–16 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000)). But that argument mistakes final agency action—which is a merits question under the APA—with standing. "[I]t is 'now firmly established' that finality under the APA is non-jurisdictional." *Flytenow, Inc. v. FAA*, 808 F.3d 882, 888 (D.C. Cir. 2015) (quoting *Vietnam Veterans of Am. v. Shinseki,* 599 F.3d 654, 661 (D.C. Cir. 2010)). In other words, the absence of final agency action can no more deprive a court of jurisdiction than the presence of it can confer jurisdiction where none exists. The appropriate standing inquiry, therefore, is whether, on October 31, there was a "substantial risk" of harm "in the near future." *Murthy*, 603 U.S. at 58.

That standard is amply met here. In their notice to this court, Defendants stated that the NCPC would meet on November 5, that NPS approval could occur "as early as" the same day, and that construction could also begin "as early as" that day. Notice, ECF No. 63. The District and Virginia filed suit five days before November 5. Given the timeline, and that (1) the NCPC had approved preliminary designs in July by an 8–1 vote,[2] (2) substantial elements of the designs remained unchanged since that meeting,[3] and (3) the NCPC meeting on November 5 was the final external review before the project's approval, there was plainly a "substantial risk" on October 31 that harm would occur "in the near future." *Murthy*, 603 U.S. at 58.

Next, Defendants insist that the District and Virginia "cannot establish standing based on the costs of assessing and studying the Arch project's impacts or mitigation planning" because "[n]o law obligates" them "to spend money" for those purposes, Opp'n at 17 (quoting D.C. & Va. Compl. ¶ 71), and a plaintiff "who 'has not suffered a concrete injury caused by a defendant's action cannot spend his way into standing,'" *id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 394). But Defendants' own materials show that their actions will significantly increase congestion not only during construction of the Arch, but even once it is completed. *See* Revised EA at 50–54, B-24 to B-30. And it is a "commonsense inference[]" that when nearby construction threatens to clog a major artery to a city, the city will take measures to assess and overcome its effects. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 190 (2026) (quoting *Diamond Alt. Energy*, 606 U.S. at 116). No law obligating such expenditures is required.

---

[2] *See* Associated Press & Darlene Superville, *Trump's Plan for a Triumphal Arch in DC Wins Early Approval from a Key Federal Agency*, WECT News 6 (July 10, 2026, at 00:46 ET), https://perma.cc/KC4X-5ALR.

[3] U.S. Dep't of the Interior, *Synopsis for the New Monumental Arch*, at 1, https://perma.cc/G5GF-F2W5 (last visited Nov. 3, 2026).

Put differently, the District and Virginia's economic harm is "fairly traceable" to Defendants' actions because they would have no "incentive to engage in []any of the[se] countermeasures" were the Arch not being constructed. *Clapper*, 568 U.S. at 417. And because Defendants' "action causes" the harm faced by the District and Virginia, enjoining the construction of the Arch will likely redress their injuries. *All. for Hippocratic Med.*, 602 U.S. at 381. Defendants' belated and unsupported assertion that the Arch will yield national security benefits does not alter this analysis. *See infra* Part III.A.3. Accordingly, the District and Virginia have demonstrated a "substantial likelihood" of standing. *Mennonite Church*, No. 25-5209, slip op. at 11 (quoting *Food & Water Watch*, 808 F.3d at 913).

**ii. APA Claims**

Turning to the merits of their claims, the District and Virginia argue, *inter alia*, that Interior's final approval violates the CWA and is therefore contrary to law under the APA. *See* 5 U.S.C. § 706(2)(A), (C); *D.C. & Va.* Compl. ¶¶ 108–117. In response, Defendants contend that the harms the District and Virginia face fall outside the zone of interests protected by the CWA, and that in any event, Congress has authorized the construction of the Arch. *See* Opp'n at 24–30. On the record before the court, the District and Virginia are likely to succeed.

