**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL LEMMON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Civil Action No. 26-cv-544 (TSC) |
| DISTRICT OF COLUMBIA and COMMONWEALTH OF VIRGINIA,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL PARK SERVICE, et al.,<br><br>Defendants. | Civil Action No. 26-cv-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

# MEMORANDUM OF LAW IN SUPPORT OF LEMMON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Nicolas Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs Michael Lemmon, et al.*

November 10, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 2

Statutory Background ..... 2

Factual and Procedural Background ..... 4

LEGAL STANDARD ..... 7

ARGUMENT ..... 7

I. The Lemmon Plaintiffs have standing. ..... 7

II. The Lemmon Plaintiffs are likely to succeed on their APA "contrary to law" claims. ..... 10

A. Agency Defendants' authorization is final agency action subject to APA review. ..... 10

B. Agency Defendants' authorization is contrary to the Commemorative Works Act. ..... 11

C. Agency Defendants' authorization is contrary to Section 8106. ..... 14

III. The remaining preliminary injunction factors support the Lemmon Plaintiffs. ..... 15

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**Cases** **Page**

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) ........ 15, 16

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 10

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ........ 17

*Center for Biological Diversity v. United States Fish & Wildlife Service*,
146 F.4th 1144 (D.C. Cir. 2025) ........ 9

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........ 7

*D.C. Preservation League v. United States Department of the Interior*,
— F. Supp. 3d —, 2026 WL 3210227 (D.D.C. Oct. 26, 2026) ........ 16

*Friends of Gateway v. Slater*,
257 F.3d 74 (2d Cir. 2001) ........ 9

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) ........ 8

*International Dark-Sky Ass'n, Inc. v. Federal Communications Commission*,
106 F.4th 1206 (D.C. Cir. 2024) ........ 9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 7

*National Ass'n of Home Builders v. United States Army Corps of Engineers*,
417 F.3d 1272 (D.C. Cir. 2005) ........ 11

*National Park Service v. National Trust for Historic Preservation in the United States*,
609 U.S. 1068 (2026) ........ 8

*National Trust for Historic Preservation in the United States v. National Park Service*,
185 F.4th 1185 (D.C. Cir. 2026) ........ 14, 15

*Pursuing America's Greatness v. Federal Election Commission*,
831 F.3d 500 (D.C. Cir. 2016) ........ 7

*South Carolina Coastal Conservation League v. United States Army Corps of Engineers,*
— F.4th —, 2026 WL 3179802 (4th Cir. Oct. 23, 2026) ........ 11

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 7

**Statutes**

5 U.S.C. § 706(2)(A) .......... 10

16 U.S.C. § 451 (1912) .......... 14

40 U.S.C. § 68 (1912) .......... 3

40 U.S.C. § 8106 .......... 3, 14

40 U.S.C. § 8901(1) .......... 3

40 U.S.C. § 8901(4) .......... 3, 11

40 U.S.C. § 8902(a)(1) .......... 3, 12

40 U.S.C. § 8902(a)(2) .......... 3, 11

40 U.S.C. § 8902(a)(4) .......... 3, 11

40 U.S.C. § 8903(a) .......... 11

40 U.S.C. § 8903(a)(1) .......... 3, 11, 12

40 U.S.C. § 8904 .......... 4

40 U.S.C. § 8905(a) .......... 4, 11

40 U.S.C. § 8905(a)(1) .......... 4

40 U.S.C. § 8906(a)(2) .......... 4

40 U.S.C. § 8908(b) .......... 4

40 U.S.C. § 8908(b)(1) .......... 4, 11, 12

54 U.S.C. § 306108 .......... 19

Act of February 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 .......... 5, 6, 12, 13

Commemorative Works Act, Pub. L. No. 99-652, 100 Stat. 3650 (Nov. 14, 1986) .......... 3

**Other Authorities**

Exec. Order No. 6166 (June 10, 1933) .......... 13

Jacob R. Straus, Congressional Research Service, *Commemorative Works in the District of Columbia: Background and Practice* (updated May 8, 2023)........................................... 2, 3, 4

**Regulations**

36 C.F.R. § 800.5 ........................................................................................................ 19

36 C.F.R. § 800.6 ........................................................................................................ 19

**INTRODUCTION**

On November 5, 2026, Defendants National Park Service (NPS) and U.S. Department of the Interior (together, Agency Defendants) issued a "Decision Record" authorizing construction of a commemorative arch in Memorial Circle in accordance with final design, site, and building plans developed by Agency Defendants. Because Congress has not specifically authorized an arch to be built in Memorial Circle, however, Agency Defendants' November 5 action is contrary to both the Commemorative Works Act of 1986 (CWA) and 40 U.S.C. § 8106.

