UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL LEMMON**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**DONALD J. TRUMP**, *et al.*,<br><br>*Defendants.* | Civil Action No. 26-cv-544 (TSC) |
| **DISTRICT OF COLUMBIA**,<br>400 6th Street NW<br>Washington, D.C. 20001,<br><br>and<br><br>**AND**<br>**COMMONWEALTH OF VIRGINIA**,<br>200 North Ninth St.<br>Richmond, VA 23219,<br><br>*Plaintiffs*,<br><br>v.<br><br>**NATIONAL PARK SERVICE**,<br><br>1849 C Street NW<br><br>Washington, D.C. 20240, *et al.*,<br><br>**JESSICA BOWRON**, in her official capacity as Comptroller Exercising the Delegated Authority of the Director, National Park Service,<br>1849 C Street NW<br>Washington, D.C. 20240,<br><br>**U.S. DEPARTMENT OF THE INTERIOR**,<br>1849 C Street NW<br>Washington, D.C. 20240, | Case<br><br>Civil Action No.: 1:. 26-cv-038383838 (TSC)<br><br>**CONSOLIDATED CASES**<br><br>**FIRST AMENDED COMPLAINT** |

~~and~~

~~**DOUG BURGUM**, in his official capacity as Secretary of the Interior,~~
~~1849 C Street NW~~
~~Washington, D.C. 20240,~~

*Defendants*.

## INTRODUCTION

1. Defendants have ~~announced that, as soon as November 5, they will begin~~authorized construction of a 250-foot triumphal arch in Memorial Circle, a busy traffic intersection that abuts the border between the District of Columbia and Virginia. This project is flagrantly unlawful. The Commemorative Works Act and 40 U.S.C. § 8106 require the federal government to obtain specific congressional authorization before building a monument on federal land in the District; it has obtained none. The Height of Buildings Act provides that, with limited and inapplicable exceptions, "[n]o building" in the District may exceed 130 feet; the Arch would nearly double that statutory restriction. And a series of other statutes—the Administrative Procedure Act, the National Environmental Policy Act, and the National Historic Preservation Act—require Defendants to consider alternatives, weigh costs, and engage in appropriate consultation before undertaking a project that would transform the District's physical landscape and upend its historic plan. In their rush to break ground on the Arch, Defendants have made only half-hearted gestures at complying with these requirements.

2. Perhaps recognizing that the project is legally indefensible, Defendants have made clear that they will attempt to outrun judicial review. On October 21, 2026, they informed this Court that they may begin construction of the Arch *the very day* it is approved by the National Capital Planning Commission. It is entirely foreseeable that, once construction begins, Defendants will argue—as they have done in other cases—that an order halting construction would irreparably harm the federal government, pose security risks, and impermissibly alter the status quo they have unilaterally created.

3. The Court should not allow this cynical gambit to succeed. As soon as Defendants break ground on this project, they will inflict irreparable harm on both the District and Virginia. The Arch site sits at the center of a major traffic artery between the District and Virginia, in the

monumental core of the capital, on an island that straddles the Potomac River. During the three-year period of construction, the Arch project will inevitably snarl traffic between the jurisdictions, produce pollution and stormwater runoff in the Potomac, interfere with emergency services, and pose numerous other challenges. Both jurisdictions will need to take immediate and costly steps to assess, respond to, and mitigate these harmful effects. These costs are severe and unrecoverable—particularly because Defendants have refused to take them into account or adequately consult with either jurisdiction during their hurried and preordained process to approve the Arch and start construction.

4. This is not the first time that Defendants have rushed to dramatically remake the District too quickly for courts to intervene. This Court should not allow this effort to escape judicial scrutiny. It should declare the Arch unlawful, enjoin its construction, and ensure that Congress—and the people it represents—have the final say in any new monuments constructed in the Nation's capital.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

6. There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 1651, 2201–2202, 5 U.S.C. §§ 704–706, and the Court's equitable powers.

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The District and multiple Defendants are either residents of or have a place of business in this judicial

district, and all or a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in the District.

## PARTIES

8. Plaintiff the District of Columbia (the District) is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest. D.C. Code § 1-301.81.

9. Plaintiff Commonwealth of Virginia is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. *Id.* § 2.2-513.

10. Defendant National Park Service (NPS) is a bureau within the U.S. Department of the Interior. 54 U.S.C. § 100301. NPS is an agency within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551(1), 701(b)(1), and is headquartered in Washington, D.C. NPS was established by statute to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101. NPS is responsible for administering and maintaining the land on Memorial Circle, which is located in Lady Bird Johnson Park. NPS is the agency that is effectuating the planning and construction of the Arch.

11. The office of NPS Director is currently vacant. Defendant Jessica Bowron, the agency Comptroller, assumed the role of Acting Director of the National Park Service on or about January 20, 2025, and more recently has been referred to as the "Comptroller Exercising the Delegated Authority of the NPS Director." She is sued solely in her official capacity. The NPS Director is responsible for "the supervision, management, and control of [National Park] System units." 54 U.S.C. § 100302(a)(3).

12. Defendant U.S. Department of the Interior (DOI) is an agency within the meaning of the APA, 5 U.S.C. §§ 551(1), 701(b)(1), and is headquartered in Washington, D.C. NPS's operations are overseen by DOI's Assistant Secretary of the Interior for Fish and Wildlife and Parks.

13. Defendant Doug Burgum is the Secretary of the Interior and is sued solely in his official capacity. As Secretary, Mr. Burgum has oversight over all decisions and actions of NPS and is responsible for ensuring compliance with federal law in all NPS actions related to the Arch.

## LEGAL BACKGROUND

### A. Statutes Governing Construction in the District of Columbia

14. In 1790, Congress exercised its "exclusive" authority over the "Seat of Government," U.S. Const. art. I, § 8, cl. 17, to establish the District of Columbia as the Nation's capital. *See* Act of July 16, 1790, 1 Stat. 130.

15. From the start, Congress intended the District to be a planned city. And over the intervening centuries, Congress has enacted a series of statutes to ensure that any development in the capital respects the District's design and the needs of its residents and visitors alike.

16. First, Congress has acted to preserve the primacy of the capital's central symbols of American democracy—most notably, the U.S. Capitol Building and the Washington

Monument—by sharply restricting the height of buildings in the District. In 1910, it enacted the Height of Buildings Act, Pub. L. No. 61-196, 36 Stat. 452 (codified as amended at D.C. Code § 6-601.05 *et seq*.) (Height Act), which provides that—with limited exceptions not relevant here—"[n]o buildings" in the District "shall be erected, altered, or raised in any manner as to exceed the height of 130 feet on a business street or avenue," or "90 feet in height" "[o]n a residence street." D.C. Code § 6-601.05(b)–(c).

17. Unlike an 1899 version of the Height Act that this statute repealed, the 1910 Height Act contains no exemption for federal buildings. *See* Act of Mar. 1, 1899, § 7, ch. 322, 30 Stat. 922 (exempting any "Federal or municipal buildings" from prior, repealed height restrictions).

18. Second, Congress has acted to "preserve the important historical and natural features of the National Capital" by requiring that any federal construction in the District receive the review and approval of the National Capital Planning Commission (NCPC). 40 U.S.C. § 8711(a).

19. Federal agencies must "advise and consult" with NCPC as they "prepare plans and programs . . . that affect the plan and development of the National Capital." *Id.* § 8722(b)(1). For new "statues, fountains, and monuments," agencies must also consult with the Commission of Fine Arts. *Id.* § 9102(a).

20. NCPC must approve "the location, height, bulk, number of stories, and size of Federal public buildings in the District of Columbia." *Id.* § 8722(d). As presently constituted, NCPC includes six presidential appointees and four representatives of the District government, including the Mayor and the Chairman of the City Council. *Id.* § 8711(b).

21. Finally, Congress has required certain federal buildings in the District to obtain the approval of Congress itself.

22. In 40 U.S.C. § 8106, Congress provided that "[a] building or structure shall not be erected on" any federal land in the District of Columbia "without express authority of Congress." *Id.* § 8106.

23. Similarly, in the Commemorative Works Act, 40 U.S.C. §§ 8901–8909, Congress barred the construction of any "commemorative work" in the District—including any "monument . . . or other structure . . . designed to perpetuate . . . the memory of an individual, group, event, or other significant element of American history"—unless Congress has "specifically authorized" it. *Id.* §§ 8902(a)(1), 8903(a)(1).

