**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**MICHAEL LEMMON**, *et al.*,

*Plaintiffs,*

v.

**DONALD J. TRUMP**, *et al.*,

*Defendants.*

Civil Action No. 26-544 (TSC)

**DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA**,

*Plaintiffs*,

v.

**NATIONAL PARK SERVICE**, *et al.*,

*Defendants*.

Civil Action No. 26-3838 (TSC)

**CONSOLIDATED CASES**

**MEMORANDUM OF LAW IN SUPPORT OF DISTRICT AND VIRGINIA PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .... ii

INTRODUCTION .... 1

ARGUMENT .... 2

I. Plaintiffs Are Likely to Succeed on the Merits .... 2

A. The District and Virginia Have Standing .... 2

B. The Arch Is Unlawful .... 7

II. Plaintiffs Will Suffer Irreparable Injury Absent an Injunction or Section 705 Stay .... 14

III. The Equities Favor Relief .... 20

CONCLUSION .... 21

**TABLE OF AUTHORITIES**

*Cases*

*Am. Ass'n of Nurse Practitioners v. McMahon*,
836 F. Supp. 3d 175 (D.D.C. 2026) ....................20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................5

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................8

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020)....................9

**Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................9

*Mullin v. Friends of the Ruidosa Church*,
2026 WL 3386954 (U.S. Nov. 9, 2026) ....................19

*Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026)....................12

*Nw. Pipeline Corp. v. Pipeline Right of Way Easement*,
197 F. Supp. 2d 1241 (E.D. Wa. 2002) ....................19

**Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025)....................2

*Techworld Dev. Corp. v. D.C. Pres. League*,
648 F. Supp. 106 (D.D.C. 1986) ....................9

*Constitutional Provisions*

U.S. Const. art. I, § 8, cl. 17....................12

*Statutes*

5 U.S.C. § 705....................1, 14, 21

23 U.S.C. § 116....................4

31 U.S.C. § 1341 ..... 12

40 U.S.C. § 8106 ..... 7, 8

40 U.S.C. § 8902 ..... 8

54 U.S.C. § 100101 ..... 12

D.C. Code § 7-2201 ..... 6

D.C. Code § 9-101.01 ..... 4

Va. Code § 33.2-223 ..... 4

Va. Code § 33.2-256 ..... 4

Va. Code § 44-146.14 ..... 6

Va. Code § 44-146.17 ..... 6

Va. Code § 44-146.18 ..... 6

*Other Authorities*

The White House, National Resilience Strategy (2026) ..... 6

Principles of Federal Appropriations Law (3d ed. 2015) ..... 12

## INTRODUCTION

On November 5, 2026, Defendants were poised to begin construction of an illegal 250-foot triumphal arch in Memorial Circle. That morning, a construction contractor was seen engaging in "preparatory" work at the circle. ECF No. 104. That evening, following a marathon nine-hour hearing, the President's appointees on the National Capital Planning Commission (NCPC) rammed through approval of the Arch, ECF No. 107—insisting, over the objection of all four of the District of Columbia's representatives, that "the project proponent is looking for a decision tonight" so that it can "commence building very quickly." National Capital Planning Commission (USA) Meeting, November 5, 2026, at 8:26:31–8:27:04, https://tinyurl.com/5642x7ud (NCPC Meeting); *see* Ex. 30 at 4–5. Within an hour of that vote, at approximately 11:40 p.m., the Department of Interior authorized construction to begin. ECF No. 109. Had this Court not swiftly entered a temporary restraining order at that point, Defendants would almost certainly have begun building the Arch, irreparably altering the status quo in a busy traffic corridor between the District and Virginia and conducting an end-run around judicial review.

The Court should enter a preliminary injunction and Section 705 stay to ensure that Defendants cannot renew their efforts to outrun judicial review when the TRO expires. As this Court correctly concluded—and as the additional declarations attached to this Motion confirm—the District and Virginia have standing to challenge the Arch and would suffer irreparable injury as soon as construction begins. Op. 12–17, 25–29, ECF No. 111. The Arch is plainly illegal: not only does it violate the Commemorative Works Act, *see* Op. 20–25, and a series of other enactments, *see* TRO Mot. 25–38, No. 1:26-cv-3838, ECF No. 2-1, but it lacks any lawful source of funding and was not validly approved by NCPC, *see infra* pp. 11–14. And the equities favor

preserving the century-long status quo rather than rewarding Defendants' attempt to evade judicial scrutiny based on an eleventh-hour, transparently pretextual national security justification.

