**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL LEMMON, *et al.*,<br>*Plaintiffs*,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>*Defendants*. | Case No. 26-cv-544 (TSC) |
| DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA,<br>*Plaintiffs*,<br>v.<br>NATIONAL PARK SERVICE, et al.,<br>*Defendants*. | Case No. 26-cv-3838 (TSC)<br>**CONSOLIDATED CASES** |

**DECLARATION OF BRIGADIER GENERAL STEVEN M. ANDERSON, U.S. ARMY (RET.) IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Brigadier General Steven M. Anderson (Ret.), make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

1. I am over the age of eighteen and a resident of Virginia. I make this declaration based on my personal knowledge.

2. I served a 31-year career in the U.S. Army. I served as an Ordnance officer and logistics leader across key command and staff assignments in Korea, Iraq, Kuwait, Afghanistan, Germany, Hawaii, and the Pentagon. I am a 1978 graduate of West Point with a master's degree from the Naval Postgraduate School in Operations Research, and I was recognized with numerous awards, including the Distinguished Service Medal with Oak Leaf Cluster and the Bronze Star.

3. In addition to other positions, in 1995, I assumed command of the 725th Main Support Battalion until 1997. Following my command tour and attendance at the Army War College, I reported as the Chief of Logistics Operations for the Joint Chiefs of Staff – J4, Logistics Readiness Center at the Pentagon. I returned to Korea in 2000 as the Commander of the 2nd Infantry Division Support Command, where I commanded more than 2,500 logistics soldiers forward-deployed to the northern sector of South Korea on 19 different installations.

4. Following duty as Executive Officer to the Deputy Commander of Army Materiel Command and the Army G-4, I became the senior U.S. logistician in Korea (Deputy C-4 for the United Nations Command/Combined Forces Command and J4, United States Forces Korea) in 2004 to 2006, and spearheaded the development of Camp Humphreys, the new combined and U.S. headquarters facility in central Korea.

5. In 2006, I served as the Multi-National Forces – Iraq, Director of Sustainment and Resources (MNF-I C4) of a 32-nation coalition conducting warfighting in support of Operation Iraqi Freedom. I was a direct report to General David Petraeus, responsible for all logistics support, construction, personnel actions, and financial resourcing. I led a multi-national coalition planning effort to expand logistics capabilities and infrastructure in support of the 5-brigade surge in early 2007, to include logistical, medical, personnel, and financial management (over $20B annually), and successfully enabled an additional 50,000 troops to deploy into the Iraq theater and enable them to execute their missions. During my time in Iraq, I built several military installations in the middle of the Iraqi desert and have extensive experience building and maintaining military facilities in demanding combat environments.

6. I culminated my Army career in 2008 as the Director, Operations and Logistics Readiness, G43, on the Army staff at the Pentagon. There, I led a staff responsible for all Army logistics readiness reporting, served as Army lead for resourcing and policy regarding weapon systems sustainment, war reserve stocks, expeditionary housing, and ran the Army's Logistics Operations Center—a 24 hour/7 days-a-week operations center located in Pentagon. I am also a board member at Vet Voice Foundation, a nonpartisan veterans advocacy organization representing almost two million veterans, military families, and supporters,

7. I understand that Defendants in this case have asserted that the proposed Arch will have national security benefits. I have reviewed the Declaration of Markwayne Mullin ("Mullin Declaration") and Declaration of Pete Hegseth ("Hegseth Declaration"). *Lemmon* Dkt. #s 74-8 & 74-9. I have also reviewed the "Updated Submission Materials 2" for the November 5 National Capital Planning Commission Meeting, including renderings of the proposed Arch.

8. I understand that the Trump Administration contends that the Arch will be a "top grade Military Complex/Triumphal Arch to house, store, and have the rapid ability to use large numbers of drones, plus Snipers, on both the roof and plaza areas, and additionally have and hold large quantities of sniper ammunition in storage." *District of Columbia* Dkt. # 2-20. I also understand that a website proponents of the Arch recently published reiterates claims that the Arch will be suitable for storing "munitions", for use by "snipers" and "countersnipers" including a "sniper nest," and provide for launching drones. *See* The Military Triumphal Arch, https://triumphalarch.com (last visited Nov. 8, 2026).

9. I understand that Secretary of Defense Pete Hegseth has claimed that the Arch will be "utilized as a dual-purpose structure: a major national monument that also incorporates military utility." Hegseth Decl. ¶ 10, *Lemmon* Dkt. # 74-. He claims that the Arch will be suitable for military equipment and personnel. *Id.* ¶¶ 10-12. He also claims that the Arch "will incorporate protected, resilient, and

secure spaces and infrastructure to support a range of critical military and force-protection functions," and that it will contain ammunition and drones. *Id.* ¶ 13. He claims that these intended military uses "would not require any structural modifications or alterations to the existing plans for the Arch." *Id.* ¶ 15.

10. I see that Secretary of Homeland Security Markwayne Mullin also refers to the Arch as a "Triumphal Arch and Military Complex." Mullin Decl. ¶ 15, *Lemmon* Dkt. # 74-8. He claims that the Arch would be suitable for counter-drone purposes, and "would not require any structural modifications or alterations to the existing plans for the Arch." *Id.* ¶ 16.

