**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL LEMMON, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Case No. 26-cv-544 (TSC) |
| DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL PARK SERVICE, et al.,<br><br>*Defendants*. | Case No. 26-cv-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

**DECLARATION OF DR. DONELL HARVIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Donell Harvin, DrPH, make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

1. I am over the age of eighteen and a resident of Maryland. I make this declaration based on my personal knowledge.

2. I am a homeland security and public health emergency subject-matter expert. I currently serve as faculty in Georgetown University's Emergency Disaster Management Master's Program and the Applied Intelligence Master's Program within the School of Continuing Studies. I teach terrorism studies at the Walsh School of Foreign Service and public health in the Master of Science in Health and the Public Interest program. My courses include simulated responses to terrorist attacks on the National Mall in Washington, D.C. I am also an appointed Visiting Scientist at the Harvard School of Public Health, where I oversee the Harvard Humanitarian Initiative Chemical, Biological, Radiological/Nuclear & Explosives (CBRNE) research and training program, focusing on disaster-related capacity-building activities within Ukraine.

3. I hold an undergraduate degree in fire and emergency services management and graduate degrees in emergency management (MPA) and terrorism studies (MA) from John Jay College; a graduate degree in environmental science (MPH) from Hunter College; and a doctorate in public health (DrPH) from SUNY Downstate Health Sciences University, specializing in environmental epidemiology and public health disasters.

4. My public safety career spans more than 30 years. During the terrorist attacks of September 11, 2001, I served in the New York City Fire Department (FDNY). I was later the Director of Special Investigations and Special Operations

for the New York City Medical Examiner's Office, and then the chief research scientist for the New York City Department of Health in their Bureau of Environmental Emergency Response. After moving to the District of Columbia, I served as the administrator for Emergency Management and Forensic Field Operations for the D.C. Office of the Chief Medical Examiner.

5. In October 2018, I was promoted to Chief of Homeland Security and Intelligence for the Government of the District of Columbia, where I oversaw the National Capital Region Threat Intelligence Center—D.C.'s fusion intelligence center. As the Executive Director of the fusion center, I oversaw the District's operational intelligence and response to the insurrection at the U.S. Capitol on January 6, 2021. Based on this training and experience, I am very familiar with emergency management in the District of Columbia, and as it relates to Arlington Memorial Bridge and surrounding areas.

6. I am aware that on November 5, 2026, the Defendants in this case received approval to begin construction of a Triumphal Arch at Memorial Circle in the District of Columbia to commemorate the Nation's 250th anniversary. Decision Record at 1, *Lemmon* Dkt. # 109-1. I have reviewed relevant portions of the record, including the October 2026 Revised Environmental Assessment, *District of Columbia* Dkt. # 2-13 ("Revised EA"), the Hegseth Declaration, *Lemmon* Dkt. # 74-9, and the Mullin Declaration, *Lemmon* Dkt. # 74-8.

7. Memorial Circle sits on a busy commuter route between Virginia and the District that likewise serves as the "ceremonial gateway" to the Nation's capital, and is a heavily trafficked corridor by vehicles, cyclists, and pedestrians. It is also extensively used by emergency response vehicles servicing the District and parts of Virginia. Memorial Circle is part of the District and receives emergency services from the District's public safety agencies. The Arlington County Fire Department and Joint Base Myer-Henderson Hall Fire Department, both located in Virginia, also provide services to the area. *See* Ltr. from Arlington County, Va. (June 17, 2026), *District of Columbia* Dkt. # 2-26.

8. According to the National Park Service (NPS), commuters and visitors alike pass through the area, resulting in Memorial Circle's "regularly exhibiting operational strain." Revised EA at 50. Vehicle volumes are expected to grow through the end of the decade and continue to strain existing infrastructure. *Id.* at 50-51.

9. NPS estimates that the proposed Arch would draw up to an additional 22,000 visitors per day. *Id.* at A-8. I understand that the Arch is intended to be a tourist destination with a viewing platform, exhibit space, cafe, and gift shop, similar to other civic attractions in the District. *Id.* at 11. It will also be, according to Secretary of Defense Pete Hegseth, a "generational national defense opportunity," to include military personnel, communications and sensor

equipment, and drone systems. Hegseth Decl. ¶¶ 10-13, *Lemmon* Dkt. # 74-9. The Arch is anticipated to provide “air-defense and counter-drone” capabilities “to support a range of critical military and force-protection functions.” *Id.* ¶¶ 13, 16; *Mullin* Decl. ¶¶ 18-20, *Lemmon* Dkt. # 74-8.

