# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL LEMMON, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Case No. 26-cv-544 (TSC) |
| DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA,<br><br>*Plaintiffs*,<br><br>v.<br><br>NATIONAL PARK SERVICE, et al.,<br><br>*Defendants*. | Case No. 26-cv-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

## DECLARATION OF RACHEL WEINBERGER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Rachel Weinberger, make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

1. I am over the age of eighteen and a resident of New York. I make this declaration based on my personal knowledge.

2. I am a transportation researcher and policy expert serving as Vice President for Transportation and the Peter W. Herman Chair at the Regional Plan Association (RPA), an independent non-profit civic organization that focuses on improving quality of life in the New York City tristate area.[1] I have more than 35 years of experience advancing evidence-based transportation policy and planning. My work focuses on research design, travel behavior, transportation economics, land use and transportation interactions, parking and curb management, and the economic performance of transportation systems.

3. I hold a Ph.D. in Urban Planning and an M.S. in Civil Engineering from the University of California, Berkeley, and a B.A. and Master of Urban Planning from Hunter College, City University of New York.

4. Prior to joining RPA, I served in transportation policy and advisory roles for a variety of clients representing the private, public, and non-profit sectors. I was on the faculty of the University of Pennsylvania and I currently serve as an adjunct faculty member at Columbia University. I served for many years as an editor of the Transportation Research Record, the journal of record for the Transportation Research Board, a division of the National Academies of Sciences, Engineering, and Medicine.

---

[1] I make this declaration in my personal capacity and not on behalf of RPA.

5. I have authored and co-authored major analyses examining congestion pricing, transit investment, regional economic competitiveness, and transportation system performance. My recent work includes *New York Penn Station Constraints and Considerations for Meeting Future Demand*; *The False Promise of Building Roads: Transit Outpaces Highways for Economic Value*; RPA's analysis of the MTA 2025-2029 Capital Plan; *Congestion Pricing: What it Means to Save Time*, which estimated up to $1.3 billion in annual commuter time savings due to reduced traffic delay from congestion pricing; and *The Value of NJ TRANSIT*, which quantified the economic, mobility, and quality-of-life benefits generated by the nation's third-largest transit system. In 2024-2025, I was a member of the consulting team that evaluated the social and economic costs of street closures due to adjacent building construction for the New York City Department of Transportation. Based on my experience, I am familiar with how large construction projects affect the flow of traffic and quality of life for residents.

6. I am aware that on November 5, 2026, the Defendants in this case received approval to begin construction of a Triumphal Arch at Memorial Circle in the District of Columbia to commemorate the Nation's 250th anniversary. Decision Record, *Lemmon* Dkt. # 109-1. I have conducted a preliminary review of portions of the record related to plans for the Arch, including the July 2026 National Capital Planning Commission (NCPC) Staff Report, the National Park Service (NPS)

Revised Environmental Assessment of October 2026, *District of Columbia* Dkt. # 2-13 ("Revised EA"), the November 2026 NCPC Staff Report,[2] and the NPS Decision Record of November 5, 2026, *Lemmon* Dkt. # 109-1 ("Decision Record").

7. I understand that Memorial Circle sits on a busy commuter route between Virginia and the District that serves as the "ceremonial gateway" to the Nation's capital. I also understand that the corridor running from Arlington National Cemetery, over Arlington Memorial Bridge, and to the Lincoln Memorial presently sees more than 27,000 vehicles, 1,100 cyclists, and 1,200 pedestrians per day. Revised EA at 50.

8. According to the information I have reviewed, commuters and visitors alike pass through the area, resulting in Memorial Circle's "regularly exhibiting operational strain." Revised EA at 50-51, *but see id.* at B-24 (claiming "A" level of service). Vehicle volumes are expected to grow through the end of the decade and continue to strain existing infrastructure. *Id.* at 51-52. I am aware of existing congestion issues in the vicinity of Memorial Circle, including average queues of approximately 2,700 feet, a distance approximately equal to a half mile, for vehicles on Washington Boulevard south of the Circle during peak morning commute hours. Revised EA at B-2.

[2] Available at https://www.ncpc.gov/docs/actions/2026November/8778_New_Monumental_Arch_Staff_Report_Nov2026.pdf.

