**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**MICHAEL LEMMON**, *et al.*,

*Plaintiffs*,

v.

**DONALD J. TRUMP**, *et al.*,

*Defendants*.

Civil Action No. 26-cv-544 (TSC)

**DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA**,

*Plaintiffs*,

v.

**NATIONAL PARK SERVICE**, *et al.*,

*Defendants*.

Civil Action No. 26-cv-3838 (TSC)

**CONSOLIDATED CASES**

**DEFENDANTS' OPPOSITION TO LEMMON PLAINTIFFS' MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 1

STANDARD OF REVIEW ........................................................................................ 4

ARGUMENT ............................................................................................................. 4

I. Supplementation is Futile Because Plaintiffs Do Not Allege a Concrete and Particularized Injury.................................................................................. 4

II. Supplementation Is Futile Because Plaintiffs Cannot Establish Article III Standing When They Filed Suit. .................................................................. 12

A. No case or controversy existed when suit was filed. ............................... 13

B. The “time-of-filing” rule controls standing. ............................................ 15

CONCLUSION ......................................................................................................... 16

## TABLE OF AUTHORITIES

### Cases

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) .......... 24

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) .......... 27, 28

*Clean Water Action v. Pruitt*,
315 F. Supp. 3d 72 (D.D.C. 2018) .......... 5, 6

*Diamond v. Charles*,
476 U.S. 54 (1986) .......... 9

*EDF v. FERC*,
2 F.4th 953 (D.C. Cir. 2021) .......... 19

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 8, 9, 13, 16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 14

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*,
541 U.S. 567 (2004) .......... 22, 29

*Hall v. C.I.A.*,
437 F.3d 94 (D.C. Cir. 2006) .......... 5

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) .......... 6

*Hutto v. Davis*,
454 U.S. 370 (1982) .......... 21

*James Madison Ltd. by Hecht v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) .......... 6

*Mollan v. Torrance,*
9 Wheat. 537, 6 L.Ed. 154 (1824) .......... 23, 30

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 20

*Nat'l Park Serv. v. Nat'l Trust for Historic Pres. in the United States*,
609 U.S. 1068 (2026) .......... passim

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) .......... passim

*Nuclear Regul. Comm'n v. Texas,*
605 U.S. 665 (2025) .......... 30

*Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*,
656 F. Supp. 3d 137 (D.D.C. 2023) ........ 26, 28

*SAI v. DHS*,
149 F. Supp. 3d 99 (D.D.C. 2015) ........ 6

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) ........ 28, 29

*State Nat'l Bank of Big Spring v. Lew*,
795 F.3d 48 (D.C. Cir. 2015) ........ 25

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........ 26, 27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 8, 14, 15

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) ........ 20

*Trump v. California*,
609 U.S. 1032 (2026) ........ passim

*Trump v. New York*,
592 U.S. 125 (2020) ........ 29

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
998 F.3d 926 (D.C. Cir. 2021) ........ 25

*United Transp. Union v. I.C.C.*,
891 F.2d 908 (D.C. Cir. 1989) ........ 24

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
454 U. S. 464 (1982) ........ 13

**Rules**

Fed. R. Civ. P. 15(a) ........ 5

Fed. R. Civ. P. 15(d) ........ 4, 5

**Other Authorities**

91 Fed. Reg. 54,966 (Aug. 26, 2026) ........ 21

## INTRODUCTION

Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gunderson, and Calder Loth (Lemmon Plaintiffs) seek leave to supplement their Complaint, but they fail to fix the fundamental defect with their claims: they lack concrete and particularized Article III injuries. As the government's numerous prior briefs have explained, the Lemmon Plaintiffs' distaste for the arch does not establish Article III injury. And nothing in their proposed supplemental pleading articulates a new injury, much less addresses the Supreme Court's governing decision in *National Park Service v. National Trust for Historic Preservation in the United States* (*NPS*), 609 U.S. 1068 (2026). Because supplementation is futile, the Court should deny their motion.

