**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MICHAEL LEMMON**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**DONALD J. TRUMP**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-544 (TSC) |
| **DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA**,<br><br>*Plaintiffs*,<br><br>v.<br><br>**NATIONAL PARK SERVICE**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

I. Legal Background ..... 1

A. Congress approved constructing tall structures surmounted by statues on Columbia Island when authorizing Arlington Memorial Bridge ..... 1

B. The Executive Branch has long approved design changes to Arlington Memorial Bridge development ..... 3

C. Other Statutes Do Not Curtail Executive Branch Design Discretion ..... 4

II. Factual and Procedural Background ..... 8

A. The Executive Branch has diligently complied with the relevant statutory processes for review of the arch proposal ..... 8

B. Procedural History ..... 10

STANDARD OF REVIEW ..... 11

ARGUMENT ..... 12

I. Plaintiffs Have Not Carried Their Burden to Establish Standing ..... 12

A. The *Lemmon* Plaintiffs Lack a Concrete and Particularized Injury ..... 13

B. The District and Virginia Lack Standing ..... 15

1. Traffic ..... 15

2. Emergency Planning ..... 20

3. Stormwater ..... 22

C. Plaintiffs' Injuries Fall Outside the Statutory Zone of Interests ..... 23

1. 40 U.S.C. § 8106 ..... 23

2. National Historic Preservation Act ..... 24

3. Commemorative Works Act ..... 25

4. Height of Buildings Act ..... 26

5. NEPA ..... 26

6. Antideficiency Act ... 26

7. 40 U.S.C. § 8722 ... 27

II. Plaintiffs' Suits Cannot Proceed Because They Cannot Establish Article III Standing When They Filed Suit ... 28

III. Plaintiffs Have Failed to Establish a Substantial Likelihood of Success on the Merits ... 31

A. The Proposed Arch Does Not Violate Any Statutes ... 31

1. The Authorization Act and the Organic Act Authorize the Arch ... 32

2. The CWA Does Not Apply ... 37

3. Section 8106 Does Not Apply ... 39

4. The Arch Does Not Violate the Height of Buildings Act ... 42

a. The HBA Does Not Apply to Federal Buildings ... 42

b. The Arch is not a "building" under the HB ... 46

c. The Authorization Act authorizes high structures ... 47

d. The Arch conforms to any applicable HBA requirements ... 47

5. NPS's NEPA Review Was Adequate ... 49

6. NPS Complied with the NHPA ... 53

7. NPS Complied with the National Capital Planning Act ... 55

8. The Arch Is Not Unlawfully Funded ... 56

9. Plaintiffs Cannot Bring a Standalone APA Claim ... 57

IV. Plaintiffs Have Not Carried Their Burden to Establish Irreparable Harm ... 59

A. *Lemmon* Plaintiffs ... 59

B DC/VA Plaintiffs ... 61

V. The Public Interest Weighs Against Injunctive Relief ... 63

VI. Relief ... 65

VII. Motion for a Stay Pending Appeal ........................................................ 65

CONCLUSION ........................................................................................................ 67

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018)........................................................................................ 64

*Abramski v. United States*,
573 U.S. 169 (2014)........................................................................................ 39

*Air Transport Ass'n of Am., Inc. v. Export-Import Bank*,
840 F. Supp. 2d 327 (D.D.C. 2012) .................................................................. 62

*All. for Legal Action v. F.A.A.*,
69 F. App'x 617 (4th Cir. 2003) ...................................................................... 49

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987)........................................................................................ 63

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003)........................................................................................ 32

*Bicycle Trails Council of Marin v. Babbitt,*
82 F.3d 1445 (9th Cir. 1996) ........................................................................... 35

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984)........................................................................................ 27

*Bluewater Network v. Salazar*,
721 F. Supp. 2d 7 (D.D.C. 2010) ..................................................................... 36

*Britt v. U.S. Army Corps of Eng'rs*,
769 F.2d 84 (2d Cir. 1985)............................................................................... 32

*Center for Taxpayer Rts. v. IRS*,
190 F.4th 990 (D.C. Cir. 2026) ....................................................................... 59

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 61

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) ................................................................. 65

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) ................................................................... 38, 50

**City of Alexandria v. Slater*,
198 F.3d 862 (D.C. Cir. 1999) ......................................................... 7, 49, 50, 55

*City of Los Angeles v. Lyons*,
416 U.S. 95, 102 (1983)................................................................................... 22

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)..................................................................................... 18, 29

*Clarke v. Securities Indus. Ass'n*,
479 U.S. 388 (1987)........................................................................................................ 23

*Clean Wis. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020)....................................................................................... 15

*Comm. for Auto Resp. (C.A.R.) v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) ........................................................................................ 25

*Connecticut National Bank v. Germain*,
503 U.S. 249 (1992)........................................................................................................ 45

*CTIA-Wireless Ass'n v. FCC*,
466 F.3d 105 (D.C. Cir. 2006) ................................................................................ 6, 7, 53

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
698 F. Supp. 3d 39 (D.D.C. 2023) .................................................................................. 57

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005)....................................................................................... 13

*Daingerfield Island Protective Soc'y v. Babbitt,*
40 F.3d 442 (D.C. Cir. 1994) .................................................................................... 35, 36

*Davis v. Latschar,*
202 F.3d 359 (D.C. Cir. 2000) ...................................................................................... 7, 35

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024).......................................................................................................... 45

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)........................................................................................................ 58

*Department of State v. AIDS Vaccine Advocacy Coal.*,
146 S. Ct. 19 (2025)........................................................................................................ 27

*Dunn v. Architect of the Capitol*,
No. 25-cv-1844, 2026 WL 2948909 (D.D.C. Oct. 1, 2026) ........................................... 14

*Fed. Power Comm'n v. Fla. Power & Light Co.*,
404 U.S. 453 (1972)........................................................................................................ 66

*Fisheries Survival Fund v. Jewell*,
236 F. Supp. 3d 332 (D.D.C. 2017) ................................................................................ 59

**Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)........................................................................................ 12, 19, 20, 22

*Food & Drug Admin. v. R. J. Reynolds Vapor Co.*,
606 U.S. 226 (2025)........................................................................................................ 23

*Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)........................................................................................................ 14

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
541 U.S. 567 (2004) .......... 30

*Gulf Oil Corp. v. Department of Energy*,
514 F. Supp. 1019 (D.D.C. 1981) .......... 62

*Gunpowder Riverkeeper v. FERC*,
807 F.3d 267 (D.C. Cir. 2015) .......... 26

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .......... 59

*Hardaway v. D.C. Hous. Auth.*,
843 F.3d 973 (D.C. Cir. 2016) .......... 28

*Harris Cnty. Texas v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) .......... 12

*Hilton v. Braunskill*,
481 U.S. 770 (1987) .......... 66

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
861 F.3d 944 (9th Cir. 2017) .......... 58

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
534 U.S. 124 (2001) .......... 43

*Jama v. Immigration & Customs Enf't*,
543 U.S. 335 (2005) .......... 44

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
140 F. Supp. 3d 1123 (D.N.M. 2015) .......... 58

*Lackey v. Stinnie*,
604 U.S. 192 (2025) .......... 11

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 59

*Lee v. Thornburgh*,
877 F.2d 1053 (D.C. Cir. 1989) .......... 7, 53

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 41

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 12, 28

*Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019) .......... 15

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) .......... 15, 18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ........ 23

*Metro. Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983) ........ 26

*Morton v. Mancari*,
417 U.S. 535 (1974) ........ 43

*Mountain States Legal Found. v. Glickman*,
92 F.3d 1228 (D.C. Cir. 1996) ........ 24, 25

*Munaf v. Geren*,
553 U.S. 674 (2008) ........ 11

**Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 12, 16, 18, 28

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ........ 63

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005) ........ 52, 59

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
595 U.S. 109 (2022) ........ 41

**Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres.,*
*(NPS)*, 609 U.S. 1068 (2026) ........ 14, 15, 64, 65

*Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) ........ 24

*Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
435 F.3d 326 (D.C. Cir. 2006) ........ 65

*New Jersey Conservation Found. v. FERC*,
111 F.4th 42 (D.C. Cir. 2024) ........ 49

*Newman-Green, Inc. v. Alfonzo-Larrain*,
490 U.S. 826 (1989) ........ 28, 29

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........ 37

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ........ 31

*Organized Fishermen of Fla. v. Hodel,*
775 F.2d 1544 (11th Cir. 1985) ........ 35

*Pawnee Nation of Oklahoma v. Zeldin*,
No. 25-9548, 2026 WL 3092945 (10th Cir. Oct. 16, 2026) ........ 32

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .......... 20

*Posadas v. Nat'l City Bank of N.Y.*,
296 U.S. 497 (1936) .......... 43

*Powder River Basin Res. Council v. U.S. Dep't of the Interior*,
749 F. Supp. 3d 151 (D.D.C. 2024) .......... 26

*Pres. Soc'y of Newport Cnty. v. Burgum*,
No. 23-CV-03510 (APM), 2026 WL 787910 (D.D.C. Mar. 20, 2026) .......... 7, 53

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .......... 63

*Rubin v. Islamic Republic of Iran*,
138 S. Ct. 816 (2018) .......... 44

*S. Utah Wilderness All. v. Dabney*,
222 F.3d 819 (10th Cir. 2000) .......... 36

*Save the Sound, Inc. v. FAA*,
183 F.4th 763 (D.C. Cir. 2026) .......... 49, 53

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) .......... 30

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty, Colo.*,
605 U.S. 168 (2025) .......... passim

*Shenandoah Valley Network v. Capka*,
2009 WL 2905564 (W.D. Va. Sept. 3, 2009) .......... 50

*Sierra Club v. Fed. Highway Admin*,
715 F. Supp. 2d 721 (S.D. Tex. 2010) .......... 50

*Sierra Club v. FERC*,
145 F.4th 74 (D.C. Cir. 2025) .......... 50

*Sierra Club v. FERC*,
153 F.4th 1295 (D.C. Cir. 2025) .......... 52

*Sierra Club v. FERC*,
97 F.4th 16 (D.C. Cir. 2024) .......... 52

*Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025) .......... 20

*Sierra Club, Inc. v. United States Forest Serv.*,
897 F.3d 582 (4th Cir. 2018) .......... 49

*Stagg P.C. v. U.S. Dep't of State*,
673 F. App'x 93 (2d Cir. 2016) .......... 64

*State v. Musk*,
769 F. Supp. 3d 1 (D.D.C. 2025) .......... 59

*Techworld Dev. Corp. v. D.C. Pres. League*,
648 F. Supp. 106 (D.D.C. 1986) .......... 48, 49

*Techworld Dev. Corp. v. D.C. Pres. League*,
No. 86-5630, C/A/86-00252, 1987 WL 1367570 (D.C. Cir. June 2, 1987).......... 48

*Thompson v. North Am. Stainless, LP*,
562 U.S. 170 (2011).......... 23, 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).......... 12, 13

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) .......... 57

**Trump v. California*,
609 U.S. 1032 (2026).......... 28, 30, 66

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025).......... 64, 66

*Twin Rivers Paper Co. LLC. v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) .......... 24

*United Keetoowah Band of Cherokee Indians v. F.C.C.*,
933 F.3d 728 (D.C. Cir. 2019) .......... 7, 53

*United States Ass'n of Reptile Keepers, Inc. v. Jewell*,
106 F. Supp. 3d 125 (D.D.C. 2015) .......... 65

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982).......... 14

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978).......... 7

*W. Wood Preservers Inst. v. McHugh*,
925 F. Supp. 2d 63 (D.D.C.) .......... 13

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
50 F.4th 164 (D.C. Cir. 2022) .......... 41

*Webster v. U.S. Dept. of Agric.*,
685 F.3d 411 (4th Cir. 2012) .......... 49

*Weinberger v. Catholic Action of Hawaii/Peace Education Project*,
454 U.S. 139 (1981).......... 52

*Whitman v. American Trucking Ass'n*,
531 U.S. 457 (2001).......... 44

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)........................................ 29

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................ passim

**Statutes**

16 U.S.C. § 451........................................ 40

30 Stat. 922 (1899)........................................ 5, 6, 42, 43

31 U.S.C. § 1349........................................ 27

31 U.S.C. § 1350........................................ 27

31 U.S.C. § 1351........................................ 27

33 Stat. 10 (Feb. 2, 1904)........................................ 48

33 U.S.C. § 1365........................................ 22

36 Stat. 452 (1910)........................................ passim

37 Stat. 417 (1912)........................................ 5, 39, 40

40 U.S.C. § 3312(c)........................................ 46

40 U.S.C. § 6502(c)(2)........................................ 45

40 U.S.C. § 8106........................................ 5, 23, 39, 40

40 U.S.C. § 8711(b)(1)........................................ 29

40 U.S.C. § 8721........................................ 8

40 U.S.C. § 8722(a)........................................ 8

40 U.S.C. § 8722(a)........................................ 56

40 U.S.C. § 8722(b)(1)........................................ 8

40 U.S.C. § 8722(d)........................................ 27, 29, 46

40 U.S.C. § 8901........................................ 25

40 U.S.C. § 8902(a)(1)........................................ 37

40 U.S.C. § 8902(b)........................................ 5, 38

40 U.S.C. § 8905(b)(2)(B)........................................ 25

40 U.S.C. § 9102........................................ 5

42 U.S.C. § 4332........................................ 7

42 U.S.C. § 4332(2)(C)(iii)........................................ 50

42 U.S.C. § 4336(b)(2) ........ 7, 8
49 U.S.C. § 46110 ........ 22
5 U.S.C. § 701(a)(1) ........ 27
5 U.S.C. §§ 701-706 ........ 57
54 U.S.C. § 100101(a) ........ 34
54 U.S.C. § 101101(2) ........ 35, 56
54 U.S.C. § 306108 ........ 24
54 U.S.C. §§ 306101–306114 ........ 6
D.C. Code § 6-601.05 ........ 45
D.C. Code § 6-601.05(a) ........ 48
D.C. Code § 6-601.05(b) ........ 6
D.C. Code § 6-601.05(b)–(c) ........ 47
D.C. Code § 6-601.05(h) ........ 6
D.C. Code § 6-641.01 ........ 46
D.C. Code § 6-641.06 ........ 46
D.C. Code § 6-641.15 ........ 46
D.C. Code § 9–1201.05 ........ 48
D.C. Code §§ 6-601.01-6-601.09 ........ 6
Pub. L. No. 100-480, 102 Stat. 2328 (1988) ........ 45
Pub. L. No. 101-512, 104 Stat. 1915 (1990) ........ 40
Pub. L. No. 103-111, 107 Stat. 1046 (1993) ........ 41
Pub. L. No. 104-333, 110 Stat. 4093 (1996) ........ 40
Pub. L. No. 62-432, 37 Stat. 866 (1913) ........ 2
Pub. L. No. 68-463, 43 Stat. 974 (1925) ........ passim
Pub. L. No. 80-841, 62 Stat. 1112 (1948) ........ 40
Pub. L. No. 99-652, 100 Stat. 3650 (1986) ........ 5, 38

**Rules**

Fed. R. App. P. 8(a)(1) ........ 66
Fed. R. App. P. 8(a)(2) ........ 65
Fed. R. Civ. P. 12(h)(3) ........ 31

Fed. R. Civ. P. 15(d) ... 30

**Regulations**

18 D.C.M.R. § 2210.1 (2019) ... 21
36 C.F.R. § 800.2 ... 54
36 C.F.R. § 800.3(c) ... 54
36 C.F.R. § 800.3(g) ... 53, 54
36 C.F.R. § 800.4–5 ... 7
36 C.F.R. § 800.6 ... 55
36 C.F.R. § 800.6(c) ... 7
36 C.F.R. § 800.7(a) ... 54

**Other Authorities**

61 H. Rep. 720 (1910) ... 42
89 Fed. Reg. 97,631 (Dec. 9, 2024) ... 34
91 Fed. Reg. 54,966 (Aug. 26, 2026) ... 30
A-8713, 4 Comp. Gen. 832 (Apr. 3, 1925) ... 56
B-223725 (Comp. Gen. Feb. 20, 1987) ... 57
S. Doc. No. 68-95 (1924) ... 2
S. Res. 17, 49th Cong., Cong. Rec. 4826 (1886) ... 1

# INTRODUCTION

Plaintiffs in this consolidated action have not met the burden necessary for this Court to enjoin construction of a proposed arch at Memorial Circle. Plaintiffs lack standing, as recent Supreme Court precedents reject similar attempts to manufacture standing based on aesthetic offense or self-inflicted costs. And it has been settled law for more than a century that States cannot establish standing as *parens patriae* to bring an action against the federal government for alleged harm to their citizens.

