**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL LEMMON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Civil Action No. 26-cv-544 (TSC) |
| DISTRICT OF COLUMBIA and COMMONWEALTH OF VIRGINIA,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL PARK SERVICE, et al.,<br><br>Defendants. | Civil Action No. 26-cv-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

# REPLY IN SUPPORT OF LEMMON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Nicolas Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs Michael Lemmon, et al.*

November 18, 2026

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ..................................................................................... 1

ARGUMENT ..................................................................................... 2

I. The Lemmon Plaintiffs have standing. ..................................................................................... 2

A. The Lemmon Plaintiffs have shown concrete, particularized aesthetic injury. ............ 3

B. The Lemmon Plaintiffs' injury was not speculative at the time they filed suit and is undisputedly not speculative now. ..................................................................................... 6

II. The Lemmon Plaintiffs are within the zone of interests of Section 8106 and the Commemorative Works Act. ..................................................................................... 9

III. The Lemmon Plaintiffs are likely to succeed on their claims that the challenged actions are contrary to law. ..................................................................................... 11

A. Construction of the arch violates the Commemorative Works Act. .......................... 11

B. Construction of the arch violates Section 8106. ....................................................... 18

IV. The remaining preliminary injunction factors favor the Lemmon Plaintiffs. .................. 21

V. The requested relief is appropriately tailored. ............................................................ 24

VI. Defendants' request for a stay pending appeal is unreasonable and premature. ............. 24

CONCLUSION ..................................................................................... 25

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Center for Biological Diversity v. United States Fish & Wildlife Service*,
146 F.4th 1144 (D.C. Cir. 2025) ........ 4

*CSL Plasma Inc. v. United States Customs & Border Protection*,
33 F.4th 584 (D.C. Cir. 2022) ........ 11

*D.C. Preservation League v. Department of the Interior*,
— F. Supp. 3d —, 2026 WL 3210227 (D.D.C. Oct. 26, 2026) ........ 22

*Food & Drug Administration v. R.J. Reynolds Vapor Co.*,
606 U.S. 226 (2025) ........ 9, 10

*Grupo Dataflux v. Atlas Global Group, L.P.*,
541 U.S. 567 (2004) ........ 8

*Heating, Air Conditioning & Refrigeration Distributors International v. Environmental Protection Agency*,
71 F.4th 59 (D.C. Cir. 2023) ........ 16, 17

*Howard R.L. Cook & Tommy Shaw Foundation for Black Employees of the Library of Congress, Inc. v. Billington*,
737 F.3d 767 (D.C. Cir. 2013) ........ 10

*International Dark-Sky Ass'n, Inc. v. Federal Communications Commission*,
106 F.4th 1206 (D.C. Cir. 2024) ........ 5

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) ........ 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 3

*National Ass'n of the Deaf v. Trump*,
808 F. Supp. 3d 150 (D.D.C. 2025) ........ 25

*National Park Service v. National Trust for Historic Preservation in the United States*,
609 U.S. 1068 (2026) ........ 5, 22

*National Trust for Historic Preservation in the United States v. National Park Service*,
185 F.4th 1185 (D.C. Cir. 2026) ........ 18, 20

*Occidental Petroleum Corp. v. Securities & Exchange Commission*,
873 F.2d 325 (D.C. Cir. 1989) ........ 21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 17

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U.S. 477 (1989) .......... 9

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) .......... 8

*Sierra Club v. Morton*,
405 U.S. 727 (1972) .......... 5

*Trump v. California*,
609 U.S. 1032 (2026) .......... 8

*United States v. Torres*,
115 F.3d 1033 (D.C. Cir. 1997) .......... 9

**Statutes**

16 U.S.C. § 451 (1912) .......... 18

40 U.S.C. § 8106 .......... 10, 18

40 U.S.C. § 8901(1) .......... 11

40 U.S.C. § 8901(4)(A) .......... 11

40 U.S.C. § 8902(a)(1) .......... 12, 13

40 U.S.C. § 8902(b) .......... 13

40 U.S.C. § 8903(a)(1) .......... 11, 17

54 U.S.C. § 100101(a) .......... 16

Act of February 24, 1925,
Pub. L. No. 68-463, 43 Stat. 974 .......... 13, 14, 15

Act of August 21, 2002,
Pub. L. No. 107-217, 116 Stat. 1062 .......... 19

Department of the Interior and Related Agencies Appropriations Act,
Pub. L. No. 101-512, 104 Stat. 1915 (Nov. 5, 1990) .......... 20

Interior Department Appropriation Act,
Pub. L. No. 80-841, 62 Stat. 1112 (June 29, 1948) .......... 20

## INTRODUCTION

In opposing the motion for a preliminary injunction filed by Plaintiffs Michael Lemmon, Shaun Byrnes, Jon Gundersen, and Calder Loth (Lemmon Plaintiffs), Defendants trot out a series of arguments they have made multiple times before. This Court rejected several of these arguments just two weeks ago, when it issued a temporary restraining order barring Defendants from proceeding with their plan to build an unauthorized triumphal arch in Memorial Circle until November 19. This Court should again reject Defendants' arguments and grant the motion for a preliminary injunction to forestall construction during the pendency of this litigation.

Defendants start by challenging the Lemmon Plaintiffs' standing, but they ignore a long line of precedent establishing that the concrete and particularized aesthetic injuries that the Lemmon Plaintiffs assert here are cognizable harms capable of supporting Article III standing. And in arguing that the risk of such injury was speculative at the time the Lemmon Plaintiffs filed suit, Defendants distort the case's factual record and improperly diminish the significance of intervening events that confirm that the risk was always real.

On the merits, Defendants offer no basis for this Court to second-guess its prior holding that the construction authorization issued by Defendants National Park Service (NPS) and U.S. Department of the Interior on November 5, 2026, likely violates the Commemorative Works Act (CWA). What is more, 40 U.S.C. § 8106—which prohibits erecting structures on federal parkland in the District of Columbia absent express congressional authorization—forms an independent basis for holding the authorization contrary to law. Unable to harmonize their actions with Section 8106's clear text, Defendants advance a series of arguments as to why Section 8106 should be read to contain an unwritten exception for NPS construction projects. The D.C. Circuit, though, has rejected those arguments, and rightly so.

