**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MICHAEL LEMMON**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**DONALD J. TRUMP**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-544 (TSC) |
| **DISTRICT OF COLUMBIA AND COMMONWEALTH OF VIRGINIA**,<br><br>*Plaintiffs*,<br><br>v.<br><br>**NATIONAL PARK SERVICE**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-3838 (TSC)<br><br>**CONSOLIDATED CASES** |

**REPLY IN SUPPORT OF DISTRICT AND VIRGINIA PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Plaintiffs Are Likely to Succeed on the Merits ..... 2

A. The District and Virginia Have Standing ..... 2

B. Plaintiffs Established Standing at the Time of Filing ..... 8

C. The District and Virginia Fall Within the Relevant Zones of Interests ..... 9

D. The Arch Is Unlawful ..... 11

1. The Arch Violates the Commemorative Works Act ..... 11

2. The Arch Violates 40 U.S.C. § 8106 ..... 14

3. The Arch Violates the Height of Buildings Act ..... 14

4. The Decision to Approve the Arch Is Arbitrary and Capricious ..... 16

5. The Decision to Approve the Arch Violates NEPA ..... 17

6. The Arch Violates the National Historic Preservation Act ..... 18

7. The Arch Is Unlawfully Funded ..... 20

8. The Arch Violates the National Capital Planning Act ..... 20

II. Plaintiffs Will Suffer Irreparable Injury Absent an Injunction or Section 705 Stay ..... 21

III. The Public Interest Favors Preliminary Relief ..... 23

IV. The Court Should Deny a Stay Pending Appeal and Require Continued Notice ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

*Cases*

*Am. Ass'n of Nurse Practitioners v. McMahon*,
836 F. Supp. 3d 175 (D.D.C. 2026) ....................24

*Am. Trucking Ass'ns, Inc. v. Scheiner*,
483 U.S. 266 (1987)....................6

*Britt v. U.S. Army Corps of Eng'rs*,
769 F.2d 84 (2d Cir. 1985)....................12

*Common Cause v. Dep't of Justice*,
2026 WL 3306909 (D.D.C. Nov. 2, 2026)....................17

**Ctr. for Taxpayer Rts. v. IRS*,
190 F.4th 990 (D.C. Cir. 2026) ....................5

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025)....................6

*Farmers Union Cent. Exch. v. FERC*,
734 F.2d 1486 (D.C. Cir. 1984) ....................16

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................5

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
860 F.3d 1244 (9th Cir. 2017)....................18

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
541 U.S. 567 (2004)....................8, 9

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....................23

*Michigan v. EPA*,
576 U.S. 743 (2015)....................16

**Nat'l Tr. for Historic Pres. v. NPS*,
185 F.4th 1185 (D.C. Cir. 2026)....................10, 13, 14

*Newman-Green, Inc. v. Alfonzo-Larrain,*
490 U.S. 826 (1989)....................8

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017)....14

*Realty Income Tr. v. Eckerd*,
564 F.2d 447 (D.C. Cir. 1977)....10

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007)....8

*Royal Canin U.S.A., Inc. v. Wullschleger*,
604 U.S. 22 (2025)....8

*Ryan v. Chi., B. & Q. R.R. Co.*,
59 F.2d 137 (7th Cir. 1932)....12

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018)....8

*Sierra Club v. FERC*,
145 F.4th 74 (D.C. Cir. 2025)....18

**Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025)....5, 7, 8

*Trump v. California*,
609 U.S. 1032 (2026)....9

*Twin Rivers Paper Co. LLC v. SEC*,
934 F.3d 607 (D.C. Cir. 2019)....10

*United States v. 2,606.84 Acres of Land*,
432 F.2d 1286 (5th Cir. 1970)....12

*Viasat, Inc. v. FCC*,
47 F.4th 769 (D.C. Cir. 2022)....10

*Wash. All. of Tech. Workers v. DHS*,
50 F.4th 164 (D.C. Cir. 2022)....14

*Statutes & Regulations*

5 U.S.C. § 705....1, 21, 23, 25

40 U.S.C. § 8106....9, 14

40 U.S.C. § 8701 ........ 11

40 U.S.C. § 8711 ........ 11

40 U.S.C. § 8722 ........ 20

40 U.S.C. § 8901 ........ 9, 10

40 U.S.C. § 8905 ........ 9

42 U.S.C. § 4332 ........ 18

54 U.S.C. § 100101 ........ 11, 20

54 U.S.C. § 101101 ........ 11, 20

Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 ........ 12, 15

Act of Nov. 12, 1996, Pub. L. No. 104-333, 110 Stat. 4093 ........ 18

Height Act of 1910, Pub. L. No. 61-196, 36 Stat. 452 ........ 15

D.C. Code § 6-601.05 ........ 16

D.C. Code § 6-601.08 ........ 10

D.C. Code § 7-2201 ........ 6

D.C. Code § 7-2205 ........ 6

36 C.F.R. § 800.3 ........ 19

36 C.F.R. § 800.6 ........ 19

*Other Authorities*

45 Cong. Rec. 4534 (1910) ........ 15

Nat'l Capital Planning Comm'n, File No. 8778, Exec. Director Recommendation ........ 15, 16

Nat'l Capital Planning Comm'n, Height Master Plan for Washington, DC (2013) ........ 10

Nat'l Park Serv., Historic Am. Eng'g Record: Arlington Memorial Bridge ........ 13

Nat'l Park Serv., Mgmt. Policies: The Foundation ........ 13

## INTRODUCTION

Almost two weeks ago, this Court issued a thoroughly reasoned opinion holding that the District of Columbia and Virginia likely have standing to challenge the construction of a triumphal arch in Memorial Circle, that the Arch is likely unlawful, and that the equities favor issuance of a temporary restraining order. *See* Op., ECF No. 111. Yet Defendants' 67-page opposition brief barely acknowledges that decision and—except for one passing reference, *see* PI Opp. 35, ECF No. 127—makes no attempt to engage with any of the Court's reasoning. Nor do Defendants offer new evidence that would affect the factual underpinnings of the Court's decision. Instead, they repeat, largely verbatim, the same standing and merits arguments this Court already rejected.

Defendants also fail to rebut the numerous other reasons preliminary relief is warranted. As Plaintiffs have explained, the construction of the Arch violates a wide range of enactments, from the Height of Buildings Act to the National Environmental Policy Act, and much else besides. Further, a series of new declarations amply confirms Plaintiffs' standing and the irreparable harm they would suffer absent relief. Defendants' responses to those arguments are largely cut-and-pasted from prior filings, and the handful of new arguments they do raise are uniformly meritless.