**a. Final Agency Action**

The APA restricts judicial review to "final agency action." 5 U.S.C. § 704. That requirement is met here, as Defendants have conceded that the Department of the Interior's approval, following NCPC authorization, is "final agency action" within the meaning of the APA. *See* Oct. 30, 2026 Hr'g Tr. 51:4–10, ECF No. 89 (conceding as much); *Lemmon* Defs.' Reply to Opp'n to Mot. for Summ. J. at 1, ECF No. 51 (same); Decl. of Joshua Fisher ("Fisher Decl.") ¶ 4, ECF No. 24-1 (averring that NPS's "authorizing arch construction to proceed" will constitute

"final agency action"); *Decision Record,* ECF No. 109-1. And for good reason: the approval appears to (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) "determine 'rights or obligations,' or produce 'legal consequences.'" *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). As to the first prong, there is nothing "tentative" or "interlocutory" about Interior's decision, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005), which has come after months of assessments,[4] reviews from the CFA and the NCPC,[5] and the emergence of a "final design." Oct 30, 2026 Hr'g Tr. 48:15. Defendants have themselves characterized the decision of the Department of the Interior—which houses NPS—following the NCPC's approval as "a final decision" on the Arch. ECF No. 63. So Interior's approval is plainly the culmination of its decisionmaking process.

As for the second prong, Interior's final approval carries significant legal consequences: it authorizes the construction of a 250-foot arch over a period of roughly three years that will disrupt traffic, create noise, result in large-scale excavation, and more. *See* Revised EA at 11–68. The approval will authorize the exclusion of the public from the construction area, divert traffic, and create what will amount to legal nuisances. These "concrete consequences" make it clear that the second prong of the finality analysis is also met. *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (quoting *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020)). Accordingly, the approval is likely final agency action.

---

[4] *See, e.g.*, NPS, *Triumphal Arch at Memorial Circle: Revised Environmental Assessment* (Oct. 9, 2026), https://perma.cc/G2Q6-RWK6.

[5] *See, e.g.*, NCPC, *Commission Action* (July 9, 2026), https://perma.cc/UER7-3MJJ.

**b. Zone of Interests**

In addition to demonstrating final agency action, a plaintiff suing under the APA must show that "[t]he interest he asserts . . . [is] 'arguably within the zone of interests to be protected . . . by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). As the APA makes "agency action presumptively reviewable," this test "is not meant to be especially demanding." *Id*. at 225 (quoting *Camp*, 397 U.S. at 153, and *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403 (1987)). The injury need only "bear[] a 'plausible relationship to the policies' underlying" the statute. *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 593 (D.C. Cir. 2022) (citing *Clarke*, 479 U.S. at 403).

Defendants insist that the District and Virginia cannot invoke the CWA because the harms they have pleaded for standing purposes fall outside "the zone of interests" protected by the statute. Opp'n at 25. But one of the CWA's express purposes is "to ensure that future commemorative works . . . in the District of Columbia and its environs . . . are appropriately designed, constructed, and located." 40 U.S.C. §§ 8901(4)(A). And the District and Virginia's threatened economic injuries, which are tied to increased traffic, delays, and disruption, arise out of the scale of the Arch, its multi-year construction, and its location at a traffic nerve center in the area. Because these harms "bear[] a 'plausible relationship to the policies' underlying" the CWA, they fall within the zone of interests protected by the statute. *CSL Plasma*, 33 F.4th at 593 (citing *Clarke*, 479 U.S. at 403).

### c. Agency Action That Is Contrary to Law

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," "without observance of procedure required by law," or "otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C), (D). In determining whether an agency has violated a statute's congressional command, courts "'decide all relevant questions of law' and 'interpret . . . statutory provisions'" without deference to the agency's position. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398 (2024) (emphasis and alteration omitted) (quoting 5 U.S.C. § 706). That means interpreting "the relevant statutory provisions *de novo*." *Michigan v. U.S. Dep't of Energy*, No. 25-1159, slip op. at 25 (D.C. Cir. Sept. 11, 2026) (citing *Loper Bright*, 603 U.S. at 400–01).