Recognizing the illegality, this Court, within minutes of Agency Defendants' issuance of their authorization, entered a fourteen-day temporary restraining order (TRO) to halt construction. *See* ECF 110. In its opinion, ECF 111, the Court ruled that construction of the arch likely violates the CWA and threatens to cause irreparable harm, and that the public interest supports enjoining construction. Because the Court's TRO expires on November 19, Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gundersen, and Calder Loth (Lemmon Plaintiffs) now move for a preliminary injunction to enjoin construction during the pendency of this litigation based on two of their claims under the Administrative Procedure Act (APA): that Agency Defendants' action authorizing construction is contrary to the CWA and that the authorization is contrary to Section 8106.

A preliminary injunction barring construction while this litigation proceeds is necessary to protect against imminent harm. Despite the lack of congressional authorization, construction of the arch is set to begin promptly and according to an aggressive timeline. Absent a preliminary injunction, the Lemmon Plaintiffs' use and enjoyment of Arlington National Cemetery and other areas in the vicinity of Memorial Circle will be degraded by the resulting noise, construction activity, blocked viewshed, and increased tourist presence. By contrast, a preliminary injunction would not harm Agency Defendants, who have identified no reason why construction of a

decorative arch in Memorial Circle cannot await a determination of the project's legality. Finally, the public interest supports an injunction that bars the hasty construction of a giant monument that has no legal foundation. Comments submitted by members of the public and consulting parties during Agency Defendants' review processes overwhelmingly opposed construction of the arch, and Agency Defendants' own assessments find that the arch will have significant adverse effects on more than forty historic properties. Moreover, the CWA and Section 8106 aim to ensure that monuments on federal land in the Nation's capital receive democratic deliberation and approval from the People's elected representatives in Congress. Allowing Agency Defendants to bypass the applicable statutory processes would countenance a situation in which politicians can build idiosyncratic pet projects first and answer lawsuits later. The result would be exactly the sort of commemorative free-for-all that Congress determined was inappropriate for our carefully planned national capital.

## BACKGROUND

### Statutory Background

Since the founding of Washington, DC, in the late eighteenth century, the configuration of structures and monuments within the city has been subject to careful and deliberate planning. *See* Jacob R. Straus, Cong. Research Serv., *Commemorative Works in the District of Columbia: Background and Practice*, Summary (updated May 8, 2023) (Straus, *Commemorative Works*).[1] As the legislative body that speaks on behalf of the American public, Congress has long been responsible for authorizing the monuments and structures that appear on federally administered land within the national capital to tell the story of our country. *See id.*

[1] https://www.congress.gov/crs_external_products/R/PDF/R41658/R41658.12.pdf.

In 1912, Congress took a substantial step toward formalizing its oversight of construction on public federal land in Washington, DC, by passing a statute prohibiting "any building or structure" from being built on such lands "without express authority of Congress." 40 U.S.C. § 68 (1912). The statute, which has seen only minor, non-substantive amendments in the 110-plus years since its enactment, is now codified at 40 U.S.C. § 8106. Section 8106 speaks categorically: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

Nonetheless, even after 1912, "the process for approving site locations, memorial design plans, and funding" for monuments remained "haphazard." Straus, *Commemorative Works*, at Summary. Congress responded in 1986 by passing the Commemorative Works Act, Pub. L. No. 99-652, 100 Stat. 3650 (Nov. 14, 1986). Among the CWA's purposes are to "preserve the integrity of the comprehensive design of … the Nation's Capital," 40 U.S.C. § 8901(1), and to ensure that commemorative works on federally administered land in Washington, DC, and its environs "are appropriately designed, constructed, and located," and that they "reflect a consensus of the lasting national significance of the subjects involved," *id.* § 8901(4).

The CWA sets out a detailed process for approving commemorative works—defined to include "any statue, monument, sculpture, … or other structure or landscape feature[] … designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history," *id.* § 8902(a)(1)—in areas in and around Washington, DC, that are administered by NPS or the General Services Administration, *see id.* § 8902(a)(2). To begin, the CWA requires that any such work be "specifically authorized by law." *Id.* § 8903(a)(1). Upon authorizing a commemorative work, Congress designates a sponsor that will develop the project. *See id.* § 8902(a)(4). The sponsor then must, among other things, consult with the National Capital

Memorial Advisory Commission "regarding the selection of alternative sites and design concepts for the commemorative work." *Id.* § 8905(a)(1); *see id.* § 8904 (establishing the Commission). Once this and other requirements have been satisfied, the sponsor may apply to the Secretary of the Interior or the Administrator of General Services for a construction permit. *See id.* § 8905(a). A permit may issue if, among other things, "knowledgeable individuals qualified in the field of preservation and maintenance have been consulted … to ensure that the commemorative work meets high professional standards." *Id.* § 8906(a)(2).