24. Once a commemorative work receives Congress's approval, the agency or entity authorized to establish the work must also consult with the National Capital Memorial Advisory Commission "regarding the selection of alternative sites and design concepts for the commemorative work," and obtain the approval of both the Commission of Fine Arts and NCPC for the final site and design. *Id.* § 8905(a)(1)–(2); *see id.* § 8902(a)(4).

25. Congress designed this process to ensure that new monuments in the District "preserve the integrity of the comprehensive design . . . for the Nation's Capital," "reflect a consensus of the lasting national significance of the subjects involved," and "ensure the continued public use and enjoyment of open space in the District of Columbia and its environs." 40 U.S.C. § 8901(1)–(2), (4)(B).

**B. Other Statutory Requirements Governing Agency Action**

26. In addition to observing the statutory requirements specific to the Nation's capital, agencies constructing new works in the District must adhere to several foundational statutes that govern agency actions more broadly.

27. Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 300101 *et seq.*, requires agencies to "take into account the effect of [any] undertaking on any historic property" before taking new agency action. *Id.* § 306108. Pursuant to Section 106 and its implementing regulations, agencies must consult extensively with State Historic Preservation Officers and other stakeholders during each of four distinct project phases: agencies must engage with the States to conduct initial project planning, *see* 36 C.F.R. § 800.3; identify historic properties in the vicinity of the project, *id.* § 800.4; assess potential adverse impacts on those properties, *id.* § 800.5; and determine how to avoid, minimize, or mitigate such adverse effects, *id.* § 800.6.

28. The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, similarly contains "action-forcing provisions" to ensure that agencies "consider[] . . . the environmental impact of their actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976) (citation omitted). Under this Act, agencies must prepare a detailed "environmental impact statement" for any proposed agency action that "has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). If an agency concludes that a proposed action will have no such impact, or if the significance of such impacts are unknown, it is required to prepare an "environmental assessment" that "set[s] forth the basis of [the] agency's finding of no significant impact or determination that an environmental impact statement is necessary." *Id.* § 4336(b)(2). That environmental assessment may be "concise," *id.*, but it must "accurately identify the relevant environment concern," take a "hard look at the problem," and "make a convincing case for [the agency's] finding of no significant impact," including by demonstrating that the agency considered "reasonable alternatives to the proposed action." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322–23 (D.C. Cir. 2015).

29. Finally, federal agencies must comply with the Administrative Procedure Act. That familiar statute demands that agency actions be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). To satisfy this requirement, agencies must explain the basis for their decisions, consider costs, take into account reliance interests, and assess reasonable alternatives. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28–30 (2020). Courts must set aside actions that fail to satisfy these requirements or are otherwise not in accordance with law. 5 U.S.C. § 706.

## FACTUAL BACKGROUND

### A. The Historical Setting of the Arlington Memorial Bridge Corridor

30. For more than 200 years, development of the District's central core has carefully followed the *Plan of the City of Washington*, designed by Pierre Charles L'Enfant, the Revolutionary War military engineer and architectural designer appointed by President George Washington.

31. In his 1791 plan, L'Enfant relied on grand spaces interconnected by a network of sweeping vistas defined by architectural elements. His design elements were intended to express the character and structure of a new democracy defined by a balance of powers among three branches of government. As part of this design, L'Enfant identified an east-west axis extending from the Congress House (now the U.S. Capitol) to the Potomac River along a "Grand Avenue" (now the National Mall), flanked by prominent landmarks intended to be visible to one another. L'Enfant also created a northwest-southeast axis linking the Executive Mansion (now the White House) and the Congress House, establishing a physical expression of the interdependent

relationship between the Executive and Legislative branches, with the diagonal of Pennsylvania Avenue creating reciprocal vistas between the two power centers.

32. In 1901, the U.S. Senate established the Park Commission, also known as the McMillan Commission, to develop a comprehensive plan for the monumental core and park system of the District, focusing most attention on the National Mall. The Commission adopted the McMillan Plan, which expanded and reinterpreted portions of L'Enfant's earlier plan to address proposals for newly reclaimed lands along the Potomac River. The plan was intended to address proposed improvements as part of a unified system for the enhancement of the city as a whole, rather than as scattered individual projects.

33. Among other recommendations, the Commission proposed a national memorial to honor President Abraham Lincoln that would serve as the terminus of the grand axis from the Capitol.

34. The McMillan Commission also proposed a bridge linking the Lincoln Memorial with Arlington National Cemetery across the river in Virginia. The bridge was intended to serve as both a monumental entry to the federal city and a formal, processional route to the national cemetery.

35. Congress established the Arlington Memorial Bridge Commission (AMBC) to develop a design and carry out construction of the bridge. The design process for the Arlington Memorial Bridge had originally begun in the 1880s, decades prior to the adoption of the McMillan Plan and establishment of the AMBC, and an initial design for the bridge included prominent arched drawbridge towers. But the final report from the AMBC to Congress in 1924 rejected the arch design elements in favor of an alternative architectural design of a low horizontal bridge with vertical pylons marking its entries.

36. The resulting Arlington Memorial Bridge was intentionally designed to create an axial vista from the Lincoln Memorial directly to the Robert E. Lee Memorial in Virginia's Arlington National Cemetery, known as Arlington House, following similar design principles as the Pennsylvania Avenue corridor. This unobstructed, reciprocal view was designed to symbolize the unification of the country after the Civil War.

37. The viewshed played a critical role in the design of the low bridge: the AMBC report emphasized that the low bridge was designed so as "not to interfere with the view of the Lincoln Memorial as seen from Columbia Island." Report of the Arlington Memorial Bridge Commission, S. Doc. No. 68-95 (Apr. 22, 1924) (AMBC Report). In discussing the development of Columbia Island as a park, the AMBC Report also suggested the construction at the cross-axis where Memorial Circle now sits of two "stately columns . . . framing in *but not interfering with* the view of the Lincoln Memorial from the Lee Mansion." *Id.* at 9 (emphasis added). The final bridge design's elements were widely spaced to maintain a sweeping open vista between the terminal focal points.

38. Construction on the bridge began in 1926 and was largely complete by 1929, and the memorial avenue was completed by 1932. Memorial Circle was constructed beginning in 1940. Although the proposed two "stately columns" were ultimately not included in the final project, the project incorporated vertical pylons from the architectural design. The final design adhered to the L'Enfant and McMillan Plan principles of framing the visual termini of the Lincoln Memorial and Arlington House and maintaining sweeping vistas, which have remained unobstructed for nearly a century.

39. In addition to representing unification of the nation, Arlington Memorial Bridge holds further symbolic significance as the physical and ceremonial connection between

Washington, D.C. and Arlington National Cemetery—the final resting place of more than 400,000 active-duty service members, veterans, and their family members. The cemetery hosts approximately 150 funerals in a typical week, with attendees directed to arrive via Memorial Avenue, which links the bridge and Memorial Circle to the cemetery entrance. Arlington Memorial Bridge therefore provides both a ceremonial entrance to the District from Virginia and a ceremonial entrance from the District to Arlington National Cemetery.

40. Today, Memorial Circle, located within the boundaries of the District of Columbia in Lady Bird Johnson Park, connects Arlington Memorial Bridge to Memorial Avenue, forming a gateway to Arlington National Cemetery. Seven memorials line Memorial Avenue—conceived as an "Avenue of Heroes"—including the Women in Military Service for America Memorial. None of these memorials intrudes upon the unbroken vista linking the Lincoln Memorial to Arlington House. Together, Arlington Memorial Bridge, Memorial Circle, Memorial Avenue, and the cemetery entrance constitute the "Memorial Avenue Corridor," which is "a major element of … the monumental core of Washington, D.C."[1]

[1] Memorial Avenue Corridor Cultural Landscape, National Park Service, https://www.nps.gov/articles/600247.htm#4/31.80/-78.13 (last updated Oct. 7, 2021).

<u>Figure 1: Memorial Circle & Its Environs</u>




Memorial Circle (within Red Box) Shown with Surrounding Area. Source: D.C. Office of Planning, *District of Columbia Street Map* (Nov. 14, 2010) (excerpted and modified with box).

### B. The Arch Project

41. On October 15, 2025, President Trump announced that he intended to construct a 250-foot triumphal arch in the District of Columbia.