For these reasons, as well as those set forth in Plaintiffs' memorandum and reply in support of a TRO—both of which Plaintiffs hereby incorporate by reference, *see* ECF No. 113, at 2—construction of the Arch should be enjoined and its approval should be stayed. Every other commemorative work in the capital has been approved by Congress and erected in compliance with its laws, and this proposed triumphal arch should be no different.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

#### A. The District and Virginia Have Standing.

This Court correctly concluded that the District and Virginia likely have standing to challenge the construction of the Arch. Op. 12–17. Among other injuries, both the three-year period of construction and the completed Arch will foreseeably clog traffic between the District and Virginia, TRO Mot. 11–13, upend emergency planning, *id.* at 13–15, inflict environmental harms, *id.* at 15–17, and undermine the historic value of the District's property, *id.* at 17–19. Plaintiffs will need to expend resources to assess, respond to, and mitigate these harmful consequences. Op. 14; TRO Mot. 11–17; TRO Reply 2–7, ECF No. 100. And because those expenditures are necessary to "mitigate and recover from harms that could have been prevented" if the Arch was not built, they constitute an "injury to [Plaintiffs'] proprietary interest[s] sufficient to confer standing." *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1181 (D.C. Cir. 2025); *see* Op. 14–15.

Plaintiffs' standing has only become clearer since this Court's TRO decision. On November 5, NCPC approved the Arch and the Department of the Interior formally authorized

NPS to begin construction. ECF Nos. 107, 109. Plaintiffs have amended their complaint to challenge that decision. *See* Am. Compl. ¶¶ 66–70. Accordingly, there is no longer any dispute that Plaintiffs' claims are ripe. Op. 15–16; *see* TRO Opp. 15–16, ECF No. 95 (arguing that "Plaintiffs will be unable to establish standing until they file an amended complaint after Interior issues a final decision"). Further, Plaintiffs have filed a series of additional declarations concurrent with this Motion that reinforce their claims for standing and confirm that the Arch will inflict substantial costs on both the District and Virginia.

*First*, Plaintiffs have submitted three additional declarations confirming that the Arch will increase traffic on a major thoroughfare between the District and Virginia and require both jurisdictions to spend substantial resources to respond to and mitigate those effects. *See* Kershbaum Decl. ¶¶ 11, 22–32; Mannell Decl. ¶¶ 5, 16; Weinberger Decl. ¶¶ 11, 22–24; *accord* Mendelson Decl. ¶¶ 58–64. The Director of the District's Department of Transportation explains that the three-year period of construction "will substantially worsen traffic between the District and Virginia throughout the duration of the Arch project," including by producing "lengthier waiting times," and "back-ups onto adjacent roadways in the area," and that the completed Arch will cause similar "long-term traffic increases." Kershbaum Decl. ¶¶ 16, 19. The Director of Planning at the Virginia Department of Transportation describes how construction of the Arch "will directly impact VDOT-controlled roadways," including by "degrad[ing]" the level of service on Virginia roads and "shift[ing] heavy traffic onto alternative VDOT corridors" such as Columbia Pike, Richmond Highway, and Memorial Drive. Mannell Decl. ¶¶ 7, 15–16, 23.c. And Dr. Rachel Weinberger, an expert with 35 years of experience in transportation policy and planning, details how the Arch will "be a major traffic generator and create unanticipated infrastructure issues for

both the District and Virginia." Weinberger Decl. ¶ 11; *see id.* ¶¶ 12–21 (detailing deficiencies in Defendants' traffic analysis).

Further, all three declarants explain that the District and Virginia will incur "significant costs" as a result of these traffic disruptions. *Id.* ¶¶ 11, 24; *see* Kershbaum Decl. ¶¶ 27–30; Mannell Decl. ¶ 5. Among other harms, the traffic created by the Arch will "disrupt and deter travel" between the District and Virginia, Kershbaum Decl. ¶ 23, impede emergency responders who travel between the District and Arlington, *id.* ¶ 25, impair use of an emergency evacuation route out of the District, *id.* ¶ 26, and necessitate expanded coordination with the federal government before, during, and after the period of construction, *id.* ¶¶ 27–28. Both jurisdictions will need to "expend resources" to "assess[] and study[]" these impacts and develop "necessary mitigation responses." Mannell Decl. ¶¶ 5, 16; *see* Kershbaum Decl. ¶¶ 27–30. They will also need to devote "hundreds of hours of additional staff time throughout the duration of the Arch project" to "consulting with NPS on the traffic impacts and identifying appropriate mitigation measures." Kershbaum Decl. ¶ 28; *see* NCPC, Commission Action (Nov. 5, 2026), Ex. 31 (encouraging NPS to "continue to work with the . . . District Department of Transportation" and "Arlington County . . . regarding the proposed changes and impacts to the surface transportation network through construction and project implementation"). Moreover, by producing overflows of traffic onto Virginia and District roads, the project will necessarily cause additional wear-and-tear on local roadways that both jurisdictions are obligated to maintain. *See* Mannell Decl. ¶¶ 7, 23–25; Weinberger Decl. ¶ 11; Kershbaum Decl. ¶ 16; *see also* 23 U.S.C. § 116(b); D.C. Code § 9-101.01; Va. Code §§ 33.2-223, 33.2-256.

Plaintiffs cannot "reasonably avoid" these expenses. Kershbaum Decl. ¶ 28. Both jurisdictions have a statutory responsibility to ensure the safety of local roadways and drivers. *See*

TRO Mot. 5 (citing authorities). Indeed, maintaining roadways and keeping traffic moving is quintessentially what governments do. It is, in other words, a component of Plaintiffs' "core business activities," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), and so even absent any statutory obligation, "it is a 'commonsense inference[]' that when nearby construction threatens to clog a major artery to a city, the city will take measures to assess and overcome its effects." Op. 16 (quoting *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 190 (2026)).