11. As part of my past experience with the U.S. military, I have overseen multiple ammunition and weapons storage and distribution facilities. Based on my knowledge and experience, the planned Arch is not suitable for the purported national security purposes asserted. Having had responsibility for multiple military installations where ammunition, explosives, and military equipment was stored, I am aware of the precautions necessary to do so safely. Not only is the Arch not suitable for any practical military facility, but it actually degrades security in the National Capital Region by placing a high-payoff target for our enemies just a few meters from a major road network and the traffic circle that surrounds the Arch. One can only imagine the potential damage that could be caused by a vehicle loaded with explosives that is detonated a few meters from the Arch complex. The

1983 truck bombing in Beirut at the Marine Barracks that killed 251 or the 1995 truck bombing at an FBI facility in Oklahoma that killed 168 are but two examples of the danger posed by allowing vehicles within close proximity of comparable military or law enforcement targets.

12. It would be wholly inappropriate to use the Arch for storage of ammunition, explosives, and drones (including any related explosives) in such close proximity to civilians, whether those visiting the arch, the surrounding tourist attractions, or passing by on foot, bicycle, or car traffic. The storing of explosives is highly regulated, and even on military bases requires certain safety procedures. I note the dearth of information regarding the quantity of ammunition or other explosives intended to be stored.

13. Prior to designating a site for storing ammunition, the Military generally conducts a Net Explosive Weight (NEW) calculation to determine whether the location can safely hold such material and, if so, the installations needed to do so securely. Usually, the analysis that arises from this calculation requires that the Military store ammunition and/or explosives only in a storage facility that is underground and surrounded by at least a foot of solid concrete and/or steel and several feet of dirt berms. Additionally, NEW calculation generally calls for many meters of standoff space—mandatory clearance required between stored ammunition and explosives and surrounding structures, hazards, or

external infrastructure—in an area secured by a fence and patrolled by guards and motion-sensitive cameras.

14. In this case, not only would the ammunition be stored in an unsecure area such as a monument intended to be visited by tourists, but it would be just a few meters from a major road network (the Arlington Memorial Bridge, two branches of Washington Boulevard, the Arlington traffic circle and the George Washington Parkway). This would be considered a tremendous risk and would violate every ammunition storage regulation of which I am aware.

15. I am not aware that any safety precautions concerning ammunition and explosives storage whatsoever are planned for the Arch, and no suitable precautions for any sizable amount of ammunition could be implemented in such a small area that is also intended to serve as a tourist attraction.

16. Aside from the storage of ammunition at the Arch, the planned use of the Arch for storing and launching drones, and to stage snipers, raises further concerns. Launching drones (particularly if they are armed) poses clear hazards to civilians in the area, especially if the operators lose control of the drones through error, malfunction, or because of jamming by bad actors. This danger is compounded by the location of the Arch in flight paths to Ronald Reagan Washington National Airport, and to regional aircraft. The claim that use of the Arch for these purposes does "[n]ot require any structural modifications to the

existing plans" is implausible. Mullin Decl. ¶ 16, *Lemmon* Dkt. # 74-8; *see also* Hegseth Decl. ¶ 15, *Lemmon* Dkt. # 74-9. There are no provisions that make accommodations for military use, including drone launching or observation pads, or sniper platforms.

17. In my professional opinion, the proposed Arch raises substantial national security risks that far exceed the purported benefits identified by Secretary Mullin and Secretary Hegseth. Indeed, in my professional opinion, those benefits are illusory: the National Capitol Region DHS would simply not "benefit from the development and construction of a platform such as the planned Arch for C-UAS operations in the NCR." Mullin Decl. ¶ 17, *Lemmon* Dkt. # 74-8; *see also* Hegseth Decl. ¶ 16, *Lemmon* Dkt. # 74-9 (claiming the Arch "will offer vital support to the security of the NCR"). There are no features of the Arch that would support enhanced national security or military operations. In fact, the Arch would increase the workload of the DHS community, because another unsecured monument would be exposed to the public only a few meters from a major road network that DHS would have to secure. Moreover, counter-drone operations run from the Arch would not be effective due to its lack of proximity to any significant high-threat areas. This is in part because, contrary to Secretary Hegseth's claim that "[t]he structure's elevation and protected observation capability will support broad situational awareness of the surrounding environment," Hegseth Decl. ¶ 13,

*Lemmon* Dkt. #74-9, the Arch's observation deck at 168 feet provides no direct line-of-sight observation to any high threat areas on the other side of the Potomac River.

18. Moreover, the placement of military equipment in and on the Arch, aside from the danger it would pose to civilians nearby and visiting the Arch, would further pose a danger to the surrounding area because it would become a potential target for bad actors, and a hazard because of the possibility of inadvertent detonation. As just one example, the devastation and possible civilian harm that would be wrought by an electrical fire at the Arch could be exponentially increased if ammunition and other explosives were on site.

19. In addition, there are other military installations near Memorial Circle that are far more secure where the Defendants could place the capabilities they describe without endangering civilians. This includes not only the Pentagon (less than a mile from Memorial Circle), but Joint Base Myer-Henderson Hall (JBMHH) (2 miles from Memorial Circle), and Fort McNair (4 miles from Memorial Circle). Any of these facilities would be much better at providing the capabilities outlined in both the Mullins and Hegseth Declarations in a secure environment that would not pose addition risk to the community.

20. The Hegseth and Mullin Declarations are also striking for what they do not say. They fail to acknowledge, let alone address, any concern for safety of

persons in the vicinity of the Arch due to the placement of weapons and ammunition there. They fail to discuss the significant purpose-built safety features that would be necessary to use the Arch for the military and security purposes they propose.

21. In sum, based on my military experience and knowledge, I view the purported military and national security uses of the Arch as ill-conceived and unsupportable as described. Additionally, I strongly believe that the Arch would pose a significant risk to the National Capital Region by providing a huge potential target to would-be terrorists.

22. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Dated this 10th day of November, 2026.

Brig. Gen. Steven Anderson (Ret.)