10. In my view, the proposed project would impact the most consequential critical infrastructure assets in the National Capital Region. As an emergency preparedness expert, I know that a project of this kind requires the highest levels of preparation, coordination, and assessment among the relevant governmental authorities charged with maintaining emergency infrastructure. These analyses must be carried out before a project is begun to avoid harmful consequences.

11. I know from my experience that Memorial Circle lies along a regional egress route as identified by government-published evacuation plans. I also know that the evacuation route, which runs over Arlington Memorial Bridge, is a designated evacuation route for both the District and Northern Virginia, and that emergency traffic may run both ways over the Bridge.

12. I understand that constructing the 250-foot-tall Arch would close off portions of Memorial Circle and Arlington Memorial Bridge for years. I also see that NPS’s assessments of the Arch’s prospective impact did not include the Arch’s proposed military functions. From my review of NPS’s assessments, I see

that NPS has not quantitatively measured the impact of the proposed Arch on emergency-vehicle response times.

13. Based on my knowledge and experience, Defendants' plans to construct a Triumphal Arch in Memorial Circle would impede emergency services, alter the risk environment, and require the District of Columbia and Virginia to make significant investments to amend emergency response plans and safely oversee the Arlington Memorial Bridge traffic corridor. Defendants do not appear to have undertaken the necessary preparation, coordination, and assessments for a project that would so fundamentally alter the Capital Region's emergency-response outlook. Moreover, ordinary traffic analysis and operations do not necessarily translate into acceptable emergency response performance, where minutes can often mean the difference between life and death.

14. In my experience coordinating emergency preparedness, I know that any change to existing evacuation routes requires careful planning for contingencies. Because the Arlington Memorial Bridge corridor is a key evacuation route for the District and Northern Virginia, the Arch project is certain to disrupt existing plans. This is doubly so during construction, which is projected to last years and will constrict traffic capacity around Memorial Circle. Yet I am not aware of Defendants' having conducted the rigorous planning for mitigating these issues that would normally be applied. Based on my experience in emergency

planning, updating the District's and Virginia's emergency response and evacuation plans would require coordination with federal, state, and local partners, including reviewing existing procedures, developing contingencies for construction-related disruptions, and stress testing those plans through scenario-based exercises. Based on previous planning efforts that I have been involved with in the District, I would estimate several hundred cumulative staff hours—approximately 200 to 500—across participating District agencies (in addition to efforts by Virginia), excluding specialized modeling, exercise design, execution and evaluation, and ongoing coordination throughout construction.

15. Closures during construction will leave only two lanes open for westbound traffic on Arlington Memorial Bridge, not taking into account additional obstructions or delays resulting from construction activities at the Circle. Crucially, Memorial Circle's location along an evacuation route passing over Memorial Bridge means that an alternative route or detour would be limited or impossible—instead, other evacuation routes will take on significant additional strain in an emergency. This creates a clear risk of delaying emergency response times, particularly during a major incident or evacuation.

16. I know Arlington Memorial Bridge to be one of only three primary Potomac River crossing corridors providing direct access between Northern Virginia and the National Mall. The NPS Revised Environmental Assessment

identifies concurrent or planned rehabilitation projects affecting the Theodore Roosevelt Bridge and the 14th Street Bridge corridors. Revised EA at F-1 to F-3. Simultaneous restrictions on these critical crossings would severely compromise emergency response, the provision of mutual aid, and evacuation during a major incident.

17. In my professional judgment, proceeding without comprehensive regional traffic modeling, coordinated construction schedules, and emergency contingency plans would introduce an unacceptable and avoidable risk to public safety, potentially with catastrophic consequences. Should this project move forward, the District and Virginia would need to perform this modeling and planning forthwith, ideally before construction begins. In my experience, the modeling of the proposed traffic patterns, contingencies, and cascading impacts is generally both time-consuming and resource-intensive.