9. I understand the proposed Arch is intended to be a tourist destination with a viewing platform, exhibit space, cafe, and gift shop, similar to other civic attractions in the District. *Id.* at 3. According to NPS, the proposed Arch would draw up to an additional 22,000 visitors per day, who rather than simply passing through the traffic corridor would stop at and patronize the Arch. *Id.* at A-8.

10. According to NPS, construction of the proposed Arch is anticipated to last three years and for most of that time would close the southern part of Memorial Circle, reduce westbound traffic on Arlington Memorial Bridge from three to two lanes, and impose directional restrictions. *Id.* at 10. NCPC also anticipates that the peak queue to merge northbound on Washington Boulevard will increase over 500 feet, from just over 2,700 feet to nearly 3,300 feet, during the morning commute. Nov. 2026 NCPC Staff Report at 28. NPS notes that additional impediments to traffic may arise during construction. Decision Record at 3, *Lemmon* Dkt. # 109-1.

11. As a transportation research and policy expert, I believe that the proposed Triumphal Arch would be a major traffic generator and create unanticipated infrastructure issues for both the District and Virginia. Defendants propose to close down large portions of a commuter roadway for years, including parts of a bridge connecting the Nation's Capital with its 12th-most-populous state. Given that Memorial Circle is already part of a congested area, construction is

likely to exacerbate traffic beyond what is discernable from NPS and NCPC reports, and would result in significant costs for Virginia and the District to continue operation of the Arlington Memorial Bridge traffic corridor.

12. Based on my experience and expertise, the traffic analysis conducted by Defendants is incomplete and the available data do not support the conclusions reached. I believe the proposed Arch is likely to create impediments to traffic that the District and Virginia will need to consider and analyze because they are not included in Defendants' analysis.

13. The final plans detail peak hour traffic counts (1) at present, (2) in five years with no Arch (the "No Build" condition), and (3) in five years with the Arch (the "Build" condition). *Id.* Nov. 2026 NCPC Staff Report at 24-25, 27. Expected traffic growth for the No Build condition is 0.5% per year for the next five years, totaling 2.5%. *Id.* at 25. The expected traffic growth figures for the Build condition are nearly identical, and the analysis assumes the growth is equally distributed across all hours of the day and week.

14. The Revised Environmental Assessment implausibly shows no change in vehicle traffic or even a reduction in vehicle traffic under the Build condition. For example, on Saturday afternoon—likely to be one of the busiest times for memorial visitors—the assessment estimates that building the Arch would result in 40 fewer vehicles entering Washington Boulevard northbound compared to the No

Build condition. *Compare* Revised EA at 107, *District of Columbia* Dkt. # 2-13 (projected No Build flow), *with id.* at 112 (projected Build flow). This appears to be a finding that building the Arch will reduce vehicle traffic during peak visiting hours, despite the fact that the assessment elsewhere acknowledges that "vehicle volumes [are] expected to grow through the end of the decade" for the No Build scenario. *Id.* at 60. I find it implausible that the Arch as described would reduce vehicle traffic as Defendants claim.

15. For each of the three time periods during which traffic impacts were projected, NCPC claims nearly identical traffic increases with and without the Arch. Nov. 2026 NCPC Staff Report at 25. Based on my expertise, I know that large monumental projects like the Arch attract increased vehicle traffic even outside of peak visitor hours. Therefore, I do not think it is likely that traffic conditions around Memorial Circle will grow similarly over the next five years both with and without the Arch.

16. Because the plans do not show traffic counts for the full day, nor show the assumptions on access modes and capacity, the data do not support Defendants' claim that the Arch will not dramatically worsen congestion.[3] I know from my

[3] The November 2026 NCPC Staff Report claims (at 9) that only the three time periods studied in the Report were necessary to examine traffic-flow impacts because recurring congestion is not expected during the Arch's anticipated peak visiting times.

expertise in studying traffic flows that while commuter traffic is often congested in the mornings, visitor traffic to public attractions and monuments like the proposed Arch is often highest in the afternoons. *See also* Nov. 2026 NCPC Staff Report at 9 ("[T]he project will likely attract the highest volumes of visitors during the early afternoon, weekends, and holidays . . . ."). As a transportation expert, I would anticipate a project like the Arch to worsen congestion through the corridor and have a negative impact on travelers. Without a full hour-by-hour daily estimate of how the Arch would impact traffic volumes, the full impact on congestion cannot be readily measured, and I anticipate that the District and Virginia will have to study, quantify, and take actions to alleviate these harms to continue operation of the roadways.