Nor can the Lemmon Plaintiffs attempt to establish standing for the first time eight months after their suit began. Instead, "the time when standing is measured" is "the time this suit was filed." *Trump v. California*, 609 U.S. 1032, 1039 (2026). When the Lemmon Plaintiffs filed suit, they "had to engage in a string of speculations" about how agency Defendants would ultimately implement a Presidential desire to articulate any injury. *Id.* They cannot use a supplemental pleading to change the time when standing is measured, lest the Judicial and Executive Branches be deluged by speculative challenges to internal directives. "Federal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule." *Id.* at 1040. For these reasons, the Defendants respectfully request that the Court deny Plaintiffs' Motion for Leave to File a Supplemental Complaint, Dkt. 112.

## BACKGROUND

On February 19, 2026, the Lemmon Plaintiffs filed the instant action. *Lemmon* Compl., Dkt. 1. They challenged the proposed construction of an Arch on Memorial Circle in Washington, D.C., and they requested that this Court declare such construction unlawful. *Id.* at 18. But no such construction had been authorized at the time. Indeed, the National Park Service (NPS) would not

finally approve construction of the Arch for nearly nine more months. NPS, *Decision Record: Triumphal Arch at Memorial Circle* (Nov. 5, 2026), Dkt. 109-1.

The only events alleged in their original complaint were social media posts by the President and others, as well as announcements to the press. *Lemmon* Compl. ¶¶ 29–49. The Lemmon Plaintiffs allege that such statements amounted to unconstitutional *ultra vires* actions taken by the President or by federal agencies. *Id.* ¶¶ 52–64. They assert injury because the Arch will block the view between Lincoln Memorial and Arlington National Cemetary. *Id.* ¶¶ 51–51. This, they feel, will "interrupt the symbolic connection between the Lincoln Memorial and Arlington National Cemetery." Lemmon Decl. ¶ 8, Dkt. 7-2. They allege that the "project is profoundly disturbing," a "visual affront" to democracy "and a personal affront to people," and that many others share their "outrage." *Id.* ¶¶ 8–9, 12–13. And the Lemmon Plaintiffs originally alleged that—without judicial intervention—the Arch would be constructed by July 4, 2026, and that Defendants would not follow procedural prerequisites under the National Environmental Policy Act (NEPA) and Section 106 of the National Historic Preservation Act (NHPA), *Lemmon* Compl. ¶ 64, nor submit the plans for "consultation and review by the [National Capital Planning Committee (NCPC)] and the [Committee on Fine Arts (CFA)]," *id.* ¶¶ 27, 55–56.

Soon after filing the original complaint, the Lemmon Plaintiffs sought a preliminary injunction. Their motion assumed the arch would be constructed without review by the NCPC and the CFA, and without complying with procedural requirements under NEPA and Section 106 of the NHPA. *See* Pls.' Prelim. Inj. Br. 23–24, Dkt. 7-1. In response to the mistaken assumptions in that preliminary injunction motion, Defendants explained that the proposed arch would not be built before NPS issued a final agency action authorizing arch construction, and that NPS would comply with NEPA and the NHPA, as well as submit the proposal for review by the NCPC and CFA.

Lands Decl., Dkt. 12-1; Fisher Decl., Dkt. 24-1. Based on those representations, the Lemmon Plaintiffs agreed to an order dismissing their preliminary injunction motion. Consent Order, Dkt. 26.

The Lemmon Plaintiffs and Defendants then proceeded to fully litigate this suit on the merits, through three dispositive motions. Defendants moved to dismiss the Complaint in April; that motion was fully briefed in May. Dkts. 31, 33, 35. After the Court denied Defendants' motion to stay summary judgment briefing pending a ruling on their motion to dismiss,[1] the original Parties fully briefed two cross-motions for summary judgment by July. Dkts. 36, 44, 45, 48, 49, 51. All three motions addressed Lemmon Plaintiffs' standing in two respects: whether mere offense at viewing the proposed arch and its alleged interference with Plaintiffs' viewshed constitutes Article III injury-in-fact; and whether Plaintiffs had alleged non-speculative, imminent injuries when this suit began. Those three dispositive motions remain pending.