Even if Plaintiffs could establish standing, the Arch fulfills a century-old congressional vision authorizing the redesign and construction of 166-foot-tall columns surmounted by statues at that site. The National Park Service (NPS) complied with all legal requirements, preparing numerous lengthy analyses to comply with each statute Plaintiffs invoke. Plaintiffs' disagreement with the agency's decision, however strongly felt, does not establish illegality, irreparable harm, or any other need for a preliminary injunction.

## I. Legal Background

### A. Congress approved constructing tall structures surmounted by statues on Columbia Island when authorizing Arlington Memorial Bridge.

American leaders have long envisioned majestic arches adorning the banks of the Potomac. President Andrew Jackson sought a bridge spanning the Potomac River "with arches of ever-enduring granite," Case No. 26-cv-544, Dkt. 36-22 at 1[1] and Secretary of State Daniel Webster pushed to fulfill that vision, *see id.* The U.S. Senate eventually acted to make that vision a reality, directing the Secretary of War to examine and report on such a bridge in 1886. S. Res. 17, 49th Cong., Cong. Rec. 4826 (1886). Ensuing design competitions were held to consider different proposals for the bridge. *E.g.*, U.S. Comm'n of Fine Arts, Designing the Nation's Capital: The

[1] Unless otherwise indicated all docket entries cited refer to those in Civil Action 26-544.

1901 Plan for Washington, D.C. 118 (2006) (Eds., Sue Kohler & Pamela Scott), Dkt. 44-18. One prominent proposal, seen below, "was the favored design" of the Senate Park Commission (a.k.a. the McMillan Commission) when it began its work:



Fig. 16 George Keller, proposed design for Memorial Bridge, 1900; perspective view from Washington side of the bridge. Library of Congress, General Collections

*Id.* at 117–118. Other designs proposed arches atop the bridge itself "that masked the working of its central draw" *id.* at 116–117, as seen at Dkts. 44-21 & 44-22.

Following this extensive architectural dialogue, Congress created the Arlington Memorial Bridge Commission (Bridge Commission) to report "to Congress a suitable design for a Memorial Bridge across the Potomac River." Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913). The Bridge Commission reviewed much of the previous design work done for the bridge before reporting its design in 1924, proposing designs not only for the bridge, but also for Columbia Island.[2] The Bridge Commission recommended "development of Columbia Island as a park," and advocated for building "two stately columns" "surmounted by statues" to provide "a plaza with fitting

---

[2] Report of the Arlington Memorial Bridge Commission 21–30, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report), available at https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf.

architectural adornment." Bridge Commission Report 40–41. "The columns are 166 feet high or practically of the same height as the Colonne de Juillet in Paris." *Id.* at 41.

Congress authorized construction "in accordance with the design" in the Bridge Commission Report. Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925) (Authorization Act). But Congress did not mandate rigid adherence to that design; it empowered the Bridge Commission to make design changes "without increasing the total cost of the project as in its discretion may be found to be necessary or advisable." *Id.*

### B. The Executive Branch has long approved design changes to Arlington Memorial Bridge development.

Despite explicit congressional authorization, the monument plaza has not yet been built. In 1931, concerns were raised that the dredged soil of Columbia Island may prove insufficient for column foundations and the columns may interfere with aviation interests at the old Washington-Hoover Airport. Dkt. 74-2; Dkt. 12 at 6. The CFA thus recommended "postpon[ing] the erection of these columns until the other features" were finished, while emphasizing that the columns were "an essential feature in the proposed development of Columbia Island." Dkt. 74-2.

The architect of the Arlington Memorial Bridge, William Kendall, "felt that the columns were absolutely necessary to his design and even went so far as to write President Hoover (who had asked that the columns be omitted) giving his arguments for keeping them, including a suggestion that the airport be moved if interference with aircraft was really a problem." Sue A. Kohler, The Commission of Fine Arts: A Brief History 1910–1995, 26 (1996) (Kohler, Brief History). His colleague likewise expressed great distress at eliminating a feature at "the very essence of the design." Dkt. 74-3.

After the Bridge Commission functions were reassigned to NPS, the National Capital Planning Commission (NCPC) returned to the treatment of Columbia Island. Dkt. 74-4. Once the

dredged land had settled, NCPC recommended that NPS, in conjunction with CFA and District Commissioners "undertake a restudy of the plans for the treatment of Columbia Island under the Arlington Memorial Bridge Project, with a view to completion of the project by 1950." *Id.* The Chairman of the NCPC, U.S. Grant III (who was also the former Executive Officer of the Bridge Commission) wrote to the NPS Director observing that—while other parts of the bridge were finally nearing completion—"the central plaza on Columbia Island has never been undertaken and seems to be absolutely essential to link together the two parts of the project, namely, the main bridge itself and entrance to Arlington Cemetery." Dkt. 74-5. The CFA Chairman concurred and called for new plans to be drawn up "as the old original plans prepared by the architects of the bridge are no longer applicable." Dkt. 74-6. The NCPC agreed, explaining that "[b]ecause of the war and the other things the plan for development of the Island was forgotten," leaving the "middle knocked out" of the design. Dkt. 74-7.

Although other aspects of the bridge—like the equestrian statues that replaced Kendall's original pylons at the Washington entrance to the bridge—were eventually added by 1951, Columbia Island remains incomplete. It does not resemble "a plaza with fitting architectural adornment," including "two stately columns" "surmounted by statues." Bridge Commission Report 40–41. Memorial Circle instead remains an approximately 300-foot-diameter circle of grass.

**C. Other Statutes Do Not Curtail Executive Branch Design Discretion.**

1. In 1912, the Army Corps of Engineers—then known as the Engineer Department in the War Department—had jurisdiction over parks in the District of Columbia. In that year's appropriations bill for the Engineer Department, Congress included a provision stating that "[h]ereafter there shall not be erected on any reservation, park, or public grounds, of the United

States within the District of Columbia, any building or structure without express authority of Congress." Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 444– (1912). That provision is currently codified at 40 U.S.C. § 8106, which cannot be read to require anything more than some form of authorization from Congress to construct a building. Section 8106 says nothing about *design* approval, a subject that Congress has entrusted to the CFA and NCPC. *See, e.g.*, 40 U.S.C. § 9102 (requiring deciding officers to seek the CFA's advice on "selection of models for statues, fountains, and monuments erected under the authority of the Federal Government").

2. In 1986, Congress passed the Commemorative Works Act (CWA), which sets forth specific procedures for new authorizations of commemorative works in certain areas of the District of Columbia. Pub. L. No. 99-652, 100 Stat. 3650 (1986), codified at 40 U.S.C. ch. 89. But the Act "does not apply to commemorative works authorized by a law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3650, 3654 (1986), codified at 40 U.S.C. § 8902(b). Thus, commemorative structures authorized by a law enacted by an earlier Congress, such as the Fourth Division Memorial, can be completed without following CWA procedures, even if many decades have passed since the authorizing law was enacted.

3. Primarily concerned about fire safety, in 1899 Congress enacted legislation restricting the height of buildings in the District of Columbia. "An Act To regulate the height of buildings in the District of Columbia," ch. 322, 30 Stat. 922 (1899). This Height of Building Act (HBA) set height restrictions for buildings made of "combustible or nonfireproof" materials further established that "no building shall be erected or altered on any street in [D.C.] to exceed in height above the sidewalk the width of the street in its front." *Id.* §§ 1, 4. It further set maximum heights of 90 and 110 feet for buildings on residence and business streets respectively. *Id.* § 4. But the

HBA expressly stated that its height limits "*shall not* apply to Federal or municipal buildings." *Id.* § 7 (emphasis added).

In 1910, Congress amended the HBA. "An Act To regulate the height of buildings in the District of Columbia[,]" ch. 263, 36 Stat. 452 (1910) (codified at D.C. Code §§ 6-601.01 to 6-601.09). Along with other adjustments, the 1910 HBA increased the maximum height for a "building" on a "business street or avenue," to 130 feet with an exception on the north side of Pennsylvania Avenue between 1st and 15th streets, where a height of 160 feet is allowed. *Id.* § 6-601.05(b) . As in the original act, "[s]pires, towers, domes" were excepted from the height restrictions, but the amended act added excepted "minarets, pinnacles, penthouses, ventilation shafts, chimneys, smokestacks, and fire sprinkler tanks," and prescribed that such structures "may be erected to a greater height." *Id.* § 6-601.05(h) . "[P]rovided, however, that such structures when above such limit of height shall be fireproof, and, . . . no floor or compartment thereof shall be constructed or used for human occupancy above the top story of the building upon which such structures are placed[.]" *Id.* The 1910 HBA repealed only those laws "in conflict herewith." 36 Stat. 452 § 9. The 1910 HBA makes violations of the act a "common nuisance" subject to an action by the corporation counsel in D.C. Superior Court. *Id.* § 8.

4. Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 306101–306114, also does not curtail construction or design. The NHPA requires "federal agencies to 'take into account' the effects of their 'undertaking[s]' on historic properties 'included' or 'eligible for inclusion' in the [National] Register." *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 106 (D.C. Cir. 2006) (first alteration in original). In doing so, the NHPA does "not require [a federal agency] to engage in any particular preservation activities; rather, Section 106 only requires that the [agency] consult the [State Historic Preservation Office] and the [Advisory Council on Historic

Preservation] and consider the impacts of its undertaking." *Id.* at 106–07 (alterations in original) (quoting *Davis v. Latschar,* 202 F.3d 359, 370 (D.C. Cir. 2000)). Thus, "Congress intended these provisions to have a limited reach": "they are aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989).

The NHPA consultation process may end in "a Memorandum of Agreement among the consulting parties signifying agreement upon how the detrimental effects will be 'taken into account.'" *See City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (citing 36 C.F.R. § 800.4–5). But "[e]ven where disagreement precludes the completion of a Memorandum of Agreement an agency may implement a project after receiving and considering comments from the Advisory Council on Historic Preservation." *Id.* (citing 36 C.F.R. § 800.6(c)). Accordingly, the review process "does not dictate particular decisional outcomes, but merely prohibits uninformed—rather than unwise—agency action." *United Keetoowah Band of Cherokee Indians v. F.C.C.*, 933 F.3d 728, 734 (D.C. Cir. 2019) (cleaned up). "[T]he NHPA does not require . . . changes being made to the proposed project." *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 23-CV-03510 (APM), 2026 WL 787910, at *16 (D.D.C. Mar. 20, 2026).

5. The National Environmental Policy Act (NEPA) requires agencies to consider environmental impacts of major federal actions. 42 U.S.C. § 4332. To do so, agencies may prepare an Environmental Assessment (EA). 42 U.S.C. § 4336(b)(2). Judicial review of the agency's determination "is a limited one." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty, Colo.*, 605 U.S. 168, 185 (2025) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)). An EA is required for a "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the

significance of such effect is unknown," unless a categorical exclusion applies. 42 U.S.C. § 4336(b)(2). NPS has "broad latitude" to decide "where to draw the line" in assessing environmental effects, and "substantial discretion" in designating "feasible alternatives." *Seven Cnty.*, 605 U.S. at 168, 181–82.

6. The National Capital Planning Act established the National Capital Planning Commission (NCPC) as the central planning agency for the Federal Government in the National Capital. 40 U.S.C. § 8721. The Act requires federal planning agencies to furnish information to the Commission "on [its] request." *Id.* § 8722(a). The Act also directs federal planning agencies to consult with the Commission "before preparing construction plans . . . for proposed developments and projects." *Id.* § 8722(b)(1).

## II. Factual and Procedural Background

### A. The Executive Branch has diligently complied with the relevant statutory processes for review of the arch proposal.

Over a year ago, President Trump first publicly proposed building an arch in Memorial Circle on Columbia Island, a site managed by NPS. Since the President announced his idea for an Arch in Memorial Circle, NPS has undertaken activities to diligently comply with the statutory processes for review and approval of the arch proposal. NPS prepared environmental assessments to comply with NEPA. *E.g.*, Revised Environmental Assessment (EA), Dkt. 74-1. NPS consulted with local governments and interested parties on the effects the proposed arch would have on historic properties under Section 106 of the NHPA. NPS presented the arch proposal to other agencies with responsibility for evaluating various aspects of the project: the Federal Aviation Administration (FAA) determined it would not be a hazard to air navigation; the CFA approved the architectural design; and the NCPC preliminarily approved site and building plans.

National security agencies have considered that the Arch can be incorporated into their ongoing efforts to defend the National Capital Region from evolving threats, like those posed by the proliferation of small, unmanned aircraft systems (UAS). The Arch's current design—its location and height—present an "opportunity to mitigate these evolving threats." Decl. of Pete Hegseth, Secretary of War ¶ 10, Dkt. 74-9; *see also* Decl. of Markwayne Mullin, Sec'y of Homeland Sec. ¶¶ 12–18, Dkt. 74-8 (the Arch could enhance the Department of Homeland Security's ability to counter threats from unmanned aircraft). The capabilities being considered "would not require any structural modifications or alterations to the existing plans for the Arch." Hegseth Decl., ¶ 15; Mullin Decl., ¶ 16. Both agencies are in the planning process for how to integrate the uses being considered into the Arch and have not made final decisions. Ex. A, Decl. of Ricky D. Buria, Chief of Staff to the Sec'y of War, ¶ 4 (originally submitted in Civ. No. 26-3372, E.D. Va.); Ex. B, Decl. of Steven Willoughby, Exec. Dir., Program Exec. Office for UAS, Dep't of Homeland Sec. ¶ 4 (originally submitted in Civ. No. 26-3372, E.D. Va.).

On November 5, 2026, the NCPC approved the final site and building plans for the proposed arch, and the Department of Interior authorized construction. Ex. C, Media Release: "NCPC Approves New Monumental Arch Final Site and Building Plans" (Nov. 6, 2026). After the NCPC approved the building site and design, NPS issued its final decision approving construction. Ex. D, NPS, Decision Record, "Triumphal Arch at Memorial Circle," (Nov. 5, 2026). The initial stage of construction is anticipated to involve fencing off grassy areas, connecting utilities, and mobilizing construction equipment. Decl. of Jennifer Nersesian, Regional Dir., NPS, ¶¶ 8–11, Dkt. 95-9. And the initial six to eight months of construction is planned to focus exclusively on below-grade excavation and foundation construction. Revised EA at 7, Dkt. 74-1. Above-ground construction of the structure is thus not anticipated to begin until May 2027, at the

earliest. The total construction schedule, from start to finish, is anticipated to take 33 to 39 months. *Id.* at 7–8; *see also* Dkt. 74 at 12.

**B. Procedural History**

In February 2026, well before NPS approved construction on November 5, 2026, the *Lemmon* Plaintiffs filed an action alleging an ultra vires claim and a claim based on the Constitution's Take Care Clause. *See Lemmon* Compl. ¶¶ 52–64, Dkt. 1. They alleged no claims under the Administrative Procedures Act (APA). The *Lemmon* Plaintiffs asserted aesthetic, personal, and professional interests in an unobstructed view between Lincoln Memorial and Arlington National Cemetery and injury to the same from the eventual construction of the Arch. *Id.* ¶¶ 50–51.