Finally, Defendants' latest filing casts no doubt on this Court's determination that the balance of the equities tips against them. Defendants do not deny that, absent an injunction, they plan to blaze ahead as quickly as possible with a construction project that will transform the monumental core of the Nation's capital and irreparably degrade the solemnity of the Lemmon Plaintiffs' visits to the gravesites at Arlington National Cemetery. On the other side of the scale, Defendants identify no concrete harm that an injunction will inflict. Although Defendants allude vaguely to national security functions that the arch could theoretically fulfill, Defendants' own evidence establishes that no such functions are currently planned.

This Court should grant the Lemmon Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

### I. The Lemmon Plaintiffs have standing.

In challenging the Lemmon Plaintiffs' standing, Defendants do not dispute that construction of a large arch in Memorial Circle will "detract from the broader commemorative landscape" of the area and "modify one of the most important designed views associated with the Arlington House Cultural Landscape: the axial relationship intentionally established between the Arlington House portico and the Lincoln Memorial." NPS, *Triumphal Arch at Memorial Circle: Revised Environmental Assessment* (Oct. 9, 2026) (NPS, *Env't Assessment*), ECF 74-1, at 22, 42. Defendants do not dispute that each of the Lemmon Plaintiffs regularly visits, admires, and derives profound personal meaning from the existing commemorative landscape in and around Arlington National Cemetery—including the unobstructed view between Arlington House and the Lincoln Memorial. *See* Pls. Memo. in Support of Pls. Mot. for Prelim. Inj. (Pls. Memo.), ECF 115-1, at 7–8 & 8 n.3 (citing testimony). And Defendants do not dispute that "construction of an arch in Memorial Circle will irreparably degrade [the Lemmon Plaintiffs'] aesthetic experience of the

area," *id.* at 8, that this aesthetic injury is traceable to Defendants' challenged actions, and that the injunctive relief sought in this case will redress that injury.

Defendants instead argue that the Lemmon Plaintiffs' undisputed injuries are not cognizable for purposes of Article III, Defs. Opp. to Pls. Mot. for Prelim. Inj. (Defs. Opp.), ECF 127, at 13–15, and that these injuries were speculative when the Lemmon Plaintiffs filed suit in February 2026, *id.* at 28–31. Neither of these arguments has merit.

### A. The Lemmon Plaintiffs have shown concrete, particularized aesthetic injury.

Defendants' argument that the undisputed aesthetic degradation that the arch will work on the Lemmon Plaintiffs' future visits to Arlington National Cemetery "is not an Article III injury," Defs. Opp. 15, is foreclosed by reams of Supreme Court and D.C. Circuit precedent. *See* Pls. Memo. 8–9 (citing cases). As the case law firmly establishes, "the desire to … observe" a particular phenomenon, "even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992). Defendants ignore this principle and the long line of cases that have applied it.

Defendants instead mischaracterize the Lemmon Plaintiffs' injury as "offense at the perceived meaning of the Arch." Defs. Opp. 13. But the Lemmon Plaintiffs have consistently explained that their injury derives from the imposition of a massive new obtrusion into a landscape that they cherish in its current form. *See, e.g.*, Oct. 30, 2026, Hearing Tr. 24 (Michael Lemmon's testimony that introducing a "250-foot monstrous edifice" into the landscape, "looming over and dominating it," would "change[] the entire experience" of visiting Arlington National Cemetery "in a profoundly negative way"); Lemmon Decl., ECF 7-2, ¶ 8 (explaining that the arch "will interrupt" the unobstructed view between the Lincoln Memorial and Arlington National Cemetery); Byrnes Decl., ECF 7-3, ¶ 10 (explaining that the arch "will obstruct the clear line-of-

sight view of the Lincoln Memorial and other monuments … from the cemetery"); Gundersen Decl., ECF 7-4, ¶ 8 (explaining that the arch "will profoundly diminish my enjoyment of the view from Arlington National Cemetery"); Loth Decl., ECF 7-5, ¶ 8 (expressing concern that, once the arch is built, "Arlington House will no longer be visible from Washington, DC, destroying [the] view"). Although some of the Lemmon Plaintiffs have *also* expressed misgivings about the arch's symbolism, *see* Defs. Opp. 14, these misgivings do not detract from their unrebutted testimony that the construction of a massive new tourist attraction in Memorial Circle—whatever its purpose—will degrade the quality of their future visits to Arlington National Cemetery.

Defendants are thus wrong to state that the Lemmon Plaintiffs "do not allege that they will be 'forced … to abandon' using the Cemetery 'as they had in the past.'" *Id.* (omission in original; quoting *NPS v. Nat'l Trust for Historic Pres. in the U.S.*, 609 U.S. 1068, 1072 (2026) (per curiam)). To start, two of the Lemmon Plaintiffs may "abandon" their plans to be interred at Arlington National Cemetery if the arch is constructed. *See* Lemmon Decl. ¶ 9; Byrnes Decl. ¶ 12. Moreover, the Lemmon Plaintiffs have testified that, on their visits to Arlington National Cemetery, they "revel in the uninterrupted and inspiring view of the Lincoln Memorial," Lemmon Decl. ¶ 6, "look out over the beautiful and uninterrupted view of the Lincoln Memorial," Byrnes Decl. ¶ 9, "look[] out from the cemetery at the inspiring view of the Lincoln Memorial," Gundersen Decl. ¶ 6, and "view[] and photograph[] the reciprocal views between the Lincoln Memorial and Arlington National Cemetery," Loth Decl. ¶ 7. Again, Defendants' own findings establish that the arch will destroy that view. *See* NPS, *Env't Assessment* at 42. This injury to the Lemmon Plaintiffs' use of the area is cognizable for purposes of Article III. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1158 (D.C. Cir. 2025) (finding standing where the defendants' challenged action diminished a declarant's opportunity to "see and enjoy" a beetle

species "in its natural habitat"); *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (finding standing based on testimony that "the negative effects of light pollution" would adversely affect the declarant's "personal interest in viewing the night sky").

Defendants' reliance on the Supreme Court's interim order in *National Park Service v. National Trust for Historic Preservation in the United States*, 609 U.S. 1068 (2026) (per curiam), is misplaced. The *National Park Service* decision did not purport to overrule or modify the aesthetic-standing precedents that the Lemmon Plaintiffs have cited and that Defendants do not address. To the contrary, *National Park Service* reaffirmed that "the 'desire to … observe'" a particular phenomenon, "'even for purely esthetic purposes,' can constitute 'a cognizable interest for purpose of standing.'" *Id.* at 1072 (omission in original; quoting *Lujan*, 504 U.S. at 562–63).