In short, Defendants offer no reason for this Court to refrain from issuing a preliminary injunction or Section 705 stay. And Defendants' brief only confirms the necessity of preliminary relief. Rather than disputing that they will try to outrun judicial review, Defendants make clear that the only "limits" on how quickly they build the Arch are what they "can physically accomplish." PI Opp. 60. Moreover, Defendants have again shifted their position on the supposed security need for the Arch, now claiming that they have made no "final decision" on military uses, Willoughby Decl. ¶ 4, even as they insist the Court must deny relief on national security grounds, PI Opp. 65. Rather than countenancing the ever-changing justifications for this illegal monument,

the Court should hold the Arch unlawful and prevent Defendants from irreparably altering the status quo—and irreversibly transforming the capital region—while litigation proceeds.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

#### A. The District and Virginia Have Standing.

As the Court has explained, the "District and Virginia have demonstrated a 'substantial likelihood' of standing" to challenge the Arch. Op. 13. The Court has already found that the Arch's construction will inflict "tangible economic harms" on the District and Virginia, both of which will need to "expend resources in assessing and responding to the [traffic] congestion" that "Defendants' own materials" show the project will create. Op. 13–14, 16; *see* PI Mot. 3–5, ECF No. 117-1; TRO Mot. 11–13, No. 1:26-cv-03838, ECF No. 2-1. And as Plaintiffs have explained, the Arch will also put more cars on state roadways, PI Mot. 4, impair both jurisdictions' ability to respond to emergencies, PI Mot. 5–6; TRO Mot. 13–15, inflict environmental harms on the District, PI Mot. 6–7; TRO Mot. 15–17, disrupt the District's historic plan and undermine the historic value of the District's property, TRO Mot. 17–19, and violate the District's and Virginia's procedural rights, TRO Mot. 19–21. Defendants fail to address the historic and procedural injuries that Plaintiffs explained at length in their TRO papers and incorporated by reference into their opening brief. *See* PI Mot. 2; TRO Mot. 17–21; TRO Reply 7–9, ECF No. 100. But Defendants continue to press their contention that constructing a massive concrete arch in the middle of one of the busiest traffic circles in the region will cause no cognizable traffic, emergency-planning, or environmental harms. The Court has already rejected this argument, and it should do so again.

*1. Traffic Harms.* As the Court has explained, Defendants' own environmental assessment shows that the Arch will substantially disrupt traffic in and around Memorial Circle, "requir[ing]

the District and Virginia to expend resources in assessing and responding to the congestion." Op. 14. This conclusion is reinforced by new testimony from the District's Department of Transportation (DDOT), the Virginia Department of Transportation (VDOT), and an expert, who explain that the Arch will "substantially worsen traffic between the District and Virginia," Kershbaum Decl. ¶¶ 16, 19; "shift heavy traffic onto" Virginia roads, Mannell Decl. ¶¶ 7, 23; and "create unanticipated infrastructure issues" and "significant costs" for both jurisdictions, Weinberger Decl. ¶ 11. *See* PI Mot. 3–5; *see also* Mendelson Decl. ¶¶ 57–64. Defendants make several efforts to minimize the import of these harms. None is supported by the record or the law.

Defendants first argue (at 16) that years-long lane closures on one of the region's busiest traffic circles, the replacement of the circle's free traffic flow with traffic signals, and the addition of thousands of daily visitors will all have *no* material impact on traffic. This claim defies logic and is inconsistent with the record evidence. Defendants' own assessment clearly states that the Arch will "notably constrain[]" movement and could "intensify congestion" at Memorial Circle and cause "increased queuing, intermittent delays, and less consistent traffic flow" for "all users" traveling between the District and Virginia. Ex. 8 ("Revised EA") at 51, 54.[1] The other record evidence is in accord. *See* Kershbaum Decl. ¶ 16; Mannell Decl. ¶ 13; Weinberger Decl. ¶ 16.

Defendants argue that even if the Arch creates more traffic, it will be "localized to Memorial Circle" and will not affect District or Virginia roads. PI Opp. 16. The Court has already rejected that argument, explaining that "Defendants' own projections demonstrate that the Arch will disrupt the level of service on roadways maintained by Virginia." Op. 14; *see* Revised EA at B-24, B-30. This disruption is also evident in DDOT's assessment, which shows that curtailing

[1] All exhibit references refer to the exhibits attached to Plaintiffs' opening motions. *See* ECF No. 117-7 (identifying exhibits); No. 1:26-cv-03838, ECF No. 2-5 (same).

traffic on Memorial Bridge "will" have "effects [on] other bridges into the District," as these "crossings rely on the Memorial Bridge as a spillover artery." Kershbaum Decl. ¶¶ 11, 17. And though Defendants suggest that the traffic disruption will occur no matter whether the Arch is built, PI Opp. 17, the Revised EA "projects greater delays under the 'future build' scenario (under which the Arch has been constructed) than the 'future baseline' scenario (under which no Arch has been constructed) in multiple intersections or approaches in Virginia during the weekday a.m. peak hour." Mannell Decl. ¶¶ 14–16. That projection is separately confirmed by VDOT's review of INRIX traffic travel-time data, which indicates that the Arch is "likely" to "exacerbate morning peak bottlenecks on northbound VA-27 and Route 110." *Id.* ¶ 23.

Defendants' misapprehension of the importance of "existing traffic flows" (at 18) only highlights the optimistic nature of their study. Defendants' own "future baseline" and "future build" predictions are projected from "existing traffic volumes." Revised EA at B-13. If the limited study area that Defendants used to set their existing-traffic-volumes baseline omitted queues that extend farther back *today* (including those extending back to I-395, as shown in VDOT's review of INRIX data), Mannell Decl. ¶¶ 19–25, then those same queues are missing from Defendants' future projections. This further highlights that Defendants are understating the Arch's impacts, since all agree future traffic volumes will exceed today's. Revised EA at B-21.

Defendants next try to characterize the traffic-related harms to the District and Virginia as "standing as *parens patriae*." PI Opp. 15. The Court has rejected that argument, too, explaining that "a government 'that demonstrates direct harm to *its* economic, environmental, or administrative interests as a result of federal action may have standing to sue.'" Op. 13 (quoting *Clean Wis. v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (per curiam)). And traffic disruptions created by the Arch will "require the District and Virginia to expend resources in assessing and

responding to the congestion." Op. 14; Mannell Decl. ¶¶ 5, 16; Kershbaum Decl. ¶¶ 27–30.