The District and Virginia have established that construction of the Arch likely violates the CWA, 40 U.S.C. §§ 8901-8909. The CWA imposes a series of procedural requirements before any "commemorative work," defined as a "statue, monument, sculpture, memorial, plaque, inscription or other structure . . . designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history," may be erected. *Id.* § 8902(a)(1). Foremost is that any work in "areas administered by the National Park Service . . . in the District of Columbia and its environs" must "be established . . . only as specifically authorized by law" by Congress. *Id.* §§ 8901(4), 8903(a)(1). Moreover, it must be built "subject to applicable" procedures. *Id.* § 8903(a)(2). For example, "[i]n considering legislation authorizing commemorative works in the District of Columbia and its environs, the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate" are required to "solicit the views of the National Capital Memorial Advisory Commission." *Id.* § 8903(d). Congress must also appoint a "sponsor authorized by law to

establish a commemorative work" who "must consult with the National Capital Memorial Advisory Commission regarding the selection of alternative sites and design concepts for the commemorative work." *Id.* § 8905(a), (a)(1).

Defendants complied with none of these procedures. Congress has not enacted any statute authorizing construction of the Arch, as it has for other commemorative works in the District. *See, e.g.*, Act of Oct. 28, 1986, Pub. L. No. 99-572, § 1, 100 Stat. 3226 (authorizing establishment of "a memorial . . . to honor members of the Armed Forces of the United States who served in the Korean war"); Act of May 25, 1993, Pub. L. No. 103-32, § 1(a), 107 Stat. 90 (authorizing establishment of "a memorial . . . to honor members of the Armed Forces who served in World War II and to commemorate the participation of the United States in that war"). Nor did Defendants ever solicit input from the National Capital Memorial Advisory Commission. 40 U.S.C. § 8903(d); Decl. of David Maloney ¶ 39, No. 26-cv-3838, ECF No. 2-3. And there has been no Congressionally appointed sponsor stewarding the construction. 40 U.S.C. § 8905(a). The construction of the Arch thus appears to contravene the plain text of the CWA. *See Riley v. Bondi*, 606 U.S. 259, 274 (2025) ("We start with the text of the statute.").

Although the record indicates that the Arch is a "structure . . . designed to perpetuate in a permanent manner the memory of" a "significant element of American history," 40 U.S.C. § 8902(a)(1)—the Nation's 250th anniversary, *see* Revised EA at 1—Defendants suggest that it is not a "commemorative work" within the meaning of the CWA. They argue that the District and Virginia have not shown that merely because the Arch will "celebrate" the Nation's 250th anniversary, "it is [also] designed to perpetuate the memory of that element of history." Opp'n at 28. Defendants also claim that Plaintiffs "lack evidence that a final decision has been made as to what the arch is designed to celebrate or symbolize," as it may be "intended to inspire

future American greatness" instead of being a "backwards-looking project[] that commemorate[s] something." *Id.* (emphases omitted). Finally, they contend that Plaintiffs have not shown that the Arch will "'primarily' be used to perpetuate the memory of a significant element of American history, rather than for another purpose, such as a decorative gateway to D.C., a tourist attraction, and a national security hub." *Id.* They argue that the "primary purpose of the structure is up to the government to decide, not the Plaintiffs." *Id.*; *see also* 40 U.S.C. § 8902(a)(1).

These arguments are unavailing. Defendants' own submissions describe the purpose of the Arch as "honoring America's founding principles" and "promoting . . . the preservation of our history and heritage." Revised EA at 1. And they have admitted statements from the White House press secretary that the 250-foot high Arch will be "a fitting way to commemorate the 250th anniversary of American independence." *Lemmon* Defs.' Resp. to Pls.' Statement of Material Facts ¶¶ 17–18, ECF No. 45-1. Indeed, Defendants have themselves characterized the Arch as a "major commemorative feature anchoring" Memorial Circle, Revised EA at A-2, and explained that its purpose "align[s] with the [George Washington Memorial] Parkway's long-standing function as a landscape dedicated to reflection on national ideals, unity, and sacrifice." *Id.* at A-1. Consequently, the court finds that it is likely the Arch was primarily designed to perpetuate the memory of the Nation's independence and founding principles. At this preliminary stage, the Arch is likely a "commemorative work" within the meaning of the CWA.