The CWA imposes special procedural requirements for works located in specific areas around the monumental core of the capital. *See id.* § 8908(b); *see also id.* § 8902(a)(2). Of particular relevance here, commemorative works may be built in an area designated "Area I" only if the Secretary of the Interior or the Administrator of General Services "decides that the subject of the commemorative work is of preeminent historical and lasting significance to the United States," recommends to Congress that the work be sited in Area I, and receives Congress's "approv[al]" of the recommendation "by law." *Id.* § 8908(b)(1).

**Factual and Procedural Background**

Memorial Circle is an NPS-administered area that sits inside Lady Bird Johnson Park in Washington, DC, and falls within Area I for purposes of the Commemorative Works Act. *See* Straus, *Commemorative Works*, at 30; Fisher Decl., ECF 24-1, ¶ 2. Memorial Circle is situated directly on the visual axis between the Lincoln Memorial and Arlington House, the Robert E. Lee Memorial inside Arlington National Cemetery. *See* Straus, *Commemorative Works*, at 30. The reciprocal views between those two structures have historically been left intentionally unobstructed to create a visual symbol of the Nation's reunification following the Civil War. *See* NPS, *Arlington Memorial Bridge & Avenue* (last updated Apr. 5, 2023), ECF 36-22.

Last fall, President Trump announced the decision to build a monumental arch in Memorial Circle to commemorate the Nation's 250th anniversary. *See* Mem. Op., ECF 111, at 4–5. The Lemmon Plaintiffs—three Vietnam veterans and an architectural historian who all regularly visit and intend to continue visiting the area around Memorial Circle, and whose aesthetic interest in the unobstructed views between the Lincoln Memorial and Arlington National Cemetery will be degraded by the construction of an arch—filed a lawsuit claiming that the decision is (1) ultra vires and (2) in violation of the President's constitutional duty to take care that Congress's laws be faithfully executed. *See* Compl., ECF 1; *see also* Lemmon Decl., ECF 7-2, ¶¶ 2, 6–9; Byrnes Decl., ECF 7-3, ¶¶ 2, 8–10, 13; Gundersen Decl., ECF 7-4, ¶¶ 2, 6–9; Loth Decl., ECF 7-5, ¶¶ 2, 5–10. Defendants moved to dismiss these claims, ECF 31; the parties filed cross-motions for summary judgment on the claims, ECF 36, ECF 44; and the Lemmon Plaintiffs have moved to preliminarily enjoin construction of the arch on the basis of these claims, ECF 64. These motions are all fully briefed and pending before the Court. *See* ECF 31, ECF 33, ECF 35 (motion to dismiss); ECF 36-1, ECF 45, ECF 48 (Lemmon Plaintiffs' motion for summary judgment); ECF 44-1, ECF 49, ECF 51 (Defendants' cross-motion for summary judgment); ECF 64-1, ECF 74, ECF 85 (Lemmon Plaintiffs' motion for preliminary injunction).

On November 5, 2026, Agency Defendants issued an authorization for construction on the arch to proceed according to final design, site, and building plans developed by Agency Defendants. *See* NPS, *Decision Record: Triumphal Arch at Memorial Circle* (Nov. 5, 2026) (*Decision Record*), ECF 109-1. The authorization claims that the source of legal authority for the arch is the Act of February 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 (1925 Act). *See Decision Record* at 10. That 1925 Act authorized the now-disbanded Arlington Memorial Bridge Commission to build a memorial bridge in accordance with the Commission's design, for a sum

not to exceed $14.75 million, pursuant to a "ten-year program of expenditures and construction" that the Commission had set forth in a report to Congress the preceding year. 1925 Act, §§ 2, 6, 43 Stat. at 974–75. Although the 1925 Act permitted the Commission to modify the bridge design that it had proposed "without increasing the total cost of the project," *id.* § 1, 43 Stat. at 974, the final design (like the Commission's original design) did not include an arch. *See* Report of the Arlington Memorial Bridge Commission, S. Doc. No. 95, 68th Cong., 1st Sess. (Apr. 21, 1924), ECF 36-20, at 40–41 (explaining that the Commission's original design provided for a pair of slender, widely spaced columns—not an arch—on the island where Memorial Circle now lies); NPS, *Historic American Engineering Record: Arlington Memorial Bridge*, HAER No. DC-7 (1988), ECF 36-21, Addendum at 92 (noting that the Commission deleted the columns from its final design in 1931). Arlington Memorial Bridge opened to the public on January 18, 1932, having been completed for a total cost of $12.2 million, with no monumental arch ever having been part of the Commission's design. *See* Bradley Akin, U.S. Bur. of Labor Stats., *Arlington Memorial Bridge Spans the Decades as a Study in Long-Term Price Change* (Oct. 13, 2017), ECF 36-19.