42. The President explained that this Arch would be located in Memorial Circle because "[s]omething's supposed to be here." When asked whom the Arch was for, the President said: "Me."[2]

43. Over the following year, NPS worked to fulfill the President's wishes.

44. In April 2026, NPS unveiled a proposed design for the Arch and submitted it to the Commission of Fine Arts for review. After that Commission announced its support for the design, subject to minor revisions, NPS submitted the proposal to NCPC for its preliminary approval. The

[2] Kathryn Watson, *Arc De Trump? President Shows Off Model of Independence Arch, Says "It's Going to Be Really Beautiful,"* CBS News (Oct. 16, 2025), https://www.cbsnews.com/news/trump-new-arch-resembling-arc-de-triomphe/.

Commission of Fine Arts subsequently provided its final approval on May 21, 2026. NPS has submitted a proposal for NCPC's final approval at a meeting scheduled for November 5, 2026.

45. As set forth in its final submissions, NPS will construct a 250-foot "Triumphal Arch" in Memorial Circle to "honor[] the nation's 250th anniversary." This Arch would be a "concrete structure clad in granite or marble veneer," topped with a "central winged figure and two statues," and surrounded by a paved plaza.[3] Its interior would contain a ground floor with ticketing and security; a gallery level with a central stair hall and two program spaces; and an observation deck. NPS estimates that the building could accommodate 450 visitors at a time, and that between 2,000 to 22,000 individuals would visit the site each day.

Figure 2: Defendants' Rendering of Arch




Defendants' Rendering of Arch Facing Arlington House. Source: Nat'l Park Serv., U.S. Dep't of Interior, Triumphal Arch at Memorial Circle, Revised Envt'l Assessment, DOI-NPS-136973, at 5 (Oct. 2026) (excerpted).

[3] Nat'l Park Serv., Triumphal Arch at Memorial Circle, Revised Envt'l Assessment at 3, DOI-NPS-136973 (Oct. 2026) (Revised EA).

46. NPS says that construction of the Arch would take place year-round "over an approximately two-to-three year period," and last for "20 hours per day . . . for the duration of the construction period."[4]

47. Throughout this period, the project would "alter existing traffic operations": the south side of Memorial Circle would be closed for "construction and staging," westbound traffic from Memorial Bridge would be reduced to two lanes, and "construction traffic could be substantial" as approximately "20 to 30 trucks . . . carry 80 to 100 loads per day." In addition, NPS would make permanent changes to traffic operations in this "major traffic rotary," including by installing several new traffic signals, "reshap[ing] roadway geometry," and creating a dedicated pickup and drop-off area along Memorial Avenue.[5]

48. In its materials, NPS acknowledges that the Arch would cause "direct physical disturbances and long-term changes to the site's" environment. To build the Arch, work crews would need to excavate and remove 1,400 truckloads of existing soil, import roughly 400 truckloads of engineered fill, and run utility lines to the site. They would also need to implement "stormwater and erosion control practices" to "protect adjacent drainage systems and waterways" during construction. Before construction ends, NPS explains, it would need to install a long-term stormwater retention system "in compliance with District of Columbia stormwater management regulations."[6]

49. NPS also acknowledges that the Arch would have "adverse effects on the integrity" of the surrounding historic landscape.[7]

---

[4] *Id.* at 7, 10.
[5] Prelim. Project Report at 11–12.
[6] *Id.* at 13; Nat'l Park Serv., Revised Finding of No Significant Impact at 7, 14 (Oct. 2026) (Revised FONSI).
[7] Revised FONSI at 11.

50. As explained above, Memorial Bridge and its surrounding elements were designed to bind together the North and the South after the Civil War by creating a direct line of sight between Arlington House and the Lincoln Memorial. NPS concedes that the Arch would "occupy the center of this designated vista, obstructing the reciprocal view and impairing the clarity of this sightline." It would also diminish the "traditional visual primacy" of the Washington Monument—one of the central design elements of the capital—by adding "a competing illuminated vertical element to the Monumental Core."[8]

[8] *Id.* at 11–12.

<u>Figure 3: View of Lincoln Memorial from Arlington House Before & After Arch</u>



Top: Current View of Lincoln Memorial from Arlington House. Bottom: Defendants' Rendering of View of Lincoln Memorial from Arlington House with Arch. Source: Nat'l Park Serv., U.S. Dep't of Interior, Triumphal Arch at Memorial Circle, Revised Envt'l Assessment, DOI-NPS-136973, at 19 (Oct. 2026).

51. Adverse effects on historic properties, including obstruction of sightlines, are usually resolved through the consultation process pursuant to Section 106 of the National Historic Preservation Act and its implementing regulations, and NPS typically engages in this consultation with State Historic Preservation Officers (SHPO) and other parties early in a project's design

process. But NPS did not initiate the consultation process for the Arch until June 5, 2026, nearly eight months after the initial announcement of the Arch project and far into the design approval process. NPS also requested that the District's and Virginia's SHPOs agree to expedite consultation so as to push the project to final approval as quickly as possible.

52. As part of the Section 106 process, NPS issued its Assessment of Effects report for public comment. The report described the design elements of the proposed Arch and identified historic properties that could be adversely affected by it. After receiving comments from the SHPOs and other consulting parties, NPS expanded the list of historic properties that would be adversely affected by the Arch.

53. Around the same time, NPS issued an Environmental Assessment (EA) for the Arch as part of its obligation under NEPA to evaluate the environmental impact of the project. NEPA analyses are supposed to consider alternatives, but for this assessment, NPS considered only two: constructing a 250-foot arch at Memorial Circle or nothing. Although NPS conceded in the EA that there would be a number of impacts to the human environment, including increased stormwater runoff, noise disturbances, and disruptions to traffic patterns, NPS issued a Finding of No Significant Impact (FONSI). NPS issued a Revised EA and a Revised FONSI on October 9, 2026.

54. Commenters, participating parties, and Plaintiffs have repeatedly advised NPS that the Arch and the process leading to its approval are unlawful. Several commenters have observed that NPS has not obtained congressional approval for the Arch, as required by both the Commemorative Works Act and 40 U.S.C. § 8106. The general counsel of NCPC has explained that the Arch is subject to the Height Act, which the Commission has consistently applied to federal buildings in the District since NCPC was given responsibility for approval of federal buildings in

1938. And the historic preservation offices for both the District of Columbia and Virginia have explained that NPS failed to meaningfully engage in the consultation required by Section 106 of the National Historic Preservation Act and its implementing regulations.

55. Commenters, participating parties, and Plaintiffs also provided NPS with alternatives to the proposed Arch location and design—such as a smaller arch or two slender vertical columns—as a means of avoiding some of the Arch's adverse effects.

56. In addition, parties have pointed out to NPS that no congressional appropriation authorizes the use of funds to construct the Arch.

~~56.~~57. Despite these objections, NPS ~~has~~ made clear that it intend~~s~~ed to proceed with construction of the Arch as planned. In addition to finding that the Arch would have "no significant impact" on the environment, NPS prematurely terminated consultations with the District and Virginia that are required by Section 106 of the NHPA without developing any "alternatives . . . to the undertaking." 36 C.F.R. § 800.6(a). In addition, NPS ~~has~~ explained that—given what it deems the symbolic importance of building a 250-foot Arch in Memorial Circle to commemorate the 250th anniversary of American independence—it "eliminated" from consideration any alternatives to construction of the Arch as planned.[9] And it has stated that the Arch will be funded entirely through private donations. Secretary Burgum ~~has~~ announced that "[a]fter 125 years of waiting, the most powerful capital in the world will be home of the most spectacular and beautiful arch of them all!"[10]

~~57.~~58. NCPC ~~has~~ likewise made clear that it ~~will~~would approve the project. The Commission's chairman ~~has~~ published a lengthy essay asserting that "[i]t is a national

---

[9] Revised EA at A-1.

[10] Doug Burgum, X (Sept. 3, 2026), https://x.com/SecretaryBurgum/status/2095587973907755133.

embarrassment" that the Arch has not yet been built, and stating that "[a]s chairman of the National Capital Planning Commission, I applaud President Trump's historic efforts to build a monumental arch at Memorial Circle, and will vote to approve this project."[11] Six members of the Commission, including the chairman, are federal appointees subject to the control of the President. And the Commission ~~has already~~had previously voted, repeatedly, to approve preliminary plans for the Arch with minor or no modifications.

~~58.~~59. ~~In recent weeks, two~~Two additional developments ~~have~~ further clarified Defendants' plans.