*Second*, the District and Virginia have submitted declarations confirming that the Arch will undermine their emergency preparedness and require the expenditure of significant resources to revise, evaluate, and implement new emergency plans. *See* Harvin Decl. ¶¶ 13–25; Anderson Decl. ¶¶ 11-20; *accord* Mendelson Decl. ¶¶ 65–72. Dr. Donell Harvin, a homeland security expert who recently served as the District's Chief of Homeland Security and Intelligence, explains that the Arch will "impede emergency services, alter the risk environment, and require the District of Columbia and Virginia to make significant investments to amend emergency response plans and safely oversee the Arlington Memorial Bridge traffic corridor." Harvin Decl. ¶ 13. In particular, he notes that because the proposed Arch will block an evacuation route and constrict traffic capacity around Memorial Circle, it will likely require "several hundred cumulative staff hours" to update the jurisdictions' emergency response and evacuation plans, develop contingencies for construction-related disruptions, and stress test those plans. *Id.* ¶ 14. Similarly, by making it "impossible for medevac and other aerial emergency vehicles to land at Memorial Circle," the Arch will require both jurisdictions to "devote the time to properly prepare and plan for alternative landing sites and any disruptions to emergency service and rescue operations." *Id.* ¶ 17. And because both the cranes used to build the Arch and drones launched from the Arch site will pose

"a potential hazard to passing aircraft, as well as an obstacle to emergency flight-path deviations," Plaintiffs will "bear the costs of anticipating complications arising from these functions." *Id.* ¶ 18; *see* Anderson Decl. ¶ 15.

Like the traffic impacts resulting from the Arch, these are not costs that either jurisdiction can reasonably forgo. Both the District and Virginia have a statutory obligation to prepare for emergencies; in the District's case, that obligation is imposed by federal law. *See* D.C. Code § 7-2201; Va. Code §§ 44-146.14, 44-146.17, 44-146.18. And it is common sense that, when a project curtails a jurisdiction's evacuation planning and interferes with its ability to respond swiftly to emergencies, a jurisdiction cannot simply sit on its hands. Instead, as the White House recently emphasized, "State and local governments *must* . . . invest in emergency management as a core function of government." The White House, National Resilience Strategy at 7 (June 2026), Ex. 32 (emphasis added).

*Third*, Defendants have eliminated any doubt that the District has standing based on the environmental costs imposed by the Arch project. As Plaintiffs have explained (and as Defendants' own documents confirm), the excavation of 1,400 truckloads of soil to construct the Arch would expose sediment that stormwater may carry into the Potomac. TRO Mot. 15–16; *see* NPS, Decision Record: Triumphal Arch at Memorial Circle at 7 (Nov. 5, 2026), ECF No. 109-1 (Decision Record). Defendants accordingly must obtain the District's approval for a Soil Erosion and Sediment Control Plan before beginning construction of the Arch. TRO Mot. 16. But at the November 5 NCPC meeting in which Defendants authorized construction of the Arch, a representative of NPS confirmed that "no permits have been issued or applied for." NCPC Meeting at 47:03–47:51; *see* Ex. 30 at 2–3. Accordingly, notwithstanding the suggestion in their brief opposing a TRO, Defendants have not obtained the permits necessary to comply with the District's

environmental laws before beginning construction. *Cf.* TRO Opp. 20 n.4, ECF No. 95 (calling this risk "conjectural [and] hypothetical"). Defendants will therefore be in evident violation of those laws when they fulfill their plan to "immediately" start construction of the Arch, ECF No. 63, and the District will need to incur costs monitoring and ensuring compliance with its environmental obligations as soon as construction starts. *See* Mot. 16–17; Mendelson Decl. ¶¶ 48–52.

**B. The Arch Is Unlawful.**

The District and Virginia are also likely to succeed in establishing that the Arch is unlawful. The Court rightly concluded that the Arch likely violates the Commemorative Works Act (CWA). Op. 20–25. In order to preserve the broadest possible foundation for an injunction, the Court should hold that the Arch is unlawful for numerous other reasons as well. As Plaintiffs have explained—and as recent developments only reinforce—the Arch violates 40 U.S.C. § 8106, the Height of Buildings Act, the Administrative Procedure Act (APA), the National Environmental Policy Act (NEPA), and the National Historic Preservation Act (NHPA). *See* TRO Mot. 25–38. And developments since the filing of Plaintiffs' original complaint confirm that it violates two additional legal requirements: it is funded through private donations, in violation of NPS's organic statute and the limits on the agency's gift authority, and it was not validly presented to or approved by NCPC.