18. I understand that construction of the Arch will make it impossible for medevac and other aerial emergency vehicles to land at Memorial Circle, both during construction and following completion. Even if there are alternate locations for such landings, not all landing sites are necessarily operationally equivalent. Indeed, there could be significant discrepancies in terms of flight access, patient transfer, ground ambulance access, or response times. Adequate consideration and analysis of these issues does not appear to have been done here. It would be

imperative that the District and Virginia devote the time to properly prepare and plan for alternative landing sites and any disruptions to emergency service and rescue operations.

19. I also understand that while construction proceeds, large vertical cranes will obstruct views across the Potomac, complicating navigational sight lines and presenting a potential hazard to passing aircraft, as well as an obstacle to emergency flight-path deviations from nearby Ronald Reagan Washington National Airport. In the event of a local emergency requiring an aerial response, vehicles in the air would be required to navigate around large construction equipment. Aerial navigation would be further complicated by the Arch's anticipated use as a drone port, which was not taken into account in Defendants' various assessments. Without adequate consideration of these issues by Defendants, it is the District and Virginia who will bear the costs of anticipating complications arising from these functions.

20. Nor will concerns be mitigated once construction is complete. The tens of thousands of additional daily visitors to the site, as well as increased car, bus, and motorcoach traffic, will delay emergency response times and could obstruct existing evacuation routes. Because Memorial Circle receives emergency services from both the District and Arlington County, and lies along an evacuation route for both regions, first responders could be moving both eastbound and

westbound in an emergency, further exacerbating congestion issues caused by the Arch. The increased presence of tourists and traffic at the Arch will inevitably increase the number of required emergency response deployments to the site, and bad actors may identify and use congestion points as a tool to amplify harm.

21. As an expert in homeland security and emergency management issues, I know that the Arch's proposed dual use as a tourist site and a military installation could prove deadly in an emergency. The Arch is a monumental visitors' attraction close to the National Mall, which sees tens of thousands of visitors per day. According to Secretary Hegseth, it is also a "generational national defense opportunity" intended "to support a range of critical military and force-protection functions." Hegseth Decl. ¶¶ 10, 13, *Lemmon* Dkt. # 74-9.

22. Combining a monumental site with a national security locus means that, in an emergency, military resources could be deploying to the site *during* evacuation of visitors from the same site. My experience and expertise have focused in part on anticipating adversarial attacks on the National Mall. In the event of a terrorist attack so close to the Arch, given its critical nature, military personnel would seek to secure the site against further attacks. This would obstruct the movement of thousands of tourists away from the site in event of an evacuation, as protecting the military installation could necessitate further limiting or even entirely closing the key evacuation route along Arlington Memorial

Bridge. Such an evacuation would be even more challenging during high-attendance events in the District, such as presidential inaugurations. This would undoubtedly complicate emergency response and pose a hazard to civilians near the Arch.

23. Additionally, the Arch could itself present a hardened military target for an attack by bad actors. I understand that Defendants plan to store ammunition, drones, and potentially other weapons at the Arch. This creates a potentially deadly scenario for visitors and complicates emergency planning. Terrorists and other bad actors could attempt to target the Arch directly because it is a national security asset. And I am not aware of any plan that Defendants have offered for mitigating emergency-response issues caused by the dangers of military ordnance, such as the risks of explosion, fire, or accidental discharge, located contiguously with a visitors' attraction. Emergency services would struggle to reach civilians in need if the military were actively defending the Arch during an attack.

24. The designation of the Arch as a national security site and the presence of munitions might also draw protestors to the site, whether permitted or not. This, too, could impede emergency response times.

25. In summary, Defendants' proposed Arch would present serious unaddressed issues for emergency response and disaster preparedness in the

District, posing a danger to visitors and requiring significant investments by the District and Virginia to mitigate.

26. I am being compensated by Plaintiffs in Case No. 26-cv-3838 for providing this declaration, in order to cover my time reviewing and analyzing the relevant material. No part of this compensation is contingent on the outcome of this case, nor is it dependent on the specific facts, opinions, or testimony provided in this declaration.

27. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Dated this 10th day of November, 2026.

Donell Harvin, DrPH