17. The traffic analysis is also incomplete as relates to parking accommodations and regional congestion. NCPC anticipates that visitors to the Arch using personal vehicles will park using existing facilities at Arlington National Cemetery, while a renovated Memorial Circle will accommodate bus and motorcoach drop-off and pick-up for visitors. Defendants thus appear to have no plans for additional parking capacity for visitors, as the final plans only contemplate "passenger pickup and drop-off, staff parking, bus loading and unloading, and other delivery and service activities" abutting Memorial Circle. *Id.* at 31. A comprehensive traffic analysis would measure how up to 22,000

anticipated additional daily visitors, *see* Revised EA at A-8, would burden nearby infrastructure like Arlington National Cemetery (which it inevitably will). Yet I have seen no indication that Defendants' traffic study considered, for example, the congestion impact on access roads to and from the Cemetery.

18. Although NCPC claims to have assumed "conservative, high-visitation conditions," I have not observed sufficient evidence that existing infrastructure can accommodate future demand in the region, nor sufficient information to support NCPC's own conclusions. Instead, the project is likely to worsen regional strains, including overwhelming infrastructure at Arlington National Cemetery and lengthening queues leading to and from Memorial Bridge. That is not to mention additional delays caused by construction vehicles and unanticipated temporary closures.

19. Furthermore, a proper traffic assessment is only possible with a comprehensive breakdown of the anticipated number of additional vehicles. NCPC estimates the number of additional visitors, *see* Revised EA at A-8, but nowhere breaks down the number of additional vehicles—whether tour buses, private cars, taxis, or other livery—that are expected to access Memorial Circle once the Arch is complete. Because this information is missing, the traffic projections relied on by Defendants are certainly an undercount of the burdens to the traffic pattern that the Arch would impose.

20. Apart from the additional people who visit the site, there will be an increase in drivers who pass by the area to see the new monument. The National Park Service cannot control these passersby using timed entries or visitor management. Their presence will increase traffic around Memorial Circle. However, Defendants' assessments do not consider this issue at all.

21. Also missing from Defendants' assessments is consideration of the different means by which people will access the site—that is, how many people will travel to it by private vehicle, bus, or walking. Likewise, while the final plans provide estimated traffic flow numbers for the roadways, they do not provide each roadway's maximum vehicle capacity, a highly relevant number when evaluating impact. All of this information is highly relevant to a thorough assessment of traffic impacts, and if the federal government does not conduct this assessment, it would be necessary for the District and Virginia to expend considerable efforts and funds to do so.

22. Nor does Defendants' assessment contain any analysis of how pedestrian crossings will affect the traffic flow, including additional traffic crossings proposed to be installed. Presumably, *all* visitors who travel to see the Arch—whether they drive, take the Metro, or walk—will cross the Circle to access the Arch. The anticipated significant increase in pedestrian traffic will inevitably require vehicles to drive more slowly, thus further reducing the capacity of the

existing Circle and impeding traffic. Even assuming Defendants are correct that vehicle traffic will be lighter during peak pedestrian visiting hours, this will not eliminate the traffic impacts, and it would also mean vehicles are unimpeded by congestion and driving faster at the precise times that the most pedestrians are crossing the Circle, increasing the likelihood of serious injury to pedestrians. Defendants' analysis does not appear to take these significant risks into account.

23. Based on my experience as a transportation research and policy expert, I therefore believe that Defendants' plans to construct a Triumphal Arch in Memorial Circle would be a major traffic generator and would require the District of Columbia and Virginia to make significant investments to continue operation of the Arlington Memorial Bridge traffic corridor.

24. As a transportation expert, I know that severe disruptions to existing commuter traffic patterns can cause wider social harms. Additional traffic creates additional air and water pollution, including (but not limited) to EPA-criteria pollutants like carbon monoxide and asthma-inducing PM2.5. Traffic also causes delays and associated vehicle idling, compounding the polluting effect. It creates additional risks of injury and property damage due to crashes. The extent of delay and time burden on travelers in the corridor is relevant to any large project.

25. In conclusion, the proposed Arch is likely to produce serious traffic issues both surrounding Memorial Circle and in the nearby region, during and after construction, which the District and Virginia would be forced to study and mitigate, incurring significant costs.

26. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Dated this 10th day of November, 2026.

Rachel Weinberger