On November 5, 2026, after awaiting approval by the NCPC, NPS approved construction of the Arch. Dkt. 109-1. In response to a motion for a temporary restraining order by the District of Columbia and Virginia, the Court issued an order enjoining construction on the same day. Order, Dkt. 111.

Two days later, the Lemmon Plaintiffs brought the instant motion to supplement their original complaint. Mot. to Suppl. Compl., Dkt. 112. They seek to add the Department of the Interior as a supplemental "Agency Defendant". Dkt. 112-2 ¶ 5. And they make three additional claims, all under the Administrative Procedures Act (APA): (1) violation of the Commemorative Works Act (CWA); (2) violation of 40 U.S.C. § 8106; and (3) arbitrary and capricious action. *Id.*

---

[1] *See* Minute Order (June 9, 2026).

¶¶ 48–66. All supplemental claims arise from "Agency Defendants' action giving authorization for construction" of the Arch. *Id.* ¶¶ 54, 60, 66.

## STANDARD OF REVIEW

A plaintiff must seek leave of court to supplement a complaint. See Fed. R. Civ. P. 15(d). As opposed to an amendment, which relates to matters that occurred prior to filing the complaint, supplements set forth events that have happened after filing. *Hall v. C.I.A.*, 437 F.3d 94, 100 (D.C. Cir. 2006). While Rule 15(a) states that courts "should freely give leave" to amend complaints "when justice so requires," Rule 15(d) is permissive: a court "may, on just terms" permit supplementation. *Compare* Fed. R. Civ. P. 15(a), *with* Fed. R. Civ. P. 15(d). "The plain text of Rule 15(d) thus permits a court to grant leave to supplement, but imposes no standard requiring a court to do so." *Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, 80 (D.D.C. 2018).

"'Both motions for leave to amend and motions to supplement should be denied where amendment (or supplementation) would be futile,' *i.e.*, if the proposed claim would not survive a motion to dismiss." *Id.* (quoting *SAI v. DHS*, 149 F. Supp. 3d 99, 126 (D.D.C. 2015) (cleaned up)); *see also Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (affirming denial of leave to supplement on futility grounds).

## ARGUMENT

### I. Supplementation is Futile Because Plaintiffs Do Not Allege a Concrete and Particularized Injury.

An amendment is futile if the proposed claim would not survive a motion to dismiss. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citations omitted). As previously explained in three dispositive motions, the Lemmon Plaintiffs' claims must be dismissed for lack of standing because their aesthetic and emotional displeasure at the perceived symbolism of the proposed arch does not establish a concrete and particularized injury under the

Supreme Court's controlling decision, *NPS*, 609 U.S. 1068. There, the plaintiff claimed injury to her "'aesthetic, cultural, and historical interests' because she [found] the 'scale,' 'height,' and 'massing' of the government's design distasteful." *Id.* at 1070. Plaintiffs here allege injury from the arch's symbolic and aesthetic effect on views of the Lincoln Memorial when they stand in a particular place in Arlington National Cemetery. Compl ¶¶ 8-10; Dkts. 7-2 to 7-5. The Supreme Court held that this type of harm—which amounts to "mere offense, disagreement, or distaste"—"does not qualify as a concrete and particularized injury under Article III." *NPS,* 609 U.S. at 1071.

1. The "law of Art. III standing is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021). Because Article III limits federal courts to adjudicating "cases and controversies," they "do not possess a roving commission to publicly opine on every legal question." *Id.* at 423. Nor do they "exercise general legal oversight of the Legislative and Executive Branches." *Id.* at 423–24. "Article III standing screens out" disputes grounded in a "general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986).