The *Lemmon* Plaintiffs soon filed their first motion for a preliminary injunction to prevent construction of the proposed arch, calling it a "dignitary affront" that would leave them "feeling insulted and disrespected" and disrupt their "aesthetic experience of personally meaningful vistas." 1st Prelim. Inj. Br. 20–22, Dkt. 7-1. After the United States explained that construction would only begin after compliance with NEPA and the NHPA and after review by the NCPC and CFA, both parties agreed to a consent order dismissing the first preliminary injunction motion and requiring the United States to provide the Court with fourteen days' notice prior to commencing construction activity. Consent Order, Dkt. 26.

In April, the United States filed a motion to dismiss the *Lemmon* Plaintiffs' complaint, which both parties fully briefed. *See* Dkts. 31, 33, 35. Shortly afterward, both parties filed cross-motions for summary judgment, which were also fully briefed. *See* Dkts. 36, 44, 48, 49, 51. These dispositive motions remain unresolved.

On October 31, 2026, the DC/VA Plaintiffs filed suit, which was consolidated with the instant case. Oct. 31, 2026 Minute Order. DC/VA Compl., Civ. No, 26-3838, Dkt. 1. Alongside their complaint, DC/VA Plaintiffs filed a motion for a temporary restraining order, for a stay of agency action, and for an administrative stay. DC/VA TRO Motion, Civ. No. 26-3838, Dkt. 2.

After the Court entered an order on the TRO on November 5, 2026, DC/VA Plaintiffs amended their complaint. DC/VA Am. Compl., Dkt. 116 (Nov. 10, 2026). They bring eight claims under the APA, one claim for ultra vires action, and one claim for a writ of mandamus. DC/VA Am. Compl. ¶¶ 116-206. They allege five categories of harm: (1) increased traffic congestion, (2) incurring costs to develop new emergency response plans, (3) environmental impacts, (4) aesthetic impact on the historic character of the District and surrounding historic properties, and (5) procedural harms. *Id.* ¶¶ 73–115.

On November 5, 2026, the day construction was authorized, the Court granted DC/VA Plaintiffs' motion for a temporary restraining order, deferred ruling on their motion for a stay of agency action, and denied their request for an administrative stay. TRO Order 32, Dkt. 111. The *Lemmon* Plaintiffs' second motion for a preliminary injunction was held in abeyance. *Id.* The Court ordered briefing for a new round of motions for a preliminary injunction. Nov. 9, 2026 Minute Order. On November 10, Plaintiffs in both cases filed the instant motions, Dkt. 115 (*Lemmon*) and Dkt. 117 (DC/VA), which the United States opposes.

## <u>STANDARD OF REVIEW</u>

A preliminary injunction is "an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities as the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (citation

modified). To obtain a preliminary injunction, the moving party must make a "clear showing": (1) that it is "likely to succeed on the merits" of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) "that the balance of equities tips in [its'] favor"; and (4) that the proposed "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008). "The last two factors merge when the government is a party." *Harris Cnty. Texas v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citation omitted).

## ARGUMENT

### I. Plaintiffs Have Not Carried Their Burden to Establish Standing.

Plaintiffs lack Article III standing to pursue their claims. On a preliminary injunction, a "plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). To establish standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations, footnote, citations, and quotation omitted). "Concrete," means "real and not abstract"; and "particularized" means affecting in a personal way and not a generalized grievance. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes" and "do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press." *TransUnion LLC*, 594 U.S. at 431. "Standing must be assessed on a claim-by-claim basis." *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 71 (D.D.C.), *on reconsideration in part*, 292 F.R.D. 145 (D.D.C. 2013). With regard to procedural injuries, a plaintiff may establish standing based on a procedural injury only if (1) the government violated a procedural right that was designed to protect their threatened concrete interest, and (2) the violation in fact resulted in injury to that concrete, particularized interest. *Ctr. for Law & Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1157 (D.C. Cir. 2005). Thus, for the Court to have jurisdiction over each claim brought by each set of plaintiffs, each Plaintiff must identify a real, non-abstract, and particularized (non-general) injury from the Arch to its cognizable interests under each statute that is caused by the agency action and that a court can redress. *TransUnion LLC*, 594 U.S. at 417 ("No concrete harm, no standing.").

Neither set of Plaintiffs can make the required showings. In their original complaint, the *Lemmon* Plaintiffs allege injuries under the Constitution and the CWA based on their offense at the perceived meaning of the Arch; the injury is the same for the statutory claims that they seek to add in their supplemental complaint. Mere offense or disagreement is not a cognizable injury in the first instance. The District and Virginia identify three categories of injuries—traffic, emergency planning, and stormwater—but none of are sufficient to establish Article III standing.

### A. The *Lemmon* Plaintiffs Lack a Concrete and Particularized Injury

The *Lemmon* Plaintiffs argue that they have standing because the Arch will "irreparably degrade [their] aesthetic experience[s]" around Memorial Circle. Dkt. 115-1 at 7–8. Their asserted injury is that the completed Arch will "radically transform" their "personal experiences" while

visiting Arlington National Cemetery, "including by adversely impacting a symbolic viewshed that holds strong personal meaning" for the *Lemmon* plaintiffs. *Id.* at 8–9.

The Supreme Court "has not found standing in circumstances like these before." *Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres. (NPS)*, 609 U.S. 1068, 1071 (2026) (per curiam). "To the contrary," the Supreme Court has "repeatedly held that mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III." *Id.* The mere "psychological consequence presumably produced by observation of conduct with which one disagrees" is "not an injury sufficient to confer standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982)).

The *Lemmon* Plaintiffs dislike what they believe the Arch represents: "moral and ethical corruption," Lemmon Decl. ¶ 8, Dkt. 7-2; "a continuous visual affront to the cardinal American principle that no one is above the law," Byrnes Decl. ¶ 13, Dkt. 7-3; or "a symbol of [the President's] own ego," Gundersen Decl. ¶ 8, Dkt. 7-4. They do not allege that they will be "forced . . . to abandon" using the Cemetery "as they had in the past." *NPS*, 609 U.S. at 1072 (citing *Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*, 528 U.S. 167, 181–83 (2000)). Instead, they argue that the presence of the Arch will affect their experience of the Cemetery. These injuries are "precisely the kind of psychological consequence arising from disagreement with government conduct that, standing alone, does not constitute a concrete injury under Article III." *Dunn v. Architect of the Capitol*, No. 25-cv-1844, 2026 WL 2948909, at *3 (D.D.C. Oct. 1, 2026) (citing *NPS*, 609 U.S. at 1072). Although the *Lemmon* plaintiffs have "an understandable and deeply personal interest" in this case, "Article III standing 'is not measured by the intensity of the litigant's interest.'" *Id.* (quoting *Valley Forge*, 454 U.S. at 486).

Plaintiffs cannot make their injury concrete by arguing that the Arch will "radically transform [their] personal experiences" at the Cemetery. Dkt. 115-1 at 9. The plaintiff in *NPS* similarly argued that she "visit[ed] the neighborhood around the White House" and that the planned ballroom would make that experience "distasteful." 609 U.S. at 1070. The Supreme Court looked past this framing because the underlying reason for the plaintiff's change in experience was her "offense, disagreement, or distaste" at having to view the ballroom. *Id.* at 1071. Here, similarly, the reason that Plaintiffs would have a different personal experience is because of their negative views of the Arch and what they believe it symbolizes. Under *NPS*, this is not an Article III injury.

### B. The District and Virginia Lack Standing.

The District and Virginia rely on three categories of injury in their motion: (1) congestion, (2) emergency planning, and (3) environmental harms. None of these injuries are sufficient to establish standing to challenge the Arch project.

#### 1. Traffic

The District and Virginia do not allege a cognizable injury based on traffic congestion. States cannot establish "standing as *parens patriae* to bring an action against the federal government." *Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)). Plaintiffs therefore cannot establish standing based on the effects of increased traffic on their citizens. Instead, they must identify how traffic congestion resulting from federal action inflicts "direct harm to [their] economic, environmental, or administrative interests." *Clean Wis. v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020). But Plaintiffs cannot show that the Arch would meaningfully worsen congestion at all. Even if they make that showing, they cannot show that it will directly harm the District or Virginia. Plaintiffs cannot rely

on their precautionary spending on transportation planning and coordination to bridge that gap because that spending is a voluntary, self-inflicted injury that cannot confer standing.

Start with congestion. Construction will not substantially worsen congestion in Memorial Circle. Although construction will require temporary lane closures and reconfigurations, these changes will "maintain access for the most high-volume traffic movements with limited disruption throughout construction." Revised EA at 53, Dkt. 74-1. Construction-related closures and detours will cause "similar congestion at the Washington Boulevard/[George Washington Memorial Parkway] ramp merge area that occurs today." *Id.* at B-34. New crosswalks will cause queues of eastbound through traffic to extend by approximately six vehicles but will "not cause congestion or excessive delays." *Id.* For westbound through traffic, "queueing and delays are negligible." *Id.* Although the right turn from Washington Boulevard onto memorial bridge could experience significant delays "during the weekday morning peak," this would happen only "[u]nder assumptions of maximum pedestrian signal activation" and "would be offset by the removal of the Arlington Boulevard northbound merge lane." *Id.* at 54. Additional short-term closures may be required for utility installations and reconfiguring traffic patterns, but the effects "would remain localized to the area around Memorial Circle." *Id.* at 53. Thus, the traffic effects will be localized to Memorial Circle.

Next, to effects on DC/VA Plaintiffs' own roadways, their submissions fall short of the "clear showing" necessary to demonstrate an injury to their own roadways. *Murthy*, 603 U.S. at 58. Memorial Circle, Memorial Bridge, and the GW Parkway are all federal roads, and the District has not shown that congestion on those roads will spill over to injure the District. The District's declarant speculates that traffic back-ups will "potentially" reach District roadways, but provides no data to support that assertion, instead stating that the effects are "unpredictable." Kershbaum

Decl. ¶ 16, Dkt. 117-4. But the EA modeled the effects and identified only a 150-foot additional vehicle queue, which would not reach any District roads. Revised EA, Dkt. 74-1 at B-34.

Virginia has likewise failed to show any harm to its roadways during the construction period. Virginia's declarant asserts that construction "will directly impact VDOT-controlled roadways," Mannell Decl. ¶ 7, Dkt. 117-5, with his analysis focusing on what will happen after construction is completed and permanent modifications to Memorial Circle's traffic patterns are completed, *see, e.g.*, *id.* ¶ 23(c) (evaluating "added signal delay"). But after construction is completed, traffic will "operate under stable flow conditions, generally without signs of congestion or operational instability." Revised EA at 53, Dkt. 74-1. After permanent traffic signals are installed, the left turn from the Richmond Highway northbound off-ramp onto Memorial Avenue is expected to experience a queue of approximately six vehicles, but this "queue is not expected to impact traffic operations throughout the network." *Id.* at B-30. Recurring congestion for commuters is "driven by the downstream weave condition" at the Washington Boulevard/GW Memorial Parkway ramps. *Id.* at B-2. Any delays from added signalization in Memorial Circle will remain short of that area and thus "are not expected to exacerbate existing traffic congestion" or "affect[] the broader transportation network." *Id.* at B-30. And "the busiest visiting times at the memorials usually do not occur during rush hour," so "the project is not expected to cause major slowdowns for commuters." *Id.* at 54. The plan for the Arch adds no new parking; instead, most visitors are expected to arrive on foot or by Metrorail. *See id.* at 56. Indeed, the District's own declaration acknowledges the Park Service's findings that "proposed signals and pedestrian improvements would not materially worsen ordinary modeled commuter congestion." Mendelson Decl., 26-3838, Dkt. 2-4 ¶ 62.

The District and Virginia dispute Defendants' traffic analysis, but do not do so concretely. The District's declarant relies on a "preliminary review" of the Arch plan, Weinberger Decl. ¶ 6, Dkt. 117-6, while Virginia's declarant presents quantitative data solely about existing traffic flows without attempting to model what future flows will look like, Mannell Decl. ¶ 21. These declarations fall short of the "clear showing" necessary at this stage. *Murthy*, 603 U.S. at 58.

Finally, to costs, even if DC/VA Plaintiffs are correct that the Arch will increase congestion, they fail to identify significant costs to them associated with that congestion. Plaintiffs speculate that the Arch will "disrupt and deter travel" because the District will be less "inviting." Kershbaum Decl. ¶¶ 23-24. This is not a harm to the District itself, *see Mellon*, 262 U.S. at 485–86, and DC/VA Plaintiffs' declarants do not attempt to calculate how many people (if any) would stop commuting to or visiting the District. DC/VA Plaintiffs also assert that Arch-related traffic will impede emergency responders, Kershbaum Decl. ¶ 25, but the transportation modeling conducted for the project determined that "neither construction activities nor operation of the completed Arch would result in delays to emergency vehicles traveling on Washington Boulevard, Memorial Avenue, or other nearby roadways," Revised EA at A-3, Dkt. 74-1. The District's declarant offers no specifics about how any construction-related delays would meaningfully degrade the District's emergency response or impose increased costs on the District. The District also says traffic will "impair use of an emergency evacuation route out of the District." Kershbaum Decl. ¶ 26. No District-wide evacuation is "certainly impending," *Clapper v. Amnesty International USA*, 568 U.S. 398, 402 (2013), and the District does not show that partial lane closures during construction would inflict an injury on DC/VA Plaintiffs.

Finally, DC/VA Plaintiffs speculate that additional traffic will cause "additional wear-and-tear on local roadways." DC/VA Br. 4, Dkt. 117-1. But the declarations they cite refer only vaguely

to "infrastructure issues," Weinberger Decl. ¶ 11, the possibility of "diversion of traffic to an alternative route," Mannell Decl. ¶ 25, and drivers "likely . . . choosing alternative routes," Kershbaum Decl. ¶ 16. These declarations say nothing about the effects of diverted traffic on pavement conditions or any associated maintenance or repair costs. There is no "real and not abstract" effect evident here. *All. for Hippocratic Med.*, 602 U.S. at 381. Instead, it is speculative that temporary disruption to this area of federal roads would directly harm DC/VA Plaintiffs' emergency services or economies. Indeed, traffic flows and impacts on the economy are often multifaceted and attenuated.

Absent any direct injury, DC/VA Plaintiffs point to their own spending: assessing and studying the (negligible) traffic impacts and coordinating with the federal government to mitigate those impacts. DC/VA Br. 4. But a plaintiff "cannot spend its way into standing simply by expending money to gather information" about a defendant's actions. *All. for Hippocratic Med.*, 602 U.S. at 394. The *Alliance* plaintiffs argued that the federal government's inaction required them to "conduct their own studies" so that they could "better inform their members and the public" about the "risks" of a federal action, as well as "drafting citizen petitions" to try to persuade the FDA of their views. *Id.* Here, similarly, DC/VA Plaintiffs point to the "dozens of hours" they have spent evaluating traffic impacts, Kershbaum Decl. ¶ 27, and the "hundreds of hours" they expect to spend "consulting with NPS on the traffic impacts and identifying appropriate mitigation measures," *id.* ¶ 28. A plaintiff "cannot manufacture its own standing in this way." *All. for Hippocratic Med.*, 602 U.S. at 394.

The principal case on which DC/VA Plaintiffs rely illustrates the deficiencies in their alleged injury. *Sierra Club* involved a new rule that would allow railroads to transport large volumes of liquified natural gas (LNG) by train, which led New York to spend money purchasing

safety equipment and training its firefighters "specifically on how to combat LNG pool fires." *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1181 (D.C. Cir. 2025). The D.C. Circuit concluded that these expenditures amounted to a "cognizable proprietary injury," reasoning that two recent "catastrophic" rail car accidents made it necessary to "begin spending funds on safety measures." *Id.* Here, by contrast, DC/VA Plaintiffs seek to spend money here to study congestion resulting from a project that will "not materially worsen ordinary modeled commuter congestion." Mendelson Decl. ¶ 62, Civ. No. 26-3838, Dkt. 2-4. Unlike *Sierra Club*, DC/VA Plaintiffs make no effort to show cognizable harms caused by similar projects and the need to engage in such studies to mitigate future potential harms. DC/VA Plaintiffs' assessment and coordination costs are more akin to the studies and petitions in *Alliance for Hippocratic Medicine* than the concrete purchases New York had to make to address a new, potentially catastrophic hazard. DC/VA Plaintiffs' desire to spend money to second-guess the Revised EA is not an injury inflicted by the Defendants. A plaintiff cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam).