Moreover, in *National Park Service*, the Court understood the injury asserted by the plaintiff to be based on "distaste[]" for "the government's design" of a new White House ballroom. *Id.* at 1070. As the Court explained, "mere offense, disagreement, or distaste does not qualify as a concrete and particularized injury under Article III," *id.* at 1071: a cognizable aesthetic harm "involve[s] *more* than mere offense," *id.* at 1072. Again, the Lemmon Plaintiffs' injury is not based on "distaste" for the arch's particular design but on the adverse impact that the arch will have on a historic viewshed that the Lemmon Plaintiffs regularly visit and admire and plan to continue visiting and admiring, and on their experience visiting the gravesites of fallen comrades. The degradation that the arch will work to the Lemmon Plaintiffs' future visits to Arlington National Cemetery is precisely the sort of concrete, particularized injury that supports standing under the Supreme Court's precedents. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (observing that an aesthetic injury is concrete and particularized where a plaintiff "use[s]" a particular area "in a[ ] way that would be significantly affected by the proposed actions of the [defendants]").

To be sure, as Defendants point out, the declarant in *National Park Service* "visit[ed] the neighborhood around the White House." Defs. Opp. 15 (alteration in original; quoting *NPS*, 609 U.S. at 1070). The Court, however, did not describe the declarant as regularly engaging in any use of the existing landscape that was incompatible with the challenged construction. Here, in contrast, the Lemmon Plaintiffs seek to halt the irrevocable transformation of a landscape from which they each derive profound personal meaning and solace. *See, e.g.*, Oct. 30, 2026, Hearing Tr. 24 (Michael Lemmon's testimony about how admiring the unobstructed view from the Lincoln Memorial to Arlington National Cemetery, "where so many of [his] brothers are buried," causes "the hurt, the anger, the pain, [and] the trauma" from his combat experience to "recede").

**B. The Lemmon Plaintiffs' injury was not speculative at the time they filed suit and is undisputedly not speculative now.**

Defendants do not dispute the Lemmon Plaintiffs' showing of "a substantial risk—indeed, a practical certainty—that the threatened harm" from Defendants' actions "will materialize absent judicial relief." Pls. Memo. 9. Rather, Defendants claim that jurisdiction is lacking because, irrespective of the fact that the Lemmon Plaintiffs undisputedly face a substantial risk of injury, that injury was supposedly speculative at the time that the Lemmon Plaintiffs filed suit in February 2026. *See* Defs. Opp. 28–31. Defendants' argument is both wrong and legally irrelevant.

**1.** To begin, Defendants are incorrect that the Lemmon Plaintiffs' injury was speculative in February 2026. The Lemmon Plaintiffs' original complaint challenges Defendants' decision to build an arch in Memorial Circle—a settled decision that Defendants repeatedly announced to the American people starting in October 2025. *See* Compl., ECF 1, ¶¶ 29–40. By the time the complaint was filed, Defendants had determined where the arch would be built, *id.* ¶ 30, had decided that it would be sizeable, *id.* ¶ 32, had begun to develop designs, *id.* ¶ 35, and had retained an architect to construct the arch, *id.* ¶ 37. Subsequent events have confirmed that the decision to

build a massive arch in Memorial Circle was never a point in question. Although Defendants received evidence of overwhelming public opposition to the arch and of the adverse impacts that the arch will have on large numbers of surrounding historic properties, *see* Proposed Suppl. Compl., ECF 112-2, ¶¶ 15–16, 18, 24, 26–29, 31–34, they refused to consider any alternative sites or designs that might mitigate these adverse impacts, *see id.* ¶¶ 17, 23, 25, 29, 35–37.

Accordingly, it is irrelevant that the Lemmon Plaintiffs' suit "predated" certain procedural steps that Defendants took to obtain approvals for specific design and building plans in preparation for the issuance by NPS and the Department of the Interior of a November 5, 2026, authorization for construction to begin in accordance with those plans. Defs. Opp. 28. The Lemmon Plaintiffs' original claims did not challenge—and could not have challenged—that authorization.[1] Instead, they challenged Defendants' decision to build a massive arch of *any* design in Memorial Circle. That decision was made prior to February 2026, and there was a substantial risk that, absent judicial intervention, Defendants would act swiftly to implement that decision, exactly as they repeatedly announced that they would do (and exactly as they in fact have done).

Nor is it relevant that the Lemmon Plaintiffs could not at the time of filing predict precisely when the challenged decision would be effectuated. Although Defendants fault the Lemmon Plaintiffs for crediting Defendants' statements that Defendants planned to break ground on the

[1] Contrary to Defendants' contention, the fact that the Lemmon Plaintiffs now assert supplemental claims challenging the November 5 authorization is not an "admi[ssion] that they had a path to meaningful judicial review all along" by waiting to challenge the arch until after that authorization had issued. Defs. Opp. 31. The Lemmon Plaintiffs' challenge to a discrete final agency action approving a particular design and building plan to implement the "decision to build an arch in Memorial Circle absent congressional authorization" does not obviate their claims challenging that ultra vires and unconstitutional decision. Pls. Memo. in Support of Pls. Mot. for Leave to File Suppl. Compl., ECF 112-1, at 5. And because the Lemmon Plaintiffs assert injury from the construction of a large arch in Memorial Circle, regardless of the particular design, "[a] judicial ruling on [those claims] remains crucial to provide complete relief to the Lemmon Plaintiffs." *Id.*

arch by July 4, 2026, *see* Defs. Opp. 28, Defendants do not rebut the Lemmon Plaintiffs' showing of a substantial risk that Defendants planned to break ground as quickly as possible. The fact that Defendants were delayed by four months, *see* Notice, ECF 63 (stating that Defendants were preparing to break ground on November 5, "immediately" after obtaining approval of their final building plans), hardly suggests that the Lemmon Plaintiffs' risk of injury was ever speculative.