In response, Defendants repeat their well-worn argument that the District's and Virginia's costs of studying and mitigating traffic are self-inflicted and not cognizable under *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). But this Court (and the D.C. Circuit) have already rejected this reading of *Alliance*, and with good reason. *See* Op. 14–15; *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1001 (D.C. Cir. 2026); PI Mot. 4–5. *Alliance* forecloses an organization from "establish[ing] standing simply by spending money 'opposing those policies' that it dislike[s]." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1001 (quoting *Alliance*, 602 U.S. at 394). It does not eliminate standing where an organization—including a government—shows that it must "divert[] its resources to continue pursuing" its "core . . . activities." *Id.*; *see, e.g.*, *Sierra Club v. U.S. Dept. of Transp.*, 125 F.4th 1170, 1181 (D.C. Cir. 2025). Given that maintaining the free flow of traffic is a "core" governmental function, *see, e.g.*, Kershbaum Decl. ¶ 24, it is wholly reasonable to expect that "when nearby construction threatens to clog a major artery to a city, the city will take measures to assess and overcome its effects." Op. 16.

Moreover, *Alliance* is particularly inapposite here given that the Arch will directly increase the use of *state* roadways. For instance, as VDOT has explained, "[d]river rerouting" after construction is complete "will shift heavy traffic onto alternative VDOT corridors, including Columbia Pike (VA-244)" and "Richmond Highway (Route 110)." Mannell Decl. ¶ 23. And Defendants' own documents show that throughout the construction period, they will transport heavy trucks and construction materials over Virginia roads. Revised EA at 10. This additional traffic burden on state roadways is not only a harm sufficient to create standing by itself, *see* TRO Reply 3–4, but also complicates planning and increases maintenance costs. *See* Kershbaum Decl. ¶ 17; Weinberger Decl. ¶ 11. Despite Defendants' protests that these costs are not "real," PI Opp.

19, it is an obvious and "commonsense inference[]" that adding cars and heavy trucks to a roadway will increase road wear. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025); *see also, e.g.*, *Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 270 (1987) (observing that trucks create "higher road-related expenditures" due to their "weight and size").

*2. Emergency Planning Harms.* The District and Virginia have also shown that lane closures at Memorial Circle and on Memorial Bridge, as well as resulting traffic, will impede emergency responders and constrain one of the few emergency evacuation routes across the Potomac River. PI Mot. 16. The Arch will also create new dangers that Plaintiffs must plan for and mitigate, including hazards to aircraft and terrorism risks. PI Mot. 16; Harvin Decl. ¶ 14.

Defendants attempt to minimize the harms to emergency response on the ground that there will be no "congestion or excessive delays" and that construction will not "block" the evacuation route. PI Opp. 20. But these assertions are contradicted by a record that shows that the Arch *will* cause significant traffic disruptions in and around Memorial Circle, *supra* pp. 2–5, and it is self-evident that evacuation plans will need to change due to lane closures and the addition of thousands of daily visitors to the Circle. Moreover, the District's former Chief of Homeland Security has explained that the Arch "is certain to disrupt existing [evacuation] plans," will force "other evacuation routes [to] take on significant additional strain in an emergency," and will create a "clear risk of delaying emergency response times." Harvin Decl. ¶¶ 14, 15. Defendants offer no evidence to rebut this testimony other than counsel's suggestion that first responders might "use their lights and sirens to require other vehicles to move out of the way." PI Opp. 21. And though Defendants argue that there is no "imminent emergency requiring an evacuation," the District, which regularly hosts high-risk events in an elevated threat environment, is required by federal law to prepare for emergencies. *See* D.C. Code §§ 7-2201, 7-2205. Virginia must do so, as well,

PI Mot. 6, and waiting until disaster strikes is not an option. *See Sierra Club*, 125 F.4th at 1181.

Pointing to the FAA's approval of the project, Defendants also claim that the Arch will not increase the risk of disaster. PI Opp. 21–22. But the FAA's decision to greenlight 320-foot construction cranes and a 250-foot building under the approach path of a major airport in no way binds the Plaintiffs' emergency planning personnel or relieves them of their obligation to independently assess and mitigate risk. Mendelson Decl. ¶ 72. And even if the FAA's assessment had any persuasive value, it does not purport to address the dangers of placing a drone port or snipers in the Arch, nor does it speak to the myriad, evident risks of storing ammunition and explosives inside of a major tourist attraction. Harvin Decl. ¶¶ 19–23; Anderson Decl. ¶¶ 11–18.

*3. Environmental Harms.* The Arch's construction will require the District to expend funds and resources to ensure compliance with wildlife conservation duties imposed by federal law. TRO Mot. 17; Mendelson Decl. ¶¶ 53–56. And because Defendants have not obtained required District permits and approvals prior to engaging in land-disturbing activity, the District will incur monitoring and compliance costs related to the District's own obligations under the Clean Water Act. PI Mot. 6–7; TRO Mot. 16–17. Defendants nowhere address the District's wildlife conservation costs, nor do they dispute their representative's admission that they have not sought or obtained a District-approved Soil Erosion and Sediment Control Plan, even though they planned to start land-disturbing activities more than a week ago. *See* PI Mot. 6.

Instead, Defendants argue that any injury based on the costs of monitoring discharges and compliance at the construction site is "conjectural" and predicated on an assumption that "NPS will violate District requirements in the future." PI Opp. 22. But there is no need for speculation: Defendants have not obtained the required permit, even though they planned to begin land-disturbing activity on Day 6 (November 11, 2026). Decision Record at 5, ECF No. 109-1; PI Mot.

6–7. Given that failure, Defendants' assurance that they will "implement stormwater and erosion control practices," PI Opp. 22, rings hollow and, in any event, does not relieve the District of its independent obligation to monitor discharges from unpermitted excavations at one of the largest construction sites in the city. Finally, no matter how many times Defendants cite *Alliance* to support their assertion that states "cannot establish an injury . . . based on their choice to" prevent serious harm, PI Opp. 22, the law simply does not require the District to sit on its hands and wait until the Potomac is polluted before taking action. *See Sierra Club*, 125 F.4th at 1181.

**B. Plaintiffs Established Standing at the Time of Filing.**

Plaintiffs properly established jurisdiction when they filed both their initial complaint and their amended complaint. This Court has already concluded that Plaintiffs likely had standing when they filed the original complaint. Op. 15–16. Further, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 460, 473–74 (2007); *see Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 37 (2025) ("[T]he rule . . . that jurisdiction follows the amended (*i.e.*, now operative) pleading applies across the board."); *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) ("[W]e hold that a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint."). Thus, even if Plaintiffs lacked standing when they originally filed, they have plainly established it through amendment. *See* Am. Compl. ¶¶ 66–70.