Defendants claim that the construction of the Arch is nonetheless authorized by a statute Congress enacted in 1925, taking it beyond the purview of the CWA. Opp'n at 29; *see* 40 U.S.C. § 8902(b) ("This chapter does not apply to commemorative works authorized by a law enacted before January 3, 1985."). This 1925 statute authorized the construction of Memorial Bridge, charged the Arlington Memorial Bridge Commission ("the Commission") with supervising the

project, and authorized a total budget of $14,750,000. *See* Act of Feb. 24, 1925, Pub. L. No. 68-463, §§ 1–2, 43 Stat. 974 ("1925 Act"). In particular, it required "execution of the project . . . in accordance with" the "design, surveys, and estimates of cost" that the Commission had transmitted to Congress in 1924. *Id.* §§ 1, 2. The 1925 Act also authorized the Commission to "make such changes in design and location of said bridge without increasing the total cost of the project as in its discretion may be found to be necessary or advisable." *Id.* § 1.

The Commission's design, in turn, proposed "the ultimate development of Columbia Island," where Memorial Circle now sits, "as a park" and "a plaza" with "two stately columns," "framing in but *not interfering with the view of the Lincoln Memorial* from the direction of the Lee Mansion." Arlington Mem'l Bridge Comm'n, *Report of the Arlington Memorial Bridge Commission*, S. Doc. No. 68-95, at 40–41 (1st Sess. 1924), https://perma.cc/JH2B-9X3A ("Bridge Comm'n Rep.") (emphasis added). In the Commission's proposal, each column would be "166 feet high" and "surmounted by statues of Victory." *Id.* at 41. Those columns were deleted from the designs submitted in December 1931 "in the interests of aviation safety and economy," and the bridge was completed without them. NPS, *Historic American Engineering Record: Arlington Memorial Bridge*, HAER No. DC-7, Addendum at 92 (1988), https://perma.cc/5QMY-A5MC.

Defendants contend that the 1925 Act remains in effect because "Columbia Island remains incomplete"—an "approximately 300-foot-diameter circle of grass" instead of a plaza and park. Opp'n at 5. And they claim the 1925 Act authorizes construction of the Arch at that location. *See id.* at 29. But merely to state this argument is to reveal its flaws. The sheer improbability that a 100-year-old statute would contain authority, unknown to every previous administration, to erect a 250-foot arch at a principal location in the Nation's capital indicates how far Defendants must stretch to justify this project. Assume, for purposes of argument, that the construction of Memorial

Bridge has not yet ended and the 1925 Act remains in effect. The Act would authorize only the construction of two 166-foot columns that do not block the "view of the Lincoln Memorial from the direction of the Lee Mansion." Bridge Comm'n Rep. at 41. The proposed Arch is 250 feet tall, fifty percent taller than the columns that were ultimately rejected. It would squarely block the view of the Lincoln Memorial from the Lee Mansion. *See* Revised EA at 19. And it would be built for an entirely different purpose—commemoration of the Nation's independence—than the 1925 Act's authorization for "the construction of a memorial bridge across the Potomac River." 1925 Act § 1.

Nonetheless, Defendants insist that the 1925 Act "did not mandate rigid adherence" to the Bridge Commission's design, instead "empower[ing] the Bridge Commission to make design changes 'as in its discretion may be found to be necessary or advisable.'" *Lemmon* Defs.' Opp'n to Pls.' Second Mot. for Prelim. Inj. at 5, ECF No. 74 (quoting 1925 Act § 1). But Defendants omit the full context of the statute, which permitted "such changes in design and location of said bridge" only "without increasing the total cost of the project." 1925 Act § 1. Increasing the height of the columns by over half their original size, and transforming them into an arch—not to mention building an observation deck, "restroom facilities, a store," a "café or similar food establishment," Revised EA at 57, and fitting the structure with anti-drone sensors and military communications equipment, *see* Hegseth Decl. ¶¶ 12–13, ECF No. 74-9—would surely stretch the project beyond its original budget, of which just over $2.5 million remained as of mid-1933. *See* Bradley Akin, *Arlington Memorial Bridge Spans the Decades as a Study in Long-Term Price Change*, Beyond Nos.: Prices & Spending, U.S. Bureau of Labor Statistics (Oct. 13, 2017).