Moments after Agency Defendants issued their authorization, this Court entered a TRO enjoining Agency Defendants for fourteen days from "initiating, making, or otherwise effectuating any construction, excavation, demolition, land-disturbance, utility-installation, or roadway-closure activity, or any other construction-related activity at or near Memorial Circle in Washington, D.C., that is for the purpose of constructing an arch at Memorial Circle." Order, ECF 110, at 1.

On November 7, the Lemmon Plaintiffs moved for leave to file a supplemental complaint raising APA claims challenging the authorization as (1) contrary to the CWA, (2) contrary to

Section 8106, and (3) arbitrary and capricious. *See* ECF 112. They now move for a preliminary injunction on the basis of the first two of these claims.[2]

## LEGAL STANDARD

To secure a preliminary injunction, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Where, as here, the injunction would run against the government, the final two factors merge. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("[T]he [government's] harm and the public interest are one and the same, because the government's interest *is* the public interest.").

## ARGUMENT

### I. The Lemmon Plaintiffs have standing.

To establish standing, a plaintiff must present evidence that the defendant's challenged action has caused or will cause the plaintiff to suffer an "injury in fact" that is "concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Critically, "[a]n allegation of future injury may suffice" to establish standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted).

The Lemmon Plaintiffs have made the requisite showing. Each has presented uncontroverted evidence that he regularly visits and holds a deep personal connection to the

[2] Prior to granting the requested relief, the Court should grant the Lemmon Plaintiffs' pending motion for leave to file a supplemental complaint for the reasons given in the memorandum of law accompanying that motion. *See* ECF 112-1.

landmarks around Memorial Circle, including within Arlington National Cemetery; that he derives profound aesthetic and symbolic enjoyment from the existing lines of sight between those landmarks; and that the construction of an arch in Memorial Circle will irreparably degrade his aesthetic experience of the area. *See* Lemmon Decl. ¶¶ 6–9; Byrnes Decl. ¶¶ 8–10, 13; Gundersen Decl. ¶¶ 6–9; Loth Decl. ¶¶ 5–10. As Plaintiff Michael Lemmon, a Vietnam veteran, testified: "The effect of combat produces trauma in all of us, different kinds of trauma…. So when I would walk … to the Lincoln Memorial and look across at Arlington National Cemetery, where so many of my brothers are buried, I personally felt the hurt, the anger, the pain, the trauma recede." Oct. 30, 2026, Hearing Tr. at 23–24. Mr. Lemmon went on to explain that introducing a "250-foot monstrous edifice" into the landscape, "looming over and dominating it," would "change[] the entire experience in a profoundly negative way." *Id.* at 24.[3]

As the Supreme Court recently reiterated in *National Park Service v. National Trust for Historic Preservation in the United States*, 609 U.S. 1068 (2026) (per curiam), "the 'desire to … observe'" a particular phenomenon, "'even for purely esthetic purposes,' can constitute 'a cognizable interest for purpose of standing.'" *Id.* at 1072 (omission in original; quoting *Lujan*, 504 U.S. at 562–63). Ample Supreme Court and D.C. Circuit precedents reinforce this principle. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("We

[3] *See* Lemmon Decl. ¶ 6 (explaining that the visual link between Arlington National Cemetery and the Lincoln Memorial "holds deep personal significance to me, embodying the reunification of our country after a bloody civil war and the commitment to bind up its wounds and to honor those who died in its defense"); Byrnes Decl. ¶ 9 (explaining that the "beautiful and uninterrupted view of the Lincoln Memorial" from the cemetery "symbolizes the restoration of the Union after the bloody Civil War, in which several of my ancestors fought"); Gundersen Decl. ¶ 6 (explaining that "the inspiring view of the Lincoln Memorial" from the cemetery "reminds me of the ideals for which I fought and fills me with pride for my many years of service"); Loth Decl. ¶ 6 (explaining that the "axial vista [that] visually connects the Lincoln Memorial to Arlington House[] … creates a symbolic link between the North and the South" that "I revere" as "a native Virginian and descendent of Confederate veterans").

have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972))); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025) (finding standing based on aesthetic injury). These precedents confirm that construction of a massive arch that will radically transform the Lemmon Plaintiffs' personal experiences when visiting the gravesites at Arlington National Cemetery, including by adversely impacting a symbolic viewshed that holds strong personal meaning for each of the Lemmon Plaintiffs, will cause cognizable injury. *See, e.g.*, *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (finding that stargazers and astronomers whose aesthetic and recreational activities will be inhibited by light pollution have standing to challenge a satellite license); *Friends of Gateway v. Slater*, 257 F.3d 74, 78 (2d Cir. 2001) (holding that plaintiffs had standing to challenge construction of an "eyesore" in a park that they "regularly use[d]").