~~59.~~60. On September 20, 2026, President Trump announced in a post on Truth Social that he had "agreed to convert the magnificent Triumphal Arch . . . into a top grade Military Complex/Triumphal Arch to house, store, and have the rapid ability to use large numbers of drones, plus Snipers, on both the roof and plaza areas, and additionally have and hold large quantities of sniper ammunition in storage."[12]

~~60.~~61. The final plans for the Arch do not reference any such military uses of the building; instead, those documents affirmatively state that the proposed project "does not involve hazardous materials" or present any "safety risks."[13]

~~61.~~62. Nonetheless, the White House ~~has~~ rejected the contention that the President's "plans [for a military complex] ha[ve] changed," and the Department of the Interior has stated that

---

[11] Mark Paoletta, *Trump's Triumphal Arch Completes a Longstanding National Aspiration*, The Federalist (Oct. 5, 2026), https://thefederalist.com/2026/10/05/trumps-triumphal-arch-completes-a-longstanding-national-aspiration/.
[12] Donald J. Trump, Truth Social (Sept. 20, 2026, 7:34 a.m.).
[13] Revised FONSI at 18.

"[t]he current design of the Triumphal Arch is capable of accommodating the national security functions—and more—highlighted in the President's Truth Social Post."[14]

~~62.~~63. Consistent with those statements, both the Secretary of Defense and the Secretary of Homeland Security ~~have~~ filed declarations attesting that the Arch "will be utilized as a dual-purpose structure: a major national monument that also incorporates military utility," and that it will include "counter-sniper personnel," "drones," and "ammunition."[15]

~~63.~~64. Then, on October 21, 2026, Defendants provided a notice to this Court that they ~~a~~were on the cusp of beginning construction. That notice stated that, "[i]n the event the NCPC approves the [Arch] Proposal at the November 5 meeting and the Department of the Interior thereafter issues a final decision authorizing construction of the Proposal . . . construction could commence as early as November 5, 2026."[16]

~~64.~~65. Defendants ~~have~~ thus made clear that, once NCPC approve~~s~~d the project, the Court ~~may~~could have only a matter of hours—or less—to enjoin the project before construction begins.

66. On November 5, 2026 at approximately 10:28 p.m., NCPC approved the final site and building plans for the triumphal arch at Memorial Circle. The vote was 8-4, with all of the President's appointees voting in favor of the Arch and all of the District's representatives voting against.

67. Approximately one hour later, the Department of the Interior issued a Decision Record authorizing construction of the Arch.

---

[14] Dan Diamond, *Final plans for Trump's arch appear to abandon his 'military complex' idea*, Wash. Post (Oct. 16, 2026).

[15] Decl. of Pete Hegseth ¶¶ 10–12, 13.d, *Lemmon v. Trump*, No. 1:26-cv-00544-TSC, ECF No. 74-9 (Oct. 28, 2026); *see* Decl. of Markwayne Mullin ¶¶ 15-20, *Lemmon*, No. 1:26-cv-00544-TSC, ECF No. 74-8 (Oct. 28, 2026).

[16] Notice, *Lemmon v. Trump*, No. 1:26-cv-544-TSC, ECF No. 63 (Oct. 21, 2026).

68. The Decision Record largely restates prior analyses contained in the Assessment of Effects. For instance, it does not include any further discussion of alternatives studied or potential adverse effects on traffic, the environment, or historic resources, or proposed mitigation measures for traffic or environmental impacts.

69. The Decision Record also notes that “the Secretary of War and the Secretary of Homeland Security have identified national security uses for the Arch, after completion of its construction,” but states that “NPS’s NEPA analysis does not consider any potential future uses of the Arch for national security purposes.”

70. Approximately five minutes after Defendants filed the Decision Notice, this Court granted the District and Virginia’s Motion for a Temporary Restraining Order.

71. On November 6, 2026, an organization calling itself the United States Triumphal Arch Foundation launched a new website entitled “The Military Triumphal Arch.” The same day, the White House’s official X account posted a link to the website as part of a statement discussing the Arch’s commemorative objectives.[17]

72. Among other things, the website describes the planned military functions of the Arch: “Inside the two massive columns will be storage for munitions. In addition, areas on the pedestal and Observation Deck will be set aside for snipers, countersnipers, and provisions for a sniper nest. Likewise, the open ground area at the base of the Monument will be designed for launching drones and other homeland security assets, if and when necessary. The Military component will play a large role in the planning and development of this Project. It will be Highly Secretive but, at the same time, a Top Level and Lethal structure, the likes of which has not been

[17] The White House, X (Nov. 6, 2026, 8:58 a.m.), https://x.com/WhiteHouse/status/2118704527599673506.

seen in this Country before. It is long overdue, and has been sought for many years, especially by the Military."

## HARMS TO THE DISTRICT OF COLUMBIA AND VIRGINIA

~~65.~~73. The construction of the Arch will inflict immediate and irreparable harm on the District and Virginia. The Arch is slated to be built on a busy traffic circle that abuts the border between the jurisdictions, at the center of a historic viewshed, in a river whose environment the District has a statutory responsibility to protect. Both the construction of the Arch and the completed monument will disrupt the operations of both jurisdictions, impair their ability to carry out their responsibilities under federal and local law, and require the expenditure of substantial resources to mitigate and address those impacts.

### A. Traffic Impacts

~~66.~~74. Construction of the Arch would clog traffic at one of the principal corridors between the District and Virginia, impeding travel and requiring both jurisdictions to incur costs to assess and mitigate those effects.

~~67.~~75. Memorial Circle sits at "the gateway to Washington, D.C." and serves as "a key commuter corridor for both motorists and bicyclists." Each day, more than 27,000 vehicles, 1,100 bicyclists, and 1,200 pedestrians drive through the Circle between Virginia and the District, and the roadways "regularly exhibit[] operational strain."[18]

~~68.~~76. Throughout the two- to three-year period of construction, Defendants would close the south side of the Circle, reduce the number of lanes on Memorial Bridge, and introduce detours, with "[a]dditional short-term closures and detours . . . required at the beginning of the project." All the while, "construction traffic would be substantial," as dozens of vehicles bring up to a

[18] Revised EA at 49–50.

hundred loads of soil and fill to and from the site each day.[19]

~~69.~~77. The predictable result, as NPS acknowledges, is that construction would "intensify congestion" in and around Memorial Circle, cause "increased queuing, intermittent delays, and less consistent traffic flow," and "reduce the predictability of travel for all users" traveling between the District and Virginia.[20]

~~70.~~78. Increased traffic at one of the major arteries between the District and Virginia would foreseeably impede both jurisdictions' operations. Among other things, increased congestion would make it more difficult for emergency responders to travel between the District and Arlington County—jurisdictions that have mutual-aid agreements and that regularly provide emergency aid to one another. It would impede one of the District's emergency evacuation routes. And it would foreseeably deter tourists, workers, and other visitors from traveling between Arlington and the District, undermining each jurisdiction's economy and tax base.

~~71.~~79. In addition, both the District and Virginia would need to expend resources to assess and respond to the traffic disruptions. For instance, the Revised EA indicates that changes resulting from construction of the Arch would degrade the level of service on Virginia's roadways. The Arch project will also affect the District's transportation planning and coordination efforts and require continued professional staff time and resources. Both during construction and after it concludes, transportation officials would need to assess and study the Arch project's impacts and engage in mitigation planning.

**B. Emergency Response Impacts**

~~72.~~80. The Arch will require the District to expend additional resources on emergency

[19] *Id.*; Nat'l Park Serv., Triumphal Arch at Memorial Circle: NCPC Preliminary Project Report at 11–12 (June 2026) (Prelim. Project Report).
[20] Revised EA at 51.

planning and preparedness.

~~73.~~81. Congress has required the District to develop "plans and programs to provide necessary protection, relief, and assistance for persons and property in the District" in the event of a "disaster." D.C. Code § 7-2201; *see* D.C. Code § 5-101.03(1), (4), (3) (assigning the Mayor the "duty" to "preserve the public peace," "prevent crime," and "protect the rights of persons and of property"). The District has entrusted that responsibility to its Homeland Security & Emergency Management Agency (HSEMA), which evaluates, monitors, and mitigates threats and coordinates emergency and disaster response.

~~74.~~82. The Arch will require HSEMA to expend resources on new risk assessments and update preparedness plans because of the unique threats that the Arch and its construction pose to the District.