*Commemorative Works Act.* The Arch violates the Commemorative Works Act. As this Court has explained, the Arch is a "commemorative work"; it was not specifically authorized by Congress; and the 1925 Memorial Bridge Act plainly did not grant Defendants a blank check, in perpetuity, to build any monument they wished at Memorial Circle. Op. 20–25. Defendants' final decisional documents only further support this point. In his letter explaining the Department of the Interior's decision to proceed with the Arch, the Secretary of the Interior stated that "[t]he

purpose of the proposed Triumphal Arch is to *commemorate* the 250th anniversary of American independence." Response to ACHP Final Comments, ECF No. 108-1, at 7 (Nov. 5, 2026) (emphasis added); *see id.* at 2 (similar). Other final documents contain similar statements: they note that the "purpose" of the Arch "is to celebrate 250 years of American independence by honoring America's founding principles," Decision Record at 1, "to celebrate America's Semiquincentennial," Commission Action at 1, and to "celebrate[] and reflect[] the 250 years of American independence," Decision Record at D-2. These statements eliminate any doubt that the Arch is a "commemorative work" subject to the CWA. 40 U.S.C. § 8902(a)(1).

*40 U.S.C. § 8106.* Because the Arch violates the CWA, it also necessarily violates 40 U.S.C. § 8106, which provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Defendants have offered no textually plausible argument that the Arch falls outside the scope of this statute. *See* TRO Reply 14. And their contention that the Memorial Bridge Act constitutes "express[] authoriz[ation]" for the Arch fails for the same reasons this Court rejected Defendants' reliance on that statute under the CWA. *See* Op. 22–24.

*Height of Buildings Act.* Defendants' arguments under the Height of Buildings Act also fail. In approving the Arch, NCPC explicitly declined to endorse Defendants' argument concerning the "applicability of the Height of Buildings Act to the federal government." Commission Action at 1. The Commission therefore has not departed from its unbroken 78-year-old position that federal buildings are subject to the Height Act. *See* TRO Mot. 30. That "consistent," longstanding view of the responsible federal entity is entitled to "very great respect," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024), and Defendants' labored arguments offer no reason to depart from it. *See* TRO Reply 15–16.

Defendants' other attempts to escape the unambiguous numerical limits of the Height Act are similarly meritless. TRO Opp. 35–37. If the Memorial Bridge Act does not supply "authority" to build the Arch, Op. 23, then it *a fortiori* does not contain "clear and manifest" authority to build the Arch in violation of the preexisting limits of the Height Act. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (citation omitted) (setting forth standard for implied repeals). Defendants' argument that the Arch is not a "building," TRO Opp. 35, is belied by both ordinary English and the project sponsor's own characterization. *See* TRO Reply 16; U.S. Triumphal Arch Foundation, "The Military Triumphal Arch: An American Vision Finally Realized" (Military Triumphal Arch), Ex. 33 at 6 (describing the Arch as "a *Building* whose Joint Purpose will be the Military protection of our Capital" (emphasis added)). And their suggestion that the Arch may be up to 320 feet high because it sits in a 300-foot-wide field of grass, TRO Opp. 37, finds support neither in the text of the statute—which limits the height of buildings to the width of the fronting "*street, avenue, or highway*" (not grass field) plus 20 feet, D.C. Code § 6-601.05(a) (emphasis added)—nor in the vacated 1986 district court opinion on which they rely, which holds that, regardless, of the width of the fronting street, "[t]he maximum allowable height is . . . 130 feet." *See Techworld Dev. Corp. v. D.C. Pres. League*, 648 F. Supp. 106, 121 (D.D.C. 1986), *vacated as moot*, No. 86-5630, 1987 WL 1367570 (D.C. Cir. June 2, 1987).

*Arbitrary and Capricious*. The Arch is also arbitrary and capricious. Now that Defendants have unquestionably "produced a final decision" approving the Arch, Defendants cannot claim that they are excused from "provid[ing] a reasoned explanation." TRO Opp. 38. Instead, like all agencies, they must demonstrate both that they considered "important aspect[s] of the problem" and weighed "alternatives." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 51 (1983).

Defendants' final decisional documents fail on both scores. The Decision Record contains no consideration of the planned military uses of the Arch. Indeed, it is explicit on this point: it says that Defendants "d[id] not consider any potential future uses of the Arch for national security purposes," and that "[a]ny future decision to use the Arch for national security purposes may require additional review." Decision Record at 9. But the federal government has *already* decided to use the Arch for military purposes. Two sworn declarations from Cabinet secretaries state that the Arch "*will* be utilized as a dual-purpose structure" that "incorporates military utility." Hegseth Decl. ¶ 10, ECF No. 74-9 (emphasis added); *see* Mullin Decl. ¶ 16, ECF No. 74-8. The President has "agreed to convert" the Arch into a "Military Complex." Ex. 15. And the project's sponsor has described in detail how the Arch will incorporate military uses: apparently, its "two massive columns will be storage for munitions"; "areas on the pedestal and Observation Deck will be set aside for snipers, countersnipers, and provisions for a sniper nest"; and "the open ground area at the base of the Monument will be designed for launching drones and other homeland security assets." Military Triumphal Arch at 6.