A plaintiff thus must demonstrate that he or she has a "personal stake" in the controversy by showing he or she suffered an "injury-in-fact." *All. for Hippocratic Med.*, 602 U.S. at 379. An injury in fact must be "concrete," meaning "real and not abstract," and "particularized," meaning affecting in a personal way and "not a generalized grievance" *Id.* at 381.

2. Aesthetic injuries that amount to "mere offense, disagreement, or distaste" are insufficient to establish Article III standing. *NPS*, 609 U.S. at 1071. In *NPS*, the plaintiff's declarant, Professor Alison Hoagland, claimed that "having to view the finished ballroom the

government is constructing would cause her to suffer injuries to her aesthetic, cultural, and historical interests because she finds the scale, height, and massing of the government's design distasteful." *Id.* at 1070 (citation omitted).

Professor Hoagland, a member and leader of the National Trust for more than 40 years and a professor of historic preservation, claimed a profound symbolic and professional interest in the preservation of the White House's "republican simplicity" through many renovations. *Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, 185 F.4th 1185, 1209 (D.C. Cir. 2026) (quoting Hoagland Decl. ¶ 10). She claimed that if the ballroom is constructed on the former site of the East Wing, it would "overshadow[] the White House, exceeding it in height and massing." Hoagland Decl. ¶ 13 (Pet. App. 75a), *NPS*, No. 26A203 (U.S.). This would obstruct unvarnished views and change the symbolic meaning of the site: "No longer would the eye be drawn to the jewel of the building in the center, declaring to viewers that our president lives in a *house*." *Id.* It would change the essential character of the site by "diminish[ing] the primacy of the White House, which makes its structural statement through its singularity on the landscape." *Id.*

The D.C. Circuit held that the National Trust had adequately alleged standing based on Professor Hoagland's assertions. *Nat'l Trust.*, 185 F.4th at 1210. The court observed that Hoagland had alleged a permanent alteration of her view: "Professor Hoagland will no longer be able to 'use[ and] derive benefit from' seeing and studying a White House with historic and intentionally designed 'republican simplicity,' and that permanent loss will injure her 'aesthetic, cultural, and historical interests.'" *Id.* at 1213 (citing Hoagland Decl. ¶¶ 3, 10, 14). And: "She will also lose forever the opportunity to view Lafayette Square with the intentional architectural symmetry of the 235-year-old L'Enfant Plan—an experience she greatly values—if the ballroom is constructed as planned." *Id.* (citing Hoagland Decl. ¶¶ 9, 13). The court also noted a change in the symmetry

of the White House complex, rendering it out of "harmony with the symmetry of Major L'Enfant's axial plan of the capital city, in which the President's House and the Capitol building sit symmetrically on perpendicular axes." *Id.* (explaining that the change would alter the "architectural integrity," and that the symmetrically designed "axial relationship" was "one of the defining attributes for the entirety of Washington, DC's monumental core"). The D.C. Circuit insisted that Hoagland alleged more than a mere "psychological" injury, and that she alleged "concrete" "recreational," "aesthetic," and "professional" injuries. *Id.* at 1211-13.

The Supreme Court rejected all of this. It held that Professor Hoagland likely failed to establish a concrete and particularized injury. *NPS*, 609 U.S. at 1072–73. Hoagland's "desire to view" a symmetric White House demonstrated nothing beyond "'the psychological consequence presumably produced by observation of conduct with which one disagrees.'" *Id.* at 1071–72 (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U. S. 464, 485 (1982)). The asserted injuries were thus merely "distress at or disagreement with the activities of others," like doctors being distressed that other doctors might perform abortions in *Hippocratic Medicine*, which "is not a basis under Article III for a plaintiff to bring a federal lawsuit." *All. for Hippocratic Med.*, 602 U.S. 367, 390 (2024). Because "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III," that plaintiffs were unlikely to establish standing. *NPS*, 609 U.S. at 1071.