**2. Emergency Planning**

The District and Virginia do not allege a cognizable injury based on emergency preparedness or associated planning costs. DC/VA Plaintiffs first point to construction-related disruptions, DC/VA Br. 5, but as explained above, the Revised EA analyzed this issue and determined that "neither construction activities nor operation of the completed Arch would result in delays to emergency vehicles." Revised EA at A-3, Dkt. 74-1. During the construction period, there will be "some queueing and delay" at some intersections, but this will "not cause congestion or excessive delays." *Id.* at B-34. Plaintiffs significantly overstate the record by asserting that construction will "block an evacuation route." DC/VA Br. 5. Westbound traffic out of DC will

drop from three lanes to two, but the route will remain open. Revised EA at 5, Dkt. 74-1. DC/VA Plaintiffs offer no reason to believe that any delays would interfere with emergency vehicles, which can, of course, use their lights and sirens to require other vehicles to move out of the way. *See* 18 D.C.M.R. § 2210.1 (2019). And DC/VA Plaintiffs offer no data supporting that a single lane closure, given all the other tools emergency services have available to facilitate a real evacuation, would significantly hinder any evacuation or require the District to make substantial changes to its existing evacuation plans. Nor do they point to any imminent emergency requiring an evacuation that would be worsened by construction related to the Arch. The harm is speculative and unsubstantiated.

DC/VA Plaintiffs also contend that the loss of Memorial Circle as a site for medevac use will require Plaintiffs to identify alternatives. DC/VA Br. 5; Harvin Decl. ¶ 18, Dkt. 117-3. The Revised EA specifically addressed this issue as well: Memorial Circle is infrequently used (approximately five times per year) for U.S. Park Police medevac operations. Revised EA at A-3, Dkt. 74-1. Park Police have already "identified other nearby areas that can safely accommodate helicopter landings," so "emergency response functions would continue without meaningful disruption." *Id.* Plaintiffs do not identify any of their aircraft that use Memorial Circle as a landing site. DC/VA Plaintiffs cannot base their standing on a change in federal agency operations that the federal agency has already addressed and resolved.

Finally, DC/VA Plaintiffs contend that construction cranes will pose a hazard to passing aircraft, "as well as an obstacle to emergency flight-path deviations." DC/VA Br. 5–6. But the FAA has already reviewed the project and concluded that the Arch will not present a hazard to air navigation. Ex. G, FAA Aeronautical Study No. 2026-AEA-8628-OE (Sept. 18, 2026). That determination "include[s] temporary construction equipment such as cranes." *Id.* If DC/VA

Plaintiffs seek to dispute that determination, they must file a petition for review in the court of appeals, *see* 49 U.S.C. § 46110, not launch an indirect attack in district court. Nor has DC/VA demonstrated that such emergency flights are frequent or would be hampered by construction in this area, making any injury speculative and they do not explain how such hazards could directly harm D.C. or Viriginia themselves.

**3. Stormwater**

Finally, DC/VA Plaintiffs argue they have standing based on their speculation that Defendants will begin construction without a District-approved erosion and sediment control plan. DC/VA Br. 7. DC/VA Plaintiffs argue that the District will necessarily "incur costs monitoring and ensuring compliance with its environmental obligations" as a result. *Id.* But this theory assumes that NPS will violate District requirements in the future, which is the sort of "conjectural or hypothetical" injury insufficient to confer standing. *City of Los Angeles v. Lyons*, 416 U.S. 95, 102 (1983) (citation omitted). In any event, as the EA explains, the project will implement "stormwater and erosion control practices" that will "maintain compliance with applicable stormwater requirements." Revised EA at 9, Dkt. 74-1. The Park Service therefore found that any additional runoff from the project "will not alter Potomac River conditions, sedimentation patterns, or long-term water quality." ROD at C-7, Dkt. 109-1. If the Park Service violates the Clean Water Act in the future, the appropriate remedy would be an action under that statute's citizen-suit provision. *See* 33 U.S.C. § 1365. But the Clean Water Act does not obligate the District to inspect every construction site; DC/VA Plaintiffs cannot establish an injury now based on their choice to monitor water quality standards at the site. *See All. for Hippocratic Med.*, 602 U.S. at 394.

### C. Plaintiffs' Injuries Fall Outside the Statutory Zone of Interests.

Plaintiffs fall outside the zone of interest of the statutes they rely on. "To invoke a statutory cause of action, a plaintiff must be within the 'zone of interests' that the statute protects." *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025). That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 178 (2011).

A plaintiff has no right to review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987). When a plaintiff attempts to use the APA's cause of action to challenge the government's compliance with a different statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quotation omitted).

All Plaintiffs fall outside the zone of interests of 40 U.S.C. § 8106 and the Commemorative Works Act. The District and Virginia also fall outside the zone of interests of the NHPA and, depending on which, if any, injury the court finds adequate to establish standing, may also fall outside the zone of interests of the CWA, the Height of Buildings Act, and NEPA.

#### 1. 40 U.S.C. § 8106

All Plaintiffs' injuries fall outside the zone of interests of 40 U.S.C. § 8106. That statute forbids construction of any buildings or structures "on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." This

statute focuses solely on Congress's decision-making power. The statute operates to preserve Congress's control over buildings on federal land in the District. *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, 185 F.4th 1185, 1196 (D.C. Cir. 2026), *stay granted*, 609 U.S. 1068 (2026) (per curiam).

"[T]he injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests' for purposes of prudential standing," *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). To fall within the statutory zone of interests, a plaintiff's interests must "coincide systematically, not fortuitously with those of intended beneficiaries." *Twin Rivers Paper Co. LLC. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (quotation omitted). None of the alleged injuries that Plaintiffs rely on to establish standing—traffic, emergency services, stormwater, or aesthetic harms—systematically coincide with Congress's unique institutional interest in its authority over federal land. Plaintiffs' alleged injuries are "unrelated to the statutory prohibition[]" in Section 8106 and would continue to exist in exactly the same form if Congress passed another law expressly authorizing the Arch tomorrow. *Thompson*, 562 U.S. at 170. Plaintiffs do not fall within the zone of interests of the statute.

**2. National Historic Preservation Act**

The District and Virginia focus their preliminary injunction briefing on traffic congestion, emergency services, and stormwater. None of these injuries fall within the zone of interests of the NHPA, which is concerned with the effects of a federal action on historic properties. 54 U.S.C. § 306108. Although the District asserts in passing that the Arch will "undermine the historic value of the District's property," DC/VA Br. 2, it does not develop this argument in its briefing nor is it clear how that would be an injury to DC/VA. Here, DC/VA Plaintiffs' stated concerns are environmental, as set forth above, not historical. DC/VA Plaintiffs have thus failed to allege a

concrete injury in fact to *any* particular, cognizable historic interests for purposes of any claim under the NHPA, in the first instance. And traffic congestion, emergency services, and stormwater runoff have nothing to do with historic properties and are outside the zone of interests that the NHPA was intended to protect. DC/VA Plaintiffs' NHPA claim cannot ride the coattails of unrelated injuries. *See Comm. for Auto Resp. (C.A.R.) v. Solomon*, 603 F.2d 992, 998–99 (D.C. Cir. 1979) (injuries alleged were sufficient to support a claim under NEPA only, not an unrelated statute). Plaintiffs cannot fall within the zone of interests without identifying an injury to historic properties sufficient to establish Article III standing. *Mountain States*, 92 F.3d at 1232.

**3. Commemorative Works Act**

The District and Virginia's traffic, emergency services, and stormwater injuries fall outside the zone of interests of the Commemorative Works Act. This statute does not speak to use of roadways or water quality; instead, it exists to "preserve, protect and maintain the limited amount of open space" available in the District, to "ensure the continued public use and enjoyment" of that open space, and to ensure that commemorative works "are appropriately designed, constructed, and located." 40 U.S.C. § 8901. To that end, the statute requires that works be located so as to "protect[] open space, existing public use, and cultural and natural resources." *Id.* § 8905(b)(2)(B). The District and Virginia's alleged injuries—the costs of traffic studies and planning, emergency planning and coordination costs, wear and tear on other roads, the effect of cranes on aviation, and monitoring federal compliance with stormwater laws—are largely unrelated to the statutory purposes identified in Section 8901. Because the injury that supports standing must be the same as the injury that falls within the zone of interests, *Mountain States*, 92 F.3d at 1232, the District and Virginia are outside the zone if the court finds standing based on one of those injuries.

**4. Height of Buildings Act**

The DC/VA Plaintiffs' injuries fall outside the zone of interests of the HBA. This statute was enacted primarily to address fire safety concerns at a time when combustible building materials were frequently used. It contains no indication that it is intended to reduce traffic congestion, control emergency planning costs, or mitigate stormwater runoff. Consider a scenario where the Arch is slightly shorter: the lane closures and traffic-pattern changes still happen; the medevac site is still lost; the impervious surfaces around the Arch remain; and the District and Virginia incur the same planning and coordination costs. The only height-related injury the District and Virginia cite is the height of the cranes potentially interfering with aircraft. DC/VA Br. at 5, Dkt. 117-1. But cranes are temporary construction equipment, not buildings subject to the HBA, and nothing in this statute suggest its 1910 authors were concerned that the Wright brothers might collide with a crane. Their asserted injuries fall outside the zone of the HBA.

**5. NEPA**

The District and Virginia's financial injuries fall outside the zone of interests of NEPA. NEPA's zone of interests extends to "protecting the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983). Plaintiffs' asserted "economic interests simply do not fall within" NEPA's zone. *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015); *see, e.g.*, *Powder River Basin Res. Council v. U.S. Dep't of the Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024). The District and Virginia's financial injuries, including planning, monitoring, and coordination costs, fall outside NEPA.

**6. Antideficiency Act**

The District and Virginia's "Amended" Complaint adds a new claim under the Appropriations Clause and Antideficiency Act (ADA). DC/VA Am. Compl. ¶¶ 184–191. These

statutes operate to protect Congress's authority over federal spending. None of the injuries alleged by the District and Virginia are about federal spending. All of the alleged injuries reflect the consequences of the construction and completion of the Arch project itself, not how it is paid for. DC/VA Plaintiffs therefore do not fall within the zone of interests of the Antideficiency Act.

Nor can Plaintiffs bring an ADA claim under the APA. A cause of action under the APA is not available if any other "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). Such preclusion can arise through "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). The ADA creates a complex enforcement system: violations must be reported to Congress, the President, and the Comptroller General, 31 U.S.C. § 1351, followed by administrative discipline, 31 U.S.C. § 1349, and potential criminal referral, 31 U.S.C. § 1350. The Supreme Court recently held that a similar internal-enforcement system "preclude[d] respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce" appropriations statutes. *Department of State v. AIDS Vaccine Advocacy Coal.*, 146 S. Ct. 19 (2025). The ADA's structure indicates that Congress intended violations to be handled by Congress and the President through the specified enforcement mechanisms, not through private litigation.

**7. 40 U.S.C. § 8722**

The District and Virginia's Amended Complaint also adds a claim under 40 U.S.C. § 8722. DC/VA Am. Compl. ¶¶ 200–206.[3] This statute operates to protect the NCPC's role in approving "the location, height, bulk, numbers of stories, and size of federal public buildings" in the District. 40 U.S.C. § 8722(d). As the declarations explain, any proposed military uses would not change any of these features of the building. Ex. A, Buria Decl. ¶¶ 3–4; Ex. B, Willoughby Decl. ¶¶ 3–4.

[3] There are no paragraphs numbered 192–199 in the Amended Complaint.

Plaintiffs' concern about the *uses* of the structure do not fall within the zone of interests of a statute that only discusses form and location.

## II. Plaintiffs' Suits Cannot Proceed Because They Cannot Establish Article III Standing When They Filed Suit.

In addition to their failure to allege a concrete and particularized injury from the Arch, the Plaintiffs also lack standing because they filed their suits too soon. Standing is assessed based on "the facts as they exist when the complaint is filed." *Lujan*, 504 U.S. at 569 n.4 (emphasis omitted) (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)); *see, e.g.*, *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016) (assessing standing based on facts "[a]t the outset of the litigation").

The *Lemmon* Plaintiffs lacked standing at the outset of this litigation. To establish standing to seek prospective relief, a plaintiff "must demonstrate a substantial risk that, in the near future, they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek." *Murthy*, 603 U.S. at 49–50. The *Lemmon* Plaintiffs filed their Complaint in February 2026, Dkt. 1, but faced no "substantial risk" of harm at that time. Their Complaint speculated that Defendants would "construct the Arch prior to July 4, 2026, without securing congressional approval or satisfying other procedural requirements." *Id.* ¶ 4. But all their Complaint could point to was Presidential statements—no agency had yet acted. *See id.* ¶¶ 29–41. Courts review final agency actions, not "antecedent internal directives to propose a rule." *Trump v. California*, 609 U.S. 1032, 1040 (2026) (per curiam). The *Lemmon* Plaintiffs' suit predated CFA approval of the design, the NEPA process, NHPA review, and approval by the NCPC of the final plans for the Arch. It is now well past July 4, 2026, and despite Plaintiffs' predictions, there is still no Arch, underscoring how speculative their injury was at the time of filing. All the *Lemmon*

Plaintiffs had at filing were "[a]llegations of possible future injury," which "do not satisfy the requirements of [Article] III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

The DC/VA Plaintiffs likewise lacked standing at the outset of this litigation. Although their Complaint incorrectly claimed that "Defendants have taken final agency action by deciding to construct an Arch in Memorial Circle." DC/VA Compl. ¶ 111, Case No. 26-cv-3838, Dkt. 1, they filed before the NCPC approved the final design of the Arch. Standing may not be based on "speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). At the time of filing, the DC/VA Plaintiffs' standing relied on their assumption that the NCPC would approve the project. Final approval by the NCPC was required before any construction could begin. 40 U.S.C. § 8722(d). The NCPC is an independent agency with 12 commissioners, six of whom are neither appointed by President nor representatives of Executive Branch agencies. 40 U.S.C. § 8711(b)(1). The vote of the NCPC was not a foregone conclusion: four of the commissioners represent the District, and two more represent the relevant Congressional committees. Had the District been able to persuade Congress's representatives that Congress had not approved the Arch, those representatives could have voted with the District's representative to defend Congress's prerogatives. That the District failed to persuade Congress's representatives reflects the strength of their legal theories on the merits, not the inevitability of the NCPC's process. NPS had also not yet issued its final decision approving the Arch, which it could not do until the NCPC voted.

The DC/VA Plaintiffs cannot cure this defect by filing an amended complaint. An amendment allows a plaintiff to cure "incorrect statements about jurisdiction that actually exists," not "defects in the jurisdictional facts themselves." *Newman-Green*, 490 U.S. at 831. The Supreme Court addressed a similar issue in *Grupo Dataflux v. Atlas Global Grp., L.P.*, where the parties

were not diverse at the time of filing but became diverse shortly before trial. 541 U.S. 567, 569 (2004). The Supreme Court applied the time-of-filing rule to conclude that these post-filing events could not cure the initial lack of jurisdiction. *Id.* at 574–75. The appropriate vehicle for alleging "event[s] that happened after the date of the pleading" is a supplemental pleading, not an amended complaint. *See* Fed. R. Civ. P. 15(d). A supplemental complaint requires leave of court, *id.*, which the DC/VA Plaintiffs have failed to seek or obtain.