**2.** Moreover, regardless of the imminence of the Lemmon Plaintiffs' injury in February 2026, the Lemmon Plaintiffs have sought leave to file a supplemental complaint that removes any conceivable doubt that their injuries are now certainly impending absent judicial relief. And as the D.C. Circuit held in *Scahill v. District of Columbia*, 909 F.3d 1177 (D.C. Cir. 2018), "a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint." *Id.* at 1184; *see* Defs. Opp. 30 (conceding that a supplemental complaint is a "proper vehicle to allege post-filing factual developments"). Defendants do not (and could not) dispute that their construction of an arch in Memorial Circle is imminent today.

Defendants contend that *Scahill* is "no longer good law" because the Supreme Court's interim order in *Trump v. California*, 609 U.S. 1032 (2026) (per curiam), "reaffirmed" that standing is usually assessed at the time a case is filed. Defs. Opp. 30.[2] The general rule restated in *California*, however, long predated *Scahill*, *see Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 582 (2004) (stating that the "time-of-filing rule … has a pedigree of almost two centuries"), and was known to the D.C. Circuit at the time, *see Scahill*, 909 F.3d at 1183 (noting that some courts had applied the time-of-filing rule to hold that "subsequent events" cannot cure a

[2] Alternatively, Defendants argue that *Scahill*'s holding should "not [be] extended to standing." Defs. Opp. 30. *Scahill*'s holding, though, explicitly addressed standing. *See Scahill*, 909 F.3d at 1184 ("[W]e hold that a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint.").

"standing deficiency" that existed at the time a lawsuit was filed, but disagreeing with those courts). Moreover, *California* does not address the issue resolved in *Scahill*—the jurisdictional effect of a supplemental complaint—and casts no doubt on *Scahill*'s resolution of that issue. *Scahill* thus binds this Court. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (stating that, "[i]f a precedent … has direct application in a case," even if it "appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the appellate court] the prerogative of overruling its own decisions"); *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("[D]istrict judges, like [D.C. Circuit] panels[,] … are obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule[s] it.").

## II. The Lemmon Plaintiffs are within the zone of interests of Section 8106 and the Commemorative Works Act.

Defendants contend that the Lemmon Plaintiffs cannot pursue claims challenging Defendants' actions as contrary to law under the Administrative Procedure Act (APA) because the Lemmon Plaintiffs "fall outside the zone of interest of the statutes" that Defendants' actions contravene: Section 8106 and the CWA. Defs. Opp. 23. Defendants are wrong. The Supreme Court has interpreted the zone-of-interests requirement "broadly, as covering anyone even '*arguably* within the zone of interests to be protected or regulated by the statute … in question.'" *FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 232–33 (2025) (emphasis and omission in original; quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). This "inquiry is 'not especially demanding,'" *id.* at 233 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)), and it is satisfied "unless [the plaintiff's] 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit,'" *id.* (quoting *Clarke v. Sec.*

*Indus. Ass'n*, 479 U.S. 388, 399 (1987)). The Lemmon Plaintiffs easily satisfy this "low bar." *Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Library of Cong., Inc. v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013).

The Lemmon Plaintiffs, whose intensely personal experience of public grounds in and around Washington, DC, will be degraded by the construction of an unauthorized structure, clearly fall within the zone of interests of Section 8106, which bars constructing "[a] building or structure … on any … public grounds of the Federal Government in the District of Columbia without express authority of Congress." Defendants make the conclusory assertion that the Lemmon Plaintiffs' "aesthetic harms" are unrelated to the statute's purpose, which Defendants characterize as "preserv[ing] Congress's control over buildings on federal land in the District." Defs. Opp. 24. Congress maintains such control, however, not for the purpose of asserting authority for authority's sake, but for the benefit of the People. And Defendants do not explain why the Lemmon Plaintiffs' injuries—which arise from Defendants' usurpation of the congressional control that Defendants admit Section 8106 guarantees—are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended" for those injuries to be redressed through the APA. *R.J. Reynolds*, 606 U.S. at 233 (quoting *Clarke*, 479 U.S. at 399). Further, whether the Lemmon Plaintiffs' injuries would "exist in exactly the same form" were Congress to authorize the arch is not relevant to the zone-of-interests inquiry. Defs. Opp. 24. That Defendants could *legally* inflict injury on the Lemmon Plaintiffs on a different, hypothetical set of facts is no reason to doubt that the Lemmon Plaintiffs fall within the zone of interests of the statute that makes the infliction of injury *illegal* on the facts here.

As for the CWA, although Defendants state that "[a]ll Plaintiffs fall outside [its] zone of interests," *id.* at 23, Defendants' arguments address only the District of Columbia and Virginia,

not the Lemmon Plaintiffs, *see id.* at 25 (arguing that "[t]he District and Virginia's traffic, emergency services, and stormwater injuries," which are distinct from the Lemmon Plaintiffs' aesthetic injuries, "fall outside the zone of interests of the Commemorative Works Act"). Defendants have thus forfeited any argument with respect to the Lemmon Plaintiffs. *See CSL Plasma Inc. v. CBP*, 33 F.4th 584, 588 (D.C. Cir. 2022) (explaining that the zone-of-interests requirement is not jurisdictional and so must be raised by the government). In any event, redressing the Lemmon Plaintiffs' aesthetic injury is plainly consistent with the CWA's express purposes, which include "preserv[ing] the integrity of the comprehensive design of … the Nation's Capital," 40 U.S.C. § 8901(1), and ensuring that commemorative works in areas that include Memorial Circle "are appropriately designed, constructed, and located," *id.* § 8901(4)(A).

## III. The Lemmon Plaintiffs are likely to succeed on their claims that the challenged actions are contrary to law.

### A. Construction of the arch violates the Commemorative Works Act.

This Court has already held that Defendants' actions likely violate the CWA, *see* Mem. Op., ECF 111, at 20, which provides a mandatory process for constructing commemorative works on NPS land in Washington, DC—a process that starts with "specific[]" congressional authorization, 40 U.S.C. § 8903(a)(1). Defendants do not dispute that they have not complied with the CWA's requirements. Rather, they contend that those requirements do not apply. Defs. Opp. 37–39. Defendants' arguments, which this Court has rejected, Mem. Op. 20–25, remain meritless.