Defendants' cases are not to the contrary. In *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989), and *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004), the Court held that a plaintiff may amend a complaint "at any time" to remove a nondiverse party, thereby curing a jurisdictional defect that existed at the time of filing. *Newman-Green*, 490 U.S. at 832;

*Grupo Dataflux*, 541 U.S. at 573. And in *Trump v. California*, 609 U.S. 1032 (2026), the plaintiffs had not filed an amended complaint to cure the jurisdictional defect the Court identified, so the Court had no occasion to address the significance of such a filing. Indeed, Defendants themselves previously indicated that Plaintiffs could establish standing by filing an "amended complaint after Interior issues a final decision." TRO Opp. 15–16, ECF No. 95. Notwithstanding Defendants' opportunistic retreat from that position, *see* PI Opp. 30, their earlier statement remains correct.

**C. The District and Virginia Fall Within the Relevant Zones of Interests.**

Plaintiffs fall within the zone of interests of each of the statutes they invoke. This Court has already found that Plaintiffs likely fall within the zone of interests of the Commemorative Works Act (CWA), *see* Op. 19, and Plaintiffs have demonstrated that they fall comfortably within the ambit of the remaining statutes, *see* TRO Reply at 9–11. Defendants—who largely repeat their prior zone-of-interest arguments without change—fail to rebut these arguments.

*Commemorative Works Act*. As this Court explained, both Plaintiffs "fall within the zone of interests protected by" the CWA because their "threatened economic injuries, which are tied to increased traffic, delays, and disruption," bear a plausible relationship to the statute's "express purpose[] of "'ensur[ing] that future commemorative works . . . in the District of Columbia and its environs . . . are appropriately designed, constructed, and located.'" Op. 19 (quoting 40 U.S.C. § 8901(4)(A)). Defendants offer no substantive response; if anything, they reaffirm this Court's conclusion by noting that the statute also requires works to be located "so as to protect open space, existing public use, and cultural and natural resources." PI Opp. 25 (quoting 40 U.S.C. § 8905(b)(2)(B)). That interest is plainly implicated by the Arch's impact on traffic, emergency services, the environment, and the surrounding historic viewshed. *See supra* pp. 2–8.

*40 U.S.C. § 8106.* Plaintiffs also fall within the zone of interests of 40 U.S.C. § 8106

because they seek to preserve Congress's historic plan for "the Nation's Capital," 40 U.S.C. § 8901(1), and carry out their delegated authorities to govern the capital in the way Congress intended, *see* TRO Reply 10. These interests are at least "arguably" related, Op. 19, to Congress's goal of "barr[ing] construction on parks and other public grounds . . . in the District of Columbia" without statutory authority. *Nat'l Tr. for Historic Pres. v. NPS*, 185 F.4th 1185, 1221 (D.C. Cir. 2026) (emphasis omitted), *underlying injunction stayed on other grounds*, 609 U.S. 1068 (2026). Defendants point to nothing stating that the sole purpose of this statute is to vindicate Congress's legislative authority; on the contrary, they themselves have argued in prior litigation that one of the statute's aims is to prevent unlawful "encroachments upon park property." *Id.* at 1220.

*Height of Buildings Act*. Plaintiffs are also within the zone of interests of the Height Act. That statute expressly vests the District's Attorney General with authority to challenge violations of that Act as "common nuisances." D.C. Code § 6-601.08; *see Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) ("intended beneficiaries" of a statute fall within its zone of interests). Further, the Height Act is designed both to protect public safety, *see* PI Opp. 26, and to preserve the visual "preeminence of our democratic institutions," NCPC, Height Master Plan for Washington, DC, at i (2013), https://perma.cc/67M2-XY2M. The District seeks to vindicate both sets of interests. *See supra* p. 2.

*NEPA and NHPA*. Plaintiffs' interests fall squarely within the scope of NEPA and the NHPA, as well. TRO Reply 11. It is well-established that effects on the physical environment—including traffic, stormwater, and visual impairments for surrounding landmarks—fall within NEPA's zone of interests. *See, e.g.*, *Viasat, Inc. v. FCC*, 47 F.4th 769, 780 (D.C. Cir. 2022); *Realty Income Tr. v. Eckerd*, 564 F.2d 447, 452 n.10 (D.C. Cir. 1977). And Defendants have conceded that Plaintiffs' historic preservation interests—which Plaintiffs of course continue to assert, *see*

*supra* p. 2—fall within the NHPA's ambit. *See* TRO Opp. 26.

*NPS Organic Act*. Plaintiffs also fall within the zone of interests of the NPS Organic Act. That statute permits NPS to accept gifts only for "the purposes of the [National Park] System," 54 U.S.C. § 101101(2), which the Act defines as "conserv[ing] the scenery, natural and historic objects, and wild life in the System units" and "provid[ing] for the[ir] enjoyment," *id.* § 100101(a). Plaintiffs contend that the Arch will irreparably harm, rather than conserve, those very interests. *See infra* pp. 13, 21–23. Nothing more is necessary for Plaintiffs to assert their claims under these statutes, which do not depend on the Antideficiency Act. *Contra* PI Opp. 26–27.

*National Capital Planning Act*. Finally, the District and Virginia have an interest in compliance with the National Capital Planning Act, whose stated "objective" is to ensure that development in the capital and its environs "promote[s] public health, safety, morals, order, convenience, prosperity, and the general welfare" and exhibits "due regard for the rights and prerogatives of the adjoining States and local governments." 40 U.S.C. § 8701(b)(2)(A)–(B); *see also id.* § 8711(a). All of Plaintiffs' asserted harms fall comfortably within those categories.

**D. The Arch Is Unlawful.**

*1. The Arch Violates the Commemorative Works Act.*

This Court correctly concluded that the Arch likely violates the CWA. Op. 20–25. Defendants reprise their contention that the Arch falls outside the scope of that statute because it is not designed to "*commemorate* something." PI Opp. 37–38. But their own Secretary disagrees: he stated, in one of his final decisional documents, that "[t]he purpose of the proposed Triumphal Arch is to *commemorate* the 250th anniversary of American independence." ECF No. 108-1 at 7 (emphasis added); *see id.* at 2 (same). This statement constitutes an authoritative articulation of the Department's position. And even Defendants' preferred document repeatedly says the Arch is

designed to "celebrate 250 years of American independence by honoring America's founding principles." Decision Record at 1. Notwithstanding their self-serving denials, Defendants "own submissions" thus affirm that the Arch is "primarily designed to perpetuate the memory of the Nation's independence and founding principles." Op. 22.