Perhaps aware that their 1925 Act argument rests on an unstable foundation, Defendants claim a different statute also authorizes the construction of the Arch: the NPS Organic Act, which

empowers the agency to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." Opp'n at 27 (quoting 54 U.S.C. § 100101(a)). But the same provision upon which Defendants rely explains the "fundamental purpose of the System units": to "conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). That objective hardly covers the construction of a 250-foot monumental arch commemorating the Nation's independence and its founding principles.

Defendants counter that NPS has used its Organic Act "authority for decades to engage in major construction in national park system units, including in the District of Columbia, without any further congressional approval." Opp'n at 27. But all the construction projects they cite—ranging from U.S. Park Police facilities to golf courses in public parks—appear consistent with NPS's mission. *See id.* The Arch does not. Moreover, it is "a commonplace of statutory construction that the specific governs the general." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). And here, the "general" authorization in the Organic Act "yields to the more specific" prohibition of the CWA. *See id.*

Accordingly, the District and Virginia are likely to succeed on the merits of this APA claim.

**2. Likelihood of Irreparable Harm**

Under the second factor of the temporary restraining order and stay analysis, the District and Virginia must show that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis and citations omitted). Harm is irreparable if it is "'beyond remediation'

by compensatory or other relief at the conclusion of litigation." *Talbott v. United States*, 176 F.4th 720, 747 (D.C. Cir. 2026) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The harm must be "'certain and great,' 'actual and not theoretical,' and 'beyond remediation' at a later date." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1010 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016)). The District and Virginia have made that showing here, for many of the same reasons provided in the standing analysis, *see supra* Part III.A.1.i. In particular, they have shown that construction of the Arch will cause harm by "clogging traffic, impeding disaster preparedness, and harming the environment," which will also "require both jurisdictions to expend resources to monitor and mitigate those impacts." Reply at 21.

*First*, the harm is certain. Defendants initially notified the court that construction could begin as early as November 5, 2026, if the NCPC approves the project at its meeting that day and the Department of the Interior authorizes construction. Notice, ECF No. 63. Defendants have now notified the court that construction has officially been approved. *See Decision Record*, ECF No. 109-1. They have separately made clear that the Arch is "absolutely a high priority project." Oct. 30, 2026 Hr'g Tr. at 56:21–22. Traffic disruptions would begin, of course, with construction itself. According to NPS's Revised Environmental Assessment, construction will require "lane closures," "reconfigurations," and "detours," reducing westbound traffic from Arlington Memorial Bridge to two lanes, restricting eastbound traffic, and prohibiting northbound traffic from entering the circle. Revised EA at 53. That disruption would continue for the two to three years construction is expected to last. *Id.* at 7–8, 52. Defendants' contention that relief is premature cannot be squared with their own notice, and nothing in the record suggests they will wait to begin construction. *See* ECF No. 63; Oct. 30, 2026 Hr'g Tr. at 56:21–22. Thus, the District and Virginia have offered

enough proof "indicating that the harm is certain to occur in the near future" to show irreparable harm. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

*Second*, the District and Virginia will incur significant unrecoverable costs. As soon as construction begins, DDOT will need to "expend staff time and operating resources" to "affirmatively and proactively manage temporary detours, crashes or disabled vehicles, unanticipated incidents, major special events, or changed construction conditions." Mendelson Decl. ¶ 62. Those costs will not end when construction ends. The District will need "continued transportation planning and coordination to assess the impact of the Arch on the District, both when construction begins and for years into the future." *Id.* ¶¶ 62, 64. And NPS projects that, even after completion, Memorial Circle will experience "significant delay[s]," "reduced maneuverability, and limited ability to recover from disruptions." Revised EA at 54.