Finally, the Lemmon Plaintiffs have also demonstrated a substantial risk—indeed, a practical certainty—that the threatened harm will materialize absent judicial relief. Agency Defendants' own findings reflect that the arch, if built as authorized, will "detract from the broader commemorative landscape" and "modify one of the most important designed views associated with the Arlington House Cultural Landscape: the axial relationship intentionally established between the Arlington House portico and the Lincoln Memorial." NPS, *Triumphal Arch at Memorial Circle: Revised Environmental Assessment* (Oct. 9, 2026) (*Revised Env't Assessment*), ECF 74-1, at 22, 42. And Defendants have left no doubt that they intend to move forward rapidly with construction if they are permitted to do so, explaining that construction will proceed "year-round with work occurring in two 10-hour shifts per day (20 hours per day)," *id.* at 10, and

indicating that they are prepared to begin work immediately, *see* Notice, ECF 63 (stating that the commencement of construction could follow "immediately" upon Agency Defendants' issuance of an authorization). In fact, Agency Defendants issued their authorization within minutes after the National Capital Planning Commission approved their final site and building plans at approximately 10:30 PM, despite pending emergency motions in this Court. *See* Notice, ECF 109.

Because the concrete injury that Plaintiffs will face if construction is allowed to proceed is directly traceable to Agency Defendants' challenged authorization and is redressable by vacating that authorization and declaring it unlawful, Plaintiffs have standing.

**II. The Lemmon Plaintiffs are likely to succeed on their APA "contrary to law" claims.**

**A. Agency Defendants' authorization is final agency action subject to APA review.**

The APA authorizes a court to "hold unlawful and set aside agency action" that is "found to be … not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is reviewable under the APA if it is "final": That is, "the action must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted).

As this Court has already concluded, Agency Defendants' authorization satisfies both requirements for finality. *See* Mem. Op. 17. As to the first requirement, "there is nothing 'tentative' or 'interlocutory' about [the] decision," which has come "after months of assessments, reviews from the [Commission of Fine Arts] and the [National Capital Planning Commission], and the emergence of a 'final design.'" *Id.* at 18 (footnotes omitted; quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005)). And as to the second requirement, the authorization "carries significant legal consequences: it authorizes the

construction of a 250-foot arch over a period of roughly three years that will disrupt traffic, create noise, result in large-scale excavation, and more." *Id.* Thus, Agency Defendants have conceded that an NPS action "authorizing arch construction to proceed" would constitute "final agency action." Fisher Decl. ¶ 4; *see* Oct. 30, 2026, Hearing Tr. at 51 (similar). They were correct to do so. *See, e.g.*, *Nat'l Ass'n of Home Builders*, 417 F.3d at 1278–81 (holding that an agency's issuance of an authorization to discharge materials into wetlands was final agency action); *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs,* — F.4th —, 2026 WL 3179802, at *4 (4th Cir. Oct. 23, 2026) (same).

**B. Agency Defendants' authorization is contrary to the Commemorative Works Act.**

The CWA sets forth a mandatory process for establishing a commemorative work on land administered by NPS in certain areas in and around Washington, DC, including land located in a region that has been designated as "Area I." 40 U.S.C. § 8903(a); *see id.* §§ 8901(4), 8902(a)(2). Any such work must be "specifically authorized by law," *id.* § 8903(a)(1), and assigned a congressionally designated sponsor responsible for fulfilling the Act's procedural steps, *see, e.g.*, *id.* § 8905(a) (describing requirements that "[a] sponsor authorized by law to establish a commemorative work in the District of Columbia and its environs" must meet before "request[ing] a permit for construction of the commemorative work"); *id.* § 8902(a)(4) (making clear that a sponsor must be "authorized by Congress"). And for works that will be sited in Area I specifically, additional congressional authorization is required. *See id.* § 8908(b)(1) (explaining that a commemorative work may be sited in Area I only if the Secretary of the Interior or the Administrator of General Services so recommends and Congress approves the recommendation "by law not later than 150 calendar days" after receiving it).

Agency Defendants' authorization is contrary to the CWA because it purports to allow construction to proceed even though the arch has not satisfied these statutory requirements. As this Court has already concluded, *see* Mem. Op. 21–22, the arch is likely intended as a commemorative work within the meaning of the Act because it will be a "monument[] … or other structure or landscape feature[] … designed to perpetuate in a permanent manner the memory of an … event or other significant element of American history"—namely, the Nation's 250th anniversary. 40 U.S.C. § 8902(a)(1); *see, e.g.*, *Decision Record* at 16 (recognizing "[t]he Arch's role in celebrating the 250th anniversary of the United States"). And because Memorial Circle is NPS-administered land within Area I, the arch cannot lawfully be built there unless Congress has "specifically authorized [it] by law," 40 U.S.C. § 8903(a)(1), designated a sponsor, and approved a recommendation that the arch be sited in Area I, *see id.* § 8908(b)(1). Congress, though, has not authorized the arch, has not appointed a sponsor, and has not approved construction in Area I.