~~75.~~83. Memorial Bridge currently serves as a critical corridor for evacuations from the District, as well as for first responders who need to enter the District in an emergency. The construction-related closures of the Circle, new pedestrian crossings, and additional pedestrian and vehicular traffic after construction is finished will all complicate evacuations from and emergency response in the District. As a consequence, HSEMA will immediately need to devote additional resources and staff time to revise evacuation and emergency plans, regularly monitor road closures at Memorial Circle, and adjust protocols during events like presidential inaugurations.

~~76.~~84. In addition, HSEMA will need to prepare for the risks the Arch and nearby construction equipment will pose to incoming aircraft. The District and Northern Virginia have one of the most restrictive and complex civilian airspaces in the country. Due to its close proximity to the approach to Reagan National Airport, the 250-foot Arch and associated construction tower cranes reaching approximately 320 feet will pose risks to air safety that directly implicate

HSEMA's emergency planning and response obligations.

~~77.~~85. These risks are real. As the National Transportation Safety Board found in its investigation of the tragic January 29, 2025, mid-air collision over the Potomac River, there have been about 18 reports per year of near proximity events in the crowded airspace near Reagan National Airport. As a result, HSEMA will immediately need to divert personnel resources to understand operational implications from ongoing construction, develop contingency procedures, and establish consequence management plans in the event of an aircraft collision with the structure.

~~78.~~86. These safety risks, and HSEMA's planning and preparedness costs, will substantially increase due to the Arch's planned use as a military installation. The District's monumental core is not designed to support active military operations, and the introduction of weapons systems, munitions, and drones would alter HSEMA's risk environment dramatically, requiring a level of coordination and preparedness far beyond existing civilian-planning frameworks. And the Federal Aviation Administration's study of the Arch's aviation impacts predated the announcement of military use and did not contemplate a launch site for drones.

**C. Environmental Impacts**

~~79.~~87. The Arch will have environmental impacts that directly implicate the District's compliance and environmental interests.

~~80.~~88. Under the Clean Water Act, the federal government is "subject to, and [must] comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution." 33 U.S.C. § 1323(a). Construction of the Arch will require a large-scale excavation of Memorial Circle, exposing soil and sediment that will, absent appropriate mitigation efforts, be carried into the Potomac River by stormwater. Similarly, the completed Arch will include a newly paved surface

of 62,875 square feet of impervious area that cannot absorb water. Absent mitigation efforts, that paved surface will cause stormwater runoff to increase substantially, increasing the risk that sediment will flow into the river.

~~81.~~89. The District will incur costs no matter how Defendants address these discharges.

~~82.~~90. If Defendants do not seek approvals from the District for these discharges, they will be in violation of the District's laws and will be making uncontrolled discharges into its waters, inflicting a quintessential environmental injury. During NCPC's debate and deliberations on the Arch on November 5, an NPS representative indicated that NPS had not sought or received any environmental permits from the District aside from a permit authorizing archaeological testing in advance of construction.

~~83.~~91. By contrast, if Defendants implement measures to be in "compliance with" the District's stormwater requirements—as they have indicated they will do, both during and after construction—then they will need to obtain a District-approved Soil Erosion and Sediment Control plan before "engag[ing] in . . . land-disturbing activity, including . . . excavating" to manage the site's construction runoff, *see* 21 D.C.M.R. § 540, and a District-approved Stormwater Management Plan to control post-construction runoff, *see id.* § 516.

~~84.~~92. The District and its agencies will need to expend time and resources to review and approve the plans and monitor compliance, including through field inspections. These expenses are not optional: if the District does not expend resources to review, approve, and confirm compliance with these plans, the District risks noncompliance with federal law, which requires the District to maintain water quality standards in the Potomac by ensuring that entities limit direct and indirect discharges into the river.

~~85.~~93. The Arch will also require the District to take action to protect local wildlife. As

the public trustee for natural resources within its borders, the District has an obligation to conserve wildlife in the District and must take steps to monitor threats to endangered and other vulnerable species. *See* D.C. Code § 8-151.08(8). The District also has conservation duties imposed by federal law, such as the responsibility to manage and control the taking of wildlife in the District, D.C. Code § 8-2221.28, and the duty to implement a State Wildlife Action Plan under a U.S. Fish and Wildlife Service grant, 16 U.S.C. § 669b(c).

~~86.~~94. The Arch directly implicates those interests and obligations. NPS acknowledges the potential occurrence of two endangered or proposed endangered bats—the northern long-eared bat and the tricolored bat—near the site of the Arch. The presence of tall construction cranes, the installation of new artificial lights, and, eventually, a monumental Arch all have, at minimum, the potential to interfere with the bats as they forage in or traverse Memorial Circle.

~~87.~~95. As the District is specifically required by its State Wildlife Action Plan to take conservation measures with respect to these species, it will need to expend additional funds to study the impacts of the Arch on these species and take appropriate protective measures.

**D. Historic Preservation Impacts**

~~88.~~96. The Arch will change the District's historic character and substantially disrupt the L'Enfant Plan and historic properties in the District and Virginia. Memorial Circle and its surrounding landscapes form an essential component of the historic fabric linking the Lincoln Memorial, Arlington Memorial Bridge, and Arlington House. These relationships were intentionally designed to reflect the principles encapsulated in the L'Enfant Plan (and expanded through the McMillan Plan), which has guided the development of the monumental core for more than two centuries.

~~89.~~97. The District's well-preserved historic neighborhoods, low city profile crowned by historic landmarks, and distinctive L'Enfant Plan make it unique among American cities and help the District attract new residents, visitors, and even planning scholars and heritage tourists from around the world. The District thus has a strong interest in defending the integrity of the L'Enfant Plan and preserving the historic character of its landmarks and oldest neighborhoods.

~~90.~~98. Defendants' Arch substantially damages this interest. By blocking the symbolic axis connecting Arlington House to the Lincoln Memorial, the Arch not only robs both structures of much of their meaning but also violates the L'Enfant Plan's emphasis on framing and leaving fully unobstructed visual termini of the District's avenues.

~~91.~~99. At 250 feet, the Arch will also be one of the tallest structures in the District, visible from across the height-limited District, and will adversely affect all other prominent historic landmarks on the skyline of the national capital in its vicinity, including the Washington Monument, Capitol Building, and National Cathedral, by noticeably diminishing their relative prominence. Even NPS concedes in its Assessment of Effects report that these historic resources will be adversely affected.

Figure 4: Elevations of the Arch & Capitol Building



Defendants' Rendering of Elevation of the Arch (left) and Thomas U. Walter Drawing of the U.S. Capitol (right), at 1:1 Scale. Source Left: U.S. Dep't of Interior, Triumphal Arch

at Memorial Circle, Revised Envt'l Assessment, DOI-NPS-136973, at 4 (Oct. 2026). Source Right: Thomas U. Walter, *Elevation of Dome of U.S. Capitol* (1859) (Smithsonian Inst.).

~~92.~~100. The Arch will also impair the historic character of preserved neighborhoods like the Georgetown Historic District, where the District owns several properties, as well as District-owned landmarks like the Key Bridge.

~~93.~~101. All of these harms will make it more difficult for the District to maintain and enhance the unique character of its neighborhoods, promote the integrity of the L'Enfant and McMillan plans, maintain its desirability among residents and visitors, and protect the value and character of its own properties.

~~94.~~102. The Arch will also impair historic properties in Virginia. As described above, the Arch will result in an almost complete disruption of the visual dialogue between the Lincoln Memorial, Arlington National Cemetery, and Arlington House—an intentionally designed visual connection between the resting place for the soldiers who sacrificed their lives for the Union during the Civil War and Robert E. Lee's former home in Virginia with the memorial for the President who fought and ultimately died to keep this nation united across the Potomac River. This visual connection represents the restored Union, symbolically reuniting the North and the South, which is critical to Virginia's history. The Arch truncates that ongoing connection.