Given that the federal government has already decided that the Arch will incorporate military uses, Defendants were obligated to consider the costs of that decision in explaining their decision to construct the Arch. TRO Mot. 32. As multiple declarants explain, those costs are considerable. The storage of ammunition in a monument frequented by tourists would violate "ammunition storage regulation[s]" and pose a "tremendous risk" to civilians. Anderson Decl. ¶¶ 13–14. Launching drones near the airport would pose "clear hazards to civilians" and to "regional aircraft." *Id.* ¶ 16. And combining military and tourist functions in a single building would make the structure a "hardened military target for an attack by bad actors." Harvin Decl. ¶ 23. Yet

Defendants' documents consider none of these risks, let alone explain why they are outweighed by the Arch's purported benefits.

Defendants' decisional documents also fail to offer a reasoned consideration of alternatives. Like the Revised Environmental Assessment, these documents contain a one-sided assessment of a handful of proffered alternatives, rejecting each one on the ground that they purportedly would not commemorate the 250th anniversary as well as a 250-foot Arch, Decision Record at D-6, or that they would not achieve the "location-dependent purpose of the undertaking," *Id.* at D-11; *see also* Response to ACHP Comments at 3. But what the APA requires—and what these documents lack—is any assessment of whether the alternatives would mitigate the *costs* of the 250-foot Arch. They therefore remain arbitrary and capricious. *See* TRO Mot. 33–34.

*NEPA and NHPA.* Defendants also remain in violation of NEPA and the NHPA. As to NEPA, the final documents adopt the Revised Finding of No Significant Impact and the Revised EA without change. *See* Decision Record at 1; ECF No. 109-2. Those documents failed to engage in the "hard look" that NEPA requires when they were issued, and they continue to do so, especially now that the federal government's planned military uses for the Arch have become all the clearer. TRO Mot. 34–36. Likewise, Secretary Burgum's letter concluding Section 106 review does not attempt to cure Defendants' multiple failures to engage in the consultation that the NHPA required at earlier stages in the process. Response to ACHP Comments at 1–2; *see* TRO Mot. 36–38.

*Unlawful funding.* Defendants' recent statements have revealed an additional reason the Arch is unlawful: Defendants lack any authority to expend funds on its construction. It is a bedrock principle of our constitutional system that federal agencies may not spend money without congressional authorization. The Appropriations Clause of the Constitution provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

U.S. Const. art. I, § 9, cl. 17. And the Antideficiency Act reinforces that limit by providing that "an officer or employee of the United States Government may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A).

Defendants have not claimed that any congressional appropriation permits them to expend money on the Arch. Instead, they have indicated that the Arch will be funded exclusively through "private donations." TRO Opp. 29. But just as agencies may not withdraw funds from the Treasury without statutory authorization, "a government agency may not accept for its own use . . . gifts of money or other property in the absence of specific statutory authority." 6 Principles of Federal Appropriations Law pt. E, § 3 (3d ed. 2015). Defendants therefore must identify some statute that authorizes NPS to accept funds and expend them on the Arch.

There is no such statute. As relevant, Congress has limited NPS's gift authority to the acceptance of "money that may be donated for the purposes of the [National Park] System." 54 U.S.C. § 101101(2). The NPS Organic Act, in turn, states:

> [T]he fundamental purpose of the System units . . . is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

*Id.* § 100101(a). As this Court has explained, "[this] objective hardly covers the construction of a 250-foot monumental arch commemorating the Nation's independence and its founding principles." Op. 25. Indeed, it is hard to see how the elimination of a historic viewshed—and its replacement with a dual-purpose monument and military installation—could be said to "conserve" the "scenery" or "historic objects" on Columbia Island. 54 U.S.C. § 100101(a); *cf. Nat'l Tr. for Historic Preservation in U.S. v. NPS*, 185 F.4th 1185, 1221–22 (D.C. Cir. 2026) (rejecting the contention that "significantly and permanently alter[ing] the historic appearance and architecture

of the entire White House campus . . . can possibly 'conserve' the East Wing, much less the 'scenery' of President's Park"), *injunction stayed on other grounds pending appeal*, 609 U.S. 1068. Defendants therefore have no authority to accept gifts for that purpose.

*NCPC approval.* Finally, the Arch is unlawful because Defendants did not validly consult with NCPC or obtain its approval for the military uses of the Arch. The National Capital Planning Act provides that, "[t]o ensure the comprehensive planning and orderly development of the National Capital," an agency must "advise and consult with the Commission as the agency prepares plans and programs . . . that affect the plans and development of the National Capital." 40 U.S.C. § 8722(b)(2). In addition, "the location, height, bulk, numbers of stories, and size of federal public buildings and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of the Commission." *Id.* § 8722(d).