It was thus irrelevant that Professor Hoagland used the affected area and would derive less aesthetic and recreational value because of the ballroom. Whereas the D.C. Circuit found the member "'adequately alleged' an injury in fact" by "'aver[ring] that she uses the affected area'

and is an individual 'for whom the aesthetic and recreational values of the area will be lessened,'"[2] the Supreme Court rejected her use-by-viewing theory of standing, *NPS*, 609 U.S. at 1071–73. This holding harmonizes with the Court's precedent on the "concreteness" requirement. "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including . . . reputational harm." *TransUnion*, 594 U.S. at 417. "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* The aesthetic injuries that Professor Hoagland alleged fail that test because they do not bear a "'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424.

3. Plaintiffs here allege that the arch offends their sensibilities because it will (eventually) interfere with their view of other monuments if they choose to stand in various—but unspecified—locations in Arlington National Cemetery and gaze at Washington, D.C. Just as Professor Hoagland could not establish standing based on her "desire to view" the White House, *NPS*, 609 U.S. at 1072, Plaintiffs cannot establish standing based on their desire to view the Lincoln Memorial from a specific place in a public Cemetery, much less their "outrage" at "a politician intent on building a vainglorious monument." Gundersen Decl. ¶¶ 8-10, Dkt. 7-4. Nothing in their standing declarations establishes a concrete and particularized injury.

Each Plaintiff bases their injury on offense at the proposed arch and its perceived symbolism. Michael Lemmon believes "the President's planned arch will be a continuous visual affront" to the principle that "we are a Nation of laws," Lemmon Decl. ¶ 12, as it will "represent

---

[2] *Nat'l Tr.*, 185 F.4th at 1210 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000), citation modified).

a powerful leader unilaterally imposing his will," *id.* ¶ 8 (the arch "violates the values that I have held dear throughout my life and career"). Shaun Byrnes is "concerned about the arch's symbolism," Byrnes Decl. ¶ 11, which he "will perceive . . . as a personal affront," *id.* ¶ 13. Jon Gundersen finds the arch "a vainglorious monument," Gundersen Decl. ¶ 8, that will leave him "feeling insulted and disrespected," *id.* ¶ 9. And Calder Loth thinks the arch "will dominate," Loth Decl. ¶ 8, Dkt. 7-5, "as a disrespectful imposition" on the landscape, *id.* ¶ 9. All those allegations are the sort of "general legal, moral, ideological, or policy objection to a particular government action" that "Article III standing screens out." *All. for Hippocratic Med.*, 602 U.S. at 368.

Plaintiffs' remaining allegations attempt to transmute their ideological objections into aesthetic injuries in violation of Article III's requirement that injuries be concrete and particularized. Mr. Lemmon objects that the proposed arch "will interrupt the symbolic connection between the Lincoln Memorial and Arlington National Cemetery," Lemmon Decl. ¶ 8, diminishing his ability to "revel in the uninterrupted and inspiring view of the Lincoln Memorial," *id.* ¶ 6. Mr. Byrne "enjoy[s] the unobstructed vista of the Lincoln Memorial" from Arlington National Cemetery that "symbolizes the restoration of the Union" and "creates an aura of peace for [him]." Byrnes Decl. ¶ 9. The remaining Plaintiffs, Jon Gunderson and Calder Loth, express similar desires for an unobstructed view between the Arlington National Cemetery and the Lincoln Memorial. *E.g.*, Gunderson Decl. ¶ 6 ("I find great personal satisfaction in looking out from the cemetery at the inspiring view of the Lincoln Memorial); Loth Decl. ¶ 6 ("I also find symbolic meaning and aesthetic satisfaction in the reciprocal view, across Arlington Memorial Bridge from the Lincoln Memorial in Washington, DC, to Arlington.").