The *Lemmon* Plaintiffs sought leave to file a supplemental complaint. Dkt. 112. While this is ordinarily the proper vehicle to allege post-filing factual developments, it cannot be used to cure a standing defect at the time of filing. The D.C. Circuit has previously held that a plaintiff who lacked standing at filing could cure by supplementing their complaint under Rule 15(d). *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018). But *Scahill* is no longer good law, or at a minimum should be limited to the "curable defect" exception to issue preclusion and not extended to standing. *See id.* at 1182. Subsequent Supreme Court rulings have reaffirmed that standing must be measured when the "suit was filed," even if subsequent government actions. *California*, 609 U.S. at 1039. Although the agency had issued a final rule by the time of the decision,[4] the Supreme Court considered only whether publication of that final rule was non-speculative when the "suit was filed" because that is "the time when standing is measured." *Id.* at 1039. *California* explained that courts "review final rules, not proposed rules." *Id.* at 1040. If plaintiffs are harmed by a final rule, "they may challenge that rule" through a separate lawsuit. *Id.*; *see* Complaint, *California v. U.S. Postal Serv.*, No. 26-cv-13917 (D. Mass. filed Aug. 26, 2026) (filing a new lawsuit challenging the final rule). The *Lemmon* Plaintiffs should not be permitted to

[4] *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 54,966 (Aug. 26, 2026) (final rule effective August 21, 2026, three days before Supreme Court's *California* decision).

supplement their complaint—adding new claims against new defendants, based on a new final agency action—while relying on a meritless claim over which this Court *never* had jurisdiction.

Plaintiffs' premature filing approach would upend judicial review of Executive Branch actions, allowing speculative challenges to internal planning directives, with jurisdictional defects becoming curable at the last minute by supplemental pleadings. The *Lemmon* Plaintiffs' rush-to-the-courthouse-approach highlights the prejudice and judicial inefficiency caused by this type of improper premature pleading. The *Lemmon* Plaintiffs originally brought improper *ultra vires* claims, presumably because they recognized there had not yet been any final agency action. Now, after the parties have briefed dispositive motions on those claims three times, Plaintiffs seek to bring APA claims, apparently admitting that they had a path to meaningful judicial review all along. Dkt. 112. Failure to dismiss the *Lemmon* Plaintiffs' claims would only encourage more Hail-Mary *ultra vires* claims, in violation of the Supreme Court's recent caution against such review "becom[ing] an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n v. Texas* (NRC), 605 U.S. 665, 681 (2025). The *Lemmon* Plaintiffs thus cannot evade Article III requirements by filing *ultra vires* claims as placeholders for APA claims and then filing motions to supplement should final agency action issue. *See id.*

Accordingly, because Plaintiffs do not have standing for their claims, the Court may stop the merits inquiry for those claims here (and should dismiss them, Fed. R. Civ. P. 12(h)(3)).

## III. Plaintiffs Have Failed to Establish a Substantial Likelihood of Success on the Merits.

### A. The Proposed Arch Does Not Violate Any Statutes.

The 1925 Authorization Act specifically authorizes construction of a monument plaza on Memorial Circle that has never been completed. *Supra* 1–4. More broadly, the NPS Organic Act independently authorizes NPS construction in national parks to advance the purposes of those

parks. The Executive Branch has used that authority for decades to engage in major construction in National Park system Units, including in the District of Columbia, without any further congressional approval. Those two statutes—the Authorization Act and the Organic Act—together authorize construction of the Arch. Neither the Commemorative Works Act nor 40 U.S.C. § 8106 apply here to limit those authorizations.

### 1. The Authorization Act and the Organic Act Authorize the Arch.

NPS has authority to build the Arch under the 1925 Authorization Act and NPS's Organic Act. As set forth above, Congress authorized construction of Memorial Bridge and development of Columbia Island as a park "in accordance with the design" set forth in the Bridge Commission Report, Pub. L. No. 68-463, § 1, 43 Stat. 974 (1925) and empowered the Bridge Commission to make design changes, "as in its discretion may be found to be necessary or advisable." *Id.* When Congress authorizes a project "in accordance with" plans set forth in a report to Congress, the Executive Branch generally has "considerable discretion" to modify aspects of the project's design. *See, e.g.*, *Britt v. U.S. Army Corps of Eng'rs*, 769 F.2d 84, 89-90 (2d Cir. 1985) (collecting cases). And here the 1925 Authorization Act expressly specified that the Commission had such discretion.

The Authorization Act contains no language indicating that the authorization of construction pursuant to a "ten-year program of expenditures and construction," 43 Stat. at 974–75, expired or was repealed after that time, or that congressional reauthorization was necessary. Because the Authorization Act does not contain any sunset or express expiration, the authorization provided therein remains in effect today. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003). "[S]tatutes seldom say anything about their duration, and we usually only find a duly enacted provision of Congress is expired when it says so." *Pawnee Nation of Oklahoma v. Zeldin*, No. 25-9548, 2026 WL 3092945, at *10 (10th Cir. Oct. 16, 2026). Here, Congress elected not to

include any sunset date for the Authorization Act, and it remains in effect even if prior administrations did not prioritize completing this aspect of the design.

The historical implementation of the Authorization Act reflects that design elements changed over time and construction under the Act continued well past 1935—the 10-year benchmark—to add elements. *Supra* 3–4. In 1947, 12 years past the 10-year timeline, NCPC considered that the authority was still valid, as shown by its recommendation to NPS to complete the project, Dkt. 74-4, including by adding the "middle" back into the design—the structure on Memorial Circle. Dkt. 74-7. Further, elements were indeed added after that. Equestrian statutes at the Washington entrance to the bridge—not part of the original design—were added to Memorial Bridge by 1951,[5] under the aegis of the Authorization Act. Thus, although the monument plaza has not yet been built, the Congressional authorization remains both to build on Memorial Circle and to do so under designs approved by the NPS, NCPC, and CFA.

The Authorization Act permits design updates, such as an arch of 166 feet plus statues on top instead of columns of 166 feet plus statues on top. *Compare* NPS Decision Record at 2, *with* Bridge Commission Report at 41. The original pylons envisioned at the Washington entrance to the bridge gave way to gold equestrian statues; the "stately columns" "surmounted by statues" can also give way to a different element on Memorial Circle under the Act's authorization to make design changes "as in its discretion may be found to be necessary or advisable." Pub. L. No. 68-463 § 1, 43 Stat. 974. Plaintiff has not shown otherwise. And as explained *infra* at 35–36, the

---

[5] Although sculptors prepared plaster models in 1941, the statues were not added until 1951, after the Government of Italy cast them as a gift. National Park Service, Historic American Engineering Record (HAER), Arlington Memorial Bridge, HAER No. DC-7, at 96–102, https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0600/dc0604/data/dc0604data.pdf.

Arch's purposes of presenting an inspiring ceremonial gateway to Washington, DC, while celebrating the future of America are in accordance with the goals of the Authorization Act.

In addition to the Authorization Act, NPS has authority to construct the Arch pursuant to its Organic Act authority and its general authorization to operate the Park System. Congress specifically empowered the Secretary of Interior, through NPS, to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and . . . to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). This power dates back to the initial NPS Organic Act, ch. 408, 39 Stat. 535 (1916). NPS has used this statute for more than 100 years to engage in major construction on parkland. *Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities* (1945-1972), 89 Fed. Reg. 97,631, 97,631 (Dec. 9, 2024).

As relevant here, NPS has used that authority for decades to engage in major construction in national park system units in the District of Columbia without any further congressional approval. This includes the National Capital Region Headquarters; the U.S. Park Police Headquarters; 74,000 square feet of administrative facilities in East Potomac Park; U.S. Park Police Stables on the National Mall; and a 7,500-seat tennis stadium in Rock Creek Park. *See* Nat'l Cap. Plan. Comm'n, Executive Director's Recommendation, at 1 (Jan. 7, 2016), https://perma.cc/8D47-BNV6 (last visited Nov. 12, 2026); Ex. E, Decl. of Tammy Stidham, Assoc. Reg. Dir., Lands and Planning, NPS (dated November 13, 2026) (originally submitted in 26-3372 (E.D. Va.)). None of those projects were specifically exempted from § 8106 by an act of Congress.

All were done pursuant to the NPS Organic Act and its general authorization to operate the National Park System.

Under the Organic Act, the fundamental purpose of the national park system "begins with a mandate to conserve park resources and values," and "also includes providing for the enjoyment of park resources and values by the people of the United States." *See NPS Management Policies 2006*, § 1.4.3.[6] "The enjoyment that is contemplated by the statute is broad; it is the enjoyment of all the people of the United States" and includes deriving "inspiration from parks." *Id.* The D.C. Circuit and many other courts have recognized that "[b]ecause the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate." *Davis v. Latschar,* 202 F.3d 359,at 365 (D.C. Cir. 2000) (citing *Daingerfield Island Protective Soc'y v. Babbitt,* 40 F.3d 442, 446 (D.C. Cir. 1994); *Bicycle Trails Council of Marin v. Babbitt,* 40 F.3d 442, 446 (D.C.Cir.1994); *Bicycle Trails Council of Marin v. Babbitt,* 40 F.3d 442, 446 (D.C. Cir. 1994); *Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1454 (9th Cir. 1996); *Organized Fishermen of Fla. v. Hodel,* 775 F.2d 1544, 1550 (11th Cir. 1985).

The construction of the Arch is consistent with this fundamental purpose under the Organic Act because it will inspire the American people with a ceremonial gateway to DC celebrating the future of America. Respectfully, this Court overlooked that such inspiration falls within the purposes of the Organic Act, TRO Order 25, and Plaintiffs never grapple with this crucial aspect of the Organic Act's purposes. And as Plaintiffs themselves acknowledge (DC/VA Br. 12), the Organic Act allows donations "for the purposes of the [National Park] System." 54 U.S.C. § 101101(2).

---

6 Available at https://www.nps.gov/subjects/policy/mp-1-foundation.htm.

While the Organic Act certainly requires NPS to conserve park resources, that broad, discretionary duty is separate from the Act's actual prohibition on the impairment of park resources. Under the Organic Act, NPS "balance[s] the sometimes conflicting policies of resource conservation and visitor enjoyment in determining what activities should be permitted or prohibited." *S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 826 (10th Cir. 2000). The "test for whether the NPS has performed its balancing properly is whether the resulting action leaves the resources 'unimpaired for the enjoyment of future generations.'" *See id.* at 827.

Here, NPS issued a non-impairment determination (NID) finding that "construction of the Arch will not result in impairment of Park resources or values." Ex. D, NPS Decision Record, Appendix C (NID), C-1. That determination would be subject to arbitrary-and-capricious review under the APA. *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 21 (D.D.C. 2010). Like other APA actions, the court will "uphold the Park Service's exercise of discretion unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and so long as it is "based on a reasoned, permissible construction of the relevant statute.'" *Daingerfield Island Protective Soc.*, 40 F.3d at 446.

Here, Plaintiffs cursorily suggest that the Arch is inconsistent with the Organic Act because of impacts on a "historic viewshed," *see* DC/VA Br. 12–13, but they never acknowledge the NPS's non-impairment determination, much less develop an argument that it was arbitrary and capricious. As such, their argument that NPS could not rely on its Organic Act authority must fail. Moreover, the NID considered the park resources subject to the Organic Act's non-impairment requirement, including historic views and sweeping vistas. Ex. D, NPS Decision Record, Appendix C (NID), C-2–C-6. In finding non-impairment for the Parkway's historic views, NPS noted that early concepts for Memorial Circle included prominent architectural features—two large columns—

"which would have introduced substantial vertical elements in the same location as the Arch and would themselves have reframed historic sightlines[,]" *id.* at C-4; thus, NPS reasonably concluded that the introduction of vertical elements now "does not represent a fundamental departure from the area's designed framework." *Id.* NPS determined that "the key characteristics that define the Parkway's historic views remain discernible and intact and available to enjoy." *Id.* at C-5. Thus, NPS reasonably concluded that the fundamental resources of the Parkway—its historic views—would not be impaired.[7] *Id.*

Accordingly, the Arch is authorized by the Authorization Act of 1925 and the Organic Act.

**2. The CWA Does Not Apply.**

The CWA does not apply to the Arch for two independent reasons—the Arch is not a "commemorative work" within the meaning of the CWA, and even if it were a "commemorative work," the CWA does not apply to such works authorized by laws enacted before 1985. The CWA defines a "commemorative work" as one "designed to perpetuate in a permanent manner the memory of an . . . event or other significant element of American history, except that the term does not include . . . a structure which is primarily used for other purposes." 40 U.S.C. § 8902(a)(1); *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021) ("Congress's decision to use the indefinite article 'a' thus supplies some evidence that it used the term . . . as a discrete, countable thing."). In its Final Decision Record, NPS explained that the Arch is designed to "celebrate 250 years of American independence" and "symbolizes perseverance, strength, and greatness" and "the profound blessing of living in this great country, America." Ex D, NPS Decision Record, at 1. Thus, NPS explained that the Arch is "not designed to perpetuate the memory of any individual,

[7] "Under NPS Management Policies, impairment occurs only when an impact will harm the integrity of park resources or values, including the opportunities that otherwise will be present for the enjoyment of those resources or values." *Id.* at C-5.

group, event or other significant element of American history[,]" and is, instead, a "monument to the future of America." *Id.* Thus, the Arch is *forward-looking* in design, intended to perpetuate American greatness, not *backwards-looking* to *commemorate* something. Plaintiffs assert (DC/VA Br. 7-8) that the Arch must be commemorative because it celebrates 250 years of American independence, but they fail to engage with the Arch's forward-looking purpose and that it is not grounded in discrete event or element of American history. In any event, while some official documents note that the Arch also commemorates the 250th anniversary, this Court should look to the decision document to determine the primary purposes of the Arch, which as explained are forward looking and to provide a ceremonial entrance to Washington, DC. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

The definition of a commemorative work also excludes "a structure which is primarily used for other purposes," and Plaintiffs have not shown that the Arch will "primarily" be used to perpetuate the memory of a significant element of American history. Rather, NPS has explained that "[r]egardless of the symbolism that any one person attaches to it, the arch will be used for the primary purpose of presenting an inspiring ceremonial gateway to Washington, D.C." Ex. D, NPS Decision Record, at 1. This purpose is consistent with the goals of the Authorization Act which included "the provision of a magnificent entrance to Washington from Virginia for the Lee Highway coming across the entire country from Los Angeles, California." Bridge Commission Report 5. The primary purpose of the Arch is up to the government to decide, not Plaintiffs.

Second, even assuming the Arch were a commemorative work under the CWA, the CWA "does not apply to commemorative works authorized by ***a*** law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3654, codified at 40 U.S.C. § 8902(b) (emphasis added). As

explained above, the Arch was authorized by "a" law enacted before 1985—the Authorization Act of 1925. *Supra* 1–4.

### 3. Section 8106 Does Not Apply.

40 U.S.C. § 8106 also does not apply to the Arch for two independent reasons. First, as explained above, Congress authorized the Arch with the Authorization Act of 1925, so § 8106 does not apply; there is no question that § 8106 permits construction of buildings or structures with "express authority of Congress." 40 U.S.C. § 8106. On this claim, the court should stop there.

Second, § 8106 does not apply (and has never applied) to the NPS. Section 8106 provides that: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." *Id.* But this language cannot be read in isolation and must be understood considering the entire enacting statute, the provision's history, and its implementation over the years. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[W]e must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'") (additional citation omitted).

Congress originally enacted the provision that would become § 8106 via an appropriations bill in 1912. Aug. 24, 1912, ch. 355, 37 Stat. 417, 442–44 (1912) . That original enactment prohibited the Engineer Department in the War Department (now the Army Corps of Engineers) from construction of buildings or structures on any reservation, park, or public grounds in DC without expression Congressional authority. *See id.* ("Under Engineer Department . . . [h]ereafter there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress."). In the very same appropriations bill, Congress enacted a separate limitation on the Interior Department's

administration of national parks: "No expenditure for construction of administration or other buildings . . . exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." *Id.* at 460 (later codified at 16 U.S.C. § 451).