**1.** Defendants first maintain that the arch does not fall within the CWA's definition of a commemorative work that is subject to the Act's requirements because it is not "designed to perpetuate in a permanent manner the memory of an … event or other significant element of American history." Defs. Opp. 37 (omission in original; quoting 40 U.S.C. § 8902(a)(1)). Defendants, however, admit that "official documents note that the Arch … commemorates the

[Nation's] 250th anniversary," *id.* at 38, and they do not dispute that the anniversary is an "event or other significant element of American history," 40 U.S.C. § 8902(a)(1). What is more, Defendants have repeatedly proclaimed the arch's commemorative purpose. *See, e.g.*, NPS, *Env't Assessment* at 1 (stating that the "[t]he purpose" of the arch "is to celebrate 250 years of American independence"); U.S. Triumphal Arch Found., *The Military Triumphal Arch*, ECF 117-11, at 1 (stating that "[t]he United States Military Triumphal Arch celebrates America's first 250 years"); CBS News, *Leavitt Discusses "Arc de Trump" at White House Briefing* (YouTube, Apr. 15, 2026) (statement from White House spokesperson that the arch is "a fitting way to commemorate the 250th anniversary of American independence").[3] Indeed, while Defendants urge this Court to "look to the decision document" issued by NPS and the Department of the Interior "to determine the primary purposes of the Arch," Defs. Opp. 38, that document identifies "celebrating the 250th anniversary of the United States" as one of the arch's essential "purposes." NPS, *Decision Record* (Nov. 5, 2026) (NPS, *Decision Record*), ECF 109-1, at 16; *see* Mem. Op. 22 (finding it "likely the Arch was primarily designed to perpetuate the memory of the Nation's independence and founding principles" and so falls within the CWA's definition of a commemorative work).

Defendants assert that the arch is also intended to serve the "forward-looking purpose" of "perpetuat[ing] American greatness," Defs. Opp. 38, but commemorative works typically prompt reflection on broader themes. *See, e.g.*, NPS, *Washington Monument* (last updated Dec. 24, 2025) (describing the Washington Monument as a "tribute to the nation's first president" and a symbol of "the strength and unity of the nation");[4] NPS, *Vietnam Veterans Memorial* (last updated Jan. 27, 2026) (explaining that the Vietnam Veterans Memorial not only "honors the service and sacrifice

---

[3] https://www.youtube.com/watch?v=cdSGqqrCzCo.

[4] https://www.nps.gov/places/000/washington-monument.htm.

of the more than three million Americans who served in the Vietnam War" but also reinforces how "the war's legacy continues to shape those who remember it").[5] And although Defendants emphasize that the CWA does not apply to "a structure which is primarily used for … purposes" other than commemoration, Defs. Opp. 38 (quoting 40 U.S.C. § 8902(a)(1)), Defendants do not identify a way that the arch will be primarily "used" as anything other than a commemorative monument.[6] Defendants' statement that the arch will be used as "an inspiring ceremonial gateway to Washington, D.C.," *id.* (quoting NPS, *Decision Record* at 1), is entirely consistent with the arch's function of "perpetuat[ing] in a permanent manner the memory" of the 250th anniversary of American independence. 40 U.S.C. § 8902(a)(1).

**2.** Pointing to the Act of February 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 (1925 Act), Defendants contend that the arch falls into the CWA's exception for "commemorative works authorized by a law enacted before January 3, 1985." 40 U.S.C. § 8902(b); *see* Defs. Opp. 38–39. Tellingly, though, Defendants do not identify anything in the 1925 Act that authorizes the construction of a triumphal arch in Memorial Circle as a "commemorative work[]," 40 U.S.C. § 8902(b), to celebrate the Nation's semiquincentennial. Rather, the 1925 Act authorized "the construction of a memorial bridge across the Potomac River," with accompanying "landscape features," in accordance with a 1924 design created by the Arlington Memorial Bridge Commission, subject to "such changes in design … of said bridge" as the now-abolished Commission found "necessary or advisable." 1925 Act, § 1, 43 Stat. at 974.

Defendants' attempt to shoehorn a 250-foot, standalone commemorative arch into the century-old Arlington Memorial Bridge authorization is absurd. *See* Mem. Op. 23 ("The sheer

---

[5] https://www.nps.gov/places/000/vietnam-veterans-memorial.htm.

[6] Although Defendants hope to "integrate [military] capabilities into the … Arch," Defs. Opp. 64, they do not contend that the arch will primarily serve a military purpose.

improbability that a 100-year-old statute would contain authority, unknown to every previous administration, to erect a 250-foot arch at a principal location in the Nation's capital indicates how far Defendants must stretch to justify [their] project."). Defendants do not dispute that the 1924 design approved by Congress did *not* include an arch. They argue, though, that the arch reflects their exercise of statutory discretion to make changes to the 1924 design, Defs. Opp. 33–34, which included a pair of "stately" columns "framing in but not interfering with the view of the Lincoln Memorial" from Arlington National Cemetery. *See* Report of the Arlington Memorial Bridge Commission, S. Doc. No. 95, 68th Cong., 1st Sess. (Apr. 21, 1924), ECF 36-20, at 41.[7] But Defendants ignore that the Arlington Memorial Bridge Commission (which, unlike Defendants, had statutory authority to design and construct the bridge, *see* 1925 Act, § 1, 43 Stat. at 974) exercised that design-change authority ninety-five years ago by *eliminating* the columns, *see* ECF 36-21 at 92—not by converting the two slim columns into a massive arch that interferes with the viewshed that the Commission expressly aimed to preserve. Defendants' claim that their arch "fulfills a century-old congressional vision," Defs. Opp. 1, is accordingly nonsense.

Defendants' reading of the 1925 Act to authorize presidential administrations to build whatever new monuments they want on Columbia Island, indefinitely into the future, is untenable. Although Defendants point out that the 1925 Act "does not contain any sunset or express expiration," *id.* at 32, the statute is rife with textual indications that Congress authorized a discrete, one-time construction project that would promptly be "prosecuted to completion." 1925 Act, § 2,

[7] Defendants have unearthed a proposed bridge design from the year 1900 that includes an arch on the eastern side of the Potomac—across the river from what is now Memorial Circle. *See* Defs. Opp. 2. This proposal for an arch at a different location—which was never adopted—is wholly irrelevant. It also predates the 1913 creation of the Arlington Memorial Bridge Commission, the 1914–1922 construction of the Lincoln Memorial, the Commission's 1924 proposal of a design that frames the view of the Memorial, and Congress's 1925 approval of the Commission's design.