Defendants also reiterate their argument that Congress authorized construction of the Arch in the Memorial Bridge Act of 1925. PI Opp. 32–34 (discussing Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974). This Court comprehensively explained why that argument is wrong, Op. 22–24, and Defendants largely fail to engage with its reasoning. They suggest that the Second Circuit's decision in *Britt v. U.S. Army Corps of Eng'rs*, 769 F.2d 84 (2d Cir. 1985), supports their position that they have open-ended discretion to "modify aspects of the project's design." PI Opp. 32. Just the opposite is true. In *Britt*, the court construed a statute that authorized construction "in accordance with the plans of the district engineer and with such modification thereof as in the discretion of the Chief of Engineers may be advisable." *Id.* at 89 (cleaned up). Unlike the Memorial Bridge Act, that statute—as well as the statutes in each of the cases *Britt* cited—did not prohibit changes that increase the "total cost" of the project or limit changes to just one element of the project, such as the "bridge." Memorial Bridge Act § 1; *cf., e.g.*, *United States v. 2,606.84 Acres of Land*, 432 F.2d 1286, 1292 (5th Cir. 1970) (construing similarly broad statute); *Ryan v. Chi., B & Q. R.R. Co.*, 59 F.2d 137, 144 (7th Cir. 1932) (similar). These precedents thus reinforce, rather than refute, the limits on the discretion conferred by the Memorial Bridge Act.

Nor does post-enactment history support Defendants' position. Defendants cite a brief snippet from the minutes of a 1941 NCPC meeting, but it affirmatively undercuts their position: in it, an NCPC official indicates that that NPS would need to "get[] . . . an appropriation" before "completing . . . the Arlington Memorial Bridge Project." ECF No. 74-7. Likewise, although two

statues were added to the bridge in 1951, those elements were part of the "bridge" itself, constituted minor changes to the statuary originally proposed for the same location, and were authorized and designed using "AMBC [Arlington Memorial Bridge Commission] funds" in 1929. NPS, Historic Am. Eng'g Record: Arlington Memorial Bridge, at 96–98, https://perma.cc/4ARW-ZRY6.

Defendants also repeat their contention that the NPS Organic Act authorizes the Arch. PI Opp. 34–37. This Court correctly rejected that argument, explaining that the Arch would not advance the "fundamental purpose of the System units" because it would not "conserve"—and in fact would irreparably alter—"the scenery, natural, and historic objects, and wild life." Op. 25 (quoting 54 U.S.C. § 100101(a)). Further, the Organic Act "says nothing about construction," let alone commemorative works. *Nat'l Trust*, 185 F.4th at 1221. Thus, the statute's "general authorization . . . yields to the more specific" prohibition in the CWA. Op. 25.

Defendants claim this Court "overlooked" an NPS website that says "inspiration falls within the purposes of the Organic Act." PI Opp. 35. But what that less-than-authoritative website actually says is that while "deriving . . . inspiration from parks" is one form of "enjoyment," "courts have consistently interpreted the Organic Act" to provide that "when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant." NPS, Mgmt. Policies: The Foundation, https://perma.cc/W8QY-ACF4. The Arch would not "conserve" anything; even Defendants acknowledge that it would have "adverse effects" on surrounding historic properties and the historic viewshed. ECF No. 127-4, at C-6.

Finally, Defendants' appeal to past practice does not help them. They do not cite any instance in which the Organic Act was used to construct a commemorative work. *See* Stidham Decl. ¶¶ 11–21. Instead, the examples they cite generally involved either conservation of existing buildings or replacement of aging or temporary buildings. *Id.* ¶¶ 11, 14–16, 19. As the D.C.

Circuit explained in rejecting the same examples, "no one challenged those projects in court, and 'the existence of a prior administrative practice' does not 'relieve [a court] of [its] responsibility to determine whether that practice is consistent with the agency's statutory authority." *Nat'l Trust*, 185 F.4th at 1222 (quoting *SEC v. Sloan*, 436 U.S. 103, 118 (1978)). Further, these projects "appear far more consistent" with the Organic Act, *id.* at 1223, than the construction of a new monument, in violation of the CWA, that would substantially alter the surrounding landscape. *See* Op. 25.

*2. The Arch Violates 40 U.S.C. § 8106.*

The Arch also violates 40 U.S.C. § 8106. As just noted, no statute provides "express authority" to construct the Arch. 40 U.S.C. § 8106. And there is no textual basis for Defendants' contention that NPS is categorically exempt from Section 8106. *See* TRO Mot. 25–26. Indeed, the D.C. Circuit has already rejected that very argument. *See Nat'l Trust*, 185 F.4th at 1220.

Nor has Congress acquiesced in their atextual reading of the statute. They cite a handful of examples over the course of a century in which NPS allegedly constructed buildings in the District without congressional authorization. *See* PI Opp. 40–41. But there is no evidence that Congress was apprised of these construction projects or of NPS's interpretation of Section 8106, let alone that Congress's failure to act reflected agreement with NPS's position. On this spare record, "Congress's failure to speak up does not fairly imply that it has acquiesced in [NPS's] interpretation." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 308 (2017) *cf. Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 182–83 (D.C. Cir. 2022) (finding congressional acquiescence based on a lengthy history of published rules, congressional hearings, and statutory amendments).

*3. The Arch Violates the Height of Buildings Act.*

The Arch also violates the Height Act. At 250 feet, the Arch would far exceed the statute's 130-foot limit. PI Mot. 8–9; TRO Mot. 27. And none of Defendants' four arguments—which are,

again, copied almost verbatim from their prior filings—provides a basis for excusing that violation.

*First*, the Height Act contains no exemption for federal buildings. The 1910 Height Act repealed the 1899 Height Act's exemption for federal and municipal buildings, and history, context, and longstanding practice confirm that Congress did not wish to carry that exemption forward. *See* TRO Mot. 29–31; TRO Reply 15–16; NCPC, Executive Director's Recommendation att. 3 (July 2026), https://perma.cc/2QG2-XYTA. Defendants note that Congress did not enact a version of the Height Act that would have repealed the 1899 law in its entirety. *See* 45 Cong. Rec. 4534 (1910). But nothing indicates this change was designed to preserve the federal and municipal exemption.[2] And the text of the repealing clause refutes such a reading, since an exemption for federal and municipal buildings is plainly "in conflict" with a rule that "[n]o building" may exceed the Act's height limits. Height Act of 1910, Pub. L. No. 61-196, §§ 5, 9, 36 Stat. 452, 453, 455.

*Second*, the Arch is a "building." TRO Reply 16; PI Mot. 9. Defendants' bespoke definition of "building" has no basis in any dictionary and would include the Arch in any event. TRO Reply 16. And the fact that the project's own sponsor has described the Arch as a "Building" reaffirms that Defendants' interpretation is irreconcilable with ordinary English usage. PI Mot. 8.