These are not self-inflicted costs. When federal action causes a state to undertake "expenditures to mitigate and recover from harms that could have been prevented" absent that action, the state suffers an injury to its proprietary interests. *Sierra Club*, 125 F.4th at 1181 (quoting *Air All. Hous.*, 906 F.3d at 1059–60). In *Sierra Club*, the D.C. Circuit held that New York's spending to prepare for certain emergencies, caused by a federal rule, was "in no way self-inflicted or premised on speculative harm," because New York "cannot wait until there is an LNG pool fire in its territory to begin spending funds on safety measures." *Id.* So too here. The District and Virginia will face the effects of "increased traffic congestion" and consequent safety problems that "cannot be compensated financially." *D.C. & Va.* Pls.' Mem. Supp. Mot. for TRO at 39–40 (quoting *Nw. Pipeline Corp. v. Pipeline Right of Way Easement*, 197 F. Supp. 2d 1241, 1246 (E.D. Wash. 2002)). The District and Virginia cannot wait until a major commuter artery is disrupted to begin managing the detours.

In opposition, Defendants highlight that, as a general rule, economic harm does not constitute irreparable injury. Opp'n at 12; *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). They quote *National Mining Ass'n v. Jackson* for the proposition that "businesses suing the federal government must demonstrate great economic loss—*e.g.*, 'economic loss that threatens the survival of the movant's business'—to establish irreparable harm." Opp'n at 12–13 (quoting 768 F. Supp. 2d 34, 50–54 (D.D.C. 2011)). Defendants omit that the *Jackson* court also recognized that "where the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity, any loss of income suffered by the plaintiff is irreparable *per se*." 768 F. Supp. 2d at 52–53 (alteration omitted) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)). Indeed, courts have generally recognized an exception to the general rule that economic harm is not irreparable where, as here, the economic loss is unrecoverable because of the government's sovereign immunity. *See e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020).

*Third*, many of the harms the District and Virginia face do not involve expenditures. Construction would congest Memorial Circle, which more than 27,000 vehicles, 1,100 cyclists, and 1,200 pedestrians use each day to travel between the jurisdictions. Revised EA at 50; *see D.C. & Va.* Compl. ¶¶ 66–71. It would degrade the level of service on Virginia's roadways. *Id.* ¶ 71. Excavation of roughly 1,400 truckloads of soil would expose sediment that stormwater will carry into the Potomac. *Id.* ¶¶ 48, 80; *see* Revised EA at 9. And the finished structure would adversely affect historic properties the District owns. *D.C. & Va.* Compl. ¶¶ 92, 139. Environmental injury of this kind "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

In short, "[i]t will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits." *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982). The District and Virginia will "begin to incur these costs as soon as Defendants shut down Memorial Circle, and they will continue to incur them throughout the three-year construction period." Reply at 23. This is not a case in which "adequate compensatory or other corrective relief will be available at a later date." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Accordingly, the District and Virginia are likely to suffer irreparable harm in the absence of judicial relief, and therefore the second factor also counsels in favor of a temporary restraining order.

**3. The Balance of the Equities and Public Interest**

The final two factors—balancing of the equities and the public interest—similarly support granting a temporary restraining order. Where, as here, the movant seeks to enjoin the government, the equities and the public interest merge "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511–512 (D.C. Cir. 2016) (emphasis omitted) (citing *Nken*, 556 U.S. at 435). When assessing the equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco*, 480 U.S. at 542).

The District and Virginia's "high likelihood of success on the merits is a strong indicator" that a temporary restraining order "would serve the public interest." *Newby*, 838 F.3d at 12. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Indeed, it "follows that the public interest factor" of the temporary restraining

order test "should weigh in favor of whoever has the stronger arguments on the merits." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 83 (D.D.C. 2013).

Defendants posit that the government is "always 'likely to suffer irreparable harm' when courts enter 'injunctions that likely exceed the authority conferred' to them." Opp'n at 43 (quoting *Trump v. CASA*, *Inc.*, 606 U.S. 831, 860 (2025)). But the converse is also true: the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Am. Ass'n of Nurse Pracs. v. McMahon*, 836 F. Supp. 3d 175, 208 (D.D.C. 2026) (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). Indeed, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12 (citing *Pursuing Am.'s Greatness*, 831 F.3d at 511–512). As previously discussed, *see supra* Part III.A.1.ii, the government's actions likely violate the APA. And because the harms described above would begin the moment construction starts, *see supra* Part III.A.2, preserving the status quo while the court considers the merits serves the public interest.