Agency Defendants, however, claim to have found congressional authorization for the arch in the 1925 Act, which provided for the design and construction of Arlington Memorial Bridge. *See, e.g.*, *Decision Record* at 10. This Court has correctly recognized that this argument is unlikely to succeed. *See* Mem. Op. 22–24. The 1925 Act, after all, cannot reasonably be read to authorize a massive arch to commemorate a national anniversary that, at the time of the statute's enactment, lay more than a century in the future. Rather, the Act authorized the Arlington Memorial Bridge Commission (not Defendants) to "proceed at once" to construct Arlington Memorial Bridge according to the Commission's (not Defendants') design. 1925 Act, § 1, 43 Stat. at 974. The statute directed the project, "as speedily as practicable," to be "prosecuted to completion … in a total sum not to exceed $14,750,000," *id.* § 2, 43 Stat. at 974, pursuant to a "ten-year program of expenditures and construction," *id.* § 6, 43 Stat. at 975. At the "completion of the project," the

statute authorized the Commission to transfer the land associated with the project "to the park system." *Id.* § 4, 43 Stat. at 975. Although the statute allowed the Commission to modify the design that it initially submitted to Congress in 1924 "without increasing the total cost of the project," *id.* § 1, 43 Stat. at 974, the Commission's design never included a monumental arch, *see supra* p. 6.[4]

The project that Congress authorized in the 1925 Act was completed more than ninety years ago. Arlington Memorial Bridge opened for use on January 18, 1932, within the ten-year timeframe set by Congress, *see supra* p. 6, and the Arlington Memorial Bridge Commission was accordingly abolished the following year, *see* Exec. Order No. 6166, § 2 (June 10, 1933). The project nearly reached the expenditure cap set by Congress, coming in at a total cost of $12.2 million. *See supra* p. 6. And, following the project's completion, the land around Arlington Memorial Bridge reverted to the park system as Congress had anticipated. *See* Fisher Decl. ¶ 2.

Agency Defendants' suggestion that the 1925 Act creates limitless authority for the Executive Branch to build *new* monumental structures in the vicinity of Arlington Memorial Bridge—indefinitely into the future, and at whatever cost—has no basis in the statute. As this Court has already held, the Act is properly read to authorize a finite project, of limited duration, that was long ago completed. Any new commemorative monument in Memorial Circle, therefore, must comply with the CWA's requirements—including the requirement of specific congressional

[4] Defendants have relied heavily on the fact that an early design proposal included "two large columns." Defs. Opp. to Pls. Mot. for Prelim. Inj. (Defs. Opp.), ECF 74, at 33. Of course, the arch cannot reasonably be equated with two columns, let alone the two columns included in the Commission's early design, which were proposed as "framing in but not interfering with the view of the Lincoln Memorial from the direction of" Arlington House. Report of the Arlington Memorial Bridge Commission, S. Doc. No. 95, 68th Cong., 1st Sess. (Apr. 21, 1924), *cited in* Defs. Opp. at 5 n.2, at 41; *see id.* at 53–54 (showing two narrow columns, widely spaced, at the western end of the bridge). Even putting aside that point, the Commission that Congress authorized to design the bridge *removed* the columns from the final design, and the project was intentionally completed without them. *See supra* p. 6.

authorization. Because the arch does not comply with those requirements, Agency Defendants' action authorizing construction to begin is contrary to law.

**C. Agency Defendants' authorization is contrary to Section 8106.**

Agency Defendants' authorization is also independently contrary to Section 8106, which provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." The arch is a "structure" that will be "erected" on Memorial Circle, which is a "park[] or public grounds of the Federal Government in the District of Columbia." Again, Congress has not supplied express authorization for the project, and absent such authorization, "[t]he plain text of Section 8106 unambiguously bars … construction." *Nat'l Trust for Historic Pres. in the U.S. v. NPS*, 185 F.4th 1185, 1220 (D.C. Cir. 2026), *abrogated on other grounds*, 609 U.S. 1068.

In earlier briefing, Defendants argued that a now-repealed statute, 16 U.S.C. § 451 (1912), casts "doubt" on whether NPS is subject to Section 8106. Defs. Opp. to Pls. Mot. for Prelim. Inj. (Defs. Opp.), ECF 74, at 38. Enacted contemporaneously in 1912 with Section 8106's predecessor statute, Section 451 required "express authority of Congress" for the expenditure of sums above a specified threshold "for construction of administration or other buildings … in any national park." Because Section 451 governed "NPS's construction in national parks," the argument runs, Section 8106 "was never intended" to do so. Defs. Opp. 39. And now that Congress has repealed Section 451, Defendants argue, Congress's authorization is no longer required for any structure that NPS wishes to build in the national parks. *See id*. Defendants' argument, however, does not support the construction of an unauthorized arch in Memorial Circle. Although Memorial Circle sits within a "park[] or public grounds of the Federal Government in the District of Columbia," and so falls within the scope of Section 8106, it does not sit within a "national park" and so never fell within