~~95.~~103. The Arch in no way resembles the two "stately columns . . . framing in *but not interfering with* the view of the Lincoln Memorial from the Lee Mansion" that were described in the 1924 AMBC report. Unlike those columns—and in breaking with the AMBC's parallel objective of not "interfer[ing] with the view of the Lincoln Memorial"—the Arch will stand as a massive obstruction that blocks the view of both historic properties. And by interrupting the graceful open link between the federal capital and the Commonwealth that the AMBC designed,

the Arch will undermine the landscape of national unity and post-Civil War reconciliation that Congress sought to create.[21]

Figure 5: Renderings of 1924 AMBC Framing Columns & 2026 Arch



Top: Design for Columns as Depicted in AMBC Report. Source: Report of the Arlington Memorial Bridge Commission (S. Doc. No. 68-95, at 34* (1924)) (excerpted). Bottom: Defendants' Rendering of Arch from Lincoln Memorial. Source: *View from the Lincoln Memorial Toward the Arlington House and Arlington Hemicycle with the Proposed Triumphal Arch*, *published in* Nat'l Park Serv., U.S. Dep't of Interior, Triumphal Arch at Memorial Circle, Revised Envt'l Assessment, DOI-NPS-136973, at 20 (Oct. 2026) (excerpted).

~~96.~~104. Defendants' Arch also adversely affects other Virginia sites that have been designated as National Historic Landmarks, including Fort Myer National Historic Landmark

[21] AMBC Report at 9, 39 (emphasis added).

District and the Pentagon National Historic Landmark. These harms will impair Virginia's ability to preserve the historic character of these properties.

~~97.~~105. Despite the significant nature of the adverse effects to these nationally significant landscapes and historic properties and, in the case of Arlington National Cemetery, hallowed ground, Defendants declined Virginia's and the District's requests to avoid, minimize, or establish meaningful mitigation measures. Instead, much of Defendants' proposed documentation-style "mitigation" is partially or fully duplicative of existing documentation for the impacted properties.

**E. Violation of Procedural Rights**

~~98.~~106. Defendants have also violated both the District's and Virginia's procedural rights by circumventing statutorily mandated processes.

~~99.~~107. First, Defendants have violated the District's procedural rights related to the National Capital Memorial Advisory Commission.

~~100.~~108. The Commemorative Works Act grants the District a representative on the National Capital Memorial Advisory Commission and specifies that project sponsors and Congress must consult with the Commission. 40 U.S.C. §§ 8904(a)(6), 8905(a). This consultation requirement allows the District a crucial voice in the planning of new monuments and helps to ensure that both Congress and project sponsors are mindful of impacts on the District.

~~101.~~109. Defendants, however, have bypassed the Memorial Advisory Commission in its entirety, depriving the District of an important opportunity to provide input on the planning of the Arch, especially regarding the impacts of the Arch on the District.

~~102.~~110. In bypassing the Memorial Advisory Commission, Defendants have also impeded the District's rights to participate as a member of NCPC, which votes on site and design

proposals subject to the Commemorative Works Act. *See id.* § 8905(a)(2). NCPC takes such votes only *after* the Memorial Advisory Commission provides its advice. *Id.* § 8905(a).

~~103.~~111. As this sequenced approval structure suggests, advice from the Memorial Advisory Commission is necessary to allow NCPC members to cast an informed vote on projects under review. And without that information, none of the District's representatives on the Commission could meaningfully evaluate the project or fulfill their role on the Commission, and the District was effectively excluded from the process.

~~104.~~112. Defendants violated a third set of the District's and Virginia's procedural rights: Section 106 of the NHPA and its implementing regulations requires federal agencies to consult with the relevant State Historic Preservation Officers (SHPO) to develop solutions to reduce adverse impacts on historic properties. *See* 54 U.S.C. § 306108.

~~105.~~113. Though such consultations must begin "early in the . . . planning" process to ensure that a "broad range of alternatives may be considered," 36 C.F.R. § 800.1(c), Defendants declined to consult the District's or Virginia's SHPOs until after making site selection and design decisions.

~~106.~~114. Once they finally initiated consultations, Defendants unlawfully expedited the consultations without the SHPOs' consent and made clear that that they would not actually consider alternatives to the Arch's site or design concept, in violation of Defendants' duty to consult to avoid, minimize, and mitigate the Arch's adverse effects.

~~107.~~115. Defendants' decision to flout the Section 106 process deprived Plaintiffs of an opportunity to protect treasured sites within their boundaries, including Arlington National Cemetery, and several District-owned properties within the Georgetown Historic District.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the Administrative Procedure Act
### Contrary to Law—Commemorative Works Act
### (All Defendants)

~~108.~~116. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~109.~~117. Under the Administrative Procedure Act (APA), a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)–(D).

~~110.~~118. Defendants National Park Service and U.S. Department of the Interior are agencies subject to the APA. *Id.* § 701(b)(1).

~~111.~~119. Defendants have taken final agency action by ~~deciding to construct an~~authorizing construction of the Arch in Memorial Circle.

~~112.~~120. The Commemorative Works Act prohibits construction of any commemorative work within specified areas of the District and its environs, including Memorial Circle, without specific authorization from Congress. 40 U.S.C. § 8903(a)(1). The Act further requires Congress to specifically approve the construction of any commemorative work within Area I, including Memorial Circle. This specific authorization must occur after Congress is notified that the Secretary of the Interior or the Administrator of General Services has determined that the commemorative work's subject is of "preeminent historical and lasting significance to the United States." *Id.* § 8908(b)(1).

~~113.~~121. The Commemorative Works Act also sets forth several procedural requirements for commemorative works in covered areas, including Memorial Circle. The Act requires project sponsors to "consult with the National Capital Memorial Advisory Commission"

on site selection and design concepts. *Id.* § 8905(a)(1). It also requires the Secretary of the Interior or the Administrator of General Services to "submit . . . site and design proposals to the Commission on Fine Arts and the National Capital Planning Commission" after such consultation with the National Capital Memorial Advisory Commission. *Id.* § 8905(a)(2).

~~114.~~122. The Arch is a "commemorative work" subject to the Commemorative Works Act's requirements, including the requirements applicable to works within Area I. Nonetheless, Defendants have failed to meet several of the statute's mandatory requirements.

~~115.~~123. Defendants did not obtain specific authorization from Congress, did not notify Congress that the Arch's subject is of "preeminent historical and lasting significance to the United States," did not obtain approval from Congress to site the Arch within Area I, and did not consult with the National Capital Memorial Advisory Commission.

~~116.~~124. Defendants' failure to comply with the Commemorative Works Act deprived the District of an opportunity to meaningfully participate in several mandated procedures, including those involving the National Capital Memorial Advisory Commission and the National Capital Planning Commission.

~~117.~~125. Defendants' decision to construct the Arch without having satisfied the Commemorative Works Act's requirement is contrary to the Act, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law" and should be set aside and vacated pursuant to 5 U.S.C. § 706(2)(A), (C)–(D).

**COUNT TWO**
**Violation of the Administrative Procedure Act**
**Contrary to Law—40 U.S.C. § 8106**
**(All Defendants)**

~~118.~~126. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~119.~~127. 40 U.S.C. § 8106 provides that "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

~~120.~~128. The Arch is a "building or structure."

~~121.~~129. Memorial Circle is a "reservation, park, or public grounds of the Federal Government in the District of Columbia."

~~122.~~130. Congress has not granted "express authority" to construct an arch on Memorial Circle.

~~123.~~131. Despite the absence of any approval from Congress to construct the Arch, Defendants plan to erect the Arch on a park or public grounds of the Federal Government at Memorial Circle.

~~124.~~132. Defendants' decision to construct the Arch without having satisfied the requirement of 40 U.S.C. § 8106 is contrary to the statute, "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and should be set aside and vacated pursuant to 5 U.S.C. § 706(2)(A), (C).

**COUNT THREE**
**Violation of the Administrative Procedure Act**
**Contrary to Law—Height of Buildings Act**
**(All Defendants)**

~~125.~~133. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~126.~~134. The Height of Buildings Act provides that, with limited exceptions, "[n]o buildings shall be erected" in the District of Columbia "to exceed the height of 130 feet on a business street or avenue" or "90 feet in height" "[o]n a residence street." D.C. Code § 6-601.05(b)–(c).

~~127.~~135. The Arch is a building.

~~128.~~136. The Arch's proposed location at the center of Memorial Circle is in the District of Columbia.

~~129.~~137. Defendants' design proposes the Arch to be 250 feet in height, nearly double the 130-foot maximum.

~~130.~~138. The Height of Buildings Act allows some specified architectural features, including spires, towers, domes, and penthouses, to be erected to a greater height when certain conditions, including approval by the Mayor and no human occupation, are met.

~~131.~~139. As proposed, no components of the Arch would qualify for any exception to the Act's height limits.

~~132.~~140. Defendants' decision to construct the Arch in violation of the Height of Buildings Act is contrary to the statute, "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and should be set aside and vacated pursuant to 5 U.S.C. § 706(2)(A), (C).