Defendants failed to comply with both of these requirements because they never sought NCPC's input or approval as to one of the principal uses of the Arch: its planned function as a military structure. The military uses of the Arch would plainly affect the "plans and development of the National Capital," *id.* § 8722(b)(2); introducing a drone port and military installation into the District's monumental core would necessitate changes in the flight paths of planes, the evacuation routes from the District, and the emergency plans of both jurisdictions. Harvin Decl. ¶¶ 22–24; Anderson Decl. ¶¶ 11–21; Mendelson Decl. ¶¶ 71–72. Further, they would alter the use of "open space in and around" the Arch itself, 40 U.S.C. § 8722(d), including by using "the open ground area at the base of the Monument" to "launch[] drones and other homeland security assets." Military Triumphal Arch at 6. Defendants were required to disclose these uses of the Arch to NCPC and obtain its "advi[c]e" and "approval," 40 U.S.C. § 8722(b)(2), (d), but failed to do so.

NCPC's own submission guidelines confirm that Defendants failed to fulfill their obligations under this statute. Those guidelines state that, before obtaining final NCPC approval of a proposed building, the relevant agency must "[d]escribe what is proposed for the project site including the . . . allocation of land to proposed uses," detail the "[u]ses allocated to all interior space," and evaluate "the project's effect on the public realm in the project area." NCPC, Submission Guidelines at 20–22 (Jan. 2026), Ex. 34; *see id.* at 12–14 (imposing similar requirements during NCPC's preliminary review). Consistent with those requirements, Defendants sought NCPC's approval and input on numerous less significant features of the Arch project, including the "number of signal poles," the plans for "parking and loading/unloading for visitors," and the "proposed lighting concept." Commission Action at 1–3. Yet Defendants failed to even *mention* the military uses of the Arch in the materials submitted to NCPC, let alone explain which spaces would be allocated those uses or how they would affect the surrounding area. The Arch is thus unlawful for that reason, as well.

**II. Plaintiffs Will Suffer Irreparable Injury Absent an Injunction or Section 705 Stay.**

The District and Virginia have shown that "irreparable injury is likely in the absence of an injunction." Op. 25. A threatened injury is irreparable if it is "'certain and great,' 'actual and not theoretical,' and 'beyond remediation' at a later date." *Id.* at 26 (quoting *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1010 (D.C. Cir. 2026)). As the Court explained, in addition to preservation impacts, TRO Mot. 41–42, the District and Virginia have "shown that construction of the Arch will cause harm by 'clogging traffic, impeding disaster preparedness, and harming the environment,'" which will also require "both jurisdictions to expend resources to monitor and mitigate those impacts." Op. 26 (quoting TRO Reply 21); *see* TRO Mot. 38–42. The magnitude, actuality, and

irreparable nature of these traffic, preparedness, and environmental costs have only become clearer in the days since the Court issued its opinion.

*First*, there is now no doubt that once the TRO expires, the District and Virginia will face serious traffic-related harms that they will need to expend significant resources to study and mitigate. Defendants' own traffic assessment makes clear that the Arch and its construction will cause "[t]raffic disruptions." Op. 26. And it is now apparent that that assessment "likely *understates*" the impacts. Mannell Decl. ¶ 18 (emphasis added); Weinberger Decl. ¶ 16. In Virginia, the Arch's construction "will directly impact VDOT-controlled roadways" during construction, will "likely exacerbate existing morning peak bottlenecks on VA-27 and [Virginia] Route 110" after construction is complete, and will "shift heavy traffic onto alternative VDOT corridors, including Columbia Pike (VA-244)." Mannell Decl. ¶¶ 7, 23. In the District, "back-ups" from the Arch will increase "traffic on other roadways," causing "unpredictable effects on traffic in the surrounding area," including District-managed bridges that "rely on the Memorial Bridge as a spillover artery." Kershbaum Decl. ¶¶ 16, 17.

All of this will "disrupt and deter travel into and out of the District" for "commuters," including "District government employees," as well as for "business travelers, tourists, and individuals visiting the District to shop and patronize businesses." Kershbaum Decl. ¶ 23. It will also force the District and Virginia to "incur[] significant costs" and "reprioritiz[e] . . . resources" to "study and mitigate" the traffic disruptions," Weinberger Decl. ¶ 11; Kershbaum Decl. ¶ 27; Mannell Decl. ¶ 5, including by spending "additional staff time collecting and evaluating new traffic and speed data and otherwise coordinating with NPS," both during and after construction. Kershbaum Decl. ¶ 31; *see* Mannell Decl. ¶¶ 5, 16. And it will move traffic from federal roadways to state roads, such as VA-244 and VA-110, that the Plaintiffs are responsible for maintaining from

their own budgets. Mannell Decl. ¶¶ 23–25. These impacts "will consume limited" resources "that would otherwise be dedicated to carrying out . . . other statutory mandates and ensuring the maintenance and safety of" the District's and Virginia's roads. Kershbaum Decl. ¶ 32.

*Second*, the same is true of the emergency-planning harms, which are just as "certain" and "great." Op. 26 (quoting *Ctr. for Taxpayer Rts.*, 190 F.4th at 1010). The Arch and its construction "present serious unaddressed issues for emergency response and disaster preparedness" that will require "significant investments by the District and Virginia to mitigate." Harvin Decl. ¶ 25. New traffic patterns at Memorial Circle will "impede emergency responders" who "regularly supply aid" across jurisdictions and "frequently travel to Memorial Circle to respond to traffic accidents and other emergencies." Kershbaum Decl. ¶ 25. They will also block an important "emergency evacuation route out of the District." *Id.* ¶ 26.