As detailed above, Plaintiffs' "aesthetic" injuries are indistinguishable from those of Professor Hoagland in *National Park Service*. Professor Hoagland attested that building the

"ballroom 'would cause permanent and irreparable harm to the White House and President's Park' because it would "overshadow the White House, exceeding it in height and massing, and would diminish the primacy of the White House." *Nat'l Tr.*, 185 F.4th at 1209 (quoting Hoagland Decl. ¶ 13, citation modified). And she objected that "'no longer would the eye be drawn to the jewel of the building in the center,' which was designed to 'declare to viewers that our president lives in a *house*,' and 'not a palace.'" *Id.*

Just as Professor Hoagland desired a view of the White House unaffected by a large ballroom she found distasteful, Plaintiffs here desire "unobstructed" views between the Arlington National Cemetery and the Lincoln Memorial unaffected by an arch that offends them. But the Supreme Court explained that Hoagland's "desire to view" a symmetric White House and distress caused by the construction of a massive ballroom at the East Wing demonstrated nothing beyond "disagreement with the activities of others," which does not qualify as a concrete and particularized injury under Article III. *NPS*, 609 U.S. at 1071–72 (citation omitted).

Plaintiffs cannot distinguish their interests as being about "the *destruction* of a landscape," *contra* Pls.' Notice of Supp. Authority, Dkt. 54, at 4–5, as Professor Hoagland made indistinguishable arguments about "the permanent visual destruction" of a planned landscape, *Nat'l Tr.*, 85 F.4th at 1213. Nor does Plaintiffs' preference for what the existing landscape "symbolizes" suffice. Professor Hoagland similarly sought standing based on her preference for the "republican simplicity" of the prior East Wing, *Nat'l Tr.*, 185 F.4th at 1213 (quoting Hoagland Decl. ¶ 10), but the Supreme Court held "none of this helps," *NPS*, 609 U.S. at 1072; *accord EDF v. FERC*, 2 F.4th 953, 968 (D.C. Cir. 2021) (rejecting standing to challenge pipeline construction where plaintiff alleged that a metering station "is a looming eyesore and a traffic hazard," and "not in keeping with the character of [her] neighborhood").

And Plaintiffs cannot establish concrete or particularized injuries based on a "profound personal relationship to the iconic vista." *Contra* Dkt. 54, at 3. Such allegations are indistinguishable from Professor Hoagland's averments that "she greatly values" "view[ing] Lafayette Square" and "the architectural significance it embodies." *Nat'l Tr.*, 185 F.4th at 1213–14. But the Supreme Court rejected her attempts to inflate her viewing interests: "Article III standing, we have consistently held, is not measured by the intensity of the litigant's interest, or by a litigant's special interest in the subject." *NPS*, 609 U.S. at 1073 (citation modified). Thus, Plaintiffs' personal and professional experiences cannot transform distaste for the arch and its proposed placement into concrete and particularized Article III injuries. *See id.*

In sum, Plaintiffs' lack of standing is "squarely controlled" by *National Park Service*, which addressed a "similar" question of standing and "does not otherwise differ from [this case] in any pertinent respect." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (finding an interim order controlling). "Lower court judges may sometimes disagree with this Court's decisions, but they are never free to defy them." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring in part and dissenting in part). "[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (*per curiam*).

Because the Lemmon Plaintiffs have not established any harm beyond mere offense, disagreement, or distaste, they lack standing, and their claims must be dismissed for lack of jurisdiction. Their supplemental APA claims do not offer any new theory of harm. The Court should therefore deny Plaintiffs' motion to supplement on the grounds that supplementation is futile.