Thus, Congress enacted two different limitations at the same time: one on Interior's construction on national park lands everywhere (codified at 16 U.S.C. § 451), and a separate one on the War Department's construction in the District of Columbia specifically (codified at 40 U.S.C. § 8106). The limitation on NPS's construction on parklands via Section 451 confirms that NPS **does** *otherwise* have general authority to construct buildings and structures under its Organic Act—there would be no need for a *limitation* if NPS has no authority in the first instance. In other words, Congress enacted a specific limit on NPS to cabin its inherent construction authority.

However, § 8106 placed no restriction on NPS, as shown by Congress routinely exempting NPS construction activity—including in the District of Columbia—from Section 451, *see, e.g.*, Pub. L. No. 80-841, 62 Stat. 1112, 1141 (1948); Pub. L. No. 101-512, 104 Stat. 1915, 1920 (1990), but not from § 8106. Thus, NPS constructed the National Capital Region Headquarters, the U.S. Park Police Headquarters, and the Rock Creek Tennis Center, as well as countless kiosks and other structures in the National Capital Region, all without either a specific exemption from or authorization pursuant to § 8106. Executive Director's Recommendation, National Capital Region Campus Renovation Project and Park Police District 1 Substation, Commission Meeting, National Capital Planning Commission at 1 (Jan. 7, 2016). Congress' regular exemption of NPS construction from Section 451, but not from § 8106—even for projects in the District—shows that Congress intended the limit in Section 451 rather than § 8106 to apply to NPS construction in DC.

In 1996, Congress repealed Section 451. Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996). And NPS continued to construct buildings and structures in DC without any congressional

exemption from § 8106, including new U.S. Park Police Stables on the National Mall and a 7,500-seat tennis stadium in Rock Creek Park. Ex. E, Stidham Decl. ¶¶ 17–21. Congress acquiesced in this interpretation. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (explaining "longstanding practice of the government" is an "aid" to "inform a court's determination of what the law is" (citation modified)). Indeed, "[i]f Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'" *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022). Here, Congress has not exempted any NPS construction from the strictures of § 8106 and did not act at all in response to any of the above construction. The lack of exemption from § 8106 for NPS construction projects in the District after the repeal of Section 451 thus confirms that Section 451 was the *only* limit on NPS' construction on District parklands. Accordingly, the best reading of § 8106 is that Congress understands it not to apply to NPS construction on parklands in the District.

To drive the point home, the sole example of Congress exempting a particular building in the District pursuant to § 8106 is a 1993 statute providing that "the limitation on construction contained in [§ 8106] shall not apply to the construction" of "facilities to house bonsai collections at the National Arboretum." Pub. L. No. 103-111, 107 Stat. 1046, 1051 (1993). The exemption was necessary because the National Arboretum is managed by the Department of Agriculture, not NPS, and is not a national park. Accordingly, a reading of § 8106 as restricting entities other than NPS from constructing buildings on national parkland in D.C., is the best reading.

Finally, even if § 8106 did apply, and it does not, it cannot be read to require anything more than some form of authorization from Congress to construct a building. The Authorization Act of

1925 and the Organic Act, as explained, provide authorization to construct buildings on national parkland; as also explained below, approval of the Arch is consistent with the Organic Act.

### 4. The Arch Does Not Violate the Height of Buildings Act.

The Arch does not violate the HBA for four reasons. *Contra* DC/VA Br. 8-11. First, the HBA's height restrictions do not apply to federal buildings. Second, even they did, the Arch is not a "building," covered by the statute. Third, even if the Arch is a building, the Authorization Act authorized it to exceed the 130-foot limit Plaintiffs contend applies. Finally, the Arch complies with the HBA's height restriction for buildings on traffic circles.

#### a. The HBA Does Not Apply to Federal Buildings.

Under basic principles of statutory interpretation and the application of long accepted Supreme Court jurisprudence, the 1910 HBA did not repeal the 1899 HBA's exception of federal buildings from its height restrictions. The original HBA expressly stated that its height limits "shall not apply to Federal or municipal buildings." 30 Stat. 922 § 7. Contrary to the District and Virginia's assertion, the 1910 HBA did not repeal the entire 1899 HBA.[8] TRO Reply Br. 15. The legislative history shows that Congress *considered* but ultimately *rejected* repealing the original 1899 in full. When the House first voted on the 1910 HBA, it contained a provision expressly repealing the entire 1899 HBA. 45 Cong. Rec. 4534, Dkt. 95-1. But the legislation was amended

---

[8] DC/VA Plaintiffs contend that the Senate and House reports "listed the provisions the believed were not repealed, and they did not include the exemption for federal buildings." *Id.* at 15 n.2. This is not accurate. While the Congressional reports cited do not mention the federal building exemption, they also do not list all repealed sections but describes "the *changes* in detail proposed to be made [in the 1910 HBA]. *See* 61 H. Rep. 720 (1910) at 1. Thus, that the federal exemption is not discussed among the "changes" supports the argument that it was *unchanged*, *i.e.*, not repealed.

to repeal only "laws in conflict herewith." *Id.* at 4535 (quotations omitted); 36 Stat. at 455.[9] So, for example, the increased height limit in Section 5 of the 1910 amendment—of 130 feet for buildings on business streets, *see* 36 Stat. at 453—repeals the conflicting 110-foot limit in the original act, 30 Stat. 922.. But nothing in the 1910 HBA references federal buildings or otherwise conflicts with original act's exception. As such, any argument that the 1910 HBA repealed the exception of federal buildings from height restrictions rests on implication only.

Repeals by implication are rare and only occur when (1) provisions of the two acts are in irreconcilable conflict; or (2) when the later act covers the whole subject of the earlier one and is clearly intended as a substitute. *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). If neither of those two circumstances exist then "the later act is to be construed as a continuation of, and not a substitute for, the first act." *Id.* The original act's exception of federal buildings is not irreconcilable with the 1910 amendment. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001) (when "two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective" (citation omitted)). Moreover, the legislative history does not support the conclusion that 1910 amendment was intended as a substitute for the entire 1899 HBA. Rather, the House's revision of the earlier version that repealed the entire HBA to a limited repeal of only those portions conflicting with the 1910 amendment demonstrates a "clearly expressed congressional intention" *not to repeal* or substitute for the entire 1899 HBA. And contrary to Plaintiffs' assertion, TRO Reply 15, Congress's silence in the 1910 HBA regarding the federal exemption is insufficient to support a repeal by implication. *Morton v. Mancari*, 417 U.S. 535, 550 (1974) (rejecting argument

---

[9] When asked about the purpose of the modification, Representative Campbell explained that "[t]he act as reported repeals a number of laws outright, and I am proposing to repeal the laws in conflict herewith rather than to repeal these acts." 45 Cong. Rec. at 4535.

that congressional silence should be read as effectuates an implicit repeal). Thus, the 1910 amendment did not implicitly repeal the earlier HBA's federal building exception.

Indeed, if Congress intended to regulate federal building heights by amending a law that had regulated only private buildings in D.C., it would have clearly expressed its intent by using clear language. For example, Congress used clear language in section 3, which requires that "all buildings in the District of Columbia, including buildings *of every kind, class, and description whatsoever, excepting churches only*, hereafter erected . . . shall be fireproof or noncombustible." 36 Stat. 452 (emphasis added). Section 5, restricting height, contains no such language, and if Congress intended Section 5 to likewise apply to buildings of "every kind, class and description whatsoever," 36 Stat. 452 "it knew how to say so." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018); *see also Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest"). Additionally, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001), and reading to impose restrictions on federal buildings that did not exist before through a *non obstante* provision does just that.

Historical practice confirms this understanding. Soon after the HBA was enacted, the National Archives Building was constructed on Constitution Avenue to a height of 166 feet, exceeding the HBA's generally applicable 130-foot limit for buildings on business streets.[10] And,

---

[10] *See* "Short History of the National Archives Building," available at https://www.archives.gov/about/history/building.html; "The National Archives Building: Temple

where Congress wanted federal buildings to comply with the HBA, it expressly said so. For instance, when Congress authorized the creation of the Thurgood Marshall Federal Judiciary Building, it expressly required that its height comply with the HBA. *See* Judiciary Office Building Development Act, Pub. L. No. 100-480, § 3(a)(8)(B), 102 Stat. 2328, 2329–30 (codified as amended 40 U.S.C. § 6502(c)(2)). That provision is surplusage if the HBA already applied, by its own force, to the Judiciary Building. To avoid rendering that "language superfluous," *Connecticut National Bank v. Germain*, 503 U.S. 249, 253 (1992), the better view is that the HBA does *not* apply to federal buildings *absent* congressional say-so.

The remedies available for HBA violations also demonstrate Congress' intent to regulate private parties, not the Federal government. The 1910 HBA declared that violation of the height limits are "common nuisances" and those "in charge of or maintaining" them are subject to prosecution in D.C. police courts and subject to fines. § 8, 36 Stat. at 454. Congress could not have intended to subject the Federal government to criminal prosecution and/or civil penalties for violating the HBA because the statute does not meet the bar for a waiver of the United States' sovereign immunity for civil damages. It neither "unmistakably" waives sovereign immunity nor "explicitly authorizes suit against [the] government on [a nuisance] claim." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49 (2024) (citation omitted).

The HBA is properly viewed as local zoning regulations. The HBA has been codified in the same chapter of D.C. laws addressing zoning. *See* D.C. Code § 6-601.05 (placed in Chapter 6, Subchapter I, of Title 6, titled "Zoning and Height of Buildings"). Currently, the D.C. Zoning Commission regulates the "height . . . of buildings and other structures" under the provisions of

---

to our History," available at https://artsandculture.google.com/story/the-national-archives-building-temple-to-our-history-u-s-national-archives/YwXxwO5TwRFIIw?hl=en.

Chapter 6, Subchapter IV, of the D.C. Code. D.C. Code § 6-641.01. Subchapter IV further provides that "[t]he permissible height of buildings in any district shall not exceed the maximum height of buildings now authorized . . . by subchapter I [the HBA]." *Id.* § 6-641.06.

But the D.C. zoning regulations expressly do "not apply to federal public buildings[.]" *Id.* § 6-641.15.[11] Rather, the regulations provide that the "height . . . of *federal public* buildings in the District of Columbia . . . will be subject to the approval of the [NCPC]." *Id.* (emphasis added). The NCPS's organic statute also exempts federal buildings from D.C. zoning regulation and directs that the "height . . . of federal public buildings in the District of Columbia . . . [is] subject to the approval of the Commission." 40 U.S.C. § 8722(d).

DC/VA Plaintiffs' hang their hat on the fact the NCPC has historically applied the HBA-derived height limits to most D.C. buildings, DC/VA Br. 8. But that accords with the Commission's discretion to regulate building height, while considering, but not being compelled by, the HBA. *Accord* 40 U.S.C. § 3312(c) (directing General Services Administration to consider local zoning laws in building construction but not mandating compliance with them).

b. The Arch is not a "building" under the HBA.

The HBA applies only to "buildings." *See* 36 Stat. at 454. Contrary to Plaintiffs' assertions, the Arch is not a "building" as the term was defined in 1910. Tellingly, Plaintiffs omit the following italicized language from the 1913 dictionary definition of "building," "[t]hat which is built; a fabric or edifice constructed, *as a house, a church, etc*." *Compare* TRO Br. 26, No. 1:26-

---

[11] DC/VA Plaintiffs contend that D.C. Code section 6-641.15 affirmatively supports an argument that Congress *did not exempt* federal buildings from the HBA because that section explicitly exempts Federal public buildings only from the regulations in Subchapter IV with no mention of Subchapter I, which contains the codified the 1910 HBA amendments. TRO Br. 30. But again, because the 1910 amendment did not repeal the 1899 federal building exception, there was no need for Congress to extend the Section 6-415.15 exception to Subchapter I.

cv-3838, ECF No. 2-1, *with* Webster's Unabridged Dictionary at *1646 (1913), https://archive.org/details/2976582. The use of "house" and "church" to define "building," demonstrates that the term encompassed edifices that shelter the activities occurring inside, as distinguished from other structures. A free-standing Arch is more like a monument, tower, or sculpture than a "house" or a "church." The Arch does not exist to shelter activities occurring inside—much like the Washington Monument does not exist to shelter activities inside, even though it contains an elevator and viewing areas. That some colloquially refer to the Arch as a building, does not alter the definition of the term as used in the 1910 HBA. *Contra* DC/VA Br. 9.

c. The Authorization Act authorizes high structures.

Even if the HBA applies to federal buildings and the Arch is considered a building, the Authorization Act authorizing implementation of the Memorial Bridge Commission's 1924 Report (discussed *supra* 1–3) explicitly authorized exceeding the 130-foot limitation that Plaintiffs contend applies. DC/VA Br. 9. The 1925 Authorization Act approved a plan that included two 166-foot-tall columns and delegated design discretion, Pub. L. No. 68-463 § 1, 43 Stat. 974 (empowering the Bridge Commission to make design changes "as in its discretion may be found to be necessary or advisable"), which extends to redesigning two 166-foot columns into an Arch.

d. The Arch conforms to any applicable HBA requirements.

Finally, even if the HBA applies to federal buildings, and the Court concludes that the Arch is a building that was not authorized pursuant to the 1925 Authorization Act, the Arch still does violate the HBA's terms. The Arch is to be constructed on Memorial Circle, which is neither a "residence" nor a "business" street where heights are generally limited to 90 and 130 feet, respectively. D.C. Code § 6-601.05(b)–(c). Because neither homes nor businesses are located around Memorial Circle, these limits do not apply to the project. And the D.C. Council's authority

to "denominate portions of streets in the District of Columbia as 'business streets,'" D.C. Code § 9–1201.05, does not extend to Memorial Circle, which sits on federal park system land and is under the exclusive jurisdiction of the federal government. When Congress granted the D.C. Council authority to denominate business streets, it specifically excluded the federal "park system." *See* 58 Cong. Ch. 89, 33 Stat. 10 (Feb. 2, 1904), *amending* 55 Cong. Ch. 543, 30 Stat. 570 § 2 (July 1, 1898) (placing "the park system of the District of Columbia . . . under the exclusive charge and control of the Chief of Engineers of the United States Army, under such regulations as may be prescribed by the President of the United States").

Nor would the generally applicable height limit to "the width of the street, avenue, or highway in its front, increased by 20 feet," D.C. Code § 6-601.05(a), require a shorter Arch. "When a fronting street forms part of a public traffic circle, square, or other public space, the Surveyor [of the District of Columbia] determines its width by measuring full across the entire public space depicted on the plat." *Techworld Dev. Corp. v. D.C. Pres. League*, 648 F. Supp. 106, 121 (D.D.C. 1986), *vacated as moot*, No. 86-5630, 1987 WL 1367570 (D.C. Cir. June 2, 1987).[12] Here, "Memorial Circle, a traffic circle 300 feet in diameter," exceeds the project's 250-feet height. National Park Service, Cultural Landscapes Inventory - Memorial Avenue Corridor 31 (2004), *available at* https://npshistory.com/publications/gwmp/cli-memorial-ave-corridor.pdf. Thus, the 250-foot Arch would comply with restrictions set forth in D.C. Code § 6-601.05(a). And contrary to DC and Virginia's assertion, in *Techworld*, the court did not hold that 130-feet was the

---

[12] Contrary to DC and Virginia's suggestion, that court's decision in *Techworld* was later vacated as moot as result of Congressional action (unrelated to the HBA) and a settlement agreement, does not detract from the court's finding regarding the HBA. *Techworld Dev. Corp. v. D.C. Pres. League*, No. 86–5630, C/A/86–00252, 1987 WL 1367570, at *2 (D.C. Cir. June 2, 1987).

maximum allowable height, full stop. Rather it held that 130 feet was the maximum allowable height of the building at issue in that case. *Techworld*, 648 F. Supp. at 121.