43 Stat. at 974; *see id.* (providing that "construction shall be entered upon as speedily as practicable"); *id.* §§ 1–2, 43 Stat. at 974 (requiring the total cost of the bridge "not to exceed $14,750,000" and providing that any design changes made by the Arlington Memorial Bridge Commission shall not "increas[e] the total cost of the project"); *id.* § 4, 43 Stat. at 975 (authorizing the Commission "to transfer to the park system" the land associated with the bridge project "on completion of the project"); *id.* § 6, 43 Stat. at 975 (directing construction to proceed according to a "ten-year program of expenditures and construction"). Defendants' interpretation of the statute to confer limitless construction authority forever into the future lacks any textual support.

The history that Defendants recite does not support Defendants' implausible construction of the 1925 Act. Defendants note that work on the project continued until as late as 1951, when certain design elements that had been developed a decade prior were added to the bridge. *See* Defs. Opp. 33 & 33 n.5. But this point only underscores that work on the bridge concluded seventy-five years ago. And, unsurprisingly, Defendants identify no evidence that, after that time, anybody understood that the 1925 authorization lay dormant, available for use decades later (and decades after that) to introduce an enormous new structure that had never previously formed any part of the bridge's design. In short, the 1925 Act cannot be plausibly read to authorize the construction free-for-all that Defendants' position would require it to. *See* Mem. Op. 23 (recognizing that "to state [Defendants'] argument is to reveal its flaws").

**3.** Defendants further maintain, without explanation, that the CWA does not "apply … to limit" construction of the arch pursuant to NPS's Organic Act. Defs. Opp. 32. Whatever Defendants understand to be the relationship between the CWA and the Organic Act, *see id.* at 38–39 (citing the 1925 Act, but not the Organic Act, as a basis for the CWA's supposed

inapplicability), Defendants' argument that the Organic Act authorizes construction of the arch is meritless, as this Court has already correctly held. *See* Mem. Op. 24–25.

The Organic Act broadly authorizes NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose" of "conserv[ing] the scenery, natural and historic objects, and wild life in the System" and "provid[ing] for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). This language cannot reasonably be read to authorize the construction of a gigantic new monument on NPS land, let alone a monument that NPS acknowledges will be a "dominant visual element" in an area of the national capital that has previously "emphasize[d] horizontally oriented views, natural scenery, and modestly scaled built features," NPS, *Env't Assessment* at 39, and will have an adverse impact on more than forty historic properties, *see id.* App'x C.

Defendants contend that NPS can overlook these adverse impacts because the arch will "inspire the American people," Defs. Opp. 35, but reading the Organic Act's general grant of park-management authority to confer on NPS limitless authority to transform the national capital, even in a way that it finds inspiring, "strains against the ordinary use of language." *Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*, 71 F.4th 59, 68 (D.C. Cir. 2023); *see Learning Resources, Inc. v. Trump*, 607 U.S. 229, 243 (2026) (declining to read "ambiguous [statutory] language" to "delegate[] 'highly consequential power' " (citation omitted)).

Although Defendants identify a handful of instances in which NPS has relied on its Organic Act authority to engage in "major construction in national park system units in the District of Columbia," Defs. Opp. 34, they cite no judicial authority upholding this construction as lawful. Moreover, even if Defendants are right that the Organic Act confers authority on NPS to build and

renovate "administrative offices," Stidham Decl., ECF 127-5, ¶ 14, sporting facilities, *id.* ¶ 17, and Park Police infrastructure, *id.* ¶¶ 19–20, Defendants do not explain how the authority to build facilities that promote park management and facilitate public recreation can be stretched to confer unilateral authority to construct a national monument that the White House has touted as "one of the most iconic landmarks not only in Washington, D.C., but throughout the world," and the realization of a "bold vision [that] will be imprinted upon the fabric of America and be felt by generations to come." Kathryn Watson, *Trump Says He Wants Proposed Arch to Be World's "Biggest,"* CBS News (Feb. 5, 2026).[8] In other words, even if "the construction projects [Defendants] cite … appear consistent with NPS's mission," the arch "does not." Mem. Op. 25.

Furthermore, any construction authority that the general language in the Organic Act confers cannot override the specific provisions of the CWA that govern construction of commemorative works on NPS land in the monumental core of Washington, DC. Where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," the "specific provision[s]" of that scheme are best "construed as an exception" to "a general permission or prohibition" established elsewhere. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted). Thus, whatever the scope of NPS's construction authority under the Organic Act, it cannot reasonably be read to authorize construction of commemorative works that the CWA provides may be built "only as specifically authorized" by Congress. 40 U.S.C. § 8903(a)(1); *see Heating, Air Conditioning & Refrigeration Distributors*, 71 F.4th at 67 (cautioning against reading "statutory ambiguities" to permit agencies "to make decisions vested in our elected representatives").

[8] https://www.cbsnews.com/news/trump-arch-dca-airport-flight-path.

**B. Construction of the arch violates Section 8106.**

Defendants' actions independently violate Section 8106, which provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Here too, Defendants contend that the 1925 Act provides express authority for their arch, Defs. Opp. 39, and here too, their argument fails for the reasons explained above. *See supra* Part III.A.2.

Arguing that Section 8106 "does not apply … to the NPS," Defs. Opp. 39, Defendants ignore that the D.C. Circuit has rejected exactly this argument as inconsistent with statutory text. *See Nat'l Trust for Historic Pres. in the U.S. v. NPS*, 185 F.4th 1185, 1220 (D.C. Cir. 2026) (holding that, "by its plain terms," Section 8106 requires NPS to "identify 'express authority' … to erect structures in federal parks in the District of Columbia"), *abrogated on other grounds*, 609 U.S. 1068. Instead of identifying a textual basis for their proposed carve-out, Defendants advance an argument based on inferences drawn from the history of Section 8106 and a now-repealed statute, 16 U.S.C. § 451 (1912). Enacted contemporaneously in 1912 with Section 8106's predecessor statute, Section 451 required "express authority of Congress" for the expenditure of sums above a specified threshold "for construction of administration or other buildings … in any national park." Because Section 451 placed "a specific limit on NPS," Defendants argue, it follows that Section 8106 and its predecessor "placed no restriction on NPS" at all. Defs. Opp. 40. And now that Congress has repealed Section 451, Defendants argue, Congress's authorization is no longer required for NPS to build any structure in the national parks. *See id.* at 40–41.