*Third*, the Memorial Bridge Act does not authorize a 250-foot Arch. TRO Mot. 28; TRO Reply 17; PI Mot. 9. That statute does not authorize an arch at all, let alone with the clarity needed to impliedly repeal the Height Act. Nor is it possible to read the statute's authorization of two 166-foot columns as open-ended authority to build "high structures" of every kind. PI Opp. 47.

*Fourth*, the Arch is not exempt from the Height Act merely because it sits inside Memorial

---

[2] Contrary to Defendants' portrayal (at 42 n.8), three separate House and Senate reports include a detailed comparison of "present law" to "[t]he proposed act" and note where provisions of the 1899 law were "not changed" or were retained in modified form. H. Rep. 61-720, at 1–3 (1910); H.R. Rep. 61-581, at 2–3 (1910); S. Rep. 61-494, at 1–2 (1910). Had the drafters understood the Act to implicitly retain the federal exemption, it is highly likely it would have said so.

Circle. TRO Reply 17–18; PI Mot. 9. As NCPC has explained, the Act's 130-foot limit applies on "all streets but Pennsylvania Avenue," Master Height Plan at 14 n.14, including Memorial Circle, *see* NCPC Executive Director's Recommendation at 10. Section 6-601.05(a) does not exempt Defendants from this limit. Rather, it imposes an *additional* prohibition, on top of the 130-foot limit, that bars any building from "exceed[ing] in height above the sidewalk the width of the *street, avenue, or highway in its front*, increased by 20 feet," D.C. Code § 6-601.05(a) (emphasis added). The grass circle inside Memorial Circle is not part of the "street" that "front[s]" the Arch. TRO Reply 18; PI Mot. 8.[3] And as Defendants admit, the sole authority they cite for their view—a vacated district court decision that contains no textual analysis—ultimately held that "130 feet was the maximum allowable height of the building at issue." PI Opp. 49.

*4. The Decision to Approve the Arch Is Arbitrary and Capricious.*

Defendants' approval of the Arch is arbitrary and capricious twice over. *First*, Defendants failed to reasonably assess any alternatives to construction of a 250-foot Arch in Memorial Circle. PI Mot. 11. Defendants assert that "no statute" required consideration of the costs and benefits of various alternatives. PI Opp. 58. But consideration of the comparative costs of agency action is a core part of the "[r]reasonable regulation" required by the APA itself. *Michigan v. EPA*, 576 U.S. 743, 752 (2015); *see Farmers Union Cent. Exch. v. FERC*, 734 F.2d 1486, 1511–14 (D.C. Cir. 1984). Plaintiffs need not identify a separate "statutory benchmark" to hold agencies to that basic reasoned-decisionmaking requirement. TRO Reply 18.

*Second*, Defendants acted arbitrarily and capriciously by failing to assess the planned

[3] Consistent with this plain-text reading, the D.C. Office of Zoning Administration has informed counsel that, in applying D.C. Code § 6-601.05(a) to buildings on a traffic circle, it determines the permissible height by measuring the width of the streets surrounding the circle, not by measuring the diameter of the circle itself. *Accord* NCPC Executive Director's Recommendation at 10.

military uses of the Arch. PI Mot. 10. At the time Defendants approved the Arch, two Cabinet secretaries had stated in sworn declarations that the Arch "will" be used for military purposes, including to stage drones, snipers, and ammunition. Hegseth Decl. ¶¶ 13, 15–16; Mullin Decl. ¶ 16; *see* Ex. 15. Yet Defendants failed to acknowledge or analyze those planned uses in any way. Defendants suggest they were free to ignore the Arch's military uses because other agencies would implement them. PI Opp. 58. But "the APA's requirement of reasoned decisionmaking demands that agencies consider risks from predictable third-party behavior." *Common Cause v. DOJ*, No. 26-1352, 2026 WL 3306909, at *5 (D.D.C. Nov. 2, 2026). It was not just "predictable" but avowed under oath that the Executive Branch would use the Arch as a military installation. *See* Ex. 15.

Defendants rely on *post hoc* declarations submitted by two subordinate officials at the Departments of Defense and Homeland Security, who now assert that the agencies have "not yet made any final decision" on "how to integrate national defense uses . . . into the Arch." Buria Decl. ¶ 4; Willoughby Decl. ¶ 4. Those declarations were not before Defendants at the time they acted, and they express a degree of uncertainty incompatible with the definitive statements of the two Cabinet secretaries for whom those officials work. In any event, these declarations do not deny that the agencies have decided to incorporate military uses into the Arch; they simply claim that the agencies are deciding "how" to do so. *See also* PI Opp. 67 (continuing to describe the Arch as "a Military Triumphal Arch . . . which will help fortify Washington, D.C."). It thus remains incumbent on Defendants to justify and explain the use of the Arch as a military installation.

5. *The Decision to Approve the Arch Violates NEPA.*

For similar reasons, Defendants' approval of the Arch violates NEPA. Defendants do not dispute that they defined exceedingly narrow criteria for the Arch and refused to consider every alternative that did not satisfy them. *See* PI Opp. 49–51; TRO Mot. 34–35. That is unlawful:

Defendants may not "define[] the objectives of [an] action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of [the] action." *Sierra Club v. FERC*, 145 F.4th 74, 87–88 (D.C. Cir. 2025). Defendants respond (at 51) by citing examples in which agencies refused to consider any alternatives to commemorative works explicitly approved by Congress. But in those cases, the agency was required by statute to build a particular monument for a particular commemorative purpose. *See, e.g.*, Pub. L. No. 104-333, § 508, 110 Stat. 4093 (1996). Here, there is no contention that any statute required Defendants to build "an ornate monumental arch" of exactly 250 feet in Memorial Circle. PI Opp. 49–50; *see* Revised EA at A-1 to A-2.

Nor can Defendants justify their failure to examine the military uses of the Arch. They argue that they were excused from considering those uses because only national security agencies possess the necessary expertise. PI Opp. 51–52. But NEPA provides that, before issuing an environmental assessment, agencies must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(C). Thus, if specialized military expertise was necessary to assess the environmental consequences, NPS was required to obtain that expertise before completing the environmental assessment, not postpone that analysis while nevertheless concluding that environmental impacts would be insignificant. *See Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244, 1255 (9th Cir. 2017) (highlighting importance of NEPA's consultation requirement in evaluating risks associated with ammunition storage).