Defendants also assert—belatedly—that the Arch represents "a generational national defense opportunity," and that the Arch may assist in combating or deterring assassination attempts on the President. Opp'n at 43 (quoting Hegseth Decl. ¶ 10); Oct. 30, 2026 Hr'g Tr. at 63:1–7. They submit, through declarations proffered by the Secretaries of War and Homeland Security, that "significant national security benefits" would result from the Arch's construction. Opp'n at 43–45. The court appreciates the government's significant interest in national security. But these recent and unsupported attestations of security aspects of a structure that has been extensively discussed over the last year appear nowhere in the planning documents on which the project was reviewed and approved. Indeed, they materialized, for the first time, when Defendants filed their opposition brief last week. When asked at the hearing about the security aspects raised in the

Hegseth and Mullin declarations, the government responded that it had no further information other than what was contained in the declarations. Oct. 30 Hr'g Tr. at 66:16–24. Nor do Defendants explain how a brief delay in starting a project expected to take two to three years to complete would compromise those interests. *Cf. D.C. Pres. League v. Dep't of the Interior*, No. 26-cv-477, 2026 WL 3067893, at *2 (D.D.C. Oct. 13, 2026) (finding the balance of equities favored plaintiffs given "the professed lack of any governmental interest in proceeding urgently"); *see also* Reply at 25.

Accordingly, the balance of the equities and the public interest decidedly favor granting the requested relief.

**B. Remedy**

The District and Virginia also ask the court to stay agency action under Section 705 of the APA. Mot. for TRO at 1–2. The court will defer ruling on that request.

Section 705 of the APA allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. As the D.C. Circuit has consistently held, "APA remedies are not party-restricted and permit a court to stay or vacate an unlawful agency action in its entirety." *Am. Ass'n of Nurse Pracs.*, 836 F. Supp. 3d at 210 (citing *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). In other words, a § 705 stay operates on the agency action entirely, not merely as to the named plaintiffs. When "a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n*, 145 F.3d at 1409 (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21

(D.C. Cir. 1989)). "[C]ourts in this and other circuits have applied that same rule to section 705 stays." *Neguse v. ICE*, 813 F. Supp. 3d 45, 100 (D.D.C. 2025) (collecting cases).

Section 705 authorizes relief only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. A stay is not necessary to prevent irreparable injury at this stage. The temporary restraining order entered today bars Defendants from beginning construction or site preparation at Memorial Circle. That order fully preserves the status quo while the court considers the merits.

The *Lemmon* Plaintiffs have separately moved for a preliminary injunction. *Lemmon* Pls.' Second Mot. for Prelim. Inj., ECF No. 64. The court will hold that motion in abeyance. The *Lemmon* Plaintiffs sue three defendants who are not parties to the case brought by the District and Virginia: President Trump, the Director of the White House Domestic Policy Council, and the Executive Office of the President. *See Lemmon* Compl. ¶¶ 11–13. But the Government has represented that the National Park Service "is the Executive Branch agency with jurisdiction over Memorial Circle and, under existing statutory requirements, its approval or authorization is a condition precedent to construction on that land." Fisher Decl. ¶ 2, ECF No. 24-1. And it has averred that "[n]either the Director of the Domestic Policy Council nor the Executive Office of the President will authorize construction for the [Arch] Project." *Id.* ¶ 3. Because the temporary restraining order entered today enjoins NPS, it preserves the status quo as to all parties, including the *Lemmon* plaintiffs.

## IV. CONCLUSION

For the foregoing reasons, the District of Columbia and the Commonwealth of Virginia's Motion for a Temporary Restraining Order, Case No. 26-cv-3838, ECF No. 2, will be GRANTED. The court will DEFER ruling on the motion for a stay of agency action, *id.*, and DENY the request for an administrative stay, *id.* The court will HOLD IN ABEYANCE the motion for preliminary

injunction in *Lemmon v. Trump*, Case No. 26-cv-544, ECF No. 64. The court will require a $1.00 bond. A separate Order accompanies this Memorandum Opinion.

Date: November 5, 2026

Tanya S. Chutkan
TANYA S. CHUTKAN
United States District Judge