the scope of Section 451. *See* NPS, *National Park System* (listing the national parks);[5] NPS, *Lady Bird Johnson Park* (explaining that Lady Bird Johnson Park, which houses Memorial Circle, "is a unit of the George Washington Memorial Parkway").[6] More fundamentally, Defendants provide no support for the underlying premise of their argument: that Congress intended the restriction that now-rescinded Section 451 placed on construction in national parks throughout the country (no unauthorized building projects above a certain cost threshold) to supplant the more demanding restriction that Section 8106 and its predecessor placed on construction in federal parkland within Washington, DC, specifically (no unauthorized building projects at all).

Thus, for the independent reason that the arch violates Section 8106—the "statutory exclamation point" that Congress placed on its own "exclusive powers" over federal lands in Washington, DC, *Nat'l Trust for Historic Pres.*, 185 F.4th at 1196—Agency Defendants' action authorizing construction is contrary to law.

## III. The remaining preliminary injunction factors support the Lemmon Plaintiffs.

**A.** The Lemmon Plaintiffs will suffer irreparable injury absent an injunction that bars construction from proceeding during the pendency of this lawsuit. As explained above, *supra* Part I, the arch will inflict profound aesthetic harm on Plaintiffs by interfering with a symbolic landscape and solemn environment that holds great personal meaning. *See Decision Record* at D-2 (NPS recognition that the arch, as authorized, will "substantially intrude into the viewshed"). An aesthetic injury of this sort, like environmental harm, "by its nature, can seldom," if ever, "be adequately remedied by money damages and is often permanent." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). After all, every visit to Arlington National Cemetery that is

---

[5] https://www.nps.gov/aboutus/national-park-system.htm.

[6] https://www.nps.gov/gwmp/planyourvisit/ladybirdjohnsonpark.htm.

degraded by Agency Defendants' construction work is a visit that can never be recreated. Given the inherently irreparable nature of such an aesthetic injury, then, "[i]f such injury is sufficiently likely, … the balance of harms will usually favor the issuance of an injunction." *Id.*

There is no question that, absent an injunction, Defendants will move rapidly to push the arch toward completion as quickly as possible and before final judgment is entered in this case. *See supra* pp. 9–10. Particularly given Defendants' track record of moving swiftly to implement their preferred architectural projects even in the face of active legal challenges, the pendency of this litigation would, if anything, encourage Defendants to try to outrun final judgment. *See, e.g.*, *D.C. Pres. League v. U.S. Dep't of Interior*, — F. Supp. 3d —, 2026 WL 3210227, at *3 (D.D.C. Oct. 26, 2026) (explaining how NPS "bulldozed hundreds of trees" in preparation for construction of a legally disputed golf course even though "there was no urgency" to do so); Notice, *Cultural Landscape Found. v. U.S. Dep't of Interior*, No. 1:26-cv-1593 (D.D.C.), ECF 18 (filed June 3, 2026) (notice from NPS stating that challenged work on the Lincoln Memorial Reflecting Pool had been "complete[d]" during the pendency of a motion to preliminarily enjoin that work).

Moreover, the imminent harm is not limited to the adverse impact of a *completed* arch. Even the early stages of the arch's construction—which will involve excavation, drilling, and foundation construction, *see Revised Env't Assessment* at 7—will degrade the Lemmon Plaintiffs' personal experiences when they visit the cemetery, including to visit the gravesites of comrades-in-arms with whom they served, *see* Lemmon Decl. ¶ 6; Byrnes Decl. ¶ 8; Gundersen Decl. ¶ 6. And this disturbance would be near-continuous, because "[w]ork would occur year-round with work occurring in two 10-hour shifts per day (20 hours per day) for the duration of the construction period." *Revised Env't Assessment* at 10. Moreover, even before the arch is at full height, construction activities will interfere with and degrade the Lemmon Plaintiffs' personal experiences

of the currently unobstructed vista, as Agency Defendants have reported that construction will "require several tower cranes, forklifts, skid steers, drill rigs, and concrete pumping systems," *id.*, including "tower cranes (up to 320 feet tall)," *id.* at 7.

**B.** As against the irreparable harm that the Lemmon Plaintiffs face absent an injunction, Agency Defendants—and, by extension, the public—will suffer no cognizable harm from a preliminary injunction. After all, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). And Agency Defendants have not explained why delay in constructing even a *lawful* arch would cause harm.