**COUNT FOUR**
**Violation of the Administrative Procedure Act**
**Contrary to Law—National Historic Preservation Act**
**(All Defendants)**

~~133.~~141. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~134.~~142. Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108, requires federal agencies, prior to approving an undertaking, to "take into account the effect of any historic property" listed in or eligible for the National Register of Historic Places.

~~135.~~143. Construction of the Arch is an "undertaking" within the meaning of Section 106 and its implementing regulations.

~~136.~~144. The regulations implementing Section 106 require an agency proposing an undertaking to assess whether the undertaking will have adverse effects on those properties and

consult with the State Historic Preservation Officer, local governments, and other consulting parties to avoid, minimize, or mitigate adverse effects. *See* 36 C.F.R. §§ 800.4–800.6. The agency must initiate this consultation process "early in the undertaking's planning" to ensure that a "broad range of alternatives may be considered during the planning process." *Id.* § 800.1(c).

~~137.~~145. Under those regulations, an "adverse effect" occurs when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify it for inclusion in the National Register in a manner that would, among other impacts, diminish its integrity of location or setting. *Id.* § 800.5(a)(1).

~~138.~~146. Memorial Circle, the site of the Arch, is a place of extraordinary historic significance.

~~139.~~147. Due to its highly visible location and overwhelming bulk and height (250 feet), the Arch will adversely affect numerous historic properties, including all prominent historic landmarks on the skyline of the national capital in its vicinity, noticeably diminishing their relative prominence. The adverse effects are felt by historic properties owned by the District of Columbia, including Key Bridge and District-owned properties within the affected Georgetown Historic District, and by historic properties in Virginia, including Arlington National Cemetery, Arlington House, and the cultural landscape connecting these properties to Washington, DC and the Lincoln Memorial via the Arlington Memorial Bridge.

~~140.~~148. Defendants were aware that the Arch would have significant impacts on numerous historic properties early in the planning process. Nonetheless, Defendants did not consult with the State Historic Preservation Officers (SHPO) "early in the undertaking's planning," as required by 36 C.F.R. § 800.1(c). Instead, Defendants waited until more than seven months

after the Arch was first announced—and after making site selection and design decisions—to contact the District's and Virginia's SHPOs to initiate the Section 106 consultation process.

~~141.~~149. Defendants expedited the consultation process without consent from the SHPOs, and did not meaningfully consider comments from consulting parties, including the District's and Virginia's SHPOs. Defendants did not consider alternatives to avoid, minimize, or sufficiently mitigate the adverse effects of the Arch on nearby historic properties. Defendants made clear that they would not consider any site alternatives or design alternatives. Defendants also did not consider measures that would reasonably mitigate the adverse effects of the Arch. And Defendants did not consult with SHPOs at all on their decision to place a military installation in the Arch.

~~142.~~150. Defendants abruptly and prematurely terminated the Section 106 consultation process with the District's SHPO, Virginia's SHPO, and other consulting parties.

~~143.~~151. Defendants' failure to initiate the consultation process until after site selection and design decisions had been made violated 36 C.F.R. § 800.1(c)'s requirement that agencies consult with State Historic Preservation Officers "early in the undertaking's planning" to ensure that a "broad range of alternatives may be considered during the planning process." Defendants' abrupt and premature termination of the consultation process, and their failure to consider alternatives or modifications that could avoid, minimize, or reasonably mitigate the Arch's impacts on historic properties, violated 36 C.F.R. § 800.6(a).

~~144.~~152. Defendants' failure to comply with Section 106 and its implementing regulations deprived the District's State Historic Preservation Officer of an opportunity to protect historic properties in the District and avoid significant adverse impacts on such properties, including properties owned by the District.

~~145.~~153. Defendants' failure to comply with Section 106 and its implementing regulations deprived Virginia's State Historic Preservation Officer of an opportunity to protect historic properties in the Commonwealth and has significant adverse impacts on such properties, including properties owned by Virginia.

~~146.~~154. By proceeding with construction of the Arch without first complying with Section 106 and its implementing regulations, Defendants unlawfully withheld and unreasonably delayed agency action required by law, in violation of 5 U.S.C. 706(1), and have acted not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and "without observance of procedure required by law," in violation of 5 U.S.C. § 706(2)(A), (C), (D).

**COUNT FIVE**
**Violation of the Administrative Procedure Act**
**Contrary to Law—National Environmental Policy Act**
**(All Defendants)**

~~147.~~155. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~148.~~156. The National Environmental Policy Act (NEPA) requires an agency to prepare a detailed "environmental impact statement" for any proposed agency action that "has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). If an agency concludes that a proposed action will have no such impact, or if the significance of such impacts are unknown, it is required to prepare an "environmental assessment" that "set[s] forth the basis of [the] agency's finding of no significant impact or determination that an environmental impact statement is necessary." *Id.* § 4336(b)(2).

~~149.~~157. That assessment must include a discussion of "reasonable alternatives to the proposed action" and a "hard look at [its] environmental impacts." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1323, 1325 (D.C. Cir. 2015).

~~150.~~158. The decision to construct the Arch is a "major federal action" for purposes of NEPA that is under Defendants' substantial direction and control. 42 U.S.C. § 4336e(10)(A).

~~151.~~159. The Arch's Environmental Assessment (EA) fails to analyze a reasonable range of alternatives to the Arch. The EA explicitly "eliminated" consideration of every alternative except "no action" or a "250-foot-tall" Arch "within Memorial Circle," on the grounds that none of the proffered alternatives adequately advanced the "purpose and need" for the Arch. The agency defined its "purpose and need" in a way that is coterminous with the precise characteristics of the Arch itself: it said that it sought to construct a building whose "height[]" is "representative" of "250 years of American independence," that is "grounded in the historic design intent for the Arlington Memorial Bridge and Memorial Avenue Corridor," and that has a "grand and ornate design."[22] NEPA forbids an agency from defining its objectives "in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (Thomas, J.); *see Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 667 (7th Cir. 1997).

~~152.~~160. Defendants have also failed to conduct the hard look at environmental impacts that NEPA requires. Among other defects, Defendants:

a. Failed to adequately assess the Arch's effects on traffic, congestion, noise, water resources, and cultural and historic resources;

b. Failed to assess the potential harms from mishaps or accidents related to housing drones, ammunition, and other military equipment within a large facility that lies within a major traffic circle in a busy and populous area;

[22] Revised EA at A-1 to A-2.

c. Relied on unreliable or stale data for assessing the impacts of the Arch project on traffic congestion, aircraft noise, and water runoff, among others;

d. Failed to conduct a detailed analysis of impacts on public safety and air quality, among others;

e. Failed to obtain or consider the comments and views of the Department of Energy and Environment, the District agency authorized to develop and enforce environmental standards;

f. Failed to prepare a supplemental EA or full Environmental Impact Statement (EIS) to account for transformation of the Arch project into a military installation housing drones and ammunition, among other things; and

g. Failed to conclude the Arch project would cause significant effects requiring preparation of an EIS.

~~153.~~161. Defendants' failure to conduct the required environmental review in accordance with NEPA deprives the District and the public of the procedure to which they are entitled under law.

~~154.~~162. Defendants' decision to construct the Arch in violation of NEPA is contrary to the statute, "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and should be set aside and vacated pursuant to 5 U.S.C. § 706(2)(A), (C).

**COUNT SIX**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**
**(All Defendants)**

~~155.~~163. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~156.~~164. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

~~157.~~165. An agency action is arbitrary or capricious where the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

~~158.~~166. An agency must, at minimum, consider alternatives and "important aspect[s] of the problem," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (citations and internal quotation marks omitted).