And the Arch will itself create new dangers that Plaintiffs must plan for. These include the Arch's height, which poses a "potential hazard to passing aircraft"; the real and serious threat from terrorism that Defendants' use of the Arch as a military installation will invite; and the "significant risk" of accident that Defendants will create when they store ammunition and explosives inside a poorly secured tourist attraction in the heart of a major American city. Harvin Decl. ¶¶ 19–23; Anderson Decl. ¶¶ 11–18. All of this will require the "District and Virginia . . . to perform" emergency "modeling and planning forthwith" to mitigate these risks and ensure that they are ready to respond to a disaster. Harvin Decl. ¶ 17. Such modeling and planning work is "generally both time-consuming and resource-intensive" and "will require the District" and Virginia to expend "significant internal effort." Harvin Decl. ¶ 17; Kershbaum Decl. ¶¶ 26–27.

*Third*, the Arch would cause "certain and great" harms to the environment. Op. 26. This includes the "significant risks posed by the runoff of soils and sediments from the project site,"

which will "threaten water quality in the District" and "jeopardize the District's compliance with [EPA] water-quality standards" and "compel the expenditure of District resources to ensure compliance with federal and District law." TRO Mot. 40–41 (citing Mendelson Decl. ¶¶ 51–52). It also includes the "air and water pollution, including (but not limited) to EPA-criteria pollutants like carbon monoxide and asthma-inducing PM2.5" that the traffic disruptions will create. Weinberger Decl. ¶ 24.

Defendants cannot seriously dispute that these harms are "actual and not theoretical." Op. 26 (quoting *Ctr. for Taxpayer Rts*, 190 F.4th at 1010). Indeed, the "expenses described . . . *have already begun*" due to Defendants' advancement of their project. Kershbaum ¶ 32 (emphasis added). And now that Defendants have approved the Arch, the costs to the District and Virginia will "accelerate" immediately if and when the TRO is lifted. *Id.*

Defendants' own construction schedule shows how. According to Defendants, during the first five days after the TRO lapses—and while the District and Virginia urgently plan for impending disruptions to traffic, evacuations, and first response, Harvin Decl. ¶ 17; Kershbaum Decl. ¶ 27; Weinberger Decl. ¶ 23—Defendants will fence off "the staging area and Memorial Circle" and install "matting and gravel" and "construction site trailers." Decision Record at 5. From Day 6 onward, Defendants will spend two to three months excavating the site and installing utilities, which will require them to divert "pedestrian, bicycle, and vehicle" traffic onto other roadways, snarling commutes across the region and creating new traffic-management, planning, and maintenance costs. *Id.*; Weinberger Decl. ¶¶ 16, 18, 23. Defendants will excavate the site even though—by their own admission—they have neglected to obtain approval of a required environmental plan from the District, which will force the District to incur additional monitoring costs and will put the District's compliance with its own Clean Water Act obligations at risk. *Supra*

pp. 6–7; Mendelson Decl. ¶¶ 48–52; TRO Mot. 16–17. Then Defendants will spend the better part of five months bringing "heavy equipment" to the project site over Virginia roads and drilling "continuous[ly]" into the bedrock "to a depth of approximately 75 feet" to "install the deep foundation system." Decision Record at 5; Ex. 10, Revised EA at 10. They will follow that by erecting 320-foot tall cranes that for months will stand next to the approach path to Runway 19, creating hazards to landing aircraft that the District and Virginia must be prepared to respond to. Decision Record at 5; Harvin Decl. ¶ 19. These cranes will be used to construct the "vertical and horizontal elements of the Arch," which will, in turn, damage the historic landscape that flanks both sides of the Potomac River, impairing the historic value of the District's own properties. Decision Record at 5; TRO Mot. 18–19.

Once the Arch is standing, there will be months more of trucking in "granite panels" from as far away as Italy, which will—again—be transported on Virginia roadways. Decision Record at 5; Revised EA at 10. And when Defendants finally finish construction, they will invite thousands of tourists to Memorial Circle, which will require the District and Virginia to "study, quantify, and . . . alleviate" traffic changes yet again and plan for the risks that accompany Defendants' use of the commemorative site as a military facility. Weinberger Decl. ¶ 16; Mannell Decl. ¶¶ 5, 23–25; Kershbaum Decl. ¶¶ 18–20, 29; Harvin Decl. ¶¶ 13–14, 17–19, 25.

These costs to the District and Virginia are "beyond remediation at a later date." Op. 26 (quoting *Ctr. for Taxpayer Rts.*, 190 F.4th at 1010). Expenses like staff overtime and roadway maintenance simply cannot be recouped at the end of this litigation "because of the government's sovereign immunity." Op. 28 (citing *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020)). As the Supreme Court reiterated just yesterday, "[w]hile the loss of money is not typically considered irreparable harm, that changes if the funds cannot be recouped and are

thus irrevocably expended." *Mullin v. Friends of the Ruidosa Church*, No. 26A560, ___ S. Ct. ___, 2026 WL 3386954 (Nov. 9, 2026) (per curiam) (quoting *Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (mem.)).