## II. Supplementation Is Futile Because Plaintiffs Cannot Establish Article III Standing When They Filed Suit.

In addition to their failure to allege a concrete and particularized injury from the Arch, the Lemmon Plaintiffs also lack standing because they filed their suit over eight months too soon, before any proposed agency action, much less final agency action, had been taken. "At the time this suit was filed—the time when standing is measured—the [Lemmon Plaintiffs] had to engage in a string of speculations" to articulate any injury. *California*, 609 U.S. at 1039. In *California*, although the agency had issued a final rule by the time of the Supreme Court's decision,[3] the Supreme Court considered only whether publication of that final rule was non-speculative when the "suit was filed" because that is "the time when standing is measured." *California*, 609 U.S. at 1039. And the Court held that while plaintiffs might be able to challenge the final rule, they could not challenge "antecedent internal directives to propose a rule." *Id.* at 1040.

Their proposed supplementation attempts an end run around that on-point Supreme Court decision by resetting the time when standing is determined. The Lemmon Plaintiffs would thus violate "hornbook law . . . taught to first-year law students in any basic course on federal civil procedure": "that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance,* 9 Wheat. 537, 539, 6 L.Ed. 154 (1824)). Because Plaintiffs lacked non-speculative, imminent injuries when their suit was filed, they cannot reset the time when standing is analyzed by supplementing their pleading.

---

[3] *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026) (final rule effective August 21, 2026, three days before Supreme Court's *California* decision).

**A. No case or controversy existed when suit was filed.**

In their original complaint, Plaintiffs did not challenge any agency action or bring a single APA claim. At the time of suit, NPS had not taken any action to construct the proposed arch. Indeed, final approval was more than eight months away. Instead, Plaintiffs cited social media posts by the President and announcements to the press. In lieu of APA claims, Plaintiffs brought two *ultra vires* claims arguing that these posts and announcements amounted to action taken beyond constitutional authority. Accordingly, in April, the United States moved to dismiss the *Lemmon* Plaintiffs' claims, in part for lack of standing and because their claims were unripe. Mot. to Dismiss at 10–21, Dkt. 31.

Plaintiffs' original claims—the currently operative claims—were purely speculative at the time of suit. Speculation about future actions an agency might take does not establish a concrete, imminent injury. *Trump v. California*, 609 U.S. at 1035–36. This is especially true when the predicted injury resulting from the eventual action rests on a "long chain of inferences." *Id.* at 1036 (citation modified). As explained in the United States' motion to dismiss, Plaintiffs' original suit rested on a long chain of speculative inferences about how numerous agencies might ultimately act. Mot. to Dismiss at 10–16, Dkt. 31. As Defendants explained, D.C. Circuit law establishes that "any petitioner alleging only future injuries confronts a significantly more rigorous burden to establish standing." *United Transp. Union v. I.C.C.*, 891 F.2d 908, 913 (D.C. Cir. 1989). Courts in this circuit thus have "well-established" authority to "reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions." *Id.* at 912; *accord Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015).

The D.C. Circuit "has been reluctant to find standing based on predictions of how agencies will exercise discretion in future proceedings." *Union of Concerned Scientists v. U.S. Dep't of*

*Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021) (citing *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015)). Even when an agency announces its objectionable "plans" in "the preamble to [its final] rule," that announcement remains "too speculative for Article III purposes" when the agency retains "discretion" in how to implement its plans. *Id.* at 929–30. Similarly here, when NPS retained discretion to modify or disapprove the proposed arch, Compl. ¶ 14, that outstanding discretion "takes" Plaintiffs' alleged construction-related injuries "from the decidedly likely to the speculative," *Union of Concerned Scientists*, 998 F.3d at 930.

Without any precedent on their side, Plaintiffs asked the Court to make remarkable new law, dramatically expanding the "substantial risk" test for imminence to allow unprecedented claims based on the speculative "risk" that an agency might act. *See* MSJ Opp'n 14-15, Dkt. 49 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). But Courts utilize that test to evaluate imminence claims where defendants have already acted, creating an imminent risk that plaintiffs could be injured "at any moment"—including the moment they filed suit. *Pharm. Rsch. & Manufacturers of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 153 (D.D.C. 2023).