**5. NPS's NEPA Review Was Adequate.**

The District and Virginia incorrectly contend that NPS's statement of purpose and need and evaluation of alternatives did not fulfill NEPA's requirements. DC/VA Am. Compl. ¶¶ 159–160, DC/VA Br. 11. NEPA's "requirements are modest, purely procedural, and serve only to facilitate informed agency decision-making." *Save the Sound, Inc. v. FAA*, 183 F.4th 763, 768 (D.C. Cir. 2026). As it has for other symbolic and ceremonial structures within the District of Columbia, the agency took its direction from Congress and the President as to the purpose and need for the project and examined all viable alternatives that would achieve those ends.

NPS's statement of purpose and need was not deficient. "The statement of a project's purpose and need is left to the agency's expertise and discretion," and courts "defer to the agency if the statement is reasonable." *Sierra Club, Inc. v. United States Forest Serv.*, 897 F.3d 582, 598 (4th Cir. 2018); *see also Seven Cnty.*, 605 U.S. at 179 ("[T]he central principle of judicial review in NEPA cases is deference."). An agency's statement of purpose and need is reasonable where, as here, it reflects "the goals of the project sponsors" and of Congress. *All. for Legal Action v. F.A.A.*, 69 F. App'x 617, 622 (4th Cir. 2003); *see also Webster v. U.S. Dept. of Agric.*, 685 F.3d 411, 423–24 (4th Cir. 2012).

Plaintiffs contend that NPS violated NEPA by crafting an unduly narrow "purpose and need" that is "conterminous" with the Arch itself. But NEPA "does not substantively constrain an agency's choice of objectives." *Slater*, 198 F.3d at 867; *see also New Jersey Conservation Found. v. FERC*, 111 F.4th 42, 58 (D.C. Cir. 2024) (rejecting NEPA claim even though the agency's purpose "could hardly have been more narrowly described"). Rather, courts "uphold an agency's

definition of objectives so long as the objectives that the agency chooses are reasonable." *Busey*, 938 F.2d at 196. This inquiry requires considering the "views of Congress, expressed, to the extent the agency can determine them, in the agency's statutory authorization to act[.]" *Id.* NPS's objective of building an ornate monumental arch is an appropriate exercise of its discretion and is entitled to deference. Revised EA at 1, Dkt. 74-1.

Plaintiffs' argument that NPS failed to consider a sufficient range of alternatives misconstrues NEPA's requirements for a project with a specific purpose. "NEPA requires agencies to consider "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(iii). "Because objectives limit alternatives, the more specific the objective, the narrower the range of alternatives." *Sierra Club v. FERC*, 145 F.4th 74, 87–88 (D.C. Cir. 2025). An EA need only include a no-action alternative and a preferred alternative, but beyond that, NEPA does not require a "minimum number of alternatives that an agency must consider." *Sierra Club v. Fed. Highway Admin*, 715 F. Supp. 2d 721, 732 (S.D. Tex. 2010). An agency has "substantial discretion" in determining what constitute reasonable alternatives when assessing a particular project. *Seven Cnty.*, 605 U.S. at 181-82. And it is the purpose of the project "that provide[s] the point of reference for a determination whether an alternative is 'reasonable' in the first place." *City of Alexandria, Va. v. Slater,* 198 F.3d 862, 867 (D.C. Cir. 1999) (internal citations omitted); *Shenandoah Valley Network v. Capka*, 2009 WL 2905564, at *10 (W.D. Va. Sept. 3, 2009) ("An alternative is reasonable only if it will bring about the ends of the federal action." (quoting *Citizens Against Burlington Inc. v. Busey*, 938 F.2d 190, 194–95 (D.C. Cir. 1991))).

Here, NPS eliminated several alternatives from detailed consideration that were inconsistent with the project's purpose. *See* Revised EA at A-1–2, Dkt. 74-1. For example, NPS

explained that building a monumental arch at a different location would "sever the project from the specific historic planning precedent that provides the rationale for the undertaking's placement." Revised EA at A-1, Dkt. 74-1. NPS also considered, but ultimately eliminated, the possibility of building a smaller arch because it would result in "greater impacts on the cultural landscapes, specifically the views between the Lincoln Memorial and Arlington National Cemetery." *Id.*

The NEPA review was also not unusual. As the NEPA documentation for numerous celebratory sites that NPS established in recent administrations shows, the purpose and need includes a specific site and memorial features in keeping with those already envisioned for the project and then examines an action and no-action alternative. Notable examples of these analyses include (1) the Martin Luther King, Jr., Memorial (planning documents available at https://parkplanning.nps.gov/document.cfm?parkID=427&projectID=13015&documentID=29527); (2) the Dwight D. Eisenhower Memorial (planning documents available at https://parkplanning.nps.gov/documentsList.cfm?projectID=16139); (3) the National Desert Storm and Desert Shield Memorial (planning documents available at https://parkplanning.nps.gov/documentsList.cfm?projectID=62216) and (4) the Peace Corps Commemorative Park (planning documents available at https://parkplanning.nps.gov/documentsList.cfm?projectID=54907).

Nor is there any merit to DC/VA Plaintiffs' suggestion that there was no "hard look" under NEPA because the extant environmental documents do not consider proposed security features of the arch. DC/VA Br. 11. The determination of "what facts" are relevant to the agency's decision is one entitled to substantial deference. *Seven Cnty.*, 605 U.S. at 185. And Plaintiffs do not present evidence establishing how the Arch's design might be modified to accommodate such applications. *Contra* Hegseth Decl. ¶ 15. It would generally be the prerogative of national security agencies, not

NPS, to analyze such design modifications.[13] In any event, that aspect has yet to be fully determined by the relevant decision-makers and would be subject to other reviews. And_"the district court" "exceed[s] the proper scope of its inquiry when it place[s] probative weight upon evidence of" the DOW's or DHS' "subjective intent." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 198 (4th Cir. 2005). Further, when there is additional planning to be done, subject to additional environmental reviews, the proper remedy is to wait for those specific reviews, not enjoin the national security project. *Id.* at 202 (reversing the district court's grant of an injunction prohibiting the Navy from taking any action to construct a base during the pendency of additional environmental reviews). So while there may be a subsequent dispute about whether NPS must prepare a supplemental EA or EIS, no such dispute is ripe now. *See Sierra Club v. FERC*, 97 F.4th 16, 28 (D.C. Cir. 2024) (rejecting NEPA claim because agency "made no changes to the proposed project that would trigger a supplemental NEPA analysis").

The deference point warrants emphasis: *Seven County* repeatedly emphasized to lower courts that "the central principle of judicial review in NEPA cases is deference." 605 U.S. at 179. Thus, all NEPA requires courts to review is whether the agency "drew a reasonable and 'manageable line,'" not whether "NEPA would support drawing a different line," and not whether this Court or the plaintiffs would like the agency to draw a different line. *Id.*; *see also Sierra Club v. FERC*, 153 F.4th 1295, 1311 (D.C. Cir. 2025) (recognizing that, "[a]fter *Seven County*, the era of searching NEPA review is over"). This precedent forecloses Plaintiffs' NEPA argument, which relies on second-guessing agency decisionmaking and looking beyond the agency's own analysis to demand analysis of projects features that have not been fully defined.

---

[13] Under the Supreme Court's holding in *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, a NEPA analysis "need not be disclosed" if necessary to "preserve military secrets." 454 U.S. 139, 145 (1981).

Assuming that the court were to find a likely violation of NEPA's purely procedural requirements, that would not support a preliminary injunction. Even at final judgment, a NEPA "deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to [its analysis]." *Seven Cnty.*, 605 U.S. at 185 (addressing an environmental impact statement); *see Save the Sound*, 183 F.4th at 768-77 (applying *Seven County* to an environmental assessment). There is no indication here that NPS would disapprove the project if it added more to its NEPA analysis.

**6. NPS Complied with the NHPA.**

The District and Virginia's NHPA claim likewise fails as Section 106 of the NHPA does not mandate any substantive outcome, such as mitigation or changes to a project. *United Keetoowah Band*, 933 F.3d at 734. It instead requires federal agencies to "take into account" the effects of their "undertaking[s]" on historic properties, *CTIA-Wireless Ass'n*, 466 F.3d at 106. The NHPA thus has "a limited reach," "aimed," as it is, "solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." *Thornburgh*, 877 F.2d at 1056. The NPS thus did not contravene the NHPA by declining to change its project. *Pres. Soc'y of Newport Cnty.*, 2026 WL 787910, at *16 ("[T]he NHPA does not require . . . changes being made to the proposed project.").

Nor did the NPS fail to adhere to the procedural requirements of the NHPA. NPS released a 24-page preliminary assessment of effects for multiple rounds of public comment. Revised Assessment of Effects at 6, Dkt. 95-2; Preliminary Assessment of Effects, Dkt. 95-3.[14] It held two

---

[14] Although NPS proposed expedited consultation under 36 C.F.R. § 800.3(g) that addressed multiple procedural steps in one, it ultimately declined to pursue expedited consultation after

consulting party meetings. *E.g.*, NHPA Meeting Slides, Dkt. 95-8. After considering public comments and consultation input, NHPA Public Comment Summary and Report, Dkts. 95-6, 95-7, NPS produced a 133-page revised assessment of effects report. *See* Revised Assessment of Effects. After NPS and the consulting parties were unable to agree on how to resolve those effects, the ACHP terminated the consultation pursuant to 36 CFR § 800.7(a). Dkt. 95-4. And the ACHP then provided comments to NPS. Dkt 95-5.

The NPS did not violate 36 C.F.R. §§ 800.3(c) or (e) based on when it initiated consultation. *Contra* TRO Br. 36–38. While those regulations require NPS to "determine the appropriate SHPO" "[a]s part of its initial planning," they do not require NPS to "initiate consultation" with the SHPO at any particular time in the initial planning. *See* 36 C.F.R. § 800.3(c) ("The agency official shall *then* initiate consultation . . ." (Emphasis added)). The SHPOs participated in every step of the consultation—identifying historic properties and the area of potential effects, assessing effects on those properties, and resolving those effects. Section 106 does not require anything more.

Nor did NPS improperly condense the multi-step consultation process over SHPO objection in violation of 36 C.F.R. § 800.3(g). *Contra* TRO Br. 37. Although NPS proposed doing so to the SHPOs, it undertook separate consultation steps after the SHPOs objected. *See* Revised Assessment of Effects at 6. After consultation was initiated—and the SHPOs objected to expedition—NPS twice consulted about the identification of historic properties. *Id.* And NPS consulted about two separate draft assessments of effects on historic properties. *See id.* at 6–7. NPS also attempted to resolve adverse effects through consultation; when those attempts were

SHPOs objected. It thus separately consulted on identification of historic properties and area of potential effect to comply with 36 C.F.R. § 800.2. *See* Dkt. 95-2 at 6.

unsuccessful, ACHP terminated the consultation. Dkt. 95-4. While the full scope of NPS's substantial consultation efforts will be documented in an administrative record, even DC/VA Plaintiffs' self-serving declarations acknowledge the substantial correspondence between NPS and the SHPOs.[15]

Finally, NPS did not fail to consider alternatives or modifications to the undertaking under 36 C.F.R. § 800.6. *Contra* TRO Br. 37–38. NPS "worked to avoid or resolve the adverse effects to historic properties by developing and evaluating alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects." Revised Assessment of Effects at 35–45, Dkt. 95-2 (discussing numerous alternatives, avoidance, mitigation and minimization measures). That none of the numerous alternatives discussed were sufficient to satisfy the SHPOs does not demonstrate a failure to consult; it demonstrates that "further consultation would not be productive," which was why ACHP terminated further consultation. Termination Letter at 1, Dkt. 95-4. "[W]here disagreement precludes the completion of a Memorandum of Agreement an agency may implement a project after receiving and considering comments from" ACHP. *Slater*, 198 F.3d at 871.

Plaintiffs are thus unlikely to prevail in demonstrating an NHPA violation.

**7. NPS Complied with the National Capital Planning Act.**

Defendants complied with their obligations under the National Capital Planning Act. NPS presented the project materials and concept plans to NCPC in June 2026, followed by updated materials and design plans in July and October. Ex. D, NPS Decision Record at 12-13. NCPC approved the site and project design on November 5, 2026. Ex. C, NCPC Media Release. After

---

15 For example, the Kirchen Declaration documents a robust initiation letter, Kirchen Decl. ¶¶ 33–35, and six additional rounds of correspondence between NPS and SHPOs, *id.* ¶¶ 49–55.

the NCPC approved the building site and design, NPS issued its final decision approving construction. Ex. D, NPS Decision Record at 13.

The District and Virginia contend that Defendants did not validly comply because Defendants did not seek the NCPC's advice and approval regarding the national security functions of the Arch. DC/VA Br. 13. First, DC/VA Plaintiffs cite no evidence to support their argument that the NCPC (which is not a party to this action) needed information on this topic; indeed, if it did, NCPC could have requested it pursuant to Section 8722(a), which requires federal planning agencies to furnish information to the Commission "on [its] request." *Id.* 40 U.S.C. § 8722(a). Second, while Departments of War and Homeland Security have identified national security uses for the Arch, Department of Interior explained in its final decision document that those future uses are "not within the NPS's or the Department of Interior's regulatory authority," were not part of the NPS's decision, and may require additional review. Ex. D, NPS Decision Record at 9. Thus, the Department of Interior was under no obligation to provide information to NCPC that it did not have.

**8. The Arch Is Not Unlawfully Funded.**

Contrary to the DC/VA Plaintiffs' suggestion, the Arch is not unlawfully funded. As previously explained (TRO Opp. 29-30), the Authorization Act's cap on appropriations does not rule out alternative sources of funding, such as private donations. *See* A-8713, 4 Comp. Gen. 832 (Apr. 3, 1925). Plaintiffs themselves acknowledge (DC/VA Br. 12) that the Organic Act allows donations "for the purposes of the [National Park] System." 54 U.S.C. § 101101(2). And as discussed in Section B.1 above, the construction of the Arch is consistent with this fundamental purpose under the Organic Act because it will inspire the American people with a ceremonial gateway to DC celebrating the future of America.

Where "the authorizing legislation is silent as to monetary contributions from non-federal sources" and "in the absence of contrary congressional direction," amounts contributed by "non-federal entities" "are not to be counted" as part of the federal cost or against the cost ceiling. B-223725 (Comp. Gen. Feb. 20, 1987). Here, there is no "contrary congressional direction"; rather, the 1925 statute's reference to completing the project through means "most economical and advantageous to the Government," Authorization Act § 2, 43 Stat. at 974, undercuts a reading of the appropriations cap as foreclosing private funding—that funding would, by definition, make the project "most economical" to the government. Historical practice confirms that approach, as the equestrian statues at the bridge's east end were gifted by the government of Italy. HAER No. DC-7, at 99, 101–02.[16]

**9. Plaintiffs Cannot Bring a Standalone APA Claim.**

The District and Virginia's standalone APA claim (Count Six) fails as a matter of law. DC/VA Am. Comp. ¶¶ 163-168. While the APA provides a limited waiver of sovereign immunity, a cause of action, and a standard of review for challenges to final agency action, it does not prescribe substantive legal requirements. 5 U.S.C. §§ 701-706. In other words, "[t]he APA 'supplies a generic cause of action' to bring claims based on substantive law found elsewhere." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 58 (D.D.C. 2023) (quoting *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 (D.C. Cir. 2006))), *aff'd*, 146 F.4th 1144 (D.C. Cir. 2025). Accordingly, "arbitrary and capricious review does not apply in the absence

---

16 Ex. H, at 8 ("When [World War II] ended and the metal again became available, government authorities found the increased cost of bronze greater than the funds available. In September 1948 the National Park Service, which is in direct charge of the Arlington Memorial Bridge, sought the assistance of the Economic Cooperation Administration to find a solution to the problem. The offer of the Italian Government to cast the statutes and present them to the United States as a gift of the Italian people is the result.").

of a statutory benchmark against which to measure an agency's exercise of discretion." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 955 (9th Cir. 2017); *see also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1202 (D.N.M. 2015) (collecting cases). Because DC/VA Plaintiffs provide no statutory benchmark for their standalone APA arguments, this claim fails.