The Lemmon Plaintiffs' opening memorandum explains why this argument is wrong, *see* Pls. Memo. 14–15, and Defendants do not respond. Specifically, Defendants do not grapple with the fact that, although Memorial Circle "sits within a 'park[] or public grounds of the Federal

Government in the District of Columbia,' and so falls within the scope of Section 8106, it does not sit within a 'national park' and so never fell within the scope of Section 451." *Id.* (alteration in original). And Defendants continue to "provide no support for the underlying premise of their argument: that Congress intended the restriction that now-rescinded Section 451 placed on construction in national parks throughout the country (no unauthorized building projects above a certain cost threshold) to supplant the more demanding restriction that Section 8106 and its predecessor placed on construction in federal parkland within Washington, DC, specifically (no unauthorized building projects at all)." *Id.* at 15.

As for Defendants' suggestion that Section 8106's 1912 predecessor applied only to what is now the Army Corps of Engineers, *see* Defs. Opp. 39, their own citations belie that assertion. *See id.* at 41 (citing a 1993 statute that exempted a Department of Agriculture project from the predecessor statute, which Congress presumably understood would otherwise bar construction). And in any event, the operative version of Section 8106, which was enacted in 2002, *see* Pub. L. No. 107-217, 116 Stat. 1062, 1206 (Aug. 21, 2002), omits the language that Defendants contend limited the predecessor statute's application.

Defendants also maintain that Congress's practice of "routinely exempting NPS construction activity—including in the District of Columbia—from Section 451, but not from [Section] 8106" establishes that Section 451 provided the only limit on NPS construction in the District of Columbia. Defs. Opp. 40 (citations omitted). Defendants, however, cite only two examples of Congress's supposedly "routine[ ]" practice, *id.*, and neither one supports Defendants' conclusion. Defendants' first example authorizes "construction, reconstruction, improvement, repair, and maintenance of roads, trails, utilities, and buildings without regard to [Section 451]," with specific authorizations for construction in North Carolina's Great Smoky Mountains National

Park and New Mexico's Carlsbad Caverns National Park. Interior Department Appropriation Act, Pub. L. No. 80-841, 62 Stat. 1112, 1141–42 (June 29, 1948). The provision's only reference to the District of Columbia authorizes expenditures for "personal services," not construction. *Id.* Defendants' second example exempts unspecified "high priority projects" from Section 451 without referencing the District of Columbia at all. Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 101-512, 104 Stat. 1915, 1920 (Nov. 5, 1990).

Although Defendants point to construction projects that NPS has undertaken in the District of Columbia without express congressional authorization as evidence that Section 8106 does not bind NPS, Defs. Opp. 40–41, the D.C. Circuit has explained why this argument lacks force. As that court reasoned, "no one challenged those projects in court, and 'the existence of a prior administrative practice' does not 'relieve [courts] of [their] responsibility to determine whether that practice is consistent with the agency's statutory authority.'" *Nat'l Trust for Historic Pres.*, 185 F.4th at 1222 (quoting *SEC v. Sloan*, 436 U.S. 103, 118 (1978)). And although Defendants argue that the Organic Act "provide[s] authorization to construct buildings on national parkland," Defs. Opp. 42, the D.C. Circuit has recognized that, even if the Act "authorizes the Park Service to engage in some construction projects in national parks generally," the Act's "general language" cannot "constitute the 'express authority' for 'erect[ion]' of building[s] or structure[s]' on public grounds *in the District of Columbia* that 40 U.S.C. § 8106 demands." *Nat'l Trust for Historic Pres.*, 185 F.4th at 1223 (alterations in original); *see id.* (citing examples of where Congress has "time and again expressly authorized construction projects on public grounds in the District of Columbia" and observing that the Organic Act "bears no resemblance to those express authorizations"); *see also supra* p. 17 (citing cases for the proposition that specific statutory prohibitions—such as Section 8106's—are best read as exceptions to general authorizations).

**IV. The remaining preliminary injunction factors favor the Lemmon Plaintiffs.**

**A.** Defendants do not dispute that the aesthetic injury that construction of the arch will inflict on the Lemmon Plaintiffs, and the consequent degradation of the Lemmon Plaintiffs' visits to the gravesites in Arlington National Cemetery, is irreparable. *See* Pls. Memo. 15–16. And Defendants do not dispute that they plan to "move rapidly to push the arch toward completion as quickly as possible." *Id.* at 16; *see* NPS, *Env't Assessment* at 10 (explaining that work on the arch will "occur year-round with work occurring in two 10-hour shifts per day (20 hours per day)"). Instead, Defendants state that "there are limits on what Defendants can physically accomplish" and maintain that the "tower cranes" that will obstruct the viewshed will likely not arrive until six months after construction begins. Defs. Opp. 60. Given this timeline, Defendants argue, this Court "will be able to resolve the [case's] merits" before the Lemmon Plaintiffs' injury manifests. *Id.*

Of course, Defendants cannot predict how long this case will take before final judgment—including the time for appeals, which Defendants have made clear they will take if Plaintiffs prevail. *See id.* at 65–67. And Plaintiffs' claim challenging the authorization issued by NPS and the Department of the Interior as arbitrary and capricious, *see* Proposed Suppl. Compl., ECF 112-2, ¶¶ 61–66, cannot move to summary-judgment briefing until after Defendants have compiled and produced the administrative record. *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989) ("[I]n order to allow for meaningful judicial review [under the APA], the agency must produce an administrative record that delineates the path by which it reached its decision.").