*6. The Arch Violates the National Historic Preservation Act.*

Defendants violated the NHPA by failing to timely engage with the District's and Virginia's State Historic Preservation Officers (SHPOs), expediting consultations over the SHPOs' objection, and refusing to properly consult with the SHPOs about mitigating adverse effects. PI Mot. 11;

TRO Mot. 36–38. Defendants respond by reprising arguments from their TRO opposition that 36 C.F.R. § 800.3 does not "require NPS to 'initiate consultation' with the SHPO at any particular time in the initial planning"; that they did not "improperly condense the multi-step consultation process over SHPO objection"; and that they "did not fail to consider alternatives" to the Arch. PI Opp. 54–55; TRO Opp. 40–42. Plaintiffs have already responded to these arguments in their prior reply, *see* TRO Reply 20–21, and each of the three arguments remains without merit today.

First, Section 800.3 states that an agency must, during the initial planning phase, "consult[] with the SHPO" on a "plan for involving the public in the section 106 process." *Id.* § 800.3(c), (e). Defendants, however, waited to contact the SHPOs until after initial planning, announcing the project, and "multiple rounds of public comment." Maloney Decl. ¶ 41; Kirchen Decl. ¶ 32.

Second, the very document Defendants cite for the proposition that they did not improperly condense multiple consultation steps, ECF No. 95-2, in fact shows the opposite: NPS had one public comment period on a draft assessment of effects (Step 3); then asked consulting parties for comments on a list of historic properties (Step 2); then asked consulting parties to review a revised assessment of effects and revised list of historic properties (Steps 2 and 3). ECF No. 95-2 at 6–7; Kirchen Decl. ¶¶ 13–17. This kind of hopping back and forth confirms that NPS was "address[ing] multiple steps" simultaneously without the SHPO consent required by 36 C.F.R. § 800.3(g).

Third, 36 C.F.R. § 800.6 and NPS regulations require "assessment of the widest range of preservation alternatives," which necessarily include site and design alternatives. 63 Fed. Reg. 20503. NPS considered neither: it "made clear that it has not and will not consider alternative sites for the Arch" and that it "will not be considering any design alternatives." Maloney Decl. ¶¶ 60, 65. And again, Defendants' own document shows that NPS was unwilling to consider a different site: "Avoidance of adverse effects through relocation was not carried forward because the

undertaking is inherently location dependent." ECF No. 95-2 at 35. As for the SHPOs' suggestions of a less-intrusive design, NPS responded that they were simply "not consistent with the undertaking's purpose" because NPS had already decided to build an arch. ECF No. 95-2 at 36. Far from showing an agency that was giving "full consideration" to alternatives, 63 Fed. Reg. 20503, this record only confirms that NPS, before consulting with the SHPOs, already decided what it wanted to build and where, and failed to even *consider* alternatives.

*7. The Arch Is Unlawfully Funded.*

Defendants offer no valid defense of their plan for funding the Arch. They admit that the Arch will be funded through private donations, and that the sole authority to accept such gifts is the NPS Organic Act. PI Opp. 56 (citing 54 U.S.C. § 101101(2)). But as discussed above, the Arch is not authorized by the Organic Act because it would not conserve—and, indeed, would irreparably harm—the physical and historical surroundings. *See supra* pp. 13–14. Defendants therefore have no authority to accept donations for the Arch or use them to fund its construction.

*8. The Arch Violates the National Capital Planning Act.*

Finally, Defendants violated their statutory obligation to consult with and obtain NCPC's approval regarding the Arch's military functions. Defendants do not dispute that the military uses of the Arch would "affect the plan and development of the National Capital" and "the provision for open space in and around" the building. 40 U.S.C. § 8722(b)(1), (d). It follows that Defendants were required to inform NCPC of those uses and obtain its approval for them. PI Mot. 13–14.

Defendants' responses are unavailing. Defendants suggest (at 56) that NCPC could have requested additional information about those uses under Section 8722(a). But it is the *applicant's* burden to "advise and consult with" NCPC and obtain its approval before beginning construction. 40 U.S.C. § 8722(b)(1). That obligation cannot be satisfied by withholding a major component of

the project and then faulting NCPC for not asking about it.

Defendants also assert that NPS did not need to inform NCPC about these uses because they were "not within [Defendants'] regulatory authority" and "may require additional review." PI Opp. 56. But, at the time Defendants sought NCPC approval, multiple senior federal officials—up to and including the President—had unequivocally stated that the Arch would be used for military purposes, including staging drones, snipers, and ammunition. *See supra* p. 17. That was more than enough information for NPS to advise NCPC of such a use. Further, nothing in the statute permits an applicant to omit the effects of a proposed building merely because they are attributable to third parties; on the contrary, many important uses and effects of public buildings (including the Arch itself) are attributable to other entities. *See, e.g.*, Ex. 7 at 14–22 (assessing how members of the public would respond to traffic impacts of the Arch). NCPC simply could not make an informed decision to approve what Defendants now call the "Military Triumphal Arch," PI Opp. 67, without knowing anything about its military uses.

**II. Plaintiffs Will Suffer Irreparable Injury Absent an Injunction or Section 705 Stay.**

Plaintiffs have shown that "irreparable injury is likely in the absence of an injunction." Op. 25; PI Mot. 14. As Plaintiffs have explained, once the TRO expires, the District and Virginia will suffer serious traffic-related harms, disruptions to emergency planning, and preservation and environmental harms. PI Mot. 14–16; TRO Mot. 38–44. These costs are "beyond remediation at a later date," PI Mot. 18 (quoting Op. 26), because sovereign immunity bars recovery of financial costs, and some harms, like traffic disruption, historic preservation, and resource diversion, do not involve expenditures, PI Mot. 18–19; TRO Mot. 38–44.

Defendants dispute that these harms are real, again asserting that the Arch will not create traffic congestion, impair evacuations, or pose an aviation hazard. But as already explained, the

record evidence, including Defendants' own environmental assessment, plainly shows that the Arch will create significant traffic disruptions that will affect DDOT and VDOT operations. *Supra* pp. 2–5. Because the "District and Virginia cannot wait until a major commuter artery is disrupted to begin managing the detours," Op. 27, and because it is increasingly clear that Defendants' traffic assessment "understates" the project's traffic impacts, Mannell Decl. ¶ 18; Weinberger Decl. ¶ 16, both jurisdictions must begin planning now.

The same is true of the Arch's impacts on emergency management. The declarations of Dr. Harvin and General Anderson make clear that the Arch's height, its location on an evacuation site, and its use as a military facility all dramatically increase risks to the public—risks that the District and Virginia must evaluate, plan for, and mitigate. Harvin Decl. ¶¶ 14–25; Anderson Decl. ¶¶ 17–21. Defendants seek to buy several months of construction time by suggesting that the Arch will not pose a danger to aircraft "for the first six to eight months of work," PI Opp. 62, but disaster preparedness takes time and, by its nature, requires Plaintiffs to incur costs now to be ready to respond in six months. Harvin Decl. ¶ 17.