Further, the public interest favors taking the time to ensure that any monument constructed in Memorial Circle is lawful. The arch has drawn an enormous amount of public attention, with tens of thousands of public comments submitted during Agency Defendants' administrative process. *See, e.g.*, *Decision Record* at D-1 (explaining that NPS received more than 100,000 public comments regarding the arch during one ten-day comment period in June 2026 alone). This outpouring of interest in the project is unsurprising. Even under Agency Defendants' own assessment, after all, the arch will "modify one of the most important designed views associated with the Arlington House Cultural Landscape: the axial relationship intentionally established between the Arlington House portico and the Lincoln Memorial." *Revised Env't Assessment* at 42. And the effects will not end there. As Mr. Lemmon testified, "having a tourism platform 200-some-odd feet in the air looming over or observing the burials, the visitations, [and] the ceremonies" at Arlington National Cemetery could have a profound effect on servicemembers and their families. Oct. 30, 2026, Hearing Tr. at 25; *see id.* (describing it as "disturbing and, frankly,

disrespectful"—"almost blasphemous"—to treat proceedings in the cemetery as "entertainment" to be viewed from an observation deck). Agency Defendants have acknowledged the adverse impact of the arch on more than forty historic properties. *See Revised Env't Assessment*, App'x C. And an independent expert analysis has revealed that the arch will at times cast a shadow over more than 500,000 gravesites and over monuments such as the Vietnam Veterans Memorial. *See* VoteVets, *Overshadowing the Fallen*;[7] Jarrett Ley et al., *Trump's Arch Would Cast Shadow on Arlington Graves, Including Kennedy's*, Wash. Post (Oct. 27, 2026).[8]

The administration's recent statements that the arch, in addition to being "equipped with an observation deck and gilded figures," Mullin Decl., ECF 74-8, ¶ 15, represents a "generational national defense opportunity," Hegseth Decl., ECF 74-9, ¶ 10, do not offer reason to believe that the public would suffer harm if the Court bars construction during the pendency of this litigation. The late-breaking declarations offered by Agency Defendants that the arch would "offer[] *an opportunity* to situate … defense capacities" in the Washington, DC, region, Hegseth Decl. ¶ 10 (emphasis added), and that the arch could "provide *an opportunity*" to expand detection of unmanned aircraft and "*could* provide a forum" to support security of federal officials and facilities, Mullin Decl. ¶¶ 18–19 (emphases added), do not come close to establishing that the equities support Agency Defendants barreling ahead with unauthorized construction.

Indeed, the declarations serve to highlight the unlawful nature of Agency Defendants' authorization. While the National Historic Preservation Act of 1966 requires federal agencies to consider the effects of federal undertakings on historic properties and seek ways to avoid, minimize, or mitigate any such effects, *see* 54 U.S.C. § 306108; 36 C.F.R. §§ 800.5, 800.6, Agency

---

[7] https://votevets.org/wp-content/uploads/2026/10/Overshadowing-the-Fallen.pdf.

[8] https://www.washingtonpost.com/investigations/interactive/2026/10/27/trumps-arch-would-cast-shadow-arlington-cemetery.

Defendants' review under this statute did not contemplate the use of the arch to support drones, snipers, or other military installations. *See generally* National Historic Preservation Act Consultation Correspondence, ECF 109-3. The review therefore did not take impacts related to those proposed uses into consideration. Similarly, the final site and building plans approved by the National Capital Planning Commission on November 5 made no mention of the security features that Agency Defendants claim that the arch "will" incorporate. Hegseth Decl. ¶ 10. Thus, the national-security declarations establish that Agency Defendants have not even properly obtained the NPS and National Capital Planning Commission approvals that they themselves believe are needed—even putting aside Agency Defendants' usurpation of Congress's role as the initial authorizing body.

Given the enormous aesthetic and practical effects that the arch will have on the Nation's capital, assessing whether the arch is lawful before it is built will serve the public interest. In particular, determining whether the arch has the requisite congressional authorization will preserve Congress's role in authorizing the design and siting of commemorative works and other structures on federal land in our national capital, thereby ensuring democratic accountability and a measure of consensus in determining the symbolic configuration of those landmarks and the national narrative that they convey. Requiring Defendants to comply with the requirements of the CWA and Section 8106 will ensure that all Americans have the opportunity to make their voices heard through their representatives in Congress and will accordingly confer public legitimacy on whatever monument, if any, is ultimately authorized.

## CONCLUSION

This Court should grant the Lemmon Plaintiffs' motion for a preliminary injunction and enjoin Defendants NPS and U.S. Department of the Interior from taking any steps to construct, or

to direct, facilitate, or authorize construction of, any structure in Memorial Circle, absent congressional authorization, during the pendency of this litigation. Because the fourteen-day TRO that is currently in effect expires on November 19, the Lemmon Plaintiffs respectfully request a ruling on this motion by midnight on November 19.

Dated: November 10, 2026

Respectfully submitted,

/s/ Nicolas Sansone

Nicolas Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs Michael Lemmon, et al.*