~~159.~~167. Defendants' actions, including their decision to rush consultations under the Section 106 process established under the NHPA, and decline to conduct considered assessments and follow other requirements imposed by NEPA, are arbitrary and capricious for several reasons, including the following:

a. Defendants have refused to consider alternatives to building the Arch at Memorial Circle, such as alternative sites or alternative designs, despite acknowledging that the Arch will adversely affect dozens of historic properties and landmarks and receiving alternative proposals from consulting parties;

b. Defendants have flouted the standard Section 106 consultation process to rush the project to final approval, ignoring harms to historical properties in the District and Virginia, disregarding the reliance interests of District and Virginia residents in the

historical viewshed, and failing to account for harms to the District's status as a planned federal city;

c. Defendants have failed to account for the potential disruptions to evacuation routes and emergency services for the District that will occur both during and after construction of the Arch;

d. Defendants have failed to account for costs related to assessing and mitigating the traffic impacts of redesigning traffic patterns at Memorial Circle, including installing new traffic and pedestrian crossing signals, which are likely to require adjustments to signalization elsewhere;

e. Defendants have failed to adequately account for the environmental harms that will stem from the Arch's construction; and

f. Defendants have repeatedly stated publicly that the Arch will be used for military purposes, but no planning documents mention the purpose or weigh costs or alternatives for that use. For instance, Defendants have failed to account for the risks to civilian aviation of placing a military installation equipped with drones within hundreds of feet of the approach pathway to a major U.S. airport within one of the busiest and most complicated airspaces in the nation.

~~160.~~168. For all these and other reasons, Defendants have acted arbitrarily and capriciously in violation of 5 U.S.C. § 706, and their decision to construct the Arch should be set aside and vacated pursuant to 5 U.S.C. § 706(2)(A), (C).

**COUNT SEVEN**
**Ultra Vires Action**
**(All Defendants)**

~~161.~~169. Plaintiffs restate and reallege all paragraphs above as if fully set forth here

~~162.~~170. Plaintiffs have a non-statutory cause of action to enjoin and declare unlawful official agency executive action that is ultra vires and in excess of legal authority.

~~163.~~171. The Commemorative Works Act and 40 U.S.C. § 8106 forbid the construction of the Arch absent specific congressional authorization.

~~164.~~172. The Height of Buildings Act forbids the construction of the Arch due to its excessive height.

~~165.~~173. The National Historic Preservation Act of 1966 and NEPA impose procedural requirements that must be satisfied before federal projects like the Arch may be constructed.

~~166.~~174. Defendants ~~will start~~have authorized construction of the Arch ~~as soon as November 5, 2026,~~ without complying with these statutory requirements.

~~167.~~175. Defendants' decision to construct the Arch without congressional approval and without satisfaction of the procedural requirements Congress mandated is in excess of the powers that Congress has granted to Defendants and is contrary to specific statutory requirements.

~~168.~~176. Plaintiffs therefore are entitled to an order enjoining Defendants, and all persons acting on their behalf, from undertaking, authorizing, funding, permitting, or otherwise effectuating any aspect of construction or site preparation for the Arch at Memorial Circle.

**COUNT EIGHT**
**Mandamus and Prohibition**
**(All Defendants)**

~~169.~~177. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~170.~~178. Mandamus and prohibitory relief is appropriate where a plaintiff has a clear right to relief but no other adequate legal remedy, and where the defendant has a clear duty to act or refrain from acting.

~~171.~~179. The Commemorative Works Act and 40 U.S.C. § 8106 impose a non-discretionary duty to obtain congressional approval before constructing buildings like the Arch on Memorial Circle.

~~172.~~180. The Height of Buildings Act prohibits construction of the Arch due to its excessive height.

~~173.~~181. The National Historic Preservation Act of 1966 and National Environmental Policy Act impose procedural requirements that must be satisfied before federal projects like the Arch may be constructed.

~~174.~~182. Defendants ~~will start constructing~~have authorized construction of the Arch ~~as soon as November 5, 2026,~~ without ~~having complied~~complying with these requirements.

~~175.~~183. Plaintiffs therefore are entitled to a writ of mandamus and prohibition, and injunctive relief ordering Defendants to comply with their mandatory, non-discretionary duties under the Commemorative Works Act, 40 U.S.C. § 8106, the Height of Buildings Act, the National Historic Preservation Act, and the National Environmental Policy Act.

**COUNT NINE**
**Violation of the Administrative Procedure Act**
**Contrary to Law—Expenditure of Funds Without Congressional Authorization**
**(All Defendants)**

184. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

185. The Appropriations Clause provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

186. The Antideficiency Act similarly provides that "an officer or employee of the United States Government may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A).

187. In general, "a government agency may not accept for its own use . . . gifts of money or other property in the absence of specific statutory authority." 6 Principles of Federal Appropriations Law pt. E, § 3 (3d ed. 2015).

188. No appropriation authorizes the expenditure of funds to construct the Arch.

189. Nor does any statute authorize NPS to accept gifts to fund the Arch. As relevant, NPS's gift authority is limited to the acceptance of "money that may be donated for the purposes of the [National Park] System." 54 U.S.C. § 101101(2).

190. Construction of the Arch does not advance the purposes of the National Park System, which are limited by statute to "conserv[ing] the scenery, natural and historic objections, and wild life in the System units" and "provid[ing] for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.* § 100101(a).

191. Defendants' decision to construct the Arch without any appropriation or other statute authorizing the expenditure of funds for such project is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and should be set aside and vacated pursuant to 5 U.S.C. § 706(2)(A), (C).

## COUNT TEN
## Violation of the Administrative Procedure Act
## Contrary to Law—40 U.S.C. § 8722
## (All Defendants)

200. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

201. 40 U.S.C. § 8722(b)(2) requires federal agencies to "advise and consult with the [National Capital Planning] Commission as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital." Agencies are

required to engage in such consultation "*before* preparing construction plans the agency originates for proposed developments and project." *Id.* (emphasis added).

202. 40 U.S.C. § 8722(d) further provides that "the location, height, bulk, numbers of stories, and size of federal public buildings and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of the Commission."

203. President Trump has announced—and Defendants have subsequently confirmed—that the Arch will be used for the deployment of drones and housing snipers. These functions will naturally encroach upon the "open space in and around" the Arch. Indeed, the Military Triumphal Arch webpage indicates that "the open ground area at the base of the Monument will be designed for launching drones and other homeland security assets, if and when necessary."

204. None of the planning documents that Defendants provided to NCPC for final approval at the November 5, 2026 meeting contain any information regarding the proposed military uses for the Arch, including any proposed designs, safety risk assessments regarding munitions storage, environmental assessments, or assessments of adverse effects on historic properties related to the military functions of the Arch.

205. By failing to provide *any* planning information regarding the Arch's military uses, Defendants failed to consult with NCPC "before preparing construction plans," nor did Defendants consult with NCPC at the "preliminary and successive stages" of planning for the Arch's construction, as required under 40 U.S.C. § 8722(b)(1). Defendants also failed to obtain NCPC's approval for those uses, as required under 40 U.S.C. § 8722(d).

206. Defendants' decision to construct the Arch for military use without first consulting NCPC or obtaining its approval for the military uses of the Arch is contrary to statute, "not in

accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and should be set aside and vacated pursuant to 5 U.S.C. § 706(2)(A), (C).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs District of Columbia and Commonwealth of Virginia respectfully request that the Court:

1. Declare that Defendants' approval, authorization, and advancement of the Arch project at Memorial Circle—including their determinations under the Commemorative Works Act, the Height of Buildings Act, the National Environmental Policy Act, the National Historic Preservation Act, and any related federal review processes—are unlawful;
2. Preliminarily and permanently enjoin Defendants, and all persons acting on their behalf, from undertaking, authorizing, funding, permitting, expending funds on, accepting gifts for the purpose of funding, or otherwise effectuating any aspect of construction or site preparation for the Arch at Memorial Circle;
3. Vacate and set aside any federal approvals, findings, determinations, or authorizations issued in connection with the Arch, including the Environmental Assessment and the Finding of No Significant Impact;
4. Maintain the status quo at Memorial Circle pending full compliance with applicable federal, District, and Virginia statutes and regulations; and
5. Award such additional relief as the interests of justice may require, including but not limited to further declaratory or injunctive relief necessary to prevent irreparable harm to the District of Columbia, the Commonwealth of Virginia, and their agencies.

Dated: ~~October 31~~November 10, 2026 Respectfully submitted,

JAY JONES
Attorney General of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN (1672508)
MICHAEL K. PERLOFF (1601047)
Deputy Solicitors General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 997-5222
Email: mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (1026153)
ELIZA H. SIMON (90035651)
Senior Counsels to the Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH (1044671)
Senior Counsel to the Attorney General

/s/ Karthik P. Reddy
KARTHIK P. REDDY (1048848)
Special Assistant Attorney General
NICOLE S. HILL (888324938)
JOHN B. LYMAN (156467)
SAMANTHA HALL (1014735)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW
Washington, DC 20001
Tel: (202) 279-1261
Email: mitchell.reich@dc.gov

*Counsel for the District of Columbia*