And as this Court has explained, "many of the harms to the District do not involve expenditures." Op. 28. For instance, the disruption to traffic is irreparable by its very nature. *See Nw. Pipeline Corp. v. Pipeline Right of Way Easement*, 197 F. Supp. 2d 1241, 1246 (E.D. Wash 2002). The diversion of resources while this litigation unfolds would leave the District and Virginia unable to "carry[] out . . . other statutory mandates." Kershbaum Decl. ¶ 32. Defendants' unpermitted excavations will threaten water quality in the Potomac, TRO Mot. 40–41, and additional traffic will increase harmful air emissions on roadways within both Virginia and the District, Weinberger Decl. ¶ 24. And the rising Arch will "adversely affect historic properties" that "the District owns." Op. 28; TRO Mot. 41. As the Court has explained, injuries "of this kind 'can seldom be adequately remedied by money damages and is often permanently or at least of long duration, *i.e.*, irreparable." Op. 28 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). And it is far from clear that it will be possible to undo "construction of a project of this scale" at a later date due to the "sheer scale of the building, the difficulty of removing deep foundational piles and installed utilities, and the potential environmental harms that would be likely to accompany demolition," and because Defendants themselves will surely assert (meritless) national security grounds to object to any Court-ordered demolition of the Arch after final judgment. TRO Mot. 42. In short, the Court correctly found that "the District and Virginia are likely to suffer irreparable harm in the absence of judicial relief," and Plaintiffs' new evidence only reinforces that conclusion. Op. 29.

**III. The Equities Favor Relief.**

Finally, the Court correctly concluded that the equities favor injunctive relief. Op. 29–30. Because construction of the Arch is unlawful many times over, there remains a substantial public interest in enjoining an "unlawful practice." *Am. Ass'n of Nurse Pracs. v. McMahon*, 836 F. Supp. 3d 175, 208 (D.D.C. 2026). And as Plaintiffs' experts detail, the Arch will inflict numerous practical harms on the public if construction proceeds: among other things, it will "create[] a clear risk of delaying emergency response time, particularly during a major incident or evacuation," Harvin Decl. ¶ 15, present a "potential hazard to passing aircraft," *id.* ¶ 19, "worsen congestion" in a key traffic corridor, Weinberger Decl. ¶ 16, and increase air and water pollution, *id.* ¶ 24; *see* Mendelson Decl. ¶ 52. The public has a clear interest in avoiding these harms. TRO Mot. 42–43.

Defendants, by contrast, have no cognizable interest in building an illegal monument. Op. 30. Indeed, permitting construction to proceed during the pendency of litigation would contravene the public's interest in ensuring adherence to the law, as Defendants have repeatedly made clear—most recently in their late-night dash to approve and begin construction on the Arch on November 5—that they will seize every opportunity to alter the status quo to their benefit. *See supra* p. 1; *see also* Resp. to Mot. to Clarify 2–3, ECF No. 99.

Defendants' "recent and unsupported" appeals to national security do nothing to alter this conclusion. Op. 30. Defendants have not explained why a delay "in starting a project expected to take two to three years to complete would compromise" their purported national security interests. *Id.* at 31. Furthermore, as Brigadier General Steven Anderson explains, the claimed national security benefits of the Arch are "illusory," given that there are "no features of the Arch that would support enhanced national security or military operations"; "the Arch's observation deck . . . provides no direct line-of-sight observation to any high threat areas on the other side of the

Potomac River"; and "there are other military installations near Memorial Circle that are far more secure where the Defendants could place the capabilities they describe without endangering civilians." Anderson Decl. ¶¶ 17, 19. Defendants' conclusory declarations fail to rebut these obvious difficulties, nor explain why it makes a lick of sense to house ammunition, drones, and snipers in a tourist attraction. Defendants' belated and conclusory appeals to national security thus provide no justification to allow construction of an unlawful monument to proceed.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Plaintiffs' Memorandum and Reply in Support of Their Motion for a Temporary Restraining Order and 5 U.S.C. § 705 Stay, the Motion for a Preliminary Injunction and 5 U.S.C. § 705 Stay should be granted.

Dated: November 10, 2026

Respectfully submitted,

JAY JONES
Attorney General of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN (1672508)
MICHAEL K. PERLOFF (1601047)
Deputy Solicitors General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 997-5222
Email: mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (1026153)
ELIZA H. SIMON (90035651)
Senior Counsels to the Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH (1044671)
Senior Counsel to the Attorney General

/s/ Karthik P. Reddy
KARTHIK P. REDDY (1048848)
Special Assistant Attorney General
NICOLE S. HILL (888324938)
JOHN B. LYMAN (156467)
SAMANTHA HALL (1014735)
Assistant Attorneys General
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Tel: (202) 279-1261
Email: mitchell.reich@dc.gov

*Counsel for the District of Columbia*