In *Driehaus*, for example, plaintiffs sought to enjoin an enacted Ohio statute criminalizing certain political statements, based on the threatened injury of future enforcement. 573 U.S. at 152–56. The Supreme Court analyzed their standing under a three-prong test for pre-enforcement standing, which analyzed the "history of past enforcement" to determine whether the enforcement threat was substantial. *Id.* at 162–166. Because the statute could be enforced by any person, and was "not restricted to state officials who are constrained by explicit guidelines or ethical obligations," the Court determined that plaintiffs faced "a real risk of complaints" from the statute sufficient to constitute imminent harm. *Id.* at 164.

Similarly, in *Attias v. Carefirst, Inc.*, the defendants acted by allowing a cyberattack to steal their customers' personal information, which in turn created "substantial risk of identity fraud." 865 F.3d 620, 628 (D.C. Cir. 2017). Because the hack occurred before plaintiffs filed suit, that "substantial risk of harm exists *already*." *Id.* at 859 (emphasis added). In both cases, even though harm was not certain, "the full risk was present when the complaint was filed—it did not depend on a long sequence of uncertain contingencies." *Pharm. Rsch.*, 656 F. Supp. 3d at 153 (citation modified).

In contrast here, NPS had not acted at all when this suit began. Plaintiffs could only speculate about the outcomes of numerous regulatory approval processes; indeed, they speculated wrongly—predicting that those approval processes would be skipped over to construct an arch by July 4. *See* Compl. ¶¶ 27, 45, 55, 64; *see also* First PI Tr. 27:18-20, Dkt. 19. They thus faced no imminent, non-speculative risk of harm.

**B. The "time-of-filing" rule controls standing.**

A circuit split once existed on an "open jurisdictional question": whether plaintiffs who filed a case without standing could cure this defect by waiting for events to unfold and then moving to supplement their complaint. *See Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018). The D.C. Circuit, seeking to avoid "technical obstacle[s]," ruled that they could, in a case where the federal government was not a party and the D.C. government did not take a position. *See id.* But *Scahill* is no longer good law.

Subsequent Supreme Court rulings have reaffirmed that standing must be measured when the "suit was filed" despite subsequent government actions. *California*, 609 U.S. at 1039. That holding accords with the "foundational principle of Article III is that an actual controversy must exist *not only at the time the complaint is filed*, but through all stages of litigation." *Trump v. New*

*York*, 592 U.S. 125, 131 (2020) (emphasis added). This rule, known as the "time-of-filing" rule, dates back two centuries. *Grupo Dataflux*, 541 U.S. at 583–84 (citing *Mollan*, 9 Wheat. at 539).

The Lemmon Plaintiffs' alternative approach would upend judicial review of Executive Branch actions, sanctioning speculative challenges to internal planning directives, with jurisdictional defects becoming curable at the last minute by supplemental pleadings. That approach would only encourage more Hail-Mary *ultra vires* claims, in violation of the Supreme Court's recent caution against *ultra vires* review "becom[ing] an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n v. Texas (NRC)*, 605 U.S. 665, 681 (2025). Plaintiffs thus cannot evade Article III requirements by filing speculative *ultra vires* claims as placeholders and then filing motions to supplement should final agency action issue.

Because Plaintiffs' supplemental pleading cannot cure their lack of non-speculative injuries when this suit was filed, supplementation is futile and must be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion to Supplement.

Date: November 13, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT STANDER
Deputy Assistant Attorney General

BENJAMIN HAYES
Deputy Assistant Attorney General

*/s/ Alison S. Vicks*
MICHAEL S. SAWYER, Senior Attorney
ALISON S. VICKS, Trial Attorney
Energy and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
202-353-5134 (Sawyer)
202-267-2862 (Vicks)
E-mail: michael.sawyer@usdoj.gov
alison.vicks@usdoj.gov

*Counsel for Defendants*