Plaintiffs' arbitrary and capricious arguments (DC/VA Br. 9-11) also fail on their own terms. NPS is reasonably fulfilling a century-old vision of the Memorial Bridge complex, which explains why the Arch is necessary and why at Memorial Circle. *Supra* 1–4. The decision here "can be scrutinized by courts and the interested public." *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), and while the record is not yet before the Court, the public documents available show the agency diligently pursued the required reviews and adequately explained its findings. For example, as explained *supra* at 49–52, NPS adequately considered alternatives. And aside from conclusory assertions (DC/VA Br. 11), Plaintiffs point to no statute requiring the type of comparative analysis of costs they wish was required.

Plaintiffs also contend that NPS did not adequately consider "planned military uses of the Arch," and Plaintiffs insist that "the federal government has *already* decided to use the Arch for military purposes." DC/VA Br. 10. But Plaintiffs are mistaken and fail to grapple with NPS's reasoning in the Decision Record. As discussed above at 9, while national security agencies have evaluated the Arch, plans for any operations have not yet been finalized, are not included in the record, and fall outside the Department of the Interior's regulatory authority. For these reasons, NPS reasonably acknowledged those potential national security uses but did not analyze them. Ex. D, NPS Decision Record at 9, "Triumphal Arch at Memorial Circle," (Nov. 5, 2026). Any future national security uses would result from separate action by the Departments of War or Homeland

Security, Ex. A, Buria Decl. ¶ 4, Ex. B, Willoughby Decl. ¶ 4, neither of which is a defendant in this case. And in any event, when there is additional planning to be done, subject to additional environmental reviews, the proper remedy is to wait for those specific reviews, not enjoin the whole project. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 202 (4th Cir. 2005) (reversing the district court's grant of an injunction prohibiting the Navy from taking any action to construct a base during the pendency of additional environmental reviews).

In sum, Plaintiffs cannot establish that NPS's decision is arbitrary and capricious.

## IV. Plaintiffs Have Not Carried Their Burden to Establish Irreparable Harm.

The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). A plaintiff's alleged injury "must be both certain and great, actual and not theoretical, beyond remediation, *and of such imminence* that there is a clear and present need for equitable relief." *State v. Musk*, 769 F. Supp. 3d 1, 5 (D.D.C. 2025) (cleaned up). "The possibility of irreparable harm is not enough." *Id.* Plaintiffs "must demonstrate injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024).

### A. *Lemmon* Plaintiffs

The *Lemmon* Plaintiffs will not suffer irreparable harm absent a preliminary injunction. The D.C. Circuit has a high standard for irreparable injury, which "must be both certain and great" and "actual and not theoretical." *Center for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1010 (D.C. Cir. 2026) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016)). Plaintiffs must show that they are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Even assuming their aesthetic injury is cognizable, the *Lemmon* Plaintiffs cannot establish irreparable harm. Construction will begin with 2–3 months of excavation, followed by 4–5 months of foundation work, Dkt. 74-1 at 7. Plaintiffs are concerned that "construction activities will interfere with . . . the currently unobstructed vista" before construction is complete, Dkt. 115-1 at 16–17, but a minimum of six months separates the beginning of construction and the arrival of any tower cranes, *see* Dkt. 74-1 at 7. These Plaintiffs' claims have already been extensively briefed on cross-motions for summary judgment. *See* Dkts. 36, 44. The court will be able to resolve the merits well before any harm to the *Lemmon* Plaintiffs arises, obviating the need for a preliminary injunction.

The *Lemmon* Plaintiffs argue that the government is not going to adhere to this timeline, suggesting that Defendants will "try to outrun final judgment." Dkt. 115-1 at 16. But there are limits on what Defendants can physically accomplish. The six-to-eight months needed for excavation and foundation work assumes work will occur for twenty hours per day for the duration of the construction period. Dkt. 74-1 at 10. The phases identified in the Revised EA are sequential; work cannot begin on the Arch's structural components until the foundation system is complete. *Id.* at 7. There is little room to compress that schedule further.

The *Lemmon* Plaintiffs argue that even the "excavation, drilling, and foundation construction" will "degrade [their] personal experiences." Dkt. 115-1 at 16. But the EA evaluated the noise levels that will result from construction, focusing on pile driving during the early stages of the project, and determined that the use of a noise blanket will "limit[] the potential for adverse acoustic impacts." Dkt. 74-1 at 63. The noise blanket is a mandatory component of the project. *Id.* at 10. With the noise blanket in place, construction noise will not exceed fifty-seven decibels across most of the Cemetery, including at the Tomb of the Unknown Soldier and in the areas where most

interments are expected to occur. *Id.* at 65–66. This level of noise is lower than typical ambient noise levels from traffic and aircraft overflights. *Id.* at 61–62. Although a "limited number of small, discrete locations within the cemetery" may experience more noise, *id.* at 66, the *Lemmon* Plaintiffs have not indicated that they visit any of those locations. The *Lemmon* Plaintiffs do not bring a NEPA claim or otherwise challenge the sufficiency of the EA's noise analysis. Absent some explanation for how the construction noise will affect them, they cannot identify irreparable harm from the early stages of construction.

**B. DC/VA Plaintiffs**

Even if the court agrees that traffic congestion may increase because of Arch construction, the DC/VA Plaintiffs have not shown that they are certain to suffer irreparable harm as a result. Only Defendants, not Plaintiffs, have conducted a full traffic analysis. That analysis shows that queueing and delays during construction would be limited and would not result in significant congestion. Revised EA at B-34, Dkt. 74-1. That analysis also concluded that any added traffic in Memorial Circle will not result in delays to emergency vehicles. *Id.* at A-3. Plaintiffs challenge various aspects of Defendants' analysis, but have not shown that they are "certain" to suffer "great" irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2007). Any lane closures or other traffic-pattern changes can be quickly undone if Plaintiffs prevail on the merits, so they also have not shown that any harms are "beyond remediation." *Id.*

DC/VA Plaintiffs' emergency-planning injury likewise does not establish irreparable harm requiring a preliminary injunction. Many of these harms do not belong to the District or Virginia at all; the loss of the medevac site is the Park Police's concern, and the Park Police has already responded by identifying alternate medevac sites. Revised EA at A-3, Dkt. 74-1. Any threat to aviation is the FAA's responsibility, and the FAA has already issued its no-hazard determination.

And as explained above, no cranes will be used at the project for the first six to eight months of work, providing the Court ample time to resolve the merits before the harm materializes.

DC/VA Plaintiffs are left with their planning costs, but this harm—essentially the same planning they had to do during the 2018–2020 closure of the same site—is not "serious in terms of its effect on the plaintiff" and therefore not sufficiently "significant" to warrant preliminary injunctive relief. *California Ass'n of Private Postsecondary Schools v. DeVos*, 1344 F. Supp. 3d 158, 170 (D.D.C. 2018) (quoting *Gulf Oil Corp. v. Department of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)). "[A]n asserted 'economic harm' must 'be significant, even where it is irretrievable because a defendant has sovereign immunity.'" *Id.* (quoting *Air Transport Ass'n of Am., Inc. v. Export-Import Bank*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012)). The District's own declarant estimates planning will require 200 to 500 cumulative staff hours across all District agencies—or roughly 0.1 to 0.25 full-time positions. Harvin Decl. ¶ 14. Virginia does not offer any estimate of its planning costs, and the District does not explain how this use of staff time could affect its existing priorities. *Cf.* Kershbaum Decl. ¶ 32 (observing vaguely that staff time would otherwise be used for "other statutory mandates"). The District's Homeland Security and Emergency Management Agency 2027 budget includes funding for 120 full-time employees.[17] *See* Ex. F, Homeland Sec. & Emergency Mgmt. Agency, *FY 2027 Approved Budget and Financial Plan* at C-67. Considered "in proportion to the plaintiff's operations," *Gulf Oil*, 514 F. Supp. at 1025, an additional 0.1–0.25 employees is not the "great" or even "significant" harm required for a preliminary injunction.

---

[17] https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/bn0_hsema_chapter_2027a_1.pdf

Finally, the District claims irreparable environmental harm will occur if the project goes forward. But like any other harm, environmental harm must be "likely" to justify a preliminary injunction. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Interior's Decision Record requires the installation of "silt fences or mulch socks along all site fencing to prevent runoff," a "sediment treatment tank" to manage any water on site, "inlet protection devices" on storm drains in the work zone, and a concrete apron and stone track at site access points to ensure sediments are not carried out of the site on truck tires. Decision Record at 7. With these measures in place, construction "will not result in impairment" of any water resources. *Id.* at C-7. Plaintiffs have put forward no evidence demonstrating that these measures are likely to be insufficient or suggesting that runoff will in any way alter water quality in the Potomac. Interior also determined that construction "equipment use and vehicle trips would not significantly affect regional air quality," FONSI at 17, Dkt. 109-2, and DC/VA Plaintiffs have put forward no evidence on this point either.

## V. The Public Interest Weighs Against Injunctive Relief.

Because Plaintiffs have not demonstrated likelihood of success on the merits or imminent irreparable injury, the Court need not consider the final two factors of the *Winter* standard. But these factors also tilt heavily against a temporary restraining order. In assessing these factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest is the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

1. Plaintiffs tellingly provide no argument as to why a preliminary injunction would serve the public interest, instead resting on their likelihood of success on the merits. *See* DC/VA Br. 20–21 (discussing "noise disturbances," threatened water quality and "disrupt[ion of] the historic viewshed"); *Lemmon* Br. 17–19. But nothing in Plaintiffs' brief supports an assertion that any of these alleged "public harms" will occur, let alone threaten the public interest within the time to decide this action on the merits.

Conversely, the "inability to enforce its duly enacted plans clearly inflicts irreparable harm" on the government. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). And the government is always "likely to suffer irreparable harm" when courts enter "injunctions that likely exceed the authority conferred" to them. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025).

2. Entry of a preliminary injunction here would be particularly damaging to the public interest. As the declarations proffered from the Departments of War and Homeland Security describe, the Arch represents an "opportunity to mitigate" evolving threats from the proliferation of small, unmanned aircraft systems (UAS). Hegseth Decl. ¶ 10; Mullin Decl. ¶ 18 (the Arch "would, when properly equipped, provide an opportunity to substantially expand UAS detection"). The agencies are currently in the planning process for how to integrate such capabilities into the existing design of the Arch. Ex. A, ¶ 4; Ex. B, ¶ 4. This planning process is based on the current proposed location and height for the Arch. *See* Hegseth Decl. ¶¶ 11–12; Mullin Decl. ¶¶ 14–15; Ex. A, Buria Decl., ¶ 3; Ex. B, Willoughby Decl., ¶ 3.

An injunction would forestall the opportunity for these significant national security benefits and prohibit the government from taking important steps to mitigate an ever-growing threat to the Nation's capital. *Winter*, 555 U.S. at 33 (vacating preliminary injunction when it could jeopardize national security); *NPS*, 609 U.S. at 1075 (similarly staying preliminary injunction); *Stagg P.C. v.*

*U.S. Dep't of State*, 673 F. App'x 93, 96 (2d Cir. 2016) (affirming denial of preliminary injunction when public interest in maintaining national security weighed against plaintiff's claimed harm); *Church v. Biden*, 573 F. Supp. 3d 118, 147-148 (D.D.C. 2021) (denying motion for preliminary injunction where public interest in military readiness outweighed plaintiffs' claims of harm). These significant national defense concerns "plainly outweigh" Plaintiffs' asserted interests. *See Winter*, 555 U.S. at 25–26. Because the "harms and equities are not nearly in equipoise," no injunction can issue. *NPS*, 609 U.S. at 1075.

## VI. Relief Should Be Narrowly Tailored

Any preliminary relief must be limited to restricting construction activities at or within the immediate vicinity of Memorial Circle. "An injunction must be narrowly tailored to remedy the specific harm shown." *Nebraska Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (vacating overbroad injunctive relief). "The need for narrow tailoring, moreover, is particularly important in the context of preliminary injunction . . . where the court has yet finally to resolve the merits of the dispute." *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015), *aff'd sub nom. United States Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017). Here, Plaintiffs' alleged harms are tied only to construction activity at or within the immediate vicinity of Memorial Circle. Accordingly, any preliminary relief, at minimum, must be tailored to address only those harms. And the government should be free to otherwise keep planning and preparing without burdensome notice requirements unrelated to the requested relief.

## VII. Motion for a Stay Pending Appeal

If the Court nonetheless grants a preliminary injunction, Defendants intend to appeal and seek a stay pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2). Pursuant to

Rule 8(a)(1), Defendants therefore request that if the Court grants a preliminary injunction, it stay or delay implementation of that order pending a decision from the D.C. Circuit on Defendants' appeal.

The Court should stay its order pending appeal because each of the three stay factors weighs in favor of Defendants. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (three factors govern the stay determination: likelihood of success on appeal, irreparable injury to the United States, and the combined balancing of harms and the public interest). First, as demonstrated above, Defendants are likely to succeed on the merits. Construction of a structure within Memorial Circle is authorized by two statutes and does not contravene any others. *See supra* 31–59. Moreover, NPS complied with applicable procedures and issued a reasoned decision based on the evidence before the agency. *See supra* 8–10. Second, the proposed injunction constitutes an imminent, ongoing injury to the Executive Branch. *See Trump*, 609 U.S. at 1041. The government is always "likely to suffer irreparable harm" when courts enter "injunctions that likely exceed the authority conferred" to them. *CASA, Inc.*, 606 U.S. at 860. The preliminary injunction could impede further study and planning related to national security against technology that seeks to outpace our nation's vigilance. By contrast, Plaintiff will not suffer from a stay pending appeal because they have not identified an imminent, concrete harm—from changes in traffic patterns or flight paths or impacts on viewsheds or environmental harms. And the DC/VA Plaintiffs planning concerns are non-concrete administrative burdens.

Third, the requested preliminary injunction improperly intrudes upon the province of the Executive Branch without conveying any benefit to the public. *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 464 (1972). Congress authorized the construction of monumental columns "surmounted by statues" on Columbia Island. Bridge Commission Report 41. Over a

century later, that mandate remains unfulfilled. The equities weigh in favor of carrying out Congress's mandate.

The merits weigh against enjoining the Arch, but if the Court grants an injunction, relief should be stayed pending appeal. At a minimum, the Court should stay any injunction for thirty days to allow the D.C. Circuit adequate time to consider the complicated issues and historical statutes at hand.

## CONCLUSION

Because Plaintiffs have failed at every step to meet their burden of showing their entitlement to a preliminary injunction, the Court must deny their motion. The government has the authority to build the two columns. They were approved long ago by statute, including language expressly authorizing the government to make design changes "as in its discretion may be found to be necessary or advisable." Therefore, the government has the authority to build a Military Triumphal Arch, something which will help fortify Washington, D.C. and the surrounding area and will represent a beautification of D.C. that should not be forfeited. Scores of cities around the world have Triumphal Arches, and Washington, D.C. should have one. The Nation deserves an Arch that inspires its Successes and Triumphs.

Date: November 16, 2026.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BENJAMIN HAYES
Deputy Assistant Attorney General

*<u>/s/ Michael S. Sawyer</u>*
MICHAEL S. SAWYER, Senior Attorney
ALISON S. VICKS, Trial Attorney
Energy and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-353-5134
E-mail: michael.sawyer@usdoj.gov
alison.vicks@usdoj.gov

*Counsel for Defendants*