Just as importantly, Defendants are wrong that the Lemmon Plaintiffs face no risk of irreparable harm in the first six months of construction, during which Defendants plan to build the arch's "foundation system." Defs. Opp. 60. Recent history has shown that, once construction starts, it is difficult to stop. Preliminary relief (or final judgment) before the work begins may therefore

be necessary to secure meaningful relief at all. *See NPS*, 609 U.S. at 1075 (declining to stay a construction project that had already begun because "freezing construction" midway would raise "significant" practical problems); *cf. D.C. Pres. League v. Dep't of Interior*, — F. Supp. 3d —, 2026 WL 3210227, at *33 (D.D.C. Oct. 26, 2026) (rejecting the government's "now-familiar shell game" of arguing that "even if Plaintiffs may suffer irreparable harm from" a completed construction plan, "they will not suffer any such harm" from individual preliminary steps taken toward implementing the plan). Moreover, the harm to the Lemmon Plaintiffs from the disturbance of the "year-round," 20-hour-per-day construction work, NPS, *Env't Assessment* at 10, that will occur each time they visit gravesites, attend funerals, or seek to enjoy the viewshed cannot be undone. In addition, Defendants' argument that the construction may not create excessive noise in "most of the Cemetery," is accompanied by a concession that it will create excessive noise in some parts. Defs. Opp. 60. And Defendants err in equating the focused noise of construction, including drilling, to the ambient sound of traffic. *See id*. Moreover, the disruption that ongoing construction will cause to the Lemmon Plaintiffs' experience of Arlington National Cemetery does not derive solely from noise. Rather, the transformation of "the most hallowed site in America," Loth Decl. ¶ 5—the "final resting place of thousands and thousands of our veterans," *id.* ¶ 8—into a construction site for a tourist attraction that will "loom[] over and dominat[e] it," will "change[] the entire experience in a profoundly negative way," Oct. 30, 2026, Hearing Tr. 24.

**B.** As against the irreparable harm that the Lemmon Plaintiffs face absent an injunction, Defendants identify no concrete harm that they will suffer if they must await a determination on the arch's legality before starting construction. Defendants assert vaguely that they will experience harm if they are prevented from "enforc[ing] [their] duly enacted plans," Defs. Opp. 64 (quoting *Abbot v. Perez*, 585 U.S. 579, 602 n.17 (2018)), but whether Defendants' plans are "duly enacted"

or otherwise legitimate is a merits issue, and Defendants are unlikely to prevail on the merits. *See supra* Part III. Similarly, Defendants' argument that they will suffer irreparable harm from entry of an injunction that "likely exceed[s] the authority conferred" on this Court, Defs. Opp. 64 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025)), assumes that Defendants are likely to prevail on their jurisdictional arguments. *But see supra* Part I.

Defendants' evidence that "[n]ational security agencies have considered that the Arch *can be* incorporated into their ongoing efforts to defend the National Capital Region," Defs. Opp. 9 (emphasis added), comes nowhere near showing that the arch is a necessary component of those efforts, let alone that delaying construction until after this Court has determined whether the arch is legal will compromise military readiness. Indeed, Defendants admit that no "final decisions" have been made about whether or how the arch can be used to further national security in the first place. *Id.* A preliminary injunction against NPS and the Department of the Interior, *see* Pls. Proposed Order, ECF 115-2, will not stop the "[n]ational security agencies" from continuing the "planning process" with respect to the military uses being "considered" for the arch. Defs. Opp. 9.

Not only are Defendants unable to show that an injunction will cause harm to them (and, by extension, to the public), but Defendants also have no answer to the Lemmon Plaintiffs' arguments as to why an injunction *promotes* the public interest. Defendants claim—wrongly—that the Lemmon Plaintiffs made no such arguments. *See* Defs. Opp. 64. In fact, the Lemmon Plaintiffs have explained "why the public interest favors taking the time to ensure that any monument constructed in Memorial Circle is lawful," in light of the substantial public interest the arch has drawn and the enormous impact that the project will have on some of our most treasured national landmarks. Pls. Memo. 17. And they have explained that the public has an interest in "preserv[ing] Congress's role in authorizing the design and siting of commemorative works and other structures

on federal land in our national capital, thereby ensuring democratic accountability and a measure of consensus in determining the symbolic configuration of those landmarks and the national narrative that they convey." *Id.* at 19. Defendants do not argue otherwise.

**V. The requested relief is appropriately tailored.**

Defendants briefly argue that an injunction should be narrowly tailored to address the harms that their actions threaten to produce. *See* Defs. Opp. 65. The Lemmon Plaintiffs filed a proposed order that would enjoin NPS and the Department of the Interior from "taking any steps to construct, or to direct, facilitate, or authorize construction of, any structure in Memorial Circle, absent congressional authorization." Pls. Proposed Order, ECF 115-2. Defendants neither argue that this language is too broad nor propose any alternative language. And although Defendants object to unspecified "burdensome notice requirements unrelated to the requested relief," Defs. Opp. 65, the proposed order does not impose any such requirements. Accordingly, this Court should enter the relief that the Lemmon Plaintiffs have requested.

**VI. Defendants' request for a stay pending appeal is unreasonable and premature.**

Defendants conclude by asking this Court to stay any preliminary injunction pending Defendants' planned appeal to the D.C. Circuit. *See* Defs. Opp. 65–67. In making this argument, Defendants reiterate their arguments against entry of a preliminary injunction. *See id.* But of course, if this Court grants a preliminary injunction, it necessarily will have rejected those arguments. And in the circumstances of this case, to issue a preliminary injunction and then to stay the injunction would, in effect, be to deny the injunction by allowing construction to begin—exactly the action that the Lemmon Plaintiffs' motion for a preliminary injunction seeks to block.

Moreover, until this Court has issued a preliminary injunction, whether Defendants will have a reasonable basis for seeking a stay is purely speculative. This Court should deny as

premature Defendants' invitation to predict and resolve the arguments that Defendants might advance in favor of staying an order that does not yet exist. *See, e.g.*, *Nat'l Ass'n of the Deaf v. Trump*, 808 F. Supp. 3d 150, 167 n.7 (D.D.C. 2025) (denying a request for a stay of a preliminary injunction pending appeal as "premature" and inviting the enjoined party to move for a stay pending appeal *after* "reviewing th[e] opinion and order" granting the injunction), *appeal filed* No. 25-5402 (D.C. Cir. Nov. 13, 2025).

## CONCLUSION

For the foregoing reasons and the reasons given in the Lemmon Plaintiffs' opening memorandum, this Court should grant the Lemmon Plaintiffs' motion for a preliminary injunction.

Dated: November 18, 2026

Respectfully submitted,

/s/ Nicolas Sansone
Nicolas Sansone (DC Bar No. 1686810)
Wendy Liu (DC Bar No. 1600942)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs Michael Lemmon, et al.*