Defendants also argue that environmental harm from water discharges is not "likely" because Defendants have committed to installing protective sediment-control measures. PI Opp. 63. But Defendants also committed to complying "with District of Columbia stormwater management regulations," TRO Opp. 14 (quoting Revised EA at 9), which they have not done, despite intending to start construction days ago. *Supra* p. 7. Thus, it is more than "likely" that the District will need to expend resources to monitor runoff from the project and take appropriate corrective actions to protect its own compliance with the Clean Water Act. *Supra* pp. 7–8.

Defendants also claim that Defendants' planning costs are too speculative to constitute irreparable harm. PI Opp. 62. But "[t]hat misses the point." *League of Women Voters of U.S. v.*

*Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Defendants' actions "harm the [Plaintiffs] because they will likely impair their efforts" to maintain safe and passable roads, efficient evacuation and emergency response plans, clean water, and historic neighborhoods. *Id.*; *see, e.g.*, Kershbaum Decl. ¶ 24. Plaintiffs' "expenditures are merely a symptom of that programmatic injury." *Newby*, 838 F.3d at 9. And even on their own, these costs are significant. Defendants note that Dr. Harvin estimated 200 to 500 staff hours for emergency planning, but that expressly "exclud[ed]" the costs of "specialized modeling, exercise design, execution and evaluation, and ongoing coordination throughout construction." Harvin Decl. ¶ 14. It also excluded the "significant costs" of traffic studies and traffic mitigation measures, including "hundreds of hours of additional staff time" spent "consulting with NPS"; roadway maintenance expenses; environmental monitoring costs; and the immeasurable costs of disrupting a centuries-old historic plan and impairing the historic value of the District's properties. Kershbaum Decl. ¶ 28; Weinberger Decl. ¶ 11; Maloney Decl. ¶¶ 33–34. Whether measured individually or collectively, these are serious costs that Plaintiffs should not be required to bear while Defendants try to outrun this Court's review.

**III. The Public Interest Favors Preliminary Relief.**

An injunction or Section 705 stay is in the public interest. As this Court previously recognized, Plaintiffs' strong showing on the merits is itself powerful evidence that injunctive relief serves the public interest. Op. 29–30. And notwithstanding Defendants' assertions to the contrary, PI Opp. 64, Plaintiffs do not rely solely on their likelihood of success on the merits. Plaintiffs have identified substantial public harms that will result from construction of the Arch, including traffic congestion, threats to emergency response times, aviation safety concerns, degradation of water quality, and harm to historic resources. PI Mot. 20; TRO Mot. 43. The public plainly has an interest in avoiding those harms. Defendants, by contrast, "cannot suffer harm from

an injunction that merely ends an unlawful practice." *Am. Ass'n of Nurse Pracs. v. McMahon*, 836 F. Supp. 3d 175, 208 (D.D.C. 2026) (citation omitted).

Nor do Defendants' revised national security arguments alter the balance. The Court previously described those assertions as "recent and unsupported," having appeared nowhere in the documents underlying the Arch's approval and surfaced only after litigation commenced. Op. 30. Defendants now assert that the Departments of Defense and Homeland Security are merely "currently in the planning process" of determining "how" such capabilities might be integrated into the Arch. PI Opp. 64. That concession underscores the problem—if purported military functions are still being developed, they cannot justify denying injunctive relief for a project that already received final approvals without any analysis of those functions. And if those functions are genuinely important, that only highlights the deficiencies in Defendants' review process.

Most importantly, Defendants still do not explain why preserving the status quo during this litigation would meaningfully impair national security. The Arch is expected to take years to complete, and Defendants offer no evidence that a preliminary injunction pending resolution of this case would foreclose any future security capability. As General Anderson explains, moreover, the claimed national security benefits are speculative at best, given the absence of operational advantages unique to the Arch and the existence of more secure alternative locations for the capabilities Defendants describe. Anderson Decl. ¶¶ 17, 19. On this record, Defendants ask the Court to elevate hypothetical future benefits over concrete present harms and likely legal violations. The public interest does not favor such a result.

## IV. The Court Should Deny a Stay Pending Appeal and Require Continued Notice.

Defendants' motion for a stay pending appeal should be denied. Defendants have no likelihood of success on the merits, and they fail to make out even a colorable claim of irreparable

injury. Nothing in Plaintiffs' requested injunction would prevent Defendants from engaging in "further study and planning related to national security." PI Opp. 66. And Defendants cannot plausibly allege that a delay of several months in starting of construction, "[o]ver a century" after they (wrongly) claim the Arch was authorized, would inflict any meaningful harm. *Id.* at 66–67.

The Court should also deny Defendants' request for a 30-day stay. That request would not buy "time" for the D.C. Circuit, PI Opp. 67; it would buy Defendants a full month to attempt to alter the status quo beyond any court's ability to reverse. Presented here with the opportunity to deny that they are trying to "outrun final judgment," Defendants have conspicuously demurred, instead making clear that they will do everything within the "limits" of what they "can physically accomplish" to speed construction of the Arch while it is under review. PI Opp. 60. The Court should not give Defendants a free month to pursue that cynical and improper effort.

For much the same reason, the Court should not excuse Defendants from their notice obligations under this Court's November 4 order. *See* ECF No. 101. This Court has already made clear that this order does not require Defendants to notify it of "internal planning" or when "reviewing or drafting documents," *id.* at 2; *cf.* PI Opp. 65. But as recent events have confirmed, prompt notice of any actions related to or in preparation for construction of the Arch is critical to preventing evasion of judicial review and midnight efforts to alter the status quo.

## CONCLUSION

The Motion for a Preliminary Injunction and 5 U.S.C. § 705 Stay should be granted.

Dated: November 18, 2026

Respectfully submitted,

JAY JONES
Attorney General of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN (1672508)
MICHAEL K. PERLOFF (1601047)
Deputy Solicitors General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 997-5222
Email: mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (1026153)
ELIZA H. SIMON (90035651)
Senior Counsels to the Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH (1044671)
Senior Counsel to the Attorney General

/s/ Karthik P. Reddy
KARTHIK P. REDDY (1048848)
Special Assistant Attorney General
NICOLE S. HILL (888324938)
JOHN B. LYMAN (156467)
SAMANTHA HALL (1014735)
Assistant Attorneys General
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Tel: (202) 279-1261
Email: mitchell.reich@dc.gov

*Counsel for the District of Columbia*